# Exhibit A

## **DECLARATION OF MICHAEL G. SEIDEL**

I, Michael G. Seidel, declare as follows:

(1) I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("FOIPA") litigation cases nationwide. Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various assignments from 1994 to September 2006 culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIPA litigation for the U.S. Army. I am an attorney registered in the State of Ohio and the District of Columbia.

(2) In my official capacity as the Section Chief of RIDS, I supervise approximately 240 FBI employees, supported by approximately 95 contractors, who staff a total of ten (10) FBI Headquarters (FBIHQ) units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of

1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a. This declaration provides an update on the status of the FBI's FOIA program as a result of precautions RIDS has implemented to address the on-going COVID-19 pandemic and ensure the health and safety of its employees.

(4) The COVID-19 pandemic has no recent analogue. According to reporting, as of December 6, 2020, there were more than 14.4 million COVID cases in the United States and more than 280,000 people have in the United States have died.[1] Worldwide numbers indicate more than 65 million cases with more than 1.5 million people having died.[2] Also as of December 7, 2020, heat maps tracking the spread of the virus in the United States reflect new infections at a rate of 25 or more new cases per every 100,000 people (or essentially unchecked community spread) in all but three states in the United States.[3]

---

[1] *See* Centers for Disease Control and Prevention, "CDC COVID Data Tracker" website, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last accessed Dec. 7, 2020).

[2] *See id.*

[3] *See, e.g.,* https://www.npr.org/sections/health-shots/2020/09/01/816707182/map-tracking-the-spread-of-the-coronavirus-in-the-u-s (last accessed Dec. 7, 2020).

2

(5) The Secretary of Health and Human Services declared COVID-19 as a public health emergency effective January 27, 2020.[4] The World Health Organization publicly characterized it as a pandemic on March 11, 2020,[5] and thereafter, on March 13, 2020, the President declared a National Emergency in an effort to address the spread of COVID-19.[6]

(6) These declarations were followed by series of guidance and guidelines to slow the spread of the virus by the President and the Centers for Disease Control and Prevention (CDC) for the general public; by the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM) with respect to Federal agencies and the Federal workforce; and by state and local governments for their respective communities.

(7) The CDC recommends that people engage in social distancing by keeping at least six feet from other people; not gathering in groups; and staying away from crowded places and mass gatherings.[7] The CDC has also recommended that masks be worn in public settings where social distancing measures are difficult to maintain.[8] Guidance consistent with these

---

[4] *See* https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html (last accessed Apr. 23, 2020).

[5] Centers for Disease Control and Prevention. "Coronavirus Disease 2019 (COVID-19): Situation Summary." www.cdc.gov (last accessed March 13, 2020).

[6] *See* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed Mar. 17, 2020).

[7] *See, e.g.*, Centers for Disease Control and Prevention, "Interim Guidance for Businesses and Employers" https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html (last accessed Mar. 17, 2020).

*See also* Centers for Disease Control and Prevention, "Social Distancing, Quarantine, and Isolation," https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last accessed Apr. 23, 2020).

[8] *See* Centers for Disease Control and Prevention, "Use of Cloth Face Coverings to Help Slow the Spread of COVID-19," https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html (last accessed Apr. 23, 2020).

3

recommendations has been issued to protect the Federal workforce, and by extension, the American people.[9]

(8) The FBI continues to implement these guidelines to protect its employees as well as their families and communities, and to ensure that it can continue to protect the American people during this national emergency.

(9) RIDS has never before dealt with a crisis of this magnitude that has posed similar widespread and immediate risks to the health and safety of every one of its employees, as well as their families and communities, and indeed the populace of the United States and the world.

(10) The FBI supports the public's right to request and obtain agency records. But in the midst of a deadly pandemic, the health and safety of FBI employees, their families, and their communities is a paramount concern of agency decisionmakers who must make difficult decisions about what agency functions are critical to the continuation of the FBI's mission of ensuring the safety of the American people, investigating and interdicting criminal activities, and protecting the national security.

(11) On March 17, 2020, RIDS temporarily halted its FOIA program in response to the COVID-19 pandemic.[10] This decision was not made lightly. However, it was necessary and proper because RIDS's Government Information Specialist (GIS) positions were rightly designated as not mission-critical[11] and are not telework-capable positions.

---

[9] *See, e.g.,* https://www.opm.gov/policy-data-oversight/covid-19/ (last accessed Dec. 4, 2020).

[10] A limited number of employees have been permitted to rotate into the office during the temporary suspension of FOIA operations to handle any emergencies or critical issues arising during the period, to operate the eFOIA portal, and to receive and route as appropriate mail and submissions to the eFOIA portal.

[11] A mission-critical position is one that's functions absolutely cannot be put on hold. RIDS management concluded that the functions of a GIS position could temporarily be put on hold without risking the FBI being unable to fulfill its primary mission as a law enforcement and national security agency.

(12) Like other intelligence/national security agencies, the vast majority of FBI work is performed on classified systems. Significantly, the records system that the FBI primarily relies upon for conducting FOIA searches – the Central Records System, which is accessed by the FBI's SENTINEL case management system – is located on the FBI's SECRET-level classified enclave, as is the FBI's FOIA Document Processing System (FDPS). Given the volume of classified information that the FBI handles and maintains, operating in a classified enclave is both necessary and efficient; classified systems can handle both classified and unclassified materials whereas unclassified systems can only handle unclassified materials.

(13) Moreover, putting aside a host of logistical and procedural challenges to moving unclassified records from the classified system for FOIA processing, the FBI does not currently have the technology resources necessary to process unclassified records remotely, which at a minimum would require the acquisition and configuration of laptops and remote connection technology compatible with FBI Information Technology security requirements for hundreds of employees.[12]

(14) These are just some of the reasons why RIDS employees are not telework capable and cannot process FOIA requests remotely. Accordingly, upon designating GIS positions as not mission-critical, RIDS had to temporarily halt FOIA processing.

(15) RIDS management continually monitored the situation and ultimately concluded that it could begin bringing employees back to work to safely in a limited fashion in order to

---

[12] Challenges include the identification of records potentially suitable for reviewing on unclassified systems, location of those records in FDPS, review of the records to ensure that they do not include classified or sensitive information that cannot be placed on an unclassified system, extraction of the records, and transfer of those records to an unclassified system, all of which would require employees to spend substantial hours in the office. Moreover, once processed, the records would have to be moved back to the classified enclave to run required security scans on them before they could be produced to a requester.

resume FOIA operations starting on April 29, 2020. By June 8, 2020, RIDS was able to authorize returning to a 100% staffing posture.

(16) Nevertheless, through the summer and fall, RIDS continued to experience less than full staffing as employees and contractors were exposed to the virus and required to quarantine. Since October, COVID exposures and related absences due to required quarantining in RIDS have been trending higher as infection rates increase nationally. Moreover, RIDS is housed in buildings that also house other sections of FBI's Information Management Division (IMD). COVID exposures and related absences in those workforces, which share space with RIDS, have similarly increased significantly since the summer.

(17) In order to ensure the health and safety of RIDS and other IMD personnel, their families, and their communities, IMD management concluded that it was necessary to draw down its physical presence and footprint in its facilities by maximizing spacing and reducing the number of personnel in the office to mitigate exposure and spread of the virus. At the same time, IMD management recognizes the importance of the continued operability of the FOIA program to the American people. To that end, RIDS is reducing to a 50% staffing posture as of Monday, December 7, 2020 at three of its five operating facilities.[13] Employees will be split into two groups. Over a two-week period, the first group will report to the office for work on Monday, Wednesday, and Friday of the first week and Tuesday and Thursday of the second week. The second group will report to the office on Tuesday and Thursday of the first week and Monday, Wednesday, and Friday of the second week.

---

[13] This reduced staffing includes both facilities in Winchester, Virginia and one Regional Service Center, which together collectively house 11 of RIDS 12 total units. Thus, RIDS's processing capability will wholesale be negatively impacted.

(18) Since RIDS staff cannot process FOIA requests remotely, for the reasons described above, this reduced staffing posture means that RIDS's FOIA processing capacity will be at most 50% of its normal capacity.[14] RIDS's goal is to process at least 50% of the normal monthly processing rate established in this case.[15] In the event, however, that RIDS is unable to sustain a 50% operability status, it will endeavor to process as many pages as possible based on available staff.[16]

(19) IMD management continues to monitor the situation to ensure the continuity of FOIA operations while also protecting the health and safety of employees, their families, and their communities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___8th___ day of December, 2020.

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

---

[14] As it is possible and indeed likely that employees and contractors will continue to be exposed to the virus away from work, RIDS anticipates that staffing levels likely will not actually reach or sustain at a 50% level, despite the safety precautions being implemented.

[15] Holistically viewed given overall reduced operations and continued, unpredictable COVID impacts, this 50% production goal represents RIDS' good faith effort to provide the most information it can to the most requesters under these unprecedented circumstances.

[16] Also, RIDS's ability to complete processing of requests is and will continue to be impacted by the availability of employees in other divisions and offices to assist in conducting searches, as well as the availability of agency subject matter experts to assist in reviewing records.

7