Exhibit 8

1               HERSH - CONFIDENTIAL

2         UNITED STATES DISTRICT COURT

3         FOR THE DISTRICT OF COLUMBIA

4      Civil Action No. 1:18-cv-00681-RJL

5             Hon. Richard J. Leon

6    _____

7    AARON RICH,                              )

8                   Plaintiff,                )

9        v.                                   )

10   EDWARD BUTOWSKY, MATTHEW COUCH and       )

11   AMERICA FIRST MEDIA,                     )

12                   Defendants.              )

13   _____ )

14

15

16             ORAL DEPOSITION OF

17             SEYMOUR M. HERSH

18      TAKEN REMOTELY BY VIDEO CONFERENCE

19             July 15, 2020

20

21

22

23

24   Reported by:  Mary Ann Payonk

25   Job No. 181204

Page 2

HERSH - CONFIDENTIAL

1
2
3
4
5               July 15, 2020
6               9:42 a.m.
7
8      Oral deposition of SEYMOUR M. HERSH
9 taken remotely by video conference pursuant to
10 Notice and agreement of counsel, reported
11 stenographically by Mary Ann Payonk, Shorthand
12 Reporter and Notary Public of the District of
13 Columbia, Commonwealth of Virginia, and State
14 of New York, California CSR No. 13431.
15
16
17
18
19
20
21
22
23
24
25

Page 3

HERSH - CONFIDENTIAL

1
2 APPEARANCES:
3 ON BEHALF OF PLAINTIFF AARON RICH:
4      EDEN QUAINTON, ESQ.
5      QUAINTON LAW
6      1001 Avenue of the Americas
7      New York, New York 10018
8
9 ON BEHALF OF DEFENDANTS MATTHEW COUCH and
10 AMERICA FIRST MEDIA:
11      MERYL GOVERNSKI, ESQ.
12      ERICA SPEVACK, ESQ.
13      BOIES SCHILLER FLEXNER
14      1401 New York Avenue, N.W.
15      Washington, D.C. 20005
16
17      MICHAEL GOTTLIEB, ESQ.
18      WILLKIE FARR & GALLAGHER
19      1875 K Street, N.W.
20      Washington, D.C. 20006
21
22
23
24
25

Page 4

HERSH - CONFIDENTIAL

1
2 Appearances (Cont'd.):
3 ON BEHALF OF THE WITNESS:
4      CHAD BOWMAN, ESQ.
5      BALLARD SPAHR
6      1909 K Street, N.W.
7      Washington, D.C. 20006
8
9 ALSO IN ATTENDANCE:
10      Lem Lattimer, Legal Video Specialist
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

HERSH - CONFIDENTIAL

1
2 THE VIDEOGRAPHER:  Good morning,
3 counselors.  My name is Lem Lattimer.  I
4 am a legal videographer in association
5 with TSG Reporting.  Due to the severity
6 of COVID-19, and following the practice
7 of social distancing, I will not be in
8 the same room with the witness; instead,
9 I will record this videotaped deposition
10 remotely.  The reporter, Mary Ann
11 Payonk, also will not be in the same
12 room and will swear the witness in
13 remotely.  Do all parties stipulate to
14 the validity of this video recording and
15 remote swearing, and that it will be
16 admissible in the courtroom as if it had
17 been taken following Rule 30 of the
18 Federal Rules of Civil Procedures and
19 the state's rules where this case is
20 pending?
21 MR. QUAINTON:  I do.
22 THE VIDEOGRAPHER:  Thank you.
23 THE REPORTER:  Ma'am, I need your
24 agreement.
25 MS. GOVERNSKI:  Oh, it just took me

HERSH - CONFIDENTIAL

1       HERSH - CONFIDENTIAL
2  a while to find the unmute.  I do.
3       THE REPORTER:  Thank you.
4       MR. BOWMAN:  The witness also
5  stipulates.
6       THE REPORTER:  Thank you.
7       THE VIDEOGRAPHER:  This is the
8  start of media labeled number 1 of the
9  video-recorded deposition of Seymour
10  Hersh in the matter of Aaron Rich versus
11  Edward Butowsky, et al. on July 15,
12  2020, at approximately 9:42 a.m.  All
13  appearances are noted on the record.
14  Will the court reporter please swear in
15  the witness.
16      (The witness was sworn.)
17       MR. QUAINTON:  This is Eden
18  Quainton, and just one preliminary point
19  is we had a brief discussion among
20  counsel before the witness was sworn in,
21  and we agreed that opposing counsel and
22  counsel for the witness would -- would
23  have a standing objection as to form
24  questions.  Of course, if they interject
25  with objections, that's -- that's not a

1       HERSH - CONFIDENTIAL
2  problem, but all objects as to form will
3  be preserved.  I offer that, and
4  Ms. Governski, Mr. Bowman, if that's
5  acceptable to proceed so that your
6  objections as to form would not be
7  waived by your failure to assert any
8  objection during the deposition.
9       MS. GOVERNSKI:  This is Meryl
10  Governski.  I -- I appreciate that and
11  agree.  I also, just so that the record
12  is clear, should state that my
13  colleagues Michael Gottlieb with Willkie
14  Farr and Erica Spevack with Boies
15  Schiller, both on behalf of plaintiff,
16  also are joined via the audio.
17       MR. BOWMAN:  This is Chad Bowman on
18  behalf of the witness.  We also agree.
19  And in the interest of saving time also,
20  to the extent that during the deposition
21  I assert an objection under the
22  reporter's privilege, I'm referring to
23  DC Code Section, DC shield law Code
24  Section 16-4702 as well as the privilege
25  under the First Amendment of the

1       HERSH - CONFIDENTIAL
2     US Constitution and the common law.  So
3  rather than say that every time, I'll
4  just say journalist's privilege.
5       MR. QUAINTON:  Okay.
6  SEYMOUR M. HERSH,
7     called as a witness, having been duly
8     sworn, was examined and testified as
9     follows:
10        EXAMINATION
11  BY MR. QUAINTON:
12    Q.  Mr. Hersh, good morning.
13    A.  Hi.
14    Q.  Thank you for taking the time to be
15  at this deposition this morning.  My name, as
16  you heard, is Eden Quainton, and I represent
17  the defendants in this case, Edward Butowsky
18  and Matthew Couch.
19     Let me just say as a preliminary
20  matter if at any time, Mr. Hersh, you would
21  like to take a break, you're feeling
22  uncomfortable or you need a bathroom break or a
23  water break or whatever it might be, don't
24  hesitate.  And that goes for counsel as well.
25  And I'll -- I'll follow that myself.  If I feel

1       HERSH - CONFIDENTIAL
2  the need to stop for a few minutes, I'll ask
3  that we go off the record.  Please don't
4  hesitate, and be as comfortable as you can.  As
5  you see, I took off my tie because I wanted to
6  be as comfortable as possible.  So that's what
7  I'd encourage you to do as well.
8     Mr. Hersh, I -- you're here pursuant
9  to a subpoena that was sent to you by the
10  defendant, Edward Butowsky; is that correct?
11    A.  Yes.
12    Q.  And have you this morning taken any
13  drugs or alcohol or any mood-altering
14  substances that would affect your ability to
15  testify truthfully and accurately?
16    A.  No.
17    Q.  Are you on any kind of a medication,
18  a pain medication or any other kind of
19  medication that might affect your ability to
20  testify truthfully and accurately?
21    A.  No.
22    Q.  Now, I understand that you're --
23  you're an avid tennis player.  Is that -- is
24  that true?
25    A.  Lousy, but avid.

Page 10

```
 1              HERSH - CONFIDENTIAL
 2       Q.    Have you been able to get exercise
 3  during the -- the COVID period?
 4       A.    It's -- it's really not relevant,
 5  counselor.  The answer's yes.
 6       Q.    Oh, good.  And you -- you feel active
 7  physically and -- and mentally as you -- as you
 8  come to this deposition today?
 9       A.    Yes, sir.
10       Q.    Mr. Hersh, could you just briefly
11  describe for me your educational and
12  professional background?
13       A.    Graduate of the University of
14  Chicago, period.  Been a journalist for -- I
15  guess since 1960.  That would make it, what, 50
16  years?  60 years?  Something like that.  There
17  you go.
18       Q.    Okay.  And you -- could you just
19  maybe say a little bit more about your
20  professional background in terms of where
21  you -- where you began the -- some of the
22  organizations that you were with and then how
23  you've pursued your -- pursued your career over
24  the last 15, 20 years?
25       A.    Police reporter in Chicago, worked
```

Page 11

```
 1              HERSH - CONFIDENTIAL
 2  for wire services, worked for the New York
 3  Times, the New Yorker, pretty much been on my
 4  own for two or three decades.
 5            THE REPORTER:  If I could stop and
 6       respectfully ask the witness to be still
 7       in his chair.  You're moving back and
 8       forth, and it's showing.  Thank you.
 9            THE WITNESS:  I'll do the best I
10       can.
11            THE REPORTER:  Thank you.
12  BY MR. QUAINTON:
13       Q.    And let me -- let me just say,
14  Mr. Hersh, I'm sure you -- this is not going to
15  be a surprise to you, but I am a personal
16  admirer of yours and personal admirer of -- of
17  your reporting and so I, just as a -- a
18  personal event, I'm honored that you're here
19  talking to us today.
20            Now, as to your reporting practice, I
21  understand that you -- you delete your emails
22  on a regular basis with various people that
23  you -- that you talk to; is that -- is that
24  correct?
25       A.    Yes.
```

Page 12

```
 1              HERSH - CONFIDENTIAL
 2       Q.    Do you preserve any emails that you
 3  may have with sources or other individuals that
 4  would be relevant to -- to stories you're
 5  working on?
 6       A.    I print out certain ones that are
 7  relevant to what I'm doing professionally, but
 8  almost all the other stuff I delete
 9  permanently.
10       Q.    And do you preserve notes of stories
11  that you're working on?
12       A.    Sure.  Of course.
13       Q.    And you preserve drafts of stories,
14  or --
15       A.    Well, I --
16       Q.    -- do you delete --
17       A.    I --
18       Q.    -- drafts?
19       A.    No, I don't preserve drafts
20  necessarily because there's -- sometimes
21  there's -- particularly, you know, at a place
22  like The New Yorker, there may be 15 drafts of
23  certain articles so that gets to be too
24  voluminous.  No, I sometimes do, but most of
25  the time not.
```

Page 13

```
 1              HERSH - CONFIDENTIAL
 2       Q.    Okay.  Now, are you -- so now you're
 3  familiar with a person named Edward Butowsky?
 4       A.    Yes.
 5       Q.    And how -- how are you familiar with
 6  him?
 7       A.    I had a phone call with him that you
 8  know about, of course, period.
 9       Q.    Excuse me?
10       A.    That's the only contact was one phone
11  call with him except for some emails that I --
12  I unfortunately did not keep.
13       Q.    Do you recall when that phone
14  conversation occurred?
15       A.    You know, I really -- I would guess
16  in 2017, and perhaps a little later.  But I --
17  I -- I have not gone back to try and find it in
18  my files or notes.  But it would have been
19  about 2017 I would think, maybe '18.
20            MR. BOWMAN:  I -- I instruct the
21       witness not to guess.  To the extent you
22       have an answer or have a -- recall an
23       answer, please give that your best
24       recall.
25            THE WITNESS:  Absolutely.
```

Page 14

HERSH - CONFIDENTIAL

1
2      A.   No, I don't have a specific
3  recollection of when I did -- when I had a
4  conversation with him.
5      Q.   Do you recall the -- the inauguration
6  of President Trump in January of 2017?
7      A.   Sure.  Yes.
8      Q.   And to the best of your recollection,
9  was the conversation with Mr. Butowsky -- did
10 it occur shortly after the inauguration of
11 President Trump?
12     A.   I -- within the confines of -- I --
13 I'm -- I am sure it did, but I -- I would never
14 swear about anything because it was years ago.
15 So I -- I'm -- I would say afterwards, that
16 would be my guess.  But it's just a guess, and
17 I've been asked by counsel not to guess.  It's
18 not much of a guess.
19     Q.   And why did -- why did that
20 conversation with Mr. Butowsky occur?
21     A.   I was asked to call him.
22     Q.   And who asked?  Who asked you to call
23 him?
24     A.   A good friend.
25     Q.   All right.  And who was that good

Page 15

HERSH - CONFIDENTIAL

1  friend?
2      A.   His name is Larry, Larry Johnson.
3      Q.   And -- and why did Larry Johnson ask
4  you to call Mr. Butowsky?
5          MR. BOWMAN:  Objection.  Answer if
6      you know.
7      A.   I -- I don't really know.  Of course
8  not.
9      Q.   Well, why did -- why did Mr. Johnson
10 tell you that he was asking you to call
11 Mr. Butowsky?
12     A.   The -- I can tell you what I came
13 away from the conversation thinking, but
14 that -- that -- and I will just tell you that,
15 which is I came away thinking that he was --
16 he -- Larry -- I've known Larry a long time,
17 and he was trying to get some business, I
18 thought, from Mr. Butowsky, some client
19 relationship.
20     Q.   And so why would you call -- why
21 would -- why would Sy -- Sy Hersh call
22 Mr. Butowsky to help Larry Johnson get
23 business, as you understand that?
24     A.   Well, if he asked me -- I -- I've

Page 16

HERSH - CONFIDENTIAL

1
2  known him for many years, and he asked me to do
3  a favor and call him because -- I -- I don't
4  know what was in his mind.  I have a guess he
5  wanted me to help get business for him, but
6  that's just a supposition.  That's the one I
7  made, anyway.
8      Q.   Oh.  Did he ask you to discuss any
9  particular topics --
10     A.   Yes.
11     Q.   -- with -- and what topic did he ask
12 you to discuss with Mr. Butowsky?
13     A.   I had told him something.  I picked
14 up some basically secondhand information.  He
15 was talking about the Seth Rich issue that
16 we're talking about here, and I'd mentioned it
17 to him, and he asked me if I would talk to
18 Mr. Butowsky about such.
19     Q.   About -- about Seth Rich; is that
20 correct?
21     A.   Yes.
22     Q.   And so did -- did you call
23 Mr. Butowsky?
24     A.   Yes.
25          MR. QUAINTON:  All right, so now --

Page 17

HERSH - CONFIDENTIAL

1
2  so before we get into the audio itself, I
3  want to just very, very briefly for
4  you just -- and this will -- this will
5  be very brief.  I just want to bring to
6  mind some of the background to the -- to
7  the call itself.  So -- and this should
8  be -- this should be quick, then we
9  will -- we will -- we will move to the
10 audio itself.
11     So what I'm going to try to do --
12 and the -- the reporter asked would we
13 be familiar with Zoom, and I'm not
14 particularly familiar with -- with Zoom,
15 so -- so bear with me.
16     I'm going to share my screen now
17 and call up some -- some documents and
18 some videos and audios.  The documents
19 and the links to the videos and audios
20 were provided to your counsel last
21 night, and I believe he got those to you
22 this morning.  Most of these documents,
23 we'll not -- we'll not be going through
24 them in any sort of -- any sort of
25 detail.  So let me try to see if I can

Page 18

```
1              HERSH - CONFIDENTIAL
2    pull this off here.  So I go to share
3    screen, share.
4         So I'm going to show you,
5    Mr. Hersh, an audio -- a -- a video that
6    was -- was taken on ITV.  And let me see
7    if this will come up.  Sorry, Mr. Hersh,
8    do you see -- do you see what I'm
9    showing you on my screen?
10        THE WITNESS:  I -- I -- I see a --
11   a -- a list of documents, yes.
12        MR. QUAINTON:  Okay.  You do not --
13   do you see a video?
14        THE WITNESS:  No.
15        MR. QUAINTON:  Can anybody else see
16   that, or do you just see a list of
17   documents?
18        MR. BOWMAN:  I just see the list of
19   documents.
20        THE VIDEOGRAPHER:  I can talk you
21   through if you need to.
22        MR. QUAINTON:  Yes.
23        THE VIDEOGRAPHER:  Do it on the
24   record?
25        MR. QUAINTON:  If everybody
```

Page 19

```
1              HERSH - CONFIDENTIAL
2    wouldn't object, do it off the record?
3         MR. BOWMAN:  Okay.
4         MR. QUAINTON:  Do you want to go
5    off the record?
6         THE VIDEOGRAPHER:  The time is
7    9:56.  We're off the record.
8    (Discussion held off the record.)
9         THE VIDEOGRAPHER:  9:58 a.m.  We're
10   on the record.
11   (Exhibit No. DH1 was marked for
12   identification.)
13        MR. QUAINTON:  So I'm going to just
14   play a short video that's been marked as
15   DH1, and I will circulate to counsel a
16   sheet that has the actual internet link
17   to this clip.
18   (The clip was played.)
19        MS. GOVERNSKI:  I objected prior to
20   the playing of this clip, and I would
21   ask Mr. Quainton to take the time to
22   allow opposing counsel to object so that
23   the transcript is accurate.  I object to
24   playing the entire audio/video, that you
25   have not established foundation with the
```

Page 20

```
1              HERSH - CONFIDENTIAL
2    witness.
3    BY MR. QUAINTON:
4         Q.   Mr. Hersh, do you recognize that
5    video clip that I just played?
6         A.   No.
7         Q.   Do you recognize any of the people
8    who appear on that video clip?
9         A.   Of course.
10        Q.   And who do you recognize on that
11   video clip?
12        A.   Julian Assange.
13        Q.   And how -- when you say "of course,"
14   how is it that you recognize him?
15        A.   I'm --
16        MR. BOWMAN:  Object to the extent
17        it calls for news-gathering material.
18        The witness can answer the question if
19        it doesn't call for revelation of
20        news-gathering efforts.
21   BY MR. QUAINTON:
22        Q.   You -- you can answer the question,
23   Mr. Hersh.
24        A.   I met him once in my life, yes.
25        Q.   Okay.  And do you -- do you recognize
```

Page 21

```
1              HERSH - CONFIDENTIAL
2    the -- the other person in that video?
3         A.   No.
4         Q.   Mr. Hersh, can you see my screen?
5    Can you see just a list of documents?  Can you
6    see --
7         A.   Yeah.
8         Q.   Can you see something that says DH2
9    right now?  Can you just see a list of
10   documents?
11        A.   Yes, it's underlined, yes.  It says
12   Nakashima article, yes.
13        Q.   Oh, sorry.  Hold on.  I think I need
14   you to start over.  I'm starting over.
15        Do you see the text of an actual
16   article on your screen?
17        A.   No.
18        Q.   Do you see it now?
19        A.   Yes.
20        MR. QUAINTON:  So I'm showing the
21        witness what's been premarked as DH2.
22   (Exhibit No. DH2 was marked for
23   identification.)
24   BY MR. QUAINTON:
25        Q.   And I'm just going to ask the witness
```

HERSH - CONFIDENTIAL

1  to very briefly -- if you have it printed out,
2  that's fine.  If you want me to scroll on the
3  screen, I can do that as well.  Just very -- do
4  you have this document printed out, Mr. Hersh?
5
6      A.   No.
7      Q.   Okay.  Are you able to read it
8  briefly on the screen?  All I need you to do is
9  very briefly -- I'm not going to ask you really
10 anything much of substance on the -- on the
11 content, I'm just going to ask you to scan
12 this.  Is that -- can you sort of follow along
13 as I move on the screen?
14     MR. BOWMAN:  Let's go off the
15     record and -- and talk about the
16     witness's ability to review the
17     documents.  Can we go off the record for
18     a moment?
19     MS. GOVERNSKI:  Can I just say one
20     thing before we go off the record?  I
21     just -- Mr. Quainton, can we have a
22     standing objection as to exhibits?
23     Because we have not had the opportunity
24     to review them for authenticity, and it
25     would just be easier to have a standing

HERSH - CONFIDENTIAL

1  objection until we have a chance to
2  review after the deposition.
3
4      MR. QUAINTON:  Yes, I -- what I was
5      thinking was showing the document on the
6      screen was the equivalent of handing you
7      a document at the deposition just so you
8      wouldn't be blindsided.  I don't want
9      you to not have what I'm looking at, but
10     I can't physically hand you a document,
11     so putting it on the screen was my way
12     of physically handing it to you.  And I
13     was going to put -- I was going to give
14     you the documents as well after the --
15     after the deposition.
16     MS. GOVERNSKI:  I appreciate that.
17     But while you're scrolling through, it's
18     not really possible for us to really
19     fully review it so it would just be
20     better to have a standing objection so
21     that --
22     MR. QUAINTON:  I see.  That's fair
23     enough.  But you know what I'm going to
24     do?  Let's go back on the record.  I'm
25     just going to ask Mr. Hersh --

HERSH - CONFIDENTIAL

1
2      MR. BOWMAN:  I'm not sure we went
3      off yet.  Do you want to go off the
4      record and talk about the handling of
5      exhibits?
6      THE VIDEOGRAPHER:  The time is
7      10:06 a.m.  We are off the record.
8      (Discussion held off the record.)
9      THE VIDEOGRAPHER:  The time is
10     10:12 a.m.  We're on the record.
11 BY MR. QUAINTON:
12     Q.   Mr. Hersh, I've -- I've put in the
13 Zoom chat room a document that's been premarked
14 as DH2.  That's Defendant Hersh Exhibit 2.  And
15 I'd just like you to, if you could, click on
16 that document and just briefly review it.
17     A.   I know the document.
18     Q.   Did you briefly review it?  Could you
19 just open it and -- and just --
20     A.   I -- I'm -- I -- I have reason to
21 know that document.
22     Q.   Okay.  And -- and why do you have
23 reason to know that document?
24     A.   I have been reporting on Hillary
25 Clinton since she became Secretary of State.

HERSH - CONFIDENTIAL

1
2      Q.   And, well, so you very quickly
3  identified that document.  Do you -- are you
4  familiar with Ellen Nakashima?
5      A.   I -- I -- the byline, yes.
6      Q.   Have you -- do you know her
7  personally?
8      A.   No.
9      Q.   And this article discusses the
10 alleged Russian hack into DNC servers; is -- is
11 that correct?
12     A.   Yes.
13     Q.   And what do you think of the theory
14 that's put forward in the article?
15     A.   I -- I -- it doesn't matter what I
16 think.  It matters what I write.
17     Q.   Well, respectfully, it's my
18 deposition.  I'd like to know what -- what do
19 you think of the theory that's put forward in
20 the article?
21     A.   I'm naturally a skeptic.
22     Q.   So you're skeptical of the theory
23 that is put forward in the article; is that
24 correct?
25     A.   I'm a -- skeptical, essentially, of

HERSH - CONFIDENTIAL

1  an awful lot of reporting that goes on today
2  based on sources that I don't think I know.  So
3  I can say that safely.  I -- I -- I don't --
4  I -- I can't go beyond that, I can just say
5  what -- what my skepticism is.
6      Q.   And your skepticism is just news
7  generally today you have a -- you're skeptical
8  of?
9      A.   A lot of it, yes, quite -- quite --
10  quite a bit, yes.
11      Q.   Are you particularly skeptical of
12  news reporting on the so-called Russian hack of
13  the DNC servers?
14      A.   Russian?  I -- I didn't hear it.
15      Q.   The Russian alleged hack of the DNC
16  servers.  Are you particularly skeptical of the
17  reporting on that alleged event?
18      A.   Yes, sir.
19      Q.   I'm going to show you -- let me ask
20  you.  Why -- why is that?
21      A.   You're -- you're getting into my
22  professional -- an -- an area of my -- my
23  professional expertise that I don't wish to
24  discuss.  I don't think it's relevant.
25

HERSH - CONFIDENTIAL

1      MR. BOWMAN:  Eden, can I have a
2  proffer of how this relates to the
3  conversation with Mr. Butowsky that I
4  understand was the subject of this
5  deposition?
6      MR. QUAINTON:  Yes.  We will get
7  into the call.  At the end of the call,
8  towards the end, Mr. Hersh will say, "I
9  have a narrative as to how that all --"
10  pardon my language "-- fucking thing
11  began," and so this relates to what we
12  will get into when we get into the
13  audio, which is just Mr. Hersh's
14  statements about the Russian hacking
15  narrative.  So that's how -- that's --
16  that's my proffer.  I -- but I don't
17  want to -- I don't want to belabor this,
18  because we don't have much time, so I'm
19  going to go on to the next document that
20  I have, which is --
21      MS. GOVERNSKI:  For the record, can
22  I just say that I object to having
23  discussions in front of the witness
24  about what he will or will not say?
25

HERSH - CONFIDENTIAL

1      MR. QUAINTON:  Well, I was asked
2  for a proffer and I gave a proffer.  So
3  now let me go to the next one.  I'll get
4  the hang of this eventually.  Okay, I've
5  put into the chat window a PDF of what's
6  been premarked as DH3, Guccifer 2.0
7  posts.
8      (Exhibit No. DH3 was marked for
9      identification.)
10  BY MR. QUAINTON:
11      Q.   And I would just like you, Mr. Hersh,
12  very briefly to -- to look at that, open that
13  PDF and look at it, if you will.
14      A.   You want me to open it?
15      Q.   Yes, if you could.  Just on your
16  screen, click on the PDF and -- and briefly
17  review the document.
18      A.   Counsel, I'm a dedicated Luddite.
19      Q.   Okay.  I thought you had -- had
20  reviewed -- I thought when you talked to --
21      MR. QUAINTON:  Let's go off the
22  record.
23      THE VIDEOGRAPHER:  The time is
24  10:17.  We're off the record.
25

HERSH - CONFIDENTIAL

1      (Discussion held off the record.)
2      THE VIDEOGRAPHER:  The time is
3  10:32 a.m.  We're on the record.
4  BY MR. QUAINTON:
5      Q.   Mr. Hersh, I've put in the Zoom chat
6  room a document that's been premarked as DH3,
7  Guccifer 2.0 posts, and I've asked you to open
8  that document and -- and briefly look at it.
9      Have you done that?
10      A.   It's DH4 I thought you told me to
11  look at.
12      Q.   Well, if you could, just look at DH3
13  first.
14      A.   I have the 4 up.  Let's just do the 4
15  while I have it up.  Come on, make it easy on
16  me, man, I -- I --
17      Q.   Okay.  Fair enough.
18      (Exhibit No. DH4 was marked for
19      identification.)
20  BY MR. QUAINTON:
21      Q.   Open up DH -- DH4, and that's
22  "Guccifer 2.0 Taking Responsibility for Hack."
23  Now, do you -- do you see that document?
24      A.   Yes.
25

Page 30

HERSH - CONFIDENTIAL

1
2  Q.   And you managed to scroll through it?
3       MS. GOVERNSKI:  Excuse me.  I
4  object.  You haven't sent opposing
5  counsel the document, Mr. Quainton.
6  Please --
7       MR. QUAINTON:  Okay.
8       MS. GOVERNSKI:  -- send the
9  document.
10      MR. QUAINTON:  Okay.  Meryl?  It
11 says "privately."  It says -- I put it
12 in the chat room so it should be
13 available.  The videographer, could you
14 make this, these exhibits, available to
15 everybody?
16      THE VIDEOGRAPHER:  Yes, sir.  You
17 sent it to me privately.  You just need
18 to make sure when you send a document
19 you send it to everyone in the bottom of
20 the chat feature.
21      MS. GOVERNSKI:  Also, you need to
22 allow time to object.  None of my
23 objections are in the transcript.  I've
24 objected to your characterization of the
25 document.

Page 31

HERSH - CONFIDENTIAL

1
2       MR. QUAINTON:  Okay.  How do I --
3  I'm clicking on "videographer."  How do
4  I make that --
5       THE VIDEOGRAPHER:  So you click on
6  that, and then at the top you see
7  "everyone in meeting"?  It's at the
8  very, very top of that list.
9       MR. QUAINTON:  It says -- the first
10 one says to everyone?
11      THE VIDEOGRAPHER:  Yeah.  Make sure
12 you select "everyone in meeting" and
13 then send the documents.
14      MR. QUAINTON:  Select -- select
15 everyone first?
16      THE VIDEOGRAPHER:  Yeah, then drag
17 the PDF into the window.
18      MR. QUAINTON:  It's still just
19 going to the videographer.
20      THE VIDEOGRAPHER:  I'll do it if
21 you like.  I can download it and send it
22 to everyone.
23      MS. GOVERNSKI:  If you share your
24 screen and show your document on the
25 screen it will allow clarity of the

Page 32

HERSH - CONFIDENTIAL

1
2      record.  The way we're doing it now,
3      there's -- it's -- it's very unclear and
4      going to be unclear in the record.
5          MR. QUAINTON:  Okay.  First, he's
6      just going to put this in.
7          THE VIDEOGRAPHER:  DH4 is now in
8      the chat.
9          MR. QUAINTON:  And what about DH3?
10         THE VIDEOGRAPHER:  It's still
11     there.
12         MS. GOVERNSKI:  I have DH3 and I
13     have DH4.  And for the record, I will
14     object to DH4 to the extent it looks
15     like it's some sort of a collaboration
16     of documents that it's unclear whether
17     they actually all belong together.
18 BY MR. QUAINTON:
19     Q.   Mr. Hersh, so you have had a chance
20 to look at DH4; is that correct?
21     A.   I just looked.  I -- I have it on the
22 screen but it's just disappeared now.
23     Q.   I have it on my screen.
24     A.   It's no longer in front of me.
25     Q.   It's no longer in front of you?

Page 33

HERSH - CONFIDENTIAL

1
2     A.   No.  I see the list.  Do you want me
3  to --
4     Q.   Do you see the document now on the
5  screen?
6     A.   No.
7          MS. GOVERNSKI:  It's in with the
8          folder and not the screen with the
9          document.  You have to click "share the
10         screen" with the document.
11 BY MR. QUAINTON:
12     Q.   Do you see the document now?
13     A.   Yes.
14     Q.   Okay.  Mr. Hersh, do you see the
15 document --
16     A.   Yes.
17     Q.   -- on the screen?
18     A.   Yeah.
19     Q.   And you had a chance before to look
20 at that when you were looking at it on the
21 screen; is that correct?  That was -- this is
22 what was identified as DH4.
23     A.   I -- I don't understand your
24 question.  Have I what?
25     Q.   When you were looking at it before in

Page 34

HERSH - CONFIDENTIAL

1 the PDF, you had a chance to open up the file
2 and look at this document; isn't that correct?
3
4     A.    I just opened it up a minute ago, I
5 mean, as you know.
6     Q.    Yes.
7     A.    Yeah, it's just -- I've looked at
8 the -- it's just five drafts.  I've --
9     Q.    So you --
10    A.    -- read, yes.
11    Q.    Okay.  And so my question is --
12          MR. QUAINTON:  Meryl, so this is --
13    I don't know.  Can you see this
14    document?
15          THE WITNESS:  I see it's -- I don't
16    know where it is.  Hold on.  I'm getting
17    all sorts of stuff now all over my
18    goddamn pages.  I don't know where it is
19    anymore.
20          MR. QUAINTON:  I think you're fine,
21    Mr. Hersh, just so --
22          THE WITNESS:  Maybe I should go
23    back to -- I don't know where, it just
24    seems like now I'm getting a whole bunch
25    of stuff.  It's just running through.

Page 35

HERSH - CONFIDENTIAL

1
2 Flipping back.
3          MR. QUAINTON:  That's what I'm
4    doing to the screen.  I'm just -- I'm
5    just scrolling through the actual
6    document that you scrolled through,
7    which is DH4.
8          THE WITNESS:  Well, I only looked
9    at the first item.
10         MR. BOWMAN:  Object to the extent
11    it mischaracterizes the witness's
12    statement.
13 BY MR. QUAINTON:
14    Q.    Okay, my understanding, Mr. Hersh,
15 was you had actually looked at DH4 when you --
16 when you clicked on --
17    A.    These have --
18    Q.    -- the PDF.
19    A.    These have a lot of stuff.  I only
20 looked -- the only thing I looked at, I'm --
21 I'm back to the first document.  I looked
22 through that, five paragraphs.
23    Q.    Do you -- did you -- did you have a
24 chance, because you -- you asked me to go to
25 DH4.  Did you have a chance to look at what

Page 36

HERSH - CONFIDENTIAL

1 I've -- what I've marked as DH4?
2    A.    All of it?
3    Q.    Yes, just quickly, to -- to scroll
4 through it.  Did you have a chance to do that?
5    A.    Well, I can tell you it's stopped
6 scrolling.  It's not scrolling anymore.
7    Q.    I will scroll very slowly.
8    A.    Slowly?
9    Q.    So you can see.
10    A.    All right, so you're in control.
11 Okay.
12    Q.    I'm scrolling very slowly.
13    A.    First one.  Go ahead.
14    Q.    Why don't you tell me when -- how
15 about you tell me --
16    A.    Well, the first one --
17    Q.    -- when I scroll --
18    A.    I read the first one.  Go ahead.  Go
19 to -- the next one is -- is a blank page.
20 Looks like, all right, Donald Trump report,
21 Democratic National Committee, the date.  Hold
22 on.  It's January.  Okay, go ahead.  Scroll
23 down.  Scroll down.  Keep on going.  Keep on
24 going.

Page 37

HERSH - CONFIDENTIAL

1
2          MR. BOWMAN:  Counsel, do you have a
3    proffer as to authenticity or why the --
4    the witness should recognize this?
5          MR. QUAINTON:  Same reason as
6    before.  I believe that --
7          THE WITNESS:  What's -- if -- if
8    you want to ask me a question, ask me a
9    question.
10         MR. QUAINTON:  My question's going
11    to be very, very brief, but the proffer
12    is exactly what -- what it was before,
13    is that when Mr. Hersh says that it was
14    a disinformation operation in his audio,
15    when he says that that was Brennan
16    bullshit, I think is the word -- but we
17    will get to that -- I'm going to ask him
18    what he's referring to.  And --
19         MR. BOWMAN:  So I'm going to
20    object.  I'm going to object to showing
21    him documents with no foundation that
22    Mr. Hersh has ever read them before --
23         MR. QUAINTON:  That's --
24         MR. BOWMAN:  -- that Mr. Hersh
25    created them.

HERSH - CONFIDENTIAL

1
2      MR. QUAINTON:  That's going to be
3   my question.
4      MR. BOWMAN:  Related to -- I think
5   that he may have said -- why don't you
6   start there with what he said?
7      MR. QUAINTON:  Hold on.  What I'm
8   going to do -- this is my deposition.
9   I'm just going to -- this is going to be
10  very quick.
11  BY MR. QUAINTON:
12     Q.  So why don't you tell me, Mr. Hersh,
13  if I can go through -- are you following along
14  here?
15     A.  You know, you're back -- keep on
16  going.  I'm looking at it.
17     THE REPORTER:  This is the court
18  reporter.  I will encourage everyone to
19  give space between speakers because I
20  know people are speaking overtop of each
21  other.  And people are speaking and not
22  being recorded, so please give space
23  between speakers.  Thank you.
24     MS. GOVERNSKI:  I will note that
25  none of my objections appear to be in

HERSH - CONFIDENTIAL

1   the record.  Can you hear me?
2
3      THE REPORTER:  I can hear you now,
4   ma'am, but --
5      MS. GOVERNSKI:  Okay.
6      THE REPORTER:  But when other
7   people speak, they cut you and others
8   off.
9      MS. GOVERNSKI:  Give me time to
10  allow for objections.  But I don't
11  understand why you are testifying,
12  Mr. Quainton.  Ask your questions to the
13  witness and don't provide the testimony.
14     MR. QUAINTON:  I have been asked
15  several times for a proffer.  I have to
16  answer the proffer.  I can -- I can not
17  answer the proffer, but I was asked for
18  a proffer.  I gave the proffer.
19  BY MR. QUAINTON:
20     Q.  So now, Mr. Hersh, have you had a
21  chance to review what was marked as DH4?
22     A.  I've -- I've -- yes, as it scrolled,
23  yes.
24     Q.  And my question is, do you recognize
25  that document?

HERSH - CONFIDENTIAL

1
2      A.  No.
3      Q.  You recognize the name Guccifer 2.0?
4      A.  Sure.  Yes.
5      Q.  And why do you recognize the name
6   Guccifer 2.0?
7      A.  Well, because it's been involved --
8   totally -- it was hired by, as far as I recall,
9   my recollection is that it was hired by the DNC
10  at -- at the time that the DNC initiated the
11  first public acknowledgment or allegation
12  they'd been hacked.
13     MR. QUAINTON:  All right.  So now,
14  okay, I'm going to play a very short
15  clip, video clip from the internet,
16  which has been premarked as DH5.  And
17  it's identified as August 9, Julian
18  Assange on Dutch TV.  And so I'm going
19  to play this clip and then I'm going to
20  ask you a question about this clip.
21     (Exhibit No. DH5 was marked for
22  identification.)
23     (The clip was played.)
24     MS. GOVERNSKI:  For the record, I
25  dialed in.  Can you hear me now?

HERSH - CONFIDENTIAL

1
2      MR. QUAINTON:  I can hear you, yes.
3      MS. GOVERNSKI:  Okay.  You
4   didn't -- I would -- I would object to
5   the --
6      THE REPORTER:  Oh, we -- please
7   stop.  There's a very bad echo.  We
8   cannot have that.
9      MS. GOVERNSKI:  Okay, I'm going to
10  switch.  I was told you cannot hear me.
11  I just want my objection to playing the
12  clip noted and I'll let the questioning
13  continue.
14  BY MR. QUAINTON:
15     Q.  Mr. Hersh, I just played you a -- a
16  short two-minute clip that was premarked as
17  DH5.  And my question is, do you recognize that
18  video?
19     A.  Yes.
20     Q.  And why do you recognize -- and what
21  is that video?
22     A.  It -- do you want me to say that it's
23  interview of Julian Assange by a reporter on --
24  on Dutch TV, I take it?  I'll be glad to say
25  that.

Page 42

HERSH - CONFIDENTIAL

1
2      Q.   Okay.  And why is it that you
3  recognize that video?
4      A.   It was quite prominent at the time at
5  some point back three, four years, and it
6  was -- other than that --
7      Q.   Do you recall whether you saw that
8  video at or about the time that it first
9  appeared on the internet?
10     A.   No.
11     Q.   And do you recognize anybody on that
12  video?
13     A.   Yes, I -- I do.
14     Q.   Who do you recognize?
15     A.   Julian Assange.
16     (Exhibit No. DH6 was marked for
17      identification.)
18  BY MR. QUAINTON:
19     Q.   So now I'm going to play what's been
20  premarked as DH6.  And do you recall before we
21  had this detour into some of the background,
22  just to recap, you testified that a friend, an
23  acquaintance of yours, Larry Johnson, had asked
24  you to call Edward Butowsky.
25         Do you recall that testimony?

Page 43

HERSH - CONFIDENTIAL

1
2         MS. GOVERNSKI:  Objection.
3         MR. BOWMAN:  You can answer the
4     question.
5      A.   Yes.
6  BY MR. QUAINTON:
7      Q.   And do you recall that you testified
8  that the -- the subject matter of your call was
9  going to be Seth Rich?
10        MR. BOWMAN:  Objection.  You can
11     answer the question.
12        MS. GOVERNSKI:  Joined.
13     A.   Did I know it was going to be before
14  it was?  I -- I assumed it was, but I didn't
15  know that.
16  BY MR. QUAINTON:
17     Q.   I'd like to go back.  So in -- I -- I
18  believe you testified in 2017, and you couldn't
19  remember exactly when in 2017, you had a phone
20  conversation with Edward Butowsky; is that
21  correct?
22     A.   That's what I testified to, yes.
23     Q.   And you testified that you had that
24  call because Larry Johnson asked you to call
25  Mr. Butowsky; is that correct?

Page 44

HERSH - CONFIDENTIAL

1
2      A.   Yes.
3      Q.   Okay.  And you testified that you
4  thought Mr. Johnson wanted to get -- was
5  seeking to develop business.
6         Do you recall that?
7      A.   That was my supposition.  I -- I knew
8  he was talking to him about doing some work for
9  him, yes.
10     Q.   And I believe you said that you
11  were -- that you were calling Mr. Butowsky and
12  that the content of your call would be, as far
13  as you were concerned, would be about Seth
14  Rich.  Do you recall that?
15     A.   That's what I --
16        MS. GOVERNSKI:  Objection.
17        THE WITNESS:  Go ahead.
18        MR. BOWMAN:  You can answer, Sy.
19     It's okay.  Counsel objected.
20     A.   Yeah, that -- that was my
21  understanding, yes, from Larry, yes.
22        MR. QUAINTON:  Okay.  All right, so
23     I'm going to play the -- I'm going to
24     play an audio for you.  And this audio
25     has been, if I can find it -- let's go

Page 45

HERSH - CONFIDENTIAL

1
2  off the record for a second.
3         THE VIDEOGRAPHER:  The time is
4  10:49 a.m.  We're off the record.
5  (Discussion held off the record.)
6         THE VIDEOGRAPHER:  The time is
7  10:50 a.m.  We're on the record.
8         MR. QUAINTON:  So I'm going to play
9  the audio that's been marked as DH6.
10  This is also a document that was
11  produced by plaintiff in this litigation
12  to defendants, and it was Bates stamped
13  RICH0000139.
14        MS. GOVERNSKI:  Before you're
15  playing it, for the record, counsel has
16  agreed that the produced documents will
17  retain their designated confidentiality
18  status in spite of the witness not
19  signing the protective order.
20        MR. QUAINTON:  That's correct.
21  (The clip was played.)
22        MR. QUAINTON:  Sorry for
23  interrupting.  For the video,
24  Mr. Hersh --
25        THE WITNESS:  I forgot.  I

HERSH - CONFIDENTIAL

1  apologize.  I leaned back.
2
3          MR. QUAINTON:  No problem.  I'm
4  going to resume.
5      (The clip was played.)
6          MR. QUAINTON:  Mr. Hersh?
7          THE WITNESS:  Yeah.
8          MR. QUAINTON:  Thanks.  If we could
9  just see you for the record.
10     (The clip was played.)
11  BY MR. QUAINTON:
12     Q.  Okay, Mr. Hersh, I've played for you
13  a -- an audio clip that was 20 minutes and 59
14  seconds long.  And my question is:  Do you
15  recognize that audio clip?
16     A.  Yes.
17     Q.  And how is it that you recognize it?
18     A.  Well --
19     Q.  Strike that.
20         What is it?  What is that audio clip?
21     A.  It's a conversation.  It's a
22  conversation I had with Ed Butowsky.
23     Q.  And is that your voice on the audio?
24     A.  Yes.
25     Q.  And I think I notice at the very

HERSH - CONFIDENTIAL

1  beginning of the audio, it appears that you're
2  in a -- a stream of conversation.  Does that
3  seem accurate to you?  At the very -- very
4  beginning of the audio.
5          MS. GOVERNSKI:  Objection.
6     A.  I haven't looked at it or listened to
7  it probably in three years.  I -- I did -- I
8  did -- there is a section at the beginning that
9  isn't there, and I have no idea why.
10  BY MR. QUAINTON:
11     Q.  But from the point that I did play it
12  to the end, did -- to the best of your
13  recollection, is there anything that appears
14  edited or altered in the clip that you heard
15  just now?
16     A.  The -- the phrase "there is a report"
17  has a precedent, you know.  I -- I -- I do
18  write for a living, and it has a foundation
19  that isn't explained that I -- I do remember
20  making, which was, in other words, the -- when
21  I mentioned there is a report, I -- it's the
22  second time I'm mentioning that phrase.
23     Q.  We'll get to that in a second.  My
24  question was, again, not what was in that

HERSH - CONFIDENTIAL

1  introductory portion that appears not to be
2  captured on the audio, but simply in the
3  portion that we listened to, did anything
4  appear to you to be altered, manipulated in any
5  way?
6     A.  No.
7          MR. QUAINTON:  All right.  Well,
8  what I'm going to do to make this
9  easier, I'm going to give you a
10  transcript of the -- of the call.  This
11  is what's been marked as DH7.
12     (Exhibit No. DH7 was marked for
13  identification.)
14         MR. QUAINTON:  So I'm going to put
15  that in the chat room, and then let me
16  ask you -- I don't know if you printed
17  that out yet.  Let me put that -- let me
18  go ahead and put that in the chat room.
19  Stop share.  Videographer, could you
20  send that to everybody?  It's -- for
21  some reason, when I try to put it in the
22  chat room, it's just going to you, not
23  to everybody.
24         THE VIDEOGRAPHER:  No problem.

HERSH - CONFIDENTIAL

1  Give me one moment.
2          MR. QUAINTON:  And, Mr. Hersh, did
3  you have a chance to print out what was
4  marked as DH7?
5          THE WITNESS:  No.
6          MR. QUAINTON:  I think it would
7  be -- that one, I think it would be
8  helpful to actually print that document
9  out.  Is there any way you could do
10  that?
11         THE WITNESS:  I -- I don't see it
12  on my screen.
13         MR. QUAINTON:  Well, your counsel
14  sent it to you previously in that email,
15  in the emails that he sent you.  If you
16  want to coordinate with Mr. Bowman,
17  that's -- that's fine.
18         THE WITNESS:  I didn't get a chance
19  to look at email until 15 minutes before
20  the deposition.  I had other business
21  this morning.
22         MR. QUAINTON:  No, I understand.
23  Go off the record.
24         THE VIDEOGRAPHER:  The time is

Page 50

```
 1              HERSH - CONFIDENTIAL
 2       10:16 a.m. [sic].  We're off the record.
 3       (Discussion held off the record.)
 4            THE VIDEOGRAPHER:  Time is
 5       11:24 a.m.  We're on the record.
 6  BY MR. QUAINTON:
 7       Q.  Now, Mr. Hersh, I asked you to print
 8  out a document that was premarked as DH7, which
 9  is a transcript of the audio that we just
10  listened to.  This was a transcript prepared by
11  plaintiff in this case.  And I've put the
12  transcript in the chat room so counsel should
13  have that as well.  And what I'd like you to do
14  is briefly read through the transcript.  Just
15  take your time and read through that
16  transcript, if you would.
17            MS. GOVERNSKI:  Just for the
18       record, I'm not entirely sure whether
19       Mr. Hersh is reviewing the -- the
20       accurate document.  It doesn't look
21       like -- I just wanted to flag that for
22       time's sake.
23            MR. BOWMAN:  Mr. Hersh, is that
24       DH7?
25            THE WITNESS:  Yeah, it's a -- it's
```

Page 51

```
 1              HERSH - CONFIDENTIAL
 2       off -- it's a document that showed up
 3       in -- I've got it marked here.  DH7.  It
 4       says it's Aaron Rich.  It says taken
 5       from the audio transcript that was
 6       submitted to the -- the -- the federal
 7       court here in Washington.  And it says
 8       audio recorded, read, blah, blah, blah,
 9       back on legal services, so that's all I
10       know.
11            MS. GOVERNSKI:  Oh, I'm sorry.
12       Maybe it is correct.  My apologies.
13            MR. QUAINTON:  That's -- that's the
14       one that you sent to us, or that Erica
15       sent to us.
16            THE WITNESS:  I -- I skim-read what
17       I said, which is -- if you can hear me,
18       I've skim-read what I said.  I've gone
19       back once.
20  BY MR. QUAINTON:
21       Q.  Okay.  Let me ask you, having read
22  that, read through that transcript, does that
23  appear to you to be a -- a truthful and an
24  accurate transcription of the audio that we
25  just listened to?
```

Page 52

```
 1              HERSH - CONFIDENTIAL
 2       A.  No.
 3            MR. BOWMAN:  Objection, but go
 4       ahead.  Answer.
 5  BY MR. QUAINTON:
 6       Q.  It does not appear to be a -- a
 7  truthful and accurate transcription?
 8       A.  No.
 9       Q.  And why?  Why is that?  What do you
10  notice that is not --
11       A.  It's incomplete.
12       Q.  Oh.  This transcript is incomplete
13  based on what we just listened to?
14       A.  No, it's -- it's accurate to what I
15  just listened to.
16       Q.  Well, that was my question.  My
17  question was, does this transcript truthfully
18  and accurately reflect just what we listened
19  to, the portion that we listened to, the 20
20  minutes and whatever it was, 29 seconds that we
21  listened to?  Does this transcript truthfully
22  and accurately reflect audio that we listened
23  to?
24       A.  It -- it -- it --
25            MR. BOWMAN:  Object.
```

Page 53

```
 1              HERSH - CONFIDENTIAL
 2       A.  Yeah, I don't -- you know, I don't
 3  remember.
 4            MR. BOWMAN:  He's not -- he hasn't
 5       gone through word for word and compared
 6       the audio recording to the transcript.
 7       You're asking him to offer essentially
 8       an expert opinion that he's not able to
 9       offer.
10  BY MR. QUAINTON:
11       Q.  Does it -- does this -- does this
12  appear to you to be an accurate transcription
13  of what we -- of what we listened to?  And
14  I'm -- just to what we listened to.
15       A.  I -- I have -- I'm -- I'm
16  incapable -- I'm not capable of remembering
17  every conversation I had.  And I -- I must say
18  again, counselor, that I -- I -- I certainly
19  remember something at the beginning that's not
20  there.  But that -- and as far as you -- you --
21  I heard, it seems to be accurate as to what was
22  played.
23       Q.  Okay.  Well, we may need to play the
24  audio in pieces, then.  But let me ask you just
25  a few questions before we get into the --
```

Page 54

HERSH - CONFIDENTIAL

1  the -- the audio of the transcript.
2          Having listened to the transcript,
3  having listen to the audio and looked at the
4  transcript, does it refresh your recollection
5  as to when you had this conversation with
6  Mr. Butowsky?
7      A.   No.  Yes, in -- in the sense that
8  it's after the election, I'm -- for sure.
9      Q.   And anything else?
10     A.   I -- I -- I don't know what you mean
11 by "anything else," sir.
12     Q.   Before you recall a reference to General
13 Flynn in the audio?
14     A.   Mike Flynn.
15     Q.   Mike Flynn, yes.  Do you recall that
16 reference?
17     A.   No, but I'm --
18     Q.   Okay.  We'll get to that.
19     A.   I certainly knew Mike Flynn.
20     Q.   Don't worry, we'll -- we'll get to
21 that.
22          Do you recall what time of day it was
23 when you spoke to Mr. Hersh -- to Mr. Butowsky?
24     A.   I beg your pardon?

Page 55

HERSH - CONFIDENTIAL

1      Q.   Do you recall -- am I speaking loudly
2  enough?
3      A.   I -- you -- something bounced, so
4  there was a -- some audio bounce.  I didn't
5  hear the last sentence.
6      Q.   Do you recall what -- what time of
7  day it was when you were speaking with
8  Mr. Butowsky on this audio?
9      A.   Before lunch, that's for sure.  I
10 don't recall it, but it's in the -- it's in
11 the -- it's in the transcript.
12     Q.   Before lunch, right.
13     A.   Yeah.
14     Q.   So I take it -- had you been drinking
15 before this call?
16     A.   No, no.
17     Q.   Not even --
18     A.   No, I didn't -- didn't take any dope
19 but maybe I should have.
20     Q.   That was -- that was going to be my
21 next question.  Had you been using any
22 recreational drugs?
23     A.   No.
24     Q.   Were you on any sort of mind-altering

Page 56

HERSH - CONFIDENTIAL

1  medication?
2      A.   No.
3      Q.   Were you -- before you called, were
4  you working on a story for which you believed
5  Mr. Butowsky might have relevant information?
6      A.   I was told by -- the answer is yes.
7      Q.   What -- what was the story that -- it
8  brought out with?  What was the story that you
9  were working on?
10     A.   I'd been working on anything
11 connected with Hillary for many years.  And it
12 was my understanding from Larry Johnson that he
13 had some information that might have been
14 relevant to the Russian -- allegations about
15 Russians spying on -- on the Democrats.
16     Q.   And are you still working on a story
17 related to Russians spying on the Democrats?
18     A.   I -- there's --
19     Q.   Anything?
20          MR. BOWMAN:  Objection.
21     A.   Well, okay.  It's none of your
22 business.
23          MR. BOWMAN:  The extent of what
24          he's currently working on has no bearing

Page 57

HERSH - CONFIDENTIAL

1  and we'd assert the privilege on that.
2          MR. QUAINTON:  Yeah, my question
3          was just not -- not the content, but
4          whether he's still working on the --
5          story that he was working on before he
6          called Mr. Butowsky.
7          MR. BOWMAN:  Privilege -- our
8          privilege objection stands to the extent
9          you're asking Mr. Hersh what he's
10         working on today.  You can ask a
11         question about what he was working on at
12         the time of the phone call.
13         MR. QUAINTON:  Okay.
14 BY MR. QUAINTON:
15     Q.   Can you provide what, at least the --
16 what were you working on at the time of the
17 phone call?
18     A.   I -- I was very skeptical of the
19 published reports the previous fall that --
20 that the Russians had directly intervened in
21 the election, as Hillary Clinton claimed, you
22 know, to -- to -- to defeat her and put Trump
23 in office.
24     Q.   And did you ever attempt to get that

Page 58

HERSH - CONFIDENTIAL

1    story published?
2         A.   If she'd been -- if she'd been
3    elected, I might have done quite a bit about
4    her.
5         Q.   My question was just whether you
6    attempted to get that story published that you
7    just described --
8         A.   No.
9         Q.   -- having --
10        A.   No, no.
11        Q.   Okay.  Now I'm going to try to work
12   off the transcript, and if -- if it doesn't
13   work, we'll -- we'll -- I'll go back and --
14        A.   You're breaking up a second.  Please
15   restate it.
16        Q.   Thank you.  If I do break up --
17        A.   Yeah, it's okay.
18        Q.   -- please -- please tell me, because
19   I obviously don't know if I'm breaking up.
20            So I'm going to go through the
21   transcript that's printed out.  I'd like to do
22   that in some detail.  If that's not possible,
23   I'll go back to the audio and we'll just --
24   I'll -- I'll replay portions of the audio and

Page 59

HERSH - CONFIDENTIAL

1    ask you questions from the audio.
2            So I think I'm just going to tee up
3    my screen so that we have that audio there in
4    case we need it.
5            All right, so printed-out DH7, if you
6    could look at the very first page of DH7,
7    the -- the -- after -- after where it says DH7,
8    on the first page as we go down, it says "Audio
9    Recording of Ed Butowsky and Sy Hersh,
10   RICH0000139."
11           Do you see that?
12        A.   Yeah.
13        Q.   Then if you turn the next page, the
14   next page, do you see the page that has four
15   rectangles on it representing different pages?
16   Page 2, page 3, page 4, page 5?
17        A.   Yes.
18        Q.   Is that what you see on the second
19   page?
20        A.   Yes.
21        Q.   And then it continues like that on
22   the following page, 6, 8 -- 6, 7, 8, 9, and so
23   on, until the end of the document.  The very
24   last set of pages is 38, 39, 40, and 41 before

Page 60

HERSH - CONFIDENTIAL

1    the -- before the index at the end.  Is that
2    what you have as the last page?
3         A.   Yes.
4         Q.   All right.  So page 2, if you look at
5    page 2, line 2, "Sy Hersh," it begins -- the
6    transcript begins, "About the kid.  And I'll
7    tell you what I know."  Do you recall saying
8    that on the audio?
9         A.   No.
10        Q.   Okay, I'm going to try to -- I'm
11   going to play the audio.
12        A.   You know, I -- I -- I -- I -- I heard
13   it, but you're asking me if I recalled the
14   conversation.  As I told you before, counselor,
15   the conversation did not begin with that line,
16   in my memory.  There's something missing, and
17   I --
18        Q.   Fair enough.
19        A.   -- don't --
20        Q.   We'll get to that in a second.  We'll
21   get to that later, but --
22        A.   It's relevant, but that's your
23   business.
24        Q.   I -- I think my question is not

Page 61

HERSH - CONFIDENTIAL

1    clear.  I'm only asking you if the words on the
2    page of this transcript appear to you to
3    reflect accurately what you heard on the audio
4    that we played.  If -- if you can't make that
5    assertion, I'll just replay the audio and ask
6    you the question, which is fine with me.
7         A.   You asked me if I remembered it, but
8    I remember -- I remember hearing it, and I
9    remember reading it.  And yes, the -- what's
10   printed seems very accurate in terms of what
11   was played on the audio.
12        Q.   And so --
13        MR. BOWMAN:  I'm going to object to
14        the extent you're asking him to
15        essentially certify the transcript.
16        MR. QUAINTON:  Let's see if we can
17        go back to shared -- shared screen.
18        (A portion of the clip was played.)
19   BY MR. QUAINTON:
20        Q.   Okay.  Do you see my -- Mr. Hersh, do
21   you see the screen now that says my -- "My
22   Music" at the top?
23        A.   Yeah.
24        Q.   And then at the bottom it says DH6,

HERSH - CONFIDENTIAL

1   RICH0000139.  Do you see that?
2       A.   No.
3       Q.   In green at the very bottom.
4       A.   Oh, yeah.
5       Q.   Bottom left.  Do you see that?
6       A.   Yeah.
7       Q.   All right, I'm going to replay the --
8   the -- the little -- the beginning here.
9           (The clip was played.)
10  BY MR. QUAINTON:
11      Q.   Okay.  So that begins by saying
12  "about the kid," and "I'll tell you what I
13  know."
14          My question is, who are you talking
15  about where you say "about the kid"?
16          Who are you referring to?
17      A.   It seems -- the -- the -- the kid
18  that was shot.
19      Q.   And -- and who was that?
20      A.   Rich.
21      Q.   Do you recall that person's first
22  name?
23      A.   Yeah, of course.
24      Q.   What was that first name?

HERSH - CONFIDENTIAL

1       A.   I don't remember it right now, but I
2   do recall it.  Seth Rich.
3       Q.   Seth Rich?  Okay.
4           And that's -- that's "the kid" in
5   this.  In the statement, when you say "about
6   the kid," you're talking about Seth Rich.
7       A.   Yeah, yes.
8       Q.   Then you say "and I'll tell you what
9   I know."  That's what we just played.
10          When you say "I'll tell you what I
11  know," were you speaking hypothetically?
12      A.   I -- hypothetically?
13      Q.   Were you're saying I'll tell you what
14  I might know, or what I -- what maybe I know,
15  or were you saying I'll tell you what I know?
16      A.   It --
17          MR. BOWMAN:  Objection to the
18          extent you're assuming he remembers
19          everything about the conversation.  But
20          answer if you remember, Mr. Hersh.
21      A.   Well, what I -- I was not suggesting
22  there was anything firsthand I knew.  I -- I --
23  what I knew secondhand, and I -- I think that
24  was -- I made that very clear.

HERSH - CONFIDENTIAL

1           And also, there was a preamble about
2   why I was talking to him, because of Larry
3   Johnson.  And all that was -- there was some
4   chatter before all of this that I do remember,
5   and at no time was I presenting what I know to
6   be something, A, publishable or fact.  I was --
7   just know in the sense of a reporter learning
8   things from other people.
9       Q.   That was -- that was my question.
10      A.   Yeah.
11      Q.   Then you say "what I know" -- this
12  was what we just listened to.  "What I know
13  comes off an FBI report."
14          Were you speaking hypothetically when
15  you said "what I know comes off an FBI report"?
16      A.   At no time -- and I think I -- I made
17  this clear, whether at the beginning or at the
18  end -- at no time did I suggest I actually saw
19  or had a report.  And I -- I -- I should have
20  said probably, if I -- if I had anticipated,
21  I -- this would be not a friendly conversation
22  but something was transcribing, which, as
23  you know, I did not, I should have said what --
24  what I've heard.  That would have been a more

HERSH - CONFIDENTIAL

1   accurate description.
2           But I also made it clear that I --
3   that I was talking as a friend of Larry's.  He
4   did not know who I was, by the way.  Larry told
5   me that.  And I -- I -- I made it clear that I
6   was somebody who knows things.
7           But I hear a lot of stuff in my
8   profession, and I would -- would have been
9   much, much better if I had said let's -- let's
10  just all -- you know, what -- I'll tell you
11  what I know of what I hear, because I didn't
12  know anything.  I was a million miles away
13  journalistically from knowing anything.  And
14  that, I think, comes across in the transcript
15  too as you read it.
16      Q.   You were miles away journalistically,
17  but what you say is here "what I know comes off
18  an FBI report."  So let me ask you, how did you
19  know that there was an FBI report to say
20  anything about?
21      A.   The word "report" there has an
22  antecedent, and I don't know whether I made
23  that clear to him, to Ed, in the beginning or
24  not.  I -- I certainly made it clear to Larry

HERSH - CONFIDENTIAL

1  Johnson.  And there -- what I do is a report to
2  me doesn't necessarily mean that it's something
3  I've heard, not necessarily something I've
4  seen.  That's just the way I look at it.  And I
5  wasn't suggesting to him I -- I was -- that I
6  actually had a document.  He asked me, and I
7  said no.  I think that's in the transcript.  Or
8  pretty clear it's in the transcript.  I never
9  saw a document.  I never was really interested
10 in seeing a document.  I just, in a
11 conversation with Larry Johnson, who I -- as
12 I -- as I made clear I've known for 30 -- since
13 1985 or so, that he was -- he -- I told him
14 about this gossip I heard, and he replayed that
15 to Ed, and Ed then called me and asked me if I
16 would, and I did.
17         That's all.  That's the whole genesis
18 of why I happened to be talking to
19 Mr. Butowsky.  And I don't think he knew who I
20 was, even though he said he did.  Larry told me
21 he did not.
22      Q.   Okay.  I'm -- I'm going to -- to
23 to move to strike that as nonresponsive.
24 But -- but let's go back to this -- this

HERSH - CONFIDENTIAL

1  introductory portion that you say is not here,
2  and let me just ask you.
3         Your recollection today is that
4  before the audio of the conversation that we
5  heard, there was a portion of a discussion
6  between you and Mr. Butowsky that was not
7  recorded; is that correct?
8      A.   Are -- are -- I -- I mean, there was
9  chitchat.  There was hello, who are you, what
10 are we doing, I'm -- I'm Larry's friend.
11 That's what it's all about.  There was a lot of
12 chitchat in the beginning that I don't see
13 here.  I do remember that.  I just -- but
14 that's, you know, that's just my recollection,
15 which is not terrific because I really don't --
16 I -- I do know I talked to him at some length
17 before we began talking.  But -- but it's not
18 relevant, because I don't remember exactly what
19 was said.  I know the general gist, but I don't
20 know.
21      Q.   Okay.  You -- you're referring to
22 that pre -- that pre-audio portion, so I'm
23 just -- just for the record just wanted to give
24 you the opportunity.  Was there anything

HERSH - CONFIDENTIAL

1  material, anything important in that chitchat
2  before the audio actually begins --
3      A.   I -- I have no idea.
4      Q.   -- that you recall --
5           MS. GOVERNSKI:  Objection.
6      Q.   Answer the question.
7      A.   I -- I -- I can't profess to remember
8  conversations.  I just remember we had a -- we
9  had some conversation before that.  What I'm
10 saying is it's -- it's -- the transcript, in my
11 view, is accurate as to what's been recorded.
12      Q.   So now let's come back then to what
13 we just heard and what we see.  "What I know
14 comes off an FBI report."  And you said in
15 the -- I -- you said you haven't seen an FBI
16 report, and that wasn't my question.
17         My question was, when you say "what I
18 know comes off an FBI report," how did you know
19 that anything you were saying came off an FBI
20 report?
21      A.   You're getting into a source issue,
22 and I will tell you that at no time, as I said
23 to Mr. Butowsky, did I see a report, and at no
24 time did the person that I was talking to talk

HERSH - CONFIDENTIAL

1  to an FBI agent, although he was a person of
2  some knowledge and I've known him a long time.
3  And at no time -- when I use the word "report,"
4  it's a report that was made to him by somebody
5  who was not an FBI agent.
6      Q.   So your testimony is you spoke to a
7  person to whom FBI information was relayed.  Is
8  that --
9           MS. GOVERNSKI:  Objection.
10          MR. BOWMAN:  Mr. Hersh, if you can
11       answer the question without identifying
12       any confidential sources or otherwise
13       disclosing journalistic information, you
14       can -- you can answer the question.
15      A.   The person to whom I spoke, for whom
16 I have high regard, happened to mention to me
17 that -- that he learned -- let me see how I can
18 put this without trying -- look, we're talking
19 about whether or not I talked to an FBI agent
20 or not, or he did.  He did not.  But that
21 doesn't mean he did not speak to somebody who
22 may have had access to FBI reports who wasn't
23 in the FBI as an agent.  That's all I'm saying.
24         It was -- it was a -- it was one,

Page 70

HERSH - CONFIDENTIAL

1  two, third -- two -- two steps removed.  And
2  the only reason I mentioned it to Larry is
3  because he was very interested -- it was in the
4  context of Larry just being interested in it.
5  And I play golf with him, and we chat a lot.
6  And that's how the genesis of this conversation
7  began, period.  It was --
8  
9     Q.   I'm going to -- I'm going to move to
10  strike everything after the phrase "I play golf
11  with him" as nonresponsive and --
12     A.   Okay.
13     Q.   -- Mr. Hersh, if you could listen
14  carefully to my questions.  I didn't ask you if
15  you had spoken with an FBI agent.  I'm not
16  asking you that question.  I was simply asking
17  you -- I was trying to understand how it came
18  to be that you knew something that came off an
19  FBI report.
20           And I believe your testimony is that
21  you spoke to somebody for whom you have high
22  regard, who was not himself an FBI agent, who
23  had learned information relating to Seth Rich,
24  and that person for whom you had high regard
25  communicated that information to you, and

Page 71

HERSH - CONFIDENTIAL

1  that's how you came to know that information.
2  Is that correct?
3     MS. GOVERNSKI:  Objection.
4     MR. BOWMAN:  Objection.
5     A.   I -- I think what I -- I'm trying to
6  be careful here.  The person for whom I had
7  regard had not seen an FBI report.  And that, I
8  did know.  But he -- he had heard about an FBI
9  report, and so -- and on -- on -- that was the
10  secondhand basis.
11           And as I said, there was a caveat.
12  At -- at no time did I ever pretend that I saw
13  an FBI report or did I ever pretend or say that
14  I talked to somebody in -- an FBI agent about
15  that report.  I did not.
16     Q.   I understand.  And you -- you made
17  that clear.  And again, I'm not asking that
18  question.  I -- my question -- my next question
19  is, did the person to whom you -- you spoke,
20  did he represent to you that somebody else had
21  read him the FBI report that's discussed here?
22     MR. BOWMAN:  Objection to the
23     extent your predicate is the gender of
24     the person.

Page 72

HERSH - CONFIDENTIAL

1     A.   The person to whom I talked had not
2  suggested that he'd been -- read a report.  He
3  just had secondhand information about a report,
4  and -- and that's what I was -- thought I had
5  passed on as -- to -- to Larry Johnson.
6     Q.   Okay.
7     A.   And Johnson passed it on, and then so
8  it goes.
9     Q.   All right.  I'm going to play the
10  next portion of this.
11           Let me ask you before we move on,
12  have you been -- are you familiar with Robert
13  Mueller?
14     A.   Mueller?
15     Q.   Do you know the -- the person Robert
16  Mueller?  Do you know that name?
17     A.   Of course.
18     Q.   And who is Robert Mueller?
19     A.   Well, he was a former FBI Director.
20  He became FBI Director September 1, 2001, 10
21  days before 9/11, or 11 days.
22     Q.   And was he also the Special Counsel
23  who was appointed to investigate --
24     A.   Absolutely.

Page 73

HERSH - CONFIDENTIAL

1     Q.   -- collusion between the Trump
2  campaign and the Russian government?
3     A.   Yes.
4     Q.   And have you been contacted by Robert
5  Mueller?
6     A.   No.
7     Q.   Have you been contacted by anybody
8  purporting to work on the team of the Special
9  Counsel?
10     A.   No.
11     Q.   Have you been contacted by anybody at
12  the Department of Justice with any questions
13  about Seth Rich?
14     A.   No.
15     Q.   Have you been contacted by anybody at
16  the Metropolitan Police Department, Washington,
17  DC, with questions about the -- about Seth
18  Rich?
19     A.   No.
20     Q.   Have you -- are you familiar with
21  William Barr?
22     A.   Yes.
23     Q.   That would be the Attorney General of
24  the United States; correct?

Page 74

```
1              HERSH - CONFIDENTIAL
2      A.   Yes.
3      Q.   And has Mr. Barr contacted you
4  about --
5      A.   No.
6      Q.   -- about anything that we have been
7  listening to?
8           Has he -- has Mr. Barr ever contacted
9  you at any time?
10          MR. BOWMAN:  Objection.
11     A.   No, not -- not to my memory.  But he
12 was Attorney General in '80 and '81 or '82 when
13 I was doing a lot of reporting, and I know I
14 talked to people in Justice, but not -- I don't
15 think -- he might have approved a -- a
16 conversation with somebody in the national
17 security area, but I don't think I ever had --
18 in fact, I -- I'm positive I had no contact
19 with him.
20     Q.   And are you familiar with John
21 Durham?
22     A.   I know who he is.
23     Q.   That would be the US Attorney for
24 Connecticut; is that correct?
25     A.   Yes.
```

Page 75

```
1              HERSH - CONFIDENTIAL
2      Q.   And did Mr. Durham attempt to contact
3  you?
4      A.   No.
5      Q.   And did -- did you attempt to contact
6  any of the people that I've just mentioned --
7           MR. BOWMAN:  Objection.
8      Q.   -- anybody on his team, anybody at
9  the Department of Justice, anybody at the
10 Metropolitan Police Department with --
11          MR. BOWMAN:  I'm going to object on
12      the basis of privilege to that question.
13      I'll instruct the witness not to answer.
14      And as I mentioned at the beginning of
15      the deposition, that's the reporter's
16      privilege under the DC statute, DC Code
17      Section 16-4702 as well as the privilege
18      under the First Amendment and the common
19      law.
20 BY MR. QUAINTON:
21     Q.   So let's go -- let's go back to
22 the -- the person with whom you had the
23 conversation about a -- an FBI report.  And are
24 you familiar with the term "a letter agency"?
25     A.   No.
```

Page 76

```
1              HERSH - CONFIDENTIAL
2      Q.   When I -- if -- if I were to say
3  letter agency refers to the CIA, the NSA, the
4  FBI, would you understand what I mean?  Would
5  you understand my reference to letter agency?
6      A.   No, although I -- I can't rule out
7  having heard the phrase, but I don't remember
8  it offhand, what I -- I don't remember.
9      Q.   Was the person to whom you spoke in
10 the CIA?
11          MR. BOWMAN:  Objection.  Instruct
12      the witness not to answer.
13 BY MR. QUAINTON:
14     Q.   Was the person to whom you spoke at
15 the NSA?
16          MR. BOWMAN:  Objection, same
17      ground, privilege.  Instruct the witness
18      not to answer.
19 BY MR. QUAINTON:
20     Q.   Can you disclose the name of the
21 person with whom you spoke?
22          MR. BOWMAN:  Objection, reporter's
23      privilege.
24          MR. QUAINTON:  I'm going to return
25      to the transcript, and I think it will
```

Page 77

```
1              HERSH - CONFIDENTIAL
2  be -- I'm just going to play a portion
3  again so it will be easier.  You don't
4  have to remember the entire, you know,
5  30-page transcript.  So here we go.
6      (The clip was played.)
7  BY MR. QUAINTON:
8      Q.   Now, what we just played, you said
9  the -- "the kid."  Who were you referring to?
10     A.   Mr. Rich.
11     Q.   And you said he was 27.  How did you
12 know his -- his age?
13     A.   I read newspapers, and I read about
14 it, and then -- I don't remember if that's the
15 right age, but I -- I can probably get -- I'm
16 pretty sure he was roughly that age at the time
17 I talked.
18     (The clip was played.)
19 BY MR. QUAINTON:
20     Q.   We just read -- you said "the kid's
21 hands are marked up."  How did you know the
22 kid's hands -- I'm sorry, when you're speaking
23 about the kid, who are you referring to?
24     A.   Mr. Rich.
25     Q.   You say his hands were marked up.
```

Page 78

```
 1            HERSH - CONFIDENTIAL
 2   How do you know his hands were marked up?
 3        A.   I don't know that.  Again, as I say,
 4   words are interesting.  I don't know that in
 5   the sense that I had firsthand detailed
 6   knowledge, but I'd been told that by somebody
 7   who had a great deal of experience in that area
 8   and knew something about that area where he was
 9   shot.
10        Q.   Was the person who told you about the
11   shooting the same person who told you about the
12   FBI report?
13        A.   No.
14        Q.   Was it any person in -- in law
15   enforcement?
16        A.   No.
17        (The clip was played.)
18   BY MR. QUAINTON:
19        Q.   Now, you say they shot him twice in
20   the back.  This is a statement that -- did you
21   learn this information from the same source
22   that told you that Mr. Rich's hands were beaten
23   up?
24        A.   I -- I -- my memory is I did, yes.
25        (The clip was played.)
```

Page 79

```
 1            HERSH - CONFIDENTIAL
 2   BY MR. QUAINTON:
 3        Q.   And you say was shot with a .22 small
 4   caliber.  Again, is this the same source who
 5   told you that, the caliber of the gun, or was
 6   that a different source?
 7        A.   The same -- I -- I wouldn't say
 8   source.  I would say the same person.
 9        Q.   How do you distinguish between a
10   person and a source?
11        A.   The person who told me that was a
12   member of my family.
13        Q.   How would the person -- how would the
14   member of your family have that information?
15        A.   My brother-in-law was a public
16   defender for 35 years.  He was in charge of --
17   of -- in the end, he was -- he was always a --
18   an appellate attorney.  I mean, he did
19   litigation before the Supreme Court and the
20   Court of Appeals for the public defender's
21   office, service office, for years, which, as
22   you may know, is a very hard-to-get-into
23   office.  And one night at dinner he talked
24   about the case.
25            And he had a -- somebody in the
```

Page 80

```
 1            HERSH - CONFIDENTIAL
 2   public defender's office.  Believe me, they
 3   know that area of the city very well because
 4   there's -- it's a high-crime, high-drug area.
 5   Anybody who's worked in that office as he did,
 6   even in an appellate level, knew a great deal
 7   about those -- those -- those cases.  That's
 8   how I just happened to have heard them,
 9   anecdotally, not -- not -- period.
10        Q.   And I'm sure we can find this out.
11   What -- what is your brother-in-law's name?
12        A.   James Klein.
13        Q.   He is still a public defender?
14        A.   No, he's retired.
15        (The clip was played.)
16   BY MR. QUAINTON:
17        Q.   Now, you say, "They go into his house
18   and can't do much with his computer."  In that
19   statement, who is the -- who is the "they" that
20   you're referring, if you recall?
21        A.   The -- my -- my memory -- my memory
22   is that "they," being the police.
23        Q.   Okay.  And they go into the house and
24   can't do much with his computer.  Did you --
25   did you learn this information from your
```

Page 81

```
 1            HERSH - CONFIDENTIAL
 2   brother-in-law or from the first individual you
 3   referenced, who was your person that you've
 4   known for a long time who communicated the
 5   information to you without an FBI report?
 6        A.   That came from --
 7        MR. BOWMAN:  Objection.
 8        THE WITNESS:  Object?  Okay.
 9        MR. BOWMAN:  You can answer.
10        THE WITNESS:  It came from the
11   first person.
12        MR. QUAINTON:  Came from the first
13   person.
14        (The clip was played.)
15   BY MR. QUAINTON:
16        Q.   So again, this reference here, the
17   cyber unit in DC, is -- is this something that
18   your -- the first source, the first -- that
19   told you?
20        A.   You -- I had been working on Hillary
21   Clinton for -- by this time, since about '09
22   intensely as a -- as a -- as a subject.  And so
23   the interesting thing for me would -- this
24   relates to information I had learned about her
25   email accounts and how they were handled and
```

HERSH - CONFIDENTIAL

1  what the procedure is.  And so it -- it comes
2  from a totally different area.  I -- I -- I --
3  I spent a great deal of time journalistically
4  working on Gmails.  And -- and as you note, or
5  I can tell you, I -- I haven't published
6  anything because, like in many cases, as
7  including the information about Rich, I very --
8  I -- I don't publish much of what I know.  I --
9  I -- I just keep it, and particularly -- and so
10 it's a combination of things.
11        I -- I know how the procedure works.
12 I know what the problems are between the FBI
13 and the DC office and the -- the office in
14 Brooklyn, which is the senior office for the
15 FBI.  And the Eastern District of Brooklyn is
16 their best -- their best cyber unit.  I know a
17 lot about them, a lot more than -- than I
18 probably should.
19        Q.   So when you -- when you refer to
20 the -- the cyber unit in DC here that we
21 just -- what we just played -- and I think
22 there are going to be two cyber units, but
23 this -- you're saying that the DC cops -- you
24 can follow along if you want on the transcript.

HERSH - CONFIDENTIAL

1  We just --
2        A.   Yes.
3        Q.   -- played this.
4        A.   Yeah.
5        Q.   Page 4 of 16 to 18.  When you say
6  "The DC cops, they have a cyber unit and
7  they're more sophisticated," that's a --
8  that -- that -- do you know the name of that
9  cyber unit?
10       A.   No.
11       Q.   What you're referring to there is a
12 metropolitan police department cyber unit;
13 correct?
14       A.   Yes, absolutely.
15       (The clip was played.)
16 BY MR. QUAINTON:
17       Q.   So you say, "They come and look at
18 it.  The idea is maybe he's had a series of
19 exchanges."  Does that information come from
20 your first source that we discussed who had
21 relayed the information about an FBI report?
22       A.   Yes, the -- the first person is the
23 one who summarized the procedures or the --
24 the -- how it worked through as he understood

HERSH - CONFIDENTIAL

1  it from the low level up to the FBI cyber unit.
2        (The clip was played.)
3  BY MR. QUAINTON:
4        Q.   Now, the FBI's cyber unit that you're
5  referring to there, do you know the name of
6  that unit?
7        A.   No.
8        Q.   That be the -- the CART division?
9        A.   I have no idea.
10       Q.   But again, this is your first source
11 that we -- we talked about is relaying to you
12 information that the FBI's cyber unit was
13 called, and -- is that correct?
14       A.   My first source is the one who
15 described how it went from one place.  And
16 again, some of the characteristics of my
17 judgments about their skill are probably ones
18 I've picked up in the last 10 years in working
19 on other issues, the Gmail, etc.  I'm not sure
20 that my first person told me how good or bad it
21 is.
22       Q.   All right.
23       (The clip was played.)
24 BY MR. QUAINTON:

HERSH - CONFIDENTIAL

1        Q.   Okay.  So here again you say, "This
2  is according to the FBI report."  And when you
3  say "this is according to the FBI report," is
4  that -- well, is that information relayed to
5  you by the first source we discussed about what
6  he had heard was on an FBI report?
7        A.   Yes.
8        MS. GOVERNSKI:  Objection.
9        Q.   Did -- did your source -- if you --
10 if you -- if you answered this, did your source
11 indicate to you whether that report had been
12 read to him?
13       A.   It -- it -- I with -- want to
14 withdraw the word "he," by the way.  I -- I --
15 I don't think that's appropriate for me to get
16 into what -- his nomenclature or what -- what
17 sex he is.  But did his source -- did --
18       Q.   That person's, the -- the -- did that
19 person's source --
20       A.   He -- he --
21       Q.   -- read the report to -- purport to
22 read the report to the -- to the source?
23       A.   No.  No, I -- he was -- he was
24 someone -- he/she -- how do I describe him?

Page 86

HERSH - CONFIDENTIAL

1   No.  He was telling me what he understood what
2   was in a report if there had been a report.  He
3   was -- understood what the FBI -- information
4   the FBI had, and he was summarizing.
5           And -- and I -- I can't tell you --
6   I -- I didn't take notes on this because it
7   wasn't something I was writing, so we're --
8   we're -- I'm summarizing a conversation I had
9   to Ed -- with Ed, was just summarizing a
10  conversation I had some months earlier.  So
11  it's -- it's pretty far from -- the word
12  "report," as I said, I -- I should have said
13  "what I believe" or "what he heard," what --
14  I -- I should have caveated it more, but I did
15  not.
16      Q.   Now, you say that the -- that the --
17  the conversation that you had with your source
18  was, to your recollection, several months
19  before the time of the conversation with
20  Mr. Butowsky?
21      A.   I can't tell you when because I
22  just -- you know, this is some -- a person I've
23  known for 30, 35 years, and we talk a lot.  And
24  the -- the -- the -- the context was -- you

Page 87

HERSH - CONFIDENTIAL

1   have to understand, the context was in a lot of
2   work I'd done on Gmail for Hillary and how it's
3   handled bureaucratically in the government.
4   And it is handled -- there -- there are
5   procedures for handling this kind of stuff, and
6   warrants and others.
7           And so when I said "report," and --
8   and a report as I understood the word "report"
9   to mean, that was something that was reported
10  to him in the FBI, you know, the accurate --
11  we -- we -- in the report as related to him by
12  somebody who had looked at the report, yes, if
13  there was a report.  But I don't know.
14      Q.   Understood.  Just in terms of the
15  timing, though, we -- we -- we played a -- a
16  clip at the very beginning.  You'll recall
17  that, the -- an August 9 audio of Julian
18  Assange.  August 9, 2016, clip of Julian
19  Assange suggesting that Seth Rich might have
20  been a source.  And you testified that you
21  recognized that video.
22           Would the conversation with your
23  source have occurred around the time of that
24  Julian Assange video that we saw?

Page 88

HERSH - CONFIDENTIAL

1           MS. GOVERNSKI:  Objection.
2           MR. BOWMAN:  Objection.  Answer if
3   you know.
4       A.   I -- I -- I don't know.  Assange was
5   in the news.  Julian was in the -- the news.
6   The whole issue with Julian and me, the -- my
7   interest was not about Mr. Rich.  It was about
8   the allegations that were popping up.  And this
9   would have been the time frame that -- that the
10  Russians had been involved in the -- the
11  leaking from the -- the Russians were involved
12  in the intercepting of the unencrypted Gmail
13  DNC, Democratic National Committee, internet --
14  you know, inter -- or emails.  The -- the
15  emails were unencrypted, and they were -- a --
16  a 9-year-old hacker could have gotten in them.
17  That's all.  The context was that.
18          We were talking about -- my interest
19  was never really about Rich, but it was a
20  context of would the Russians have done
21  something like that.  That was the issue for
22  me.
23          And, by the way, I have been very
24  noisy about talking about my concern about

Page 89

HERSH - CONFIDENTIAL

1   Russians.  I -- the first time I did it would
2   have been three times after the -- the
3   inauguration.  I -- I wouldn't call it a -- I
4   said that in response to a question.  I -- I
5   answered it honestly, saying I have great
6   doubts about the Russian story.  I'm not --
7   I -- I -- I wasn't secret about my doubts about
8   the Russian story all along, and I'm still not.
9       Q.   Well, I would just -- I -- I would
10  ask you a question just in -- along the lines
11  of what you said.
12          Is it fair to say that the idea that
13  Russian military intelligence hacked into the
14  DNC, when you said something, a -- a 9-year-old
15  could have done that, that was sort of a --
16      A.   I'm --
17      Q.   -- preposterous --
18      A.   I -- I'm --
19      Q.   -- notion.
20      A.   I'm exaggerating.  I'm sorry.
21          MS. GOVERNSKI:  Objection.
22      A.   12-year-old.  A good 12-year-old kid
23  could have done that.  My kids when they were
24  12 probably could have done it.

Page 90

```
 1            HERSH - CONFIDENTIAL
 2       Q.    But do you feel it was preposterous
 3   that the Russian military intelligence hacked
 4   into the DNC?
 5       MS. GOVERNSKI:  Objection.
 6       A.    You're talking to somebody who spent
 7   10 years looking into what happened in Libya,
 8   what happened with Gmail, what happened with
 9   The Clinton Foundation.  And in those 10 years
10   I've learned a greater deal about
11   communications between the United States and
12   Russia on a lot of very -- levels, a lot of
13   very sophisticated levels that are not widely
14   known.
15            And yes, on the basis of all that
16   investigation, I found it rather incredible.
17   And I'd also spent a great deal of time talking
18   to election officials after that story first
19   became known.  It was known -- Hillary floated
20   that idea about 10 -- a week after the election
21   when she lost.  And at that time, most of the
22   experts I knew in academia and in -- the
23   retired people in the community, maybe even
24   people in the community, thought it was a
25   preposterous story.  But it was one that was
```

Page 91

```
 1            HERSH - CONFIDENTIAL
 2   very dominant in the newspapers and equivalent
 3   to the bounty story today about the Russians
 4   paying the Taliban to kill American soldiers,
 5   which is also a very suspect story, in my -- in
 6   my opinion.
 7       (The clip was played.)
 8   BY MR. QUAINTON:
 9       Q.    Now, you say the basic facts that
10   there was no DNC email beyond May 22.  Can you
11   explain to me why that's important?
12       A.    I -- I remember why it was important
13   three years ago or four years ago.  I can just
14   make a guess, and that would be silly.  I
15   don't -- I don't really remember.  But it was
16   a -- a -- a great distinction to me, because
17   nothing -- what I remember is nothing in the
18   Podesta file, nothing that was eventually made
19   by Julian Assange -- I guess that's who did it,
20   if he did do it.  I think so -- nothing that
21   was made public was after that date, May 21.
22   But I don't know.  There was a reason that was
23   important to me, but I don't remember what it
24   is now.
25       MR. QUAINTON:  Fair enough.
```

Page 92

```
 1            HERSH - CONFIDENTIAL
 2       (The clip was played.)
 3   BY MR. QUAINTON:
 4       Q.    Now here, you're very specific.  You
 5   say what -- "what the report says."  Is it
 6   still your testimony that referring to it is
 7   just the -- just the statement that was relayed
 8   to you by your source?
 9       A.    As -- as I said, secondhand by that
10   time.  You -- he had it from somebody, who was
11   not an FBI agent, and -- although, as I said,
12   I -- I tend to take his stuff seriously.  That
13   doesn't mean I publish everything because
14   often, there's nothing to publish.  And so I --
15   what -- what's your question about that
16   particular conversation?
17       Q.    You answered my question.
18       (The clip was played.)
19   BY MR. QUAINTON:
20       Q.    If I could just press you a little
21   bit on this, because it says -- you repeatedly
22   say "it," "it says," "it" being -- the
23   antecedent "it" being the report and really
24   insist on "the report," "it says," and you --
25   you mention that you have a -- a -- a contact.
```

Page 93

```
 1            HERSH - CONFIDENTIAL
 2   You're very insistent in this call on what the
 3   report says.  Is that a fair characterization
 4   of the -- the words that you're using in
 5   this --
 6       A.    Yes.
 7       Q.    -- call?
 8       MS. GOVERNSKI:  Objection.
 9       A.    It's what I said but, you know, it's
10   allegedly.  Putatively.  It's not -- not given.
11   It's just we're talking about a conversation.
12   I -- I was trying to help Larry get business
13   and so I was probably -- I was much more vocal
14   than I needed to be, for which I'm ashamed of,
15   but that's the way it is.
16            And at -- at no time -- let me say
17   this again.  At no time did this -- the initial
18   source, who I consider to be a very highly
19   competent guy, at no time did he have a report,
20   did he see a report, did he say he did, did I
21   believe there was such a -- I -- do I -- do I
22   believe there was a report?  I'm sure I
23   believed there was a report.  There would have
24   to be because the federal government is -- is
25   computerized, and -- but when I used the word
```

Case 4:20-cv-00447-ALM   Document 11-8   Filed 12/30/20   Page 26 of 86 PageID #:  168

Page 94

HERSH - CONFIDENTIAL

1   "report," I used the -- the -- the report as --
2   as made known to me, period.  And I wasn't
3   clear enough.  I didn't say -- there you go.
4   I -- I was speaking to a friend of a friend.
5          And you will understand, I hope, that
6   the idea that somebody would be recording that,
7   if I'd known that, I probably would have been
8   speaking much, much more calmly.  I was trying
9   to help a buddy.
10     Q.   Understood.
11     (The clip was played.)
12  BY MR. QUAINTON:
13     Q.   Just to be clear, in what was relayed
14  to you by your source, the fact that Seth Rich
15  made contact with WikiLeaks, that was part of
16  the information that was relayed to you by your
17  source; correct?
18     A.   That was --
19     MR. BOWMAN:  Objection.
20     MS. GOVERNSKI:  Objection.
21     A.   The -- the reports did not say "saw
22  the report."  It was in the context of the kind
23  of conversation you have with a man you've been
24  talking to for 30 years.  In many cases, as my

Page 95

HERSH - CONFIDENTIAL

1   writing shows about very sensitive things that
2   are often accurate, and often it's one person's
3   view.  And I will tell you, if it matters, as a
4   journalist, no matter how wonderful he is and
5   great he is, I never publish anything without a
6   second and often a third source, which is a
7   very -- you know, that -- that does save a lot
8   of trouble.
9          So I -- this was something that I had
10  no intention of publishing, was not interested
11  in it per se.  The only way I was interested in
12  it was in terms of how a computer system works,
13  how Hillary did stuff, why this happened to be
14  a Hillary leak, did Assange really do it, did
15  he really know anything more?  I was interested
16  in that.
17     Q.   I -- I'm going to move to strike
18  everything after the word "published."  Again,
19  if you could just focus on my -- my -- my
20  questions and just answer my question.  So when
21  your counsel objects, that's totally fair but
22  please try to remember my -- my question so
23  that -- I -- I think you answered that.
24          My question was -- and I'll say it

Page 96

HERSH - CONFIDENTIAL

1   again, because I'm not sure I got a clear
2   answer.  Was the information that Seth Rich had
3   made contact with WikiLeaks and that that
4   contact was in Seth Rich's computer, was that
5   information relayed to you by your source?
6      A.   Yes.
7      MS. GOVERNSKI:  Objection.
8      (The clip was played.)
9   BY MR. QUAINTON:
10     Q.   There's a word that is unintelligible
11  just after the word "including."  This is --
12  this is on page 8, line 18 of the transcript.
13  And -- and it says "He's under total
14  surveillance by everybody, including --" is
15  that SIGET (phonetic)?  Is that the word you
16  were thinking of?
17     A.   Page 8?
18     Q.   Page 8.  I can replay it again.  It's
19  just page --
20     A.   Yeah, signals intelligence, yeah,
21  signals -- it -- it's just S-I-G and -- and --
22  and I-N-T, SIGINT.
23     Q.   Who -- who runs SIGINT intelligence?
24     A.   Well, it -- it -- all the services

Page 97

HERSH - CONFIDENTIAL

1   and the NSA, everybody has a SIGINT unit.  I
2   mean, the FBI does.  The NSA does, obviously.
3   The CIA does.  Everybody.  The Army, the Navy,
4   the -- even the Coast Guard has a SIGINT unit.
5   It's just a common thing.
6      Q.   Would this be the NSA, though, when
7   you're referring to the surveillance of Julian
8   Assange by SIGINT?  Would that be NSA SIGINT?
9      A.   I would -- I -- I -- I don't think
10  I -- I ever thought beyond the fact that Julian
11  is clearly being observed.  It could have
12  been -- if you want to know, you'll strike it,
13  but clearly MI6, the British overseas
14  intelligence unit, was also following Assange
15  and may have been relaying stuff.  That --
16  that's always been my understanding, but I
17  don't know that.
18     (The clip was played.)
19  BY MR. QUAINTON:
20     Q.   So when you say "I'm working on it,"
21  were you working on a story about how Seth Rich
22  got in contact with WikiLeaks?
23     A.   No.  Again, I was -- the -- the
24  interest always with Julian was not so much

TSG Reporting - Worldwide   877-702-9580

Page 98

HERSH - CONFIDENTIAL

1  about Rich, it was about the allegations that
2  the Russians were involved in -- in -- in --
3  in -- in -- in -- involved with Julian on the
4  whole issue.  They had been involved.  If you
5  remember, that was part of the story, the
6  allegations that they were deeply involved
7  in -- in -- in his penetration of the DNC, etc.
8  That's my memory.
9       (The clip was played.)
10 BY MR. QUAINTON:
11      Q.   So here, what your source told you
12 was that he had been -- he or she, source had
13 been informed that Seth Rich had submitted a
14 series of documents, emails, from the DNC
15 WikiLeaks.  Is that -- is that correct?
16      A.   Yes.
17           MS. GOVERNSKI:  Objection.
18      (The clip was played.)
19 BY MR. QUAINTON:
20      Q.   Now here -- here, when you say the
21 Democrats wrote this, I take it you're
22 referring to -- are you referring to the
23 embarrassing emails between Democratic
24 officials?

Page 99

HERSH - CONFIDENTIAL

1       A.   I can't imagine what else, yes.
2       (The clip was played.)
3  BY MR. QUAINTON:
4       Q.   So here's a reference to Simpson.
5  Are you referring to Glenn Simpson?
6       A.   Yes.
7       Q.   Have you met Glenn Simpson?
8       A.   Yes.
9       Q.   And Mr. Simpson runs Fusion GPS; is
10 that correct?
11      A.   Yeah, he did then.  I don't -- I
12 don't know if he's doing it today.
13      Q.   At -- at that time, he was -- do you
14 recall his exact role within Fusion GPS?
15      A.   No, but he was -- he was -- I -- I --
16 he certainly -- I -- I did recall he was -- I
17 would say he was a major player in the company.
18 I don't know who else had stock or whatever in
19 it.  I don't know.
20      Q.   And at -- at the time of this
21 conversation, had you -- well, strike that.
22           Are you familiar with a series of --
23 sorry.  Strike that.  I'll just play a little
24 bit more.

Page 100

HERSH - CONFIDENTIAL

1       (The clip was played.)
2  BY MR. QUAINTON:
3       Q.   So when you refer to a Steele, are
4  you referring to Christopher Steele?
5       A.   Yes.
6       Q.   And I think you just said you were
7  familiar with Fusion GPS; is that correct?
8       A.   I was familiar with Glenn Simpson,
9  yes.  And I knew -- I knew there was a company
10 called Fusion, yes.
11      Q.   And are you aware that -- that
12 Mr. Steele compiled a series of reports from
13 the June 2016 to October 2016 -- 2016 time
14 frame that are commonly referred to as the
15 dossier?
16           MS. GOVERNSKI:  Objection.
17      A.   I'm aware -- is there an objection?
18 Oh.  I'm aware --
19      Q.   You can answer.
20      A.   -- that's been written, yes.
21      Q.   So if I were to refer to the -- the
22 Steele dossier, you would know that I'm
23 referring to a series of reports that were
24 prepared under the supervision of Mr. Steele

Page 101

HERSH - CONFIDENTIAL

1  from -- purporting to be from the period of
2  June through October 2016?
3       A.   I have a complicated answer for that,
4  counselor.
5       Q.   I'd like the complicated answer.
6       A.   Some of the reports were not written
7  by Mr. Steele, to the best of my knowledge.
8       Q.   Well, I -- I -- I'm aware of that.
9  My question was -- I don't think I said that
10 reports were written by him, I was simply
11 trying to make sure that we had a common
12 language.  I said reports prepared under the
13 overall direction of Mr. Steele.  And -- and
14 I'm not -- this is not a -- a trick question.
15 I'm simply trying to make sure we have a
16 common -- have common language.  Now, let me
17 see.  If you can -- I don't know if you have
18 this.
19           MR. BOWMAN:  Counselor, there's --
20      sorry to interrupt.  We're about three
21      hours in.  Do you anticipate having a
22      break soon?  Because the witness has
23      been going for quite a while.
24           THE WITNESS:  Yeah, are we close?

Page 102

HERSH - CONFIDENTIAL

1      I -- I'd continue if we're close.
2          MR. QUAINTON:  Mr. Hersh, I don't
3      think we're close, because I do want to
4      get through -- I do want to get through
5      all of this.  It's very important.  So
6      let's go off the record for one second.
7          THE VIDEOGRAPHER:  The time is
8      12:30 p.m.  We're off the record.
9      (Discussion held off the record.)
10         THE VIDEOGRAPHER:  Time is
11     12:32 p.m.  We are on the record.
12  BY MR. QUAINTON:
13     Q.  Mr. Hersh, we were talking about
14  Christopher Steele and Glenn Simpson, and I was
15  asking you if I -- if I described a series of
16  reports prepared under the overall direction of
17  Christopher Steele from the June 2016 through
18  October 2016 time frame, if I describe that
19  series of memoranda as collectively --
20         MS. SPEVACK:  Sorry.
21     Q.  -- the Steele dossier, would you know
22  what I was talking about?
23         MS. SPEVACK:  Excuse me.  This is
24     Erica Spevack.  We just are having a

Page 103

HERSH - CONFIDENTIAL

1      technical issue and Meryl is unable to
2      hear, so can we please take a short
3      break?
4          MR. QUAINTON:  Sure.
5          THE VIDEOGRAPHER:  The time is
6      12:34 p.m.  We're off the record.
7      (Discussion held off the record.)
8          THE VIDEOGRAPHER:  The time is
9      12:35 p.m.  We are on the record.
10  BY MR. QUAINTON:
11     Q.  Do you recall the question that I
12  asked you just before we went off the record,
13  Mr. Hersh?
14     A.  Would you restate it, please?
15     Q.  If I were to refer to a series of
16  memoranda prepared under the general direction
17  of Christopher Steele, prepared from the --
18  during the time period June 2016 through
19  October 2016, if I were to refer to that
20  collection of memoranda as the Steele dossier,
21  would you know what I was talking about?
22     A.  I would --
23         MS. GOVERNSKI:  Objection.
24     A.  I would know what the public

Page 104

HERSH - CONFIDENTIAL

1      account -- yes, I would know the public -- the
2   public accounts of this dossier.  I don't know
3   the dates, but would I know there was a -- a
4   lot of publicity about a series of messages
5   from Christopher Steele that were made public,
6   yes, the so-called dossier.
7      Q.  And did you ever -- did you read the
8   dossier?
9      A.  I started reading one of them, and I
10  stopped, and I've not looked back.
11     Q.  Do you recall which one, which --
12  when you say one of them, you mean one of the
13  memoranda in the Steele dossier?
14     A.  I don't even recall which one.  It
15  was published by BuzzFeed, I think, one of
16  those online things.
17     Q.  And do you recall which of the
18  memoranda you -- you read?
19         MR. BOWMAN:  Objection, asked and
20     answered.
21     Q.  I -- I didn't hear the answer.  You
22  can answer.
23     A.  No.
24     Q.  And why didn't you read -- so why

Page 105

HERSH - CONFIDENTIAL

1      didn't you read any of the other memoranda in
2   the dossier?
3      A.  I didn't read much of the first.
4   Because I -- in, I told you, nine years of
5   reporting I have reason to question -- I have
6   reason to question exactly who wrote what in
7   the dossier.
8      Q.  Well, would it be fair to say that
9   your judgment, based on what you read in the
10  memorandum that you read, was that the
11  information contained therein was preposterous?
12         MR. BOWMAN:  Objection.
13     A.  Was?
14     Q.  Was preposterous.
15     A.  Was preposterous?
16         MS. GOVERNSKI:  Objection.
17     A.  I -- I would -- I -- I don't know
18  what you mean by that word.  Do you mean that
19  it wasn't credible?
20     Q.  Was it incredible to you, the
21  information that you read, in the sense of not
22  being credible?
23     A.  My -- you're getting into what I do
24  for a living, but my -- my information is that

HERSH - CONFIDENTIAL
1  not all of it was written by Mr. Steele.
2
3       (The clip was played.)
4  BY MR. QUAINTON:
5       Q.   Here, you say "I know he offered a
6  sample."  Who is the "he" in that sentence?
7       A.   Mr. Rich.
8       Q.   And when you say "Mr. Rich," that's
9  Mr. Seth Rich?
10      A.   Yeah.
11      Q.   And when you say you know this, this
12  is information that was relayed to you by your
13  trusted source; is that correct?
14           MS. GOVERNSKI:  Objection.
15      A.   Yes.
16      (The clip was played.)
17  BY MR. QUAINTON:
18      Q.   Now, the use of a drop box by Seth
19  Rich to transfer documents to WikiLeaks, was
20  that communicated to you by your source?
21           MS. GOVERNSKI:  Objection.
22      A.   Yes.
23      Q.   Now, when I say "your source," I'm
24  referring to the first source that you
25  mentioned at the beginning of this, when we

HERSH - CONFIDENTIAL
1  began discussing the audio.  And just for
2  clarity, this -- this source is a person that
3  you've known, I think you've said some 35
4  years; is that correct?
5       A.   More maybe 31, 30, something like
6  that.
7       Q.   And this is a person that you -- that
8  you trust; is --
9       A.   Trust --
10      Q.   -- that correct?
11      A.   -- but verify.
12      Q.   But is this a person that you trust?
13      A.   Trust but verify.
14      Q.   Is this person very senior, or -- or
15  has this person been very senior in the United
16  States government?
17           MS. GOVERNSKI:  Objection.
18           MR. BOWMAN:  Object to the extent
19      this would identify the source.  If you
20      can answer the question without
21      providing sources, go ahead.
22      A.   He is very, very knowledgeable.
23      Q.   Was he very senior, would you say, in
24  the US government?

HERSH - CONFIDENTIAL
1
2           MR. BOWMAN:  Objection.
3           MS. GOVERNSKI:  Objection.
4       A.   He was certainly senior in certain
5  areas of intelligence collection, yes.
6       Q.   So when I speak about -- just for
7  clarity going forward, when I speak about the
8  first source, rather than doing this over and
9  over again, can we just agree that the phrase
10  "the first source" will refer to the person
11  that you've known for 31 years, that trust but
12  verify, and who is a senior person in
13  intelligence circles?  Can we just agree that
14  that's --
15           MS. GOVERNSKI:  Objection.
16      Q.   -- by -- when -- when I refer to the
17  first source?
18           MR. BOWMAN:  Objection.
19      A.   I think I said all I want to say
20  about him.
21      Q.   Just so we're clear, when I refer to
22  the first source, I'm just going to be
23  referring back to this person that we just -- I
24  just described.  So there's -- so we're --
25  we're clear.

HERSH - CONFIDENTIAL
1
2           MS. GOVERNSKI:  Objection.
3           MR. BOWMAN:  Objection.
4       (The clip was played.)
5  BY MR. QUAINTON:
6       Q.   So in this portion of what the --
7  your first source, it was -- this was
8  information that we just listened to.  This was
9  information communicated to you by the first
10  source?
11      A.   Could -- I couldn't -- yes, Your
12  Honor.
13      Q.   And in the information that was
14  communicated to you here, the information was
15  specifically that Seth Rich had shared this
16  drop box with friends of his.
17      A.   That --
18           MS. GOVERNSKI:  Objection.
19      A.   That's what I was told.
20      Q.   And you were told that in -- in
21  this -- in -- in -- in -- that there was a
22  report that -- that said if anything happened
23  to Seth Rich, that that would not solve your
24  problem.  When you say here "your problem,"
25  who -- whose problem were you referring to?

1              HERSH - CONFIDENTIAL
2          MS. GOVERNSKI:  Objection.
3      Q.   Let me just read to you what you said
4  again.  You said -- said, "If anything happens
5  to me, you're not -- it's not going to solve
6  your problem."  In that sentence, is -- does
7  the "me" refer to Seth Rich?
8      A.   Yeah, I -- I -- I really don't quite
9  know the context of -- shoot, I didn't -- hold
10  on.  I didn't really know the context of --
11  I -- I -- I can't remember.  I'm -- what I was
12  referring to.  I mean, I -- I'll -- I guess the
13  understanding would be that he'd shared his
14  information with some roommates.  He had
15  roommates.  But I -- I don't know that.  I
16  mean, I -- I just -- I don't remember what the
17  context was.  It was years ago when I made that
18  conversation with -- with Mr. Butowsky.
19      Q.   So you don't recall whether the
20  report or the -- the --
21      A.   There was no report that I knew
22  about.  There was just --
23      Q.   Let me get your --
24      A.   -- summarizing your conversation.
25  Somebody told him what he had learned from the

1              HERSH - CONFIDENTIAL
2  FBI.  When I used -- I -- as I say, the notion
3  that there was a physical report is -- is -- I
4  just don't know that.  You know --
5      Q.   Every report, or --
6      A.   we -- not every report is -- is
7  physical.  There are a lot of reports,
8  particularly in -- in -- in the -- in the
9  intelligence world there's a lot of information
10  that isn't put down, believe me.  There's a lot
11  of stuff that's done hand to hand.  Just the
12  whole business of being covert is not to leave
13  a trail or a paper trail.  And so in -- I
14  was -- this is somebody who lived in that
15  world, so I was speaking in that context, in
16  the context of -- you know, he may have even
17  been speaking in that context.
18          You -- you -- you don't put a lot of
19  things in writing in -- in the intelligence
20  business at a certain level, and that's -- so
21  part of the problem is it's just an
22  understanding I have with him, and -- and it's
23  a complicated sort of understanding.  But that
24  doesn't mean that he -- when he said "report,"
25  he doesn't necessarily even mean -- it's in the

1              HERSH - CONFIDENTIAL
2  report he got, not necessarily a report that
3  was written or codified.  He got a report.  He
4  gets a lot of reports, this person.
5      Q.   I understand.  And that's -- that's
6  helpful clarification.  While your testimony is
7  that you don't know whether there is a physical
8  report, physical FBI report, containing the
9  information that you are --
10          THE WITNESS:  I'm sorry, I thought
11      I turned this off.  Let me just get rid
12      of this.  I got to just turn this -- my
13      apologies.
14          MR. QUAINTON:  No problem.
15          THE WITNESS:  No, it's not.  It's a
16      problem.  I thought I turned it off.
17      That's how good I am when it comes to
18      computers.  I can't even turn off a damn
19      cell phone when I want to.  Okay,
20      anyway, I apologize.  That's so stupid.
21      Well, I think I got everything turned
22      off, but I don't know.  Go ahead.
23          MR. QUAINTON:  We'll break just
24      after this.
25  BY MR. QUAINTON:

1              HERSH - CONFIDENTIAL
2      Q.   So your -- your testimony is that
3  you -- you don't know whether there was a
4  physical report that contained -- let me just
5  finish -- that contained the information that
6  was communicated to your first source that was
7  then communicated to you.  But my question is,
8  it's certainly possible, isn't it, that there
9  is actually a physical report?
10          MS. GOVERNSKI:  Objection.
11          MR. BOWMAN:  Objection,
12      speculation.  But you can answer the
13      question if you know.
14      A.   All I know is that the word "report"
15  for somebody that I deal with doesn't
16  necessarily mean that they put it down in
17  writing.
18      Q.   I understand.
19      A.   People --
20      Q.   Doesn't necessarily --
21      A.   The world that I often deal in
22  doesn't revolve around paper.  That's what
23  makes it so friggin' hard to do what I do.  And
24  that's why you always verify everything
25  everybody tells you, because the word "report"

Page 114

HERSH - CONFIDENTIAL

1    is different to me and to him.  And not to Ed.
2    I admit that.  Not to Ed Butowsky.  Than it
3    is -- I -- I would even see -- say even Larry
4    Johnson would understand the difference between
5    "report" and "report."
6
7        Q.   Okay.  You said it doesn't
8    necessarily mean that there is a written report
9    when you refer to "report."  It doesn't --
10       A.   Well --
11       Q.   -- necessarily -- let me finish my
12   question.  It doesn't necessarily not mean that
13   there's a physical report either, does it?
14            MS. GOVERNSKI:  Objection.
15       A.   It -- I -- you want me to speculate
16   on what it means?  I mean, I've told you what
17   it means.  It means, you know, that -- that
18   they live in a world of a lot of messages
19   passed orally or in code, and -- and so that's
20   the world I deal with with this particular
21   person.
22            So the notion of a report, he --
23   the -- the word "report" is just different for
24   me than it is for a lot of other people, that's
25   all.  And I -- I think I said -- I know I said

Page 115

HERSH - CONFIDENTIAL

1    to Ed, I thought at the beginning, but I
2    certainly said it -- I'm looking at it at the
3    end.  I certainly said I'm -- you know, none of
4    this may be true because, you know, you
5    understand there's always a caveat in this --
6    in this area that I deal with.
7        Q.   Well, we'll get to what you said at
8    the end.  Right -- right now, I'm just trying
9    to focus in on the -- what -- what your
10   testimony is, because I -- you -- you're saying
11   that when you refer to a report, it doesn't
12   necessarily mean it's a written report.
13       A.   It's --
14       Q.   Is that correct?
15       A.   That's -- that's a --
16       Q.   And it doesn't necessarily not mean
17   there's a written report; isn't that correct?
18            MS. GOVERNSKI:  Objection.
19       A.   My understanding of the English
20   language is you're absolutely right.
21            MR. QUAINTON:  All right, let's --
22   let's break for lunch then.
23            THE WITNESS:  Okay.
24            THE VIDEOGRAPHER:  Off the record.
25

Page 116

HERSH - CONFIDENTIAL

1        (Recess taken.)
2            THE VIDEOGRAPHER:  The time is
3    1:32 p.m.  We're on the record.
4    BY MR. QUAINTON:
5        Q.   Okay, good afternoon, Mr. Hersh.  So
6    do you have the -- the -- the transcript of the
7    audio conversation in front of you?
8        A.   Yeah, I've got it now.
9        Q.   If you go to page 8 --
10       A.   Yeah, I see that, yes.
11       Q.   Lines 19 and 20 --
12       A.   Page?  Oh, line 19 and 20, yes.
13       Q.   And you say, "So I don't know how he
14   got in contact, but I'm working on it."  I --
15   in -- in that sentence, who does "he" refer to?
16       A.   Let me read this.  I -- I could just
17   make a guess.  I don't know.
18            MR. QUAINTON:  All right.  Fair
19   enough.  So what -- what I'm going to do
20   now, I'd just like you to sit back and
21   relax.  I want to play you a -- a clip,
22   and then I'm just going to ask you a few
23   questions about it.  Nothing heavy duty,
24   and it is interesting, I promise.  So

Page 117

HERSH - CONFIDENTIAL

1    where did you guys go?  Okay, so this is
2    what I've marked as DH8 in the chat
3    window.
4    (Exhibit No. DH8 was marked for
5    identification.)
6            MR. QUAINTON:  And I've marked that
7    as a link to the clip that I'm going to
8    play right now.  Actually, it's a -- a
9    series of portions of an interview, and
10   I'm going to go ahead right now.
11            MS. GOVERNSKI:  I'm sorry.  I would
12   object to portions.  I have to fix my
13   audio.  I'm sorry.  I would object to
14   portions of audio that are -- on -- on
15   grounds of completeness.
16            MR. QUAINTON:  Okay, here goes.
17            THE WITNESS:  I'm not hearing
18   anything.
19            THE REPORTER:  The court reporter
20   is also not hearing any sound.
21            THE WITNESS:  Hello?
22            MS. GOVERNSKI:  I'm not hearing
23   anything either.
24            MR. BOWMAN:  No.
25

HERSH - CONFIDENTIAL

1        HERSH - CONFIDENTIAL
2     MR. QUAINTON:  Is that true of
3 everybody?
4     MR. BOWMAN:  Yeah.
5     MR. QUAINTON:  Nobody's hearing
6 anything?
7     MR. BOWMAN:  Correct.
8     THE VIDEOGRAPHER:  Nor am I, sir.
9 If you tick the button to share --
10    MR. QUAINTON:  Yeah, yeah.  I'll
11 have to do a new share.
12 (The clip was played.)
13    MR. QUAINTON:  Can you hear?
14 (The clip was played.)
15    MR. QUAINTON:  Everybody can hear
16 that now?
17    MR. BOWMAN:  I can.
18    THE REPORTER:  The reporter can
19 hear it.
20    MS. GOVERNSKI:  I can hear it, and
21 I want to lodge an objection to it.
22    MR. QUAINTON:  Your objection was
23 noted, Meryl.
24 (The clip was played.)
25    MR. QUAINTON:  Can you guys hear me

HERSH - CONFIDENTIAL

1 now?  Ready to redo it.  Can anyone hear
2 me?
3    MR. BOWMAN:  We can hear you.
4    MR. QUAINTON:  Can you hear this?
5    MR. BOWMAN:  No.
6    MR. QUAINTON:  Could you hear that
7 or not?
8    MR. BOWMAN:  No.
9    MS. GOVERNSKI:  No.
10    THE REPORTER:  No.
11    MR. QUAINTON:  How about now?
12 (The clip was played.)
13    MR. QUAINTON:  Nod your head if you
14 can.
15 (The clip was played.)
16 BY MR. QUAINTON:
17   Q.   So, Mr. Hersh, do you recognize the
18 video that I just played?
19   A.   No.  No.
20   Q.   Do you recognize any of the people
21 that we saw on the video?
22   A.   I only saw one person.
23   Q.   And who did you see?
24   A.   The master of ceremonies there.  It's


HERSH - CONFIDENTIAL

1 the fellow running the show, the -- whatever
2 that show is, CNN -- CN LIVE.  I don't think
3 anybody else was shown.
4   Q.   So there -- there was a picture of a
5 person called Joe Lauria.  Do you know Joe
6 Lauria?
7   A.   No.
8   Q.   And to your knowledge, have you ever
9 spoken with Mr. Lauria?
10   A.   No.
11    MR. BOWMAN:  Objection.
12   A.   To my -- no, I -- I -- I know the
13 name.  It showed up in that period.  I don't --
14 I don't know anything about it.  I don't
15 remember why or how.  But, you know, I -- I
16 read the newspapers carefully.  He was -- he
17 was obviously somebody who for a little while
18 was involved in something.
19   Q.   He is speaking to a person who
20 identifies himself as Kim Dotcom.  Are you
21 familiar with the name Kim Dotcom?
22   A.   No.
23    MS. GOVERNSKI:  Objection.
24   A.   Thank you.  I'm sorry.  No.

HERSH - CONFIDENTIAL

1   Q.   So I take it you have never
2 communicated with anybody who goes by the name
3 of Kim Dotcom?
4    MR. BOWMAN:  Objection.
5   A.   Not to my knowledge.  How's that?  To
6 be precise.
7    MS. GOVERNSKI:  I object to future
8 use of this video.  You have not
9 established personal knowledge.
10    MR. QUAINTON:  Yeah, I'm just going
11 to pick --
12 (The clip was played.)
13    MS. GOVERNSKI:  I'd like to object.
14 For the record, I'd like to have a
15 standing objection to counsel's --
16 and -- and a motion to strike the
17 ongoing use of video for which you have
18 not established foundation and which
19 runs contrary to the fundamental Rules
20 of Evidence from an admissibility or
21 authenticity perspective.  So this
22 ongoing use of long video for which
23 there's no foundation I would object to
24 on a standing basis and -- and move to

```
                                        Page 122
 1           HERSH - CONFIDENTIAL
 2    strike.
 3           MR. BOWMAN:  And I'll -- I'll also
 4    object.  You know, I understand our
 5    agreement was that this was going to be
 6    a deposition about the telephone call,
 7    not, you know, playing a bunch of
 8    recordings that Mr. Hersh didn't give
 9    interviews to and -- and had no
10    involvement in.
11           MR. QUAINTON:  This very much was
12    about the -- the telephone call.
13    Specifically, Mr. Lauria specifically
14    talks about the telephone call.  And as
15    to --
16           MR. BOWMAN:  Or opinions about the
17    telephone call.
18           MR. QUAINTON:  As to
19    authentication, the question I -- I have
20    is simply whether Mr. Hersh recognizes
21    this audio, this video that I have --
22    that I've shown him.  And I'll ask you
23    that question.
24    BY MR. QUAINTON:
25       Q.  Do you recognize the portion that I
```

```
                                        Page 123
 1           HERSH - CONFIDENTIAL
 2    just showed you, Mr. Hersh?
 3       A.  You mean -- I just watched it, so I
 4    recognize it.  Of course I do.
 5       Q.  Oh.
 6       A.  I just watched it, if that's what
 7    you're asking me.  I watched it.
 8       Q.  You recognize this as something you
 9    had previously seen?
10       A.  I mean, you have to have a better
11    question than that.  What is your question,
12    counselor?
13       Q.  Is this a video that you had
14    previously seen?
15       A.  No, absolutely not.
16       Q.  All right.  And does that refresh
17    your recollection, though, as to whether you
18    had a conversation with Mr. Lauria?
19       A.  Mr. who?
20           MR. BOWMAN:  Objection.
21       Q.  Mr. Lauria.
22           MR. BOWMAN:  Answer if you can
23    remember.
24           MS. GOVERNSKI:  Join.
25       A.  Counselor, and I don't have a
```

```
                                        Page 124
 1           HERSH - CONFIDENTIAL
 2    computer, or does the FBI have a computer.  I
 3    have -- I just listened to that with great
 4    pleasure because it's the kind of stuff that --
 5    well, you don't need me to characterize it.
 6    You -- it can -- it stands by itself.
 7           No, I don't recognize him.  I don't
 8    remember a conversation with him.  And at no
 9    time was I planning to write a story.  And
10    my -- my friend, Larry Johnson, at no time
11    would have thought or said to anybody I was --
12    in fact, he was quite sorry that I -- he got me
13    in the middle of this mess because he knew I
14    was just trying to be nice to help him out,
15    that's all.  But that -- that's the way it
16    goes.
17           So there's nothing in there I
18    recognize.  It's all just the usual stuff
19    that -- you know, Looney Toons.
20       Q.  I'm going to move to strike
21    everything that was said after you said you
22    didn't recognize this clip.
23       A.  Okay.
24           MR. QUAINTON:  Just going to do one
25    last thing here for you, then we'll be
```

```
                                        Page 125
 1           HERSH - CONFIDENTIAL
 2    done with this.
 3           MS. GOVERNSKI:  And we would oppose
 4    that objection.
 5       (The clip was played.)
 6    BY MR. QUAINTON:
 7       Q.  So, Mr. Hersh --
 8           MS. GOVERNSKI:  Again, objection
 9    for the same reasons, and move to
10    strike.
11       Q.  Mr. Hersh, have you ever -- have you
12    seen this video clip that I showed you at any
13    previous time?
14       A.  No, no.
15       Q.  Now, at the end of this video, you
16    hear a voice saying that Seth would have needed
17    to work with somebody close.  Do you have your
18    audio on that?
19       A.  Yes.
20           MS. GOVERNSKI:  Objection.
21       Q.  And in your transcript you read
22    before on page 8, you said, "I don't know how
23    he got into contact.  I'm working on it."
24           And my question for you is, in your
25    work on -- you were investigating, did you ever
```

Page 126

HERSH - CONFIDENTIAL

1   find information about who Seth may have been
2   working with in transmitting emails to
3   WikiLeaks?
4       MR. BOWMAN:  Objection.
5       MS. GOVERNSKI:  Objection.
6   A.   Two-part answer.  One, I never found
7   anything.  And -- and two, I never looked to
8   find anything.  I was never interested in doing
9   such.
10  BY MR. QUAINTON:
11  Q.   So when you said "I'm working on it"
12  to Mr. Butowsky, what did you mean by that?
13  Well, let's go back.  Let's go back to the
14  transcript.
15  A.   As long as you don't play this again,
16  I'll do anything you want.
17  Q.   That's done.
18  A.   What page are you at?
19  Q.   So I'm still on page 8.  And if -- if
20  we just pick it up, read it to yourself on
21  page -- start at the top of page 7.  Do you see
22  that on -- on --
23  A.   Yeah.
24  Q.   -- the box?  Read down to the -- to

Page 127

HERSH - CONFIDENTIAL

1   the bottom of page 8.
2   A.   Yeah, I -- I've read it.
3   Q.   Okay.  So you see on page 8, lines 19
4   and 20, where you say "So I don't know how he
5   got in contact, but I'm working on it"?
6       After having reread that, who does
7   the "he" refer to in that sentence?
8   A.   It's -- the logic says Seth Rich, but
9   I don't know.
10  Q.   Okay.  And when you say "But I'm
11  working on it," does that refresh your
12  recollection as to whether you were working on
13  attempting to find out how Seth Rich got in
14  contact with WikiLeaks?
15  A.   The context --
16      MS. GOVERNSKI:  Objection.
17  A.   Yes, just -- just so you know, the
18  context, as I've said many times, the interest
19  totally with Assange was whether or not the
20  Russians were involved in the whole deal, in
21  the whole WikiLeaks thing, as was being
22  alleged.  And that was my interest.  And I
23  presume -- I -- it's very hard to know what's
24  said in one sentence that was said three years

Page 128

HERSH - CONFIDENTIAL

1   ago, more than -- almost -- well, it was May,
2   isn't it, of -- of -- three years ago.  I just
3   don't remember what the context was.  But I --
4   I wasn't working on Rich.  I was certainly
5   working on anything but that.  I was working on
6   Julian, seeing -- on the Russian connection.
7   And by working, I mean I actually made a call,
8   you know, to -- to Julian about it.  It's in
9   the transcript.
10  Q.   Well, so let me ask you this, though.
11  The -- the statements that you're making here
12  on this recording, you are not -- you're not
13  making this up; correct?
14  A.   I'm not what?
15  Q.   You're not making it up.  Not
16  confabulating.
17      MS. GOVERNSKI:  Objection.
18      MR. BOWMAN:  Objection.
19  A.   I don't understand what you mean by
20  that.
21  Q.   Well, when you make a statement, "So
22  I don't know how he got in contact, but I'm
23  working on it," that was -- as far as you can
24  remember, that was a truthful statement; is

Page 129

HERSH - CONFIDENTIAL

1   that correct?
2   A.   Yeah, except -- yes, it's
3   absolutely -- I -- I -- I guess you could say
4   so.  I just don't know.  I really don't
5   remember.  I wasn't working on it in the
6   sense -- normal sense as I was working on my
7   issue, as always, Assange.
8       And, as I said, I -- I have a lot of
9   collateral other information that had nothing
10  to do with the Seth Rich case about Julian and
11  what he was trying to do with the -- with the
12  Gmails and whether he released them or not and
13  who gave it to him and how he got it that have
14  nothing to do with the -- how they originated.
15  But he did -- he obviously did release emails.
16      And there's probably a lot more to
17  that story that has nothing to do with this
18  issue.  But I didn't write anything, so it
19  doesn't matter.
20  Q.   Well, my -- my question is when you
21  were speaking to Mr. Butowsky, you were not
22  making things up.  You were not inventing
23  things on Mr. Butowsky.  Is that --
24      MR. BOWMAN:  Objection.

Page 130

```
1              HERSH - CONFIDENTIAL
2         MS. GOVERNSKI:  Objection.
3      A.    Asked and answered, counselor.  I
4    mean, you know, I was -- I was having a
5    conversation with him that -- that I thought
6    was a private -- I wasn't exaggerating or
7    disputing anything.  I was having a
8    conversation that I thought was private, that I
9    was going to help a friend get a contract.  So
10   I was being -- I was being as nice as I could
11   be, and I was being forthcoming.  But I
12   wasn't -- I can tell you right now, the
13   Julian -- the Seth Rich case interested me only
14   as far as whether Julian was -- how they got
15   released, the emails, was -- was whether or not
16   the Russians had something to do with it, as
17   was -- as was being alleged at that time.  I
18   think around that time.
19        Q.    I -- I understand.  My -- my
20   question, though, is, you were -- you were
21   being -- as far as you could, you were being
22   truthful in speaking to Mr. Butowsky?
23        A.    Of course.
24        Q.    So I'm going to pick up the
25   transcript again.
```

Page 131

```
1              HERSH - CONFIDENTIAL
2         (The clip was played.)
3    BY MR. QUAINTON:
4         Q.    Just so you can follow along, this
5    one's going to start on page 15, line -- line
6    4.  We just heard him say "I can't even begin."
7         A.    Okay.
8         (The clip was played.)
9    BY MR. QUAINTON:
10        Q.    So I think this is what you were just
11   referring to, that you did speak with one of
12   Julian Assange's associates; is that correct?
13        A.    Yeah, I -- I -- I mentioned -- I
14   don't remember her name, but I mentioned the
15   name early -- earlier.  She was one of the
16   people that, when Snowden was in trouble, she
17   flew to Hong Kong and flew back with him.  A
18   young woman.
19        Q.    I see.
20        A.    Moved into that case very quickly and
21   very, I think from his point of view, probably
22   pretty smartly.  And he moved in, and she flew
23   in and flew back to him, to Russia.  She got
24   into Russia, I think.  She was with him,
25   anyway.  And that -- that's the woman I talked
```

Page 132

```
1              HERSH - CONFIDENTIAL
2    to.
3         Q.    And what was that -- that woman you
4    mentioned?  Susan Harrington?
5         A.    No, I don't remember that name, so
6    I'm wrong.  There was another -- Atkins, or
7    something like that.  Somebody named Atkins, I
8    think it was.
9         Q.    Cheryl Atkins.  Cheryl Atkinson.
10        A.    I don't -- I don't know.  Somebody
11   who works for him.  This is all public
12   knowledge.  There -- there would have been --
13   there was a wonderful book written by -- by a
14   British journalist that -- who works for the
15   London Review of Books where I do a lot of
16   writing, and he -- oh, something.  And he did a
17   book and she was all over it.  That's what I
18   remember her from.
19        Q.    And when you asked was there any
20   money in the kid's finances, who is the -- "the
21   kid" in that sentence?
22        A.    Obviously, clearly, I'm talking about
23   Seth Rich.
24        Q.    And why are you asking that question?
25        A.    Again, let me take a look at it.  Oh,
```

Page 133

```
1              HERSH - CONFIDENTIAL
2    yeah.  I was saying, you know, if he -- if he
3    wanted money, was there -- did he ever get --
4    I -- I -- that's a rhetorical question.  That's
5    the way you'd look at it if you were looking at
6    it, you were investigating it.  Did he suddenly
7    show up with a pile of money?  That's always an
8    easy way to do it.
9         Q.    And do you -- do you have any
10   knowledge about any money being --
11        A.    No.
12        Q.    -- paid to any of the Rich brothers?
13        A.    No.
14        (The clip was played.)
15   BY MR. QUAINTON:
16        Q.    I'm just going to -- I'm going to
17   jump ahead because I don't have any questions
18   on -- on this portion.  Let me find the spot.
19        (The clip was played.)
20        MR. QUAINTON:  I'm sorry, I wanted
21   to skip over this.
22        (The clip was played.)
23        MR. QUAINTON:  So this is page 18,
24   line 9 is where we're picking it up
25   again.
```

```
1              HERSH - CONFIDENTIAL
2         (The clip was played.)
3    BY MR. QUAINTON:
4         Q.   So, Mr. Hersh, when you say it was
5    all -- it's always Occam's razor, what do you
6    mean by that statement?
7         A.   You don't really want to know what I
8    mean, do you?
9         Q.   I do.
10        A.   Okay.  What do you think Julian's
11   game was with the -- with the -- with the
12   Gmails and that earlier interview you showed
13   Julian talking with the first reporter in
14   London, and the early stories from The
15   Washington Post about having these documents?
16   What do -- what do you think heuristically,
17   which is the way I think, what do you think it
18   was about?
19        Well, I'll tell you what I thought
20   heuristically.  I thought he was sending
21   Hillary a message.  I got this.  When you get
22   elected, which she looked very good, I want
23   that pardon.  That's what I thought the story
24   was, in case you care at that point.  I
25   couldn't care less about Rich.
```

```
1              HERSH - CONFIDENTIAL
2         I was very interested in that aspect
3    because I know Julian has got an extremely high
4    IQ, and he's quite brilliant.  And his only way
5    out, he knew the end was -- he's going to end
6    up just where he is now.  I -- I -- he could
7    end up -- he could end up going to London.  And
8    London will probably extradite him to here, and
9    he'll probably end up in a jail where there --
10   he might not survive the Marines beating the
11   crap out of him there.
12        And that's -- that's something else
13   that I think is very highly likely, and he
14   certainly knows it.  So he was looking for a
15   way out.  That's what I was thinking about
16   heuristically.  That's -- that was my basic
17   interest in this whole thing.  But I'm not
18   going to get into that with him, and I'm not
19   going to get into that with Larry.
20        I'm getting into it with you because
21   I'm just trying to explain some of the things I
22   was doing because obviously I never wrote
23   anything.  I never said much of anything
24   anymore about this.  I clearly wasn't
25   professionally interested, and -- and that's
```

```
1              HERSH - CONFIDENTIAL
2    what I was interested in.  It's something --
3    it's just what makes me a pretty good reporter.
4    I look at things a little differently than
5    other people.
6         I think Julian had a long game.  And
7    Julian is very smart, really smart, okay?  A
8    lot smarter than most people.  And he had a
9    long game.  His only hope was Hillary winning
10   and letting her know, I got stuff.  That's what
11   the whole thing was.  And I'm just telling you
12   that because -- all right, we just listened
13   to -- to 10 minutes of -- from CNN LIVE,
14   looking at the picture live, of total lunacy,
15   total lunacy.
16        Q.   So I just -- I move to strike
17   everything that you said after you just spoke
18   to -- to 10 minutes of CNN.
19        A.   Oh, I had a hunch you would.
20        MR. QUAINTON:  Okay, let's go on.
21        (The clip was played.)
22   BY MR. QUAINTON:
23        Q.   You said when you first met Julian
24   Assange -- earlier in your testimony, you said
25   you met him once.  Did you meet Julian on more
```

```
1              HERSH - CONFIDENTIAL
2    than one occasion?
3         A.   Do you understand words, sir?  With
4    all due respect.  That's the first time I met
5    him.  That -- it doesn't mean it's the first of
6    20.  It could just as easily mean the first and
7    only time.  The first -- literally, the words
8    mean that's the first time I met him.  I never
9    met him since.  But that's what the words say.
10   They don't say that -- I didn't say the first
11   of a long friendship with the guy.  And I also
12   said I wouldn't go near him when he was in
13   Ecuador.  That's also in the testimony.  So the
14   only way to read that, I had not read [sic] him
15   any other time.  Met him one day.  He came to
16   me.  I was giving a talk at Padula, I think it
17   was, some fancy resort.  And I was giving a
18   talk to a -- an international journalism
19   conference.  And he came up, and -- and I was
20   having a sandwich.  And he grabbed me, and we
21   talked for half an hour.  I found him
22   fascinating, by the way.
23        MR. QUAINTON:  Okay.
24        (The clip was played.)
25   BY MR. QUAINTON:
```

HERSH - CONFIDENTIAL

1
2      Q.   So, Mr. Hersh, you're saying to
3  Mr. Butowsky, I have somebody who will go and
4  read a file for me.
5      A.   Yeah, well, or have a file read for
6  me is another way to interpret it.  I -- I --
7  I'm not saying it happened.  I just have
8  somebody who will read one.  In that case, it
9  didn't happen.  I have people.
10      (The clip was played.)
11  BY MR. QUAINTON:
12      Q.   Now, this person who is unbelievably
13  careful and accurate, that is source one;
14  correct?
15      A.   Yes.  Source one.  I want -- I want
16  to repeat again, as I said earlier in my
17  testimony, I never print anything from source
18  one without force [sic] two and sometimes, if
19  it's really important, source three.
20      Q.   Got it.
21      (The clip was played.)
22  BY MR. QUAINTON:
23      Q.   Now, Mr. Butowsky is kind of pressing
24  you to get a copy of the report.  And you don't
25  tell him, Mr. Butowsky, there is no -- you

HERSH - CONFIDENTIAL

1
2  know, I don't know whether there's a report or
3  not, a physical report.  You -- you -- do
4  you -- do you tell him, Mr. Butowsky, I don't
5  know whether there's a physical report?
6      MS. GOVERNSKI:  Objection.
7      MR. BOWMAN:  Objection.
8      A.   Again, the concept of the word
9  "report" is -- is in -- as -- as I told you, a
10  report to me is not always physical.  And if I
11  left the wrong impression, that's a terrible
12  mistake, and I'm sorry.  But I -- I -- at no
13  time did I think I had -- anybody had seen a
14  report, or there was such -- you know, I have
15  reason to believe there is a report, but I
16  don't have any reason to think -- when my
17  friend says "a report" to me, it doesn't mean
18  he saw a report.  He gets information, and
19  that's called a report in the business by many
20  people.
21      (The clip was played.)
22  BY MR. QUAINTON:
23      Q.   You're mentioning --
24      A.   Wait, wait.  Speak up.
25      Q.   Yes.  In what we just read, you say I

HERSH - CONFIDENTIAL

1
2  never know if there's a --
3      A.   I -- I can't hear you, counselor.
4  Your voice has gone down.  Can you hear me?
5      Q.   -- hear you.  Can you --
6      MR. BOWMAN:  -- hear you.
7      THE REPORTER:  You're very, very
8  hard for me to hear.
9      THE WITNESS:  Who, me?
10      THE REPORTER:  The questioning
11  attorney.
12      THE WITNESS:  Yeah, it's -- the --
13  you've disappeared a little bit.
14      MR. QUAINTON:  The volume is up to
15  the maximum it --
16      THE REPORTER:  No, it's too light
17  for us -- for me to hear you.
18      MR. QUAINTON:  I think it's -- can
19  you hear me at all now?
20      THE REPORTER:  Vaguely.
21      MR. QUAINTON:  What do you suggest
22  I do?  Let's go off the record.
23      THE VIDEOGRAPHER:  The time is
24  2:20 p.m.  We're off the record.
25      (Discussion held off the record.)

HERSH - CONFIDENTIAL

1
2      THE VIDEOGRAPHER:  The time is
3  2:21 p.m.  We are on the record.
4  BY MR. QUAINTON:
5      Q.   Yes, Mr. Hersh, I was asking -- this
6  was on the top of page 22 on the transcript,
7  lines 4 to 5 --
8      A.   Yeah.
9      Q.   -- saying "If there's a marking or a
10  phrase that would trigger who, where it came
11  from," what are you referring to?
12      A.   Well, I -- yeah, earlier in that
13  sentence, in that paragraph, I said I -- I'll
14  tell you something I learned a long time ago.
15  I do have some amazing shit.  I mean, I just --
16  I'm -- I have an office full of documents I've
17  never made public or -- nor will never make
18  public from various agencies just because I
19  never know what marking might be on it or what
20  phrasing might be on it that would trigger who,
21  where it came from.
22      So I was talking -- I mean, that's
23  just -- I -- I think that's the only way to
24  read what I said.  I -- I don't -- because I
25  never know a marking.  I was talking clearly

Page 142

HERSH - CONFIDENTIAL

1  about other things, not only -- you know,
2  just --
3
4       Q.   Mr. --
5       A.   -- generically how I handle stuff.
6       Q.   Mr. Butowsky is asking you about the
7  report, and your answer is, "You know, I never
8  know if there's a marking or phrase that will
9  trigger who, where it came from." So it, just
10  in the context here, it sounds like you were
11  at -- you were responding to his question on
12  page 21, 16 to 17, "Any way we can get our
13  hands on the report?"
14       A.   Well --
15            MS. GOVERNSKI:  Objection.
16            MR. BOWMAN:  Objection.  That's not
17       a question.
18            MR. QUAINTON:  Put a question mark
19       at the end of my statement -- my
20       question.
21       A.   Well, what -- well, what is your
22  question?  Was -- was I talking about a
23  document I've testified repeatedly to I never
24  had, never saw, don't think exists as far as I
25  know?  I'm not sure what my part -- what my

Page 143

HERSH - CONFIDENTIAL

1  source note -- if you're asking about that
2  document, I couldn't have made a -- been
3  responding, talking about markings on it.  So I
4  was -- had nothing to do with that paper.  I
5  was talking generically about what happens with
6  documents.
7
8       Q.   Okay.
9       A.   Again, counselor, a report for me is
10  not always a piece of paper.  In my world that
11  I live in, I -- I don't -- I don't like pieces
12  of paper.  I almost never write it from a
13  document because that could trigger who it goes
14  back to.  So this is just a generic -- it's
15  just a precaution I take, which leads me to not
16  write a lot of stuff I know, not in this case,
17  but in other cases.
18       Q.   I understand your -- your testimony,
19  Mr. Hersh, and -- and I --
20       A.   Yes, well --
21       (The clip was played.)
22  BY MR. QUAINTON:
23       Q.   So here, there's a reference to Flynn
24  you just heard.  Would that be -- would that be
25  Mike Flynn, Michael Flynn?

Page 144

HERSH - CONFIDENTIAL

1       A.   Of course.  Yes, it would be Michael
2  Flynn.
3
4       Q.   So we were going back to try to pin
5  down the timing of this audio.  If you just
6  reread this, I think you testified earlier that
7  your recollection was refreshed that audio had
8  to be after the inauguration because you
9  mentioned Women's March and the -- the pink
10  hats.
11            So here, when you're speaking about
12  what Flynn is going to do, does that help
13  situate when this conversation would have
14  occurred?
15            MS. GOVERNSKI:  Objection.
16       A.   I can't imagine why that would.  Tell
17  me what -- what about Mike Flynn was -- he'd
18  been named in -- in -- in -- he was the first
19  appointee of -- of Trump as National Security
20  Advisor --
21       Q.   He didn't --
22       A.   -- and -- and if he --
23       Q.   Mr. Hersh, he didn't last very long
24  in that role, did he?
25       A.   No.

Page 145

HERSH - CONFIDENTIAL

1            MS. GOVERNSKI:  Objection.
2       Q.   So you would not have said this if he
3  were out of the role of National Security
4  Advisor; isn't that correct?
5       A.   I -- what?
6            MR. BOWMAN:  Objection.
7       A.   I beg your pardon?
8       Q.   If -- if Mr. Flynn has been fired
9  already, you would not say Flynn is going to up
10  that surveillance.
11       A.   But -- but -- but don't we know
12  pretty much --
13            MS. GOVERNSKI:  Objection.
14            MR. BOWMAN:  Objection.
15            THE WITNESS:  Just the --
16       counselor, the --
17            MR. BOWMAN:  That's not what it
18       says, actually.
19       A.   Yeah, we know the -- the conversation
20  took place, it seems like, in May, if I'm -- if
21  I'm -- as I go back into this.  There's --
22  there's evidence that it took place sometime in
23  May.  There was emails written and stuff like
24  that.  I don't quite understand what Flynn --

Page 146

HERSH - CONFIDENTIAL

1    Flynn's problem had to do with it.
2         I knew a lot more of Flynn than I --
3    I -- if -- if you're saying did I know more
4    about the Flynn case then, yes.  I knew the
5    stuff that blew up.  Now, I knew that for
6    years, what Flynn was doing, what he was doing.
7    He was doing bad stuff inside.  Big deal.  I
8    don't --
9         Q.   I'm just trying --
10        A.   I don't understand what the point of
11   the question is.
12        Q.   Point of the question is simply to
13   try to locate -- I mean, to try to get your
14   best recollection of when this conversation
15   occurred.  And I -- I don't believe there are
16   any references to May in this transcript.  We
17   may see something later, but my only -- my only
18   question -- we don't have to belabor this, but
19   I think just you'd agree with me, I think, as a
20   matter of logic, if you're speaking about
21   something Flynn may do in the future, Flynn has
22   not been fired yet.  Wouldn't that be a logical
23   kind of conclusion from what you just said?
24        A.   I --

Page 147

HERSH - CONFIDENTIAL

1         MS. GOVERNSKI:  Objection.
2         A.   I don't know what course you took in
3    Logic 101, but you're not making any sense to
4    me.  That's absolutely a meaningless sentence.
5    Of course I --
6         Q.   Why's that?
7         A.   I didn't -- why?  Because Trump was
8    President now.  Why?  He was out within three
9    weeks.
10        Q.   So why would -- how would Flynn have
11   been upping the surveillance shit if he was out
12   of office?
13        A.   Mr. --
14        Q.   And how can you explain that?
15        A.   Mr. --
16        Q.   How does that make it sound?
17        A.   -- are imprecise words.  I was
18   talking about surveillance on him.  The FBI
19   was -- had wiretapped him, and I knew that
20   already.  It wasn't the NSA.  The wire -- they
21   wiretapped him.  All the stuff that's come out
22   in the press recently about the unwarranted
23   wiretapping and -- on him was done by the FBI,
24   and I -- and I just happened to know that.  And

Page 148

HERSH - CONFIDENTIAL

1    that's all I'm -- that might have been
2    something I -- I -- that's what my reference
3    is.  The surveillance was post surveillance.
4    It wasn't public yet.  I wasn't showing off, I
5    just mentioned it because nobody could
6    understand that.  They're going to up the
7    surveillance.  I'm sure they were talking about
8    the fact that they were all over him.
9         Q.   Fair enough.
10        (The clip was played.)
11   BY MR. QUAINTON:
12        Q.   Again, Mr. Hersh, you say, "I can't
13   get the report."
14        A.   Yep.
15        Q.   Just to be clear, you don't say to
16   him, you don't clarify for him what you're
17   clarifying for us today in this testimony, that
18   what you mean by "report" is not what a
19   layperson like Mr. Butowsky would understand to
20   be a report; is that correct?
21        A.   I -- I -- any interpretation you
22   want.  The report I'm talking about was not
23   necessarily a physical report.  I've said that
24   from the beginning.  That's just what I was --

Page 149

HERSH - CONFIDENTIAL

1    I was consistent with my language.  I'm sorry I
2    didn't say "the putative," but I didn't.
3         (The clip was played.)
4    BY MR. QUAINTON:
5         Q.   Now, when you say, Mr. Hersh, "This
6    is the reason I'm pushing it," what is the
7    antecedent for the word "it"?  What is it that
8    you're pushing?
9         MS. GOVERNSKI:  Objection.
10        A.   My work on whether or not Russia --
11   trying to verify and do something publicly
12   about the fact that the case against Russia was
13   pretty much, in my view, hokum.  That's the
14   only "it" I could think of.
15        (The clip was played.)
16   BY MR. QUAINTON:
17        Q.   Mr. Hersh, at this point in the
18   conversation you appear to shift gears and now
19   you ask Ed Butowsky, do you know anything more?
20        Do you -- do you recall what type of
21   information you were hoping that Mr. Butowsky
22   might know about?
23        A.   Yeah, I have to --
24        MS. GOVERNSKI:  Objection.

```
1              HERSH - CONFIDENTIAL
2        A.   Yeah, sure.  I do.  I also have to
3   add that you wouldn't know somebody as
4   potty-mouth as me read Forsyth, but that's --
5   that's okay.  There are a lot of contradictions
6   in the world.  Yes, I know there -- yes, I have
7   an idea.  Yes.  The answer's yes.
8        Q.   And so what -- what were you trying
9   to -- what information were you trying to get
10  from Mr. -- Mr. Butowsky?
11       A.   Well, Larry told me -- one of the
12  things that induced me to talk to -- to Ed on
13  behalf of -- on Ed's -- on Larry's behalf,
14  besides the fact he's a friend looking for
15  business, Larry told me he knew something about
16  the Russia connection.  And he did not.
17       Q.   So to the best of your recollection,
18  Larry told you that -- that Mr. Butowsky knew
19  something about --
20       A.   No, he said he's been working this
21  stuff for a long time.  And -- and Larry agreed
22  with -- Larry worked for both the CIA, and he
23  had a very big job -- most people don't know
24  this -- in the -- in the State Department on
25  counterinsurgency.  He was basically a player.
```

```
1              HERSH - CONFIDENTIAL
2   And he also was -- for a main -- he was -- he
3   ran war games for the Joint Special Operations
4   Command, which is the most -- one of the most
5   secret units in America.  He ran war -- he ran
6   their war games and spent time abroad doing
7   things.  He was a -- a -- a very interesting
8   guy.  And he knew I was interested in Russia.
9   He was skeptical of Russia and so that's --
10  that's one of the reasons I was being so
11  egregious.
12       Q.   Were you interested in what
13  Mr. Butowsky might know about Seth Rich?
14       A.   -- guy, and he would share what he
15  knew.  No, I didn't care about Rich.
16       Q.   You -- you didn't -- you -- when --
17  so when you spoke to him, when you were asking
18  him what do you know, do you know anything
19  more, your testimony is you were -- you were
20  not interested in what Mr. Butowsky might know
21  about Seth Rich?
22       A.   I -- I can't remember any specific
23  sentence.  I've read the transcript.  I know
24  what my interest was.  And one of the reasons I
25  did call him was because I was told he had
```

```
1              HERSH - CONFIDENTIAL
2   some -- he had some very -- he had been working
3   in the Russian -- and -- and there's some
4   evidence that he did have some information
5   about it.  At least he said he did.  I was
6   hoping to convince him I was a good guy and you
7   could share with me.  I -- I -- I didn't -- my
8   mistake was I didn't know much about him.  I
9   only knew that he was a wealthy man who helped
10  out the football players in -- of the -- the
11  Denver Cowboys if they ran into money trouble.
12  I read a few clips on him, and he was a very
13  generous man, the whole football players that
14  ran into trouble.  So I thought he was a pretty
15  good guy.  Oil guy.
16       (The clip was played.)
17  BY MR. QUAINTON:
18       Q.   This is page 29, line 12?
19       A.   Yeah.
20       Q.   Tell -- "Tell me what you know."  To
21  the best of your recollection, what -- what
22  you're interested in is Russian hack and not
23  Seth Rich specifically.  Is that -- is that
24  fair?
25       A.   Well, the --
```

```
1              HERSH - CONFIDENTIAL
2        MS. GOVERNSKI:  Objection.
3        A.   That was -- there -- there were --
4   I -- it -- it was a conversation three years
5   ago.  I have a lot of conversations with people
6   like this, and I -- you always try to en --
7   en -- enchant them into information.  And --
8   and there's no question that Ed -- I -- I'm
9   just reading on for a couple pages where he
10  says, "And then the whole thing came up about
11  the hacking with the Russians."  And I was --
12       Q.   Well, let's get --
13       A.   -- looking --
14       Q.   -- to that.
15       A.   -- looking at what happened.  I mean,
16  it was clear that's what I was interested in.
17  And --
18       Q.   Well, let's --
19       A.   -- too.
20       MR. BOWMAN:  Please let the witness
21       answer the question.
22       A.   He says so later in the -- on -- two
23  pages later.  I just happened to be -- while we
24  were watching CN LIVE, I happened to read some
25  more of your transcript.  He said, well, right
```

HERSH - CONFIDENTIAL

1    there.  I mean, it sort of answers your own
2    question, you know.  I got into this, he said,
3    because the whole thing came up over the
4    hacking with the Russians, and I happened to
5    have been looking into it when it happened.
6    And I was -- you know, and I thought he -- I --
7    I -- I thought he actually -- I -- I thought he
8    was a lot smarter than I think he turned out to
9    be, or at least smarter about this, this issue.
10   And so that's the genesis of what happened.
11   Very little to do with Rich, but there you go.
12        Q.   Mr. Hersh, I'm going to -- I'm going
13   to move to -- to strike that as nonresponsive
14   from everywhere you said you've seen two pages
15   ahead.  Let's just go ahead.
16        (The clip was played.)
17   BY MR. QUAINTON:
18        Q.   So, Mr. Hersh, when you respond to
19   the information from Mr. Butowsky that Julian
20   Assange -- that Julian Assange had received
21   emails from Seth Rich, you respond, "Whoa."  So
22   would you -- would you -- is it fair to say
23   that you were interested in that information
24   that was being communicated to you?

HERSH - CONFIDENTIAL

1        A.   It is fair to say I -- I wonder
2    what --
3             MS. GOVERNSKI:  Objection.
4        A.   Well, are -- I did see I asked a
5    couple lines later, was he trying to make her?
6    That's all he thinks about, so --
7        Q.   Yeah, Mr. Hersh, I'm not talking
8    about a couple --
9        A.   That's my --
10       Q.   -- lines later.
11       A.   -- response to that.  My interest in
12   that was -- was, I guess, you know, in the
13   gutter maybe.
14       Q.   Your interest was -- so --
15       A.   Are you going to strike that, please?
16       (The clip was played.)
17   BY MR. QUAINTON:
18       Q.   Just to be clear, so the -- the
19   record is clear, at this point in the
20   conversation, there's -- there's nothing
21   salacious being discussed, is there, just in --
22       A.   I'm ahead -- I'm sorry, I got ahead
23   of you.
24            MS. GOVERNSKI:  Objection.

HERSH - CONFIDENTIAL

1        Q.   Please don't skip ahead.  Just where
2    we are now.  In what Mr. Butowsky is telling
3    you on page 29 from lines 18 to 22, there's
4    nothing salacious or scurrilous in those four
5    lines, is there?
6             MS. GOVERNSKI:  Objection.
7             MR. BOWMAN:  Objection.  The record
8        is what it is.
9             MR. QUAINTON:  My question is what
10       it is.
11       A.   Well, I could just answer by saying
12   look, when I'm -- when I'm told that Julian
13   Assange told a friend of mine who told somebody
14   else who told somebody, and I go whoa, I'm
15   getting into -- I was -- I knew I was getting
16   into la-la land, if you want to know the truth,
17   period.  That's all.  What can I tell you?
18   That, I do remember.  We got into la-la land
19   pretty quickly when he starts talking about
20   somebody who told somebody who told somebody,
21   so there we go.  I mean, you know, I -- I
22   honestly -- I hate to tell you this.  I didn't
23   take this all very seriously.  And I would have
24   passed it if he hadn't put it on the air, but

HERSH - CONFIDENTIAL

1    he did.
2        Q.   Okay, so --
3        A.   No, so my --
4        Q.   So you didn't put much credence in
5    what he just told you there; is that --
6        A.   When someone --
7        Q.   -- correct?
8        A.   When somebody you -- I'm told knows a
9    lot about something by a friend of mine that
10   would -- works -- worked at very high levels --
11   Larry was not a small fry in the intel
12   community -- says, I got a guy that knows a
13   lot, and he says I know somebody who told --
14   Assange told somebody who told a friend of
15   mine, I say, whoa, Larry what are you getting
16   me into?  That "whoa" tells me a lot.  I
17   remember that.  I remember the "whoa."  You
18   know, la-la land.
19       Q.   All right.
20       A.   But there --
21       Q.   Not -- not -- no -- there was no
22   genuine interest in what he was telling you, is
23   that fair, at that point in the conversation?
24       A.   Oh, no, I --

Page 158

```
1              HERSH - CONFIDENTIAL
2         MS. GOVERNSKI:  Objection.
3      A.    It -- it -- it didn't matter whether
4  it was genuine interest.  At that -- that kind
5  of -- there was certainly no interest in those
6  kind of statements, you know.  It's thirdhand
7  information, secondhand information.  There
8  just wasn't any interest.  "Whoa" is -- I mean,
9  I -- I didn't want to be rude to the guy, okay?
10     Q.    There was no interest in --
11     A.    He didn't know what I thought he
12 knew, and -- and -- and -- and this -- it --
13 it -- it doesn't matter whether -- we are where
14 we are.  So keep on asking questions, and the
15 answer is I -- I -- I thought -- I was told he
16 had done a lot of work on the Russia deal,
17 and --
18     Q.    I'm --
19     A.    -- I'm --
20     Q.    Yeah, I'm just trying to make clear
21 that the -- leaving aside the -- the second- or
22 thirdhand aspect of what Mr. Butowsky says to
23 you, the -- the content of what he has
24 communicated, that he has information about
25 Seth Rich giving the emails to Julian Assange,
```

Page 159

```
1              HERSH - CONFIDENTIAL
2  that content was not interesting to you.  Is
3  that -- I just want to make sure I understand
4  your testimony.  Is that -- is that true?  The
5  content --
6         MS. GOVERNSKI:  Objection.
7         MR. BOWMAN:  Objection.
8      Q.    -- of what Mr. Butowsky was
9  communicating was not interesting to you?
10     A.    As -- as it -- the whole thing wasn't
11 interesting to me as a journalist.  It was
12 interesting that he said that about Assange,
13 because I did -- I did go and wonder what --
14 you know, I told you I was interested in -- in
15 what Assange was doing.  And I called somebody.
16 And that name that's in the transcript of Sarah
17 Harrison, is -- would that -- is that the name
18 you were talking -- did you mention that
19 earlier?
20     Q.    Susan Harrington?  Was that it?  Or
21 Susan Harrison?
22     A.    I had it -- I had it wrong.  It was
23 Sarah Harrison.
24     Q.    Sarah?
25     A.    Yeah, Sarah's the one I -- Sarah was
```

Page 160

```
1              HERSH - CONFIDENTIAL
2  the -- she's the one I think that flew down
3  with -- with Snowden.  And I -- I -- I know a
4  lot about Snowden.  I mean, I -- I talked to
5  him in Moscow and stuff like that.  That's a
6  separate issue.  And so I was interested in
7  if -- if Sarah had actually said something like
8  that, that would be interesting to me.  And I
9  called and the -- the answer was, you know, the
10 answer was no.
11     Q.    I see.
12     A.    I just called --
13     Q.    And you thought he was -- thought he
14 was referring perhaps to Sarah Harrison.  He
15 was -- you thought Mr. Butowsky was perhaps
16 referring to Sarah Harrison?
17     A.    No, no, no.  The woman he was
18 referring to, I don't know.  I mean, the -- the
19 name Ratner came up much later in all their
20 conversations, Ellen Ratner.  But I -- I never
21 met her and I never talked to her, so I didn't
22 know that name then.  But I did know Sarah,
23 because -- I just knew Sarah, because she was
24 very close to Julian in the whole process.  As
25 I said, she's the one that took Snowden -- flew
```

Page 161

```
1              HERSH - CONFIDENTIAL
2  with him, Hong Kong.  So I was -- and I did get
3  called -- I did use people to get to him.  I
4  thought it would be a good idea for him if he
5  just told somebody Russia didn't do it if the
6  Russians hadn't do [sic] it.  But I, you know,
7  I also knew he had some other game going and
8  that he was never going to give it up, because
9  I -- I was pretty sure his game was the -- the
10 big play with Hillary.
11        Look, I didn't like Hillary at all.
12 And the only thing about Trump that interested
13 me was, unlike Hillary, he didn't call Putin a
14 Hitler.  She did.  And I -- I just thought the
15 only thing once -- I did -- I wrote -- wouldn't
16 vote for Trump in a hundred years, so once he
17 got in, I thought the only saving grace for
18 this guy would be that he was going to listen
19 to Maddis, who was a lot smarter than people
20 think.  He's a -- he's actually a -- a scholar
21 on things like the Peloponnesian War and
22 ancient history.  He really is quite, quite
23 sophisticated on it, reads a lot on it.
24        You know, Marines are strange people.
25 You know, a lot of them wanted to be priests
```

Page 162

HERSH - CONFIDENTIAL

1
2  and -- and popes, but they ended up joining the
3  priesthood, which was the Marine Corps, and so
4  it's another priesthood.  And so that was my
5  interest in -- in -- in -- in -- the ultimate
6  interest in this once I started talking to the
7  guy.
8       Q.   Okay.
9       A.   You can strike that.
10      (The clip was played.)
11 BY MR. QUAINTON:
12      Q.   So we're on top of page 32 of the
13 transcript, line 8.  Sorry, line 7.  "So I have
14 a -- a -- what they call long-form journalism."
15 Could you just explain to me, what is -- what
16 is long-form journalism?
17      A.   Well, you see there I was writing --
18 I said it was a Brennan operation.  And if you
19 paid attention to what's been written about the
20 investigation going on about Mr. Durham, about
21 who you asked me about, who's the -- the --
22 Democratic prosecutor who's doing the
23 investigation into alleged abuses basically by
24 the Democrats, really about the CIA now, you'll
25 see that that's what I was talking about.

Page 163

HERSH - CONFIDENTIAL

1
2       I knew a great deal about it three
3  years ago, and that's just what I do.  I just
4  collect information because it leads me to
5  other information if I wait and get a
6  narrative.  In other words, for me, a -- an
7  ordinary story is 7- to 10,000 words.  It's not
8  just a 1,500-word news story telling --
9  repeating what somebody told you yesterday
10 in -- you know, somebody in the government gave
11 you.  And so that's what I do.  And so my
12 intention all along -- this -- this whole thing
13 emerged out of -- out of -- of the -- the -- my
14 only information was what it -- what I wanted
15 to get, besides being nice to Larry, is I
16 thought if -- if this guy had some information.
17 And he did say he didn't think it was the real
18 thing, but I didn't find that very credible.  I
19 didn't think he knew anything credibly, and so
20 there we are.
21      But what I did say in -- in that
22 conversation with him was on -- online when we
23 looked at it -- haven't looked at it in two
24 years until I read this.  What I did say is, I
25 hate to tell you, it's going to be -- it's

Page 164

HERSH - CONFIDENTIAL

1
2  going to be a real problem for the Democrats if
3  it comes out before the election, which it may
4  not.
5       Q.   So was that --
6       A.   I was just in a different world than
7  you think I was at this point.  But you want to
8  strike that too.
9       Q.   No, I don't want to strike it.
10 I'm -- I -- I'm not -- I find it -- I -- I
11 don't want to strike it at all.  I want to
12 just -- I just want to ask you some more
13 questions about -- and, you know, the language
14 is what it is, but about how the -- the whole
15 fucking thing began.  And -- and I guess the
16 question I had is --
17      A.   What part are you talking about?
18      Q.   This is page 32, line -- lines 8 --
19      A.   Yeah, I see.  I got it, where the
20 whole fucking thing began, it's a Brennan
21 operation, yes.
22      Q.   What -- what are you referring to
23 there?
24      A.   I probably knew in August of 2016
25 that there was a -- a very dumb paper

Page 165

HERSH - CONFIDENTIAL

1
2  circulated by somebody in the -- what's the
3  name of that -- the -- it's -- it's the Cabinet
4  level, that -- that controls the --
5       Q.   FBI?
6       A.   What?
7       Q.   No, that's not --
8       A.   The one that controls the TSA.  What
9  is it called?
10      MR. BOWMAN:  The FBI?
11      A.   No, no, no, no, no.  Much lower.  The
12 Cabinet level that was created after 9/11.  It
13 was a big Cabinet and they put all of these --
14      Q.   Homeland?
15      A.   Homeland Security.  Homeland Security
16 had a SIGINT operation.  They had a signals
17 intelligence operation and they circulated --
18 I'm just going to give you a long answer
19 because you asked me a question.  They
20 circulated a paper in late August saying that
21 they had reason to think two precincts were
22 broken into.  It looks like they -- they
23 were -- came from Russia break-ins for which
24 there was no evidence.  Somebody broke in,
25 hacked into two precincts, get -- getting the

Page 166

```
 1              HERSH - CONFIDENTIAL
 2    names of the people registered, or something
 3    like that.  One was in Arizona, the other one
 4    was in Illinois or some -- middle west
 5    somewhere.
 6              And so they circulated a paper
 7    that -- to the agencies that was just a
 8    unclassified paper.  And Brennan made a big
 9    push on it.  Classified, it's an issue, let's
10    get on this.  And that's the first time I got
11    interested in what the hell's going on here?
12    What the -- what's -- you know, it's a long
13    story, but the CIA is a Cold War agency.  And
14    the way you make money and get budgets in the
15    CIA is you have to have a Russian enemy.
16    That's what it's been -- that's what it's been
17    for 50 years.  If there was no KGB and no CIA
18    we'd be better off.  They both were playing
19    against each other.
20              So you create a Russian threat.  You
21    know, we're a country that said in -- to Jack
22    Kennedy had -- in -- his campaign said
23    the -- the Russians have 2,000 missiles when
24    they had three.  Three.  Three, maybe four.  I
25    mean, that's the kind of stuff that goes on.
```

Page 167

```
 1              HERSH - CONFIDENTIAL
 2    And so that's what I was doing.  I was always
 3    interested in that.
 4              And once she won -- once she lost,
 5    there was not much I could -- I still keep -- I
 6    still follow it, but I -- I don't think I'll
 7    ever write anything.  I found bits that
 8    troubles me, but that's the way it goes.  And
 9    so I just collect stuff.  That's what I --
10       Q.   So --
11       A.   -- do.  It's a great job I have.  I
12    can just do what I want, sit in my office and
13    read stuff and call people.  And, yeah, fucking
14    cocksucker Rogers was telling them we knew what
15    was in the GRU.
16       Q.   Well, let's -- before we get to that,
17    I mean, you are -- you already --
18       A.   You got what you need, don't you,
19    lawyer?  I mean, you got --
20       Q.   My name is Eden.  But I'm almost done
21    with this.  And -- and -- and no, I'm not quite
22    finished.
23              When you say "It's a Brennan
24    operation," are you -- just specifically, are
25    you referring to the Russian hacking --
```

Page 168

```
 1              HERSH - CONFIDENTIAL
 2       A.   No.
 3       Q.   -- narrative?
 4       A.   I'm referring to the fact it was a
 5    formal CIA disinformation operation that the
 6    stupid Brennan created with a budget and a --
 7    and a point and involved a lot of falsehoods.
 8    The FISA court has it.  Durham -- Durham has
 9    it.  They're probably not going to prosecute a
10    former CIA Director because he has too much
11    information about operations.  He's not
12    necessarily out to screw the -- American or
13    violate national security, he just wanted
14    payback after Trump won.  But they started
15    keeping -- that's -- that's what was going on.
16              And Rogers, the NSA guy, was involved
17    in telling certain people that -- oh, even
18    Putin himself was directing this, the leaks.
19    Putin himself, the -- the picture that Putin
20    himself, you know -- you know, counselor --
21    counselor, listen a second.  We had a bounty
22    story.  The Taliban were being paid for every
23    American they kill.  So me, I would look at it
24    and say, well, so what is -- I mean, the
25    Russians were doing it.  Never mind that we've
```

Page 169

```
 1              HERSH - CONFIDENTIAL
 2    had stories for 10 years that the Russians are
 3    supporting the Taliban because the Taliban
 4    created a lot of poppy, which turns into --
 5    to -- to heroin that's driving -- that's a big
 6    issue for the Russians.  Much worse.  They're
 7    polluted with it.
 8              So they gave them money to stop them
 9    from farming, and they also gave them money
10    because the Taliban don't turn out to like
11    people like ISIS.  They don't like crazies.  So
12    the Russians are doing the same thing we would
13    do.  And so what -- what can I tell you?
14    The -- the -- the fact of the matter is the
15    questions you would ask if I'm in the New York
16    Times and somebody in government tells you
17    they -- they're collecting body -- the Taliban
18    are very mercantile.  So I say, okay, so what
19    is it?  If you get an ear of -- of an American
20    commando and you take it to Moscow, is that 50
21    rubles?  Or if -- if -- if they get paid for a
22    body, an American body, do you have to deliver
23    it personally to Putin, or -- or can -- can you
24    use an iPhone picture?  That's the kind of
25    questions I would ask about this.
```

Page 170

```
 1              HERSH - CONFIDENTIAL
 2        Three Americans have been killed
 3  in -- in the Taliban -- in the war in
 4  Afghanistan in the last nine months.  I mean,
 5  believe me, if there was a bounty on Americans,
 6  we'd be flooded with dead Americans.  The
 7  Taliban would be ripping them off even for 200
 8  bucks a body.  I mean, it's just a crazy story.
 9  So I know these things.  I can't always write
10  them, but I know it.  I knew the Russian thing
11  was bad, so I was interested in Ed, and I
12  thought maybe he knew something because Larry
13  suggested to me very strongly he did.  And
14  Larry wanted me to call him because Larry was
15  trying to get a contract.
16        THE REPORTER:  I'm sorry, sir, I
17     must ask you to slow down.
18        THE WITNESS:  Okay.
19        THE REPORTER:  And counsel, I will
20     need a break soon.  Thank you.
21  BY MR. QUAINTON:
22     Q.  Okay, let -- let -- sorry.
23  Mr. Hersh, I -- I appreciate -- and I'm not
24  going to strike it from the record.  I
25  appreciate that you're interested in the bounty
```

Page 171

```
 1  story.  And just for the record, I think it's
 2  bullshit as well.  But that is not why we're
 3  here today.  The reason that we're here --
 4        MS. GOVERNSKI:  Objection.
 5     Q.  The reason we're here is the
 6  transcript and the audio of the conversation
 7  you had with Mr. Butowsky.  And in that, one of
 8  the things that you say is that -- this is on
 9  32, lines 11 and 12 -- is, "It was an American
10  disinformation."  And I'm just trying to make
11  sure I understand what you're referring to
12  there.  You say, "It was an American
13  disinformation."  Is the -- is the antecedent
14  to "it" the Russian hacking, Russian
15  influencing the elections?  Is that what the
16  antecedent to the "it" is?
17     A.  I -- I -- I --
18        MS. GOVERNSKI:  Objection.
19     A.  Just so you know, I mean, I -- I -- I
20  just -- my reading the line before, it was a
21  Brennan operation, I just told you, sort of
22  that long soliloquy I just gave you sort of
23  answered that question.  That's what I was
24  talking about.  I wasn't talking about Seth
```

Page 172

```
 1              HERSH - CONFIDENTIAL
 2  Rich in any way.  I was talking about the
 3  Russian thing.  And I was very horribly
 4  troubled by that because it existed as a fact.
 5  And not that I like to -- I shouldn't say that
 6  much, but that's the way it is.
 7        MR. QUAINTON:  Let's move on.  So
 8     we're going to -- we're -- court
 9     reporter needed a break.  We'll be done
10     very soon.
11        (The clip was played.)
12  BY MR. QUAINTON:
13     Q.  Mr. Hersh, you say here, "I have been
14  doing this story because I smelled it in -- in
15  late August."  Are you -- what are you
16  referring to when you say "I have been doing
17  this story since late summer"?
18     A.  I -- I think I just told you.
19        MR. BOWMAN:  Objection, asked and
20     answered, but you can answer it again.
21     A.  Yeah, I told in you late August I
22  first ran into some evidence that the Homeland
23  Security people were circulating a -- a paper
24  about some break-ins at some precincts.
25  That's -- that's the reference to it.  I -- I'm
```

Page 173

```
 1              HERSH - CONFIDENTIAL
 2  totally talking about Russia at this point.  I
 3  mean, that -- done with Butowsky, with that --
 4  the kid.
 5     Q.  Okay.  And when you say "the kid,"
 6  you mean Seth Rich?
 7     A.  Yeah, I'm done with that story.  And
 8  by the way, you did notice that I -- you
 9  didn't -- you know, I -- I also -- it doesn't
10  matter.  Let's go on.  You're -- you're --
11  you're doing this.
12        (The clip was played.)
13  BY MR. QUAINTON:
14     Q.  On the top of page 36, lines 1
15  through 4, when -- when you say that you'll
16  push him hard, push Mr. Butowsky hard, asks if
17  anybody -- if he knows somebody that Julian
18  said it to, do you recall what you were
19  referring to in that sentence when you said --
20        MS. GOVERNSKI:  Objection.
21     Q.  -- could you tell me that you know
22  somebody that Julian said it to?
23     A.  "I'm going to push you hard."  Oh,
24  yeah, the -- the -- I -- I think I was
25  referring, he said that there was some woman
```

Page 174

HERSH - CONFIDENTIAL

1    who claimed that Putin -- somebody --
2    secondhand stuff, you know.  I said that I'm
3    not going to expose any -- I -- I -- I was
4    telling him I'm not writing anything about
5    this, but I guess that's what he says.  I mean,
6    I don't know.
7         MR. QUAINTON:  All right.  Let's go
8    on.
9         (The clip was played.)
10   BY MR. QUAINTON:
11        Q.   So this is the last series of
12   questions I have on the audio.  Page 39, lines
13   6 to 8, "I can tell you right now that Maddis
14   knows what I know."  Can you -- can you explain
15   what you meant by those lines?
16        A.   I can, but I can't, so there we are.
17   It has nothing to do with the Rich case.  It
18   has to do with Russia.
19        Q.   So, I'm sorry, are you -- I don't --
20   I didn't hear an objection.
21        So my question is, what did you mean
22   by "I can tell you right now Maddis knows what
23   I know"?
24        MR. BOWMAN:  Witness is asserting

Page 175

HERSH - CONFIDENTIAL

1    the privilege.
2         A.   Yeah, come on, come on, you know?  I
3    told you that I get information, and I can
4    check it with other people.  And I've always
5    had somebody high up in the government.  And
6    I'm not saying it's Maddis, but I always had
7    somebody, even in the Bush/Cheney White
8    House -- you probably don't know all the stuff
9    I wrote about Bush secret operations in Iran
10   and crap like that.  By the way, that are going
11   on again by Americans and blowing up stuff
12   there, which is quite outrageous.  But anyway,
13   I've always had other people.  So I'm not
14   suggesting necessarily in this case Maddis knew
15   anything, but he knows generally.  When he was
16   inside, he knew what I was doing.  That's --
17   that's -- that's the way it works in the
18   Washington business, that's all.  I -- it's not
19   about any -- him telling me anything.  That, I
20   never do.  It's me saying what I'm doing and
21   making sure I'm not screwing up and getting
22   some Americans killed.  That's what the whole
23   point is.  That's why I don't write a lot of
24   things I should know.  It's not about the

Page 176

HERSH - CONFIDENTIAL

1    Russia stuff and not about Seth Rich.  That's
2    all peripheral.  But there's other things I
3    know that get -- that could get guys killed in
4    the field, and I don't write that, which is one
5    reason people don't talk to me on the inside.
6    They know that.
7         Q.   Let's go down to line --
8         A.   My god.  Which one?
9         Q.   Line 13.  Page 39, line 13.  And you
10   say, "It doesn't make it true," and I -- I'd
11   just like to just unpack that a little bit, if
12   we could, without getting too metaphysical.
13   I'd just like to establish what we can say with
14   some certainty is true, if you'll just bear
15   with me.  And just if -- if you agree with me,
16   let me know.
17        Is it true that you had a
18   conversation with Edward Butowsky sometime in
19   the course of 2017 when you discussed Seth
20   Rich?  Is that a true statement?
21        A.   Absolutely.  Yes.
22        Q.   And in the course of that
23   conversation, is it a true statement that you
24   relayed to Mr. Butowsky certain information

Page 177

HERSH - CONFIDENTIAL

1    that you had heard about Seth Rich?
2         MS. GOVERNSKI:  Objection.
3         Q.   Is that a true statement?
4         A.   Yes.  I did relay to him certain
5    things I'd heard about it, and -- and with the
6    caveat that, you know, it could be true or
7    could not be true, as I said later.
8         Q.   But wait.  But is there --
9         A.   But I certainly did relay
10   information.
11        Q.   Okay.  Now, let's try to be --
12   without -- let's just get into the -- just very
13   narrowly, it's true that you had a conversation
14   with Ed Butowsky during which you relayed
15   certain information about Seth Rich that you
16   had heard from another source.  Is that a true
17   statement?
18        A.   Yes.
19        MS. GOVERNSKI:  Objection.
20        Q.   And is it a -- and it's a true
21   statement, is it not, that you actually had
22   your real conversation with a real human
23   being -- might be male, might be female -- who
24   transmitted information to you about Seth Rich,

Page 178

HERSH - CONFIDENTIAL

1    HERSH - CONFIDENTIAL
2    the tenor of which you then transmitted to
3    Mr. Butowsky?
4              MS. GOVERNSKI:  Objection.
5         A.   That's -- that's what I said.
6    That's -- that's -- that's in the transcript.
7    That's --
8         Q.   That's -- what I just said, that
9    is -- that is true; correct?
10        A.   It's -- it's on a tape, sir.
11        Q.   And just so -- just so the record is
12   clear, that what I just said to you, my -- that
13   was a true statement.
14        A.   It's on the tape, sir.
15        Q.   Okay.  We're -- we're looking at
16   the -- we're looking at the language here,
17   "doesn't make it true."  And this language has
18   given rise to lots of controversy and is, in
19   fact, one of the reasons why there's a -- a
20   lawsuit here.  And --
21             MS. GOVERNSKI:  Objection.
22        Q.   And this is -- and so I'm trying to
23   really understand and really drill down into
24   what it means when you're saying "it doesn't
25   make it true," okay?  So I am just -- and I --

Page 179

1    HERSH - CONFIDENTIAL
2    I -- I appreciate your frustration.  I'm just
3    trying to be very precise.
4              So is it a true statement that you
5    spoke with a high-level source sometime before
6    your conversation with Mr. Rich, who -- to
7    whom --
8         A.   Wait, somebody just -- wife just
9    opened the door and said, "What are you doing?"
10   And so start that question again.  Can you do
11   it a little quicker?
12        Q.   I -- I'll try.  And when I think,
13   I -- I -- I speak slowly when I'm thinking, so
14   I apologize.
15             Is it a true statement that you spoke
16   to a high-level individual sometime before you
17   spoke to Mr. Butowsky, who told you that he or
18   she had been given information about Seth Rich
19   transmitting emails to WikiLeaks?  Is that a
20   true statement?
21             MS. GOVERNSKI:  Objection.
22        A.   It's -- it's in the transcript.
23        Q.   But if you could just answer my
24   question.  Is what I said, is that a true
25   statement?

Page 180

1    HERSH - CONFIDENTIAL
2         A.   Yes, it's absolutely a true
3    statement.  I was told -- told something about
4    Seth Rich by this high-level source.
5         Q.   So -- so you had a conversation with
6    a real human being who was a real high-placed
7    source who represented that he or she had
8    received information pertaining to Seth Rich --
9    Seth Rich's transferring of emails to
10   WikiLeaks, which you then communicated to
11   Mr. Butowsky.  All of that is true; correct?
12             MR. BOWMAN:  Objection, asked and
13        answered.  You can answer.
14        A.   Well, as I said, it doesn't make it
15   true.  It's true that I had a conversation.  It
16   doesn't --
17        Q.   Well, all I'm --
18        A.   -- make the statement true, and --
19        Q.   Well, that's --
20        A.   -- that's what I --
21        Q.   -- what I'm trying to --
22        A.   What I --
23        Q.   I'm not trying to catch you, I'm
24   going to give you a chance to --
25             MR. BOWMAN:  Let the witness answer

Page 181

1    HERSH - CONFIDENTIAL
2    the question.  Counsel, let the witness
3    answer the question.
4         A.   Why are you arguing with me about it?
5    I -- I said it's in the transcript.  I said
6    because it's said doesn't make it true.  That's
7    the way I do my journalism.  And so I -- you
8    know, I -- I -- I don't quite understand what
9    you're getting at.  I mean, I had a
10   conversation.  There's -- it's on the tape.  It
11   speaks for itself, period.
12        Q.   So what I'm trying to do again, just
13   to be clear, I'm trying to separate out --
14        A.   Repeat the question.
15        Q.   -- what is true and what isn't true,
16   okay?  So I think we established what is true.
17   The only -- the -- so if -- if I say what --
18   what is not true, what -- what -- let me
19   backtrack.  When you say it doesn't make it
20   true --
21        A.   It's -- it's what I said to
22   Mr. Butowsky which is really important to me.
23        Q.   Yes.  Well, let me finish my -- my
24   question, if I could.
25        A.   Okay.

Page 182

HERSH - CONFIDENTIAL

1
2        Q.   You -- you are not telling him that
3    the information that you have received from a
4    high-level source about Seth Rich's transfer of
5    emails to WikiLeaks is false.  You are not
6    telling him that; correct?
7        A.   Seen?  Seen?
8        MS. GOVERNSKI:  Objection.
9        A.   What does that mean?  I saw nothing.
10   I've seen nothing in that case.  It was just
11   something said to me discursively that I
12   mentioned, I happened to repeat to Larry when
13   we were playing golf one day, that he told me
14   I -- he was involved in Butowsky; otherwise,
15   it never would have been -- it's just something
16   that was said that I went on with life.
17       MR. QUAINTON:  Actually, could the
18   court reporter read back the question?
19       THE WITNESS:  You said "seen."
20       MR. QUAINTON:  Could you read back
21   my question, please?
22   (The reporter read from the record as
23   follows:  "You are not telling him that
24   the information that you have received
25   from a high-level source about Seth Rich's

Page 183

HERSH - CONFIDENTIAL

1
2    transfer of emails to WikiLeaks is false.
3    You are not telling him that; correct?")
4        THE WITNESS:  So is that -- that
5    the question?  I thought it was a
6    different question.
7    BY MR. QUAINTON:
8        Q.   That was the same one.  The verb that
9    I was using was "received," not "seen."  So
10   you -- you just -- you answered the question as
11   though I had asked you whether you had -- you
12   had seen that, which was not the question I
13   asked.
14       A.   I see.  My apologies.
15       Q.   The question I asked was whether
16   the -- whether you are saying to Mr. -- to
17   Mr. Butowsky, that the information you had
18   received was false.  Were you saying that to
19   him?
20       MS. GOVERNSKI:  Objection.
21       A.   Yeah, I -- I don't -- say that again,
22   please.  You're -- you're -- you're -- you're
23   trying to push me into something that I don't
24   quite understand.  So what are you saying?  I
25   mean, it's -- there's a -- there's a -- there's

Page 184

HERSH - CONFIDENTIAL

1
2    a transcript here, counselor.
3        Q.   I'm not trying to push you into
4    anything.  I'm trying to make --
5        A.   So try it --
6        Q.   -- sure that I understand --
7        A.   -- again.
8        Q.   -- exactly --
9        A.   Repeat it.
10       Q.   Okay.  So my -- did you understand my
11   question?
12       A.   Yes, but I -- you're making an
13   assumption that because I hear it and because
14   he tells me, I automatically think that's
15   absolutely right when I've told you two or
16   three times I always go, when I'm anywhere
17   halfway seriously, even with the best of
18   sources, I always go to somebody totally else.
19   In one case, it's across the country.  I always
20   go to verify that kind of information.  So this
21   was information that I -- I -- he's an
22   honorable guy.  I took it seriously.  But that
23   doesn't mean I was anywhere -- you know, it --
24   it -- it wasn't written in -- it -- it's not --
25   it's not the Bible, it's just what somebody

Page 185

HERSH - CONFIDENTIAL

1
2    said to me about a report that he had not seen
3    and he did not get from somebody in the FBI.
4    And as has been -- been repeated a million
5    times by people who write about this in the
6    beginning, there was -- I never mentioned I
7    ever talked to anybody in the FBI.  There was
8    no firsthand information.  And so you're just
9    asking me to -- to say what's on the record.  I
10   mean, but I'll be glad to say -- ask -- ask the
11   question again.  I'll be glad to say yes, it's
12   in the -- it's in the transcript.
13       Q.   I'm just trying to be -- I'm just
14   trying to be clear.  And I think we're
15   almost -- we're almost there.  The information
16   that you received -- R-E-C-E-I-V-E-D -- that
17   you received from the trusted source that you
18   relayed to Mr. Butowsky, you were -- you were
19   not saying that information -- that you knew
20   that information to be false.  Isn't that --
21       A.   Well --
22       Q.   -- a true statement?
23       A.   I see what the trouble was.
24       MS. GOVERNSKI:  Objection.
25       A.   All right, let me just give you the

HERSH - CONFIDENTIAL

1  trouble with your sentence, that I received.
2  Let's put it this way.  The information that I
3  was offered or that was relayed to me from a
4  trusted source, I didn't ask about it.  It was
5  just something we were -- he just started
6  chatting about it, that's all.  And he happened
7  to mention that, that's -- period.  We were
8  chatting.  I wasn't reporting on it.  It was
9  all peripheral, period.
10         And as I said, I didn't take notes
11 because I wasn't interested in it.  I do take
12 notes most of the time.  Sometimes.  Certainly
13 recreate them later.  But on this, there were
14 no notes, I mean, and so it was just something
15 somebody told me in the course of a three- or
16 four-hour conversation.  We talked about a lot.
17 But it wasn't -- it wasn't given to me, it was
18 just -- it -- it -- do you understand what
19 I'm -- what I'm objecting to?  I'm objecting to
20 making it look like it was something I wanted
21 or asked for.  It was just given to me.  It was
22 an opinion, a good one, you know, that he
23 understood this from somebody who had seen a
24 file.  I called it a report, but it's -- you

HERSH - CONFIDENTIAL

1  know, it's -- whatever it was, it was a -- it
2  may have been a nonverbal file, because they do
3  exist in the world that he lives in and I know
4  a lot about.
5         So I don't even know what the
6  "report" means as I used it.  It could be
7  nothing more than a verbal report, as I've said
8  to you.  But, you know, I wasn't -- I wasn't
9  playing cops and robbers.  I was talking to a
10 friend of a friend.  And I didn't think I was
11 in a hostile situation as apparently I ended up
12 being in.
13    Q.   Well, I don't think you were in
14 necessarily a hostile situation, but I -- I do
15 under -- I do understand your objection about
16 the word --
17    A.   Called a liar and a bum and all those
18 terrible things.  He wrote some terrible emails
19 to me.
20    Q.   We'll get to those in a second.  But
21 I do understand your objection to the word
22 "received."  And I was not trying to put words
23 in your mouth.  If you prefer the information
24 that was relayed to you, conveyed to you --

HERSH - CONFIDENTIAL

1  know, it's -- whatever it was, it was a -- it
2    A.   It wasn't --
3    Q.   -- any of those verbs --
4    A.   The whole point is I didn't seek it.
5  He just told it to me.
6    Q.   But your seeking it is not implied in
7  information being relayed to you.  What I'm
8  really trying to get at is -- is -- I think
9  you're -- you're missing the -- the tenor of
10 what my question is.  All I'm trying to get you
11 to -- to answer, if you would, is whether this
12 information about Seth Rich transferring emails
13 to WikiLeaks, that was communicated to you and
14 that you communicated to Ed Butowsky.  You --
15         MR. BOWMAN:  Objection.
16    Q.   You did not --
17         MS. GOVERNSKI:  Objection.
18    Q.   -- did not believe that that
19 information was false.  Isn't that a true
20 statement?
21    A.   I --
22         MR. BOWMAN:  Objection.
23         MS. GOVERNSKI:  Objection.
24         MR. BOWMAN:  Asked and answered.
25 And also, he's answered it several

HERSH - CONFIDENTIAL

1  times.  The transcript speaks for
2  itself.  You're asking him to
3  characterize a conversation of which
4  there's a transcript.
5    A.   So you're not really asking a fair
6  question.  I -- I don't think I made a value
7  judgment about it in -- in any way, it's just
8  some -- some -- something on the -- just
9  something I -- you know, you're suggesting
10 there was -- for whatever it is, I -- I can't
11 do better than I have, counselor.
12    Q.   Okay.  So when you say "It doesn't
13 make it true," is -- is what you mean by that
14 that the information that was communicated to
15 you of Seth Rich transferring emails to
16 WikiLeaks that you communicated to Ed Butowsky,
17 that you had not been able to verify that from
18 a journalistic point of view to your
19 professional standards?  Is that a true
20 statement?
21    A.   What's true is --
22         MR. BOWMAN:  Objection.
23    A.   Let me just say this.  The
24 conversation I had with Ed Butowsky, I was

Page 190

HERSH - CONFIDENTIAL

1    relaying something that had -- I had told to
2    another person, who relayed it to Butowsky.
3    Once Butowsky mentioned that he was going to
4    go -- thinking of going to the White House with
5    this stuff, I tried to say to him, are you --
6    my message to him, hey, nothing here is true.
7    I haven't done any work on this. You're going
8    to talk to the White House? And if you
9    remember, I said don't put my name on this
10   stuff, because I have no idea whether it's good
11   or not. And in fact, I have my -- I -- I -- no
12   interest in it. When he says, I'm going to go
13   to the White House on this, are you kidding me?
14   The moment he said I -- this was something he
15   was going to take to the White House, he said,
16   as you know, I go on air to talk about things.
17   I didn't know that. I just thought he was a
18   friend of a friend. I didn't know that. So
19   there's no way I would have gone -- you know,
20   I -- I don't -- I just did a favor for somebody
21   and there's --
22       Q.   Mr. --
23       A.   -- a lot -- yeah, I shouldn't do
24   favors. He said, I'm going to go -- you know,

Page 191

HERSH - CONFIDENTIAL

1    he said I'm going to go -- I -- I'm not trying
2    to give you something to go to the White House
3    with, I said, on line 2. 1, 2, 3. Are you
4    kidding? You're going to take this to the
5    White House? Are you kidding? This
6    fourth-rate stuff? You know --
7        Q.   Mr. --
8        A.   -- I know if you go to the White
9    House with something, I'll tell you, you got to
10   have a pretty good -- and this was nothing more
11   than, you know, some guy's conversation about
12   something he heard that may or may not have --
13   there wasn't an FBI agent involved. As far as
14   I know, there was no paper involved. I don't
15   know what he meant by "report." I'm -- I'm --
16   probably, I wasn't clear enough. Well then let
17   me be very clear to you. I didn't assume that
18   there was some big secret document he had. I
19   just assumed he had a report. They live with
20   reports, the people in his business. I just --
21       Q.   I under -- Mr. Hersh, I'm -- I
22   understand, and --
23       A.   Well, I'm not sure you --
24       Q.   -- I'm trying --

Page 192

HERSH - CONFIDENTIAL

1        A.   -- you do understand.
2        Q.   -- to --
3        A.   -- to say that I thought there was
4    some gravamen to this.
5        Q.   Well, that's what I'm trying to
6    establish right now, Mr. -- Mr. Hersh.
7        A.   I didn't think there was gravamen to
8    it.
9        Q.   When you say "it," what are you
10   speaking about?
11       A.   The whole notion that somebody heard
12   something or told him something about what this
13   guy did, and going -- and -- and as I said, you
14   notice I also -- you didn't mention it, but I
15   also said everything I learned about what
16   happened there to Seth Rich had nothing to do
17   as those crazy people that you played, CN LIVE
18   talked about with somebody killing him.
19   It's -- you know, my brother-in-law happened to
20   mention it. We were talking about it one day,
21   and he mentioned there's been 10 cases.
22   That's -- that's how I knew about it.
23            And I know about warrants. And I --
24   I could be wrong about it, because things

Page 193

HERSH - CONFIDENTIAL

1    change, but I was a police reporter and a kid
2    reporter for a long time, you know, in Chicago,
3    man. I -- if I wasn't chasing 10 murders a
4    month, I was chasing -- you know, I was always
5    looking for warrants. But it could be I --
6    what I know about warrants, it could be all
7    wrong. The District of Columbia is probably a
8    different system. But I know generally cops,
9    they can't go into a computer unless -- if
10   there's a roommate, because that's always a
11   possibility. They have to get a warrant.
12   That's my understanding. But I don't even -- I
13   don't even know if that's so. I never did --
14       Q.   Sir, I'm --
15       A.   -- find out.
16       Q.   Yeah, I'm not asking you about the
17   warrant.
18       A.   Yeah, but I'm telling
19       Q.   I'm asking --
20       A.   -- you what -- what -- what the
21   reality is here.
22       Q.   Well, Mr. -- Mr. Hersh, if I could
23   ask the questions, please. Again, and -- and
24   I'm going after this -- this -- this line, and

HERSH - CONFIDENTIAL

1    I want to establish what is -- what is true and
2    what is not true.  That is -- that is important
3    to me.  This is a defamation case, so that's an
4    important issue.  I'm not going to give you a
5    speech about that.  So let's go very simple.
6
7         It's true that you had a trusted
8    source whom you had known for 31 years who
9    communicated information to you about the FBI
10   examining Seth Rich's computer, finding emails
11   from Seth Rich to WikiLeaks, and requesting
12   payment in exchange.  That is a true statement,
13   is it not?
14        A.   It's -- it's --
15             MS. GOVERNSKI:  Objection on
16        multiple grounds.
17        A.   It's in the transcript, counselor.
18        Q.   Well, I would like to know -- I want
19   to know what's true or not, because I --
20             MR. QUAINTON:  Could you read back
21        the question, please?
22             THE REPORTER:  I will read back the
23        question, but I would like to have a
24        break within five minutes.
25             MR. QUAINTON:  That's no problem.

HERSH - CONFIDENTIAL

1
2    (The reporter read from the record as
3         follows:  "It's true that you had a
4         trusted source whom you had known for 31
5         years who communicated information to you
6         about the FBI examining Seth Rich's
7         computer, finding emails from Seth Rich to
8         WikiLeaks, and requesting payment in
9         exchange.  That is a true statement, is it
10        not?")
11        A.   It's -- I've testified to that.  I've
12   testified that's what he said.  I've also
13   characterized what he said as anything but a
14   serious conversation.  It was chitchat about
15   something else.  As I said, I didn't take notes
16   on it.  And I did relay it to Ed, and I did
17   tell him, in essence, what I said.  And -- and
18   as I said, you know, it doesn't make it true.
19   I said that to him twice what -- what --
20        Q.   What part of that?
21        A.   That didn't make it true.  And I --
22   I -- I -- if -- if I'd known, and if you
23   read -- I will also say, counselor, long before
24   this case was brought, I have said three -- two
25   or three times to him in emails I didn't keep,

HERSH - CONFIDENTIAL

1
2    you know, are you kidding me?  That I've no
3    factual information, and -- and I was just
4    relayed -- he's been told that by me in emails,
5    and I've said it publicly to -- to other
6    people, that at no time did I -- I -- did I
7    ever have any reason to believe that whatever
8    happened really transpired.  I just didn't
9    know.  I pick up a lot of information, period.
10   And it doesn't make it true.  And the idea
11   that's in the transcript, that if he thought of
12   taking something like that to the White House
13   or anybody else, he would be making a huge
14   mistake because I have no basis for knowing
15   it's so, period.
16        Q.   Okay.  I -- I'm going to move to
17   strike.
18             MR. BOWMAN:  I would like to take a
19        break.
20             MR. QUAINTON:  Okay.  I'm just
21        going to move to strike the entirety of
22        that answer as nonresponsive, and we'll
23        pick it up after the break.
24             THE VIDEOGRAPHER:  The time is
25        3:25 p.m.  We're off the record.

HERSH - CONFIDENTIAL

1
2    (Recess taken.)
3             THE VIDEOGRAPHER:  The time is
4        3:47 p.m.  We are on the record.
5    BY MR. QUAINTON:
6        Q.   Mr. Hersh, when we had left off, I
7    had stricken your response to my prior
8    question.  And I'm going to ask the question
9    again, but before I do, just -- just so you can
10   understand where I'm trying to go, because I --
11   I think that there may be a miscommunication.
12   You may think I'm trying to go somewhere that
13   I'm not trying to go.  So I view this as
14   similar to a -- a -- situation where John says
15   to Sy, "It was a sunny day."  And what I want
16   to establish is that it is a true statement
17   that John told Sy it was a sunny day, leaving
18   aside the veracity of whether or not it was, in
19   fact, a sunny day.  That's -- that's -- that's
20   where I'm going with this.  That's the
21   distinction that I'm going to be trying to
22   draw.  And I think if you listen to my
23   question, that's -- what I'm asking you is
24   whether it's a true -- whether -- whether --
25   whether the -- whether you answer yes or no,

Page 198

HERSH - CONFIDENTIAL

1    HERSH - CONFIDENTIAL
2    that the question that I put to you was a true
3    statement.  So I'm going to ask the reporter to
4    read the question again.  And if you could,
5    I -- I -- I -- I don't need a long answer.
6    It's really just yes, that's a true statement,
7    or whatever your testimony is.  But I don't
8    need a gloss on it.  Do you see what I'm -- do
9    you see what I'm trying to -- to accomplish
10   here, Mr. Hersh?
11          THE WITNESS:  Let's hear the
12   question.
13          MR. QUAINTON:  Okay.
14          MR. BOWMAN:  And please state his
15   answer.
16          MR. QUAINTON:  Would you read back
17   the question that we had before?
18   (The reporter read from the record as
19   follows:  "It's true that you had a
20   trusted source whom you had known for 31
21   years who communicated information to you
22   about the FBI examining Seth Rich's
23   computer, finding emails from Seth Rich to
24   WikiLeaks, and requesting payment in
25   exchange.  That is a true statement, is it

Page 199

1    HERSH - CONFIDENTIAL
2    not?")
3          MS. GOVERNSKI:  Objection to that
4    question as well as to the -- Mr.
5    Quainton's intro into it.
6    A.   My -- my answer is it's absolutely
7    true.  I had a source who communicated
8    secondhand information to me about the issues
9    you raise.
10   BY MR. QUAINTON:
11   Q.   Going to move to strike everything
12   after the words "It's absolutely true."
13          So when you say "doesn't mean it's
14   true," does -- is what you mean by that that
15   you could not verify the -- the content of what
16   was communicated to you by your trusted source?
17   A.   No, it does not mean that to me.
18          MS. GOVERNSKI:  Objection.
19   Q.   Well, what -- what does it mean to
20   you, then?
21   A.   I made no attempt to verify.  I
22   didn't consider it something worth verifying.
23   Q.   So what doesn't make it true, though,
24   is the fact that it has not been verified.
25          MS. GOVERNSKI:  Objection.

Page 200

1    HERSH - CONFIDENTIAL
2    A.   In my business, that's pretty much
3    something that is --
4          THE REPORTER:  I'm sorry, sir,
5    "something that is"?
6          THE WITNESS:  In my -- I said in my
7    business, that's -- the fact that it --
8    it was secondhand and I couldn't verify
9    it doesn't -- doesn't make it true in
10   any way.
11          THE REPORTER:  Thank you.
12   Q.   All right.  Okay.  So let's -- and it
13   doesn't make it false.  Isn't that also true?
14   A.   Yeah, it's a no-man's land,
15   absolutely.
16          MR. QUAINTON:  All right.  So let's
17   look at DH -- marked -- marked as DH12,
18   and --
19   (Exhibit No. DH12 was marked for
20   identification.)
21          THE WITNESS:  You'll show those to
22   me, will you?  Because you say they're
23   short.
24          MR. QUAINTON:  What I'm going to
25   try to do is just pull these up on the

Page 201

1    HERSH - CONFIDENTIAL
2    screen and scroll through them so you
3    don't have to do anything on your end.
4          THE WITNESS:  If they're short, you
5    can read it if it makes it quicker.
6          MR. QUAINTON:  I think I'd prefer
7    to try to pull it up, so --
8          THE WITNESS:  Okay.  I -- I -- I'm
9    not as enthralled by your skills as
10   maybe you are.
11          MR. QUAINTON:  Believe me, I'm not
12   enthralled by my skills at all.  In
13   fact, my computer's not helping me here.
14   All right, go off the record for a
15   second.
16          THE VIDEOGRAPHER:  The time is
17   3:53.  We're off the record.
18   (Discussion held off the record.)
19          THE VIDEOGRAPHER:  4:04 p.m.  We
20   are on the record.
21   BY MR. QUAINTON:
22   Q.   Okay, Mr. Hersh, I am putting up on
23   the screen a document premarked as DH12, and I
24   would just like you to take a quick look at
25   that document --

Page 202

HERSH - CONFIDENTIAL

1
2    A.   It's not --
3    Q.   -- and --
4    A.   -- on my screen.
5        MR. BOWMAN:  And for the record,
6    it's -- it's not visible to the witness.
7  BY MR. QUAINTON:
8    Q.   This is DH12.  Do you see that?
9  And --
10   A.   I've read it already.  I -- I printed
11 it --
12   Q.   Okay.
13   A.   -- up from here.
14   Q.   You read it already.  Okay.  So do
15 you recognize this document, Mr. Hersh?
16   A.   You know, it's an email.  I mean,
17 sure.  I don't remember it, but I recognize it,
18 of course.
19   Q.   And what -- what is it?
20   A.   It's an email from -- let's see.
21 Hold on.  From Mr. Butowsky to me, April 20, at
22 8 o'clock in the morning.
23   Q.   And as you -- as you read this, this
24 would have been after your phone call with
25 Mr. Butowsky; is that right?

Page 203

HERSH - CONFIDENTIAL

1
2    A.   I have no idea.
3    Q.   Did you have any communications with
4  Mr. Butowsky before the phone call?
5    A.   I don't remember.  I might have.  I
6  just don't remember.  I -- I -- I remember
7  looking up things on him before I talked to
8  him, so I probably had some communication.
9  Either that or through Larry.  Larry -- Larry
10 was relaying some stuff to me.  I think I
11 remember something like that.  I get a lot of
12 emails.
13   Q.   This says, "I'm in Washington today.
14 Are you open for lunch?"
15   A.   Yeah, I -- I -- I --
16   Q.   Is --
17   A.   Okay.
18   Q.   Is that the kind of email that you'd
19 get from somebody that you hadn't met before or
20 talked to before?
21   A.   Yeah.  Perfectly okay.
22   Q.   All right.  So this does not refresh
23 your recollection as to what -- as to whether
24 that April 20 was after --
25   A.   Well, I -- I see it.  It --

Page 204

HERSH - CONFIDENTIAL

1
2    Q.   -- the --
3    A.   No, it -- I -- I've lost the -- the
4  thing.  It went down.  I -- I -- I see I said I
5  can't have lunch, so maybe it was afterwards.
6  I don't know.  I have no idea, just no idea
7  whatsoever.
8        MR. QUAINTON:  Okay.  So I'm
9    showing you now DH --
10       THE WITNESS:  Okay.
11       MR. QUAINTON:  What's been marked
12   DH13.
13       THE WITNESS:  All right, let me
14   scroll down.
15   (Exhibit No. DH13 was marked for
16   identification.)
17 BY MR. QUAINTON:
18   Q.   And I'm going to ask you to take a
19 look at that.
20   A.   Butowsky.  Yeah, I see it.  I read
21 it.
22   Q.   Okay.  And do you -- you recognize
23 that document?
24   A.   No, I don't remember it, but I -- I
25 mean, I -- I -- I get so many -- I -- emails a

Page 205

HERSH - CONFIDENTIAL

1
2  day, I -- so I don't keep them, no.  But go
3  ahead, I -- I'm --
4    Q.   No, no.  So you -- so that's just a
5  question.  Do -- do you --
6    A.   Right.
7    Q.   -- recognize it or -- or not?
8    A.   With the right email, it sounds like
9  it's fine.  I'm -- I -- I'm not -- go ahead.
10 What's your question, counselor?
11   Q.   That was my question.
12       MS. GOVERNSKI:  I would just object
13   to the document to the extent that
14   there's -- based on the rule of
15   completeness.
16   Q.   My question was simply -- my first
17 question was whether you recognize the
18 document.  Sounds like you do not recognize
19 this document, and --
20   A.   I don't remember being asked anything
21 like that.
22       MR. QUAINTON:  I'm going to show
23   you what's been marked DH14.
24   (Exhibit No. DH14 was marked for
25   identification.)

THE WITNESS: Let me go to it.
BY MR. QUAINTON:
Q. And let's take a look at this, this document, if you would.
A. Okay. It says "Good morning."
Q. Just look -- look at the whole thing.
A. Well, unfortunately, it's -- it's -- I -- on the right-hand of my screen I've got pictures of everybody here so it's cut off a little bit, but let -- you can read me the words. I'm --
MR. BOWMAN: Counsel, would it be possible to scroll up from the bottom so he can read in a logical way?
MR. QUAINTON: Sure.
THE WITNESS: Yeah, let me --
BY MR. QUAINTON:
Q. Can you see that?
A. Well, it just -- the last words are cut off on what I have. I mean, the right part of my screen has -- has got -- I'm looking at all the pretty faces.
Q. But you -- you can move that around, the -- the -- the thing with all the pretty

faces.
A. Well --
Q. You just click on that and hold it and move it somewhere else on the screen, like down below --
A. I -- I mean, and that's --
Q. -- put it away.
A. You mean like down or something like that? But anyway, just what -- what -- so go ahead. Well -- well, read it to me then, or -- you know, I -- I don't quite --
Q. Well, I don't want to read it to you. So if you can't -- you --
A. I -- I can't see it all, counselor. I can't read the last few words of each one.
MR. QUAINTON: Let's -- let's go off the record. And, videographer, if you could maybe explain to Mr. Hersh how he can move the --
THE WITNESS: Well, I want to get rid of the little sidebar picture. It says -- where there's -- I'm looking at myself. There's a little box with everybody on the right-hand side.

THE VIDEOGRAPHER: Time is 4:10 p.m. We are off the record.
(Discussion held off the record.)
THE VIDEOGRAPHER: Time is 4:10 p.m. We're back on the record.
THE WITNESS: So I'm looking at it, yes.
BY MR. QUAINTON:
Q. Now I'm going to scroll -- I'm going to scroll down slowly so you can see the full document.
A. Well, yeah. I got it. I see the rest of it. Go ahead.
Q. Okay. Now, do you recognize this document?
A. I -- I -- I -- I -- no, I don't think I've seen it since it came, which would have been three years ago. It's what now, three -- three years and three or -- three months, so I don't remember it. But, I mean, I don't -- I don't dispute that I got it. I don't remember this exchange. Reporters hear things, they believe things, they check it out, they say any proof, they move on. I did that right at

the -- that's all you need to know. And for your record, I do not -- not have a friend at FBI saying --
THE REPORTER: I'm sorry, sir. When you read for the record, read slowly and clearly for me. Thank you.
THE WITNESS: I was -- I was muttering. I was muttering to myself. I shouldn't have been. I'll read it by myself quietly. Okay, I've read it.
BY MR. QUAINTON:
Q. Just the first question, not whether you remember specifically, but just do you -- do you remember this -- this -- this -- this document or the -- the -- recognize this at all?
A. Well, no. No. But I'm -- I'm not disputing it. I mean I -- I -- I recognize -- I remember there was some angry ones that I didn't like at all. This one seems perfectly benign.
Q. Okay. So let's look at the -- the date of this is -- see the date at the top, May 5, 2017?

HERSH - CONFIDENTIAL

A. Yeah, yeah.

Q. And from the -- the subject line here, I think it's -- it's fair to say this would have been after your conversation on the telephone with Mr. Hersh [sic]; is -- is that correct?

A. I -- I don't know.

Q. With Mr. Butowsky.

A. I mean, it makes sense that I talked to him already about it because he's mentioning about the CB, the FBI cyber unit. But, you know, I -- I -- I -- that seems logical to me but I just don't remember sequencing. But it certainly looks like it's after, yes.

Q. And you don't -- you don't specifically -- you don't recognize -- you don't recognize this document at all?

MR. BOWMAN: Objection, asked and answered.

A. I mean, I --

Q. All right, let's move on.

A. I'm telling him -- I -- I remember what I'm saying to him, which is, you know, whoa, if I believed that, I would have

HERSH - CONFIDENTIAL

believe -- written it. I'm saying that, and I'm trying to discourage him from going farther but I -- you know, I guess. I don't know. But I -- it makes sense --

Q. All right.

A. -- to me afterwards.

THE WITNESS: So is there anything else you want me to look at?

MR. QUAINTON: No. Yes, I'll give you another document. Now I'm showing you what I've marked as DH15.

(Exhibit No. DH15 was marked for identification.)

THE WITNESS: Okay.

BY MR. QUAINTON:

Q. And DH15 I'm just going to skip over, because this is a separate document, but it's a -- it's a duplicate of what you just saw.

A. Okay.

MR. QUAINTON: So I'm going to show you what I've marked as DH16.

(Exhibit No. DH16 was marked for identification.)

BY MR. QUAINTON:

HERSH - CONFIDENTIAL

Q. And then I'm going to scroll down slowly and ask you to read through it and then tell me if you recognize this.

A. Yeah. Well -- well, hold on. Hold on.

MR. BOWMAN: Could you leave it on the screen for a moment, please?

THE WITNESS: Yeah, just let it -- it's flying around. Okay, I read it.

BY MR. QUAINTON:

Q. Do you recognize this document?

A. Well, it's -- yeah, it's an email to me from Ed Butowsky.

Q. And is the date of this email --

A. I beg your pardon?

Q. Do you see the date of the email at the top?

A. Yeah, June 2.

Q. Now, the first question I have on this is if you look, you scroll down here, I'm going to put it with my -- my cursor. "I wish you would stop telling others that you think I have -- I really wish you would stop telling others information that you think I have." And

HERSH - CONFIDENTIAL

I'm -- what are you referring to there?

A. I have no idea. But I can certainly -- I can make a guess from what he -- what he claimed I told him in the email, that I had somebody in the FBI, you know. I never said anywhere in that -- in that, I don't think. I mean, when I read this years ago, I remember thinking, whoa, you know, I -- I -- I don't read Twitter and stuff like that. My children told me about it, and they -- I -- I was told that. I -- I had said that there was a -- I never said if I had any -- talked to anybody in the FBI. That's the one thing I remember. Look, I don't remember -- I mean, I -- I -- I don't quite know what you want me to do, I mean.

Q. Well, no, no, no. Just to the extent that you can remember, that's all I'm asking.

A. You asked me a question. I answered. It all seems to be rational to me. But I, you know, I -- I -- I -- I don't quite understand why we're asking about it. I mean, it's an email to me, and I -- I said stop relaying information you didn't have right, and no --

Page 214

HERSH - CONFIDENTIAL

1    have no reason to believe is accurate.
2        Q.   Why didn't -- I'm sorry, I didn't --
3        MS. GOVERNSKI:  I object.  By the
4    way, I'm sorry, I didn't have a chance
5    to object earlier to the
6    mischaracterization of what the email
7    says.
8    BY MR. QUAINTON:
9        Q.   Okay, so the -- the first -- I wasn't
10   talking about the second piece of that
11   paragraph, I was talking about the first piece,
12   where you say -- I'm going to read it -- "I
13   really wish you would stop telling others
14   information that you think I have."
15           And my -- my question is whether you
16   have any recollection of Mr. Butowsky telling
17   anybody anything about what you told him.
18       A.   You -- you're asking me whether I
19   remembered something somebody might have
20   written or somebody might have -- you're asking
21   me something that he might have said to
22   somebody else about me?
23       Q.   No.  What you are saying to him is
24   that he has been saying things to other people.

Page 215

HERSH - CONFIDENTIAL

1        A.   Right, yeah.
2        Q.   And I'm wondering what that is based
3    on.
4        A.   Probably by -- you know, I -- I have
5    been barred for 20 years ever from -- by Mitch
6    Guilder (phonetic) from either reading Twitter
7    or -- or doing tweets.  Just -- they said just
8    stay away.  I mean, it's so full of nasty
9    stuff.  Somebody must have told me.  I -- I
10   must -- I must have heard something from
11   somebody that he was making -- saying things
12   about me that I didn't like.  But I don't
13   remember.  I mean, I -- I -- I'm a little testy
14   here because I'm -- I'm obviously hearing
15   something, but I don't -- I have no recall
16   specifically of anything.  I mean, I understand
17   that this happened, and I understand he was mad
18   at me.  I certainly know that because I told
19   you at some point, I do remember a very nasty
20   email to me calling me a liar and stuff like
21   that.
22       Q.   Well, let's just take the ones that
23   we've got.  So, yeah, I -- I understand --
24       A.   So I -- I can't help you on this.  I

Page 216

HERSH - CONFIDENTIAL

1    mean, I'm sure it's accurate, but I have no
2    way -- you know, I can't remember.  I -- I
3    have -- I have no idea who was talking and who
4    said what.  I -- I just don't know.
5        Q.   And you -- you have no recollection
6    of whether anybody was, in fact, talking about
7    this; is that right?
8        THE REPORTER:  I'm sorry, sir.  I
9        did not hear the end of the question.
10       THE WITNESS:  Okay.
11       Q.   I said you -- you have no
12   recollection of whether anybody was actually
13   talking about this information.
14       MS. GOVERNSKI:  Objection.
15       A.   Well, I certainly had some reason to
16   think somebody was, because that's what I said
17   there.  But I don't remember who said that, you
18   know?  There's a lot of things said about a lot
19   of people in the world, but I -- I certainly
20   had somebody say something to me.  I don't know
21   who told me or what.  I don't know whether it
22   came from one of my children with a tweet.
23   Sometimes they send me stuff.  And I don't know
24   where it came from.  Just don't know.  But I'm

Page 217

HERSH - CONFIDENTIAL

1    not disputing that this conversation took
2    place.  I mean, the email.
3        Q.   Okay.  Now, the -- at the end of that
4    paragraph we were just looking at, "Stop
5    relaying information that I have no reason to
6    believe is accurate."  And I take it you are
7    referring to the information that you had given
8    Mr. Butowsky in your telephone conversation
9    with him; is that right?
10       MR. BOWMAN:  Just objection --
11       MS. GOVERNSKI:  Objection.
12       MR. BOWMAN:  -- to the opening of
13       the statement.
14       A.   I -- I can't invent what I remember
15   from that.  I just can't.  I mean, it certainly
16   looks that way.  Common sense would say that,
17   but I don't have any specific memory of this
18   exchange.  I didn't even know there was such an
19   exchange.  It makes sense to me, I guess, but I
20   didn't remember.
21       Q.   Okay.  So it makes sense to you
22   that -- that you were saying that you
23   shouldn't -- you shouldn't relay information
24   that you have no reason to believe is accurate.

Page 218

HERSH - CONFIDENTIAL

1   And my question -- my next question was, do you
2   have --
3           MS. GOVERNSKI:  Objection.  That
4       misstates the email.
5       Q.   Next question was, do you have any
6   reason, recall any reason to believe that the
7   information that you relayed to Mr. Butowsky
8   was not accurate?
9           MR. BOWMAN:  Objection.
10          THE WITNESS:  My god.
11          MS. GOVERNSKI:  Objection.
12          THE WITNESS:  Yeah.
13          MR. BOWMAN:  The witness has said
14      he doesn't remember this exchange.
15      You're asking questions about the things
16      he's referring to in this exchange.  He
17      doesn't have an answer.
18          THE WITNESS:  I -- I -- I will say
19      this, just that -- that I do remember
20      that everybody was saying that -- that
21      the word was I had said that I had
22      talked to the FBI, which was not -- I
23      remember vividly reading when this came
24      on the internet and was sent to me.  And

Page 219

HERSH - CONFIDENTIAL

1   I read it once, and I read -- the first
2       thought was, whoa, you know, I never
3       said anything about talking to an FBI
4       guy about it.  And that's what I --
5       that's the memory I do have.  And I
6       assume that's the best -- best I can do
7       for you on this one.  I -- I don't
8       quite --
9           MR. QUAINTON:  All right, let's
10      move on.
11          THE WITNESS:  Please.  Okay, go
12      ahead.  Should I read down?
13          MR. QUAINTON:  Hold on, hold on.
14      So I just pulled up what I marked as
15      DH17.
16      (Exhibit No. DH17 was marked for
17      identification.)
18          THE WITNESS:  Yeah.
19  BY MR. QUAINTON:
20      Q.   Do you see that?
21      A.   I'm -- I'm just scrolling into it
22  right now.
23      Q.   Now I'm scrolling down.  You tell me
24  when you want me to scroll further down, okay?

Page 220

HERSH - CONFIDENTIAL

1       A.   I think you already showed me this
2   one.  We already talked about this one.
3       Q.   No, this is a -- this is a later one.
4       A.   Okay, it's the same issue about the
5   House Committee.  Kept asking about some House
6   Committee that I don't know anything about, but
7   I see this --
8       Q.   Okay.
9       A.   -- document.
10      Q.   Okay.
11      A.   I mean, I'm -- I'm -- this is a
12  little testy.  I remember that we had
13  already -- we had some exchanges, were testy,
14  and I'm -- I'm -- go ahead.
15      Q.   Okay.  So this purports to be a -- an
16  email from Mr. Butowsky to you dated June 27,
17  and there are two lines under the "Re," a name,
18  and then the email that -- we just looked at
19  that before.  And so I -- do -- do you
20  recognize the email that you received from --
21  that you apparently received from Mr. Butowsky
22  on June 27, 2017?
23      A.   I -- I -- I don't remember specific
24  email, but I certainly recognized that this

Page 221

HERSH - CONFIDENTIAL

1   looks like an email he sent me.  And I -- I --
2   I certainly am looking at my answer.  Not read
3   anything about FBI, have no firsthand
4   information, and I -- you know, stop telling
5   others information you think I have.  That
6   seems consistent with me.
7       Q.   Sorry, Mr. -- Mr. Hersh?
8       A.   Yeah.
9       Q.   This is a -- this is -- my next
10  question.  This is June 27, and my question
11  is --
12      A.   June 22.
13      Q.   Okay.  So if you look at this, this
14  is DH -- DH17.
15      A.   Yeah.
16      Q.   Okay?
17      A.   What are you -- what -- it -- you
18  mean the first line?  The first thing?  Re: who
19  is the person who read you the file, don't
20  defend me, the --
21          THE REPORTER:  I'm sorry, sir, I --
22      I can't understand you.  Please slow
23      down a bit.
24          THE WITNESS:  All right.  I'm

Page 222

HERSH - CONFIDENTIAL

1              HERSH - CONFIDENTIAL
2        sorry.  I apologize.
3   BY MR. QUAINTON:
4        Q.   So, Mr. Hersh, what -- what I'm
5   showing you --
6        A.   And what you're asking me, counselor,
7   it's written there.  What do you want me to
8   say?
9        Q.   Well, I -- because we're -- we're
10  talking past each other.  So I'm showing you an
11  email that's dated June 27 from Mr. Butowsky to
12  you, and that email is asking you a question.
13  And you said that you were answering a
14  question, and I'm just -- I'm pointing out for
15  the record that this email is forwarding a --
16  an earlier email exchange --
17       A.   Oh.
18       Q.   -- from June 2.
19       A.   Oh, so I --
20       Q.   So the question I have is, do you
21  recall whether you answered the June 27 email
22  to -- that Mr. Butowsky sent you.
23       A.   Oh, I see.  I looked -- I thought the
24  answer was -- the June 1, I thought that was
25  the answer to the June 27.  I was wondering why

Page 223

1              HERSH - CONFIDENTIAL
2   it was so familiar.  I don't -- I don't recall
3   the email, and I -- I -- stop being hot listed.
4   It doesn't sound -- I have no -- I don't recall
5   it.  I don't -- certainly don't recall
6   answering it.  I don't recall receiving it.
7   I -- I do remember, as I said, he was testy.
8        Q.   Okay.
9        A.   Increasingly testy.
10       Q.   So now moving on to --
11            THE WITNESS:  I'm sorry, court
12  reporter.  I apologize.  I -- I just
13  want -- I'm -- I'm -- I'm muttering when
14  I'm reading, and I shouldn't.  I should
15  keep my mouth shut, just quiet down.
16            MR. QUAINTON:  Now showing what
17  I've marked as DH18.
18  (Exhibit No. DH18 was marked for
19  identification.)
20            THE WITNESS:  Okay.
21            MR. BOWMAN:  The version of DH18
22  you sent this morning is just a cover
23  page.
24            MR. QUAINTON:  So that must be a
25  mistake on my end so we will go down to

Page 224

1              HERSH - CONFIDENTIAL
2        the next one.  This is what I've marked
3        as DH19.
4             THE WITNESS:  Okay.
5        (Exhibit No. DH19 was marked for
6        identification.)
7   BY MR. QUAINTON:
8        Q.   I'm -- just -- just for clarity, I
9   believe there is another email that is relevant
10  here, but in the interest of time I'm not going
11  to try to find it.  Obviously, there's some
12  error in attaching it to the cover page so I'm
13  just going to move on.  I believe there's one
14  more email.  This is -- let me go ahead.  This
15  is DH19.
16       A.   Yes.
17       Q.   And so this is an email.  Well, I'd
18  like you to just look at this document and tell
19  me if you recognize this.
20       A.   No.  No, I mean, I'm looking at
21  the -- I -- no, I don't.  I don't -- I -- I --
22  this came in February.  No, I -- I was not
23  paying much attention to him by this time so I
24  probably erased it without even looking at it
25  very much.  You know --

Page 225

1              HERSH - CONFIDENTIAL
2        Q.   All right.
3        A.   -- again, it had my FBI informant
4   told me and all this stuff.  I -- I -- I don't
5   think I responded to this.  I'm sure I didn't,
6   but I don't know.
7             MR. QUAINTON:  All right, I'm going
8   to move on to DH21 [sic].
9        (Exhibit No. DH20 was marked for
10  identification.)
11  BY MR. QUAINTON:
12       Q.   Now, this is -- this is a bit longer.
13  This is a -- I'm showing you what's been marked
14  as DH20.
15       A.   Uh-huh.
16       Q.   And this is a -- an article by NPR
17  dated August 1, 2017.  I can -- I'm just going
18  to scroll through this very briefly.
19  There's -- let me ask you this.  Just -- just
20  from the title, do you recall this article?
21       A.   Folkenflik.  Yes, I recall talking
22  to -- I'm sure I read it, but I -- I don't
23  remember it.  But I remember talking to him.
24       Q.   Okay.  And do you remember the
25  content of your conversation with him?

Page 226

HERSH - CONFIDENTIAL

1        A.   Yeah, it was -- it was about the
2   story and -- and, yeah, it was about a -- I
3   guess, a -- a lawsuit had evolved.
4        Q.   Your -- your recollection is you were
5   talking about the -- the lawsuit that's
6   referenced here?
7        A.   No, I just remember there was a
8   lawsuit that came out of this case, this story.
9   Am I not?  Am I not right?  I think that's
10  right.  I think there was a lawsuit that came
11  out of it.
12       Q.   I'm just going to keep on scrolling
13  here.
14       A.   Yeah, I'm reading it.  Do you want me
15  to go through?  What -- what do you --
16       Q.   No, no, no.  Just tell me if I'm
17  going too fast for you.
18       A.   No.  Oh, you're scrolling it?
19       Q.   I'm scrolling it, yeah.
20       A.   You're going too slow for me.
21       Q.   Okay.  You're faster than that.
22       A.   I'm quick.  I can go through.  Okay,
23  yeah, I see there's stuff on Hersh.
24       Q.   Okay.  So in this paragraph, in a --
25

Page 227

HERSH - CONFIDENTIAL

1        A.   Yeah.
2        Q.   So in an interview this week, Hersh
3   sounds unconvinced.  So you -- you recall
4   speaking to Mr. Folkenflik --
5        A.   Yeah.
6        Q.   -- before this was -- before this
7   article was published; right?
8        A.   Yeah.  He called me at -- at my --
9   hold on.  Well, I'm just trying to -- I'm
10  trying to -- I -- I'm missing the first -- I
11  think you control it.  I can't get this to
12  move.
13       Q.   What do you want to do?  Want to move
14  it up?
15       A.   There's a -- I -- there's a -- the
16  top of the paragraph.  Okay.  Well, in -- "In
17  an interview this week, according to the
18  transcript, Hersh -- Ed Hersh had an FBI source
19  who confirmed the report on there."  And then
20  the next line, "In an interview this week,
21  Hersh shown that --"
22            THE WITNESS:  I'm -- I'm sorry.
23       I'll speak slowly for the court
24       reporter.
25

Page 228

HERSH - CONFIDENTIAL

1            THE REPORTER:  Thank you.
2        A.   "According to the transcripts in the
3   lawsuit, Butowsky said Hersh had an FBI source
4   who confirmed the report."
5        Q.   Mr. -- Mr. Hersh, if you could just
6   read to -- read to yourself, let me know when
7   you've finished.
8        A.   Well, I -- I -- I -- I -- are you --
9   are you controlling the scroll?  No, I can
10  scroll.  Okay.
11       Q.   No, no, I'm -- I'm controlling the
12  scroll.  So let me scroll it down.  Just read
13  to yourself silently and let me know if you
14  want me to scroll any further.
15       A.   Okay.  I'm down to where it says 2 and
16  2 make 45.
17       Q.   All right.  So does this quote
18  from -- that -- that is here in the article,
19  does that appear accurate to you?
20       A.   Which quote?
21       Q.   Hersh -- when Hersh tells NPR on
22  Monday, where you're quoted, do you -- do you
23  think you were accurately quoted there?
24       A.   I'm not troubled by any of the
25

Page 229

HERSH - CONFIDENTIAL

1   quotes.  I'm sure I was accurately quoted.  I'm
2   sure he probably tape recorded it, I would
3   guess.  The guy made it accurate.  I think
4   that's the appropriate thing to do.  I think he
5   told me he was going to do that.  I don't
6   remember, but I -- I like it when reporters --
7   you know, obviously, I'm always sensitive to
8   that.  So go ahead.  Yeah, I mean, Hersh --
9   Butowsky took 2 and 2, made 45.  Okay.
10       Q.   And what -- what did you mean by that
11  when you said Butowsky took 2 and 2 and made
12  45?  What did you mean by that?
13       A.   Had no basis for knowing.  I had no
14  basis for knowing, confirming what my FBI
15  source said he heard secondhand, and from
16  somebody who was not an FBI agent.  And it
17  was -- it was a -- it was a casual -- it was
18  just a -- a casual chitchat.  I'm -- I did go
19  back and -- and I -- I didn't make notes about
20  it.  I had no notes about any of this.  I never
21  took a note on any of this, and it just was --
22  that's what I remember saying.  I -- I don't
23  remember saying it, but it sounds like
24  something I would say.  I said 2 and 2.  It's
25

Page 230

```
1              HERSH - CONFIDENTIAL
2   usually 44, but -- but that's okay.
3              MR. QUAINTON:  Okay.  All right,
4       we're going to move on to the next one.
5              THE WITNESS:  You're going to
6       another file?
7              MR. QUAINTON:  Yes, I am.
8              THE WITNESS:  Okay.
9              MR. QUAINTON:  So do you see on
10      your screen a document that's marked
11      DH21?
12             THE WITNESS:  Yes, I do.
13         (Exhibit No. DH21 was marked for
14         identification.)
15  BY MR. QUAINTON:
16      Q.   And you see I'm showing you an
17  article from NPR dated August 16, 2017 --
18      A.   Is -- is --
19      Q.   -- titled --
20      A.   Didn't you just show me that article?
21      Q.   No.  The article I just showed you
22  was August 1, so this is a second article if
23  you look at the date.
24      A.   Oh, I didn't --
25      Q.   It's August 16.
```

Page 231

```
1              HERSH - CONFIDENTIAL
2       A.   Okay, yes.
3       Q.   And this is the title:  "The Man
4   Behind the Scenes in Fox News is Discredited."
5       A.   Yeah, okay.
6       Q.   And do you -- do you recall this
7   article?
8       A.   No, I don't remember reading this at
9   all.
10      Q.   Now --
11      A.   The picture, I remember.
12      Q.   Okay.
13      A.   I remember seeing a picture of him
14  but I -- I -- I don't remember this one.
15      Q.   Okay.  I think if we scroll down,
16  there is a -- you are quoted here.
17      A.   Well, wait.  I -- you're running past
18  some stuff about me.  Want to go back up?
19      Q.   Sure.
20      A.   It starts with -- all right, five
21  days after the inauguration.  All right, go
22  ahead.
23      Q.   Do you want me to -- so does that --
24  that refresh your recollection about when you
25  had the conversation with Mr. Butowsky?
```

Page 232

```
1              HERSH - CONFIDENTIAL
2       A.   Oh, about -- about when I had a
3   conversation with Butowsky?
4       Q.   Yes.
5       A.   I -- I don't think it's that early,
6   but that's okay.  It could be.
7       Q.   I'm going to keep on scrolling down.
8       A.   I -- I -- I just don't know.  Could
9   be.
10      Q.   Just read this to yourself and tell
11  me when -- if you want me to scroll it down.
12      A.   Wait, you're -- please, you're going
13  too fast.
14      Q.   Oh, sorry.
15      A.   I'm looking carefully.  I'm trying to
16  figure out -- I wish you'd let me have control
17  of the scroll.
18      Q.   Well, unfortunately, I can't do that.
19  But I can try to make it as easy as possible.
20  What would you like me to do?
21      A.   Just go up.  "Because that did not
22  happen" is at the top of the screen.  I don't
23  know what the sentence is before that.  All
24  right.  Okay.
25      Q.   Want me to start back here at the
```

Page 233

```
1              HERSH - CONFIDENTIAL
2   top?
3       A.   Okay, hold on.  May I ask a question?
4       Q.   No.  If you would -- could just let
5   me -- if you would like me to scroll it down
6   for you so you could read totally --
7       A.   Because it says "the tape shows," and
8   I don't think I knew about the tape in January.
9   I would remember that.  I don't think I knew
10  the -- about the tape at the time of the
11  inauguration, or a week after.  There's
12  something wrong with that timeline.  I don't
13  buy it.  It's --
14      Q.   Just -- so what --
15      A.   Reporters make -- we all make
16  mistakes, okay?
17      Q.   Just on that paragraph, Mr. Hersh,
18  I -- I don't think this is -- this is saying,
19  if you look at the one -- the -- the line, the
20  fourth line of the paragraph beginning
21  "Butowsky follows the lead."
22      A.   Yeah.
23      Q.   "And the audio recording obtained by
24  NPR shows Hersh referring to insider source."
25  So that is not saying anything about when --
```

HERSH - CONFIDENTIAL

1  that particular line doesn't say anything about
2  when the recording was made, it just says
3  when -- it just says that NPR obtained the
4  recording.  The -- the first line --
5      MS. GOVERNSKI:  Objection.
6  A.  I -- I absolutely had no idea that --
7  what's the kid's name who wrote the story?
8  Folken -- what's his first name?
9  Q.  Folkenflik.
10  A.  Yeah, Folkenflik.  I -- I don't think
11  he said I have heard a tape or there is a tape.
12  I would have known that.  The story says it,
13  but I probably -- I'm -- I'm embarrassed to
14  tell you, I probably -- I don't -- I probably
15  didn't read it.  I might have read it, but
16  I'm -- I, you know, would have come -- but I
17  don't -- was this broadcast, this -- this
18  particular piece, or was it just the story?  I
19  think there was a -- there was a broadcast and
20  a story.  I think the broadcast transcript I
21  remember reading, but if there was a story, I
22  probably didn't read it.
23  Q.  Well, I think, Mr. Hersh, Meryl may
24  go over this tomorrow, but I believe you're
25

HERSH - CONFIDENTIAL

1  correct.  There is a -- an audio recording that
2  does not track this article.  So these words, I
3  believe, are not in the audio recording of --
4  A.  Oh.
5  Q.  -- the story that's a companion audio
6  to this written piece.
7  A.  Yeah, I -- I think what he had on
8  air, I remember that.  I -- what he had on air,
9  he, I mean, he -- he certainly -- what's his
10  name, Folkenflik?  I mean, he -- if he had told
11  me there's a tape of it that he was playing,
12  I -- I would have probably called Larry up and
13  tell him to hit him in the head.  What is he
14  doing, making a private conversation -- okay.
15  Q.  Yeah, so this is actually --
16      MS. GOVERNSKI:  For the record, I
17      didn't have a chance to object to the
18      question, but I -- objection noted for
19      the record.
20      THE WITNESS:  Okay, great.
21  BY MR. QUAINTON:
22  Q.  So this article was dated August 16.
23  Do you recall that, Mr. Hersh?  The article's
24  August 16.  Do you see that?
25

HERSH - CONFIDENTIAL

1  A.  I remember the photograph.  I
2  remember a photograph of Butowsky, but I don't
3  remember the story.  They were -- you know, by
4  this time, I was very uninterested in it.
5  Q.  I -- I'm just focusing on the time
6  here.  So the -- this article was August 16.
7  Do you see that?
8  A.  Oh, and by this time, we know there's
9  a tape.  I know the tape is out by then.  The
10  tape -- when was the tape?
11  Q.  Well, actually, don't -- don't
12  speculate.  I'm going to ask you the questions.
13  A.  I -- so I don't know when the tape
14  was.  I don't remember.
15  Q.  Is it --
16  A.  Sometime in May, I thought.
17  Q.  Well, I think if we go down to what
18  Mr. Folkenflik is saying, so if we go down to
19  that paragraph we were looking at earlier --
20  A.  Uh-huh.
21  Q.  -- "According to Folkenflik, Butowsky
22  speaks five days after Trump's inauguration
23  with the legendary investigative reporter
24  Seymour Hersh by telephone."  So Folkenflik's
25

HERSH - CONFIDENTIAL

1  account is that you spoke to Mr. Butowsky five
2  days after the inauguration.  Do you have any
3  reason to believe he's not accurate here?
4  A.  Yeah, I don't think that's accurate.
5      MS. GOVERNSKI:  Objection.
6  Q.  Okay.  And do you -- based on the --
7  to your -- the best of your recollection, had
8  you become aware of the existence of the audio
9  that we listened to before this article was
10  published?
11  A.  If it was the article that came out
12  earlier, I -- I -- all I can say is something
13  you showed me 16 or 17 hours ago today
14  indicated that it was a May audio.  It was done
15  in audio, I think.  I think I saw that.  I
16  mean, it was done in the spring.  And if I'd
17  read this article, I would have -- I would have
18  been upset that I -- I think I would have --
19  my -- my -- I -- I probably wouldn't have
20  done anything about it because I didn't care.
21  I mean, it was just sort of jetsam and flotsam.
22  But -- but I -- I -- if I ran into Folkenflik,
23  or whatever his name is, I'd say, why didn't
24  you tell me when you talked to me that you had
25

Page 238

HERSH - CONFIDENTIAL

1   a tape recording?
2          So I just -- the -- the date -- the
3   date he has of after of the inauguration is --
4   is totally wrong as far as I know.  I mean,
5   I -- every instinct I have.  But I can't -- I
6   don't really know, you know.  I don't keep -- I
7   don't keep -- you know, I -- I certainly don't
8   keep notes of everybody who calls me, or make a
9   note on my calendar on stuff like that.  I -- I
10  don't do anything like that.  I don't do that
11  on my calendar for a lot of good reasons.
12         Q.   Okay.  We're almost done with this.
13  So could you just read two paragraphs?  Read
14  them silently to yourself.
15         A.   Which -- which two?  May I ask?
16         Q.   The two paragraphs, at the -- they
17  should be, sorry, the top of my screen but I
18  guess not the top of your screen.  Again, it's
19  Butowsky tells Hersh.
20         A.   Yes, okay.
21         Q.   And then Hersh warns Butowsky.
22         A.   Yeah, I've read it.
23         Q.   Now, these quotations here, do these
24  appear to be quotations from the audio that we

Page 239

HERSH - CONFIDENTIAL

1   spent most of today listening to?
2          A.   Okay.  I don't dispute that.
3          Q.   All right.  So just read the next
4   paragraph.
5          A.   Which begins what?
6          Q.   "In an interview with NPR."
7          A.   Uh-huh.  Now, this is after the
8   broadcast?
9          Q.   I -- I don't know the answer to that,
10  Mr. Hersh.  I believe that the broadcast and
11  the article were simultaneous, but I'm not
12  100 percent sure.
13         A.   I will tell you I do remember the
14  photograph of Butowsky.  I do remember that.
15  Skeptical, the official -- oh, excuse me.
16  Well, it's consistent with what I've testified
17  to.  I was fishing for information from
18  Butowsky.  Other than that --
19         Q.   Well --
20         A.   -- you know --
21         Q.   -- if you can just let me ask the
22  questions, my -- my question is here, this
23  paragraph begins "in an interview with NPR."
24         A.   Uh-huh.

Page 240

HERSH - CONFIDENTIAL

1          Q.   And in the other article that we
2   read, which was dated August 1, you remembered
3   an interview with David Folkenflik.
4          A.   Uh-huh.
5          Q.   And that was the one in which he
6   quoted you as saying, you know, Butowsky took 2
7   plus 2 and made it 45.  Do you recall that?
8          A.   I -- I recall reading it, yes.  I
9   recall talking to him.  I don't remember
10  precisely what I said, but who would?
11         Q.   Fair enough.  My -- my question is,
12  did you have more than one interview with David
13  Folkenflik about the Seth Rich situation?
14         A.   Almost sure it was one.
15         Q.   So when he talks about "in an
16  interview with NPR" in this paragraph, he's
17  referring most likely to the interview you had
18  before the August 1 article; is that right?
19         MS. GOVERNSKI:  Objection.
20         THE WITNESS:  Yes, sir.
21         MR. BOWMAN:  If you remember.
22  Don't speculate.
23         Q.   Okay.
24         A.   Again, I just -- I don't know how he

Page 241

HERSH - CONFIDENTIAL

1   works, but it seems like he's a pretty serious
2   reporter, which is why I talked to him.  And I
3   don't think he would write something he knew
4   not to be correct.
5          MR. QUAINTON:  Okay, that's all I
6   have on this.  So I think we're at the
7   one-hour mark that -- one other thing I
8   did want to -- did want to do, but I
9   don't know if Chad is going to --
10  there's a five -- there's a five-minute
11  audio that I would like to play, but --
12  would you object to that, Chad, or hold
13  me to that hard stop?
14         MR. BOWMAN:  If you are telling me
15  that you need five more minutes and
16  that's it, we can accommodate five
17  minutes.  But you're at the hour.
18         MR. QUAINTON:  It's five minutes
19  and then no more than five minutes of
20  just questioning on it, I promise.  Then
21  I'd be done with everything I planned to
22  do today, if that helps you.
23         MR. BOWMAN:  I didn't catch that
24  last part.  You're saying five more

HERSH - CONFIDENTIAL
minutes and then another five minutes?
MR. QUAINTON: Well, I'd just like to play the audio, and then I have just, you know, one or two questions. I mean, it's -- it's nothing. Literally should not take me -- I could be two minutes if you'd like.
MR. BOWMAN: Okay. Finish your exam.
MR. QUAINTON: Okay. Just so we are clear, for the record, this is what I had marked as DH22, which DH22 just had the -- the link to this episode. It did not actually have the audio itself.
(Exhibit No. DH22 was marked for identification.)
MR. QUAINTON: Can you hear that?
MR. BOWMAN: No.
THE WITNESS: I hear nothing.
MS. GOVERNSKI: No.
MR. QUAINTON: Now?
MR. BOWMAN: Still nothing.
MR. QUAINTON: Can you hear that? Still nothing?

HERSH - CONFIDENTIAL
THE WITNESS: I have a message saying my internet connection is unstable.
MR. QUAINTON: Oh, I see what I did. I did the same -- I did the rookie mistake. I didn't click share computer sound.
(The clip was played.)
MR. QUAINTON: Can you hear this now?
THE WITNESS: Yeah.
(The clip was played.)
MS. GOVERNSKI: I'll just object for the record to the video for the same reasons we've discussed today.
BY MR. QUAINTON:
Q. Mr. Hersh, do you recognize that audio clip that I just played for you?
A. I don't think I've ever heard that alleged five-minute clip, which sounded to me more like 10.
Q. It was six minutes. So I'm not going to go back into the substance, but just at the very end, this is -- this is what I want to ask

HERSH - CONFIDENTIAL
you about. Folkenflik, who's the -- the reporter speaking, at the very end says that when you say "doesn't make it true," he adds on "may never have happened," and he -- the listener comes away with the impression that your conversation with your source may never have happened, that you may have been making that up. That's an impression the reader -- the listener gets. And I'd just like to make sure the record is clear. That would be a totally false impression for the listener to have, that there's any doubt that you had the conversation with the source that we've spent the last five hours discussing.
MR. BOWMAN: Objection.
MS. GOVERNSKI: I object to the question on many forms, including to the extent it is attempting to use discovery in this case for other litigation.
MR. BOWMAN: Objection.
MR. QUAINTON: You can answer the question.
MR. BOWMAN: If you can understand the question, go ahead and answer it,

HERSH - CONFIDENTIAL
Mr. Hersh.
THE WITNESS: I -- I -- I can't understand the question because the premise to your question is illogical to me. He's talking about -- it has to do with my conversation. It -- I don't think it goes to where you said it goes, so I -- I really don't have an answer to that question.
BY MR. QUAINTON:
Q. Let me try it again.
A. No, I'm -- I'm just telling you, may never have happened. You know, I don't quite understand why you would think that means that the whole thing didn't happen.
Q. What's what -- that's all I want you to confirm for me, that you are not saying and never said --
A. I -- I didn't --
Q. -- that the conversation didn't happen.
A. I'm not responsible for what somebody else puts on the air, sir.
MR. BOWMAN: Counsel, you've

Page 246

```
 1            HERSH - CONFIDENTIAL
 2    examined him about the phone call.  This
 3    does seem to be aimed at discovery in
 4    another case.
 5         MR. QUAINTON:  It's actually not in
 6    discovery in another case, it's
 7    simply -- it's aimed at discovery in
 8    this case.  And I -- I don't view my
 9    question as being confusing, it's
10    simply --
11         MS. GOVERNSKI:  I would join
12    Mr. Bowman in his -- in his opinion.
13    And I also wonder what -- what possible
14    testimony Mr. Hersh could lend as to the
15    impression of readers to an article that
16    is directly at issue in another one of
17    Mr. Butowsky's lawsuits.
18         MR. QUAINTON:  I'm just trying to
19    get it clear that Mr. --
20    BY MR. QUAINTON:
21    Q.   Mr. Hersh, you -- you never said to
22    Mr. Folkenflik or anybody else that your
23    conversation with the trusted source may not
24    have happened.
25         MR. BOWMAN:  Objection.  Can you --
```

Page 247

```
 1    can you rephrase that?
 2         MS. GOVERNSKI:  Objection.
 3         MR. QUAINTON:  You can just read it
 4    back, and you can -- the objection as to
 5    leading can stand.  And if you could,
 6    the reporter could just read that
 7    question back, then I think we can be
 8    done.
 9         THE WITNESS:  I just -- I -- I
10    can't understand the premise of your
11    question.  It was -- it was a broadcast
12    or a podcast by somebody else.  I -- I
13    don't -- I -- I don't understand the
14    premise of it.  I don't know why -- I
15    don't understand why I have -- I should
16    have an opinion on that question.  I
17    don't --
18         MR. QUAINTON:  Wasn't it a --
19         THE WITNESS:  -- have one.
20         MR. QUAINTON:  Mr. Hersh, it wasn't
21    a question of opinion.
22         THE WITNESS:  I have no idea what
23    the average reader would hear, if they
24    hear that thing, I -- I don't, so I --
25
```

Page 248

```
 1            HERSH - CONFIDENTIAL
 2         MR. QUAINTON:  But I'm not asking
 3    you --
 4         THE WITNESS:  I don't have any --
 5         MR. QUAINTON:  I'm not asking
 6    about --
 7         MR. BOWMAN:  Counsel, the witness
 8    testified about the actual event, so you
 9    can ask about the actual event.  It's
10    not proper to ask about reasonable
11    understandings of articles that he
12    didn't write that are at issue in other
13    cases.
14         MR. QUAINTON:  I -- I understand
15    that, and I'm not doing that.  If you'd
16    just listen to the question I am asking,
17    and I -- I will withdraw the question
18    about what a reasonable listener might
19    take away from that, which is a fair
20    objection.
21    BY MR. QUAINTON:
22    Q.   My question is:  Did you ever say to
23    Mr. Folkenflik that the conversation with your
24    trusted source may never have happened?  Did
25    you ever make that statement to him?
```

Page 249

```
 1            HERSH - CONFIDENTIAL
 2         MR. BOWMAN:  Go ahead and answer
 3    that question.
 4         THE WITNESS:  I beg your pardon?  I
 5    should answer that question?
 6         MR. BOWMAN:  Yes, to your memory.
 7    A.   I have no memory of what I said to
 8    Mr. Folkenflik or not.  I mean, I -- I --
 9    it's -- it's -- I just don't -- I -- I don't
10    think he's suggesting I did say that, is he?
11    If he is, that's news to me.  Sounds like a
12    comment he made.  The only thing I can tell you
13    is -- is it's a radio -- is it a radio
14    broadcast or was it a podcast or what?  What
15    was it?
16    Q.   It's a podcast.
17    A.   Podcast?  Was -- was the -- was it
18    Folkenflik who said may never happen, or was it
19    Isikoff to me saying it?
20    Q.   That was Folkenflik.
21    A.   I can't help you, counselor.  I --
22    Q.   All right.
23    A.   To my memory, I've -- I -- I don't
24    think I've ever denied a conversation that's on
25    tape.  It's --
```

HERSH - CONFIDENTIAL

MR. QUAINTON: Okay, thank you. Let's -- I'm done for now. I'm done, actually not for now. I'm done. And thank you very much for your patience and your time, Mr. Hersh. And I don't know if anybody has any -- I guess, Meryl, you don't have any cross now, right?

MS. GOVERNSKI: No. It's -- it's way beyond time and so I'll be reserving my cross for tomorrow, and perhaps closing on -- on cross. And for the record -- well, we can talk about this off the record.

MR. QUAINTON: So, Mr. Hersh, you're free to go. And thank you again.

THE WITNESS: You're welcome. Bye-bye, sir.

THE VIDEOGRAPHER: Time is 5:01 p.m. We're off the record.

(Deposition adjourned at 5:01 p.m.)

HERSH - CONFIDENTIAL

C E R T I F I C A T E

DISTRICT OF COLUMBIA:

I, MARY ANN PAYONK, shorthand reporter, do hereby certify that the witness whose deposition is hereinbefore set forth was sworn by agreement of all parties, the proceedings were reported stenographically by me, and that this transcript is a true, correct, and full record of the testimony given.

I further certify that I am not related to any of the parties to this action by blood or by marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of July, 2020.

Mary Ann Payonk

_______________________________________

MARY ANN PAYONK, Shorthand Reporter

VA:219251 8/31/2022; DC:08/31/2020; CA:13431

HERSH - CONFIDENTIAL

- INDEX TO WITNESSES -

| WITNESS | PAGE |
|---|---|
| SEYMOUR M. HERSH | |
| Examination by Mr. Quainton | 8 |

- INDEX TO EXHIBITS -

| NO. | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit No. DH1 | ITV video clip | 19 |
| Exhibit No. DH2 | Ellen Nakashima article | 21 |
| Exhibit No. DH3 | Guccifer 2.0 posts | 28 |
| Exhibit No. DH4 | "Guccifer 2.0 Taking Responsibility for Hack" | 29 |
| Exhibit No. DH5 | Video clip, Julian Assange on Dutch TV | 40 |
| Exhibit No. DH6 | Hersh Butowsky audio clip | 42 |
| Exhibit No. DH7 | Transcript of call | 48 |
| Exhibit No. DH8 | Consortium News link to clip | 117 |
| (Note: Break in exhibit numbering) | | |
| Exhibit No. DH12 | 4/20/2017 email | 200 |
| Exhibit No. DH13 | 5/5/2017 email | 204 |
| Exhibit No. DH14 | 5/5/17 email chain | 205 |
| Exhibit No. DH15 | 5/5/2017 email | 211 |

HERSH - CONFIDENTIAL

INDEX TO EXHIBITS (Cont'd.)

| NO. | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit No. DH16 | 5/2/2017 email chain | 211 |
| Exhibit No. DH17 | 5/27/2017 email | 219 |
| Exhibit No. DH18 | Cover page, "DH-18" | 223 |
| Exhibit No. DH19 | 2/12/2018 e-mail | 224 |
| Exhibit No. DH20 | 8/1/2017 NPR Folkenflik article | 225 |
| Exhibit No. DH21 | 8/16/2017 "The Man Behind the Scenes" NPR article | 230 |
| Exhibit No. DH22 | Folkenflik audio clip | 242 |

- INDEX TO CERTIFIED QUESTIONS -

| Page/Line | | Text of the Question |
|---|---|---|
| 56 | 17 | And are you still working on a story related to Russians spying on the Democrats? |
| 75 | 5 | And did you attempt to contact any of the people that I've just mentioned, anybody on his team, anybody at the Department of Justice, anybody at the Metropolitan Police Department with -- |

Page 254

```
1              HERSH - CONFIDENTIAL
2         - INDEX TO CERTIFIED QUESTIONS -
3     Page/Line              Text of the Question
4   76   9    Was the person to whom you
5            spoke in the CIA?
6   76   14   Was the person to whom you
7            spoke at the NSA?
8   76   20   Can you disclose the name of
9            the person with whom you spoke?
10  174  22   So my question is, what did you
11           mean by "I can tell you right now
12           Maddis knows what I know"?
13
14                <<INDEX END>>
15
16
17
18
19
20
21
22
23
24
25
```

Page 255

```
1              HERSH - CONFIDENTIAL
2   NAME OF CASE:  Rich vs. Butowsky
3   DATE OF DEPOSITION:  July 15, 2020
4   DEPONENT:  SEYMOUR M. HERSH
5        1.  To clarify the record.
         2.  To conform to the facts.
6        3.  To correct transcription error.
7
    Page _____ Line _____ Reason _____
8   From _____ to _____
9   Page _____ Line _____ Reason _____
    From _____ to _____
10
    Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
    From _____ to _____
13
    Page _____ Line _____ Reason _____
14  From _____ to _____
15  Page _____ Line _____ Reason _____
    From _____ to _____
16
    Page _____ Line _____ Reason _____
17  From _____ to _____
18
19            _____
20                 SEYMOUR M. HERSH
21  SUBSCRIBED AND SWORN TO BEFORE ME
22  THIS _____ DAY OF _____, 2020.
23  _____
24  (Notary Public)
25  My Commission expires: _____
```

**0**

**09** 81:21

**1**

**1** 6:8 72:21 173:14
191:4 222:24 225:17
230:22 240:3,19

**1,500-word** 163:8

**10** 72:21 84:19 90:7,
9,20 136:13,18 169:2
192:22 193:4 243:22

**10,000** 163:7

**100** 239:13

**101** 147:4

**10:06** 24:7

**10:12** 24:10

**10:16** 50:2

**10:17** 28:25

**10:32** 29:4

**10:49** 45:4

**10:50** 45:7

**11** 72:22 171:10

**11:24** 50:5

**12** 89:25 152:18
171:10

**12-year-old** 89:23

**12:30** 102:9

**12:32** 102:12

**12:34** 103:7

**12:35** 103:10

**13** 176:10

**15** 6:11 10:24 12:22
49:20 131:5

**16** 83:6 142:12
230:17,25 235:23,25
236:7 237:14

**16-4702** 7:24 75:17

**17** 142:12 237:14

**18** 13:19 83:6 96:13
133:23 156:4

**19** 116:12,13 127:4

**1960** 10:15

**1985** 66:14

**1:32** 116:4

**2**

**2** 24:14 59:17 60:5,6
191:4 212:19 222:18
228:16,17 229:10,12,
25 240:7,8

**2,000** 166:23

**2.0** 28:7 29:8,23 40:3,
6

**20** 10:24 46:13 52:19
116:12,13 127:5
137:6 202:21 203:24
215:6

**200** 170:7

**2001** 72:21

**2016** 87:19 100:14
101:3 102:18,19
103:19,20 164:24

**2017** 13:16,19 14:6
43:18,19 176:20
209:25 220:23
225:17 230:17

**2020** 6:12

**21** 91:21 142:12

**22** 79:3 91:10 141:6
156:4 221:13

**27** 77:11 220:17,23
221:11 222:11,21,25

**29** 52:20 152:18
156:4

**2:20** 140:24

**2:21** 141:3

**3**

**3** 59:17 191:4

**30** 5:17 66:13 86:24
94:25 107:6

**30-page** 77:5

**31** 107:6 108:11
194:8 195:4 198:20

**32** 162:12 164:18
171:10

**35** 79:16 86:24 107:4

**36** 173:14

**38** 59:25

**39** 59:25 174:13
176:10

**3:25** 196:25

**3:47** 197:4

**3:53** 201:17

**4**

**4** 29:15 59:17 83:6
131:6 141:7 173:15

**40** 59:25

**41** 59:25

**44** 230:2

**45** 228:17 229:10,13
240:8

**4:04** 201:19

**4:10** 208:3,6

**5**

**5** 59:17 141:7 209:25

**50** 10:15 166:17
169:20

**59** 46:13

**5:01** 250:20,23

**6**

**6** 59:23 174:14

**60** 10:16

**7**

**7** 59:23 126:22 162:13

**7-** 163:7

**8**

**8** 59:23 96:13,18,19
116:10 125:22
126:20 127:2,4
162:13 164:18
174:14 202:22

**80** 74:12

**81** 74:12

**82** 74:12

**9**

**9** 40:17 59:23 87:18,
19 133:24

**9-year-old** 88:17
89:15

**9/11** 72:22 165:12

**9:42** 6:12

**9:56** 19:7

**9:58** 19:9

**A**

**a.m.** 6:12 19:9 24:7,
10 29:4 45:4,7 50:2,5

**Aaron** 6:10 51:4

**ability** 9:14,19 22:16

**abroad** 151:6

**absolutely** 13:25
72:25 83:15 115:21
123:15 129:4 147:5
176:22 180:2 184:15
199:6,12 200:15
234:7

**abuses** 162:23

**academia** 90:22

**acceptable** 7:5

**access** 69:23

**accommodate**
241:17

**accomplish** 198:9

**account** 104:2 237:2

**accounts** 81:25
104:3

**accurate** 19:23 47:4
50:20 51:24 52:7,14
53:12,21 61:11 65:2
68:12 87:11 95:3
138:13 214:2 216:2
217:7,25 218:9
228:20 229:4 237:4,5

**accurately** 9:15,20
52:18,22 61:4 228:24
229:2

**acknowledgment**
40:11

**acquaintance** 42:23

**active** 10:6

**actual** 19:16 21:15
35:5 248:8,9

**add** 150:3

**adds** 244:4

**adjourned** 250:23

**admirer** 11:16

**admissibility** 121:21

**admissible** 5:16

**admit** 114:3

**Advisor** 144:20
145:5

**affect** 9:14,19

**Afghanistan** 170:4

**afternoon** 116:6

**age** 77:12,15,16

**agencies** 141:18
166:7

**agency** 75:24 76:3,5
166:13

**agent** 69:2,6,20,24
70:15,22 71:15 92:11
191:14 229:17

**agree** 7:11,18 108:9,
13 146:20 176:16

**agreed** 6:21 45:16
150:21

**agreement** 5:24 122:5

**ahead** 36:14,19,23 44:17 48:19 52:4 107:22 112:22 117:11 133:17 154:16 155:23 156:2 205:3,9 207:11 208:14 219:13 220:15 224:14 229:9 231:22 244:25 249:2

**aimed** 246:3,7

**air** 156:25 190:17 235:9 245:24

**alcohol** 9:13

**allegation** 40:11

**allegations** 56:15 88:9 98:2,7

**alleged** 25:10 26:16, 18 127:23 130:17 162:23 243:21

**allegedly** 93:10

**altered** 47:15 48:5

**amazing** 141:15

**Amendment** 7:25 75:18

**America** 151:5

**American** 91:4 168:12,23 169:19,22 171:10,13

**Americans** 170:2,5, 6 175:12,23

**ancient** 161:22

**anecdotally** 80:9

**angry** 209:20

**Ann** 5:10

**answer's** 10:5 150:7

**answering** 222:13 223:6

**answers** 154:2

**antecedent** 65:23 92:23 149:8 171:14, 17

**anticipate** 101:22

**anticipated** 64:21

**anymore** 34:19 36:7 135:24

**apologies** 51:12 112:13 183:14

**apologize** 46:2 112:20 179:14 222:2 223:12

**apparently** 187:12 220:22

**Appeals** 79:20

**appearances** 6:13

**appeared** 42:9

**appears** 47:2,14 48:2

**appellate** 79:18 80:6

**appointed** 72:24

**appointee** 144:19

**approved** 74:15

**approximately** 6:12

**April** 202:21 203:24

**area** 26:23 74:17 78:7,8 80:3,4 82:3 115:7

**areas** 108:5

**arguing** 181:4

**Arizona** 166:3

**Army** 97:4

**article** 21:12,16 25:9, 14,20,23 225:16,20 227:8 228:19 230:17, 20,21,22 231:7 235:3,23 236:7 237:10,12,18 239:12 240:2,19 246:15

**article's** 235:24

**articles** 12:23 248:11

**ashamed** 93:14

**asks** 173:16

**aspect** 135:2 158:22

**Assange** 20:12 40:18 41:23 42:15 87:19,20,25 88:5 91:19 95:15 97:9,15 127:20 129:8 136:24 154:21 156:14 157:15 158:25 159:12,15

**Assange's** 131:12

**assert** 7:7,21 57:2

**asserting** 174:25

**assertion** 61:6

**associates** 131:12

**association** 5:4

**assume** 191:18 219:7

**assumed** 43:14 191:20

**assuming** 63:19

**assumption** 184:13

**Atkins** 132:6,7,9

**Atkinson** 132:9

**attaching** 224:12

**attempt** 57:25 75:2,5 199:21

**attempted** 58:7

**attempting** 127:14 244:19

**attention** 162:19 224:23

**attorney** 73:24 74:12,23 79:18 140:11

**audio** 7:16 17:2,10 18:5 27:14 37:14 44:24 45:9 46:13,15, 20,23 47:2,5 48:3 50:9 51:5,8,24 52:22 53:6,24 54:2,4,14 55:5,9 58:24,25 59:2, 4,9 60:9,12 61:4,6,12 67:5 68:3 87:18 107:2 116:8 117:14, 15 122:21 125:18 144:5,7 171:7 174:13 233:23 235:2,4,6

237:9,15,16 238:25 241:12 242:4,15 243:19

**audio/video** 19:24

**audios** 17:18,19

**August** 40:17 87:18, 19 164:24 165:20 172:15,21 225:17 230:17,22,25 235:23, 25 236:7 240:3,19

**authentication** 122:19

**authenticity** 22:24 37:3 121:22

**automatically** 184:14

**average** 247:24

**avid** 9:23,25

**aware** 100:12,18,19 101:9 237:9

**awful** 26:2

**B**

**back** 11:7 13:17 23:24 34:23 35:2,21 38:15 42:5 43:17 46:2 51:9,19 58:14, 24 61:18 66:25 68:13 75:21 78:20 104:11 108:23 116:21 126:14 131:17,23 143:14 144:4 145:22 182:18,20 194:20,22 198:16 208:6 229:20 231:18 232:25 243:24 247:5,8

**background** 10:12, 20 17:6 42:21

**backtrack** 181:19

**bad** 41:7 84:21 146:8 170:11

**Barr** 73:22 74:3,8

**barred** 215:6

**based** 26:3 52:13 105:10 205:14 215:3 237:7

**basic** 91:9 135:16

**basically** 16:14 150:25 162:23

**basis** 11:22 71:11 75:12 90:15 121:25 196:14 229:14,15

**Bates** 45:12

**bathroom** 8:22

**bear** 17:15 176:15

**bearing** 56:25

**beaten** 78:22

**beating** 135:10

**beg** 54:25 145:8 212:16 249:4

**began** 10:21 27:12 67:18 70:8 107:2 164:15,20

**begin** 60:16 131:6

**beginning** 47:2,5,9 53:19 62:9 64:18 65:24 67:13 75:14 87:17 106:25 115:2 148:25 185:6 233:20

**begins** 60:6,7 62:12 68:3 239:6,24

**behalf** 7:15,18 150:13

**belabor** 27:18 146:19

**believed** 56:5 93:23 210:25

**belong** 32:17

**benign** 209:22

**Bible** 184:25

**big** 146:8 150:23 161:10 165:13 166:8 169:5 191:19

**bit** 10:19 26:11 58:4 92:21 99:25 140:13 176:12 206:11 221:24 225:12

**bits** 167:7

**blah** 51:8

Index: blank..circles

**blank** 36:20

**blew** 146:6

**blindsided** 23:8

**blowing** 175:12

**body** 169:17,22 170:8

**Boies** 7:14

**book** 132:13,17

**Books** 132:15

**bottom** 30:19 61:25 62:4,6 127:2 206:14

**bounce** 55:5

**bounced** 55:4

**bounty** 91:3 168:21 170:5,25

**Bowman** 6:4 7:4,17 13:20 15:6 18:18 19:3 20:16 22:14 24:2 27:2 35:10 37:2, 19,24 38:4 43:3,10 44:18 49:17 50:23 52:3,25 53:4 56:21, 24 57:8 61:14 63:18 69:11 71:5,23 74:10 75:7,11 76:11,16,22 81:7,9 88:3 94:20 101:20 104:20 105:13 107:19 108:2, 18 109:3 113:11 117:25 118:4,7,17 119:4,6,9 120:12 121:5 122:3,16 123:20,22 126:5 128:19 129:25 139:7 140:6 142:16 145:7, 15,18 153:20 156:8 159:7 165:10 172:19 174:25 180:12,25 188:15,22,24 189:23 196:18 198:14 202:5 206:13 210:19 212:7 217:11,13 218:10,14 223:21 240:22 241:15,24 242:9,19, 23 244:16,21,24 245:25 246:12,25 248:7 249:2,6

**box** 106:18 109:16 126:25 207:24

**break** 8:21,22,23 58:17 101:23 103:4 112:23 115:23 170:20 172:9 194:24 196:19,23

**break-ins** 165:23 172:24

**breaking** 58:15,20

**Brennan** 37:15 162:18 164:20 166:8 167:23 168:6 171:22

**briefly** 10:10 17:3 22:2,8,9 24:16,18 28:13,17 29:9 50:14 225:18

**brilliant** 135:4

**bring** 17:5

**British** 97:14 132:14

**broadcast** 234:18, 20,21 239:9,11 247:12 249:14

**broke** 165:24

**broken** 165:22

**Brooklyn** 82:15,16

**brother-in-law** 79:15 81:2 192:20

**brother-in-law's** 80:11

**brothers** 133:12

**brought** 56:9 195:24

**bucks** 170:8

**buddy** 94:10

**budget** 168:6

**budgets** 166:14

**bullshit** 37:16 171:3

**bum** 187:18

**bunch** 34:24 122:7

**bureaucratically** 87:4

**Bush** 175:10

**Bush/cheney** 175:8

**business** 15:18,24

16:5 44:5 49:21 56:23 60:24 93:12 111:12,20 139:19 150:15 175:19 191:21 200:2,7

**Butowsky** 6:11 8:17 9:10 13:3 14:9,20 15:5,12,19,23 16:12, 18,23 27:4 42:24 43:20,25 44:11 46:22 54:7,24 55:9 56:6 57:7 59:10 66:20 67:7 68:24 86:21 110:18 114:3 126:13 129:22,24 130:22 138:3,23,25 139:4 142:6 148:20 149:20, 22 150:10,18 151:13, 20 154:20 156:3 158:22 159:8 160:15 171:8 173:3,16 176:19,25 177:15 178:3 179:17 180:11 181:22 182:14 183:17 185:18 188:14 189:17,25 190:3,4 202:21,25 203:4 204:20 210:9 212:14 214:17 217:9 218:8 220:17,22 222:11,22 228:4 229:10,12 231:25 232:3 233:21 236:3, 22 237:2 238:20,22 239:15,19 240:7

**Butowsky's** 246:17

**button** 118:9

**buy** 233:13

**Buzzfeed** 104:16

**Bye-bye** 250:19

**byline** 25:5

—————

**C**

**Cabinet** 165:3,12,13

**calendar** 238:10,12

**caliber** 79:4,5

**call** 13:7,11 14:21,22 15:5,11,21,22 16:3, 22 17:7,17 20:19

27:8 42:24 43:8,24 44:12 48:11 55:16 57:13,18 89:4 93:2,7 122:6,12,14,17 128:8 151:25 161:13 162:14 167:13 170:14 202:24 203:4 246:2

**called** 8:7 56:4 57:7 66:16 84:14 100:11 120:6 139:19 159:15 160:9,12 161:3 165:9 186:25 187:18 227:9 235:13

**calling** 44:11 215:21

**calls** 20:17 238:9

**calmly** 94:9

**campaign** 73:3 166:22

**capable** 53:16

**captured** 48:3

**care** 134:24,25 151:15 237:21

**career** 10:23

**careful** 71:7 138:13

**carefully** 70:14 120:17 232:15

**CART** 84:9

**case** 5:19 8:17 50:11 59:5 79:24 129:11 130:13 131:20 134:24 138:8 143:16 146:5 149:13 174:18 175:15 182:10 184:19 194:4 195:24 226:9 244:20 246:4, 6,8

**cases** 80:7 82:7 94:25 143:17 192:22 248:13

**casual** 229:18,19

**catch** 180:23 241:24

**caveat** 71:12 115:6 177:7

**caveated** 86:15

**CB** 210:12

**cell** 112:19

**ceremonies** 119:25

**certainty** 176:15

**certify** 61:16

**Chad** 7:17 241:10,13

**chair** 11:7

**chance** 23:2 32:19 33:19 34:2 35:24,25 36:5 39:21 49:4,19 180:24 214:5 235:18

**change** 193:2

**characteristics** 84:17

**characterization** 30:24 93:3

**characterize** 124:5 189:4

**characterized** 195:13

**charge** 79:16

**chasing** 193:4,5

**chat** 24:13 28:6 29:6 30:12,20 32:8 48:16, 19,23 50:12 70:6 117:3

**chatter** 64:5

**chatting** 186:7,9

**check** 175:5 208:24

**Cheryl** 132:9

**Chicago** 10:14,25 193:3

**children** 213:11 216:23

**chitchat** 67:10,13 68:2 195:14 229:19

**Christopher** 100:5 102:15,18 103:18 104:6

**CIA** 76:3,10 97:4 150:22 162:24 166:13,15,17 168:5, 10

**circles** 108:13

**circulate** 19:15

**circulated** 165:2,17, 20 166:6

**circulating** 172:23

**city** 80:3

**Civil** 5:18

**claimed** 57:22 174:2 213:5

**clarification** 112:6

**clarify** 148:17

**clarifying** 148:18

**clarity** 31:25 107:3 108:7 224:8

**Classified** 166:9

**clear** 7:12 61:2 63:25 64:18 65:3,6,24,25 66:9,13 71:18 94:4, 14 96:2 108:21,25 148:16 153:16 155:19,20 158:20 178:12 181:13 185:14 191:17,18 242:12 244:11 246:19

**click** 24:15 28:17 31:5 33:9 207:4 243:7

**clicked** 35:16

**clicking** 31:3

**client** 15:19

**Clinton** 24:25 57:22 81:21 90:9

**clip** 19:17,18,20 20:5, 8,11 40:15,19,20,23 41:12,16 45:21 46:5, 10,13,15,20 47:15 61:19 62:10 77:6,18 78:17,25 80:15 81:14 83:16 84:3,24 87:17, 19 91:7 92:2,18 94:12 96:9 97:19 98:10,19 99:3 100:2 106:3,16 109:4 116:22 117:8 118:12, 14,24 119:13,16 121:13 124:22 125:5, 12 131:2,8 133:14,

19,22 134:2 136:21 137:24 138:10,21 139:21 143:21 148:11 149:4,16 152:16 154:17 155:17 162:10 172:11 173:12 174:10 243:9,13,19, 21

**clips** 152:12

**close** 101:25 102:2,4 125:17 160:24

**closing** 250:13

**CN** 120:3 153:24 192:18

**CNN** 120:3 136:13,18

**Coast** 97:5

**cocksucker** 167:14

**code** 7:23 75:16 114:19

**codified** 112:3

**Cold** 166:13

**collaboration** 32:15

**collateral** 129:10

**colleagues** 7:13

**collect** 163:4 167:9

**collecting** 169:17

**collection** 103:21 108:5

**collectively** 102:20

**collusion** 73:2

**Columbia** 193:8

**combination** 82:11

**comfortable** 9:4,6

**Command** 151:4

**commando** 169:20

**comment** 249:12

**Committee** 36:22 88:14 220:6,7

**common** 8:2 75:18 97:6 101:12,17 217:17

**commonly** 100:15

**communicated** 70:25 81:4 106:20 109:9,14 113:6,7 121:3 154:25 158:24 180:10 188:13,14 189:15,17 194:9 195:5 198:21 199:7, 16

**communicating** 159:9

**communication** 203:8

**communications** 90:11 203:3

**community** 90:23, 24 157:13

**companion** 235:6

**company** 99:18 100:10

**compared** 53:5

**competent** 93:19

**compiled** 100:13

**completeness** 117:16 205:15

**complicated** 101:4, 6 111:23

**computer** 80:18,24 95:13 96:5 124:2 193:10 194:10 195:7 198:23 243:7

**computer's** 201:13

**computerized** 93:25

**computers** 112:18

**concept** 139:8

**concern** 88:25

**concerned** 44:13

**conclusion** 146:24

**confabulating** 128:17

**conference** 137:19

**confidential** 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1

16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1,13 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1

204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1

**confidentiality** 45:17

**confines** 14:12

**confirm** 245:18

**confirmed** 227:20 228:5

**confirming** 229:15

**confusing** 246:9

**connected** 56:12

**Connecticut** 74:24

**connection** 128:7 150:16 243:3

**consistent** 149:2 221:7 239:17

**Constitution** 8:2

**contact** 13:10 74:18 75:2,5 92:25 94:16 96:4,5 97:23 116:15 125:23 127:6,15 128:23

**contacted** 73:5,8,12, 16 74:3,8

**contained** 105:12 113:4,5

**content** 22:11 44:12 57:4 158:23 159:2,5 199:15 225:25

**context** 70:5 86:25 87:2 88:18,21 94:23 110:9,10,17 111:15, 16,17 127:16,19 128:4 142:10

**continue** 41:13
102:2

**continues** 59:22

**contract** 130:9
170:15

**contradictions**
150:5

**contrary** 121:20

**control** 36:11 227:12
232:16

**controlling** 228:10,
12

**controls** 165:4,8

**controversy** 178:18

**conversation** 13:14
14:4,9,20 15:14 27:4
43:20 46:21,22 47:3
53:17 54:6 60:15,16
63:20 64:22 66:12
67:5 68:10 70:7
74:16 75:23 86:9,11,
18,20 87:23 92:16
93:11 94:24 99:22
110:18,24 116:8
123:18 124:8 130:5,8
144:13 145:20
146:15 149:19 153:4
155:21 157:24
163:22 171:7 176:19,
24 177:14,23 179:6
180:5,15 181:10
186:17 189:4,25
191:12 195:14 210:5
217:2,9 225:25
231:25 232:3 235:15
244:7,14 245:7,21
246:23 248:23
249:24

**conversations** 68:9
153:5 160:20

**conveyed** 187:25

**convince** 152:6

**coordinate** 49:17

**cops** 82:24 83:7
187:10 193:9

**copy** 138:24

**Corps** 162:3

**correct** 9:10 11:24
16:20 25:11,24 32:20
33:21 34:3 43:21,25
45:20 51:12 67:8
71:3 73:25 74:24
83:14 84:14 94:18
98:16 99:11 100:8
106:13 107:5,11
115:15,18 118:7
128:14 129:2 131:12
138:14 145:5 148:21
157:8 178:9 180:11
182:6 183:3 210:7
235:2 241:5

**Couch** 8:18

**counsel** 6:20,21,22
8:24 14:17 17:20
19:15,22 28:19 30:5
37:2 44:19 45:15
49:14 50:12 72:23
73:10 95:22 170:19
181:2 206:13 245:25
248:7

**counsel's** 121:16

**counselor** 10:5
53:18 60:15 101:5,20
123:12,25 130:3
140:3 143:9 145:17
168:20,21 184:2
189:12 194:17
195:23 205:10
207:15 222:6 249:21

**counselors** 5:3

**counterinsurgency**
150:25

**country** 166:21
184:19

**couple** 153:9 155:6,9

**court** 6:14 38:17 51:7
79:19,20 117:20
168:8 172:8 182:18
223:11 227:24

**courtroom** 5:16

**cover** 223:22 224:12

**covert** 111:12

**COVID** 10:3

**COVID-19** 5:6

**Cowboys** 152:11

**crap** 135:11 175:11

**crazies** 169:11

**crazy** 170:8 192:18

**create** 166:20

**created** 37:25 165:12
168:6 169:4

**credence** 157:5

**credible** 105:20,23
163:18

**credibly** 163:19

**cross** 250:8,12,13

**cursor** 212:22

**cut** 39:7 206:10,21

**cyber** 81:17 82:17,
21,23 83:7,10,13
84:2,5,13 210:12

---

**D**

**damn** 112:18

**date** 36:22 91:21
209:24 212:15,17
230:23 238:3,4

**dated** 220:17 222:11
225:17 230:17
235:23 240:3

**dates** 104:4

**David** 240:4,13

**day** 54:23 55:8
137:15 182:13
192:21 197:15,17,19
205:2

**days** 72:22 231:21
236:23 237:3

**DC** 7:23 73:18 75:16
81:17 82:14,21,24
83:7

**dead** 170:6

**deal** 78:7 80:6 82:4
90:10,17 113:15,21
114:20 115:7 127:21
146:8 158:16 163:2

**decades** 11:4

**dedicated** 28:19

**deeply** 98:7

**defamation** 194:4

**defeat** 57:23

**defend** 221:21

**defendant** 9:10
24:14

**defendants** 8:17
45:12

**defender** 79:16
80:13

**defender's** 79:20
80:2

**delete** 11:21 12:8,16

**deliver** 169:22

**Democratic** 36:22
88:14 98:24 162:22

**Democrats** 56:16,18
98:22 162:24 164:2

**denied** 249:24

**Denver** 152:11

**department** 73:13,
17 75:9,10 83:13
150:24

**deposition** 5:9 6:9
7:8,20 8:15 10:8
23:3,7,15 25:18 27:6
38:8 49:21 75:15
122:6 250:23

**describe** 10:11
85:25 102:19

**description** 65:2

**designated** 45:17

**detail** 17:25 58:23

**detailed** 78:5

**detour** 42:21

**develop** 44:5

**DH** 29:22 200:17
204:9 221:15

**DH1** 19:11,15

**DH12** 200:17,19
201:23 202:8

**DH13** 204:12,15

**DH14** 205:23,24

**DH15** 211:12,13,17

**DH16** 211:22,23

**DH17** 219:16,17
221:15

**DH18** 223:17,18,21

**DH19** 224:3,5,15

**DH2** 21:8,21,22 24:14

**DH20** 225:9,14

**DH21** 225:8 230:11,
13

**DH22** 242:13,16

**DH3** 28:7,9 29:7,13
32:9,12

**DH4** 29:11,19,22
32:7,13,14,20 33:22
35:7,15,25 36:2
39:21

**DH5** 40:16,21 41:17

**DH6** 42:16,20 45:9
61:25

**DH7** 48:12,13 49:5
50:8,24 51:3 59:6,7,8

**DH8** 117:3,5

**dialed** 40:25

**difference** 114:5

**differently** 136:4

**dinner** 79:23

**directing** 168:18

**direction** 101:14
102:17 103:17

**directly** 57:21 246:16

**Director** 72:20,21
168:10

**disappeared** 32:22
140:13

**disclose** 76:20

**disclosing** 69:14

**discourage** 211:3

**discovery** 244:19 246:3,6,7

**Discredited** 231:4

**discursively** 182:11

**discuss** 16:8,12 26:25

**discussed** 71:22 83:21 85:6 155:22 176:20 243:16

**discusses** 25:9

**discussing** 107:2 244:15

**discussion** 6:19 19:8 24:8 29:2 45:5 50:3 67:6 102:10 103:8 140:25 201:18 208:4

**discussions** 27:24

**disinformation** 37:14 168:5 171:11, 14

**dispute** 208:22 239:3

**disputing** 130:7 209:19 217:2

**distancing** 5:7

**distinction** 91:16 197:21

**distinguish** 79:9

**District** 82:16 193:8

**division** 84:9

**DNC** 25:10 26:14,16 40:9,10 88:14 89:15 90:4 91:10 98:8,15

**document** 22:5 23:5, 7,10 24:13,16,17,21, 23 25:3 27:20 28:18 29:7,9,24 30:5,9,18, 25 31:24 33:4,9,10, 12,15 34:3,14 35:6, 21 39:25 45:10 49:9 50:8,20 51:2 59:24 66:7,10,11 142:23 143:3,13 191:19 201:23,25 202:15 204:23 205:13,18,19 206:5 208:12,16 209:16 210:18

**document** 211:11,18 212:12 220:10 224:18 230:10

**documents** 17:17, 18,22 18:11,17,19 21:5,10 22:17 23:14 31:13 32:16 37:21 45:16 98:15 106:19 134:15 141:16 143:7

**dominant** 91:2

**Donald** 36:21

**door** 179:9

**dope** 55:19

**dossier** 100:16,23 102:22 103:21 104:3, 7,9,14 105:3,8

**Dotcom** 120:21,22 121:4

**doubt** 244:13

**doubts** 89:7,8

**download** 31:21

**drafts** 12:13,18,19,22 34:8

**drag** 31:16

**draw** 197:22

**drill** 178:23

**drinking** 55:15

**driving** 169:5

**drop** 106:18 109:16

**drugs** 9:13 55:23

**due** 5:5 137:4

**duly** 8:7

**dumb** 164:25

**duplicate** 211:19

**Durham** 74:21 75:2 162:20 168:8

**Dutch** 40:18 41:24

**duty** 116:24

---

**E**

**ear** 169:19

**earlier** 86:11 131:15 134:12 136:24 138:16 141:12 144:6 159:19 214:6 222:16 236:20 237:13

**early** 131:15 134:14 232:5

**easier** 22:25 48:10 77:3

**easily** 137:6

**Eastern** 82:16

**easy** 29:16 133:8 232:19

**echo** 41:7

**Ecuador** 137:13

**Ed** 46:22 59:10 65:24 66:16 86:10 114:2,3 115:2 149:20 150:12 153:8 170:11 177:15 188:14 189:17,25 195:16 212:14 227:19

**Ed's** 150:13

**Eden** 6:17 8:16 27:2 167:20

**edited** 47:15

**educational** 10:11

**Edward** 6:11 8:17 9:10 13:3 42:24 43:20 176:19

**efforts** 20:20

**egregious** 151:11

**elected** 58:4 134:22

**election** 54:9 57:22 90:18,20 164:3

**elections** 171:16

**Ellen** 25:4 160:20

**email** 49:15,20 81:25 91:10 202:16,20 203:18 205:8 212:13, 15,17 213:5,24 214:7 215:21 217:3 218:5 220:17,19,21,25 221:2 222:11,12,15, 16,21 223:3 224:9, 14,17

**emails** 11:21 12:2 13:11 49:16 88:15,16 98:15,24 126:3 129:16 130:15 145:24 154:22 158:25 179:19 180:9 182:5 183:2 187:19 188:12 189:16 194:10 195:7,25 196:4 198:23 203:12 204:25

**embarrassed** 234:14

**embarrassing** 98:24

**emerged** 163:13

**en** 153:6,7

**enchant** 153:7

**encourage** 9:7 38:18

**end** 27:8,9 47:13 59:24 60:2 64:19 79:17 115:4,9 125:15 135:5,7,9 142:19 201:3 216:10 217:4 223:25 243:25 244:3

**ended** 162:2 187:12

**enemy** 166:15

**enforcement** 78:15

**English** 115:20

**enthralled** 201:9,12

**entire** 19:24 77:4

**entirety** 196:21

**episode** 242:14

**equivalent** 23:6 91:2

**erased** 224:24

**Erica** 7:14 51:14 102:25

**error** 224:12

**essence** 195:17

**essentially** 25:25 53:7 61:16

**establish** 176:14 192:7 194:2 197:16

**established** 19:25 121:10,19 181:16

**et al** 6:11

**event** 11:18 26:18 248:8,9

**eventually** 28:5 91:18

**evidence** 121:21 145:23 152:4 165:24 172:22

**evolved** 226:4

**exact** 99:15

**exaggerating** 89:21 130:6

**exam** 242:10

**EXAMINATION** 8:10

**examined** 8:8 246:2

**examining** 194:10 195:6 198:22

**exchange** 194:12 195:9 198:25 208:23 217:19,20 218:15,17 222:16

**exchanges** 83:20 220:14

**excuse** 13:9 30:3 102:24 239:16

**exercise** 10:2

**exhibit** 19:11 21:22 24:14 28:9 29:19 40:21 42:16 48:13 117:5 200:19 204:15 205:24 211:13,23 219:17 223:18 224:5 225:9 230:13 242:16

**exhibits** 22:22 24:5 30:14

**exist** 187:4

**existed** 172:4

**existence** 237:9

**exists** 142:24

**experience** 78:7

**expert** 53:8

**expertise** 26:24

**experts** 90:22

**explain** 91:11 135:21
147:15 162:15
174:15 207:19

**explained** 47:20

**expose** 174:4

**extent** 7:20 13:21
20:16 32:14 35:10
56:24 57:9 61:15
63:19 71:24 107:19
205:13 213:18
244:19

**extradite** 135:8

**extremely** 135:3

---

**F**

**faces** 206:23 207:2

**fact** 64:7 74:18 94:15
97:11 124:12 148:9
149:13 150:14 168:4
169:14 172:4 178:19
190:12 197:19
199:24 200:7 201:13
216:7

**facts** 91:9

**factual** 196:3

**failure** 7:7

**fair** 23:22 29:18 60:19
89:13 91:25 93:3
95:22 105:9 116:19
148:10 152:24
154:23 155:2 157:24
189:6 210:4 240:12
248:19

**fall** 57:20

**false** 182:5 183:2,18
185:20 188:19
200:13 244:12

**falsehoods** 168:7

**familiar** 13:3,5 17:13,
14 25:4 72:13 73:21
74:20 75:24 99:23
100:8,9 120:22 223:2

**family** 79:12,14

**fancy** 137:17

**farming** 169:9

**Farr** 7:14

**farther** 211:3

**fascinating** 137:22

**fast** 226:18 232:13

**faster** 226:22

**favor** 16:3 190:21

**favors** 190:25

**FBI** 64:14,16 65:19,
20 68:15,16,19,20
69:2,6,8,20,23,24
70:15,19,22 71:8,9,
14,15,22 72:20,21
75:23 76:4 78:12
81:5 82:13,16 83:22
84:2 85:3,4,7 86:4,5
87:11 92:11 97:3
111:2 112:8 124:2
147:19,24 165:5,10
185:3,7 191:14 194:9
195:6 198:22 209:4
210:12 213:6,14
218:23 219:4 221:4
225:3 227:19 228:4
229:15,17

**FBI's** 84:5,13

**feature** 30:20

**February** 224:22

**federal** 5:18 51:6
93:24

**feel** 8:25 10:6 90:2

**feeling** 8:21

**fellow** 120:2

**female** 177:24

**field** 176:5

**figure** 232:16

**file** 34:2 91:18 138:4,
5 186:25 187:3
221:20 230:6

**files** 13:18

**finances** 132:20

**find** 6:2 13:17 44:25
80:10 126:2,9 127:14
133:18 163:18
164:10 193:16
224:11

**finding** 194:10 195:7
198:23

**fine** 22:3 34:20 49:18
61:7 205:9

**finish** 113:5 114:11
181:23 242:9

**finished** 167:22
228:8

**fired** 145:9 146:23

**firsthand** 63:23 78:5
185:8 221:4

**FISA** 168:8

**fishing** 239:18

**five-minute** 241:11
243:21

**fix** 117:13

**flag** 50:21

**flew** 131:17,22,23
160:2,25

**Flipping** 35:2

**floated** 90:19

**flooded** 170:6

**flotsam** 237:22

**flying** 212:10

**Flynn** 54:14,15,16,20
143:23,25 144:3,12,
17 145:9,10,25
146:3,5,7,22 147:11

**Flynn's** 146:2

**focus** 95:20 115:10

**focusing** 236:6

**folder** 33:8

**Folken** 234:9

**Folkenflik** 225:21
227:5 234:10,11
235:11 236:19,22
237:23 240:4,14
244:2 246:22 248:23
249:8,18,20

**Folkenflik's** 236:25

**follow** 8:25 22:12
82:25 131:4 167:6

**football** 152:10,13

**force** 138:18

**forgot** 45:25

**form** 6:23 7:2,6

**formal** 168:5

**forms** 244:18

**Forsyth** 150:4

**forthcoming** 130:11

**forward** 25:14,19,23
108:7

**forwarding** 222:15

**found** 90:16 126:7
137:21 167:7

**foundation** 19:25
37:21 47:19 90:9
121:19,24

**four-hour** 186:17

**fourth** 233:20

**fourth-rate** 191:7

**Fox** 231:4

**frame** 88:10 100:15
102:19

**free** 250:17

**friend** 14:24 15:2
42:22 65:4 67:11
94:5 124:10 130:9
139:17 150:14
156:14 157:10,15
187:11 190:19 209:3

**friendly** 64:22

**friends** 109:16

**friendship** 137:11

**friggin'** 113:23

**front** 27:24 32:24,25
116:8

**frustration** 179:2

**fry** 157:12

**fucking** 27:11
164:15,20 167:13

**full** 141:16 208:11
215:9

**fully** 23:19

**fundamental** 121:20

**Fusion** 99:10,15
100:8,11

**future** 121:8 146:22

---

**G**

**game** 134:11 136:6,9
161:7,9

**games** 151:3,6

**gave** 28:3 39:18
129:14 163:10 169:8,
9 171:23

**gears** 149:19

**gender** 71:24

**general** 54:13 67:20
73:24 74:12 103:17

**generally** 26:8
175:16 193:9

**generic** 143:14

**generically** 142:5
143:6

**generous** 152:13

**genesis** 66:18 70:7
154:11

**genuine** 157:23
158:4

**gist** 67:20

**give** 13:23 23:13
38:19,22 39:9 48:10
49:2 67:24 122:8
161:8 165:18 180:24
185:25 191:3 194:5
211:10

**giving** 137:16,17
158:25

**glad** 41:24 185:10,11

**Glenn** 99:6,8 100:9
102:15

**gloss** 198:8

**Gmail** 84:20 87:3
88:13 90:8

**Gmails** 82:5 129:13
134:12

**god** 176:9 218:11

**goddamn** 34:18

**golf** 70:6,10 182:13

**good** 5:2 8:12 10:6
14:24,25 84:21 89:23
112:17 116:6 134:22
136:3 152:6,15 161:4
186:23 190:11
191:11 206:6 238:12

**gossip** 66:15

**Gottlieb** 7:13

**government** 73:3
87:4 93:24 107:17,25
163:10 169:16 175:6

**Governski** 5:25 7:4,
9,10 19:19 22:19
23:16 27:22 30:3,8,
21 31:23 32:12 33:7
38:24 39:5,9 40:24
41:3,9 43:2,12 44:16
45:14 47:6 50:17
51:11 68:6 69:10
71:4 85:9 88:2 89:22
90:5 93:8 94:21 96:8
98:18 100:17 103:24
105:17 106:14,21
107:18 108:3,15
109:2,18 110:2
113:10 114:14
115:19 117:12,23
118:20 119:10
120:24 121:8,14
123:24 125:3,8,20
126:6 127:17 128:18
130:2 139:6 142:15
144:15 145:2,14
147:2 149:10,25
153:2 155:4,25 156:7
158:2 159:6 171:5,19
173:20 177:3,20
178:4,21 179:21
182:8 183:20 185:24
188:17,23 194:15
199:3,18,25 205:12
214:4 216:15 217:12
218:4,12 234:6
235:17 237:6 240:20
242:21 243:14
244:17 246:11 247:3
250:10

**GPS** 99:10,15 100:8

**grabbed** 137:20

**grace** 161:17

**Graduate** 10:13

**gravamen** 192:5,8

**great** 78:7 80:6 82:4
89:6 90:17 91:16
95:6 124:3 163:2
167:11 235:21

**greater** 90:10

**green** 62:4

**ground** 76:17

**grounds** 117:16
194:16

**GRU** 167:15

**Guard** 97:5

**Guccifer** 28:7 29:8,
23 40:3,6

**guess** 10:15 13:15,
21 14:16,17,18 16:4
91:14,19 110:12
116:18 129:4 155:13
164:15 174:6 211:4
213:4 217:20 226:4
229:4 238:19 250:7

**Guilder** 215:7

**gun** 79:5

**gutter** 155:14

**guy** 93:19 137:11
151:8,14 152:6,15
157:13 158:9 161:18
162:7 163:16 168:16
184:22 192:14 219:5
229:4

**guy's** 191:12

**guys** 117:2 118:25
176:4

**H**

**hack** 25:10 26:13,16
29:23 152:22

**hacked** 40:12 89:14
90:3 165:25

**hacker** 88:17

**hacking** 27:15
153:11 154:5 167:25
171:15

**half** 137:21

**halfway** 184:17

**hand** 23:10 111:11

**handing** 23:6,12

**handle** 142:5

**handled** 81:25 87:4,
5

**handling** 24:4 87:6

**hands** 77:21,22,25
78:2,22 142:13

**hang** 28:5

**happen** 138:9 232:22
245:16,22 249:18

**happened** 66:19
69:17 80:8 90:7,8
95:14 109:22 138:7
147:25 153:15,23,24
154:5,6,11 182:12
186:7 192:17,20
196:8 215:18 244:5,8
245:14 246:24
248:24

**hard** 113:23 127:24
140:8 173:16,23
241:14

**hard-to-get-into**
79:22

**Harrington** 132:4
159:20

**Harrison** 159:17,21,
23 160:14,16

**hate** 156:23 163:25

**hats** 144:10

**he'll** 135:9

**he/she** 85:25

**head** 119:14 235:14

**hear** 26:15 39:2,3
40:25 41:2,10 51:17
55:6 65:8,12 103:3
104:22 118:13,15,19,

20,25 119:2,4,5,7
125:16 140:3,4,5,6,8,
17,19 174:21 184:13
198:11 208:23
216:10 242:18,20,24
243:10 247:24,25

**heard** 8:16 47:15
53:21 60:13 61:4
64:25 66:4,15 67:6
68:14 71:9 76:7 80:8
85:7 86:14 131:6
143:24 177:2,6,17
191:13 192:12
215:11 229:16
234:12 243:20

**hearing** 61:9 117:18,
21,23 118:5 215:15

**heavy** 116:24

**held** 19:8 24:8 29:2
45:5 50:3 102:10
103:8 140:25 201:18
208:4

**hell's** 166:11

**helped** 152:9

**helpful** 49:9 112:6

**helping** 201:13

**helps** 241:23

**heroin** 169:5

**Hersh** 5:1 6:1,10 7:1
8:1,6,12,20 9:1,8
10:1,10 11:1,14 12:1
13:1 14:1 15:1,22
16:1 17:1 18:1,5,7
19:1 20:1,4,23 21:1,4
22:1,5 23:1,25 24:1,
12,14 25:1 26:1 27:1,
9 28:1,12 29:1,6 30:1
31:1 32:1,19 33:1,14
34:1,21 35:1,14 36:1
37:1,13,22,24 38:1,
12 39:1,20 40:1 41:1,
15 42:1 43:1 44:1
45:1,24 46:1,6,12
47:1 48:1 49:1,3
50:1,7,19,23 51:1
52:1 53:1 54:1,24
55:1 56:1 57:1,10
58:1 59:1,10 60:1,6
61:1,21 62:1 63:1,21
64:1 65:1 66:1 67:1

68:1 69:1,11 70:1,13
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1,3,14 103:1,14
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1,6 117:1 118:1
119:1,18 120:1 121:1
122:1,8,20 123:1,2
124:1 125:1,7,11
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1,4
135:1 136:1 137:1
138:1,2 139:1 140:1
141:1,5 142:1 143:1,
19 144:1,23 145:1
146:1 147:1 148:1,13
149:1,6,18 150:1
151:1 152:1 153:1
154:1,13,19 155:1,8
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1,23
171:1 172:1,13 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1,22
192:1,7 193:1,23
194:1 195:1 196:1
197:1,6 198:1,10
199:1 200:1 201:1,22
202:1,15 203:1 204:1
205:1 206:1 207:1,19
208:1 209:1 210:1,6
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1,8 222:1,
4 223:1 224:1 225:1
226:1,24 227:1,3,19,
22 228:1,4,6,22
229:1,9 230:1 231:1

232:1 233:1,17,24
234:1,24 235:1,24
236:1,25 237:1
238:1,20,22 239:1,11
240:1 241:1 242:1
243:1,18 244:1
245:1,2 246:1,14,21
247:1,21 248:1 249:1
250:1,6,16

**Hersh's** 27:14

**hesitate** 8:24 9:4

**heuristically**
134:16,20 135:16

**hey** 190:7

**high** 69:17 70:21,24
135:3 157:11 175:6

**high-crime** 80:4

**high-drug** 80:4

**high-level** 179:5,16
180:4 182:4,25

**high-placed** 180:6

**highly** 93:18 135:13

**Hillary** 24:24 56:12
57:22 81:20 87:3
90:19 95:14,15
134:21 136:9 161:10,
11,13

**hired** 40:8,9

**history** 161:22

**hit** 235:14

**Hitler** 161:14

**hokum** 149:14

**hold** 21:13 34:16
36:22 38:7 110:9
202:21 207:4 212:5
219:14 227:10 233:3
241:13

**Homeland** 165:14,
15 172:22

**honestly** 89:6
156:23

**Hong** 131:17 161:2

**Honor** 109:12

**honorable** 184:22

**honored** 11:18

**hope** 94:6 136:9

**hoping** 149:22 152:6

**horribly** 172:3

**hostile** 187:12,15

**hot** 223:3

**hour** 137:21 241:18

**hours** 101:22 237:14
244:15

**house** 80:17,23
175:9 190:5,9,14,16
191:3,6,10 196:12
220:6

**How's** 121:6

**huge** 196:13

**human** 177:23 180:6

**hunch** 136:19

**hundred** 161:16

**hypothetically**
63:12,13 64:15

———————

**I**

**I-N-T** 96:23

**idea** 47:10 68:4 83:19
84:10 89:13 90:20
94:7 150:7 161:4
190:11 196:10 203:2
204:6 213:3 216:4
234:7 247:23

**identification** 19:12
21:23 28:10 29:20
40:22 42:17 48:14
117:6 200:20 204:16
205:25 211:14,24
219:18 223:19 224:6
225:10 230:14
242:17

**identified** 25:3 33:22
40:17

**identifies** 120:21

**identify** 107:20

**identifying** 69:12

**Illinois** 166:4

**illogical** 245:5

**imagine** 99:2 144:16

**implied** 188:6

**important** 68:2
91:11,12,23 102:6
138:19 181:22 194:3,
5

**imprecise** 147:18

**impression** 139:11
244:6,9,12 246:15

**inauguration** 14:5,
10 89:4 144:8 231:21
233:11 236:23 237:3
238:4

**incapable** 53:16

**including** 82:8
96:12,15 244:18

**incomplete** 52:11,12

**Increasingly** 223:9

**incredible** 90:16
105:21

**index** 60:2

**individual** 81:2
179:16

**individuals** 12:3

**induced** 150:12

**influencing** 171:16

**informant** 225:3

**information** 16:14
56:6,14 69:8,14
70:23,25 71:2 72:4
78:21 79:14 80:25
81:5,24 82:8 83:20,
22 84:13 85:5 86:4
94:17 96:3,6 105:12,
22,25 106:12 109:8,
9,13,14 110:14 111:9
112:9 113:5 126:2
129:10 139:18
149:22 150:9 152:4
153:7 154:20,24
158:7,24 163:4,5,14,
16 168:11 175:4
176:25 177:11,16,25
179:18 180:8 182:3,
24 183:17 184:20,21
185:8,15,19,20 186:3

**illogical** 245:5

**187**:24 188:7,12,19
189:15 194:9 195:5
196:3,9 198:21 199:8
212:25 213:25
214:15 216:14 217:6,
8,24 218:8 221:5,6
239:18

**informed** 98:14

**initial** 93:17

**initiated** 40:10

**inside** 146:8 175:17
176:6

**insider** 233:24

**insist** 92:24

**insistent** 93:2

**instinct** 238:6

**instruct** 13:20 75:13
76:11,17

**intel** 157:12

**intelligence** 89:14
90:3 96:21,24 97:15
108:5,13 111:9,19
165:17

**intensely** 81:22

**intention** 95:11
163:12

**inter** 88:15

**intercepting** 88:13

**interest** 7:19 88:8,19
97:25 127:19,23
135:17 151:24
155:12,15 157:23
158:4,5,8,10 162:5,6
190:13 224:10

**interested** 66:10
70:4,5 95:11,12,16
126:9 130:13 135:2,
25 136:2 151:8,12,20
152:22 153:16
154:24 159:14 160:6
161:12 166:11 167:3
170:11,25 186:12

**interesting** 78:4
81:23 116:25 151:7
159:2,9,11,12 160:8

**interject** 6:24

**international** 137:18

**internet** 19:16 40:15
42:9 88:14 218:25
243:3

**interpret** 138:6

**interpretation**
148:22

**interrupt** 101:21

**interrupting** 45:23

**intervened** 57:21

**interview** 41:23
117:10 134:12 227:3,
18,21 239:7,24
240:4,13,17,18

**interviews** 122:9

**intro** 199:5

**introductory** 48:2
67:2

**invent** 217:15

**inventing** 129:23

**investigate** 72:24

**investigating**
125:25 133:6

**investigation** 90:16
162:20,23

**investigative** 236:24

**involved** 40:7 88:11,
12 98:3,4,5,7 120:19
127:21 168:7,16
182:14 191:14,15

**involvement** 122:10

**iphone** 169:24

**IQ** 135:4

**Iran** 175:10

**Isikoff** 249:19

**ISIS** 169:11

**issue** 16:15 68:22
88:7,22 98:5 103:2
129:8,19 154:10
160:6 166:9 169:6
194:5 220:5 246:16
248:12

**issues** 84:20 199:8

**item** 35:9

**ITV** 18:6

**J**

**Jack** 166:21

**jail** 135:9

**James** 80:12

**January** 14:6 36:23 233:8

**jetsam** 237:22

**job** 150:23 167:11

**Joe** 120:6

**John** 74:20 197:14, 17

**Johnson** 15:3,4,10, 23 42:23 43:24 44:4 56:13 64:4 66:2,12 72:6,8 114:5 124:10

**join** 123:24 246:11

**joined** 7:16 43:12

**joining** 162:2

**Joint** 151:3

**journalism** 137:18 162:14,16 181:7

**journalist** 10:14 95:5 132:14 159:11

**journalist's** 8:4

**journalistic** 69:14 189:19

**journalistically** 65:14,17 82:4

**judgment** 105:10 189:8

**judgments** 84:18

**Julian** 20:12 40:17 41:23 42:15 87:18, 19,25 88:6,7 91:19 97:8,11,25 98:4 128:7,9 129:11 130:13,14 131:12 134:13 135:3 136:6, 7,23,25 154:20,21

**Julian's** 134:10

**July** 6:11

**jump** 133:17

**June** 100:14 101:3 102:18 103:19 212:19 220:17,23 221:11,13 222:11,18, 21,24,25

**Justice** 73:13 74:14 75:9

**K**

**keeping** 168:15

**Kennedy** 166:22

**KGB** 166:17

**kid** 60:7 62:13,16,18 63:5,7 77:9,23 89:23 132:21 173:4,5 193:2

**kid's** 77:20,22 132:20 234:8

**kidding** 190:14 191:5,6 196:2

**kids** 89:24

**kill** 91:4 168:23

**killed** 170:2 175:23 176:4

**killing** 192:19

**Kim** 120:21,22 121:4

**kind** 9:17,18 87:6 94:23 124:4 138:23 146:24 158:4,6 166:25 169:24 184:20 203:18

**Klein** 80:12

**knew** 44:7 54:20 63:23,24 66:20 70:18 78:8 80:6 90:22 100:10 110:21 124:13 135:5 146:3, 5,6 147:20 150:15,18 151:8,15 152:9 156:16 158:12 160:23 161:7 163:2, 156:13 158:25 160:24 173:17,22

19 164:24 167:14 170:10,12 175:15,17 185:19 192:23 233:8, 9 241:4

**knowing** 65:14 196:14 229:14,15

**knowledge** 69:3 78:6 101:8 120:9 121:6,10 132:12 133:10

**knowledgeable** 107:23

**Kong** 131:17 161:2

**L**

**la-la** 156:17,19 157:19

**labeled** 6:8

**land** 156:17,19 157:19 200:14

**language** 27:11 101:13,17 115:21 149:2 164:13 178:16, 17

**Larry** 15:3,4,17,23 42:23 43:24 44:21 56:13 64:3 65:5,25 66:12,21 70:3,5 72:6 93:12 114:4 124:10 135:19 150:11,15,18, 21,22 157:12,16 163:15 170:12,14 182:12 203:9 235:13

**Larry's** 65:4 67:11 150:13

**late** 165:20 172:15, 17,21

**Lattimer** 5:3

**Lauria** 120:6,7,10 122:13 123:18,21

**law** 7:23 8:2 75:19 78:14

**lawsuit** 178:20 226:4,6,9,11 228:4

**lawsuits** 246:17

**lawyer** 167:19

**layperson** 148:20

**lead** 233:21

**leading** 247:6

**leads** 143:15 163:4

**leak** 95:15

**leaking** 88:12

**leaks** 168:18

**leaned** 46:2

**learn** 78:21 80:25

**learned** 69:18 70:23 81:24 90:10 110:25 141:14 192:16

**learning** 64:8

**leave** 111:12 212:7

**leaving** 158:21 197:17

**left** 62:6 139:11 197:6

**legal** 5:4 51:9

**legendary** 236:24

**Lem** 5:3

**lend** 246:14

**length** 67:17

**letter** 75:24 76:3,5

**letting** 136:10

**level** 80:6 84:2 111:20 165:4,12

**levels** 90:12,13 157:11

**liar** 187:18 215:21

**Libya** 90:7

**life** 20:24 182:16

**light** 140:16

**lines** 89:11 116:12 127:4 141:7 155:6,11 156:4,6 164:18 171:10 173:14 174:13,16 220:18

**link** 19:16 117:8 242:14

**links** 17:19

**list** 18:11,16,18 21:5, 9 31:8 33:2

**listed** 223:3

**listen** 54:4 70:13 161:18 168:21 197:22 248:16

**listened** 47:7 48:4 50:10 51:25 52:13, 15,18,19,21,22 53:13,14 54:3 64:13 109:8 124:3 136:12 237:10

**listener** 244:6,10,12 248:18

**listening** 74:7 239:2

**literally** 137:7 242:6

**litigation** 45:11 79:19 244:20

**live** 114:18 120:3 136:13,14 143:11 153:24 191:20 192:18

**lived** 111:14

**lives** 187:4

**living** 47:19 105:25

**locate** 146:14

**lodge** 118:21

**logic** 127:9 146:21 147:4

**logical** 146:23 206:15 210:13

**London** 132:15 134:14 135:7,8

**long** 15:17 46:14 69:3 81:4 121:23 126:16 136:6,9 137:11 141:14 144:23 150:21 165:18 166:12 171:23 193:3 195:23 198:5

**long-form** 162:14,16

**longer** 32:24,25 225:12

Index: looked..muttering

**looked** 32:21 34:7
35:8,15,20,21 47:7
54:4 87:13 104:11
126:8 134:22 163:23
220:19 222:23

**Looney** 124:19

**lost** 90:21 167:4
204:3

**lot** 26:2,10 35:19 65:8
67:12 70:6 74:13
82:18 86:24 87:2
90:12 95:8 104:5
111:7,9,10,18 112:4
114:18,24 129:9,17
132:15 136:8 143:16
146:3 150:5 153:5
154:9 157:10,14,17
158:16 160:4 161:19,
23,25 168:7 169:4
175:24 186:17 187:5
190:24 196:9 203:11
216:19 238:12

**lots** 178:18

**loudly** 55:2

**Lousy** 9:25

**low** 84:2

**lower** 165:11

**Luddite** 28:19

**lunacy** 136:14,15

**lunch** 55:10,13
115:23 203:14 204:5

**M**

**mad** 215:18

**Maddis** 161:19
174:14,23 175:7,15

**made** 16:7 63:25
64:17 65:3,6,23,25
66:13 69:5 71:17
91:18,21 94:3,16
96:4 104:6 110:17
128:8 141:17 143:3
166:8 189:7 199:21
229:4,10,12 234:3
240:8 249:12

**main** 151:2

**major** 99:18

**make** 10:15 29:16
30:14,18 31:4,11
48:9 61:5 91:14
101:12,16 116:18
128:22 141:17
147:17 155:6 158:20
159:3 166:14 171:11
176:11 178:17,25
180:14,18 181:6,19
184:4 189:14 195:18,
21 196:10 199:23
200:9,13 213:4
228:17 229:20
232:19 233:15 238:9
244:4,10 248:25

**makes** 113:23 136:3
201:5 210:10 211:5
217:20,22

**making** 47:21
128:12,14,16 129:23
147:4 175:22 184:12
186:21 196:13
215:12 235:15 244:8

**male** 177:24

**man** 29:17 94:24
152:9,13 193:4 231:3

**managed** 30:2

**manipulated** 48:5

**March** 144:9

**Marine** 162:3

**Marines** 135:10
161:24

**mark** 142:18 241:8

**marked** 19:11,14
21:22 28:9 29:19
36:2 39:21 40:21
42:16 45:9 48:12,13
49:5 51:3 77:21,25
78:2 117:3,5,7
200:17,19 204:11,15
205:23,24 211:12,13,
22,23 219:15,17
223:17,18 224:2,5
225:9,13 230:10,13
242:13,16

**marking** 141:9,19,25
142:8

**markings** 143:4

**Mary** 5:10

**master** 119:25

**material** 20:17 68:2

**matter** 6:10 8:20
25:15 43:8 95:5
129:20 146:21 158:3,
13 169:14 173:10

**matters** 25:16 95:4

**Matthew** 8:18

**maximum** 140:15

**meaningless** 147:5

**means** 114:16,17
178:24 187:7 245:15

**meant** 174:16 191:16

**media** 6:8

**medication** 9:17,18,
19 56:2

**meet** 136:25

**meeting** 31:7,12

**member** 79:12,14

**memoranda** 102:20
103:17,21 104:14,19
105:2

**memorandum**
105:11

**memory** 60:17 74:11
78:24 80:21 98:9
217:18 219:6 249:6,
7,23

**mentally** 10:7

**mention** 69:17 92:25
159:18 186:8 192:15,
21

**mentioned** 16:16
47:22 70:3 75:6,14
106:25 131:13,14
132:4 144:9 148:6
182:12 185:6 190:4
192:22

**mentioning** 47:23
139:23 210:11

**mercantile** 169:18

**Meryl** 7:9 30:10
34:12 103:2 118:23
234:24 250:8

**mess** 124:13

**message** 134:21
190:7 243:2

**messages** 104:5
114:18

**met** 20:24 99:8
136:23,25 137:4,8,9,
15 160:21 203:19

**metaphysical**
176:13

**metropolitan** 73:17
75:10 83:13

**MI6** 97:14

**Michael** 7:13 143:25
144:2

**middle** 124:13 166:4

**Mike** 54:15,16,20
143:25 144:17

**miles** 65:13,17

**military** 89:14 90:3

**million** 65:13 185:4

**mind** 16:4 17:6
168:25

**mind-altering** 55:25

**mine** 156:14 157:10,
16

**minute** 34:4

**minutes** 9:2 46:13
49:20 52:20 136:13,
18 194:24 241:16,18,
19,20 242:2,7 243:23

**mischaracterizatio
n** 214:7

**mischaracterizes**
35:11

**miscommunication**
197:11

**missiles** 166:23

**missing** 60:17 188:9
227:11

**misstates** 218:5

**mistake** 139:12
152:8 196:14 223:25
243:7

**mistakes** 233:16

**Mitch** 215:6

**moment** 22:18 49:2
190:15 212:8

**Monday** 228:23

**money** 132:20 133:3,
7,10 152:11 166:14
169:8,9

**month** 193:5

**months** 86:11,19
170:4 208:20

**mood-altering** 9:13

**morning** 5:2 8:12,15
9:12 17:22 49:22
202:22 206:6 223:22

**Moscow** 160:5
169:20

**motion** 121:17

**mouth** 187:24 223:15

**move** 17:9 22:13
66:24 70:9 72:12
95:18 121:25 124:20
125:9 136:16 154:14
172:7 196:16,21
199:11 206:24 207:5,
20 208:25 210:22
219:11 224:13 225:8
227:13,14 230:4

**moved** 131:20,22

**moving** 11:7 223:10

**Mueller** 72:14,15,17,
19 73:6

**multiple** 194:16

**murders** 193:4

**Music** 61:23

**muttering** 209:9
223:13

**N**

**Nakashima** 21:12 25:4

**named** 13:3 132:7 144:18

**names** 166:2

**narrative** 27:10,16 163:6 168:3

**narrowly** 177:14

**nasty** 215:9,20

**national** 36:22 74:16 88:14 144:19 145:4 168:13

**naturally** 25:21

**Navy** 97:4

**necessarily** 12:20 66:3,4 111:25 112:2 113:16,20 114:8,11, 12 115:13,17 148:24 168:12 175:15 187:15

**needed** 93:14 125:16 172:9

**news** 26:7,13 88:6 163:8 231:4 249:11

**news-gathering** 20:17,20

**newspapers** 77:13 91:2 120:17

**nice** 124:14 130:10 163:15

**night** 17:21 79:23

**no-man's** 200:14

**Nobody's** 118:5

**Nod** 119:14

**noisy** 88:25

**nomenclature** 85:17

**nonresponsive** 66:24 70:11 154:14 196:22

**nonverbal** 187:3

**normal** 129:7

**note** 38:24 82:5 143:2 229:22 238:10

**noted** 6:13 41:12 118:23 235:19

**notes** 12:10 13:18 86:7 186:11,13,15 195:15 229:20,21 238:9

**notice** 46:25 52:10 173:8 192:15

**notion** 89:20 111:2 114:22 192:12

**NPR** 225:16 228:22 230:17 233:24 234:4 239:7,24 240:17

**NSA** 76:3,15 97:2,3, 7,9 147:21 168:16

**number** 6:8

**O**

**object** 19:2,22,23 20:16 27:23 30:4,22 32:14 35:10 37:20 41:4 52:25 61:14 75:11 81:8 107:19 117:13,14 121:8,14, 24 122:4 205:12 214:4,6 235:18 241:13 243:14 244:17

**objected** 19:19 30:24 44:19

**objecting** 186:20

**objection** 6:23 7:8, 21 15:6 22:22 23:2, 20 41:11 43:2,10 44:16 47:6 52:3 56:21 57:9 63:18 68:6 69:10 71:4,5,23 74:10 75:7 76:11,16, 22 81:7 85:9 88:2,3 89:22 90:5 93:8 94:20,21 96:8 98:18 100:17,18 103:24 104:20 105:13,17 106:14,21 107:18 108:2,3,15,18 109:2, 3,18 110:2 113:10,11

114:14 115:19 118:21,22 120:12,24 121:5,16 123:20 125:4,8,20 126:5,6 127:17 128:18,19 129:25 130:2 139:6,7 142:15,16 144:15 145:2,7,14,15 147:2 149:10,25 153:2 155:4,25 156:7,8 158:2 159:6,7 171:5, 19 172:19 173:20 174:21 177:3,20 178:4,21 179:21 180:12 182:8 183:20 185:24 187:16,22 188:15,17,22,23 189:23 194:15 199:3, 18,25 210:19 216:15 217:11,12 218:4,10, 12 234:6 235:19 237:6 240:20 244:16, 21 246:25 247:3,5 248:20

**objections** 6:25 7:6 30:23 38:25 39:10

**objects** 7:2 95:22

**observed** 97:12

**obtained** 233:23 234:4

**Occam's** 134:5

**occasion** 137:2

**occur** 14:10,20

**occurred** 13:14 87:24 144:14 146:16

**October** 100:14 101:3 102:19 103:20

**offer** 7:3 53:7,9

**offered** 106:5 186:4

**offhand** 76:8

**office** 57:24 79:21,23 80:2,5 82:14,15 141:16 147:13 167:12

**official** 239:16

**officials** 90:18 98:25

**Oil** 152:15

**one's** 131:5

**one-hour** 241:8

**ongoing** 121:18,23

**online** 104:17 163:22

**open** 24:19 28:13,15 29:8,22 34:2 203:14

**opened** 34:4 179:9

**opening** 217:13

**operation** 37:14 162:18 164:21 165:16,17 167:24 168:5 171:22

**operations** 151:3 168:11 175:10

**opinion** 53:8 91:6 186:23 246:12 247:17,22

**opinions** 122:16

**opportunity** 22:23 67:25

**oppose** 125:3

**opposing** 6:21 19:22 30:4

**orally** 114:19

**order** 45:19

**ordinary** 163:7

**organizations** 10:22

**originated** 129:15

**outrageous** 175:13

**overseas** 97:14

**overtop** 38:20

**P**

**p.m.** 102:9,12 103:7, 10 116:4 140:24 141:3 196:25 197:4 201:19 208:3,6 250:21,23

**Padula** 137:16

**pages** 34:18 59:16, 25 153:9,23 154:15

**one's** 131:5

**paid** 133:12 162:19 168:22 169:21

**pain** 9:18

**paper** 111:13 113:22 143:5,10,12 164:25 165:20 166:6,8 172:23 191:15

**paragraph** 141:13 214:12 217:5 226:25 227:17 233:17,20 236:20 239:5,24 240:17

**paragraphs** 35:22 238:14,17

**pardon** 27:11 54:25 134:23 145:8 212:16 249:4

**part** 94:16 98:6 111:21 142:25 164:17 195:20 206:21 241:25

**parties** 5:13

**passed** 72:6,8 114:19 156:25

**past** 222:10 231:17

**patience** 250:5

**payback** 168:14

**paying** 91:4 224:23

**payment** 194:12 195:8 198:24

**Payonk** 5:11

**PDF** 28:6,14,17 31:17 34:2 35:18

**Peloponnesian** 161:21

**pending** 5:20

**penetration** 98:8

**people** 11:22 20:7 38:20,21 39:7 64:9 74:14 75:6 90:23,24 113:19 114:24 119:21 131:16 136:5, 8 138:9 139:20 150:23 153:5 161:3, 19,24 166:2 167:13 168:17 169:11

Index: percent..proper

172:23 175:5,14
176:6 185:5 191:21
192:18 196:6 214:25
216:20

**percent** 239:13

**perfectly** 203:21
209:21

**period** 10:3,14 13:8
70:8 80:9 94:3 101:2
103:19 120:14
156:18 181:11 186:8,
10 196:9,15

**peripheral** 176:3
186:10

**permanently** 12:9

**person** 13:3 21:2
68:25 69:2,8,16
70:24 71:7,20,25
72:2,16 75:22 76:9,
14,21 78:10,11,14
79:8,10,11,13 81:3,
11,13 83:23 84:21
86:23 107:3,8,13,15,
16 108:10,12,23
112:4 114:21 119:23
120:6,20 138:12
190:3 221:20

**person's** 62:22
85:19,20 95:3

**personal** 11:15,16,
18 121:10

**personally** 25:7
169:23

**perspective** 121:22

**pertaining** 180:8

**phone** 13:7,10,13
43:19 57:13,18
112:19 202:24 203:4
246:2

**phonetic** 96:16
215:7

**photograph** 236:2,3
239:15

**phrase** 47:17,23
70:10 76:7 108:9
141:10 142:8

**phrasing** 141:20

**physical** 111:3,7
112:7,8 113:4,9
114:13 139:3,5,10
148:24

**physically** 10:7
23:10,12

**pick** 121:12 126:21
130:24 196:9,23

**picked** 16:13 84:19

**picking** 133:24

**picture** 120:5 136:14
168:19 169:24
207:22 231:11,13

**pictures** 206:10

**piece** 143:10 214:11,
12 234:19 235:7

**pieces** 53:24 143:11

**pile** 133:7

**pin** 144:4

**pink** 144:9

**place** 12:21 84:16
145:21,23 217:3

**plaintiff** 7:15 45:11
50:11

**planned** 241:22

**planning** 124:9

**play** 19:14 40:14,19
42:19 44:23,24 45:8
47:12 53:23 60:12
70:6,10 72:10 77:2
99:24 116:22 117:9
126:16 161:10
241:12 242:4

**played** 19:18 20:5
40:23 41:15 45:21
46:5,10,12 53:22
61:5,12,19 62:10
63:10 77:6,8,18
78:17,25 80:15 81:14
82:22 83:4,16 84:3,
24 87:16 91:7 92:2,
18 94:12 96:9 97:19
98:10,19 99:3 100:2
106:3,16 109:4
118:12,14,24 119:13,
16,19 121:13 125:5
131:2,8 133:14,19,22

**physically** 134:2 136:21 137:24
138:10,21 139:21
143:21 148:11 149:4,
16 152:16 154:17
155:17 162:10
172:11 173:12
174:10 192:18 243:9,
13,19

**player** 9:23 99:18
150:25

**players** 152:10,13

**playing** 19:20,24
41:11 45:15 122:7
166:18 182:13
187:10 235:12

**pleasure** 124:4

**podcast** 247:13
249:14,16,17

**Podesta** 91:18

**point** 6:18 42:5 47:12
131:21 134:24
146:11,13 149:18
155:20 157:24 164:7
168:7 173:2 175:24
188:4 189:19 215:20

**pointing** 222:14

**police** 10:25 73:17
75:10 80:22 83:13
193:2

**polluted** 169:7

**popes** 162:2

**popping** 88:9

**poppy** 169:4

**portion** 48:2,4 52:19
61:19 67:2,6,23
72:11 77:2 109:6
122:25 133:18

**portions** 58:25
117:10,13,15

**positive** 74:18

**possibility** 193:12

**post** 134:15 148:4

**posts** 28:8 29:8

**potty-mouth** 150:4

**practice** 5:6 11:20

**pre** 67:23

**pre-audio** 67:23

**preamble** 64:2

**precaution** 143:15

**precedent** 47:18

**precincts** 165:21,25
172:24

**precise** 121:7 179:3

**precisely** 240:11

**predicate** 71:24

**prefer** 187:24 201:6

**preliminary** 6:18
8:19

**premarked** 21:21
24:13 28:7 29:7
40:16 41:16 42:20
50:8 201:23

**premise** 245:5
247:11,15

**prepared** 50:10
100:25 101:13
102:17 103:17,18

**preposterous** 89:18
90:2,25 105:12,15,16

**presenting** 64:6

**preserve** 12:2,10,13,
19

**preserved** 7:3

**President** 14:6,11
147:9

**press** 92:20 147:23

**pressing** 138:23

**presume** 127:24

**pretend** 71:13,14

**pretty** 11:3 66:9
77:16 86:12 131:22
136:3 145:13 149:14
152:14 156:20 161:9
191:11 200:2 206:23,
25 241:2

**previous** 57:20
125:13

**previously** 49:15
123:9,14

**priesthood** 162:3,4

**priests** 161:25

**print** 12:6 49:4,9 50:7
138:17

**printed** 22:2,5 48:17
58:22 61:11 202:10

**printed-out** 59:6

**prior** 19:19 197:7

**private** 130:6,8
235:15

**privately** 30:11,17

**privilege** 7:22,24 8:4
57:2,8,9 75:12,16,17
76:17,23 175:2

**problem** 7:2 46:3
48:25 109:24,25
110:6 111:21 112:14,
16 146:2 164:2
194:25

**problems** 82:13

**procedure** 82:2,12

**procedures** 5:18
83:24 87:6

**proceed** 7:5

**process** 160:24

**produced** 45:11,16

**profess** 68:8

**profession** 65:9

**professional** 10:12,
20 26:23,24 189:20

**professionally** 12:7
135:25

**proffer** 27:3,17 28:3
37:3,11 39:15,16,17,
18

**prominent** 42:4

**promise** 116:25
241:21

**proof** 208:25

**proper** 248:10

prosecute 168:9

prosecutor 162:22

protective 45:19

provide 39:13 57:16

provided 17:20

providing 107:22

public 40:11 79:15,
20 80:2,13 91:21
103:25 104:2,3,6
132:11 141:17,18
148:5

publicity 104:5

publicly 149:12
196:5

publish 82:9 92:13,
14 95:6

publishable 64:7

published 57:20
58:2,7 82:6 95:19
104:16 227:8 237:11

publishing 95:11

pull 18:2 200:25
201:7

pulled 219:15

purport 85:22

purporting 73:9
101:2

purports 220:16

pursuant 9:8

pursued 10:23

push 166:9 173:16,
23 183:23 184:3

pushing 149:7,9

put 23:13 24:12
25:14,19,23 28:6
29:6 30:11 32:6
48:15,18,19,22 50:11
57:23 69:19 111:10,
18 113:16 142:18
156:25 157:5 165:13
186:3 187:23 190:10
198:2 207:8 212:22

putative 149:3

Putatively 93:10

Putin 161:13 168:18,
19 169:23 174:2

puts 245:24

putting 23:11 201:22

___

Q

Quainton 5:21 6:17,
18 8:5,11,16 11:12
16:25 18:12,15,22,25
19:4,13,21 20:3,21
21:20,24 22:21 23:4,
22 24:11 27:7 28:2,
11,22 29:5,21 30:5,7,
10 31:2,9,14,18 32:5,
9,18 33:11 34:12,20
35:3,13 37:5,10,23
38:2,7,11 39:12,14,
19 40:13 41:2,14
42:18 43:6,16 44:22
45:8,20,22 46:3,6,8,
11 47:11 48:8,15
49:3,7,14,23 50:6
51:13,20 52:5 53:10
57:3,14,15 61:17,20
62:11 75:20 76:13,
19,24 77:7,19 78:18
79:2 80:16 81:12,15
83:17 84:4,25 91:8,
25 92:3,19 94:13
96:10 97:20 98:11,20
99:4 100:3 102:3,13
103:5,11 106:4,17
109:5 112:14,23,25
115:22 116:5,19
117:7,17 118:2,5,10,
13,15,22,25 119:5,7,
12,14,17 121:11
122:11,18,24 124:24
125:6 126:11 131:3,9
133:15,20,23 134:3
136:20,22 137:23,25
138:11,22 139:22
140:14,18,21 141:4
142:18 143:22
148:12 149:5,17
152:17 154:18
155:18 156:10
162:11 170:21 172:7,
12 173:13 174:8,11
182:17,20 183:7
194:20,25 196:20
197:5 198:13,16

199:10 200:16,24
201:6,11,21 202:7
204:8,11,17 205:22
206:3,16,18 207:17
208:9 209:12 211:10,
16,21,25 212:11
214:9 219:10,14,20
222:3 223:16,24
224:7 225:7,11
230:3,7,9,15 235:22
241:6,19 242:3,11,
18,22,24 243:5,10,17
244:22 245:11 246:5,
18,20 247:4,19,21
248:2,5,14,21 250:2,
16

Quainton's 199:5

question 20:18,22
33:24 34:11 37:8,9
38:3 39:24 40:20
41:17 43:4,11 46:14
47:25 52:16,17 55:22
57:3,12 58:6 60:25
61:7 62:15 64:10
68:7,17,18 69:12,15
70:16 71:19 75:12
89:5,11 92:15,17
95:21,23,25 101:10,
15 103:12 105:6,7
107:21 113:7,13
114:12 122:19,23
123:11 125:24
129:21 130:20
132:24 133:4 142:11,
17,18,20,22 146:12,
13,19 153:8,21 154:3
156:10 164:16
165:19 171:24
174:22 179:10,24
181:2,3,14,24
182:18,21 183:5,6,
10,12,15 184:11
185:11 188:10 189:7
194:21,23 197:8,23
198:2,4,12,17 199:4
205:5,10,11,16,17
209:13 212:20
213:20 214:16
216:10 218:2,6
221:11 222:12,14,20
233:3 235:19 239:23
240:12 244:18,23,25
245:4,5,10 246:9
247:8,12,17,22
248:16,17,22 249:3,5

question's 37:10

questioning 41:12
140:10 241:21

questions 6:24
39:12 53:25 59:2
70:14 73:13,18 95:21
116:24 133:17
158:14 164:13
169:15,25 174:13
193:24 218:16
236:13 239:23 242:5

quick 17:8 38:10
201:24 226:23

quicker 179:11 201:5

quickly 25:2 36:4
131:20 156:20

quiet 223:15

quietly 209:11

quotations 238:24,
25

quote 228:18,21

quoted 228:23,24
229:2 231:16 240:7

quotes 229:2

___

R

R-E-C-E-I-V-E-D
185:16

radio 249:13

raise 199:9

ran 151:3,5 152:11,14
172:22 237:23

rational 213:21

Ratner 160:19,20

razor 134:5

read 22:7 34:10
36:19 37:22 50:14,15
51:8,21,22 65:16
71:22 72:3 77:13,20
85:13,22,23 104:8,
19,25 105:2,4,10,11,
22 110:3 116:17
120:17 125:21
126:21,25 127:3
137:14 138:4,5,8

139:25 141:24 150:4
151:23 152:12
153:24 163:24
167:13 182:18,20,22
194:20,22 195:2,23
198:4,16,18 201:5
202:10,14,23 204:20
206:11,15 207:11,13,
16 209:6,10,11
212:3,10 213:8,10
214:13 219:2,13
221:3,20 225:22
228:7,13 232:10
233:6 234:16,23
237:18 238:14,23
239:4 240:3 247:4,7

reader 244:9 247:24

readers 246:15

reading 61:10
104:10 153:9 171:21
215:7 218:24 223:14
226:15 231:8 234:22
240:9

reads 161:23

Ready 119:2

real 163:17 164:2
177:23 180:6

reality 193:22

reason 24:20,23 37:5
48:22 70:3 91:22
105:6,7 139:15,16
149:7 165:21 171:4,6
176:6 196:7 214:2
216:16 217:6,25
218:7 237:4

reasonable 248:10,
18

reasons 125:9
151:10,24 178:19
238:12 243:16

recall 13:13,22,24
14:5 40:8 42:7,20,25
43:7 44:6,14 54:13,
16,23 55:2,7,11 60:8
62:22 63:3 68:5
80:20 87:17 99:15,17
103:12 104:12,15,18
110:19 149:21
173:18 215:16 218:7
222:21 223:2,4,5,6

225:20,21 227:4
231:6 235:24 240:8,
9,10

**recalled** 60:14

**recap** 42:22

**received** 154:21
180:8 182:3,24
183:9,18 185:16,17
186:2 187:23 220:21,
22

**receiving** 223:6

**recently** 147:23

**recess** 116:2 197:2

**recognize** 20:4,7,10,
14,25 37:4 39:24
40:3,5 41:17,20 42:3,
11,14 46:15,17
119:18,21 122:25
123:4,8 124:7,18,22
202:15,17 204:22
205:7,17,18 208:15
209:16,19 210:17,18
212:4,12 220:21
224:19 243:18

**recognized** 87:22
220:25

**recognizes** 122:20

**recollection** 14:3,8
40:9 47:14 54:5 67:4,
15 86:19 123:17
127:13 144:7 146:15
150:17 152:21
203:23 214:17 216:6,
13 226:5 231:24
237:8

**record** 5:9 6:13 7:11
9:3 18:24 19:2,5,7,8,
10 22:15,17,20 23:24
24:4,7,8,10 27:22
28:23,25 29:2,4 32:2,
4,13 39:2 40:24 45:2,
4,5,7,15 46:9 49:24
50:2,3,5,18 67:24
102:7,9,10,12 103:7,
8,10,13 115:25 116:4
121:15 140:22,24,25
141:3 155:20 156:8
170:24 171:2 178:11
182:22 185:9 195:2
196:25 197:4 198:18

201:14,17,18,20
202:5 207:18 208:3,
4,6 209:3,6 222:15
235:17,20 242:12
243:15 244:11
250:14,15,21

**recorded** 38:22 51:8
67:8 68:12 229:3

**recording** 5:14 53:6
59:10 94:7 128:13
233:23 234:3,5
235:2,4 238:2

**recordings** 122:8

**recreate** 186:14

**recreational** 55:23

**rectangles** 59:16

**redo** 119:2

**refer** 82:20 100:4,22
103:16,20 108:10,16,
21 110:7 114:9
115:12 116:16 127:8

**reference** 54:13,17
76:5 81:16 99:5
143:23 148:3 172:25

**referenced** 81:3
226:7

**references** 146:17

**referred** 100:15

**referring** 7:22 37:18
62:17 67:22 77:9,23
80:20 83:12 84:6
92:6 97:8 98:23 99:6
100:5,24 106:24
108:23 109:25
110:12 131:11
141:11 160:14,16,18
164:22 167:25 168:4
171:12 172:16
173:19,25 213:2
217:8 218:17 233:24
240:18

**refers** 76:3

**reflect** 52:18,22 61:4

**refresh** 54:5 123:16
127:12 203:22
231:24

**refreshed** 144:7

**regard** 69:17 70:22,
24 71:8

**registered** 166:2

**regular** 11:22

**related** 38:4 56:18
87:12

**relates** 27:3,12 81:24

**relating** 70:23

**relationship** 15:20

**relax** 116:22

**relay** 177:5,10
195:16 217:24

**relayed** 69:8 83:22
85:5 92:7 94:14,17
96:6 106:12 176:25
177:15 185:18 186:4
187:25 188:7 190:3
196:4 218:8

**relaying** 84:12 97:16
190:2 203:10 213:24
217:6

**release** 129:16

**released** 129:13
130:15

**relevant** 10:4 12:4,7
26:25 56:6,15 60:23
67:19 224:9

**remember** 43:19
47:20 53:3,19 61:9,
10 63:2,21 64:5
67:14,19 68:8,9 76:7,
8 77:4,14 91:12,15,
17,23 95:23 98:6
110:11,16 120:16
123:23 124:8 128:4,
25 129:6 131:14
132:5,18 151:22
156:19 157:18
190:10 202:17 203:5,
6,11 204:24 205:20
208:21,22 209:14,15,
20 210:14,23 213:9,
15,19 215:14,20
216:3,18 217:15,21
218:15,20,24 220:13,
24 223:7 225:23,24
226:8 229:7,23,24
231:8,11,13,14 233:9
234:22 235:9 236:2,

3,4,15 239:14,15
240:10,22

**remembered** 61:8
214:20 240:3

**remembering** 53:16

**remembers** 63:19

**remote** 5:15

**remotely** 5:10,13

**removed** 70:2

**repeat** 138:16 181:14
182:12 184:9

**repeated** 185:4

**repeatedly** 92:21
142:23

**repeating** 163:9

**rephrase** 247:2

**replay** 58:25 61:6
62:8 96:19

**replayed** 66:15

**report** 36:21 47:17,
22 64:14,16,20
65:19,20,22 66:2
68:15,17,19,21,24
69:4,5 70:19 71:8,10,
14,16,22 72:3,4
75:23 78:12 81:5
83:22 85:3,4,7,12,22,
23 86:3,13 87:8,9,12,
13,14 92:5,23,24
93:3,19,20,22,23
94:2,23 109:22
110:20,21 111:3,5,6,
24 112:2,3,8 113:4,9,
14,25 114:6,8,9,13,
22,23 115:12,13,18
138:24 139:2,3,5,9,
10,14,15,17,18,19
142:7,13 143:9
148:14,19,21,23,24
185:2 186:25 187:7,8
191:16,20 227:20
228:5

**reported** 87:10

**reporter** 5:10,23 6:3,
6,14 10:25 11:5,11
17:12 38:17,18 39:3,
6 41:6,23 64:8
117:20 118:18

119:11 134:13 136:3
140:7,10,16,20
170:16,19 172:9
182:18,22 193:2,3
194:22 195:2 198:3,
18 200:4,11 209:5
216:9 221:22 223:12
227:25 228:2 236:24
241:3 244:3 247:7

**reporter's** 7:22
75:15 76:22

**reporters** 208:23
229:7 233:15

**reporting** 5:5 11:17,
20 24:24 26:2,13,18
74:13 105:6 186:9

**reports** 57:20 69:23
94:22 100:13,24
101:7,11,13 102:17
111:7 112:4 191:21

**represent** 8:16 71:21

**represented** 180:7

**representing** 59:16

**requesting** 194:11
195:8 198:24

**reread** 127:7 144:6

**reserving** 250:11

**resort** 137:17

**respect** 137:4

**respectfully** 11:6
25:17

**respond** 154:19,22

**responded** 225:5

**responding** 142:11
143:4

**response** 89:5
155:12 197:7

**Responsibility**
29:23

**responsible** 245:23

**rest** 208:14

**restate** 58:16 103:15

**resume** 46:4

**retain** 45:17

**retired** 80:14 90:23

**return** 76:24

**revelation** 20:19

**review** 22:16,24 23:3,19 24:16,18 28:18 39:21 132:15

**reviewed** 28:21

**reviewing** 50:19

**revolve** 113:22

**rhetorical** 133:4

**Rich** 6:10 16:15,19 43:9 44:14 51:4 62:21 63:3,4,7 70:23 73:14,19 77:10,24 82:8 87:20 88:8,20 94:15 96:3 97:22 98:2,14 106:7,8,9,19 109:15,23 110:7 127:9,14 128:5 129:11 130:13 132:23 133:12 134:25 151:13,15,21 152:23 154:12,22 158:25 172:2 173:6 174:18 176:2,21 177:2,16,25 179:6,18 180:4,8 188:12 189:16 192:17 194:11 195:7 198:23 240:14

**Rich's** 78:22 96:5 180:9 182:4,25 194:10 195:6 198:22

**RICH0000139** 45:13 59:11 62:2

**rid** 112:11 207:22

**right-hand** 206:9 207:25

**ripping** 170:7

**rise** 178:18

**robbers** 187:10

**Robert** 72:13,16,19 73:5

**Rogers** 167:14 168:16

**role** 99:15 144:24 145:4

**rookie** 243:6

**room** 5:8,12 24:13 29:7 30:12 48:16,19, 23 50:12

**roommate** 193:11

**roommates** 110:14, 15

**roughly** 77:16

**rubles** 169:21

**rude** 158:9

**rule** 5:17 76:6 205:14

**rules** 5:18,19 121:20

**running** 34:25 120:2 231:17

**runs** 96:24 99:10 121:20

**Russia** 90:12 131:23, 24 149:11,13 150:16 151:8,9 158:16 161:5 165:23 173:2 174:19 176:2

**Russian** 25:10 26:13,15,16 27:15 56:15 73:3 89:7,9,14 90:3 128:7 152:3,22 166:15,20 167:25 170:10 171:15 172:3

**Russians** 56:16,18 57:21 88:11,12,21 89:2 91:3 98:3 127:21 130:16 153:11 154:5 161:6 166:23 168:25 169:2, 6,12

---

## S

**S-I-G** 96:22

**safely** 26:4

**sake** 50:22

**salacious** 155:22 156:5

**sample** 106:6

**sandwich** 137:20

**Sarah** 159:16,23,24, 25 160:7,14,16,22,23

**Sarah's** 159:25

**save** 95:8

**saving** 7:19 161:17

**scan** 22:11

**Scenes** 231:4

**Schiller** 7:15

**scholar** 161:20

**screen** 17:16 18:3,9 21:4,16 22:4,8,13 23:6,11 28:17 31:24, 25 32:22,23 33:5,8, 10,17,21 35:4 49:13 59:4 61:18,22 201:2, 23 202:4 206:9,22 207:5 212:8 230:10 232:22 238:18,19

**screw** 168:12

**screwing** 175:22

**scroll** 22:3 30:2 36:4, 8,18,23,24 201:2 204:14 206:14 208:10,11 212:2,21 219:25 225:18 228:10,11,13,15 231:15 232:11,17 233:5

**scrolled** 35:6 39:22

**scrolling** 23:17 35:5 36:7,13 219:22,24 226:13,19,20 232:7

**scurrilous** 156:5

**second-** 158:21

**secondhand** 16:14 63:24 71:11 72:4 92:9 158:7 174:3 199:8 200:8 229:16

**seconds** 46:14 52:20

**secret** 89:8 151:5 175:10 191:19

**Secretary** 24:25

**section** 7:23,24 47:9 75:17

**security** 74:17 144:19 145:4 165:15 168:13 172:23

**seek** 188:4

**seeking** 44:5 188:6

**select** 31:12,14

**send** 30:8,18,19 31:13,21 48:21 216:24

**sending** 134:20

**senior** 82:15 107:15, 16,24 108:4,12

**sense** 54:8 64:8 78:5 105:22 129:7 147:4 210:10 211:5 217:17, 20,22

**sensitive** 95:2 229:8

**sentence** 55:6 106:6 110:6 116:16 127:8, 25 132:21 141:13 147:5 151:23 173:19 186:2 232:23

**separate** 160:6 181:13 211:18

**September** 72:21

**sequencing** 210:14

**series** 83:19 98:15 99:23 100:13,24 102:16,20 103:16 104:5 117:10 174:12

**servers** 25:10 26:14, 17

**service** 79:21

**services** 11:2 51:9 96:25

**set** 59:25

**Seth** 16:15,19 43:9 44:13 63:3,4,7 70:23 73:14,18 87:20 94:15 96:3,5 97:22 98:14 106:9,18 109:15,23 110:7 125:16 126:2 127:9,14 129:11 130:13 132:23 151:13,21 152:23 154:22 158:25 171:25 173:6 176:2,

20 177:2,16,25 179:18 180:4,8,9 182:4,25 188:12 189:16 192:17 194:10,11 195:6,7 198:22,23 240:14

**severity** 5:5

**sex** 85:18

**Seymour** 6:9 8:6 236:25

**share** 17:16 18:2,3 31:23 33:9 48:20 118:9,11 151:14 152:7 243:7

**shared** 61:18 109:15 110:13

**she'd** 58:3

**sheet** 19:16

**shield** 7:23

**shift** 149:19

**shit** 141:15 147:12

**shoot** 110:9

**shooting** 78:11

**short** 19:14 40:14 41:16 103:3 200:23 201:4

**shortly** 14:10

**shot** 62:19 78:9,19 79:3

**show** 18:4 26:20 31:24 120:2,3 133:7 200:21 205:22 211:21 230:20

**showed** 51:2 120:14 123:2 125:12 134:12 220:2 230:21 237:14

**showing** 11:8 18:9 21:20 23:5 37:20 148:5 204:9 211:11 222:5,10 223:16 225:13 230:16

**shown** 120:4 122:22 227:22

**shows** 95:2 233:7,24

**shut** 223:15

Index: sic..submitted

**sic** 50:2 137:14 138:18 161:6 210:6 225:8

**side** 207:25

**sidebar** 207:22

**SIGET** 96:16

**SIGINT** 96:23,24 97:2,5,9 165:16

**signals** 96:21,22 165:16

**signing** 45:19

**silently** 228:14 238:15

**silly** 91:14

**similar** 197:14

**simple** 194:6

**simply** 48:3 70:16 101:11,16 122:20 146:13 205:16 246:7, 10

**Simpson** 99:5,6,8,10 100:9 102:15

**simultaneous** 239:12

**sir** 10:9 26:19 30:16 54:12 118:8 137:3 170:16 178:10,14 193:15 200:4 209:5 216:9 221:22 240:21 245:24 250:19

**sit** 116:21 167:12

**situate** 144:13

**situation** 187:12,15 197:14 240:14

**skeptic** 25:21

**skeptical** 25:22,25 26:8,12,17 57:19 151:9 239:16

**skepticism** 26:6,7

**skill** 84:18

**skills** 201:9,12

**skim-read** 51:16,18

**skip** 133:21 156:2

211:17

**slow** 170:17 221:23 226:21

**slowly** 36:8,9,13 179:13 208:11 209:7 212:3 227:24

**small** 79:3 157:12

**smart** 136:7

**smarter** 136:8 154:9, 10 161:19

**smartly** 131:22

**smelled** 172:14

**Snowden** 131:16 160:3,4,25

**so-called** 26:13 104:7

**social** 5:7

**soldiers** 91:4

**soliloquy** 171:23

**solve** 109:23 110:5

**sophisticated** 83:8 90:13 161:23

**sort** 17:24 22:12 32:15 55:25 89:16 111:23 154:2 171:22, 23 237:22

**sorts** 34:17

**sound** 117:21 147:17 223:4 243:8

**sounded** 243:21

**sounds** 142:10 205:8,18 227:4 229:24 249:11

**source** 68:22 78:21 79:4,6,8,10 81:18 83:21 84:11,15 85:6, 10,11,18,20,23 86:18 87:21,24 92:8 93:18 94:15,18 95:7 96:6 98:12,13 106:13,20, 23,24 107:3,20 108:8,10,17,22 109:7,10 113:6 138:13,15,17,19 143:2 177:17 179:5 180:4,7 182:4,25

185:17 186:5 194:8 195:4 198:20 199:7, 16 227:19 228:4 229:16 233:24 244:7, 14 246:23 248:24

**sources** 12:3 26:3 69:13 107:22 184:18

**space** 38:19,22

**speak** 39:7 69:22 108:6,7 131:11 139:24 179:13 227:24

**speakers** 38:19,23

**speaking** 38:20,21 55:2,8 63:12 64:15 77:22 94:5,9 111:15, 17 120:20 129:22 130:22 144:11 146:21 192:11 227:5 244:3

**speaks** 181:11 189:2 236:23

**Special** 72:23 73:9 151:3

**specific** 14:2 92:4 151:22 217:18 220:24

**specifically** 109:15 122:13 152:23 167:24 209:14 210:17 215:17

**speculate** 114:15 236:13 240:23

**speculation** 113:12

**speech** 194:6

**spent** 82:4 90:6,17 151:6 239:2 244:14

**Spevack** 7:14 102:21,24,25

**spite** 45:18

**spoke** 54:24 69:7,16 70:21 71:20 76:9,14, 21 136:17 151:17 179:5,15,17 237:2

**spoken** 70:15 120:10

**spot** 133:18

**spring** 237:17

**spying** 56:16,18

**stamped** 45:12

**stand** 247:6

**standards** 189:20

**standing** 6:23 22:22, 25 23:20 121:16,25

**stands** 57:9 124:6

**start** 6:8 21:14 38:6 126:22 131:5 179:10 232:25

**started** 104:10 162:6 168:14 186:6

**starting** 21:14

**starts** 156:20 231:20

**state** 7:12 24:25 150:24 198:14

**state's** 5:19

**statement** 35:12 63:6 78:20 80:19 92:7 128:22,25 134:6 142:19 176:21,24 177:4,18,22 178:13 179:4,15,20,25 180:3,18 185:22 188:20 189:21 194:12 195:9 197:16 198:3,6,25 217:14 248:25

**statements** 27:15 128:12 158:6

**States** 73:25 90:11 107:17

**status** 45:18

**statute** 75:16

**stay** 215:9

**Steele** 100:4,5,13,23, 25 101:8,14 102:15, 18,22 103:18,21 104:6,14 106:2

**steps** 70:2

**stipulate** 5:13

**stipulates** 6:5

**stock** 99:19

**stop** 9:2 11:5 41:7 48:20 169:8 212:23, 24 213:24 214:14 217:5 221:5 223:3 241:14

**stopped** 36:6 104:11

**stories** 12:4,10,13 134:14 169:2

**story** 56:5,8,9,17 57:6 58:2,7 89:7,9 90:18,25 91:3,5 97:22 98:6 124:9 129:18 134:23 163:7, 8 166:13 168:22 170:8 171:2 172:14, 17 173:7 226:3,9 234:8,13,19,21,22 235:6 236:4

**strange** 161:24

**stream** 47:3

**stricken** 197:7

**strike** 46:19 66:24 70:10 95:18 97:13 99:22,24 121:17 122:2 124:20 125:10 136:16 154:14 155:16 162:9 164:8, 9,11 170:24 196:17, 21 199:11

**strongly** 170:13

**stuff** 12:8 34:17,25 35:19 65:8 87:6 92:12 95:14 97:16 111:11 124:4,18 136:10 142:5 143:16 145:24 146:6,8 147:22 150:21 160:5 166:25 167:9,13 174:3 175:9,12 176:2 190:6,11 191:7 203:10 213:10 215:10,21 216:24 225:4 226:24 231:18 238:10

**stupid** 112:20 168:6

**subject** 27:5 43:8 81:22 210:3

**submitted** 51:6

98:14

**subpoena** 9:9

**substance** 22:10
243:24

**substances** 9:14

**suddenly** 133:6

**suggest** 64:19
140:21

**suggested** 72:3
170:13

**suggesting** 63:22
66:6 87:20 175:15
189:10 249:10

**summarized** 83:24

**summarizing** 86:5,
9,10 110:24

**summer** 172:17

**sunny** 197:15,17,19

**supervision** 100:25

**supporting** 169:3

**supposition** 16:6
44:7

**Supreme** 79:19

**surprise** 11:15

**surveillance** 96:15
97:8 145:11 147:12,
19 148:4,8

**survive** 135:10

**Susan** 132:4 159:20,
21

**suspect** 91:5

**swear** 5:12 6:14
14:14

**swearing** 5:15

**switch** 41:10

**sworn** 6:16,20 8:8

**Sy** 15:22 44:18 59:10
60:6 197:15,17

**system** 95:13 193:9

---

**T**

**taking** 8:14 29:23
196:12

**Taliban** 91:4 168:22
169:3,10,17 170:3,7

**talk** 11:23 16:17
18:20 22:15 24:4
68:25 86:24 137:16,
18 150:12 176:6
190:9,17 250:14

**talked** 28:21 67:17
69:20 71:15 72:2
74:14 77:17 79:23
84:12 131:25 137:21
160:4,21 185:7
186:17 192:19 203:7,
20 210:10 213:13
218:23 220:3 237:25
241:3

**talking** 11:19 16:15,
16 44:8 62:15 63:7
64:3 65:4 66:19
67:18 68:25 69:19
88:19,25 90:6,17
93:11 94:25 102:14,
23 103:22 132:22
134:13 141:22,25
142:22 143:4,6
147:19 148:8,23
155:8 156:20 159:18
162:6,25 164:17
171:25 172:2 173:2
187:10 192:21
214:11,12 216:4,7,14
219:4 222:10 225:21,
23 226:6 240:10
245:6

**talks** 122:14 240:16

**tape** 178:10,14
181:10 229:3 233:7,
8,10 234:12 235:12
236:10,11,14 238:2
249:25

**team** 73:9 75:8

**technical** 103:2

**tee** 59:3

**telephone** 122:6,12,
14,17 210:6 217:9
236:25

**telling** 86:2 136:11
156:3 157:23 163:8
167:14 168:17 174:5
175:20 182:2,6,23
183:3 193:19 210:23
212:23,24 214:14,17
221:5 241:15 245:13

**tells** 113:25 157:17
169:16 184:14
228:22 238:20

**tend** 92:12

**tennis** 9:23

**tenor** 178:2 188:9

**term** 75:24

**terms** 10:20 61:11
87:15 95:13

**terrible** 139:11
187:19

**terrific** 67:16

**testified** 8:8 42:22
43:7,18,22,23 44:3
87:21 142:23 144:6
195:11,12 239:17
248:8

**testify** 9:15,20

**testifying** 39:11

**testimony** 39:13
42:25 69:7 70:20
92:6 112:6 113:2
115:11 136:24
137:13 138:17
143:18 148:18
151:19 159:4 198:7
246:14

**testy** 215:14 220:13,
14 223:7,9

**text** 21:15

**theory** 25:13,19,22

**thing** 22:20 27:11
35:20 81:23 97:6
124:25 127:22
135:17 136:11
153:10 154:4 159:10
161:12,15 163:12,18
164:15,20 169:12
170:10 172:3 204:4
206:7,25 213:14
221:19 229:5 241:8

245:16 247:25
249:12

**things** 64:9 65:7
82:11 95:2 104:17
111:19 129:23,24
135:21 136:4 142:2
150:12 151:7 161:21
170:9 171:9 175:25
176:3 177:6 187:19
190:17 192:25 203:7
208:23,24 214:25
215:12 216:19
218:16

**thinking** 15:14,16
23:5 96:17 135:15
179:13 190:5 213:9

**thinks** 155:7

**thirdhand** 158:6,22

**thought** 15:19 28:20,
21 29:11 44:4 72:5
90:24 97:11 112:10,
16 115:2 124:11
130:5,8 134:19,20,23
152:14 154:7,8
158:11,15 160:13,15
161:4,14,17 163:16
170:12 183:5 190:18
192:4 196:11 219:3
222:23,24 236:17

**threat** 166:20

**three-** 186:16

**tick** 118:9

**tie** 9:5

**time** 7:19 8:3,14,20
12:25 15:17 19:6,21
24:6,9 27:19 28:24
29:3 30:22 39:9
40:10 42:4,8 45:3,6
47:23 49:25 50:4,15
54:23 55:7 57:13,17
64:6,17,19 68:23,25
69:3,4 71:13 74:9
77:16 81:4,21 82:4
86:20 87:24 88:10
89:2 90:17,21 92:10
93:16,17,19 99:14,21
100:14 102:8,11,19
103:6,9,19 116:3
124:9,10 125:13
130:17,18 137:4,7,8,
15 139:13 140:23

141:2,14 150:21
151:6 166:10 186:13
193:3 196:6,24 197:3
201:16 208:2,5
224:10,23 233:10
236:5,6,9 250:6,11,
20

**time's** 50:22

**timeline** 233:12

**times** 11:3 39:15
89:3 127:19 169:16
184:16 185:5 189:2
195:25

**timing** 87:16 144:5

**title** 225:20 231:3

**titled** 230:19

**today** 10:8 11:19
26:2,8 57:11 67:4
91:3 99:13 148:18
171:4 203:13 237:14
239:2 241:23 243:16

**told** 16:13 29:11
41:10 56:7 60:15
65:5 66:14,21 78:6,
10,11,22 79:5,11
81:19 84:21 98:12
105:5 109:19,20
110:25 114:16 139:9
150:11,15,18 151:25
156:13,14,15,21
157:6,9,14,15 158:15
159:14 161:5 163:9
171:22 172:18,21
175:4 179:17 180:3
182:13 184:15
186:16 188:5 190:2
192:13 196:4 197:17
213:5,11,12 214:18
215:10,19 216:22
225:4 229:6 235:11

**tomorrow** 234:25
250:12

**Toons** 124:19

**top** 31:6,8 61:23
126:22 141:6 162:12
173:14 209:24
212:18 227:17
232:22 233:2 238:18,
19

Index: topic..White

**topic** 16:11

**topics** 16:9

**total** 96:14 136:14,15

**totally** 40:8 82:3 95:22 127:20 173:2 184:18 233:6 238:5 244:12

**track** 235:3

**trail** 111:13

**transcribing** 64:23

**transcript** 19:23 30:23 48:11 50:9,10, 12,14,16 51:5,22 52:12,17,21 53:6 54:2,3,5 55:12 58:13, 22 60:7 61:3,16 65:15 66:8,9 68:11 76:25 77:5 82:25 96:13 116:7 125:21 126:15 128:10 130:25 141:6 146:17 151:23 153:25 159:16 162:13 171:7 178:6 179:22 181:5 184:2 185:12 189:2,5 194:17 196:11 227:19 234:21

**transcription** 51:24 52:7 53:12

**transcripts** 228:3

**transfer** 106:19 182:4 183:2

**transferring** 180:9 188:12 189:16

**transmitted** 177:25 178:2

**transmitting** 126:3 179:19

**transpired** 196:8

**trick** 101:15

**trigger** 141:10,20 142:9 143:13

**trouble** 95:9 131:16 152:11,14 185:23 186:2

**troubled** 172:4 228:25

**troubles** 167:8

**true** 9:24 115:5 118:2 159:4 176:11,15,18, 21,24 177:4,7,8,14, 17,21 178:9,13,17,25 179:4,15,20,24 180:2,11,15,18 181:6,15,16,18,20 185:22 188:19 189:14,20,22 190:7 194:2,3,7,12,19 195:3,9,18,21 196:10 197:16,24 198:2,6, 19,25 199:7,12,14,23 200:9,13 244:4

**Trump** 14:6,11 36:21 57:23 73:2 144:19 147:8 161:12,16 168:14

**Trump's** 236:23

**trust** 107:9,10,13,14 108:11

**trusted** 106:13 185:17 186:5 194:7 195:4 198:20 199:16 246:23 248:24

**truth** 156:17

**truthful** 51:23 52:7 128:25 130:22

**truthfully** 9:15,20 52:17,21

**TSA** 165:8

**TSG** 5:5

**turn** 59:14 112:12,18 169:10

**turned** 112:11,16,21 154:9

**turns** 169:4

**TV** 40:18 41:24

**tweet** 216:23

**tweets** 215:8

**Twitter** 213:10 215:7

**two-minute** 41:16

**Two-part** 126:7

**type** 149:21

---

## U

**Uh-huh** 225:15 236:21 239:8,25 240:5

**ultimate** 162:5

**unable** 103:2

**unbelievably** 138:12

**unclassified** 166:8

**unclear** 32:3,4,16

**uncomfortable** 8:22

**unconvinced** 227:4

**underlined** 21:11

**understand** 9:22 11:21 15:24 27:5 33:23 39:11 49:23 70:17 71:17 76:4,5 87:2 94:6 112:5 113:18 114:5 115:6 122:4 128:20 130:19 137:3 143:18 145:25 146:11 148:7,20 159:3 171:12 178:23 181:8 183:24 184:6, 10 186:19 187:16,22 191:23 192:2 197:10 213:22 215:17,18,24 221:23 244:24 245:4, 15 247:11,14,16 248:14

**understanding** 35:14 44:21 56:13 97:17 110:13 111:22, 23 115:20 193:13

**understandings** 248:11

**understood** 83:25 86:2,4 87:9,15 94:11 186:24

**unencrypted** 88:13, 16

**unintelligible** 96:11

**uninterested** 236:5

**unit** 81:17 82:17,21 83:7,10,13 84:2,5,7, 13 97:2,5,15 210:12

**United** 73:25 90:11 107:16

**units** 82:23 151:5

**University** 10:13

**unlike** 161:13

**unmute** 6:2

**unpack** 176:12

**unstable** 243:4

**unwarranted** 147:23

**upping** 147:12

**upset** 237:19

**usual** 124:18

---

## V

**Vaguely** 140:20

**validity** 5:14

**veracity** 197:18

**verb** 183:8

**verbal** 187:8

**verbs** 188:3

**verified** 199:24

**verify** 107:12,14 108:12 113:24 149:12 184:20 189:18 199:15,21 200:8

**verifying** 199:22

**version** 223:21

**versus** 6:10

**video** 5:14 18:5,13 19:14 20:5,8,11 21:2 40:15 41:18,21 42:3, 8,12 45:23 87:22,25 119:19,22 121:9,18, 23 122:21 123:13 125:12,15 243:15

**video-recorded** 6:9

**videos** 17:18,19

**view** 68:12 95:4 131:21 149:14 189:19 197:13 246:8

**violate** 168:13

**visible** 202:6

**vividly** 218:24

**vocal** 93:13

**voice** 46:23 125:16 140:4

**volume** 140:14

**voluminous** 12:24

**vote** 161:16

---

## W

**wait** 139:24 163:5 177:9 179:8 231:17 232:12

**waived** 7:7

**wanted** 9:5 16:5 44:4 50:21 67:24 133:3,20 161:25 163:14 168:13 170:14 186:21

**war** 151:3,5,6 161:21 166:13 170:3

**warns** 238:22

**warrant** 193:12,18

**warrants** 87:7 192:24 193:6,7

**Washington** 51:7 73:17 134:15 175:19 203:13

**watched** 123:3,6,7

**watching** 153:24

**water** 8:23

**wealthy** 152:9

**week** 90:20 227:3,18, 21 233:11

**weeks** 147:10

**west** 166:4

**whatsoever** 204:7

**White** 175:8 190:5,9, 14,16 191:3,6,9 196:12

Case 4:20-cv-00447-ALM   Document 11-8   Filed 12/30/20   Page 86 of 86 PageID #:  228

**whoa** 154:22 156:15
157:16,17,18 158:8
210:25 213:9 219:3

**Why's** 147:7

**widely** 90:13

**wife** 179:8

**Wikileaks** 94:16 96:4
97:23 98:16 106:19
126:4 127:15,22
179:19 180:10 182:5
183:2 188:13 189:17
194:11 195:8 198:24

**William** 73:22

**Willkie** 7:13

**window** 28:6 31:17
117:4

**winning** 136:9

**wire** 11:2 147:21

**wiretapped** 147:20,
22

**wiretapping** 147:24

**withdraw** 85:15
248:17

**witness's** 22:16
35:11

**woman** 131:18,25
132:3 160:17 173:25

**Women's** 144:9

**won** 167:4 168:14

**wonderful** 95:5
132:13

**wondering** 215:3
222:25

**word** 37:16 53:5
65:22 69:4 85:15
86:12 87:9 93:25
95:19 96:11,12,16
105:19 113:14,25
114:23 139:8 149:8
187:17,22 218:22

**words** 47:21 61:2
78:4 93:4 137:3,7,9
147:18 163:6,7
187:23 199:12
206:12,20 207:16
235:3

**work** 44:8 58:12,14
73:9 87:3 125:17,25
149:11 158:16 190:8

**worked** 10:25 11:2
80:5 83:25 150:22
157:11

**working** 12:5,11
56:5,10,11,17,25
57:5,6,11,12,17
81:20 82:5 84:19
97:21,22 116:15
125:23 126:3,12
127:6,12,13 128:5,6,
8,24 129:6,7 150:20
152:2

**works** 82:12 95:13
132:11,14 157:11
175:18 241:2

**world** 111:9,15
113:21 114:18,20
143:10 150:6 164:6
187:4 216:20

**worry** 54:21

**worse** 169:6

**worth** 199:22

**write** 25:16 47:19
124:9 129:19 143:12,
16 167:7 170:9
175:24 176:5 185:5
241:4 248:12

**writing** 86:8 95:2
111:19 113:17
132:16 162:17 174:5

**written** 100:21 101:7,
11 106:2 112:3 114:8
115:13,18 132:13
145:24 162:19
184:24 211:2 214:21
222:7 235:7

**wrong** 132:6 139:11
159:22 192:25 193:8
233:12 238:5

**wrote** 98:22 105:7
135:22 161:15
175:10 187:19 234:8

—————

**Y**

—————

**years** 10:16,24 14:14

16:2 42:5 47:8 56:12
79:16,21 84:19 86:24
90:7,9 91:13 94:25
105:5 107:5 108:11
110:17 127:25 128:3
146:7 153:4 161:16
163:3,24 166:17
169:2 194:8 195:5
198:21 208:19,20
213:8 215:6

**yesterday** 163:9

**York** 11:2 169:15

**Yorker** 11:3 12:22

**young** 131:18

—————

**Z**

—————

**Zoom** 17:13,14 24:13
29:6