IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| BRIAN HUDDLESTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION No. 4:20CV447 |
| v. | ) | |
| | ) | |
| FEDERAL BUREAU OF | ) | |
| INVESTIGATION and UNITED | ) | JUDGE AMOS MAZZANT |
| STATES DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' THIRD DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1) I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"), in Winchester, Virginia.

(2) This is my third declaration in this case. It supplements and incorporates by reference the information previously provided by me in my first declaration of December 8, 2020 (ECF No. 10-1) and my second declaration of January 6, 2021 (ECF No. 12-1).

(3) The FBI submits this Declaration in further support of Defendants' Second Motion to Stay filed on April 8, 2021 and in Reply to Plaintiff's Opposition to Motion to Stay filed on April 13, 2021.

(4) Plaintiff in his response opposes the FBI's request for a stay and refers the Court to his prior Opposition (ECF No. 11) filed in response to the Defendants' First Motion for Stay (ECF No. 10) wherein he claimed the FBI acted in bad faith in handling its FOIPA obligations.

1

He also asserts that if the FBI can only produce 500 pages by April 23, 3021, it should be afforded not more than two weeks to produce the remaining 1,063 pages.

(5) As discussed in my First and Second Declarations, the FBI has been operating at a reduced capacity due to the effects of the COVID-19 pandemic while balancing an unprecedented workload. Further, the FBI has exerted its best efforts to complete its searches and its review and processing of responsive, non-exempt records to Plaintiff by Friday, April 23, 2021.

(6) FBI-RIDS standard business practice is to review/process records in 500 page per month ("ppm") increments per request. In December 2020, as a result of the reduction in staffing, that processing rate was reduced from 500 ppm to 250 ppm per request. As staffing has slowly begun to increase, so has the number of ppm per request. Specifically, the page count has increased to 300 ppm for releases to requesters being made between May 1st – May 23rd and then 500 ppm for releases to requesters being made on May 24th and thereafter. Further information and details concerning FBI-RIDS processing practice is discussed in *infra*, ¶¶ 11-16.

(7) The FBI, while making great strides to review the voluminous set of potentially responsive FBI reference serials mentioned in ¶ 4 of the Second Hardy Declaration, received approximately 1,296 pages from the Department of Justice ("DOJ"), Office of Information Policy ("OIP") on February 8, 2021, for its review and consultation.

(8) Following numerous discussions between OIP and FBI personnel concerning the handling of these records, it was determined that of the approximately 1,296 pages, only a small

2

number of them (approx. 180 pages) would be handled as a consultation,[1] with the remaining documents (approx. 1,116 pages) to be handled as a referral to the FBI for direct response to the Plaintiff herein.[2] Further information and details concerning DOJ's FOIPA consultation and coordination processes and the FBI's procedures for handling other government agencies ("OGAs") equities generally are discussed *infra*, ¶¶ 17-28.

(9) In addition to the receipt of records from OIP, the FBI during its preliminary review of the OIP material, located information that provided a lead to the location of additional responsive records maintained by the FBI. Based on that information, RIDS conducted an additional search which resulted in the location of additional potentially responsive reference serials which mention/reference Seth Rich. As a result, additional time is required for the FBI to complete its review and processing of these records.

(10) In addition, the FBI recently determined that its initial (b)(6), (b)(7)(C) and (b)(7)(E) *Glomar* response provided to Plaintiff in response to his June 1, 2020 request has been partially pierced as it relates to Items 1 and 2 of Plaintiff's request below for the following records from the FBI's "CrossFire Hurricane" investigation:

1. Documents, records, or communications revealing the code names assigned to any and all individuals as part of the Crossfire Hurricane investigation.

2. Documents, records, or communications revealing the code names assigned to any and all sub-sections of the Crossfire Hurricane Investigation.

3. Documents, records, or communications revealing the code names assigned to Seth Conrad Rich.

---

[1] Upon completion of the FBI's review and marking of the 180 pages, they will be returned to OIP so that it may apply any applicable exemptions on its behalf and then include the records in its own production to Plaintiff.

[2] Since these records are being processed by the FBI for release to the requester herein, they too will undergo the same FOIA processing set forth *infra*, ¶¶ 9 (a)-(f).

3

>   4. Documents, records, or communications revealing the code names assigned to Aaron Nathan Rich.

(ECF No. 3, pages 12-13). As a result, the FBI reached out to Plaintiff's counsel *via* the AUSA on or about April 13, 2021 to determine what specific documents the Plaintiff is looking for to satisfy his request, (*i.e.* a list of code names and the true names they correspond to for the Crossfire Hurricane investigation, etc.). Plaintiff advised that he would be willing to narrow the request to locating a single document for each individual/file that contains the code name, understanding that the records will be redacted pursuant to applicable FOIPA exemptions. As such, the FBI will initiate an additional search for records responsive to the narrowed request and process them in accordance with its standard processing practice.

FBI's FOIA/PRIVACY ACT ("FOIPA") PROCESSING RESOURCES
AND STANDARD PROCESSING PRACTICE

(11)   The FBI currently employs 237 Government Information Specialists ("GISs"), with support from 91 contractors, to process requests for FBI information under the FOIA and Privacy Acts and conduct classification and declassification reviews, *inter alia.* RIDS staff are assigned to the following units:

> (a) RIDS Front Office;
>
> (b) the Classification Unit ("CU"), which reviews and makes national security classification determinations pursuant to Executive Order 13526 in response to a variety of requests, and also conducts mandatory and systematic declassification reviews;
>
> (c) FOIPA Operations Units, which process records responsive to FOIPA requests by applying exemptions and preparing them for public dissemination;

 (d) the FOIPA Support Unit ("FSU"), which serves as RIDS's Public Information Office and provides administrative assistance and support to the other RIDS units;

 (e) the Litigation Support Unit ("LSU"), which assists the FBI Office of General Counsel's FOIPA Litigation Unit in handling all FOIPA lawsuits against the FBI or involving FBI records and information by reviewing, researching, and justifying the FBI's response to FOIPA requests, and preparing detailed declarations to support motions for summary judgment;

 (f) the National Security Unit ("NSU"), which provides expert guidance and direction regarding FOIPA requests pertaining to national security matters, and develops and manages responses to requests for access to sensitive national security information in FBI records; and

 (g) the Initial Processing Operations Unit ("IPOU"), which receives and opens new FOIPA requests, initiates searches for records responsive to FOIPA requests, makes responsiveness determinations, and ensures that responsive material is scanned and imported into FOIPA Document Processing System ("FDPS").[3]

 (12) Perfected FOIPA requests are typically worked by at least two units and require action by multiple employees during their lifecycle. Requests generally start in IPOU; those that include classified information move to CU and may also undergo review by the NSU; once CU

---

[3] Some FOIPA Operations Units are "single station" units and perform the intake and initial processing work (*e.g.*, searches) instead of IPOU, as well as processing for FOIA exemptions.

and NSU have completed their reviews, the requests move to a FOIPA Operations Unit for processing; and if a request is in litigation, LSU will be involved throughout the process.[4]

(13)   RIDS's standard business practice is to review/process records in 500-page increments per month per request.  By processing and making interim responses based on 500-page work items, the FBI is able to provide more pages to more requesters, thus avoiding a system where a few large requests monopolize finite processing resources and where fewer requesters' requests are being fulfilled.[5]  By working in 500 page increments, the FBI has found that more pages get processed, reviewed, and released to more requesters each month because processors can work on 500-page work items for several requests in a month.  Also, 500-page work items are more manageable for the subject matter experts ("SMEs") outside of RIDS who review the materials to ensure that FBI equities are properly addressed and who juggle these FOIPA reviews with their FBI mission duties.[6]  Finally, it is more efficient to run required information security protocols on FOIPA releases of 500 pages or less.  Because many FBI records contain classified information and because all FBI records are processed on a classified

---

[4] This only addresses RIDS's process.  As part of the FBI's FOIA process, subject matter experts and other stakeholders within the FBI are consulted prior to release of records, and if other agencies' records or equities are implicated, the FBI consults with those agencies and/or refers records to them for processing prior to any final decisions about release or withholding under the FOIA.

[5] The FOIA encourages agencies to develop multi-track processing with the goal of responding to more requests. *See, e.g.*, 5 U.S.C. § 552(a)(6)(D).  As a result, the FBI has established four processing queues for small requests (1-50 pages), medium requests (51-950 pages), large requests (951-8,000 pages), and extra-large requests (more than 8,000 pages).

[6] SMEs can include special agents and intelligence analysts who worked on particular investigations; special agents, intelligence analysts, or other employees who are experts in particular operational or technical subject matters, such as cyber or foreign intelligence threats or CART examinations; and attorneys.

computer enclave, records can only be disclosed after being run through security protocol scans for particular information to ensure that it is not improperly disclosed. The time required to run security protocols and resolve any issues that may arise increases as pages are added.[7]

### APPLICATION OF FBI'S FOIPA PROCESSING PRACTICES TO RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(14) To date, the FBI's searches have resulted in the location of *only* reference serials and most, if not all of them, are maintained in the Special Counsel's Office ("SCO") record collection wherein both DOJ and the FBI are responsible for maintaining portions of the records, with the FBI retaining the investigative records housed in its Central Records System.[8] The FBI's standard practice for reviewing and processing reference serials is:

(a) Given the nature of FBI records, processing typically must begin in CU. That is, each work item is assigned in FDPS to a GIS in CU, who will review each record to determine whether it is classified and if so, to ensure that any classified information meets the procedural and substantive requirements of E.O. 13526. This is a detailed page-by-page, line-by-line review that involves, at a minimum, consultation with the appropriate classification guides. The CU GIS marks classified information for redaction.

(b) Once CU's review is completed, each work item is reassigned in FDPS to a GIS in a FOIPA Operations Unit, who will conduct a page-by-page, line-by-line

---

[7] *See National Security Counselors, et al. v. United States Department of Justice*, 15-5117, 848 F.3d 467 (D.C. Cir. 2017).

[8] Reference serials are records that merely mention or reference an individual, organization, or other subject matter that is contained in a main file record about a different subject matter.

review of the record to identify the specific "responsive" pages within the document that contain the mention or reference to the subject of the FOIPA request.[9] Once the responsive pages have been identified that reference the subject of the request, the FBI analyst must determine, if any additional pages are necessary to provide meaningful context to the reference to the subject.[10] After identifying the responsive pages and those necessary for context, the FOIPA GIS will conduct an additional line-by-line review of the responsive pages (those that mention/reference the subject of the request and those provided for context), to apply FOIPA exemptions, redact exempt information, and reasonably segregate non-exempt information in the responsive pages.

(c) For these particular records, an additional research step is required given the unique setting of the SCO investigative records. This additional research step concerns the applicability of the public domain doctrice to SCO material which may have a waiver impact on otherwise exempt information. This requires the FOIPA GIS to conduct extensive research to compare documents undergoing

---

[9] There is a subtle, yet significant distinction between records the FBI provides for context and "responsive" records within the meaning of <u>American Immigration Lawyers Association v. EOIR</u>, the associated OIP scoping guidance and our practice. The only truly "responsive" cross reference records within a serial or document are those pages which actually reference the subject, the contextual pages are best characterized as a discretionary release decision made on a case by case basis as a service to requesters to provide them with the "context" of the actual responsive cross reference page(s).

[10] Ordinarily, the pages provided for context, include the first page of the document (because it often includes the date and purpose relating to responsive page), the page on which the subject of the FOIA request is mentioned, and any additional pages (often the page before and/or after the mention, if relevant) necessary to understand the context in which the mention of the subject appears.

processing to records that have been officially disseminated to the public via authorized government channels to include SCO-related prosecutions.

(d) Expert GISs or Supervisory GISs in both CU and FOIPA will review the work done by the GISs in those units to ensure accuracy, consistency, and compliance with standards and processes.

(e) Once the FOIPA exemption review is completed, the work items are forwarded to the relevant SMEs within the FBI, who review the proposed processing by RIDS to ensure that operational equities are properly addressed. Based on SME feedback, the FOIPA GIS makes adjustments.

(f) Given the nature of the records here, the FBI anticipates that it will have to engage in a substantial consult process with various DOJ components and Federal agencies. The FBI generally does not receive consultation responses back in the same month that they are sent; therefore, the FBI cannot release the relevant records until all consultation responses are received.

(g) Once all consultation responses are received and necessary edits are incorporated, the pages proposed for release are run through security protocols. After making any changes identified during the security scan, the release package is prepared and sealed for public release.

(15)   Given the complexities and interconnectivity of these records, RIDS has designated a specialized team whose mission is to handle all requests for SCO records and related matters, and to process SCO-related records. This team is responsible for initial

processing (including searches) through the end of the processing.[11] Centralizing processing into this a single, specialized team allows this group of employees to develop a bird's eye view of all requests related to SCO records to ensure consistency in responses, avoids unnecessary duplication of efforts, and builds expertise in the records and prior processing decisions. It has taken months for this select team to develop expertise in responding to the wide array of interconnected SCO investigations and investigative issues. This centralized team approach also allows the FBI to manage the number of people who access this sensitive group of records. The team handling SCO records requests are responsible for processing records (as well as handling various initial processing tasks, such as conducting searches).

(16)   Given its analytical nature, FBI FOIPA processing requires a trained analyst to identify the responsive pages of a reference record and to determine whether information is, based on content and context, exempt or non-exempt. A person – and in fact, multiple people – must read each responsive page. So, while the FBI has automated certain steps in the process, the FBI's ability to process these – or any – records under the FOIPA ultimately devolves to a question of the ability of human beings to review, analyze, and render decisions about complex and sensitive information.

### DOJ's FOIA REGULATION GOVERNING
### RESPONSIBILITY FOR RESPONDING TO FOIPA REQUESTS

(17)   DOJ's FOIAA regulation at 28 C.F.R. § 16.4 addresses the "[r]esponsibility for responding to [FOIA] requests." In this regulation, DOJ recognizes that the agency that received and is processing a FOIPA request may not be in the best position to make disclosure

---

[11] The records must still be reviewed by CU.

determinations about information in its possession originating from another government agency and/or involving other government agencies ("OGAs") equities. Accordingly, at § 16.4(d), DOJ established procedures for handling such information through the referral and consultation/coordination process.

(18) According to DOJ's FOIPA regulation, "the component [processing a FOIA request] shall determine whether another agency in the Federal Government is better able to determine whether the record is exempt from disclosure under the FOIA," and if so, employ one of the three processes – referral, consultation, or coordination – to determine the disposition of the record. 28 C.F.R. § 16.4(d).

    (a) Under the **referral** process, the processing agency applies whatever redactions it deems appropriate for its information and then sends it to the OGA, which will process it for the OGA's equities and then respond directly to the FOIA requester. This process is typically used when the processing agency locates a document that originated from an OGA. *See, e.g.*, 28 C.F.R. § 16.4(d)(2). For example, if the U.S. Park Police (USPP) located an FBI FD-302 in its files, it would process the record to address USPP equities and then refer the record to the FBI. The FBI would then process the record to address FBI equities and the FBI – not USPP – would respond directly to the FOIA requester by releasing that FD-302 in whole or in part, or withholding it in full.

    (b) The **consultation** process is similar to the referral process except once the OGA finishes processing a record for its equities, it returns the record to the processing agency, which will then respond directly to the requester. Consultations can involve (i) records originating from the processing agency

that contain or implicate OGA equities, and/or (ii) records originating from an OGA where both agencies agree that the processing agency will handle the record as a consultation rather than a referral. *See* 28 C.F.R. 16.4(d)(1), (d)(2)(i). For example, if the FBI located a USPP record in its files – or located an FBI record discussing USPP equities – the FBI would send the record to USPP for consultation; USPP would make any redactions necessary and return the record to the FBI; the FBI would implement any USPP redactions as well as any FBI redactions; and then the FBI would respond to the requester. Any given record may involve consultations to multiple OGAs. That is, a single record may include information from and/or implicate the equities of multiple OGAs. It is also possible that an OGA receiving a consultation will determine that another agency also has equities in and should review the record, and so the OGA could recommend further consultation.

(c) The **coordination** process is a variation on the consultation process where the OGA whose records or equities are involved is not disclosed to the requester because that could, itself, reveal classified or otherwise exempt information, or cause harms protected against by FOIA exemptions. *See* 28 C.F.R. § 16.4(d)(3).

(19)   DOJ's FOIA regulation governing the responsibility for responding to FOIA requests also specifically addresses the handling of OGA classified information:

> Whenever a request involves a record containing information that has been classified or may be appropriate for classification by another component or agency under any applicable executive order concerning the classification of records, the receiving component shall refer the responsibility for responding to the request regarding

> that information to the component or agency that classified the information, or that should consider the information for classification. Whenever a component's record contains information that has been derivatively classified (for example, when it contains information classified by another component or agency), the component shall refer the responsibility for responding to that portion of the request to the component or agency that classified the underlying information.

28 C.F.R. § 16.4(e).

(20) These processes are not unique to DOJ and its components. Most agencies' FOIA regulations contain similar provisions governing the handling of OGA information that generally mirror these processes.

### FBI'S PROCEDURES FOR HANDLING OGA EQUITIES GENERALLY

(21) The FBI processes its records in compliance with this DOJ FOIA regulations, including § 16.4.

(22) The referral and consultation/coordination procedures outlined in § 16.4 are followed both at the administrative phase as well as for cases in litigation.

(23) The FBI typically follows the coordination version of the consultation process for OGA equities in our records. That is, we do not identify the agency or agencies to which we are sending records as part of our processing of a FOIA request. The coordination process is critical to the resolution of Intelligence Community ("IC") equities in particular because an IC agency's connection to a specific individual, activity, program, or FBI investigation can often be classified or prohibited from disclosure under a withholding statute. Unless/until the IC agency has had a chance to review the records and determine whether its equities in them can be publicly acknowledged, the FBI must rely on the coordination process. But coordination can also be key in resolving non-IC equities in our investigative records. For example, if the FBI were to consult

with the Securities and Exchange Commission ("SEC") about a particular matter, and were to disclose that it was doing so, the FBI runs the risk of exposing SEC law enforcement interest in a person or activity that may not otherwise be known in a way that adversely affects a pending SEC investigation. Accordingly, given the FBI's dual law enforcement and national security/intelligence mission, the FBI has concluded that the coordination process, whereby consultations are made without publicly identifying the OGA, is the only reasonable method to avoid potential inadvertent disclosure of classified and/or law enforcement sensitive information that would otherwise be exempt under the FOIA.[12]

(24) In implementing the consultation/coordination procedures from § 16.4, the FBI processes records to identify classified and other exempt information, and marks information to be redacted. During that process, we identify any OGA records or information, mark the information and notate which OGA needs to review it, and prepare consultation/coordination packages to be sent to the OGA(s).

(25) It is the FBI's long-standing practice to send consultation/coordination requests only after a work item has been fully processed by the FBI. Records must be fully processed to identify any classified information before they can be sent for consultation/coordination because that will govern how they are handled both by the FBI and by the OGA. Additionally, from a technology standpoint, pages that must be sent for consultation/coordination cannot be extracted while processing is still occurring on the work item in which the pages are located without

---

[12] The FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency; conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and further the foreign intelligence objectives of the United States.

14

altering the work item and consequently, interfering with the preparation of the non-consultation records for release to the requester. RIDS has not been able to identify a technological solution that would allow creation of the OGA consultation package in FDPS prior to the finalization of the relevant work item.

(26) Regardless of whether an entire record or only a portion of it requires consultation/coordination, the FBI typically removes the entire record from the relevant monthly production, rather than releasing the non-OGA portions of the record and then re-releasing the record once consultation/coordination is completed. There are both substantive and logistical reasons for this.

> (a) First, there are instances when more information than what the FBI identified contains OGA equities, such that not resolving the consultation/coordination before any information is released risks disclosing OGA equity information before that agency has a chance to advise how it should be handled (and could result in the disclosure of classified, law enforcement sensitive, or otherwise exempt information).
>
> (b) Second, in order to incorporate another agency's input once a document has already been finalized for disclosure requires various steps to revert the document to draft form in FDPS; deletion of boxes covering any information subject to consultation/coordination; the implementation of any redactions identified by the OGA; finalization of all redactions; and running information technology security protocols required by FBI policy before any releases can be made. Performing all of these steps for multiple versions of the same

15

document creates significant inefficiency, and also increases the chances of information being inadvertently released.

(c) Third, releasing multiple different versions of the same document can create confusion. Indeed, the same document may be sent to multiple OGAs for review, thus exacerbating the risk of confusion. (It would also compound the inefficiencies outlined above.)

(27) The consultation/coordination process outlined above is a long-standing one followed at the administrative stage, as well as in litigation. That is, once a request is in litigation and subject to either an agreed-upon or court-ordered processing schedule, the FBI processes the specified number of pages per month (typically 500 pages), releases the non-exempt portions of any pages not requiring consultation, coordination, or referral, and then sends the consultation/coordination requests and/or referrals to OGAs. Once OGAs send consultation/coordination responses back, the FBI finalizes those pages for release of any reasonably segregable, non-exempt information and includes them in the next-scheduled interim response. Particularly once a request is in litigation, RIDS follows up on outstanding consultation/coordination requests with OGAs on a regular basis; the frequency with which this occurs will vary depending on a variety of factors such as the number of outstanding consultation/coordination requests and how long they have been outstanding. The FBI has followed this process in responding to numerous other requests at the administrative stage and/or in litigation.

(28) Finally, when the FBI receives a consultation/coordination request from an OGA regarding a request that is in litigation, the FBI prioritizes it to the extent possible in light of litigation deadlines in cases to which the FBI is a party. In my experience, this practice is

reciprocated by OGAs receiving consultation requests from the FBI for cases in litigation. That is, they will prioritize the FBI litigation consults but only to the extent doing so does not impede their ability to meet their own litigation deadlines. This process relies on good will and cooperation among agencies to function; there is no statutory or regulatory mechanism by which one agency can compel another to respond to a consultation request by a date certain.

## CONCLUSION

(29)  The FBI has continued to diligently review and process the subset of records that existed at the time of its filing of its First Motion to Stay Scheduling Order on December 16, 2020 (ECF No. 10) and has remained committed to producing records to Plaintiff on April 23rd in accordance with its 500 ppm standard processing practice. Notwithstanding this commitment since the filing of its prior Motion to Stay, the FBI has 1) continued to experience reductions in staffing due to COVID-19, just now reconstituting; 2) received records from OIP which now must be reviewed and processed; 3) located a clear search lead from receipt of the OIP records, resulting in the search and location of additional records which must be reviewed and processed; and 4) there are additional searches which must be conducted as a result of the partial piercing of the FBI's initial (b)(6), (b)(7)(C), (b)(7)(E) *Glomar* response and Plaintiff's agreement to narrow the scope of Items 1 and 2 of his June 10, 2020 request. Accordingly, the FBI respectfully requests that this Court stay the existing scheduling order deadlines and adopt the following processing schedule: The FBI process responsive records at a rate of approximately 500 ppm, with its first interim release due April 23, 2021, and remaining responses due on the 24th day of each subsequent month, until all processing has been completed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of April 2021.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia