## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| BRIAN HUDDLESTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION No. 4:20CV447 |
| | § | |
| FEDERAL BUREAU OF INVESTIGATION | § | |
| and UNITED STATES DEPARTMENT OF | § | JUDGE AMOS MAZZANT |
| JUSTICE | § | |
| | § | |
| Defendants. | § | |

## <u>DECLARATION OF VANESSA R. BRINKMANN</u>

I, Vanessa R. Brinkmann, declare the following to be true and correct:

1.   I am Senior Counsel in the Office of Information Policy (OIP), United States

Department of Justice (DOJ or "the Department").  In this capacity, I am responsible for

supervising the handling of the Freedom of Information Act (FOIA) requests subject to litigation

processed by the Initial Request Staff (IR Staff) of OIP — a role I have served in some form

since 2008.  Prior to becoming Senior Counsel, I served as Counsel to the IR Staff, as an

Attorney-Advisor and, from 2003-2008, as a Government Information Specialist (formerly FOIA

Specialist) on the IR Staff.  The IR Staff of OIP is responsible for processing FOIA requests

seeking records from within OIP and from six senior leadership offices of the DOJ, specifically

the Offices of the Attorney General (OAG), Deputy Attorney General (ODAG), Associate

Attorney General (OASG), Legal Policy (OLP), Legislative Affairs (OLA), and Public Affairs

(PAO).  Additionally, the IR Staff is responsible for processing FOIA requests seeking records

from within the Special Counsel's Office (SCO).

2.   The IR Staff devises appropriate records searches for each FOIA request it processes on behalf of itself and the Department's senior leadership offices and SCO, and determines whether records are appropriate for release in accordance with the FOIA.  In processing such requests, the IR Staff consults with personnel in the Department's senior leadership offices and, when appropriate, with other components within the DOJ, as well as with others in the Executive Branch.

3.   I make the statements herein on the basis of personal knowledge, including my extensive experience with the FOIA, with OIP, and in handling FOIA requests for senior leadership office and SCO records, as well as on information acquired by me in the course of performing my official duties, including information provided to me by others within the Department with knowledge of the types of records at issue in this case.

## I.   Plaintiff's Initial FOIA Request to OIP, Correspondence, and OIP's Responses

4.   On June 5, 2020 Plaintiff submitted a FOIA request to OIP, seeking "documents, records, and information obtained or produced by Special Counsel Robert Mueller, his deputies, his assistants, and/or his investigators regarding (1) Seth Rich; (2) Aaron Rich; and (3) the purported 'hack' into the DNC servers in 2016, *i.e.*, the transfer of DNC data to Wikileaks."  In particular, Plaintiff's request then specified ten subparts pertaining to this subject matter.  A copy of Plaintiff's request is attached hereto as Exhibit A.

5.   By letter dated June 23, 2020, OIP acknowledged Plaintiff's FOIA request and confirmed the following tracking number: FOIA-2020-001319.  A copy of OIP's acknowledgement letter to Plaintiff is attached hereto as Exhibit B.

6.   On July 7, 2020, Plaintiff filed suit.  *See* Complaint, ECF No. 1.

7.   By letter dated April 8, 2021, OIP provided an interim response to the Plaintiff's request.  With respect to the named individual in Plaintiff's request, Aaron Rich, lacking his consent, official acknowledgment of an investigation of him, or an overriding public interest, even to acknowledge the existence of such records pertaining to this individual could reasonably be expected to constitute an unwarranted invasion of his personal privacy.  Accordingly, OIP decided to refuse to confirm or deny the existence of responsive records pertaining to Aaron Rich, pursuant to Exemptions 6 and 7(C) of the FOIA, 5 U.S.C. § 552(b)(6) and (b)(7)(C).  This type of response—refusing to confirm or deny the existence of responsive records—is commonly referred to as the "*Glomar*" response.[1]  With respect to the remainder of Plaintiff's request, OIP informed Plaintiff that searches had been conducted within SCO, and that, at that time, thirty-two pages containing records responsive to Plaintiff's request were being withheld in full pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).  A copy of OIP's interim response letter to Plaintiff is attached hereto as Exhibit C.

8.   By letter dated May 7, 2021, OIP sent its final response to Plaintiff's FOIA request. OIP informed Plaintiff that OIP had referred certain law enforcement materials to the FBI for processing and direct response to Plaintiff.  OIP also informed Plaintiff that OIP had processed an additional 179 pages containing records responsive to Plaintiff's request.  OIP provided Plaintiff 121 of these pages with information withheld pursuant to Exemptions 3, 5, 6, 7(C), 7(D), and 7(E) of the FOIA, 5 U.S.C. § 552(b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Additionally, OIP determined that fifty-eight pages should be withheld in full

---

[1] This term is derived from the case *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), which upheld the CIA's use of the "neither confirm nor deny" response to a FOIA request for records concerning CIA's reported contacts with the media regarding Howard Hughes's ship, the "Hughes Glomar Explorer."

pursuant to Exemptions 3, 5, 6, 7(C), and 7(E), 5 U.S.C. § 552(b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).  A copy of OIP's final response letter is attached hereto as Exhibit D.

9.    In the course of reviewing its searches, OIP determined that it should conduct searches for two additional custodians.  As a result of these supplemental searches, OIP identified twenty-eight additional pages containing records responsive to Plaintiff's FOIA request.  OIP provided twenty of these pages to Plaintiff, on December 15, 2021, through counsel, with information withheld pursuant to Exemptions 6 and 7(C) of the FOIA, 5 U.S.C. § 552(b)(6) and (b)(7)(C).  OIP has withheld the remaining eight pages in full pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).  In the course of reviewing materials that OIP had previously processed and withheld in full, OIP also determined that nine pages could be segregated for release in part.  OIP additionally provided these nine pages to Plaintiff, on December 15, 2021, through counsel.

## II.  Issues for Briefing

10. Through counsel, OIP has conferred with Plaintiff in an effort to ascertain what remains at issue in this case.  Plaintiff's counsel advised that Plaintiff did not object to withholding contact information, but advised he would not be willing to compromise on anything else.  Accordingly, OIP will address what it understands to be the outstanding issues in this case: (1) OIP's assertion of a *Glomar* response as to Plaintiff's request for SCO records pertaining to Aaron Rich, (2) the adequacy of OIP's search, and (3) the assertion of FOIA Exemptions within the responsive materials processed by OIP, except as to contact information.  OIP will address each of these issues in turn and, to the extent the FBI asserted withholdings within the responsive materials processed by OIP, the FBI will address its withholdings in a declaration filed contemporaneously.  *See* Fourth Declaration of Michael G. Seidel.

### III.  **OIP's *Glomar* Response as to Plaintiff's request for SCO records pertaining to Aaron Rich**

11. Both Exemptions 6 and 7(C) of the FOIA protect against unwarranted invasions of an individual's personal privacy.  Exemption 6 protects from disclosure information the release of which "would constitute a clearly unwarranted invasion of the personal privacy" of individuals. 5 U.S.C. § 552(b)(6).  Exemption 7(C) protects from disclosure information "compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

12. When determining whether to withhold information pursuant to either Exemption 6 or Exemption 7(C), OIP assesses whether there is a more than a de minimis privacy interest at stake, whether there is any "FOIA public interest" in disclosure, and if so, balances those interests to determine whether protection of the information is appropriate.  The balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard, while the balancing test for Exemption 7(C) uses a lower standard—"could reasonably be expected to constitute an unwarranted invasion of personal privacy."  For both Exemptions 6 and 7(C), the FOIA public interest is limited to information which would shed light on the Department's performance of its mission: to enforce the law and defend the interests of the United States according to the law; to ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and to ensure fair and impartial administration of justice for all Americans.

### A.  **Exemption 7 Threshold**

13. As a threshold matter, for an agency to properly withhold information pursuant to Exemption 7 and its subparts (including Exemption 7(C)), that information must be or have been

compiled for law enforcement purposes.  Here, OIP determined that any records obtained or

produced by SCO pertaining to the named individual would have been compiled for law

enforcement purposes. SCO, led by Special Counsel Robert S. Mueller, III and whose staff

included DOJ prosecutors and FBI agents, carried out investigations which were authorized by

Acting Attorney General Rod J. Rosenstein on May 17, 2017, by Order 3915-2017.  The SCO

investigation was governed by Department regulations, 28 C.F.R. § 600, et seq., and the Special

Counsel, who was appointed to conduct the investigation into Russian interference with the 2016

presidential election, was authorized to prosecute federal crimes arising from the investigation.

Under the terms of the Special Counsel's appointment, Special Counsel Mueller was authorized

to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony

before the House Permanent Select Committee on Intelligence on March 20, 2017, including (i)

any links and/or coordination between the Russian government and individuals associated with

the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly

from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)."  *See*

DOJ Order No. 3915-2017.  Therefore, the work of SCO, including any records obtained by or

produced by SCO staff, is wholly compiled for law enforcement purposes, and the Exemption 7

threshold would be satisfied for any records which could be responsive to the portion of

Plaintiff's request seeking records pertaining to Aaron Rich.

## B.   Application of Exemptions 6 and 7(C)

14. Plaintiff's FOIA request seeks "documents, records, and information obtained or

produced by Special Counsel Robert Mueller, his deputies, his assistants, and/or his investigators

regarding (1) Seth Rich; (2) Aaron Rich; and (3) the purported 'hack' into the DNC servers in

2016, *i.e.*, the transfer of DNC data to Wikileaks."  Because Plaintiff's request seeks records

targeted to a specific, living individual[2]—Aaron Rich—it would be impossible to acknowledge

the existence or nonexistence of records obtained or produced by SCO pertaining to Aaron Rich[3]

without violating his significant privacy interest.[4]

*Privacy Interest of Aaron Rich*

15. Individuals, including Aaron Rich, have a significant privacy interest in whether

agencies acknowledge that the existence of records within law enforcement files pertaining to

themselves, even those that only include a mere mention of themselves.  This certainly includes

law enforcement files created as part of the law enforcement investigation carried out by SCO.

Even revealing the existence of a mere mention of Aaron Rich within SCO files, should one

exist, would be expected to result in unwanted and uninvited public attention and to have a

stigmatizing effect.  Additionally, OIP has identified no official acknowledgement of any

investigation of Aaron Rich, and thus OIP has identified no waiver of this privacy interest.

*FOIA Public Interest*

16. In order to balance the significant privacy interest that exists, discussed above, against

any FOIA public interest that exists, OIP evaluated whether there is a FOIA public interest in

knowing whether SCO obtained or produced records pertaining to Aaron Rich.  OIP has not

identified such a FOIA public interest.  The fact of whether such records exist would not

---

[2] Although Plaintiff's request also seeks records targeted to the specific individual Seth Rich, Seth Rich does not maintain the same privacy interest as Aaron Rich because Seth Rich is deceased.  Accordingly, OIP has not asserted a *Glomar* response as to Plaintiff's request to the extent it is seeking records pertaining to Seth Rich.
[3] To the extent records exist that are responsive to Plaintiff's request on bases wholly unrelated to whether or not they pertain to Aaron Rich, and to the extent such records could be acknowledged to exist without disclosing whether or not records exist pertaining to Aaron Rich, OIP has processed such records.
[4] As discussed below, OIP did not identify a FOIA public interest sufficient to outweigh this considerable privacy interest.

7

significantly increase the public's understanding of SCO's investigation, operations, or activities. This is especially true because SCO has completed its investigation and extensive information has been disclosed regarding the process and results of the investigation, including charges that were pursued and criminal indictments that were issued by SCO against numerous individuals and entities.  In particular, where SCO did not bring any charges against a particular individual, knowing whether or not SCO investigated such an individual would not significantly inform the public about how SCO carried out its investigation.  In light of the fact that information about charges brough by SCO is already public, the disclosure of the existence or nonexistence of records pertaining to Aaron rich would not significantly aid the public's understanding of how SCO carried out its duties or its mission.

17. On balance, OIP determined that Aaron Rich's significant privacy interest substantially outweighs the FOIA public interest in identifying the existence or nonexistence of records obtained or produced by SCO pertaining to Aaron Rich.  Therefore, I have determined that the existence or non-existence of such records is protected from disclosure pursuant to FOIA Exemptions 6 and 7(C).

## C.  Foreseeable Harm

18. I have determined that if records existed that were obtained or produced by SCO pertaining to Aaron Rich, and if OIP were compelled to confirm the existence of such records, this would result in a foreseeable harm, specifically the clearly, and reasonably expected, unwarranted invasion of Aaron Rich's personal privacy, described above. In order to preserve the *Glomar's* effectiveness, a *Glomar* response is used in response to requests for records pertaining to private individuals, whether or not there are, in fact, any responsive records, in order to preserve the privacy interests of such individuals.

### D.   Segregability of Non-Exempt Information

19. OIP asserted a *Glomar* response pursuant to FOIA Exemptions 6 and 7(C), refusing to confirm or deny the existence of records obtained or produced by SCO pertaining to Aaron Rich in order to prevent any unwarranted violation of his personal privacy.  Therefore, by definition, there is no information that could reasonably be segregated for release.

### IV.   Searches Conducted by OIP in Response to Plaintiff's Request

20. Plaintiff's FOIA request seeks SCO records.  Accordingly, this section will provide an overview of OIP's search process and methods as they pertain to conducting searches for SCO records.  This section will also discuss the particular search parameters that OIP employed to conduct searches within SCO pursuant to Plaintiff's request.

### A.   Overview of OIP's Search Process

21. Upon receipt of a FOIA request, OIP makes determinations as to the appropriate office(s) in which to conduct initial records searches, records repositories within the office(s) to search, and search methods to use.  Assessments of where responsive records are likely maintained are based on a review of the content of the request itself and the nature of the records sought therein, OIP's familiarity with the types and location of records that each office maintains, discussions with knowledgeable personnel within the Department, and any research that OIP staff may conduct on the topic of the request.  Moreover, during the course of conducting records searches and in reviewing records located in response to those searches, OIP staff engage in a dynamic search process, wherein OIP follows search "leads" indicative of additional search repositories, custodians, or methods as they arise.

22. In order to ensure that reasonably thorough records searches are conducted, during the course of processing a given FOIA request, OIP continually assesses its search parameters

and will initiate additional search parameters as appropriate.  For example, OIP will evaluate whether other (both current and former) Department staff members' records should be searched or whether supplemental or alternative search methods should be used, such as targeted inquiries to knowledgeable leadership office staff regarding the existence of records that would not be identified via "keyword" searches.  This assessment is based on OIP's review of records located through initial records searches, discussions with Department personnel, or other pertinent factors.  In sum, OIP's records searches are conducted in an agile and comprehensive manner, and the various search steps undertaken by OIP staff in response to a given request work in tandem to achieve a complete records search.

23. When searching the records of SCO custodians identified as potentially having responsive records, OIP staff employ any one of a variety of search methods, or a combination of methods, depending on the factors at hand and on the type of records systems implicated in the search.  As relevant here, OIP determined that potentially responsive records may be located within email systems, individual computer drives, and/or within SCO's shared network drive.

**B.   Overview of OIP's Search Methods within Email Systems, Individual Computer Drives, and SCO's Shared Network Drive**

24. OIP, in conjunction with an eDiscovery team within the Department's Justice Management Division, conducts searches within the email records and individual computer drives of SCO employees, as well as within SCO's shared network drive.  As part of this process, OIP identifies the comprehensive set of search parameters to be used, both by OIP staff and by the eDiscovery team.  Keyword searches are then conducted within custodians' entire email accounts (including all folders and calendars) and individual computer drives, as well as within SCO's shared network drive, to isolate and locate a universe of potentially responsive records.

10

OIP staff then use an eDiscovery platform to conduct a review of the material retrieved using those initial search parameters.

### C.   Initial Searches Parameters Used by OIP in the Instant Case

25. In response to Plaintiff's request, OIP conducted searches consistent with the above-described standard search process and methods.  Additionally, OIP used the specified search parameters discussed within this section.  In total, OIP has conducted searches within the email accounts and individual computer drives of twenty-three SCO custodians.[5]  OIP determined that if information were obtained or produced by SCO on the topic of Plaintiff's request, SCO's prosecutors would have been the relevant personnel to work on these matters, as SCO's investigation was prosecutor-led, and SCO's prosecutors both participated in the collection of information and the decision-making regarding the collection of information.  The twenty-three custodians identified by OIP consisted of all SCO attorneys/prosecutors, including Special Counsel Mueller.  Additionally, OIP reviewed SCO's shared network drive file lists in order to identify potentially relevant folders or individual files.  Searches have also been conducted within these identified folders and files.  Specifically, OIP identified folders or files with names that made a direct reference to Seth Rich or that referenced topics associated with Seth Rich, as discussed within SCO's Report On The Investigation Into Russian Interference In The 2016 Presidential Election (hereinafter "Mueller Report"),[6] including Wikileaks, the DNC hack, and Julian Assange.

---

[5] OIP initially conducted searches within the email accounts and individual computer drives of twenty-one SCO custodians.  In the course of later reviewing OIP's searches, OIP determined that two additional custodians' accounts should be searched in order to ensure that OIP's search was adequate.  Accordingly, OIP took the additional step of searching these two custodians' email accounts and individual computer drives.

[6] *See* https://www.justice.gov/storage/report_volume1.pdf, at page 48-49.

26. Because Plaintiff's request pertains to both Seth Rich and the purported 'hack' into the DNC servers in 2016, and because the subparts of Plaintiff's request substantially pertain to either Seth Rich generally or to Seth Rich's involvement or noninvolvement in the purported DNC hack, OIP conducted broad searches within the identified custodians email accounts, individual computer drives, and the identified files and folders, using the search term combination "Seth w/10 Rich."[7]  This search term combination captured all material in which "Seth" appears within ten words of "Rich."  Because subpart 9 of Plaintiff's request does not overtly pertain to Seth Rich or the purported DNC hack, OIP also conducted searches using search term combinations for the five identified individuals within subpart 9.  Specifically, for each individual, OIP searched for the individual's first name within ten words of their last name.

27. For all searches conducted by OIP, OIP used no date range restriction.

### D.  Supplemental Search Parameters Used by OIP

28.  In the course reviewing the materials resulting from OIP's initial keyword searches, OIP identified a lead, consisting of certain personally identifiable information pertaining to Seth Rich.  OIP followed this lead by conducting supplemental searches using this personally identifiable information as search terms.  These supplemental searches were otherwise conducted using the same search parameters (*i.e.* the same custodians' email accounts, individual computer drives, shared network drive file and folder locations, and without date restrictions).

### E.  Results of OIP's Searches

29. The above-described keyword searches produced a substantial number of potentially responsive records, which OIP staff then manually reviewed for responsiveness.  Through this

---

[7] In light of OIP's *Glomar* response to Plaintiff's FOIA requests, discussed above in Part III, OIP did not conduct searches using terms pertaining to Aaron Rich.

review, OIP determined that 1,373 pages and one spreadsheet contained records responsive to

Plaintiff's request.  Of these 1,373 pages and one spreadsheet, 1,116 pages and the one

spreadsheet were referred to the FBI for processing and direct response to Plaintiff, 107[8] pages

were withheld in full, and 150 pages were released to plaintiff with certain information withheld

pursuant to FOIA Exemptions.

## V.   <u>Summary and Adequacy of OIP's Records Searches</u>

30. In sum, the searches conducted for this request fully reflect the agile, dynamic, and

comprehensive search process OIP conducts in response to FOIA requests.  As described above,

OIP has identified the appropriate SCO email accounts, individual computer drives, and folders

and files within which to conduct searches.  And, OIP has conducted broad searches within these

repositories, without date range restriction and using search terms reasonably tailored to

Plaintiff's FOIA request.  OIP then manually reviewed the results of these searches for

responsiveness.  The facts of this case reflect OIP's efforts to do its due diligence and to take

additional steps, as appropriate, in order to ensure that its searches are adequate.  In particular,

once OIP determined that there existed two additional custodians whose email accounts and

individual computer drives may be appropriate for searching, OIP took the additional step to

search those custodians' accounts and drives.  Further, once OIP identified search term leads

within the records it was reviewing, OIP conducted additional searches using those additional

terms.  After conducting these additional searches, OIP determined that no further searching

would reasonably be likely to identify potentially responsive records, nor were any further

---

[8] This number is larger than the total number of withheld in full pages accounted for within
paragraphs 7-9 above because OIP later determined that it had not accounted for some pages
within certain records withheld in full.  In other words, the number of records at issue has
remained the same, but additional pages within those records have now been accounted for.

"leads" identified indicating the need to expand the search to include additional repositories, methods, or parameters.

31. Based on my experience with the Department, my familiarity with the records maintained by SCO, discussions with knowledgeable staff, as well as my understanding of the scope of Plaintiff's request, and information gathered from the documents themselves, I have determined that OIP's searches were reasonably calculated to uncover all potentially responsive records and that all Department files likely to contain relevant documents were searched.

## VI.  Explanation of Information Withheld by OIP

32. As noted above, OIP has been informed that Plaintiff does not object to withholding contact information but otherwise continues to challenge the application of FOIA Exemptions as to any other information.  Among the 141 pages produced to Plaintiff by OIP, thirty-one pages contain records in which information, beyond contact information, was withheld pursuant to FOIA exemptions, in particular Exemptions 3, 5, 6, 7(C), 7(D), and 7(E) of the FOIA, 5 U.S.C. § 552(b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Further, OIP withheld 107 pages in full pursuant to Exemption 3, 5, 6, 7(C) and 7(E) of the FOIA.  *Id.* § 552(b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).

33. All Exemption 3, 7(D), and 7(E) withholdings and certain Exemption 5, 6, and 7(C) withholdings were made on behalf of the FBI.  Accordingly, the FBI will address its respective withholdings within its own declaration, filed contemporaneously.[9]  OIP will address all remaining withholdings made pursuant to Exemptions 5, 6, and 7(C).

---

[9] *See* Fourth Declaration of Michael G. Seidel.  Of the 107 pages that OIP withheld in full, twenty pages were withheld in full solely pursuant to FOIA exemptions asserted by the FBI. Accordingly, OIP's declaration and corresponding Index will only discuss the remaining eighty-seven of the pages withheld in full by OIP.

34. Additionally, within the context of this litigation, the FBI processed materials in response to FOIA a request submitted by Plaintiff to the FBI, and the FBI withheld portions of five pages on behalf of OIP pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).  This declaration will account for OIP's assertion of Exemption 5 as to these pages.

35. This declaration is intended to be read in tandem with the corresponding *Vaughn* Index ("Index") prepared by OIP, filed contemporaneously, and attached hereto as Exhibit E. This Index provides information regarding the records that OIP released in part with information, beyond contact information, withheld pursuant to FOIA Exemptions.  This Index includes the categorical descriptions of the information withheld and an indicator about whether the FBI or OIP will address the withholding in their declaration.  For ease of reference, these records containing challenged withholdings are attached to the Index, and they are marked to distinguish information withheld by OIP (orange), information withheld by the FBI (blue), and withholdings that are undisputed (black).  OIP also included in this Index information regarding the 107 pages that OIP withheld in full, as well as the five pages that the FBI released in part with certain withholdings made on behalf of OIP.

## A.   <u>Exemption 5</u>

36. One email chain released in part by OIP contains a withholding pursuant to FOIA Exemption 5.[10]  OIP also withheld 105 pages in full pursuant to Exemption 5 out of the 107 total pages withheld in full.  Eighty-seven of these 107 pages will be discussed within this declaration and the remaining eighteen will be discussed within the FBI's declaration, filed

---

[10] At the time of OIP's production to Plaintiff, a second email chain contained a redaction box listing multiple FOIA exemptions, including Exemption 5.  OIP is no longer asserting Exemption 5 as to this information; however, the remaining FOIA exemptions continue to be applied to this information.  A revised version of this email chain is attached to OIP's Index.

contemporaneously.  *See* Fourth Declaration of Michael G. Seidel.  For ease of discussion, OIP

has divided this material into categories,[11] listed below, and will discuss each category in turn.

Page Released with Information Withheld Pursuant to Exemption 5 (8 pages)

- *Attorney Work-Product Privilege: OIP's Withholdings Within Materials Processed by the FBI, Specifically FBI FD-302s* (7 pages)

- *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* (1 page)

Pages Withheld in Full Pursuant to Exemption 5 (87 pages)

- *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* (11 email chains consisting of 29 pages)

- *Attorney Work-Product & Deliberative Process Privileges: Draft Timeline Created and Reviewed by SCO Attorneys* (1 document consisting of 21 pages)

- *Attorney Work-Product & Deliberative Process Privileges: Preparatory Materials for an Internal DOJ Briefing Regarding SCO* (1 document consisting of 2 pages)

- *Deliberative Process Privilege: Draft Mueller Report Materials* (35 pages)

## 1.   **Exemption 5 Overview**

37. Exemption 5 of the FOIA exempts from mandatory disclosure "inter-agency or intra-

agency memorandums or letters which would not be available by law to a party other than an

agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  As discussed in detail below, OIP

has withheld sixty-one pages in full and one in part pursuant to the attorney work-product

privilege of Exemption 5.  OIP also withheld twenty-three of these sixty-one pages in full

---

[11] As noted within OIP's Index, certain information within certain records within these categories was also withheld by either OIP or the FBI pursuant to other FOIA exemptions, which are also discussed below or within the FBI's declaration, respectively.

pursuant to the deliberative process privilege.  Although the remaining thirty-eight pages of these sixty-one pages were not withheld in full pursuant to the deliberative process privilege, portions of these thirty-eight pages were withheld in part pursuant to the deliberative process privilege. Finally, OIP withheld an additional thirty-five pages in full pursuant to the deliberative process privilege of Exemption 5.

### 2.   Exemption 5: Inter-/Intra-Agency Threshold

38. In order to withhold records from release pursuant to Exemption 5 of the FOIA, they must be inter- or intra-agency records.  Here, all information withheld from Plaintiff pursuant to this exemption consists of FBI investigative summaries, email chains, working drafts, and preparatory briefing materials generated by, exchanged within, and wholly internal to, SCO or the Department.  As such, they are "inter-/intra-agency" records within the threshold of FOIA Exemption 5.

### 3.   Exemption 5: Attorney Work-Product Privilege[12]

39. The attorney work-product privilege encompassed by Exemption 5 of the FOIA shields materials prepared by an attorney, or at the direction of an attorney, generated in reasonable anticipation of litigation.  5 U.S.C. § 552(b)(5).  This privilege protects any part a document prepared in anticipation of litigation, not just the portions of a document concerning opinions and legal theories.  Because of this, records withheld pursuant to the attorney work-product privilege are typically withheld in their entirety.  The purpose of the privilege is to

---

[12] In addition to the protection afforded by the attorney work-product privilege, certain names of lower level nonpublic employees or third-party information referenced in these records are protected pursuant to FOIA's personal privacy Exemptions 6 and 7(C), 5 U.S.C. § 552(b)(6) and (7)(C).

protect the adversarial legal process by insulating the attorneys' preparation of materials for litigation from scrutiny.

### 4.   Exemption 5: Deliberative Process Privilege

40. The deliberative process privilege is intended to protect the decision-making process of government agencies from public scrutiny to enhance the quality of agency decisions.  To be protected by the deliberative process privilege, the information at issue must be both "pre-decisional" and "deliberative."  For each instance where OIP withheld material protected by the deliberative process privilege, OIP determined that the withheld information was both pre-decisional and deliberative, and that release of such information would chill internal deliberations and impair the Department's prosecutors' ability to foster forthright, internal discussions necessary for efficient and proper decision-making.  This lack of candor would seriously impair the Department's prosecutorial decision-making.  Frank discussions, such as those engaged in by the SCO attorneys and other Department prosecutors, are essential to efficient and effective decision-making within DOJ and among DOJ prosecutors.

### 5.   Application of Exemption 5

41. As specified in a table at the beginning of this Section, VI.A, OIP has divided the materials it withheld pursuant to Exemption 5 into distinct categories for ease of discussion.  OIP will discuss each category in turn, specifically discussing the application of the attorney work-product privilege and/or deliberative process privilege to each category.

42. OIP will also discuss the foreseeable harm standard and segregation within the Exemption 5 context, doing so at two distinct points: first, after completion of its discussion of all attorney work-product privilege categories and, second, after its discussion of the final category for which only the deliberative process privilege of Exemption 5 was asserted.

Determinations regarding the applicability of an exemption and foreseeable harm are content- and context-specific.  However, for clarity of presentation and discussion, and in recognition of the overlapping and inter-related nature of the information withheld in each record, it is again noted that each record has been organized into categories.

*Attorney Work-Product Privilege*
*OIP's Withholdings Within Materials Processed by the FBI, Specifically FBI FD-302s*

43. The records within this category consist of two sets of FBI Form FD-302, which are FBI interview summaries.  As it pertains to each set, OIP withheld a one-page attachment to the FD-302 that interviewers relied upon as part of the interview.  The FBI's contemporaneously filed Fourth Declaration of Michael G. Seidel provides a description of the FBI's Form FD-302, and this declaration should be read in tandem with the Seidel declaration.  All of the information withheld by OIP pursuant to Exemption 5 within the FD-302s presently at issue was withheld pursuant to the attorney work-product privilege.  During the pendency of the Special Counsel's investigation, all FD-302s protected by Exemption 5 were generated wholly internally to the Executive Branch—specifically, by FBI investigative personnel assigned to work under the direction of the Special Counsel.  This includes the selection of materials for attachment to the FD-302 when creating a record of the interview that occurred.

44. As discussed above, materials subject to the attorney work-product privilege are typically withheld in their entirety.  As it pertains to FD-302s created subject to SCO's investigation, including attachments selected for inclusion with the FD-302, OIP and FBI segregated portions for release, as some information has already been released to the public in the Mueller Report, and thus Exemption 5 was waived as to that information.

45. FD-302s report and summarize interviews conducted by employees of SCO during the course of the investigation.  The interviews discussed here were conducted by a combination

of FBI agents and SCO prosecutors, and were done so in furtherance of a prosecutor-directed investigation.  The withheld information within the FD-302s, as well as those materials selectively attached to the FD-302s, therefore reflect the essential attorney work product that is generated when SCO attorneys execute one of the Departments core functions of enforcing federal law.

46. As noted, FD-302s are summaries of interviews conducted by FBI investigators, and as relevant here, DOJ prosecutors.  Although these documents do not directly or explicitly contain prosecutors' impressions, opinions, or analyses regarding the conduct of the interview, prosecutorial strategies and opinions may nevertheless be revealed through disclosure of the topics covered, including the substance of the attachments interviewers selected to be used as part of the interview process, and information elicited from the witnesses.  This is particularly so in the records withheld in this case, where prosecutors participated in the interviews directly, and these prosecutors were acting pursuant to the Order authorizing SCO's investigation, discussed above in Section III.A.

47. Disclosure of the attorney work product revealed by the FD-302s at issue would expose protected information regarding litigation matters (and prospective litigation matters that had the potential to arise from the various investigations conducted by members of SCO) and would undermine both the Department's core functions as well as SCO's core functions, as ordered by the Acting Attorney General.  Accordingly, portions of these FD-302s have been withheld pursuant to the attorney work-product privilege of Exemption 5.

*Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part)*
*Email Among SCO Attorneys Discussing and Assessing Information Acquired*
*or to be Acquired as Part of a Law Enforcement Investigation*

48. The records within this category consist of internal emails among SCO attorneys regarding information that had been acquired by SCO as well as information SCO attorneys were considering making efforts to acquire in the course of carrying out their duties within a law enforcement office.  Relevant to these discussions among SCO attorneys is the fact that they were engaging in this process while simultaneously considering and evaluating their legal authority to obtain such information and what legal avenues they had to obtain such information. Substantial portions of the emails within this category were additionally withheld pursuant to FOIA Exemption 7(E), as discussed within the FBI's declaration, filed contemporaneously. [13] Thus, specifics pertaining to techniques or procedures used by SCO to acquire information and discussions among SCO attorneys regarding the acquisition of such information is exempt from disclosure.  Accordingly, OIP will discuss its assertion of the attorney work product privilege without divulging these specifics.

49. As discussed above in Section III.A, SCO was established for the purpose of conducting an investigation, and Special Counsel Robert Mueller was authorized to prosecute federal crimes arising from the investigation.  The work conducted by SCO was led by prosecutors and, given the scope and purpose of their role, their efforts to acquire and review information within the context of their investigation was done with reasonable anticipation that prosecution could result and that their work would have to support any prosecution that did in fact result.  Accordingly, the emails in this category reflect exercised judgement and strategic considerations of these prosecutors as they carried out their duties.  In other words, this information is quintessential attorney work product.

---

[13] *See* Fourth Declaration of Michael G. Seidel.

50. Although the materials within this category were not withheld in full pursuant to the deliberative process privilege, certain portions of these emails were withheld pursuant to the deliberative process privilege.  These portions consist of strategy recommendations or evaluations of information relevant to SCO's investigation, as well as the selective sharing of specific pieces of information to help further these deliberative discussions and considerations. These portions are pre-decisional in that they preceded any future determinations as to whether and how to legally obtain additional information, and their evaluation of collected information preceded any future prosecutorial determinations that the collected information could be used to support.  These portions are deliberative because they reflect the evaluations of information by SCO attorneys in order to assess their relevance to any future prosecutorial decisions, and they also reflect the suggestions and opinions of SCO attorneys as to whether or what additional information may be necessary or helpful for SCO to collect.

*Attorney Work-Product & Deliberative Process Privileges:*
*Draft Timeline Created and Reviewed by SCO Attorneys*

51. The record within this category consists of a draft timeline prepared by a SCO attorney in the course of carrying out their prosecutorial duties.  This document was prepared wholly internally to SCO.  This timeline contains information and events that this attorney deemed to be relevant to the aspect of the investigation they were working on.  The decision about what to include or not include, as well as how to present this information, reflects the subjective insights and strategic judgments of the SCO attorney who created this draft.

52. For reasons similar to those described in the preceding Subsection, such a timeline would have been created for the purpose of evaluating evidence or information acquired by SCO prosecutors in order to assess whether it would be relevant to or support prosecution down the line.  The creation of timelines and the evaluation of evidence or information are core functions

22

of prosecutors, and the records they create as they execute these core functions are essential work product.

53. The deliberative process privilege also applies to this timeline records, which is pre-decisional in two respects. First, it a draft and thus is pre-decisional to the completion of a final product. Second, it was being prepared for consideration within the context where SCO prosecutors were evaluating information with an eye toward subsequently making prosecutorial decisions. This information is deliberative in that the author of this draft had to evaluate available information, subjectively make a selection as to which information to include, and ultimately recommend how to most effectively present that information. All of these subjective insights, evaluations, and recommendations would then be able to be considered within the context of subsequent prosecutorial decision-making.

*Attorney Work-Product & Deliberative Process Privileges:*
*Preparatory Materials for an Internal DOJ Briefing Regarding SCO*

54. The record within this category consists of internal preparatory materials for an internal DOJ briefing regarding various SCO matters. This briefing involved individuals from some U.S. Attorneys' Offices. It has been publicly acknowledged that as part of the closure of SCO, certain matters were handed off to U.S. Attorneys' Offices for further consideration. This included questions or matters pertaining to Wikileaks and Julian Assange. The preparatory materials at issue here consist of a series of questions pertaining to these and other SCO matters, which participants in the internal briefing should be prepared to consider and discuss. Below some questions there is information preliminarily inserted by a DOJ attorney when preparing for this briefing. A former SCO attorney was provided a copy of these materials and invited to weigh in on a portion of the questions prior to the briefing. The questions included within these briefing materials pertain to SCO's prosecutorial decision-making and contemplate that further

23

prosecutorial decisions would still be made pertaining to some or all of the subjects covered within the preparatory materials.

55. Materials created in preparation for a briefing to discuss prosecutorial decisions and to evaluate and consider further prosecutorial decisions fall squarely within the attorney work-product privilege, as they reflect the subjective and strategic prosecutorial considerations of their author.

56. The deliberative process privilege also applies to these preparatory materials, which are pre-decisional in that they were prepared antecedent to the DOJ briefing discussed above. They are deliberative in that they include various topics and questions for consideration and evaluation as part of an effort to prepare for the briefing where it could be expected that individuals' opinions and recommendations would be solicited.

<u>Segregation of Non-Exempt Information in Materials Withheld<br>Pursuant to the Attorney Work-Product Privilege</u>

57. OIP carefully reviewed the documents withheld in full pursuant to the attorney work-product privilege of Exemption 5 and determine that these documents are covered in their entireties by the attorney work-product privilege.   The disclosure of these documents, and the facts selected for and contained within them, would undermine the core legal advice and analysis that the privilege is meant to protect by revealing prosecutors' assessments of what was deemed significant in the course of carrying out their duties.  Thus, these documents are not appropriate for segregation.

58. Further, because these documents include private information pertaining to third parties, sensitive law enforcement information, and are deliberative, OIP certainly could not segregate for release any of this doubly-exempt information, notwithstanding that the records are wholly protected as attorney work-product.  As it pertains to draft materials and preparatory

materials, which were also withheld in full pursuant to the deliberative process privilege, the

entirety of these materials consist of the author's recommendations as to what should be

considered in preparation for subsequent discussions and potential actions, and information could

not be segregated for release without revealing information about the deliberative processes

which were ongoing when these materials were created.

Foreseeable Harm in Releasing Materials Withheld
Pursuant to the Attorney Work-Product Privilege

59. Plaintiff's FOIA request seeks records of the Special Counsel's Office.  As discussed

above, SCO was created to conduct a specific investigation and was authorized to prosecute

federal crimes arising from that investigation.  This investigation was prosecutor-led, and all

work done by SCO attorneys pursuant to SCO's mission, including collecting and evaluating

information, was done with an eye toward potential prosecution and within the context of

prosecutorial decision-making.  For this reason, although each of OIP's attorney work-product

privilege determinations were made on a record-by-record basis, there is a common thread across

OIP's determinations that the attorney work-product privilege applied to certain categories of

SCO records located in this case, as well as a common thread across the harms.  In other words,

although varying types of attorney work product were produced, because they were produced by

a collective of prosecutors within the same Office and acting pursuant to the same narrow

mission, the harms in revealing any of this work product would necessarily be substantially

similar.

60.  The attorney work-product privilege exists to insulate the adversarial process by

protecting Department attorneys', including SCO prosecutors', preparation of litigation and

prosecutorial materials from public scrutiny.  Disclosure of the materials described above—

portions of FD-302 investigatory summaries, internal emails among SCO prosecutors regarding

25

the acquisition or potential acquisition of information within the context of SCO's investigation, a timeline prepared by a SCO prosecutor putting collected information together for further evaluation, and preparatory materials for an internal DOJ briefing regarding SCO's investigation and prosecutorial considerations—would reveal attorneys'/prosecutors' mental impressions, conclusions, opinions, and/or prosecutorial strategies and considerations, and have therefore been withheld to avoid disclosure of work product.  Disclosure of this information would hinder the Department's ability to fulfill one of its most critical missions—federal law enforcement. Prosecutors must be free to internally devise and employ litigation strategies.  This includes the necessary ability to evaluate information gathered in the course of an investigation, consider whether additional information must be gathered in order to initiate a prosecution, and to evaluate the available facts in order to render a prosecutorial determination.  Prosecutors could not freely do so were their adversaries able to gain access to their work product.  The documents withheld in this category reflect this routine yet essential attorney work product produced by Department prosecutors.

61. In addition to the harms that would arise were these attorney work product materials to be disclosed, there would also be a harm to the deliberative process privilege were any of the information protected by that privilege to be disclosed.[14]  Three policy rationales have been recognized as underpinning the deliberative process privilege:

"First, it protects creative debate and candid consideration of alternatives within an agency, and, thereby, improves the quality of agency policy decisions.  Second, it protects the public from the confusion that would result from premature exposure

---

[14] This discussion, of course, only pertains to those categories for which the deliberative process privilege is indicated in the category title.

to discussions occurring before the policies affecting it had actually been settled upon.  And third, it protects the integrity of the decision-making process itself by confirming that 'officials should be judged by what they decided(,) not for matters they considered before making up their minds.'"[15]

62. These three policy rationales are relevant to the records or portions thereof that OIP determined should be withheld pursuant to the deliberative process privilege, especially when it comes to SCO's work, which was highly politicized and polarizing within the news media. Where, as in these specific records, prosecutors are carefully deliberating and evaluating investigatory information and subsequent steps they could potentially take or that can be impacted by the information they are gathering, they must be given the space for that process to play out in order to reach the best decision possible.  Obtaining information in the context of a criminal law enforcement investigation is no light matter and can have significant impacts on third parties.  Ultimate prosecutorial decisions can have an even greater impact on third parties. For this reason, Department prosecutors must know that they can speak freely, engaging in a candid give and take with their colleagues, in order to reach the best decisions possible.  They need to be able to prepare, as they did here, plans for assessing the acquisition of information, draft timelines as part of the prosecutorial evaluation process, and materials for briefings to further discuss prosecutorial matters. Were this information to be disclosed, it would reasonably be expected to chill these candid conversations by prosecutors, which would have a significantly detrimental impact on one of the Department's core missions.  Additionally, public confusion would be expected to arise where mere proposals or evaluations of gathered information—as

---

[15] *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (*quoting Jordan v. U.S. Dep't. of Just.*, 591 F.2d 753, 772-773 (D.C.Cir.1978)).

discussed in emails, as organized into a draft timeline, or as included in preparatory materials for a briefing—were to be released to the public because these materials do not lay out the final findings or prosecutorial actions of SCO.

*Deliberative Process Privilege: Draft Mueller Report Materials*

63. This subcategory of records consists of draft materials created wholly internally to SCO and used to develop the Mueller Report.  Specifically, the records that OIP identified as being responsive to Plaintiff's request consist of drafts of relevant sections of the Mueller report, relevant sections of outlines used in the development of the Mueller Report, and other draft language for consideration in the Mueller Report.  These materials were being prepared by subordinate SCO staff with the understanding that superior SCO officials and peers would weigh in as part of a deliberative process, including the Special Counsel himself, who would ultimately be the final decision-maker and would have to approve the report before it became final.  Many of these draft materials include proposed edits in track changes and include information or presentations of information that do not match up with the final version of the Mueller Report, in which the section pertaining to Seth Rich was released without redaction.  The changes between the draft language and the final version are not superficial or stylistic changes, but instead reflect the substantive considerations of the Mueller Report's authors about what information to include or not include, and how to best present that information.

64. By their very nature, these outlines and draft language created in the preparation for the release of a final report are pre-decisional because they were created antecedent to the final report.  These materials are deliberative because they reflect the give and take that occurs when multiple attorneys are working together to create a final report.  They reflect initially proposed language, which in effect is the suggestion or opinion of its author as to what information should

be included and as to what the best way to present that information is.  In a number of instances, they also reflect the edits and track changes of a subsequent author who in turn makes suggestions for an alternative approach.  Indeed, even where no track changes appear, the evolution of these draft materials over time, and their differences from the ultimately-released, final version, reveal the back and forth of proposals, suggestions, and evaluations for how to best present this information and what information to ultimately present.

Segregation of Non-Exempt Information in<br>
<em>Draft Mueller Report Materials</em>

65. OIP conducted a careful, line-by-line review of the outline and draft materials within this category and determined that no information could reasonably be segregated for release.  For draft versions of the relevant section of the Mueller report that were more similar to the final version of that section, as released within the Mueller Report, OIP paid particularly close attention to the extent to which there were substantive differences between those draft versions and the final version, in order to determine whether those particular drafts could be released.  OIP determined that, given the substantive differences that existed, these draft versions could not be released without causing the harm intended to be prevented by the deliberative process privilege.

66. Furthermore, OIP could not effectively or reasonably segregate working drafts or outlines because it is the content and evolution of these materials themselves that reveal the authors' deliberative process.  Therefore, these materials are protected in full pursuant to the deliberative process privilege of Exemption 5, and no additional, non-exempt information may be segregated for release to Plaintiff.

Foreseeable Harm in Releasing <em>Draft Mueller Report Materials</em>

29

67. The previous section on foreseeable harm lays out the three policy rationales underwriting the deliberative process privilege.  All three are relevant to OIP's determination that draft Mueller Report materials, including outlines and draft language, should be withheld pursuant to the deliberative process privilege.  Public discussions, including discussions in the news media and within Congress, surrounding SCO, its role, and the ultimate report prepared and released by SCO, were highly polarized and politically charged.  In all contexts where an agency is engaged in substantive decision-making, but especially in this particular, highly sensitive and polarized context, it is critical that agency staff are able to engage freely and candidly, in order to prepare the most well-vetted report possible.  This can only happen when agency employees can proceed in deliberations with the confidence that any questions or concerns that they raise, or any opinions, suggestions, or critiques that they share will not be exposed to the public for ridicule from one side or the other.  In early stages of outlining and drafting, nascent views must be able to come to the fore for consideration, and as further drafting and editing occurs, other agency staff must be able to given feedback honestly and openly.

68. In fact, this is exactly what did happen as part of SCO's drafting process.  SCO officials did candidly share their nascent views by preparing proposing outlines and draft language about the substance and presentation of the information that might ultimately be included within the relevant section of the Mueller Report.  OIP located records in which SCO officials responded to initial drafts by proposing edits and changes.  Ultimately, there were substantive differences between draft materials and the final version of the Mueller Report.  These were not merely superficial or grammatical differences from the final version.

69. Without the confidence that SCO staff could engage in this process in this way, preparation of the Mueller Report would have been severely hampered, and OIP reasonably

expects that any future preparation of sensitive reports by agency staff would be equally be

hampered by the damage that would be done to the Department's deliberative process were this

information ordered to be disclosed.  In particular, Department employees would no longer feel

free to discuss their ideas, strategies, and advice in writing, which is critical for the Department

to effectively carry out its mission.  Or, to the extent they still made some effort to prepare

documents in writing, they would reasonably be expected to be hyper-focused on the risk that

their nascent or candid input would be exposed to public scrutiny, such that they would be

spending more time trying to prepare drafts through that lens, rather than focused on the

underlying policy goal and mission at hand, which is to produce the best, most well-vetted report

possible.

70. Furthermore, the release of outlines and draft language would be expected to result in

public confusion to the extent there are differences between draft proposals and the final version,

and to the extent different versions might create an inaccurate impression as to what information

was relevant to the Special Counsel's final conclusions within the Mueller Report, which is the

encapsulation of the actual final determinations of SCO.  The notion that agency staff should be

judged on their final actions and not their preceding considerations could not be more stark in a

context like this, where the highly publicized and publicly discussed, final Mueller Report is the

best representation of SCO' final determination, and the portion relevant to Plaintiff's FOIA

request is available for the public to judge.

**B.   Exemption 6 and 7(C)**

71. See Part III for a fuller explanation of Exemptions 6 and 7(C) of the FOIA, as well as

for an explanation as to why records created by SCO satisfy the Exemption 7 threshold.  As a

general matter, these exemptions pertain to information the release of which would constitute an

unwarranted invasion of the personal privacy, and information may be withheld where an individual's personal privacy outweighs any FOIA public interest in disclosure.  The information withheld by OIP pursuant to Exemptions 6 and 7(C) that remains at issue in this litigation consist of the initials of lower level, non-public SCO employees, as well as names and information pertaining to third-party, private citizens.  This information appears within certain pages released to Plaintiff in part, as well as within materials withheld in full.  See OIP's *Vaughn* Index, Exhibit E, for a breakdown of where Exemptions 6 and 7(C) were asserted.

## 1.  Lower Level, Non-Public SCO Employees

72. Certain pages released to Plaintiff in part, as well as certain pages within the following category contain Exemption 6 and 7(C) withholdings as to lower level, non-public SCO employees' names or initials: "*Attorney Work-Product Privilege: Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation*."

*Privacy Interest*

73. Lower level, non-public facing employees within criminal law enforcement offices have a significant privacy interest in their identities, including identifying information, such as their initials.  Revealing their identities and association with a criminal law enforcement office and investigation would be expected to result in unwanted and uninvited public attention and possibly even harassment.  It could also result in the targeting of such individuals for non-public information they obtained in the course of carrying out their duties.  This is especially true here where discussions regarding SCO and its investigation within the media have been highly polarizing and politically charged.

*FOIA Public Interest*

74. OIP has not identified a FOIA public interest in the release of lower level, non-public SCO employees' initials.  For similar reasons as described in Section III.B, information about these particular employees' identities would not significantly increase the public's understanding of SCO's investigation, operations, or activities.  This is particularly so in light of the wealth of information that has been released regarding SCO's work.

*Balancing*

75. On balance, OIP determined that these employees' significant privacy interest substantially outweighs the nonexistent or negligible FOIA public interest in these employee's identifying information—initials.  Therefore, I have determined that this information is protected from disclosure pursuant to FOIA Exemptions 6 and 7(C).

## 2.   Names and Information Pertaining to Third-Party, Private Citizens

76. Categories discussed by OIP within the Exemption 5 Section of this declaration contain the names and/or information of third-party, private citizens.  This information was withheld pursuant to Exemptions 6 and 7(C).

*Privacy Interest*

77. Third-party, private citizens who are referenced within internal criminal law enforcement records have a significant privacy interest in whether they are publicly associated with a criminal law enforcement investigation.  Revealing the identities of third-party, private citizens would be expected to have a stigmatizing effect on said individuals and to result in unwanted and uninvited public attention.  This is especially true here where discussions regarding SCO and its investigation within the media have been highly polarizing and politically charged.

33

*FOIA Public Interest*

78. OIP has not identified a FOIA public interest in the release of third-parties' names or information within SCO records.  For similar reasons as described in Section III.B, information about these private citizens identities and personal beliefs would not significantly increase the public's understanding of SCO's investigation, operations, or activities.

*Balancing*

79. On balance, OIP determined that these third-party, private citizens' significant privacy interest substantially outweighs the nonexistent or negligible FOIA public interest in knowing their identities.  Therefore, I have determined that this information is protected from disclosure pursuant to FOIA Exemptions 6 and 7(C).

### 3.   OIP Took Steps to Release all Reasonably Segregable, Non-Exempt Information When it Applied Exemptions 6 and 7(C)

80. OIP did not withhold all identities across the board.  Rather, within the pages released in part to Plaintiff, OIP released all higher level employee initials, as well as the initials of all individuals who have previously been publicly identified as having worked for SCO. Furthermore, although the materials are withheld on other grounds (Exemption 5), within the materials withheld in full by OIP, OIP is drawing the same lines as it pertains to which names Exemptions 6 and 7(C) apply to.

### 4.   Foreseeable Harm

81. If OIP were compelled to release the withheld identifying information for lower level, non-public employees, or the identifying information of third-party, private citizens, in the context of this high-profile investigation of national controversy and concern, this would result in a foreseeable harm, specifically the clearly, and reasonably expected, unwarranted invasion of these individuals' personal privacy, as described above.  As discussed, OIP took all reasonably

34

steps to segregate information in order to release information where OIP could do so without harm.  However, OIP determined that the remaining information it withheld pursuant to Exemptions 6 and 7(C) could not be released without harm.


Vanessa R. Brinkmann

Executed this 15th day of December 2021.

# Exhibit A

June 5, 2020

Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

      Re: Freedom of Information Act Request

To Whom It May Concern:

      On March 20, 2020, former Asst. U.S. Attorney Deborah Sines was deposed in *Ed Butowsky v. David Folkenflik, et al.*, Case No. 4:18-cv-00442-ALM (E.D.Tex.) about matters pertaining to Seth Conrad Rich ("Seth Rich") and his brother, Aaron Nathan Rich ("Aaron Rich"). A copy of the deposition transcript can be found at https://tinyurl.com/v7xvms7 or http://lawflog.com/wp-content/uploads/2020/04/2020.03.20-Deborah-Sines-deposition-transcript.pdf. Seth Rich was a Democratic National Committee ("DNC") employee who was murdered on or about July 10, 2016 in Washington, D.C.

      According to Ms. Sines's testimony, the FBI conducted an investigation into possible hacking attempts on Seth Rich's electronic accounts following his murder.  Ms. Sines also testified that the FBI examined Seth Rich's laptop computer as part of its investigation, and that there should be emails between her and FBI personnel.  Finally, she testified that she met with a prosecutor and an FBI agent assigned to Special Counsel Robert Mueller.

      As permitted by the Freedom of Information Act, 5 U.S.C. § 552, I seek documents, records, and information obtained or produced by Special Counsel Robert Mueller, his deputies, his assistants, and/or his investigators regarding (1) Seth Rich; (2) Aaron Rich; and (3) the purported "hack" into the DNC servers in 2016, *i.e.*, the transfer of DNC data to Wikileaks. In particular, I request the opportunity to view the following:

1. All data, documents, records, or communications (electronic or otherwise) created or obtained since January 1, 2016 that discuss or reference Seth Rich or Aaron Rich.

2. All data, documents, records, or communications regarding any person or entity's attempt to hack into Seth Rich's electronic or internet accounts (*e.g.*, email) after his death.

3. All data downloaded from all electronic devices that belonged to Seth Rich as well as all data, documents, records or communications indicating how the devices were obtained and who was responsible for downloading the information.

4. All data, documents, communications, records or other evidence indicating whether Seth Rich, Aaron Rich, or any other person or persons were involved in transferring data from the Democratic National Committee to Wikileaks in 2016, either directly or through intermediaries. This request includes, but is not limited to, any reports from CrowdStrike, Inc. as well as any reports from other government entities or personnel.

5. All documents, communications, records or other evidence reflecting orders or directions (whether formal or informal) for the handling of any evidence pertaining to Seth Rich's or Aaron Rich's involvement in transferring data from the Democratic National Committee to Wikileaks.

6. All documents, records, or communications exchanged with any other government agencies (or representatives of such agencies) since January 1, 2016 regarding (1) Seth Rich's murder; (2) Seth Rich's or Aaron Rich's involvement in transferring data from the Democratic National Committee to Wikileaks; (3) the involvement of any other person or entity in transferring data from the DNC to Wikileaks.

7. All recordings, transcripts, or notes (*e.g.*, FD-302 forms) reflecting any interviews of Aaron Rich, Deborah Sines or any other witness regarding (1) the death of Seth Rich, (2) the transfer of data from the Democratic National Committee to Wikileaks, or (3) any attempt to hack into electronic or internet accounts (e.g., email) belonging to Seth Rich.

8. All data, documents, records or communications obtained or produced by the FBI's Computer Analysis and Response Team ("CART") or any other FBI cyber unit regarding Seth Rich, Aaron Rich, and/or any other person or entity involved in the transfer of DNC emails to Wikileaks in 2016.

9. All data, documents, records or communications (including texts or emails) concerning Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, and/or Rao Abbas.

10. If any of the items or things requested herein were discarded or destroyed, produce all data, documents, records or communications reflecting that fact.

Thank you in advance for your assistance.


Sincerely,


Brian Huddleston
704 Nickelville Lane
Wylie, Texas 75098
brianhudd@gmail.com

# Exhibit B



**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*
*441 G Street, NW,*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

June 23, 2020

Brian Huddleston
704 Nickelville Lane
Wylie, TX  75098
brianhudd@gmail.com                          Re:    FOIA-2020-01319

Dear Brian Huddleston:

        This is to acknowledge receipt of your Freedom of Information Act (FOIA) request
dated and received in this Office on June 5, 2020, in which you requested records of the
Special Counsel's Office concerning Seth Rich, Aaron Rich, and the alleged hacking of servers
associated with the Democratic National Committee.

        The records you seek require a search in and/or consultation with another Office, and
so your request falls within "unusual circumstances."  See 5 U.S.C. 552 § (a)(6)(B)(i)-(iii)
(2018).  Because of these unusual circumstances, we need to extend the time limit to respond
to your request beyond the ten additional days provided by the statute.  For your information,
we use multiple tracks to process requests, but within those tracks we work in an agile manner,
and the time needed to complete our work on your request will necessarily depend on a variety
of factors, including the complexity of our records search, the volume and complexity of any
material located, and the order of receipt of your request.  At this time we have assigned your
request to the complex track.  In an effort to speed up our process, you may wish to narrow the
scope of your request to limit the number of potentially responsive records so that it can be
placed in a different processing track.  You can also agree to an alternative time frame for
processing, should records be located, or you may wish to await the completion of our records
search to discuss either of these options.  Any decision with regard to the application of fees
will be made only after we determine whether fees will be implicated for this request.

        We regret the necessity of this delay, but we assure you that your request will be
processed as soon as possible.  If you have any questions or wish to discuss reformulation or an
alternative time frame for the processing of your request, you may contact this Office by
telephone at the above number or you may write to the Office of Information Policy, United
States Department of Justice, Sixth Floor, 441 G Street, NW, Washington, DC 20530-0001.
Lastly, you may contact our FOIA Public Liaison, Valeree Villanueva, at the telephone number
listed above to discuss any aspect of your request.

        Additionally, you may contact the Office of Government Information Services (OGIS)
at the National Archives and Records Administration to inquire about the FOIA mediation
services they offer.  The contact information for OGIS is as follows:  Office of Government

-2-

Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448.

Sincerely,
Initial Request Staff
Office of Information Policy
U.S. Department of Justice

# Exhibit C



**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*
*441 G Street, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

April 8, 2021

Brian Huddleston
704 Nickelville Lane                    Re:    FOIA-2020-01319
Wylie, TX  75098                               20-cv-00447 (E.D. Tex.)
brianhudd@gmail.com                            VRB:JMB:BPF

Dear Brian Huddleston:

    This is an interim response to your FOIA request, dated and received in this Office on
June 5, 2020, in which you requested records of the Special Counsel's Office (SCO)
concerning Seth Rich, Aaron Rich, and the alleged hacking of servers associated with the
Democratic National Committee.

    With respect to the named individual, Aaron Rich, lacking his consent, official
acknowledgment of an investigation of him, or an overriding public interest, even to
acknowledge the existence of such records pertaining to this individual could reasonably be
expected to constitute an unwarranted invasion of his personal privacy.  Accordingly, I have
decided to refuse to confirm or deny the existence of responsive records pursuant to
Exemptions 6 and 7(C) of the FOIA, 5 U.S.C. §§ 552(b)(6) and (b)(7)(C).

    With respect to the remainder of your FOIA request, please be advised that searches
have been conducted within the SCO.  At this time, I have determined that 32 pages containing
records responsive to your request should be withheld in full pursuant to Exemption 5 of the
FOIA, 5 U.S.C. § 552(b)(5).  Exemption 5 pertains to certain inter- and intra-agency
communications protected by civil discovery privileges.

    For your information, Congress excluded three discrete categories of law enforcement
and national security records from the requirements of the FOIA.  See 5 U.S.C. § 552(c)
(2018).  This response is limited to those records that are subject to the requirements of the
FOIA.  This is a standard notification that is given to all our requesters and should not be taken
as an indication that excluded records do, or do not, exist.

-2-

If you have any questions regarding this response, please contact Andrea Parker of the United States Attorney's Office for the Western District of Texas, at 409-981-7938.

Sincerely,

Jonathan Breyan
Senior Supervisory Attorney
<u>for</u>
Vanessa R. Brinkmann
Senior Counsel

# Exhibit D



**U.S. Department of Justice**
Office of Information Policy
*Sixth Floor*
*441 G Street, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

May 7, 2021

Brian Huddleston
704 Nickelville Lane                    Re:    FOIA-2020-01319
Wylie, TX  75098                               20-cv-00447 (E.D. Tex.)
brianhudd@gmail.com                            VRB:JMB:BPF

Dear Brian Huddleston:

        This is a final response to your FOIA request, dated and received in this Office on June 5, 2020, in which you requested records of the Special Counsel's Office (SCO) concerning Seth Rich, Aaron Rich, and the alleged hacking of servers associated with the Democratic National Committee.

        Because certain law enforcement materials located by this Office contain equities of the FBI, we have referred those materials to the FBI for processing and direct response to you.

        On April 8, 2021, OIP sent an interim response to you.  OIP has now processed an additional 179 pages containing records responsive to your request.  I have determined that 121 of these pages are appropriate for release with information withheld pursuant to Exemptions 3, 5, 6, 7(C), 7(D), and 7(E) of the FOIA, 5 U.S.C. §§ 552(b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E), and copies are enclosed.  Additionally, I have determined that fifty-eight pages should be withheld in full pursuant to FOIA Exemptions 3, 5, 6, 7(C), and 7(E). Please note that the enclosed pages also contain records that are not responsive to your request. Those records have not been processed and are marked accordingly.

         Exemption 3 pertains to information exempted from release by statute (in this instance, Rule 6(e) of the Federal Rules of Criminal Procedure).  Exemption 5 pertains to certain inter- and intra-agency communications protected by the attorney work-product and deliberative process privileges.  Exemption 6 pertains to information the release of which would constitute a clearly unwarranted invasion of personal privacy.  Exemption 7(C) pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to constitute an unwarranted invasion of the personal privacy.  Exemption 7(D) pertains to records or information compiled for law enforcement purposes, the release of which would disclose the identity of a confidential source.  Finally, Exemption 7(E) pertains to records or information compiled for law enforcement purposes, the release of which would disclose certain techniques and procedures or guidelines for law enforcement investigations or prosecutions.

-2-

Information appearing within the Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I (March 2019) is responsive to your request.  You may locate Volume I of this Report here: https://www.justice.gov/storage/report_volume1.pdf.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  See 5 U.S.C. § 552(c) (2018).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

If you have any questions regarding this response, please contact Andrea Parker of the United States Attorney's Office for the Eastern District of Texas, at 409-981-7938.

Sincerely,

Jonathan Breyan
Senior Supervisory Attorney
for
Vanessa R. Brinkmann
Senior Counsel

Enclosures

# Exhibit E

**Office of Information Policy (OIP) *Vaughn* Index**

Huddleston v. Federal Bureau of Investigation & U.S. Department of Justice, No. 420CV447 (E.D. Tex.)

This statement describes records withheld by OIP in full pursuant to FOIA Exemption 5 (attorney work-product and/or deliberative process privileges), as well as records of which portions are withheld pursuant to FOIA Exemptions 5 (attorney work product and/or deliberative process privileges) and/or 6/7(C) (personal privacy).

The categorical descriptions for each document within this *Vaughn* Index are meant to be read in tandem with OIP's declaration, which provides a more fulsome explanation of the basis for OIP's withholdings.

This *Vaughn* Index will use the acronym SCO when referring to the Special Counsel's Office.

Attached to this *Vaughn* Index are copies of those records released in part to Plaintiff that contain withholdings in dispute.  To facilitate the Court and Plaintiff's review at briefing, OIP has shaded redaction boxes in blue if they pertain to FBI withholdings, orange if they pertain to OIP withholdings, and black for redactions that are not in dispute.  In one instance, the redaction label indicates that a large orange box pertains to a withholding in full by OIP, but portions of that information are also withheld by the FBI pursuant to other indicated Exemptions.

**DOJ Office of Information Policy, Released-In-Part Document Index**

| Bates Numbers | Date[1] | Document Sender/Recipient/Subject | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI[2] | Pages Containing Withholdings |
|---|---|---|---|---|---|---|
| 20201221-0033288 To 20201221-0033294 | 10/3/2018 11:07 PM | **FRM:** PAC<br>**TO:** RSMC, AMZ, JLQ, DWA, LRA,[3] and [redacted]<br>**SUBJ:** "Buzzfeed: This Ohio Woman's Run-In With The FBI Gives Us a Window Into Robert Mueller's Trump-Russia Probe" | Orange Box: Exemptions 6 and 7(C) | Personal Privacy: The name of a lower-level, non-public-facing SCO employee | Blue Box: Exemptions 6 and 7(C) | 1 of 7 |
| 20201221-0043669 | 06/07/18 4:09 PM | **FRM:** JSR<br>**TO:** [redacted], LRA, RKD, and [redacted]<br>**SUBJ:** "Question from [redacted]" | Orange Boxes: Exemptions 6 and 7(C) | Personal Privacy: The name of a lower-level, non-public-facing SCO employee | Blue Boxes: Exemptions 6, 7C, 7D, and 7(E) | 1 of 1 |
| 20201221-0048830 To 20201221-0048833 | 04/30/18 9:16 PM | **FRM:** [redacted] (private citizen)<br>**TO:** Special Counsel's Office Email Address<br>**SUBJ:** "Re: Guccifer 2.0 – identity" | None | | Blue Boxes: Exemptions 6 and 7(C) | 4 of 4 |
| 20201221-0045013 To 20201221-0045016 | 04/06/18 10:32AM | **FRM:** PAC<br>**TO:** RSMC, AMZ, JLQ, DWA, JSR, LRA, RKD<br>**SUBJ:** "Buzzfeed: These Messages Show Julian Assange Talked About Seeking Hacked Files From Guccifer 2.0" | Orange Box: Exemptions 6 and 7(C) | Personal Privacy: The name of a lower-level, non-public-facing SCO employee | None | 1 of 4 |

---

[1] The date stamp and sender/recipient/subject are provided for the upper-most, visible email within each email chain.

[2] Within the FBI's contemporaneously-filed Fourth Declaration of Michael G. Seidel, the FBI will address all Exemptions it asserted within the records that OIP released in part or withheld in full.  This column will indicate which Exemptions the FBI asserted and how to identify them within the attached pages.

[3] Due to a technical glitch in Adobe Acrobat, at times the final letter preceding a redaction box is missing.  OIP is including the relevant information within this Index.  Should the court need input from OIP on any additional missing letters in order to assess whether OIP properly asserted the identified FOIA Exemptions, OIP is prepared to provided such additional information to the Court.

| Bates Numbers | Date[1] | Document Sender/Recipient/Subject | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI[2] | Pages Containing Withholdings |
|---|---|---|---|---|---|---|
| 20201221-0047909 To 20201221-0047910 | 03/13/18 6:42PM | **FRM:** [redacted]<br>**TO:** RKD<br>**SUBJ:** "Records Request Processed [redacted]" | Orange Box: Exemptions 5, 6, and 7(C) | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation*<br><br>Personal Privacy: | Orange Box (FBI's Exemptions noted in label), Blue Boxes: Exemptions 3, 6, 7(C), and 7(E) | 2 of 2 |
| 20201221-0050650 | 02/23/18 5:06 PM | **FRM:** LRA<br>**TO:** [redacted]<br>**SUBJ:** (none) | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20201221-0000011 To 20201221-0000019 | 03/22/18 7:32 PM | **FRM:** [redacted]<br>**TO:** LRA, JSR<br>**SUBJ:** "RE: [redacted]" | None | | Blue Boxes: Exemptions 6, 7(C), and 7(E) | 9 of 9 |
| 20-cv-0447-00009 | 06/19/18 12:20 PM | **FRM:** AAW<br>**TO:** BNC<br>**SUBJ:** "FW: Robert Mueller has name of hitman hired by Clintons to assassinate Seth Rich" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00009 | 06/19/18 12:20 PM | **FRM:** AAW<br>**TO:** BNC<br>**SUBJ:** "FW: Robert Mueller has name of hitman hired by Clintons to assassinate Seth Rich" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |

| Bates Numbers | Date[1] | Document Sender/Recipient/Subject | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI[2] | Pages Containing Withholdings |
|---|---|---|---|---|---|---|
| 20-cv-0447-00010 | 06/19/18 4:45 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Robert Mueller has name of hitman hired by Clintons to assassinate Seth Rich" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00011 | 06/20/18 1:10 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Mueller knows who killed Seth Rich…won't reveal…Hillary hired him" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00012 | 06/20/18 7:21 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Crooked Muellers hiding name of seth rich killer" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00013 | 06/21/18 10:08 AM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Peter Strzok was running fake FBI identities, met with Obama at WH" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00014 | 06/22/18 12:46 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Mueller hiding name of Seth Rich assassin" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00015 | 06/25/18 2:07 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Mueller hiding name of Seth Rich assassin hired by Clintons" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00030 | 06/28/18 2:59 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Mueller holding name of Seth Rich assassin in secret" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |

| Bates Numbers | Date[1] | Document Sender/Recipient/Subject | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI[2] | Pages Containing Withholdings |
|---|---|---|---|---|---|---|
| 20-cv-0447-00031 | 07/02/18 9:11 AM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Rod Rosenstein hired Seth Rich assassin…mueller has name" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00032 | 07/02/18 3:09 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Sociopath Robert Mueller sitting on name of Seth Rich assassin" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00033 | 07/05/18 12:19 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Mueller covering up Seth Rich….arranged by Rosenstein" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00034 | 07/05/18 12:27 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Mueller hiding Seth Rich assassin name" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00035 | 07/05/18 12:36 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Rosenstein arranged Seth Rich hit thru secret FBI dirty ops" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00036 | 07/05/18 1:07 PM | **FRM:** AAW **TO:** BNC **SUBJ:** "FW: Mueller has name seth rich assassin and hiding it" | None | | Blue Box: Exemptions 6 and 7(C) | 1 of 1 |
| 20-cv-0447-00227 | 01/14/19 1:13 PM | **FRM:** [redacted] **TO:** (multiple) **SUBJ:** "FW: Robert Mueller has name of Seth Rich killer because" | None | | Blue Box: Exemptions 6, 7(C), and 7(E) | 1 of 1 |

| Bates Numbers | Date[1] | Document Sender/Recipient/Subject | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI[2] | Pages Containing Withholdings |
|---|---|---|---|---|---|---|
| 20-cv-0447-00794 | 02/04/19 3:01 PM | **FRM:** [redacted]<br>**TO:** (multiple)<br>**SUBJ:** "FW: Photos of jewboy Andrew Weissman in blackface" | None | | Blue Box: Exemptions 6, 7(C), and 7(E) | 1 of 1 |

**DOJ Office of Information Policy, Information Withheld within Pages Processed by the FBI[4]**

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Pages Containing OIP Withholdings |
|---|---|---|---|---|---|
| FBI(20-cv-447)-14 To FBI(20-cv-447)-16, FBI(20-cv-447)-21 | 10/21/18 | FBI FD-302 and an attachment | Exemption 5 | *Attorney Work-Product Privilege: OIP's Withholdings Within Materials Processed by the FBI, Specifically FBI FD-302s* | 4 |
| FBI(20-cv-447)-22 To FBI(20-cv-447)-23, FBI(20-cv-447)-28 | 10/23/18 | FBI FD-302 and an attachment | Exemption 5 | *Attorney Work-Product Privilege: OIP's Withholdings Within Materials Processed by the FBI, Specifically FBI FD-302s* | 3 |

---

[4] These pages are not attached to OIP's Index because they were processed and produced by the FBI.  Please see the FBI's contemporaneously-filed Fourth Declaration of Michael G. Seidel for further information.

**DOJ Office of Information Policy, Withheld-in-Full Index**

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI | Pages Withheld in Full |
|---|---|---|---|---|---|---|
| 20201221-0014439 | November 2018 | Email record within an email chain: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 6, 7(C), and 7(E) | 1 |
| 20201221-0014441 To 20201221-0014443 | November 2018 | Email records within an email chain: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 3, 6, 7(C), and 7(E) | 3 |
| 20201221-0027113 To 20201221-0027119 | October 2018 | Email record: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 3, 6, 7(C), and 7(E) | 7 |

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI | Pages Withheld in Full |
|---|---|---|---|---|---|---|
| 20201221-0037157 To 20201221-0037158 | September 2018 | Email record within an email chain: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 3, 6, 7(C), and 7(E) | 2 |
| 20201221-0041033 | July 2018 | Email record: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 3, 6, and 7(C) | 1 |
| 20201221-0041035 | July 2018 | Email record: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 3, 6, and 7(C) | 1 |

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI | Pages Withheld in Full |
|---|---|---|---|---|---|---|
| 20201221-0045355 To 20201221-0045358 | March 2018 | Email records within an email chain: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 6, 7(C), and 7(E) | 4 |
| 20201221-0047820 | March 2018 | Email records within an email chain: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 3, 6, 7(C), and 7(E) | 1 |
| 20201221-0050652 | December 2017 | Email record within an email chain: participants include SCO attorneys and staff | Exemptions 5, 6, and 7(C) | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation*<br><br>Personal Privacy: identifying third-party information | None | 1 |

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI | Pages Withheld in Full |
|---|---|---|---|---|---|---|
| 20201222-0000001 To 20201222-0000005 | April 2018 | Email records within an email chain: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 6, 7(C), and 7(E) | 5 |
| 20201222-00000020 To 20201222-00000022 | March 2018 | Email records within an email chain: participants include SCO attorneys and staff | Exemption 5 | *Attorney Work-Product Privilege (in full) & Deliberative Process Privilege (in part): Email Among SCO Attorneys Discussing and Assessing Information Acquired or to be Acquired as Part of a Law Enforcement Investigation* | Exemptions 6, 7(C), and 7(E) | 3 |
| 20201221-0113717 To 20201221-0113737 | August 2017 | This record consists of draft timeline prepared by prosecutors, organizing collected information for evaluation | Exemption 5 | *Attorney Work-Product & Deliberative Process Privileges: Draft Timeline Created and Reviewed by SCO Attorneys* | None | 21 |
| 20201221-0000510519 To 20201221-0000520 | April 2019 | **Document:** Preparatory Materials for an Internal DOJ Briefing Regarding SCO | Exemptions 5, 6, and 7(C) | *Attorney Work-Product & Deliberative Process Privileges: Preparatory Materials for an Internal DOJ Briefing Regarding SCO*<br><br>Personal Privacy: identifying third-party information | None | 2 |

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI | Pages Withheld in Full |
|---|---|---|---|---|---|---|
| 20201221-0004185, 20201221-0004201 | March 2019 | This record consists of a draft section of an Appendix to the Mueller Report, listing individuals named within the report, and contemplating whether or how to list Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20201221-0004502, 20201221-0004514 | March 2019 | This record consists of a draft section of an Appendix to the Mueller Report, listing individuals named within the report, and contemplating whether or how to list Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20201221-0004791, 20201221-0004802 | March 2019 | This record consists of a draft section of an Appendix to the Mueller Report, listing individuals named within the report, and contemplating whether or how to list Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20201221-0004816, 20201221-0004828 | March 2019 | This record consists of a draft section of an Appendix to the Mueller Report, listing individuals named within the report, and contemplating whether or how to list Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20201221-0004628 To 20201221-0004629 | March 2019 | This record consists of a draft of the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20201221-0004968 To 20201221-0004969 | March 2019 | This record consists of a draft of the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI | Pages Withheld in Full |
|---|---|---|---|---|---|---|
| 20201221-0008039 To 20201221-0008040 | December 2018 | This record consists of a draft of the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20201221-0008106 To 20201221-0008107 | December 2018 | This record consists of a draft of the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20201221-0013547 | December 2018 | This record consists of a draft of the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 1 |
| 20201221-0013569 To 20201221-0013570 | December 2018 | This record consists of a section of an early outline created as part of the drafting process for the Mueller Report.  The section in question relates to the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20201221-0013574 | December 2018 | This record consists of a section of an early outline created as part of the drafting process for the Mueller Report.  The section in question relates to the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 1 |
| 20201221-0013967 To 20201221-0013968 | December 2018 | This record consists of a section of an early outline created as part of the drafting process for the Mueller Report.  The section in question relates to the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI | Pages Withheld in Full |
|---|---|---|---|---|---|---|
| 20201221-0013972 | December 2018 | This record consists of a section of an early outline created as part of the drafting process for the Mueller Report.  The section in question relates to the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 1 |
| 20201221-0014806 | November 2018 | This record consists of a section of an early outline created as part of the drafting process for the Mueller Report.  The section in question relates to the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 1 |
| 20201221-0014808 | November 2018 | This record consists of a section of an early outline created as part of the drafting process for the Mueller Report.  The section in question relates to the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 1 |
| 20201221-0007331 To 20201221-0007332 | February 2019 | The records within these pages consists of sections of an early outline/chart created as part of the drafting process for the Mueller Report.  The sections in question relate to the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20-cv-0447-00046 To 20-cv-0447-00047 | January 2019 | This record consists of a draft of the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI | Pages Withheld in Full |
|---|---|---|---|---|---|---|
| 20-cv-0447-00231 To 20-cv-0447-00232 | January 2019 | This record consists of a draft of the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20-cv-0447-00419 To 20-cv-0447-00420 | January 2019 | This record consists of a draft of the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20-cv-0447-00609 To 20-cv-0447-00610 | January 2019 | This record consists of a draft of the section of the Mueller Report referencing Seth Rich | Exemption 5 | *Deliberative Process Privilege: Draft Mueller Report Materials* | None | 2 |
| 20201221-0116942, 20201221-0116944 | | See the FBI's Fourth Declaration of Michael G. Seidel for information on this material withheld in full by the FBI. | | | Exemptions 6, 7(C), and 7(E) | 2 |
| 20201221-0003307, 20201221-0003362, 20201221-0003363 | January 2019 | This record consists of the section of a draft prosecutorial memorandum.  See the FBI's Fourth Declaration of Michael G. Seidel for further information. | | | Exemptions 5, 6, and 7(C) | 3 |
| 20201221-0007706, 20201221-0007711, 20201221-0007712 | January 2019 | This record consists of the section of a draft prosecutorial memorandum.  See the FBI's Fourth Declaration of Michael G. Seidel for further information. | | | Exemptions 5, 6, and 7(C) | 3 |

| Bates Numbers | Date | Document Description | Exemptions Asserted by OIP | Nature of Information Withheld by OIP | Exemptions Asserted by FBI | Pages Withheld in Full |
|---|---|---|---|---|---|---|
| 20201221-0013975, 20201221-0013977 To 20201221-0013979 | November 2018 | This record consists of the section of a draft prosecutorial memorandum.  See the FBI's Fourth Declaration of Michael G. Seidel for further information. | | | Exemptions 5, 6, and 7(C) | 4 |
| 20201221-0020730, 20201221-0020732 To 20201221-0020734 | October 2018 | This record consists of the section of a draft prosecutorial memorandum.  See the FBI's Fourth Declaration of Michael G. Seidel for further information. | | | Exemptions 5, 6, and 7(C) | 4 |
| 20201221-0021040, 20201221-0021042 To 20201221-0021044 | October 2018 | This record consists of the section of a draft prosecutorial memorandum.  See the FBI's Fourth Declaration of Michael G. Seidel for further information. | | | Exemptions 5, 6, and 7(C) | 4 |

**PAC**

| | |
|---|---|
| **From:** | PAC |
| **Sent:** | Wednesday, October 3, 2018 11:07 AM |
| **To:** | RSMSC; AMZ; JLQ; DWA; JSR; LR   b6-1, b7C-1 |
| **Cc:** | b6, b7 |
| **Subject:** | BuzzFeed: This Ohio Woman's Run-In With The FBI Gives Us A Window Into Robert Mueller's Trump–Russia Probe |

**BuzzFeed: This Ohio Woman's Run-In With The FBI Gives Us A Window Into Robert Mueller's Trump–Russia Probe**
https://www.buzzfeednews.com/article/kevincollier/trump-russia-mueller-probe-guccifer-graduate-student-cleared
By Kevin Collier
October 3, 2018

**Cassandra Ford tends** to stay online late into the evening and then sleep in. So when two FBI agents dispatched by special counsel Robert Mueller's office pounded on her boyfriend's door at 10 in the morning in April of this year, they woke her up.

She stumbled downstairs and opened the door, her jaw dropping when they handed her a subpoena telling her she had to testify before a Washington grand jury in two weeks. Ford didn't recognize the first agent, who was tall, bearded, and gruff. "He was like, 'If you don't go, it's not going to be good for you,' kind of threatening," she recalled.

But she knew the other agent, Scott Halper. Back in August 2016, he'd taken her out for coffee in her native Defiance, Ohio, to talk about the unusual way she was using Twitter. He was friendly enough at the time — he just wanted to chat about a Twitter account she'd registered that June with the username @Guccifer2.

She'd created the account as something between a joke and an experiment — a riff off the hacktivist persona Guccifer 2.0, who at the time was slowly releasing files stolen from the Democratic National Committee. It would be months before the US government would publicly identify Guccifer 2.0 as a front for Russia's GRU military intelligence agency, the same group that now stands accused of hacking into the DNC and taking the emails.

But during her first meeting with Halper, she never felt like she was being investigated. Halper had even told her she should consider joining the bureau.

"I do think it's kind of funny, because if anybody's going to walk into an international hacking incident and have no clue about it, it would be me for sure," Ford told BuzzFeed News.

But it apparently wasn't funny to Mueller, who is tasked with finding crimes tied to foreign influence on the 2016 election, no matter what they may be.

At the time Mueller subpoenaed Ford, he was three months away from charging 12 GRU officers, accusing them of a host of crimes related to the DNC hack and leak. Echoing something journalists and

cybersecurity experts had said for a while, the indictment painstakingly detailed allegations of how the Russians used the Twitter account @Guccifer_2.

That account was an homage to Marcel Lazar, a Romanian who called himself Guccifer and hacked emails from political figures like Colin Powell and George W. Bush before being arrested in 2014 and extradited to the US, where he's now serving a four-year sentence. But in Russia's hands, the handle was repurposed to tweet links to stolen material, try to communicate with someone tied to Donald Trump's campaign, and pass most of the hacked material to WikiLeaks.

Cassandra Ford didn't hack the DNC. She doesn't know how to hack, was never charged with a crime, and believes she's no longer of interest to law enforcement. But her story — how a 26-year-old fell victim to Russian trolling, confused others in turn, and got swept up in Mueller's investigation — shows how fevered some Twitter obsessives got in trying to follow the threads of Russian hacking.

It also provides a view into how Mueller's probe operates and the extent that Mueller has gone to make sure he leaves no stone unturned as he looks into Russian meddling and any connection to the Trump campaign.

**Ford found herself** in some weird corners of Twitter in the spring of 2016, her final semester in Penn State's international affairs master's program and a few months before the DNC hack. She'd been studying the situation in Syria, swaths of which at the time were controlled by ISIS, when she discovered #OpISIS, a Twitter game of cat and mouse where pro-ISIS accounts tried to connect with each other and recruit, while a network of anti-ISIS activists, identifying as Anonymous despite few displaying any hacking prowess, tracked and reported them to Twitter.

Former Twitter employees say #OpISIS wasn't particularly effective at stopping the militants' use of their platform. At the time, Twitter, like other social media companies, was under significant international pressure to find a way to algorithmically stop ISIS recruitment, and was tweaking what would become a relatively effective formula to block ISIS users from posting or registering new accounts.

But Ford became obsessed with #OpISIS's immediacy, its secrecy, and the sense that people presenting themselves as both Anonymous and ISIS were interacting directly with her. She wrote a final paper for her online ethnographies course on those experiences and "the world of Anonymous that I had found myself in the middle of."

"The writing is coherent," her professor responded, "but at the end I'm still pretty mystified about who's who and what's what and the purpose of all these cloak-and-dagger communications." He gave her a B+.

Ford headed back home to Defiance that summer, listless and spending a lot of time in her online world, more concerned with the immediacy of what her friends were saying and what ISIS fanboys were doing than with what the media reported. She didn't care for that year's presidential politics. She was a registered Republican from years ago, when she'd wanted to vote for Ron Paul for president, but she disliked Donald Trump and thought Hillary Clinton's plan in Syria, to continue to aid rebels against both ISIS and Bashar al-Assad, would only continue Syria's cycle of misery. When the DNC announced on June 14 that it had been hacked, and that the company it hired to do cybersecurity response, CrowdStrike, blamed the GRU, she missed the news.

What she did see was what her circle on Twitter was saying the next day: Some guy calling

himself Guccifer 2.0 had created a WordPress blog claiming to be single-handedly behind the whole thing. Writing "DNC's servers hacked by a lone hacker," he posted several files as proof, including the party's opposition file on Trump.

For many who followed the news, this was an obvious feint. It was telling that the blog had only appeared after the DNC's announcement, and CrowdStrike was a respected company that was unlikely to stake its reputation on a such a huge claim. Because some of the released files were Word documents, and Microsoft Word captures the metadata of users who make changes, the files showed that they'd been changed most recently by someone who used Russian as their default language and had registered their name as Iron Felix, a reference to Felix Dzerzhinsky, who organized the Soviet secret police that would eventually become the KGB.

But Ford didn't see a Russian operation — she saw a mystery. Her circle on Twitter talked excitedly about this hacktivist who had disrupted a major American political party, and she saw chatter that the term "Guccifer 2" was being censored by Twitter (Twitter declined to comment for this story). She saw one friend say it was strange that Guccifer 2 didn't have a Twitter account, so she registered one. Skeptical of the people who claimed the metadata proved the hack was the work of Russia, and feeling cheeky about the online debate about the Russian metadata on those DNC documents, she made the account's Twitter avatar a googled photo of Dzerzhinsky, registered its time zone as Volgograd, and, after putting a phrase through Google Translate, tweeted, "Не верьте всему, что вы читаете" ("Do not believe everything that you read").

The problem with that, of course, is that Russia really was responsible for the DNC hack. In fact, according to Mueller's eventual indictment, the Guccifer 2.0 personality and WordPress blog were hastily created on June 14 and maintained by a handful of officers in a GRU group called Unit 74455, which was located in a Moscow military building on Kirova Street nicknamed "the Tower" and managed by Col. Aleksandr Osadchuk. Those guys weren't the DNC hackers — that was the work of other GRU officers, located in a different building — but they were tasked with disseminating Democrats' files and emails. They finally did register a Twitter account — @Guccifer_2, because Ford had already taken the cleaner one — a few days later.

Ford doesn't like to think of what she was doing with her account as trolling, and oftenwhen someone would ask her if she hacked the DNC, she'd tell them no, that wasn't her. But she didn't always go out of her way to inform people, either, and readily shared the files that the GRU released concerning Hillary Clinton.

"It was like this typical active-measures account, sowing doubt and confusion," recalled Adam Parkhomenko, who was the DNC's national field director in 2016. He spent months after the election obsessing over the account and sparring with Ford without ever knowing who she was.

And it was widely seen. While @Guccifer2 never reached 2,000 followers, it was retweeted and cited enough that it received hundreds of thousands of impressions in the months after its creation, according to Twitter's analytics for the account, which Ford screengrabbed and shared with BuzzFeed News.

Technically, Twitter recognizes Ford's account as being created June 9, and a review of her account's archive — she shared her downloaded account history with the computer forensics firm Garrett Discovery, which gave it to BuzzFeed News with Ford's permission — says she registered an account that day, and changed the username to @Guccifer2 on June 16, though she only recalls actually creating the

account on the latter date.

For Parkhomenko, the discrepancy in dates was a smoking gun. Since it appeared the account was created before the WordPress account, he figured whoever was behind it was somehow tied to a secret Russian operation. He obsessed over how the account was registered with a Volgograd time zone and tweeted at weird hours — a result of Ford's tendency to stay up all night online — and figured there must be some strange connection to the Russian government.



**Adam Parkhomenko**

✔@AdamParkhomenko

· Nov 29, 2017

Replying to @AdamParkhomenko

https://twitter.com/adamparkhomenko/status/935792544562253824 …



**Adam Parkhomenko**

✔@AdamParkhomenko

Something that
@Guccifer2, the account
 created on June 9, the day of the Trump, Jr. and Russia meeting, and 6 days before "Guccifer 2.0" was ever public doesn't like to be pointed out:

Account was registered on 6/9, Volgograd, Russia.

Tweets in Volgograd, Russia Time Zone.
1:24 AM - Dec 1, 2017

@Guccifer2's inbox — which Ford also shared, as part of her account history — soon became a honeypot for internet weirdos. One guy messaged her the email addresses and phone numbers of White House staffers, just because. One confused journalist messaged her from his verified account: "hi I am a producer at CNN. I am trying to reach Gufficer 2.0 [*sic*]."

Conspiracy theorists came in droves, eager to talk about George Soros, or about the Seth Rich conspiracy, which holds that murdered DNC staffer Rich was the actual source of the stolen emails — even though if Guccifer 2.0 were the real hacker who broke into the DNC, that makes the Seth Rich theory nonsensical.

Others asked her outright for hacking services, a violation of US law. "I am seeking services for file retrieval," a Canadian man said. "I'm looking for someone to hak [sic] into a computer." Another one asked, "Hi, can you tell me please is it possible to hack someone's twitter acct dms?"

The FBI noticed, too. Two months after she made the account, on Aug. 19, Ford received a phone call from someone in the FBI's San Francisco field office. She was friendly, and asked about the account. Ford took control of the conversation: She had been harassed a lot online, she said, and would love to talk about it in person, and to ask the FBI if she'd been hacked.

Four days later, she met Halper and one other agent. They came from the Cleveland field office to see her at Cabin Fever, a coffee shop in downtown Defiance, a northwestern Ohio town just across the Michigan border and 160 miles from Cleveland.

Exhaustively investigating all possible angles of a hacking case is par for the course, former FBI officials say. Wannabe hackers and the real ones alike often brag, and the internet is rife with people falsely claiming credit for, or accusing someone else of, such activity. If the FBI ends up bringing charges against a suspect, their entire case file is subject to discovery from the defense. If there's any hint that someone else might be behind a given hack, that's a good tool for the defense, so the FBI often tries to rule out all those other possibilities to increase the chance of a guilty plea or conviction.

"I came across a lot of those types of people in my career," said Austin Berglas, head of cyberforensics at the firm BlueVoyant and the former assistant special agent in charge of the FBI's cyber branch in New York.

Berglas was among the FBI agents who investigated and eventually took down the Silk Road, the notorious online black marketplace, largely used to sell drugs, which at the time was the largest in history. It was the brainchild of Ross Ulbricht, who went by the pseudonym Dread Pirate Roberts. In November 2013, a month after the FBI arrested Ulbricht and shuttered the site, a replacement called Silk Road 2.0, run by a second Dread Pirate Roberts, appeared online to take its place.

"When DPR was taken down, all these fake sites and DPR2 popped up. People said this is not legitimate, that DPR is done," Berglas said. The following year, as part of a massive law enforcement crackdown on popular drug sites, Berglas's team arrested Blake Benthall for running the second Silk Road.

At no point in her coffee date with the two agents did Ford feel threatened. Instead, she said, she felt emboldened. They listened to her talk about the account and the abuse she'd gotten online from strangers, and told her that with her education and taste for investigative work and international affairs, she should consider the FBI or CIA, or perhaps work at a think tank. She was intrigued, but wasn't ready to move to DC, and was spooked that her affinity for marijuana could keep her from getting a job in government intelligence. And she ruled it out completely after Trump was elected, she told BuzzFeed News, for fear of being seen as endorsing him. (The FBI declined to comment for this story, but did not dispute its broad outlines.)

Justice Department investigations are supposed to be apolitical, but that hasn't stopped pollsters, eager to take the temperature on a case that might directly impact the president of the United States, from regularly asking Americans how they feel about Mueller. His unfavorable ratings started rising last year, according to a Marist poll, though in recent months opinion has turned and now 59% of registered voters have decided they approve of his investigation, according to numerous polls.

One of the concerns is that the investigation is taking too long without yet making a firm connection between Russian meddling and the Trump campaign. Trump himself has made that claim about Mueller, who was appointed to his job on May 17, 2017.



**Donald J. Trump**
✔️ @realDonaldTrump

Congratulations America, we are now into the second year of the greatest Witch Hunt in American History...and there is still No Collusion and No Obstruction. The only Collusion was that done by Democrats who were unable to win an Election despite the spending of far more money!

7:28 AM - May 17, 2018

But the scope and importance of the investigation are precisely why it's dragged on for a year and a half with no end in sight, said Alan Rozenshtein, a law professor at the University of Minnesota and a former cybersecurity and foreign intelligence adviser to the Justice Department.

"This is simply them being very thorough. These are Boy Scouts. In the same way that the Secret Service tracks down every threat against the president, no matter how silly it may be, I suspect they are tracking every shred of evidence related to possible Russian hacking," Rozenshtein said.

"I think there's an intuition that the more important the investigation, the faster it should go. And I think that's understandable, but in fact it's the other way around. I can't think of a criminal investigation whose stakes are higher, ever, in the history of the republic, in a certain sense. So you really want to get it right."

Ford's April 2018 subpoena asked for more information than she could provide: all documents she could access concerning not only the @Guccifer2 account, but also @Guccifer_2, the WordPress account, and, for good measure, WikiLeaks and DCLeaks, another site that the GRU registered to leak hacked US political material.

After the two agents left her doorstep, Ford talked to her boyfriend, who recommended she talk to Cathy Elliott Jones, a lawyer based in Ventura County, California, who considers herself an "earth mother" adviser to Anonymous, and who has a habit of pausing, mid–phone call, to yell "fuck you, FBI!" in case her phone is tapped. Jones called a lawyer friend, who in turn recommended Jim Klimaski, a 72-year-old DC attorney who specializes in military and employment law, but who was both experienced and willing to take her on for free.

"Some lawyer in San Francisco called me up, wherever she was, Sacramento or something, and begged me to take this on, and I said OK, she can come over here and I'll walk her to the grand jury office," Klimaski told BuzzFeed News.

Ford brought printouts, including her Twitter confirmation email and account details, and headed to Klimaski's office the morning of April 20. They shared a cab over to the Department of Justice, and were seated in a small, windowless conference room across from assistant special counsel Kyle Freeny and senior assistant special counsel Jeannie Rhee. Alex Kobzanets, an FBI special agent who has

investigated <u>Russian cybercrime cases</u>, sat at the head of the table and didn't speak much.

Ford wouldn't be forced to testify, Freeny said, but after the meeting, she would have to hand over more files from her Twitter account, as well as some Telegram chats, and answer all their questions. (Freeny directed BuzzFeed News' inquiries for this story to the special counsel's spokesperson, who confirmed the job titles of the people in this story but otherwise declined to comment.)

Freeny was friendly, a good cop to Rhee's accusatory bad cop, Ford said. They talked about the account, how Ford had thought to register it, and about Jonathan Langdale, an estranged Twitter friend who had privately messaged her advice on how to handle @Guccifer2 in its early days, according to Twitter direct messages Ford provided to BuzzFeed News. When emailed for comment, Langdale replied that "In my view, your outlet publishes CNN-type propaganda, like the so-called-'dossier,' without verification," and declined to answer questions.

The prosecutors had printed out some of @Guccifer2's tweets on high-quality, glossy paper, which Ford found funny, and they asked what she had been thinking when composing them. One printed tweet was one of that account's first — a retweet of someone else talking about ActBlue, a Democratic fundraising platform. In Ford's mind, the tweet was interesting because it pertained to a class-action suit, <u>since dismissed</u>, that accused the DNC of unfairly helping Hillary Clinton beat Bernie Sanders in the primary. But for the special counsel, ActBlue was a red flag: GRU officers had hacked the Democratic Congressional Campaign Committee to change a link to ActBlue to one for Act Blues, a phishing page GRU hackers had set up.

Kobzanets, the FBI agent who specializes in tracking Russian hackers, was more interested in who Ford knew, asking for details about international Anonymous affiliates she had communicated with, but it seemed to Ford that she wasn't helpful.

"They seemed to already know everything before they started," Klimaski recalled.

As the conversation dragged on, Kobzanets appeared to grasp at straws for potential leads, Ford said. "He was like, do you have any Russian friends? Do you know any Russians? I really sat there and thought about it, and was like, I don't think I do." (Kobzanets didn't respond to attempts to verify those comments.)

Twice, the special counsel employees excused themselves, left together, and returned. When they were finished with their questions, they told Ford she wasn't a target, but asked her to hand over her phone and laptop. She hesitated, but Klimaski and Jones, reached by phone, both told her that while it was debatable whether the subpoena covered her devices, it wouldn't be any trouble at all for Freeny to write a new one. She acquiesced, and got the devices back a few days later.

That was the only time Klimaski and Ford met in person. He went on with his practice with other pro bono work. Two months later, Mueller filed his indictment against the GRU officers, including those accused of running @Guccifer_2 and those who allegedly hacked the material that account disseminated.

"We never heard from them again," Klimaski said.

**JSR**

| | |
|---|---|
| **From:** | JSR |
| **Sent:** | Thursday, June 7, 2018 4:09 PM |
| **To:** | ████ LRA; RK ███ `b6, b7C` |
| **Cc:** | ████ |
| **Subject:** | RE: Question fro ████ |

b6 -1
b7C -1
b7D -3
b7E -1

Let's talk about this.

Jeannie S. Rhee
Special Counsel's Office
██Undisputed██

NOTICE: This email (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient (or the recipient's agent), you are hereby notified that any dissemination, distribution, copying, or use of this email or its contents is strictly prohibited. If you received this email in error, please notify the sender immediately and destroy all copies.



-----Original Message-----
Fro ████
Sent: Thursday, June 7, 2018 4:07 PM
To: JS ██Undisputed██ ; LR ██Undisputed██ ; RK ██Undisputed██ `b6, b7C`
██Undisputed██
C ██Undisputed██
Subject: Question fro ████

This afternoon I received a ca ███████

Any guidance o ████

Thank you

b6 -1, -4
b7C -1, -4
b7D -3
b7E -1

Not Responsive Records

**From** b6 -4, b7C -4
**Sent:** Monday, April 30, 2018 9:16 AM
**To:** Special Counsel <specialcounsel@jmd.usdoj.gov>
**Subject:** Re: Guccifer 2.0 - identity

b6 -2, -4, b7C -2, -4

Sent with ProtonMail Secure Email.

------- Original Message -------
On April 28, 2018 7:56 PM b6 -4, b7C -4                                    wrote:

April 28, 2018

Robert S. Mueller III
Special Counsel
Department of Justice
950 Pennsylvania Avenue NW
Room B-103
Washington, DC 20530

Dear Mr. Mueller:







Sent with [ProtonMail](#) Secure Email

**PAC**

| | |
|---|---|
| **From:** | PAC |
| **Sent:** | Friday, April 6, 2018 10:32 AM |
| **To:** | RSMSC; AMZ; JLQ; DWA; JSR; LRA; RKD |
| **Cc:** | b6, b7C |
| **Subject:** | BuzzFeed: These Messages Show Julian Assange Talked About Seeking Hacked Files From Guccifer 2.0 |

**BuzzFeed: These Messages Show Julian Assange Talked About Seeking Hacked Files From Guccifer 2.0**

https://www.buzzfeed.com/kevincollier/assange-seth-rich-lies-guccifer-wikileaks-hannity?bftwnews&utm_term=.mbvqpNmlw#.fxMkamy1K

By Kevin Collier

April 5, 2018

Twitter DMs obtained by BuzzFeed News show that in the summer of 2016, WikiLeaks was working to obtain files from Guccifer 2.0, an online hacktivist persona linked to by Russian military intelligence, the clearest evidence to date of WikiLeaks admitting its pursuit of Guccifer 2.0.

"[P]lease 'leave,' their conversation with them and us," WikiLeaks asked journalist Emma Best, who was also negotiating with Guccifer 2.0 for access to what it had teased on its blog as "exclusive access" to hacked Democratic Congressional Campaign Committee files. "[W]e would appreciate it if you did not dump the docs and obviously archive.org will delete them anyway."

WikiLeaks had mentioned Guccifer 2.0 a single time before, tweeting in June 2016 — five weeks before it released its first dump of Democratic National Committee emails — that the persona had claimed it gave WikiLeaks DNC emails.

But by the time of the DM conversation with Best, WikiLeaks founder Julian Assange had shifted the story of how WikiLeaks acquired those emails, giving repeated TV interviews that floated Seth Rich, a Democratic staffer who had been murdered in what police concluded was a botched robbery, as his real source.

The messages between Assange and Best, a freelance national security journalist and online archivist, are the starkest proof yet that Assange knew a likely Russian government hacker had the Democrat leaks he wanted. And they reveal the deliberate bad faith with which Assange fed the groundless claims that Rich was his source, even as he knew the documents' origin.

Best told BuzzFeed News she first reached out to Guccifer 2.0 in August 2016 after it posted on its WordPress account a call for journalists who wanted its files. "I sent them a Direct Message and referred to that, asking what they had in mind," Best told BuzzFeed News over Signal. Best has experience posting large data sets, and wondered if she could host the files on archive.org, a nonprofit digital library.

But Guccifer 2.0 had another idea. "[I] gonna send a large trove to wikileaks," it said. Best, who had DMed with WikiLeaks before, relayed that message to WikiLeaks in a direct message on Twitter. Neither party conveyed to her whether they had interacted together before.

"I told them that Guccifer 2.0 was considering giving me at least part of the cache, which is when they asked me to be their 'agent,' which they said I would get 'credit' for," Best said. She didn't agree to act as Assange's agent, she said, but stopped messaging with Guccifer 2.0.

WikiLeaks was adamant in its communications with Best that it didn't want anyone else to leak the files.

"[T]hese other media groups are very likely to take a stupid initial angle," WikiLeaks said in one message sent Aug. 12 at 9:14 p.m., adding that other news outlets would focus less on the content of the leaks than how they came to be. "'We don't know if its true. Possibly russians who knows blah blah blah.'"

WikiLeaks's pitch worked. "I dropped the matter with both parties and never received or passed on any exclusive G2, DNC, Podesta, etc. documents," Best said.

Less than an hour after WikiLeaks's last message to Best, Guccifer 2.0 tweeted that it had handed those documents over.

Who was in control of the WikiLeaks Twitter account cannot be known with certainty. But Assange is widely considered to be the primary user of the @WikiLeaks Twitter handle, and Best believed her chats with that handle "were with him or his proxy."

Best said she deleted all her direct messages after noticing someone was trying to hack her Twitter account, but recently found the email notifications that users receive when they get a DM on Twitter. A lawyer for WikiLeaks did not respond to a request for comment.

The following is the entirety of WikiLeaks's messages to Best that night, according to the emails she provided. All times are ET. (Twitter does not send a user copies of their own messages, so the contents Best provided are one-sided.)

**8:43 p.m.:** please "leave" their conversation with them and us

**8:43 p.m.:** we would appreciate it if you did not dump the docs and obviously archive.org will delete them anyway

**9:12 p.m.:** Impact is very substantially reduced if the "news" of a release doesn't co-incide with the ability to respond to the news by searching

**9:13 p.m.:** non-searchable dumps are just channeled into a few orgs with technical resources. then others won't touch them because they perceive that the cherries have all been picked by techdirt or whatever.

**9:14 p.m.:** and these other media groups are very likely to take a stupid initial angle

**9:15 p.m.:** "We don't know if its true. Possibly russians who knows blah blah blah" because they don't properly verify prior to publication and are scared because they're not us, contaminating the entire release

**9:18 p.m.:** in that regretable event, from our perspective, please just act as our agent we can ensure you get the right credit, cross promotion etc.

Before Guccifer 2.0 began speaking with Best, the account had repeatedly claimed to be Assange's source, though it was a one-sided relationship. On June 15, more than a month before WikiLeaks published its first of two batches of Democratic emails, the persona wrote in an email to the Smoking Gun that it had "thousands of files and mails" that it already "gave to Wikileaks." When WikiLeaks released its first batch of Democrats' emails in the 2016 campaign, the "DNC Leaks," Guccifer 2.0 claimed to be the source.

But Assange chose, in television interviews both immediately before and after his conversation with Best, to not publicly bring up Guccifer 2.0, and instead to tease the conspiracy theory that Seth Rich, the Democratic National Committee staffer whose murder spawned conspiracy theories, could be the source for his leaks.

The Seth Rich conspiracy held, in essence, that Rich, a DNC staffer who supported Bernie Sanders, grew disillusioned with the party after Hillary Clinton won the nomination, stole emails to give to WikiLeaks, and was killed for it.

The theory didn't account for how a regular staffer would have had access to Clinton campaign manager John Podesta's email account, which WikiLeaks released in October, or files stored on the DCCC's server, which Guccifer 2.0 released slowly over the summer on its WordPress account and in emails to reporters. Nor did it account for why the NSA, FBI, and CIA, as well as a number of US and foreign private threat

intelligence companies, would each conclude there was sufficient evidence that the GRU, Russia's military intelligence arm, had indeed hacked those targets.

Rich's murder, two weeks after Assange first began leaking the hacked DNC documents, was likely the result of a robbery attempt gone bad, police concluded. But the conspiracy theory was spread quickly by alt-right social media figures and conservative news sites, and lasted far beyond the election, with people like Fox News commentator Sean Hannity talking about it for months after Trump took office.

Rich's parents have since sued Fox News over "the pain and anguish that comes from seeing your murdered son's life and legacy treated as a mere political football." His brother Aaron has sued two other right-wing commentators who pushed the theory that Aaron aided his brother and illegally helped cover it up. Fox declined to comment on the legal action, but noted it has retracted the story and that Hannity announced in May 2017 that he would stop coverage of the hoax out of respect for Rich's family.

Three days before the conversation with Best, Assange brought up Rich unprompted during an appearance via livestream on Netherlands' Nieuwsuur, a nightly public news broadcast: "Whistleblowers go to significant efforts to get us material, at often very significant risks," he said. "There's a 27-year-old that works for the DNC who was shot in the back, murdered, just a few weeks ago for unknown reasons, as he was walking down the street in Washington," he said.

When host Eelco Bosch van Rosenthal echoed what DC police had concluded, that Rich's death was a botched robbery, Assange replied, "No, there's no findings."

That same day, the WikiLeaks Twitter account announced it would offer a reward for information leading to the conviction of Rich's killer.

In those interviews, despite privately angling for Guccifer 2.0's files, Assange continued to push the Seth Rich story. Two weeks after the conversation with Best, Assange appeared on Fox News, and while he didn't claim Rich was murdered over the leaks, he refused to deny it either, and made no mention of any other source.

"If there's any question about a source of Wikileaks being threatened, people can be assured that this organization will go after anyone who may have been involved in some kind of attempt to coerce or possibly kill a potential source," Assange said.

"I know you don't want to reveal your source, but it certainly sounds like you're suggesting a man who leaked information to WikiLeaks was then murdered," said host Megyn Kelly.

"If there's someone who's potentially connected to our publications and that person is then murdered in suspicious circumstances, it doesn't necessarily mean that the two are connected. But that type of allegation is very serious and it's taken very seriously by us," Assange replied. Since then, WikiLeaks has tweeted numerous times about the theory, never disputing it.

Beyond the June 2016 tweet, Assange made no mention of Guccifer 2.0. As with previousmisdirections, hinting that Rich was responsible gave WikiLeaks a means of not implicating the Russian government.

WikiLeaks has been caught covering for Russia at least twice before, both in the summer of 2016, when it declined to publish a huge cache of Russian government data, and in its 2012 exclusion, in its published "Syria Files," of a $2.4 billion transaction from the Central Bank of Syria to the VTB Bank in Russia. In September, it finally published 35 files from a private Russian intelligence company, but most of them were already public and of little news value, leading experts to allege that was a decision to quiet criticism that

WikiLeaks was too friendly to Russia.

Details about the true identity of Guccifer 2.0 are still coming to light. But in many ways, it was obvious from the start.

Guccifer 2.0 first appeared online on June 15, exactly one day after the Washington Post broke the story that the DNC had been hacked and that Russia's military intelligence agency was behind it. Guccifer 2.0 claimed to be Romanian, but didn't understand the language. It used a shady Russian VPN service that gave it access to IP addresses that weren't commercially available. Despite having files from congressional races all over the country, it prioritized leaks of swing states.

In a joint report released after the election, in January 2017, the US's top intelligence agencies announced that "We assess with high confidence that the GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks. Moscow most likely chose WikiLeaks because of its self-proclaimed reputation for authenticity." The GRU, the report said, "used the Guccifer 2.0 persona."

Last month, the Daily Beast reported that either Twitter or WordPress noticed at least once that someone logged into the Guccifer 2.0 account without turning on a VPN, revealing an IP address belonging to the GRU in Moscow.

The files that Guccifer 2.0 published on its WordPress account would later appear in both of WikiLeaks's major drops during the 2016 election: the DNC Email Archive and the Podesta Emails dumps.

In between those releases, on Aug. 12, 2016, it was clear from those messages to Best that the WikiLeaks Twitter account knew that Guccifer 2.0 was the source of hacked Democratic documents.

WikiLeaks's formal policy is to never publicly identify a source of its leaks, and Assange still refers to Chelsea Manning, the whistleblower who has admitted and spent years in prison for giving WikiLeaks Army Intelligence documents, as an "alleged source." He never mentioned Guccifer 2.0 or any other party as a potential source in those interviews.

With the exception of one final post, in which it shot back at the joint US intelligence report that detailed the Russian hacking campaign, Guccifer 2.0 went silent after Trump was elected.

OIP: b5; FBI (in part): b3 -2, b6 -1, b7C -1, b7E -6

-----Original Message-----
From b3 -2, b7E -1, -6
Sent: Tuesday, March 13, 2018 6:42 PM
To: RK  Undisputed
Subject: Records Request Processe  b3 -2, b7E -1, -6

b3 -2, b7E -1, -6

1

b3 -2, b7E -6

Document ID: 0.7.5411.5935

20201221-0047910



**From:**

**Sent:**    Thursday, March 22, 2018 7:32 PM

**To:**    'LRA'; 'JSR'

**Cc:**    'RKD'

**Subject:**    R

b6 -1, -4
b7C -1, -4
b7E -6

Jeannie, Rush,

Two quick things:

First, befor    , we wanted to confirm that we
hav    .  Our list is copied below.  If there is anything we're
missing, or if there are any oth    that you would like to add, could you let us know by
tomorrow at 12:00 pm EDT?

b7E -6

Second, as mentioned when we first spoke, we can be most helpful to you and t    in responding to
process if you simultaneously send it to us.  There have been a few subpoenas that have gone directly to the
client and we want to make sure we're also aware of them.

Thanks,

b6 -4
b7C -4

b6 -3
b7C -3
b7E -6

b6 -3
b7C -3
b7E -6

Document ID: 0.7.5411.18558



b6 -3
b7C -3
b7E -6

**From:** LR  Undisputed
**Sent:** Thursday, March 22, 2018 10:54
**To**
**Cc:** JSR                              ; RKD
**Subject:** RE

b6 -1,-2,-4
b7C -1, -4
b7E -6

I'm not sure if the analysis has started, but if possible, could we include the following addition

Thanks,
Rush

**From:** LRA
**Sent:** Wednesday, March 21, 2018 11:11 AM
**T**
**Cc:** JS Undisputed
                    ; RK Undisputed
**Subject:** R

b6 -1, -4
b7C -1, -4
b7E -1, -6

Below is a list o                                        .  We do not have an                    at this time we'd like
to include.  We're in the office all day today.

Best,
Rush

b6 -3
b7C -3
b7E -6



b6 -3
b7C -3
b7E -6

**From**
**Sent:** Monday, March 19, 2018 9:18 PM
**To:** R Undisputed
**Cc:** JS Undisputed
; RK Undisputed
**Subject:** R

b6 -1, -4
b7C -1, -4
b7E -1, -6

Thanks Rush.  We'll add these.

On Mar 19, 2018, at 9:13 PM, LR Undisputed wrote:

Further to our conversation, here are the addition

b6 -3
b7C -3
b7E -6



Happy to discuss.

Best,
Rush

**From**
**Sent:** Monday, March 19, 2018 5:38 PM
**To:** JS  Undisputed
**Cc:** LR  Undisputed
                                            RK  Undisputed
**Subject:** R

b6 -1, 4
b7C -1, 4
b7E -1, -6

That works.  We'll send a dial in.

On Mar 19, 2018, at 5:19 PM, JS  Undisputed  wrote:

> Of course.  8:30 pm ET?
>
> Jeannie S. Rhee
> Special Counsel's Office
> Undisputed
>
> NOTICE:  This email (including any attachments) is intended for the use of the individual or



entity to which it is addressed.  It may contain information that is privileged, confidential, or otherwise protected by applicable law.  If you are not the intended recipient (or the recipient's agent), you are hereby notified that any dissemination, distribution, copying, or use of this email or its contents is strictly prohibited.  If you received this email in error, please notify the sender immediately and destroy all copies.

**Fro**
**Sent:** Monday, March 19, 2018 5:17 PM
**To:** LR   Undisputed
**C**
RK   Undisputed          ; JS   Undisputed
**Subject:** R

b6 -1, -4
b7C -1, -4
b7E -1, -6

Jeannie and Rush,

Could we talk again tonight sometime after 8:30 pm EDT?

Thanks,

On Mar 16, 2018, at 7:59 PM, LR   Undisputed   wrote:

> , either day works for us this weekend.  Does sometime in the 2-4 PM Saturday or 12-2 PM Sunday timeframe work?
>
> Thanks,
> Rush

**From**
**Sent:** Friday, March 16, 2018 7:25 PM
**To:** LR   Undisputed
**C**
RKD
Undisputed          ; JS   Undisputed
**Subject:** R

b6 -1, -4
b7C -1, -4
b7E -1, -6

Rush,

Do you have time for a status call this weekend or early next week?  Please let us know what works for you.

Thanks,

On Mar 14, 2018, at 4:42 PM, LR   Undisputed   wrote:

b6 -1, -4
b7C -1, -4



Attached is a new subpoena and NDO f ▆▆▆▆▆▆▆▆▆▆
▆▆▆▆

b7E -6

Best,
Rush

**From:** LRA
**Sent:** Monday, March 12, 2018 8:06 PM
**T** ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
**C** ▆▆▆▆▆▆▆▆▆▆▆ RK  Undisputed
JS  Undisputed
**Subjec** ▆▆▆▆▆▆▆▆▆

b6 -1, -4
b7C -1, -4
b7E -1, -6

▆▆

Per our discussion Friday, please find a subpoena fo ▆▆▆▆▆
▆▆▆▆▆▆▆▆▆

Thanks,
Rush

**From** ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
**Sent:** Thursday, March 8, 2018 2:28 PM
**To:** LR  Undisputed
**Cc:** JS  Undisputed  ▆▆▆▆▆▆▆▆▆▆▆
RK  Undisputed
**Subject:** Re: Call Friday?

Thanks, we'll speak to you then.

b6 -4
b7C -4

On Thu, Mar 8, 2018 at 11:19 AM, LRA
Undisputed  wrote:

Adding Ryan Dickey.  Let's use this conference line:

Toll-fre  Undisputed
Local dialin  Undisputed
Participant Cod  Undisputed

**From** ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
**Sent:** Thursday, March 8, 2018 2:16 PM
**To:** JS  Undisputed
**Cc:** LR  Undisputed  ▆▆▆▆▆▆
▆▆▆▆▆▆▆▆
**Subject:** Re: Call Friday?

b6 -4
b7C -4

Yes, that works great.  Shall we call your office or we can
send a conference line?

Thanks,

On Thu, Mar 8, 2018 at 11:12 AM, JSR
Undisputed wrote:

b6 -4
b7C -4

> Can we do 5:30 pm ET?  Thanks much.
>
> Jeannie S. Rhee
> Special Counsel's Office
> Undisputed
>
> NOTICE:  This email (including any attachments) is
> intended for the use of the individual or entity to which it
> is addressed.  It may contain information that is privileged,
> confidential, or otherwise protected by applicable law.  If
> you are not the intended recipient (or the recipient's
> agent), you are hereby notified that any dissemination,
> distribution, copying, or use of this email or its contents is
> strictly prohibited.  If you received this email in error,
> please notify the sender immediately and destroy all
> copies.
>
> **Fro**
> **Sent:** Thursday, March 8, 2018 2:11 PM
> **To:** LR   Undisputed   ; JS   Undisputed
> **C**
> **Subject:** Call Friday?
>
> Jeannie and Rush,
>
> I am doing a hand off t                              in connection with an
> upcoming vacation.  Before I head out, we have a
> couple of things we would like to give you a heads up
> on.  Do you have time for a call on Friday?  We have
> some flexibility on time, but late afternoon ET would
> work well for us, so maybe 4 pm ET.
>
> Best,
>
>
> --

b6 -4
b7C -4
b7E -6

--



b6 -4
b7C -4

--

b6 -4
b7C -4
b7E -6

**LRA**

| | |
|---|---|
| **From:** | LRA |
| **Sent:** | Friday, February 23, 2018 5:06 PM |
| **To:** | b6 -1, b7C -1 |

https://www.vox.com/policy-and-politics/2017/5/24/15685560/seth-rich-conspiracy-theory-explained-fox-news-hannity

---------------
L. Rush Atkinson
Special Counsel's Office
Undisputed

NOTICE:  This email (including any attachments) is intended for the use of the individual or entity to which it is addressed.  It may contain information that is privileged, confidential, or otherwise protected by applicable law.  If you are not the intended recipient (or the recipient's agent), you are hereby notified that any dissemination, distribution, copying, or use of this email or its contents is strictly prohibited.  If you received this email in error, please notify the sender immediately and destroy all copies.

## FW: Robert Mueller has name of hitman hired by Clintons to assassinate Seth Rich

| | |
|---|---|
| **From:** | AAW ███████████████ |
| **To:** | BNC ███████████████ |
| **Date:** | Tue, 19 Jun 2018 12:20:32 -0400 |

From: b6-2, b7C-2
Sent: T          19, 2018 12:20:12 PM (UTC-05:00) Eastern Time (US & Canada)
To: Special Counsel; AAW
Subject: Robert Mueller has name of hitman hired by Clintons to assassinate Seth Rich

.....the name is securely locked away
in Muellers pea-size brain....because his
job is to make Hillary president in 2020..
..his only job

## FW: Robert Mueller has name of hitman hired by Clintons to assassinate Seth Rich

| | |
|---|---|
| **From:** | AAW Undisputed |
| **To:** | BNC Undisputed |
| **Date:** | Tue, 19 Jun 2018 16:45:06 -0400 |

From: b6-2, b7C-2
Sent: T            19, 2018 4:44:43 PM (UTC-05:00) Eastern Time (US & Canada)
To: Special Counsel; AAW
Subject: Robert Mueller has name of hitman hired by Clintons to assassinate Seth Rich

Mueller is so crooked, he is hiding
hiding the name to protect Hillary
from getting death penalty

## FW: Mueller knows who killed Seth Rich...won't reveal...Hillary hired him

| | |
|---|---|
| From: | AAW Undisputed |
| To: | BNC Undisputed |
| Date: | Wed, 20 Jun 2018 13:10:49 -0400 |

**From:** b6-2, b7C-2
**Sent:** W          une 20, 2018 1:10:40 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Special Counsel; AAW
**Subject:** Mueller knows who killed Seth Rich...won't reveal...Hillary hired him

Mueller won't reveal the names of Seth Rich's killer,
won't allow archiving the killers name in the special
counsel office....

## FW: Crooked Muellers hiding name of seth rich killer

| | |
|---|---|
| From: | AAW Undisputed |
| To: | BNC Undisputed |
| Date: | Wed, 20 Jun 2018 19:21:42 -0400 |

From: b6-2, b7C-2
Sent: W             une 20, 2018 7:21:32 PM (UTC-05:00) Eastern Time (US & Canada)
To: Special Counsel; AAW
Subject: Crooked Muellers hiding name of seth rich killer

.....and refusing to look at any other evidence against Hillary.

That is how these crooked investigators get away with saying:

we have seen notice evidence....

because they don look at it......

# FW: Peter Strzok was running fake FBI identities, met with Obama at WH

| | |
|---|---|
| From: | AAW Undisputed |
| To: | BNC Undisputed |
| Date: | Thu, 21 Jun 2018 10:08:52 -0400 |

From: b6-2, b7C-2
Sent: 1          e 21, 2018 10:08:36 AM (UTC-05:00) Eastern Time (US & Canada)
To: Special Counsel; AAW
Subject: Peter Strzok was running fake FBI identities, met with Obama at WH

Yes, Peter Strzok, under a fake FBI ID met with  Kingfish himself,

files kept in Muellers private safe, along with the name of the

hitman sent after Seth rich.

## FW: Mueller hiding name of Seth Rich assassin

| | |
|---|---|
| From: | AAW██Undisputed██████ |
| To: | BNC██Undisputed████ |
| Date: | Fri, 22 Jun 2018 12:46:51 -0400 |

**From:** b6-2, b7C-2
**Sent:** F          2, 2018 12:46:29 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Special Counsel; AAW
**Subject:** Mueller hiding name of Seth Rich assassin

Mueller has the name and the money trail....and it leads back to Hillary.

# FW: Mueller hiding name of Seth Rich assassin hired by Clintons

From:        AAW Undisputed
To:          BNC Undisputed
Date:        Mon, 25 Jun 2018 14:07:06 -0400

From: b6-2, b7C-2
Sent: M          25, 2018 2:02:48 PM (UTC-05:00) Eastern Time (US & Canada)
To: Special Counsel; AAW
Subject: Mueller hiding name of Seth Rich assassin hired by Clintons


Mueller promised a big cabinet post if he helps
Hillary get elected 2020

## FW: Mueller holding name of Seth Rich assassin in secret

| | |
|---|---|
| From: | AAW Undisputed |
| To: | BNC Undisputed |
| Date: | Thu, 28 Jun 2018 14:59:30 -0400 |

**From:** b6-2, b7C-2
**Sent:** 1        e 28, 2018 2:59:15 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Special Counsel; AAW
**Subject:** Mueller holding name of Seth Rich assassin in secret

....because Hillary would have to go to prison for life

## FW: Rod Rosenstein hired Seth Rich assassin...mueller has name

| From: | AAW Undisputed |
| To: | BNC Undisputed |
| Date: | Mon, 02 Jul 2018 09:11:44 -0400 |

From: b6-2, b7C-2
Sent: M          , 2018 9:11:23 AM (UTC-05:00) Eastern Time (US & Canada)
To: Special Counsel; AAW
Subject: Rod Rosenstein hired Seth Rich assassin...mueller has name

Money trail leads back to hillary and mueller refuses to investigate,
Says he will get Trump if it is the last thing he does.

## FW: Sociopath Robert Mueller sitting on name of Seth Rich assassin

| | |
|---|---|
| From: | AAW ██████████ Undisputed |
| To: | BNC ██████████ Undisputed |
| Date: | Mon, 02 Jul 2018 15:09:38 -0400 |

From: b6-2, b7C-2
Sent: M_____, 2018 3:09:21 PM (UTC-05:00) Eastern Time (US & Canada)
To: AAW; Special Counsel
Subject: Sociopath Robert Mueller sitting on name of Seth Rich assassin

Arranged by sociopath rod rosenstein.....why do you think fbi has a load of untraceble guns

# FW: Mueller covering up Seth Rich assassination....arranged by Rosenstein

| | |
|---|---|
| From: | AAW Undisputed |
| To: | BNC Undisputed |
| Date: | Thu, 05 Jul 2018 12:19:17 -0400 |

From: b6-2, b7C-2
Sent: 1            5, 2018 12:18:57 PM (UTC-05:00) Eastern Time (US & Canada)
To: Special Counsel; AAW
Subject: Mueller covering up Seth Rich assassination....arranged by Rosenstein

Mueller sitting on name of Seth Rich assassin,
says some must die for the Cause....which is
to put Hillary in the WH

## FW: Mueller hiding Seth Rich assassin name

| | | |
|---|---|---|
| **From:** | AAW | Undisputed |
| **To:** | BNC | Undisputed |
| **Date:** | Thu, 05 Jul 2018 12:27:28 -0400 | |

**From:** b6-2, b7C-2
**Sent:** 1           5, 2018 12:27:06 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Special Counsel; AAW
**Subject:** Mueller hiding Seth Rich assassin name

Assassin arranged by Rosenstein, paid thru money
laundered from Hillary campaign funds....Mueller says:
hands off, re assassins name

# FW: Rosenstein arranged Seth Rich hit thru secret FBI dirty ops

| | |
|---|---|
| From: | AAW Undisputed |
| To: | BNC Undisputed |
| Date: | Thu, 05 Jul 2018 12:36:07 -0400 |

From: b6-2, b7C-2
Sent: 1          5, 2018 12:35:45 PM (UTC-05:00) Eastern Time (US & Canada)
To: Special Counsel; AAW
Subject: Rosenstein arranged Seth Rich hit thru secret FBI dirty ops

FBI self-funds dirty ops with drug sells.....Rosenstein and Mueller
blackmailing Mr Clean, himself, Jeff Sessions, mueller has investigated
sessions......mueller demands no paper trail, operatives must
do everything from memory....mueller using old film cameras, which leave
no electronic trail

## FW: Mueller has name of seth rich assassin and hiding it

| | |
|---|---|
| From: | AAW Undisputed |
| To: | BNC Undisputed |
| Date: | Thu, 05 Jul 2018 13:07:52 -0400 |

From: b6-2, b7C-2
Sent: 1          5, 2018 1:07:17 PM (UTC-05:00) Eastern Time (US & Canada)
To: Special Counsel; AAW
Subject: Mueller has name of seth rich assassin and hiding it

......even from his own staff.....no one knows he has it

# taggedflowrate Robert Mueller has name of Seth Rich killer because

**From:** b6-2, b7C-2

**To:** special.counsel@usdoj.gov, Undisputed , itsc@usdoj.gov, Undisputed oigfoia@usdoj.govdoj.us, supremectbriefs@usdoj.gov, Undisputed ustrustee.program@usdoj.gov, info@bop.gov, askcopsrc@usdoj.gov, askpsob@usdoj.gov, Undisputed , adrweb@usdoj.gov, lockboxsupport@uscis.dhs.gov, canada@uscis.dhs.gov, foiparequest@ic.fbi.gov, b6-2, b7C-2, b7E-1

**Date:** Mon, 14 Jan 2019 13:13:04 -0500

he paid him off on orders from Hillary with Hillary campaign funds laundered thru her lawyer

## taggedflowrate Photos of jewboy Andrew Weissman in blackface



From:   b6-2, b7C-2
To:     special.counsel@usdoj.gov, Undisputed , itsc@usdoj.gov, Undisputed
        , oigfoia@usdoj.govdoj.us, supremectbriefs@usdoj.gov, Undisputed
        ustrustee.program@usdoj.gov, info@bop.gov, askcopsrc@usdoj.gov, askpsob@usdoj.gov,
        Undisputed , adrweb@usdoj.gov, lockboxsupport@uscis.dhs.gov, canada@uscis.dhs.gov,
        foiparequest@ic.fbi.gov, b6-2, b7C-2, b7E-1

Date:   Mon, 04 Feb 2019 15:01:58 -0500

Mueller is hiding the name of Seth Rich killer, paid for with clinton campaign funds

On Tuesday, January 29, 2019, 11:16:01 AM PST, b6-2, b7C-2                      wrote:

Join us in jewboys against crooked jewboy Andrew Weismman......we need honest lawyer in government,

not Gestapo Herr Mueller and his favoriste jewboy Andrew Weismmann

On Tuesday, January 29, 2019, 11:11:17 AM PST, b6-2, b7C-2                      wrote:


Herr Muellers buttboy
On Monday, January 28, 2019, 12:20:20 PM PST, b6-2, b7C-2                      wrote:

Andrew Weissmaa has been on his knees 20 years sucking  Herr Muellers cock

On Friday, January 18, 2019, 12:39:30 PM PST, b6-2, b7C-2                      wrote:

We have a three minute cellphone interception....mueller ordering leak