**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

**BRIAN HUDDLESTON**,

     Plaintiff,

vs.

**FEDERAL BUREAU OF
INVESTIGATION and UNITED STATES
DEPARTMENT OF JUSTICE**

     Defendant

**Case No. 4:20-cv-447-ALM**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT and PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT**

NOW COMES Brian Huddleston, the Plaintiff, responding in opposition to the

Defendants' Motion for Summary Judgment (Doc. No. 37) and cross-moving for summary

judgment:

**Introduction**

Six months before the Defendants' filed their motion for summary judgment ("MSJ"), the

Plaintiff identified numerous documents that were improperly redacted or withheld by the FBI,

and he asked the Court to review all of the withheld and redacted documents in camera. *See*

Motion for In Camera Review ("ICR Motion") (Doc. No. 28). The court denied the Plaintiff's

ICR Motion without prejudice on July 6, 2021 (Doc. No. 32), holding that the motion was

premature. Tellingly, when the Defendants filed their MSJ six months later, they ignored every

issue raised in the ICR Motion. Apparently the Defendants were hoping that the Plaintiff (and the

Court) would forget.

- 1 -

No such luck. The issues raised in the ICR Motion are now ripe and they are, by themselves, sufficient to defeat the Defendants' request for summary judgment. The Plaintiff therefore incorporates the ICR Motion herein by reference, along with the Plaintiff's Response in Opposition to Motion for Stay (Doc. No. 11) that it references. This pleading will provide additional proof that in camera review is not only advisable, but necessary. Accordingly, the Plaintiff renews his motion for in camera review and urges the Court to deny the MSJ in its entirety.

Before proceeding further, the Plaintiff should address an important housekeeping matter. According to some authority, a FOIA plaintiff may rely on newspaper articles to establish facts relevant to a motion for summary judgment. *See, e.g., Elec. Frontier Found. v. Dep't of Justice*, 532 F. Supp. 2d 22, 23 (D.D.C. 2008)(considering *Washington Post* article but holding that it was insufficient grounds for reconsideration).

> To be sure, none of [the newspaper articles and human rights reports] ha[ve] been tested and proved in a court of law. But *SafeCard* requires only "compelling" evidence—not tested evidence, and not even evidence that would be admissible at trial. If hundreds of pages of first-hand reports of governmental abuses do not qualify as "compelling" evidence sufficient to justify an investigation into the government's conduct, then I cannot imagine what would. After all, FOIA's purpose, as *SafeCard* recognizes, is to allow the public access to records necessary to ascertain whether the government has acted illegally. If requesters already had tried and tested proof of such illegal activity, then resort to FOIA would be unnecessary. History, moreover, is full of examples of situations in which just these sorts of allegations led to the discovery of serious government wrongdoing—from Teapot Dome in the 1920s to the FBI's COINTELPRO counterintelligence program in the 1960s to Watergate in the 1970s.

*Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 946–47 (D.C. Cir. 2003)(J.

Tatel, dissenting); *see also id.* at 930 (majority citing newspaper article); *but see Schoenman v.

F.B.I.*, 763 F. Supp. 2d 173, 201 (D.D.C. 2011), aff'd, 841 F. Supp. 2d 69 (D.D.C. 2012)(refusing

to consider newspaper article).[1] In this cross-motion, the Plaintiff seeks discovery from the

Defendants. If nothing else, the news articles are relevant to show that the Plaintiff is neither

acting on a blind hunch nor pursuing a wild goose chase. *See, e.g., Rainsy v. Facebook, Inc.*, 311

F.Supp.3d 1101, 1109 (N.D. Cal. 2019) (court relied in part on newspaper articles when deciding

whether to permit discovery). On the contrary, the matters before the Court are ones of

signigicant public interest and exceptional public importance.

## Factual Background

Seth Rich was a 27-year old Democratic National Committee employee when he was

gunned down on the streets of Washington, D.C. in what was purportedly a botched robbery. *See*

March 26, 2018 FD-302 Form at Exhibit 1, Bates-numbered pages 405-407 (hereinafter

"BATES-405," and so forth).[2] Almost immediately, rumors began to circulate that Mr. Rich was

responsible for leaking thousands of DNC emails which were ultimately published by Wikileaks.

---

[1]  The Plaintiff will also rely on reports from the U.S. Government, and those reports are
admissible as evidence in any court proceeding against the U.S. Government. *Harper v.
United States Dep't of the Interior*, No. 1:21-CV-00197-CRK, 2021 WL 5281589, at *6 (D.
Idaho Nov. 12, 2021)(public document admissible under Fed. R. Evid 201(b); 801(d);
801(c)(2)(A)–(D); and 901(b)(1) and (7)); *see also Mezerhane de Schnapp v. United States
Citizenship & Immigration Services*, 67 F. Supp. 3d 95, 107–08 (D.D.C. 2014)(out-of-court
statements by government employees acting within the scope of their employment were not
hearsay and were admissible at summary judgment stage of FOIA case).

[2]  As attested by his electronic signature on this document, Ty Clevenger declares under
penalty of perjury that the documents in Exhibit 1 are true and correct copies of the
documents produced by the FBI in response to the Plaintiff's FOIA requests. Clevenger
further declares that the files were originally produced in for separate tranches, but he
consolidated them into Exihbit 1.

*See* Andy Kroll, "Will Julian Assange and WikiLeaks Finally Tell the Truth About Seth Rich?"

November 26, 2019 Rolling Stone, https://www.rollingstone.com/politics/politics-news/will-

julian-assange-and-wikileaks-finally-tell-the-truth-about-seth-rich-918946/. (In fact, Wikileaks

founder Julian Assange all but confirmed those rumors during an interview on Dutch television.

*Id*. and "Julian Assange on Seth Rich," https://www.youtube.com/watch?v=

Kp7FkLBRpKg&t=3s).  Allegations of Rich's involvement in the DNC email leaks were

roundly denounced by all of official Washington, which blamed Russian hackers for stealing the

emails and transmitting them to Wikileaks. *See, e.g., Alex Seitz-Wald*, May 17, 2017 "DNC

Staffer's Murder Draws Fresh Conspiracy Theories," May 17, 2017 *NBC News*,

https://www.nbcnews.com/politics/white-house/dnc-staffer-s-murder-draws-fresh-conspiracy-

theories-n760186.  As the Court is undoubtedly aware, the DNC email scandal soon grew into

the "Russian collusion" scandal, which posited that Republican Presidential nominee Donald J.

Trump had colluded with the Russians to steal and publish emails that would embarrass

Democratic nominee Hillary Clinton. *See, e.g.*, Jane Coaston, The new Mueller indictments

should definitively put the Seth Rich conspiracy to rest," https://www.vox.com/2018/7/13/

17568840/russia-trump-seth-rich-conspiracy-mueller-indictments. On May 17, 2017, former FBI

director Robert S. Mueller III was appointed as special counsel to investigate the Russian

collusion matter. *See* May 17, 2017 Press Release, Office of Public Information, U.S.

Department of Justice, https://www.justice.gov/opa/pr/appointment-special-counsel.

 In the March 2019 report of his investigative findings, Mr. Mueller alleged that Russian

hackers indeed were responsible for hacking into the DNC servers and then sharing the emails

with Wikileaks and "Guccifer 2.0," an online persona that purportedly was affiliated with the

Russian government. *See* Robert S. Mueller III, "Report On The Investigation Into Russian

Interference In The 2016 Presidential Election," ("Mueller Report") Vol. I, pp. 4, 36, 41-49, 65, and 176, https://www.justice.gov/archives/sco/file/1373816/download. In a conclusory paragraph, Mr. Mueller dismissed the idea that Mr. Rich played any role in transmitting DNC emails to Wikileaks. *Id*. at 48.

In 2017, Plaintiff's Counsel filed a FOIA request seeking information about the misappropriation of DNC emails. *See* IC Motion and the Plaintiff's Response in Opposition to Motion for Stay (Doc. No. 11), as well as record citations therein. In a sworn declaration dated October 3, 2018 (Doc. No. 11-5), FBI Section Chief David M. Hardy testified that his office was unable to locate a single record about Seth Rich. On or about January 27, 2020, however, the Plaintiff learned that the FBI had previously released emails referencing Seth Rich in an unrelated FOIA case. *See* January 27, 2020 Letter to John Durham, et al. (Doc. No. 51-1), *Ty Clevenger v. U.S. Department of Justice, et al.*, Case No. 1:18-cv-1568-LB (E.D.N.Y.), referencing September 27, 2019 Letter from David M. Hardy to William F. Marshall (https://www.judicialwatch.org/wp-content/uploads/2020/01/JW-v-DOJ-Strzok-Page-Prod-16-00154.pdf), pages Bates-numbered 7414-7415. The documents at pp. 7414-7415 were emails exchanged between FBI lawyer Lisa Page and FBI Agent Peter Strzok.

On July 24, 2017, William Binney, the former technical director of the National Security Agency, along with twelve other retired intelligence professionals, published a report explaining that the DNC emails were extracted and transferred so quickly that they could not have been obtained via an external hack. *See* July 24, 2017 Memorandum, Veteran Intelligence Professionals for Sanity, https://consortiumnews.com/2017/07/24/intel-vets-challenge-russia-hack-evidence/. Instead, someone inside of the DNC must have downloaded the files onto something like a thumb drive. *Id*. On May 7, 2020, the House Intelligence Committee published

the December 5, 2017 testimony of Shawn Henry, CEO of CrowdStrike, Inc., the company hired by the DNC (and relied upon by the FBI and Mr. Mueller) to examine its computers. *See* Aaron Mate, "Hidden Over 2 Years: Dem Cyber-Firm's Sworn Testimony It Had No Proof of Russian Hack of DNC," https://www.realclearinvestigations.com/articles/2020/05/13/hidden_over_2_years_dem_cyberfirms_sworn_testimony_it_had_no_proof_of_russian_hack_of_dnc_123596.html and Transcript of December 5, 2017 Testimony of Shawn Henry, https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Shawn_Henry-MTR_Redacted.pdf. Mr. Henry admitted that his company had no "concrete evidence" that the DNC emails were hacked remotely. *Id*. In other words, there was strong reason to believe that someone inside the DNC – someone like Seth Rich – must have downloaded and transmitted the emails.

The Plaintiff filed his FOIA request to find out whether Mr. Rich and his brother Aaron played a role in leaking the DNC emails, and if so, why government officials have fought so hard to conceal their involvement. As a result of this litigation, and despite previous testimony that it had no records whatsoever about Seth Rich, the FBI has been forced to admit that it possessed hundreds of pages of documents pertaining to Seth Rich, as well as laptop computers that belonged to Mr. Rich.

<u>**Argument**</u>

Time and space do not permit the Plaintiff to flag each and every omission or inadequacy in the Defendants' responses to his FOIA requests, but the evidence of bad faith is overwhelming. The Plaintiff will address two fundamental issues: (1) the Defendants' searches were grossly inadequate; and (2) the Defendants have systematically abused statutory FOIA exemptions in order to hide responsive documents.

**(1).  The Defendants' search for records was grossly inadequate.**

    **(a) The FBI's indexing systems are worthless, and its refusal to search email accounts and text messages is inexcusable.**

In the very first request in the Plaintiff's original FOIA letter, he sought the following from the FBI:

> All data, documents, records, or <u>communications (electronic or otherwise)</u> created or obtained since January 1, 2016 that discuss or reference Seth Rich or Aaron Rich. This would include, but is not limited to, all data documents, records, or communications in the Washington Field Office, Computer Analysis Response Team ("CART"), and any other "cyber" unit within the FBI.

*See* Declaration of Michael G. Seidel (Doc. No. 37-1)(hereinafter "Seidel Decl.") ¶8(1)(emphasis added). The FBI's response to that request, and particularly its response to the request for electronic communications, is astonishing in its obstinance. As detailed below, the FBI has refused to search *any* email accounts, even where responsive emails *already have been found*.

> The FBI determined that based upon the content of the August 10, 2016 email chain, produced to the Plaintiff herein Bates-numbered FBI(20-cv-447)-1 and -2, in which FBI personnel asked and answered questions relevant to the subject matter, that an electronic search of emails was not reasonable. To the extent there were relevant emails they would have been serialized and indexed in the CRS for recordkeeping, future retrieval and located through the FBI's CRS search. See FBI's Record Management Policy Guide, 0769PG (Jun. 4, 2015) at 7-8 (Section 2.8).

Recall that in *Clevenger v. FBI*, the undersigned learned about relevant email exchanges between Ms. Page and Mr. Strzok purely by accident, namely because they were released in response to an unrelated FOIA request. *See* IC Motion and the Plaintiff's Response in Opposition to Motion for Stay (Doc. No. 11), as well as record citations therein. Those are the exact same emails that Mr. Seidel references in the paragraph above. The emails did not show up in the FBI's index systems in 2018 and they're not showing up now, yet the FBI refuses to search the email accounts of Ms. Page, Mr. Strzok, or anyone else. Instead, Mr. Seidel testifies that a search of the index systems is still good enough. Mr. Seidel knows better.

After the undersigned made the FBI aware of the responsive emails in the accounts of Ms. Page and Mr. Strzok, the FBI should have, at the absolute least, searched the emails and text messages of Ms. Page, Mr. Strzok, and every other person in that email chain. Likewise, the FBI should have searched the emails and text messages of every FBI employee whose name appears (redacted or otherwise) in the documents that the FBI has already produced in this case. If FBI agents were interviewing witnesses and writing reports concerning Seth Rich, *see, e.g.*, BATES 405-407, then it is a near certainty that his name will appear in their emails and text messages. Consider again the testimony of Mr. Seidel: "The FBI determined that based upon the content of the August 10, 2016 email chain, produced to the Plaintiff herein Bates-numbered FBI (20-cv-447)-1 and -2, in which FBI personnel asked and answered questions relevant to the subject matter, that an electronic search of emails was not reasonable." In the very same declaration, however, Mr. Seidel acknowledged that his office searched the email account of former FBI Deputy Director Andrew McCabe for records unrelated to Seth Rich. Seidel Decl. ¶69.  Clearly it is *possible* to search FBI email accounts, and apparently without much difficulty, yet Mr. Seidel testifies that it is not "reasonable" to search email accounts for records pertaining to Seth Rich or Aaron Rich. Why not? Note that the Office of Information Policy not only searched <u>all</u> emails in the Special Counsel's Office ("SCO"), but the individual computer drives of every SCO employee as well as the SCO's shared network drive. Declaration of Vanessa R. Brinkman (Doc. No. 37-2) ¶¶23-24.[3]

Mr. Seidel's failure to explain why it is not "reasonable" to search email accounts is fatal to the FBI's request for summary judgment. As a general matter, the government cannot prevail

---

[3] On the other hand, her declaration does not indicate whether OIP searched the text messages of SCO personnel. OIP should therefore be directed to search the text messages of SCO personnel.

on summary judgment when its declarations are conclusory or lack detail. *See, generally, Shapiro v. United States Dep't of Justice*, 507 F. Supp. 3d 283, 339 (D.D.C. 2020) (recounting long history of conclusory declarations from the FBI and denying summary judgment) and *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 92 (D.D.C. 2009) (summary judgment denied where declarations lacked detail). More to the point, the government cannot prevail when it arbitrarily refuses to search its email systems. *See Council on Am.-Islamic Relations-Washington v. United States Customs & Border Prot.*, 492 F. Supp. 3d 1158, 1165 (W.D. Wash. 2020) *and Neighborhood Assistance Corp. of Am., v. United States Dep't of Hous. & Urban Dev.*, 19 F. Supp. 3d 1, 9 (D.D.C. 2013). Mr. Seidel has not so much as suggested that an e-mail search would impose an undue burden on the FBI, but even if he did, that argument would need to be supported with a detailed explanation. *Cuban v. S.E.C.*, 744 F. Supp. 2d 60, 72 (D.D.C. 2010), on reconsideration in part, 795 F. Supp. 2d 43 (D.D.C. 2011) ("The Court does not dispute that searches "impos[ing] an unreasonable burden on [an] agency" need not be compelled, *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C.Cir.1995), but it cannot conclude that the plaintiff's search request would pose such an unreasonable burden based on the sparse representations that the defendant has provided."). Mr. Seidel offers no explanation at all, and for that reason alone the MSJ should be denied.

The Plaintiff must also note that private email accounts, private text messages, private storage drives, etc. are subject to FOIA if they are used to communicate or store records about government business. *Brennan Ctr. for Justice at New York Univ. Sch. of Law v. U.S. Dep't of Justice*, 377 F. Supp. 3d 428, 435 (S.D.N.Y. 2019), citing *Wright v. Admin. for Children & Families*, No. 15-cv-218, 2016 WL 5922293, at *7–*8 (D.D.C. Oct. 11, 2016) and *Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149 (D.C. Cir. 2016). Neither Mr.

Seidel nor Ms. Brinkman indicated in their respective declarations whether private communications or storage accounts were searched for responsive records. That omission would be unremarkable in a typical FOIA case, but this is not a typical FOIA case. The FBI has consistently demonstrated bad faith (and there's plenty more of that discussed below), therefore the Plaintiff moves the Court to order the Office of Information Policy ("OIP") and FBI to provide a copy of the Plaintiff's FOIA requests to every SCO and FBI employee named in the records produced thus far. The Plaintiff further moves the Court to order every such employee to produce a sworn declaration attesting that he or she either (1) has or has not privately sent, received, or stored communications or records responsive to the Plaintiff's FOIA requests; (2) has or has not made such communications or records available for production to the Plaintiff; and (3) is or is not aware of other individuals who used private means to send, receive, or store responsive communications or records. If the answer to Question #3 is in the affirmative, then the names of such individuals should be identified in the declaration.

**(b) The FBI arbitrarily refused to search offices and entities that were specifically identified in the Plaintiff's FOIA request.**

In the Plaintiff's April 9, 2020 FOIA request, he specifically requested "all data documents, records, or communications in the Washington Field Office, Computer Analysis Response Team ('CART'), and any other 'cyber' unit within the FBI." Seidel Dec. ¶8(1). After reviewing Mr. Seidel's affidavit, the undersigned noticed that Mr. Seidel made no reference to searching CART or "any other 'cyber' unit within the FBI," so he sent an email to Defendants' Counsel on December 27, 2021:

> I recently became aware of two FBI units in Quantico that may have information pertaining to Seth Rich and/or Aaron Rich: the Operational Technology Division (OTD) and the Data Intercept Technology Unit (DITU). As I understand it, the Vaughn index indicates only that only FBI headquarters and the Washington Field Office were searched.

*See* Email exchanges between Ty Clevenger and Andrea Parker (Exhibit 2). On January 4, 2022,

Defendants' Counsel forwarded a response from the FBI:

> FBI found no leads to indicate that records responsive to Plaintiff's requests concerning
> subject, Seth Rich, would likely exist in OTD and DITU. Accordingly, if Plaintiff is able
> to provide a more concrete lead to show that records likely exist in either OTD and/or
> DITU relating to Seth Rich, we would consider conducting a search of those locations.
> However, at this time such a search of these locations for records relating to Seth Rich is
> not warranted without a concrete lead indicating that records would likely exist within
> OTD and DITU. Concerning Aaron Rich, the requester does not have a signed privacy
> waiver for Aaron Rich, so the FBI's prior 6/7C response remains intact and no search
> would be conducted concerning him in either of these locations.

*Id.* Plaintiff's Counsel responded on January 5, 2022, and the Plaintiff incorporates that response

herein by reference:

> [Ms. Parker,]
>
> My frustration is not directed toward you in any way, but I am stunned by the FBI's latest
> admissions. I'll begin with the admission that the FBI failed to search the Operational
> Technology Division ("OTD"). Paragraph 8 of Michael Seidel's affidavit [Doc. No. 37-1]
> acknowledges that my client's FOIA request <u>specifically</u> covered the "Computer
> Analysis Response Team ('CART'), <u>and any other 'cyber' unit within the FBI</u>."
> [emphasis added].[4]
>
> According to publicly-available sources, *e.g.*, the FBI's own website, CART is a part of
> ODT. *See* https://archives.fbi.gov/archives/news/stories/2008/november/
> techexperts_110708. In fact, the LinkedIn page of John Dysart, the current chief of
> CART, notes that CART is part of ODT. *See* https://www.linkedin.com/in/john-dysart-
> 20056363/. Furthermore, ODT itself is unequivocally a "'cyber' unit within the FBI."
> *See* https://www.fbi.gov/services/operational-technology.
>
> Mr. Seidel should have come clean and admitted up front in his declaration that ODT /
> CART was not searched, rather than forcing me to smoke him out. Then again, this not
> the first time I've caught an FBI section chief being deceptive in response to a FOIA
> request.

---

[4]   Paragraph 8(8) is even more specific. The Plaintiff requested "[a]ll data, documents, records
or communications obtained or produced by the FBI's Computer Analysis and Response
Team ("CART") or any other FBI cyber unit regarding Seth Rich and/or Aaron Rich."

In this very litigation, after long denying that it investigated anything pertaining to Seth Rich, the FBI was finally forced to admit that it took possession of his personal and work laptops.  ODT would have been responsible for examining those laptops. We know this because, for example, ODT was responsible for examining the laptop of disgraced former Congressman Anthony Weiner when it was referred to the FBI by the New York Police Department. *See* p. 388 of the DOJ inspector general report on the investigation of Hillary Clinton's emails (https://www.scribd.com/document/381806566/IG-Report-on-FBI-and-DOJ-Handling-of-Clinton-Investigation).

I would further direct your attention to the deposition testimony of Pulitzer Prize-winning journalist Sy Hersh, wherein he testified that a source inside the government told him that the FBI had examined Seth Rich's laptop. A link to that transcript can be found on my blog at https://lawflog.com/?p=2433.[5] Obviously, our targeted FOIA request about CART was not based on a blind hunch.

Even if the FBI did not examine Seth Rich's laptops, that would be very important information in and of itself.  In Special Counsel Robert Mueller's report on his investigation, he claimed there was no evidence that Seth Rich was involved in sharing Democratic National Committee emails with Wikileaks. We know from the records already produced that the FBI conducted that investigation at Mr. Mueller's direction. If the FBI took custody of Mr. Rich's laptops but never examined those laptops, then that would call into question the integrity of the investigation conducted by Mr. Mueller and the FBI.

The FBI's next admission is an implicit one. In its response to my email to you, the FBI completely ignored my inquiry about the Data Intercept Technology Unit ("DITU"). After reviewing Mr. Seidel's declaration, it is now clear why. Beginning on p. 79, in Paragraphs 163-167, Mr. Seidel references a "sensitive investigative database" that the FBI cannot so much as acknowledge.

The existence of the DITU is not a secret, and it certainly is not classified. *See, e.g.*, Thomas Brewster, "Revealed: Two Secret Cogs In The FBI National Surveillance Machine," February 21, 2018 Forbes, https://www.forbes.com/sites/thomasbrewster/2018/02/21/fbi-hidden-hacking-groups-revealed/?sh=4e1a8c51330f and Shane Harris, "Meet the Spies Doing the NSA's Dirty Work," November 21, 2013 *Foreign Policy*, https://foreignpolicy.com/2013/11/21/meet-the-spies-doing-the-nsas-dirty-work/. Furthermore, an email previously released by the FBI in response to a FOIA request plainly references DITU (because it was sent by the acting unit chief of DITU). *See* https://www.eff.org/files/fbi_cipav-08-p9.pdf. In short, there is no legitimate basis for trying to shield DITU.

---

5    As attested by his electronic signature on this document, Ty Clevenger declares under penalty of perjury under the laws of the United States that he personally uploaded a true and correct copy of the Sy Hersh deposition at https://lawflog.com/?p=2433.

As noted above, Mr. Mueller claimed there was no evidence that Mr. Rich transmitted emails to Wikileaks. According to the publicly-available sources cited above, DITU is the entity responsible for electronic data intercepts, therefore its database would be the place to search for communications between Mr. Rich and an overseas entity such as Wikileaks. If the FBI and Mr. Mueller failed to search DITU, that fact alone is something that the public deserves to know, because it would show that the investigation was a sham.

Finally, I will address the FBI's claim that Aaron Rich's identity is subject to privacy protections. Aaron Rich has spoken very publicly about the matters pertaining to my client's FOIA request. *See, e.g.,* Michael Isikoff, "'It is indescribable': How a harassment campaign overwhelmed Seth Rich's friends and family," August 6, 2019 *Yahoo! News*, https://www.yahoo.com/now/it-is-indescribable-how-a-harassment-campaign-overwhelmed-seth-richs-friends-and-family-100000936.html. An Asst. U.S. Attorney testified that she obtained at least one of Seth Rich's laptops from Aaron Rich. A transcript of her testimony is posted on my blog. *See* March 20, 2020 Deposition of Deborah Sines, https://lawflog.com/wp-content/uploads/2020/04/2020.03.20-Deborah-Sines-deposition-transcript.pdf. Finally, Aaron Rich sued one of my clients in federal court, alleging that he was defamed because my client alleged that he played a role in leaking DNC emails to Wikileaks. *See Rich v. Butowsky et al*, Case No. 18-cv-00681-RJL (D.D.C.). Under the circumstances, Aaron Rich has no privacy interest to protect.

My client is trying to determine whether Mr. Mueller and the FBI whitewashed a murder for the sake of a partisan political agenda. Thus far, the FBI has bent itself over backwards to hide information about Seth Rich, with senior FBI personnel trying to deceive U.S. district courts in Texas and New York. The longer this chicanery continues, the greater the evidence that the FBI is indeed whitewashing a murder for the sake of politics.

*Id.* In a response dated January 10, 2022, Defendants' Counsel suggested that the Plaintiff raise these issues in his response to the MSJ. *Id.* Challenge accepted.

The FBI has admitted taking possession of Seth's personal and work laptops. *See* Defendants' Response to Plaintiff's Sur-Reply in Opposition to Motion to Stay (Doc. No. 15) and BATES-691, respectively. The FBI also has admitted that it obtained two storage discs. Siedel Aff. ¶¶16 and 19. And after the email exchange with Defendants' Counsel, the Plaintiff rediscovered the FBI document found at the pages Bates-numbered 692-694 in Exhibit 1, which is titled, "Cyber Division Request to conduct a follow-up interview with [redacted]." Those pages follow the evidence receipt for Seth's work laptop. BATES-691. Under these

circumstances, how can the FBI claim with a straight face that it "found no leads to indicate that records responsive to Plaintiff's requests" would be located in one of its cyber units? Its own documents prove that the "Cyber Division" was involved in something related to Seth Rich. Likewise, the FBI has no excuse for refusing to search DITU for relevant communications intercepts, *e.g.*, communications between Seth and Wikileaks. While such a search might have been barred by the Fourth Amendment while Seth was alive, it is no longer an excuse for refusing to search DITU. "[O]ur well-settled precedent holds that the deceased have no rights to be protected or invalidated under the Constitution." *Blanchard-Daigle v. Geers*, 802 Fed. Appx. 113, 121 (5th Cir. 2020), cert. denied, 141 S. Ct. 815, 208 L. Ed. 2d 399 (2020), citing *Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir. 1979) ("After death, one is no longer a person within our Constitutional and statutory framework, and has no rights of which he may be deprived.").

After further review, it is not entirely clear whether the database in ¶¶163-167 of Mr. Seidel's declaration is the same as the "intelligence activities" that he references in ¶¶81-85 of his declaration. Regardless, Mr. Seidel fails to explain whether redacted records could be produced that would hide the identity of the database or the nature of the "intelligence activities." This failure is fatal to the MSJ, because even intelligence agencies have a duty to segregate records that may be subject to national security concerns. *Founding Church of Scientology of Washington, D. C., Inc. v. Bell*, 603 F.2d 945, 950–51 (D.C. Cir. 1979). Mr. Seidel's affidavit is also unclear about whether all of the withheld documents have been identified in the Bates-numbered indices that it already produced. Given the FBI's bad faith in all matters pertaining to Seth Rich, all of the responsive documents – whether classified or not – should be identified and produced for in camera review.

**(c) It appears that some databases still may be excluded from the FBI's search indices.**

The FBI's bureaucratic intransigence is not a new problem. Other courts have

documented the FBI's long history of hiding the ball from FOIA requestors. In an opinion on a

FOIA requestor's motion for attorney fees, Judge Gladys Kessler lamented "the FBI's long

history of recalcitrance and 'grudging compliance' with FOIA." *Negley v. F.B.I.*, 818 F. Supp. 2d

69, 75 (D.D.C. 2011), dismissed, 13-5242, 2013 WL 5610260 (D.C. Cir. Sept. 17, 2013)

> Plaintiff is correct that this litigation has provided extremely significant and useful
> information for ordinary citizens, as well as journalists and academics, seeking to find out
> "what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom
> of the Press,* 489 U.S. 749, 772–73, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989) (internal
> quotations omitted). For the first time, the opinions in this case disclose information
> about numerous FBI databases which must be searched in order to achieve compliance
> with the agency's FOIA obligations. As Plaintiff points out, the FBI "routinely searches
> only one of those databases (the UNI), which in itself is flawed because the only method
> to search UNI is via index terms previously entered by an agent-clerk." Pl.'s Mot. 11.
>
> The FBI does not deny that, as Plaintiff states in his Reply, there is no single federal court
> opinion, other than this Court's opinion of September 24, 2009, that even mentions, let
> alone discusses, the existence of either the Zy database or the SFFO card index. *See* Pl.'s
> Reply 7. Nor does the Government deny that even when federal court opinions have
> mentioned certain databases, such as ELSUR, ACS, and ICM, none of those opinions
> have discussed, as this case has, how those databases are indexed so that FOIA requesters
> can determine whether the FBI is effectively searching for documents which are
> responsive to their requests.
>
> This information is indeed "valuable" for future FOIA requesters and litigants. The
> information will be particularly valuable, given the + The enormous public benefit
> realized by disclosures of this information will "facilitate public access to government
> documents" and will help "to pierce the veil of administrative secrecy and to open agency
> action to the light of public scrutiny." *McCutchen v. U.S. Dep't of Health & Human
> Servs.,* 30 F.3d 183, 184 (D.C.Cir.1994) (internal quotations omitted).

*Id.* (emphasis added). Eleven years later, the FBI is still playing the same old games. The FBI is

still relying on "agent-clerks" to *subjectively* determine what gets entered into the indices. Seidel

Aff. ¶50 (obviously, nobody wants to index Seth Rich). In *Jett v. Fed. Bureau of Investigation*,

139 F. Supp. 3d 352, 368 (D.D.C. 2015), the FBI was chastised again because in that case, as

here, the FBI searched only its CRS index and refused to look elsewhere. Two years later, in the very same case, the FBI was chastised yet again because it had not searched all databases likely to contain responsive records. *Jett v. Fed. Bureau of Investigation*, 241 F. Supp. 3d 1, 9 (D.D.C. 2017).

Paragraphs 65 and 163-167 of Mr. Seidel's declaration infer that some databases <u>still</u> may be excluded from the FBI's search indices. Accordingly, this case presents an opportunity for a much-needed status update post-*Negley*. Once again, "ordinary citizens, as well as journalists and academics" (and perhaps other federal courts) need to know about the FBI's ongoing practice of hiding the ball in response to FOIA requests. The Plaintiff therefore moves the Court to order the FBI to identify all databases that are excluded from CRS and the other search indices.

### (d) The FBI completely ignored some of the Plaintiff's requests.

Given the complete absence of any reference to Seth Rich in the FBI's index systems, it appears as if someone in senior management may have directed FBI personnel to exclude Seth's name from the bureau's index systems. [6] Accordingly, the Plaintiff requested "[a]ll documents, communications, records or other evidence reflecting orders or directions (whether formal or informal) for the handling of any evidence pertaining to Seth Rich's or Aaron Rich's involvement in transferring data from the Democratic National Committee to Wikileaks." Seidel Decl. ¶8(5). Mr. Seidel's declaration made no reference to that request whatsoever, thus it is unclear whether the FBI even attempted to search for records responsive to that request. For that

---

[6]   Consider, for example, the document at BATES-691, where the FBI takes custody of Seth's work laptop. Why would any FBI agent or clerk <u>not</u> enter that in the CRS index under "Seth Rich" unless he or she received orders from above? The Plaintiff would welcome a response from Mr. Seidel, but that likely will not happen unless the Court compels his deposition.

reason, the FBI should be directed to search all email accounts, text accounts and databases at FBI headquarters to determine whether anyone directed FBI personnel to omit Seth Rich and/or Aaron Rich from CRS and other search indices. Likewise, for every agent listed in the documents produced thus far, the FBI should be directed to search the email accounts of his or her chain of command.

Somewhat relatedly, the Plaintiff requested the code names that the FBI assigned to Seth and Aaron Rich. Seidel Aff. ¶25. The FBI refused to provide those names for the reasons set forth in Paragraphs 27 and 30-31 of Mr. Seidel's affidavit, and the Plaintiff will address those arguments below. For present purposes, the Court should note that Mr. Seidel's affidavit does not indicate whether the FBI searched for emails (or any other records) using the code names assigned to Seth or Aaron Rich. Likewise, the declaration of Vanessa R. Brinkman (Doc. No. 37-2) does not indicate whether records were searched via code names. Given the FBI's long history of hiding documents from FOIA requestors, it is entirely reasonable to believe that the FBI may be hiding responsive documents by assigning code names and then omitting those code names from its search parameters. Accordingly, the FBI and SCO should be ordered to search email accounts, text accounts, databases, any search indices, CART, ODT, DITU, etc. using any and all code names assigned to Seth and Aaron Rich. Although the FBI contends that the code names themselves should not be revealed, it could nonetheless produce the responsive documents with the code names redacted. We know this is achievable because that is exactly what the FBI has already done with respect to the records discussed in Paragraphs 28-29 of Mr. Seidel's affidavit. It should be easy enough for the FBI to redact any code names and then insert the name of the person to whom the code name was assigned.

In yet another instance of evasion, the FBI did not fully respond to the following request from the Plaintiff:

> All data, documents, communications, records or other evidence indicating whether Seth Rich, Aaron Rich, or any other person or persons involved in transferring data from the Democratic National Committee to Wikileaks in 2016, either directly or through intermediaries. This request includes, but is not limited to, any reports from CrowdStrike, Inc. that were obtained by the FBI while assisting Special Counsel Robert Mueller's investigation.

Seidel Decl. ¶8(4)(emphasis added). Mr. Seidel's declaration does not indicate whether or how the FBI searched for documents related to other individuals who may have been involved in the 2016 data breach. Furthermore, Mr. Seidel's declaration made no reference to reports from CrowdStrike, Inc., and the Plaintiff knows for certain that such records exist. The Plaintiff has attached a FOIA production from the FBI to Aaron Mate wherein the FBI disclosed at least one page of such a document. *See* February 6, 2022 Declaration of Aaron Mate and attached documents (Exhibit 3).

As indicated in Paragraph 8 of Mr. Seidel's declaration, the Plaintiff submitted ten individual requests on April 9, 2020. Only Request #9 was definitively answered by Mr. Seidel. With respect to Requests #2, #5, #6, #8, and #10, his declaration does not indicate whether any search was conducted at all. This too renders Mr. Seidel's declaration inadequate.

> When a FOIA requester identifies a "gap" in the agency's search, the agency must "fill" the "gap" "to carry its burden as to the adequacy of its search." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 515 (D.C. Cir. 2011). In particular, the agency should "inform the Court and plaintiff[ ] whether [any other records] of any potential relevance exist; if so whether their responsive material is reasonably likely to add to that already delivered; and, if these questions are answered affirmatively, whether there is any practical obstacle to searching them." *Id.* "Without such an explanation, and even if the Court can make 'reasonable guesses about the answers to these questions,' the Court cannot award the agency summary judgment on the adequacy of its search." *Davidson v. United States Dep't of State*, 206 F.Supp.3d 178, 191 (D.D.C. 2016) (quoting *Negley v. FBI*, 169 Fed.Appx. 591, 595 (D.C. Cir. 2006)).

> Here, [the plaintiff] identified a specific "gap" in the Bureau's search—i.e., she points to

"additional locations, and additional email addresses" that should have been searched for responsive records. Pl.'s Opp. at 11; *see also* Coffey Decl. Ex. C. Although the Bureau states that it searched "WHBO locations outside of Washington, D.C.," it has not adequately explained which other offices were searched, the type of search performed, or the names of any custodians that were searched. Nor has the agency explained whether the additional custodians identified by Ms. Coffey are likely to have responsive material and, if so, whether there is any practical obstacle to searching for those materials. Accordingly, on this record, the Court cannot determine the adequacy of the Bureau's search for records in Wild Horse and Burro Program offices outside of Washington, D.C. *See, e.g.*, *Aguirre v. S.E.C.*, 551 F.Supp.2d 33, 61 (D.D.C. 2008) (finding that the agency's search was inadequate where, although agency "list[ed] the specific offices queried for documents," it "fail[ed] to describe in detail how each office conducted its search").

*Coffey v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1, 11 (D.D.C. 2017).

Because a fundamental principle behind FOIA "is public access to government documents," courts require "agencies to make more than perfunctory searches and, indeed, to follow through on obvious leads to discover requested documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999), citing *John Doe Agency*, 493 U.S. at 151, 110 S.Ct. 471 and *Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998). Therefore, an agency only "fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.' " *Id.*, quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990); *see also Oglesby*, 920 F.2d at 68. Although there "is no requirement that an agency search every record system," an agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby*, 920 F.2d at 68.

*Watkins Law & Advocacy, PLLC v. United States Dep't of Veterans Affairs*, 412 F. Supp. 3d 98, 117 (D.D.C. 2019). The mere fact that Mr. Seidel's declaration failed to identify the search terms used for some of the Plaintiff's requests is fatal to the MSJ. *SAI v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 247 (D.D.C. 2018) (government declaration was inadequate where it did not identify search terms) and *Manatt v. United States Dep't of Homeland Sec.*, 473 F. Supp. 3d 409, 416–17 (E.D. Pa. 2020) (government's declaration was inadequate where it did not identify the search terms used or the custodians or systems searched). For the foregoing reasons, the Plaintiff moves the Court to order Mr. Seidel to address each request individually, explaining what offices were searched, what databases were searched, whose email and text accounts were searched, and

what search terms were used. For every document that is withheld or redacted, the Defendants should be directed to specify the individual request (*i.e.*, the requests found in Paragraph 8 of Mr. Seidel's affidavit) to which that document corresponds.

**(2) <u>The Defendants improperly redacted and withheld responsive records.</u>**

When objecting to redactions or the withholding of documents, a FOIA requestor is always at a serious disadvantage. It is hard to challenge the basis for a redaction when one cannot see what was redacted. Notwithstanding that, the Plaintiff has already identified records that were redacted improperly, see ICR Motion 10-11, and this cross-motion has already demonstrated bad faith in spades. "[A]gency declarations will not support summary judgment if the plaintiff puts forth contrary evidence or demonstrates the agency's bad faith." *Judicial Watch, Inc. v. U.S. Dep't of State*, No. 20-CV-124 (CRC), 2021 WL 3633611, at *2 (D.D.C. Aug. 17, 2021), citing *American Civil Liberties Union v. Department of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011). In camera review "may be particularly appropriate when either the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency, when the number of withheld documents is relatively small, and when the dispute turns on the contents of the withheld documents, and not the parties' interpretations of those documents." *Lindsey v. Fed. Bureau of Investigation*, 490 F. Supp. 3d 1, 25 (D.D.C. 2020), citing *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998) (internal quotation marks omitted).

One of the most the most glaring example of insufficient detail can be found in Paragraph 16 of Mr. Seidel's declaration, where he states that BATES-422 "represents a compact disc wherein all of the contents are being withheld in their entirety pursuant to FOIA Exemptions (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E)." That is his *entire* explanation. We do not know where

the disc came from, what sort of data it contains, or how much data it contains, much less the general subject matter of the data. Similarly, Paragraph 19 states that BATES-1565 "represents one digital video disc wherein all of the contents are being withheld in their entirety pursuant to FOIA Exemptions (b)(6), (b)(7)(C) and (b)(7)(E)." Again, that is Mr. Seidel's entire explanation. We do not know where the disc came from, who appears in it, or why it was obtained, nor do we know the general subject matter. Mr. Seidel's non-explanation is fatal to the MSJ:

> "An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions," typically through affidavit or declaration. *DiBacco*, 795 F.3d at 195 (quoting *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)). "Summary judgment is warranted based on the agency's affidavit if it 'describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith.'" *Id.* at 196 (quoting *ACLU*, 628 F.3d at 619).

*DiBacco v. Dep't of the Army*, 926 F.3d 827, 834 (D.C. Cir. 2019)(emphasis added). Note that the Plaintiff raised *the exact same issue* in June on page 10 of his motion for in camera review (Doc. No. 28), but Mr. Seidel made no attempt whatsoever to address it in his most recent declaration.

The D.C. federal courts are certainly open to in camera review, but the Fifth Circuit's preference for in camera review is even stronger:

> This court has stated that, while the FOIA "leaves to the [district] court's discretion whether to order an examination of the contents of the agency records at issue, in camera," in determining whether the claimed exemptions apply, "the legislative intent for exercise of this discretion is relatively clear." *Id.* at 1144. This is because "in instances where it is determined that records do exist, the District Court must do something more to assure itself of the factual basis and bona fides of the agency's claim of exemption than rely solely upon an affidavit." *Id.* at 1145.

*Batton v. Evers*, 598 F.3d 169, 175–76 (5th Cir. 2010). The Plaintiff will address each of the exemptions relied upon by the Defendants in numerical order.

**(a) Exemption 1: National Security**

The Freedom of Information Act permits agencies to withhold records "that are

(A) specifically authorized under criteria established by an Executive order to be kept secret in

the interest of national defense or foreign policy and (B) are in fact properly classified pursuant

to such Executive order…" 5 U.S. Code § 552(b)(1) (hereinafter "Exemption 1"). In this case,

the question is whether the withheld documents "are in fact properly classified."

> Section 1.7 of Executive Order 13,526 bars classifying information in order to conceal
> violations of the law. Exec. Order 13,526 § 1.7(1), 75 Fed. Reg. 707 (Jan. 5, 2010). A
> plaintiff alleging that an agency has classified information to conceal a violation of law
> "must provide something more than conjecture to show that the agency's withholding
> decision violates Executive Order 13,526." *Associated Press v. FBI*, 265 F. Supp. 3d 82,
> 96–97 (D.D.C. 2017). Credible evidence is required. *See Canning v. U.S. Dep't of Just.*,
> 848 F. Supp. 1037, 1047–48 (D.D.C. 1994) (rejecting plaintiff's challenge where plaintiff
> presented claims "based primarily on speculation" and failed to present "credible
> evidence that the agency's motives for its withholding decisions were improper
> or *98 otherwise in violation of E.O. 12356").

*Smith v. United States Nat'l Archives & Records Admin.*, 415 F. Supp. 3d 85, 97–98 (D.D.C.

2019). Section 1.7 is actually broader than *Smith* suggests. "In no case shall information be

classified, continue to be maintained as classified, or fail to be declassified in order to: (1)

conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a

person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of

information that does not require protection in the interest of the national security." Exec. Order

13,526 § 1.7(a). At least three of the four criteria are implicated in this case.

The Defendants argue that Exemption 1 applies on two grounds. First, Exec. Order

13526, § 1.4(c), exempts intelligence activities (including covert action), intelligence sources and

methods, and cryptology from disclosure. Seidel Affidavit ¶81. Second, Section 1.4(d) of that

allows for the classification of information related to foreign relations or foreign activities of the

United States, including confidential sources.

The Plaintiff would first remind the Court of the Defendants' official position on Seth Rich, namely that (1) he was not involved in transferring DNC emails to Wikileaks and (2) he died by happenstance in a botched robbery. *See* Mueller Report at 48 and BATES-406, respectively. If those are the parameters, then one must ask why in the world the Defendants would be invoking national security considerations (or interviewing witnesses all over the country, taking custody of his laptops, convening federal grand juries, etc.). In any event, the Plaintiff is not asking the Court to overrule Exemption 1 at this stage, but to permit further discovery and conduct an in camera review.

The Plaintiff would next direct the Court's attention to Guccifer 2.0, the person or entity that the SCO accused of publishing the DNC emails at the behest of the Russian government. *See Mueller Report*, Vol. I, pp. 4, 36, 41-49, 65, and 176. The Court will note that the name "Guccifer 2.0" appears frequently in the documents that the FBI has already produced in Exhibit 1. Given the number of times that Guccifer 2.0's name appears in the records about Seth Rich, it is evident that there is some connection between the two.  In *Transparency Project v. U.S. Department of Justice, et al.*, Case No. 4:20-cv-00467-SDJ (E.D.Tex.), another FOIA requester sought records from the CIA to determine whether it fabricated Guccifer 2.0 in order to divert blame from Seth Rich to the Russian government:

> I request the opportunity to view all metadata, communications (internal or external), records, documents, reports or other evidence regarding whether the CIA, its Directorate of Digital Innovation, or any of the CIA's foreign or domestic affiliates, agents, employees or contractors played a role in inserting Russian "fingerprints" (e.g., "COZY BEAR" or "FANCY BEAR") into data from the 2016 Data Breach. In other words, the CIA should produce all evidence indicating whether the CIA, its Directorate of Digital Innovation or any of the CIA's foreign or domestic affiliates, agents, employees or contractors inserted or fabricated evidence to make it appear that Russians or other third parties were responsible for the 2016 Data Breach. This includes, for example, any and all evidence that the Directorate of Digital Innovation created or operated the "Guccifer 2.0" or "DCLeaks" profiles or any other online profile used to promote or distribute data from the 2016 Data Breach.

First Amended Complaint ¶11(a), *Transparency Project*. The result was a *Glomar* response[7]

from the CIA, *i.e.*, a statement that it could neither confirm nor deny that it fabricated Guccifer

2.0. *See* March 16, 2021 Joint Status Report (Doc. No. 28-8) 2-3. That alone is astounding, as

one would expect the CIA to vehemently deny that it would ever do such a thing. It is, therefore,

entirely reasonable to ask whether the FBI possesses records showing that the CIA fabricated

Guccifer 2.0. If so, Exemption 1 would not apply. *See* Section 1.7(a)(1), (2), and (4).

As discussed below, there is at least some evidence that the FBI deliberately concealed

Seth Rich's role in leaking DNC emails to Wikileaks, presumably to shift blame to Russia and

ultimately blame President Trump for colluding with Russia. Such activities could violate any

number of criminal statutes, and therefore be exempt from classification under Section 1.7(a)(1).

To the extent that FBI personnel were attempting to undermine or overthrow a Presidential

administration, they violated the prohibition against rebellion and insurrection. *See* 18 U.S. Code

§ 2383. And if government personnel secured search warrants for individuals like Carter Page

when they knew the "Russian collusion" premise was false (namely because the emails

originated with Seth Rich), then they violated the prohibition on maliciously procuring search

warrants. *See* 18 U.S. Code § 2235.

Given all of the dishonest and bad-faith efforts to conceal information about Seth Rich

thus far, it also seems a near certainty that Exemption 1 was invoked to "prevent embarrassment

to a person, organization, or agency," *e.g.*, the SCO, the FBI, and their senior management. If the

SCO and the FBI knew that Seth Rich leaked the emails yet shifted the blame to the Russians,

that revelation would be more than a little embarrassing. Given the number of people inside of

---

[7] *See Phillippi v. CIA*, 546 F.2d 1009, 1010–11 (D.C. Cir. 1976)

the FBI who have been caught concealing information about Seth Rich, it appears very likely that the FBI is invoking Exemption 1 in order to protect its personnel from embarrassment. Finally, it appears that the SCO and FBI are trying to "prevent or delay the release of information that does not require protection in the interest of the national security." If the DNC emails were leaked by Seth Rich rather than hacked by the Russians, then national security will not be jeopardized by revealing that fact.

Growing evidence suggests that the FBI and the CIA may have "stiffed a call" via foreign actors in order to fabricate a pretext for a national security investigation.[8] For example, U.S. Government apparently utilized foreign government actors to target two low-level affiliates of Donald Trump's 2016 Presidential Campaign, Carter Page and George Papadopoulos, in order to trigger the SCO's "Russian collusion" investigation. *See, e.g.*, Aaron Mate, "Durham vs. Horowitz: Tension Over Truth and Consequences Grips the FBI's Trump-Russia Reckoning," January 2020, *RealClearInvestigations*, https://www.realclearinvestigations.com/articles/ 2022/01/20/the_tension_over_truth_and_consequences_gripping_the_fbis_trump- russia_reckoning_812321.html and John D. O'Connor, "AGENTS PROVOCATEUR: Did Comey's Informants Fabricate Russian Collusion Evidence?" June 29, 2018, https://dailycaller.com/2018/06/29/oddities-in-comey-informants-russian-collusion-evidence/.

---

[8] The term "stiffing a call" is a slang term that arose among law enforcement officers in California:

> "[A] common practice was to, in police slang, "stiff a call" against a "mark."  If police suspected an individual of, say, dealing drugs, then rather than go through the trouble of getting a search warrant "they would call the police -- that is, they would call themselves -- with a tip that a serious crime was being committed at that address." Subsequently a radio call would send police to that address,  they would  rush  in  to supposedly  "save" someone, and if they discovered illegal drugs in the process, it was admissible evidence.

L.A. Secret Police (undated), https://www.beyondweird.com/conspiracy/cn12-05.html.

Given the connection between Seth Rich and alleged "Russian collusion," it is entirely reasonable to question whether the FBI or the CIA solicited foreign governments to (1) conceal Seth's role in the DNC leaks or (2) intercept communications between Seth and Wikileaks. The latter would explain Mr. Seidel's testimony that the FBI relied on foreign intelligence as a source on matters relevant to Seth Rich.

Either scenario should not be subject to classification according to Section 1.7(a) of Exec. Order 13,526. First, the foregoing facts, if proven true, would be deeply embarrassing to the FBI, the CIA, and numerous officials in both agencies, and thus an improper basis for classification according to Section 1.7(a)(2). Furthermore, any conspiracy to undermine or overthrow the President of the United States would be illegal, if for no other reason than the fact that Article 1 of the Constitution vests executive authority solely in the President, and it does not authorize his agents to undermine or overthrow him. Section 1.7(a)(1) thus would prohibit classification. Finally, classification would be improper under Section 1.7(a)(4) because there is no national security interest in concealing any such improprieties.

Again, the Plaintiff is not arguing that any of the foregoing scenarios have been established with certainty. Instead, the Plaintiff is arguing that there is sufficient predicate for in camera review and discovery, particularly when one considers the FBI's consistent pattern of bad faith in all matters pertaining to Seth Rich.

**(b) Exemption 3: Information exempted by statute**

Mr. Seidel's discussion of 5 U.S.C. § 552 (b)(3)("Exemption 3") overlaps with his discussion of Exemption 1 to the extent that it pertains to national security matters, therefore the Plaintiff will simply incorporate his previous discussion of Exemption 1. The Plaintiff does not contest the fact that grand jury information and pen register information are exempt.

**(c) Exemption 4: Trade secrets and financial information**

FOIA Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). Mr. Seidel states that a ten-page document has been withheld pursuant to Exemption 4, but as usual he offers precious little detail. Seidel Aff. ¶103. All we know is that it was provided by a "private commercial institution," it is marked "COPYRIGHT PROPRIERTARY AND CONFIDENTIAL – NOT TO BE SHARED WITH THIRD PARTIES," the private institution does not want it released, and the private institution would not have shared the report if it had known that it might be released. *Id*. The Plaintiff would begin by noting that it is irrelevant, under Exemption 4, whether the private institution would have shared the report had it known that it might be subject to FOIA. And if the document is legitimately copyrighted, then the Plaintiff will gladly pay a reasonable reproduction fee.

It is impossible to tell from Mr. Seidel's declaration whether the report deals with Seth Rich's financial transactions, Aaron Rich's financial transactions, or something entirely different. In his deposition, Sy Hersh testified that a well-placed source inside the government told him that the FBI obtained and examined Seth Rich's laptop, found communications with Wikileaks, and determined that Seth had requested payment from Wikileaks. *See* Transcript of July 15, 2020 Deposition of Sy Hersh 194-195 (https://lawflog.com/?p=2433). That hearsay testimony might not seem weighty in and of itself, but compare the date of Mr. Hersh's testimony with the date of the FBI productions found in Exhibit 1. Months *before* the FBI was forced to reveal that it had possession of the laptops, Mr. Hersh already knew from his source that the FBI had possession of at least one of the laptops. Accordingly, Mr. Hersh and his source have at least some measure of credibility. While Mr. Hersh's testimony does not establish

anything conclusively, it does indicate a need for further exploration. *See, e.g., Dobronski v. F.C.C.*, 17 F.3d 275, 280 (9th Cir. 1994)(court relying on a mere "tip" received by the FOIA requestor). Accordingly, the FBI should be directed to produce the report for in camera review.

### (d) Exemption 5: Privileged information

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested." 5 U.S.C. § 552(b)(5). The issue is far from settled, but there is some authority suggesting that the crime-fraud exception would apply to documents otherwise subject to Exemption 5. *See Cox v. Dep't of Justice*, 504 F. Supp. 3d 119, 158 n.7 (E.D.N.Y. 2020) (citing cases). Given the chicanery described thus far, there is good reason to believe that some of the legal documents might be subject to the crime-fraud exception. The Plaintiff would also encourage the Court to pay particularly close attention to Paragraphs 109-111 of Mr. Seidel's declaration, which address draft FBI 302 forms. During the SCO investigation, the FBI admitted altering 302 forms, *see, e.g.*, Thomas J. Baker "'Rewrite' in Flynn's Case Shows FBI Needs Reform: The bureau's actions are even more shocking to me as a veteran agent," May 3, 2020 *Wall Street Journal*, https://www.wsj.com/articles/rewrite-in-flynns-case-shows-fbi-needs-reform-11588541993, therefore the Plaintiff must wonder whether the same occurred in matters pertaining to Seth Rich. The Plaintiff therefore moves the Court to carefully review the draft 302 forms in camera, along with all other purportedly privileged materials.

**(e)  Exemption 7: Law enforcement records and personal privacy**

Exemption 7 deals with law enforcement records, and most of Mr. Seidel's declaration deals with the subsection pertaining to privacy. Mr. Seidel correctly notes that Exemption 6 largely overlaps with Exemption 7(C), and he discusses the two together. ¶¶123-124. Before proceeding to questions of privacy, however, the Plaintiff will first address Exemption 7(D)-4, which exempts information that was obtained confidentially from foreign governments. The D.C. Circuit has suggested in dicta that bad faith would be grounds for denying an exemption under 7(D)-4, *see Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475 F.3d 381, 391 (D.C. Cir. 2007), and that is very much at issue in this case. Where foreign actors like Josef Mifsud or Alexander Downer, or even an American expatriate like Stefan Halper, are being used to spy on a U.S. Presidential campaign and then undermine a Presidential administration, *see, e.g.,* Jeff Carlson, "Spygate: The True Story of Collusion," December 28, 2020 *The Epoch Times*, https://www.theepochtimes.com/spygate-the-true-story-of-collusion_2684629.html, there is more than enough bad faith to waive Exemption 7(D)-4. Stated differently, if the FBI and the CIA are conspiring with foreign agents or foreign governments for the purpose of influencing domestic politics, then the American public has every right to know about that. And specific to this case, the American public has a right to know whether the FBI and the CIA conspired with foreign agents or governments to hide the source of the DNC email leaks.

With respect to privacy, the Defendants' standards are inconsistent at best. The FBI claims it needs to protect the identities of government personnel, informants, and witnesses, but it openly published the name of witness Jason Fishbein. BATES 10-11 and 22-23. The Plaintiff already has explained in the ICR Motion and the January 5, 2022 email quoted above that Aaron Smith and Deborah Sines waived all privacy claims because they publicly commented about

their roles in the Seth Rich investigation. *See Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995)(Ross Perot had no privacy interest under Exemption 7 because of his previous public comments). Given the Defendants' bad faith, all asserted privacy exemptions should be reviewed carefully in camera.

The FBI's privacy claim with respect to Seth Rich is particularly misguided, because death greatly diminishes privacy rights. *See Am. Civil Liberties Union v. U.S. Dep't of Justice*, 750 F.3d 927, 936 (D.C.Cir. 2014). As an initial matter, there is some degree of confusion about which of Seth's laptops are or were in the possession of the FBI. On page 2 of the Defendants' Response to Plaintiff's Sur-Reply in Opposition to Motion to Stay (Doc. No. 15), the FBI indicates that it had records reflecting receipt of Seth Rich's personal laptop. On the other hand, paragraph 137 of Mr. Seidel's affidavit suggests that the FBI only received a copy of data already extracted from the laptop, but footnote 42 of the same document seems to suggest that the FBI actually possessed the laptop. Either way, the FBI had a duty to segregate exempt materials (*e.g.*, Facebook posts) from non-exempt materials:

> The Court has an "affirmative duty" to consider whether Defendants have satisfied their segregability obligations. *Trans–Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999). Under FOIA, if a record contains some information that is exempt from disclosure, any reasonably segregable information not exempt from disclosure must be released after deleting the exempt portions, unless the non-exempt portions are inextricably intertwined with exempt portions. *Trans–Pac.*, 177 F.3d at 1027.

*Ctr. for Pub. Integrity v. United States Dep't of Commerce*, 401 F. Supp. 3d 108, 115–16 (D.D.C. 2019). The Plaintiff is willing to narrow his request, but he is particularly interested in metadata from Seth's personal laptop. Metadata are records subject to FOIA. *See Long v. Immigration & Customs Enf't*, 279 F. Supp. 3d 226, 234 (D.D.C. 2017). Paragraph 137 Mr. Seidel's declaration and BATES 405-407 indicate that someone absconded with Seth's laptop shortly after the murder, then some time later volunteered what was purportedly a copy of the laptop's contents.

As explained on pages 10-11 of the ICR Motion, Aaron Rich is almost certainly the person who absconded with the laptop. Both Mr. Seidel's declaration and BATES 405-407 indicate that it is uncertain whether someone had tampered with the purported contents of Seth's laptop, and that is why the Plaintiff wants the metadata, *i.e.*, so it can be analyzed for tampering (and perhaps deleted communications). The FBI may not be interested in what was on that laptop or whether someone tampered with its contents, but the Plaintiff and a significant portion of the public are very interested.

<u>**Conclusion and Request for Relief**</u>

The FBI is an agency known for acting in bad faith toward FOIA requestors, but this time the bureau may have outdone itself.  The MSJ should be denied in its entirety, and the Plaintiff's counter-motion should be granted. The Defendants should be directed to produce unredacted copies of all records and items for in camera review, and Plaintiff's Counsel should be permitted to review the documents pursuant to an "attorney eyes only" order. The Plaintiff seeks permission to retain counsel, subject to the Court's approval, who holds the necessary security clearances to view classified documents. The Plaintiff further asks the Court to order the Defendants to:

(1) Search the email accounts and text message accounts of every FBI employee named in the documents that the FBI has produced thus far:

(2) Search the email accounts and text message accounts of every person in the chain of command of the individuals described in Paragraph (1).

(3) Provide a copy of the Plaintiff's FOIA requests to every SCO and FBI employee named in Paragraphs (1) and (2), directing each such employee to declare that he or she either (a) has or has not privately sent, received, or stored communications or records responsive to the Plaintiff's FOIA requests; (b) has or has not made such communications or records available for production to the Plaintiff; and (c) is or is not aware of other individuals who used private means to send, receive, or store responsive communications or records. If the answer to subsection (c) is in the affirmative, then the names of such individuals should be identified by the declarant.

(4) Name all databases and records systems that are (a) under the ownership, operation, or control of the FBI, but (b) not automatically included in the FBI's search indices.

(5) Search the Operational Technology Division, Computer Analysis Response Team, Data Intercept Technology Unit, and all other information technology components of the FBI for responsive records, then process any responsive records for production and/or in camera review.

(6) Search the computers and discs identified in Michael G. Seidel's declaration for responsive records (including metadata), then process any responsive records for production and/or in camera review.

(7) Search the database identified in Paragraphs 163-167 of Mr. Seidel's declaration for responsive records, the process any responsive records for production and/or in camera review.

(8) Respond individually to each request listed in Paragraph 8 of Mr. Seidel's declaration, indicating the search terms and methodologies employed as well as the offices, devices, and accounts searched.

(9) For each document redacted or withheld, identify the request(s) in Paragraph 8 of Mr. Seidel's declaration to which it corresponds.

Finally, the Plaintiff moves the Court to schedule an evidentiary hearing to take the testimony of Mr. Seidel.

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Counsel for Plaintiff Brian Huddleston**

## **<u>Certificate of Service</u>**

On February 8, 2022, I filed a copy of this response with the Court's ECF system, which should result in automatic notification via email to Asst. U.S. Attorney Andrea Parker, Counsel for the Defendants, at <u>andrea.parker@usdoj.gov</u>.

**<u>/s/ Ty Clevenger</u>**
Ty Clevenger