# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| BRIAN HUDDLESTON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:20-CV-00447 |
| | § | Judge Mazzant |
| FEDERAL BUREAU OF | § | |
| INVESTIGATION and UNITED STATES | § | |
| DEPARTMENT OF JUSTICE, | § | |
| | § | |
| *Defendants.* | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are Defendants' Motion for Summary Judgment (Dkt. #39), and Plaintiff's Cross-Motion for Summary Judgment (Dkt. #46). After reviewing the motions and the applicable law, the Court finds that Defendants' motion should be **GRANTED in part** and **DENIED in part**, and Plaintiff's motion should be **GRANTED in part** and **DENIED in part.**

## BACKGROUND

The history of this dispute goes back to July 10, 2016, on the streets of Washington, D.C. Around 4:20 a.m., Seth Conrad Rich ("Seth Rich"), a 27-year-old Democratic National Committee ("DNC") employee, was gunned down and killed in what was purportedly a botched robbery. Almost immediately after his death, rumors began circulating that Seth Rich was responsible for publicly leaking thousands of DNC e-mails related to the involvement of Russian hackers in the presidential election of the 45th President of the United States, Donald J. Trump ("President Trump").

On May 17, 2017, former director of the Federal Bureau of Investigation ("FBI") Robert

Mueller ("Mueller"), was appointed as special counsel to investigate the matter. Approximately two years later, Mueller's report of his investigate findings (the "Mueller Report") was released to the public. The Mueller Report found that the Russian government interfered in the 2016 presidential election in a sweeping and systematic fashion, but it did not find sufficient evidence that President Trump's campaign colluded with the Russians to influence the election. The Mueller Report also found that the Russian government was responsible for publicly releasing the DNC e-mails online, and Seth Rich played no role in this scheme.

I.      *Clevenger v. FBI*

On September 1, 2017, Ty Clevenger ("Clevenger")—Plaintiff Brian Huddleston's ("Huddleston") current counsel of record—submitted a Freedom of Information Act ("FOIA") request to the FBI seeking to obtain information on Seth Rich's involvement in the DNC e-mail leaks. *Clevenger v. D.O.J., et al.*, No. 1:18-CV-1568, 2020 WL 1846565 (E.D.N.Y. Apr. 3, 2020). In relevant part, Clevenger requested "all records and correspondence pertaining to Seth Conrad Rich, who was murdered in the District of Columbia on or about July 10, 2016." *Id.* at *3. His request "included, but was not limited to, any records or correspondence resulting from any investigation of [Seth Rich's] murder." *Id.* By letter dated September 19, 2017, the FBI responded to Clevenger's request, stating the FBI had conducted a search of its central database but was unable to locate any responsive main file records. *Id.* at *7.

On September 30, 2017, Clevenger submitted an administrative appeal of the FBI's determination, alleging the FBI improperly limited its search to only main file records in the FBI's central database. Clevenger alleged the FBI should be compelled to conduct a thorough search, including e-mails and other records, physically or otherwise stored in the FBI's Washington Field Office ("WFO"). On November 9, 2017, the Office of Information Policy ("OIP") affirmed the

FBI's determination.[1] Consequently, Clevenger filed suit against the FBI and the Department of Justice ("DOJ") (collectively, the "Government") in the Eastern District of New York.

On January 27, 2020, Clevenger discovered that a two-page e-mail chain responsive to his request had been produced by the FBI in an unrelated lawsuit brought by Judicial Watch, Inc. The e-mail was sent on August 10, 2016, from an FBI employee in the FBI's WFO to other FBI personnel. The subject line of the e-mail read: "Seth Rich." The e-mail chain began with the WFO employee advising that various news outlets were "[r]eporting today that Julian Assange suggested during a recent overseas interview that DNC Staffer, Seth Rich was a Wikileaks source and may have been killed because he leaked the DNC e-mails to his organization, and that WikiLeaks was offering $20,000 for information regarding Rich's death last month" (Dkt. #54, Exhibit 1 ¶ 6). The WFO employee further advised that additional press coverage was anticipated and wanted to discuss what involvement the FBI had in the investigation. In response, an FBI employee stated that they were aware of the reporting but were not aware of any specific FBI involvement in any related case.

Despite containing Seth Rich's name in both the subject line and body of the e-mail, and despite the context of the e-mail being related to the DNC e-mail leak scandal, this e-mail was never identified or produced by the FBI in response to Clevenger's FOIA request. As a result, Clevenger requested the Eastern District of New York grant summary judgment in his favor, claiming that the Government's search was inadequate because it failed to locate the e-mail and thus failed to search all locations likely to contain records responsive to his request. *Clevenger*, 2020 WL 1846565, at *8. However, the court disagreed. The court found that the Government's search was "reasonably calculated to locate responsive documents." *Id.* at *8, *13. Accordingly,

---

[1] The OIP is a department within the DOJ that oversees agency compliance with FOIA.

on April 3, 2020, the court granted summary judgment in favor of the Government and dismissed

Clevenger's lawsuit. *Id.* at *20.

## II.   *Huddleston v. FBI*

On April 9, 2020, Huddleston submitted his first FOIA request to the FBI that, among other

information, requested all records pertaining to Seth Rich (Dkt. #3, Exhibit 1) (the "First

Request"). Specifically, the First Request sought:

1. All data, documents, records, or communications (electronic or otherwise) created or obtained since January 1, 2016, that discuss or reference Seth Rich or Aaron Rich. This would include, but is not limited to, all data documents, records, or communications in the Washington Field Office, Computer Analysis Response Team ("CART"), and any other "cyber" unit within the FBI.

2. All data, documents, records, or communications regarding any person or entity's attempt to hack into Seth Rich's electronic or internet accounts (e.g., e-mail) after his death.

3. All data downloaded from all electronic devices that belonged to Seth Rich as well as all data, documents, records or communications indicating how the devices were obtained and who was responsible for downloading the information.

4. All data, documents, communications, records or other evidence indicating whether Seth Rich, Aaron Rich, or any other person or persons were involved in transferring data from the Democratic National Committee to Wikileaks in 2016, either directly or through intermediaries. This request includes, but is not limited to, any reports from CrowdStrike, Inc. that were obtained by the FBI while assisting Special Counsel Robert Mueller's investigation.

5. All documents, communications, records or other evidence reflecting orders or directions (whether formal or informal) for the handling of any evidence pertaining to Seth Rich's or Aaron Rich's involvement in transferring data from the Democratic National Committee to Wikileaks.

6. All documents, records, or communications exchanged with any other government agencies (or representatives of such agencies) since January 1, 2016, regarding (1) Seth Rich's murder or (2) Seth Rich's or Aaron Rich's involvement in transferring data from the Democratic National Committee to Wikileaks.

7. All recordings, transcripts, or notes (e.g., FD-302 forms) reflecting any interviews of Aaron Rich, Deborah Sines or any other witness regarding (1) the death of Seth Rich, (2) the transfer of data from the Democratic National Committee to Wikileaks,

4

or (3) any attempt to hack into electronic or internet accounts (e.g., e-mail) belonging to Seth Rich.

8.  All data, documents, records or communication obtained or produced by the FBI's Computer Analysis and Response Team ("CART") or any other FBI cyber unit regarding Seth Rich and/or Aaron Rich.

9.  All data, documents, records or communications (including texts or e-mails) that reflect any meetings or communications from July 10, 2016 until July 10, 2017 between former FBI Deputy Director Andrew McCabe and any and all of the following: (1) Seymour Myron "Sy" Hersh (born on or about April 8, 1937); (2) Washington, D.C. Mayor Muriel Bowser; and/or (3) former Democratic National Committee Interim Chairwoman Donna Brazile.

10. If any of the items or things requested in this subpoena were discarded or destroyed produce all data, documents, records or communication reflecting that fact.

(Dkt. #3, Exhibit 1).

On June 1, 2020, because the Government had not yet responded to Huddleston's First Request, Huddleston filed suit in the Eastern District of Texas (Dkt. #1). On June 1, and June 5, 2020, Huddleston submitted two more FOIA requests (Dkt. #2 ¶¶ 7, 8). Huddleston's June 1 request (the "Second Request") again, in addition to other information, sought records related to Seth Rich:

1.  Documents, records or communications revealing the code names assigned to any and all individuals as part of the Crossfire Hurricane investigation.

2.  Documents, records, or communications revealing the code names assigned to any and all sub-sections of the Crossfire Hurricane investigation.

3.  Documents, records, or communications revealing the code names assigned to Seth Conrad Rich.

4.  Documents, records, or communications revealing the code names assigned to Aaron Nathan Rich.

(Dkt. #3, Exhibit 2). Huddleston's June 5 request (the "Third Request") generally sought the same information as requested in the First and Second Requests (Dkt. #3, Exhibit 3). In sum, the information Huddleston requested through his three FOIA requests related to the following four

topics: (1) records on Seth Rich; (2) records on Aaron Rich; (3) records on Deborah Sines; and (4) records on meetings and communications between former FBI Director Andrew McCabe and Seymour Myron Hersh, Washington D.C. Mayor Muriel Bowser, and DNC Interim Chairwoman Donna Brazile.

By letter dated June 19, 2020, the Government acknowledged receipt of Huddleston's First Request (Dkt. #39, Exhibit 1 ¶ 11). In stark contrast to the FBI's response to Clevenger's nearly identical FOIA request—where again, the FBI found *zero* responsive records—the FBI now acknowledged that it possessed over 20,000 pages of potentially relevant material (Dkt. #10 at p. 2).

By April 8, 2021, the Government asserted that of the potentially 20,000 pages of responsive records, it had "identified approximately 1,563 pages of potentially responsive records for further processing by the FBI" (Dkt. #21 at p. 2). By April 23, 2021, the Government had processed 500 of those pages, releasing 68 pages of material to Huddleston while withholding 508 other pages pursuant to various FOIA exemptions (Dkt. #39, Exhibit 1 ¶ 16). On May 24, 2021, the Government processed another 500 pages, and from that batch, released 52 pages to Huddleston and withheld 448 pages under various FOIA exemptions (Dkt. #39, Exhibit 1 ¶ 17). On June 24, 2021, the Government processed another 489 pages, this time releasing only 5 pages to Huddleston and withholding the remainder under various FOIA exemptions (Dkt. #39, Exhibit 1 ¶ 18). Finally, on July 23, 2021, the Government processed another 31 pages, releasing 2 pages to Huddleston and withholding the rest under various FOIA exemptions (Dkt. #39, Exhibit 1 ¶ 19). As of May 5, 2022, the Government asserts that production is still ongoing (Dkt. #54).

## III.    Relevant Procedural History

On June 15, 2021, Huddleston filed a Motion for *In Camera* Review of "all responsive

documents" in unredacted form that he alleged the Government improperly withheld or redacted (Dkt. #28). At the time, the Government's production of documents was still ongoing. Accordingly, the Court found Huddleston's request premature and denied *in camera* review (Dkt. #32). However, the Court denied the motion without prejudice, indicating that it could be refiled upon completion of the Government's production.

Approximately six months later, on December 26, 2021, the Government filed the present motion for summary judgment (Dkt. #39). The Government attached multiple documents in support, including:

(1) The FBI's *Vaughn* index (Dkt. #39, Exhibit 1 at pp. 156–243);

(2) The OIP's *Vaughn* index (Dkt. #39, Exhibit 2 at pp. 49–64);

(3) The Declaration of Michael G. Seidel ("Seidel"), Section Chief of the Record/Information Dissemination Section, Information Management Division of the FBI, in support of the FBI's *Vaughn* index (Dkt. #39, Exhibit 1 at pp. 1–89) ("Seidel Declaration");[2]

(4) The Declaration of Vanessa R. Brinkman ("Brinkman"), Senior Counsel in the OIP of the DOJ, in support of the DOJ's *Vaughn* index (Dkt. #39, Exhibit 2 at pp. 1–35) ("Brinkman Declaration");[3] and,

(5) The Declaration of Theodore B. Smith ("Smith"), Attorney-Advisor with the Executive Office for United States Attorneys of the DOJ, in support of the DOJ's *Vaughn* index (Dkt. #39, Exhibit 3) ("Smith Declaration").

The *Vaughn* indices collectively discuss approximately 1,596 pages of responsive documents. Of those documents, the Government withheld 1,469 pages under various FOIA exemptions "or as duplicates to material reviewed and processed elsewhere in the productions" that it had already

---

[2] Throughout the pendency of this action, the Government has submitted multiple versions of Seidel's Declaration. Where necessary, the Court will distinguish the versions as follows: (1) Seidel First Declaration (Dkt. #10, Exhibit 1); (2) Seidel Second Declaration (Dkt. #12, Exhibit 1); (3) Seidel Third Declaration (Dkt. #23, Exhibit 1); (4) Seidel Fourth Declaration (Dkt. #39, Exhibit 1 at pp. 1–89); and (5) Seidel Fifth Declaration (Dkt. #54, Exhibit 1).

[3] The Government has filed two different versions of Brinkman's Declaration, which the Court will refer to as Brinkman First Declaration (Dkt. #39, Exhibit 1) and Brinkman Second Declaration (Dkt. #54, Exhibit 2).

provided to Huddleston (Dkt. #39 at p. 21).

On February 7, 2022, Huddleston filed a response and cross-motion for summary judgment, in which he renewed his original request for *in camera* review (Dkt. #46). On May 2, 2022, the Government filed a motion for *in camera* review of a ten-page report (Dkt. #44). On May 6, 2022, Huddleston filed a response to the Government's request for *in camera* review and therein again renewed his original request for review of "all relevant documents" (Dkt. #57). On July 28, 2022, the Court determined that *in camera* review was necessary but not of "all relevant documents" as Huddleston desired (*see* Dkt. #68). Instead, the Court granted *in camera* review only of the Government's ten-page report. The Court has since completed *in camera* review of the report. The Government filed its reply in support of summary judgment on May 2, 2022 (Dkt. #54), to which Huddleston filed a sur-reply on May 21, 2022 (Dkt. #65). Consequently, the parties' cross-motions for summary judgment are now ripe for review.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In general, summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). However, this standard is modified in the FOIA context.

In order to recover on a claim for violation of FOIA, the plaintiff must show "that an agency has (1) improperly (2) withheld (3) agency records." *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980). Thus, "the threshold question in any FOIA suit is whether the requester can even *see* the documents the character of which determines whether they can be released." *Batton v. Evers*, 598 F.3d 169, 175 (5th Cir. 2010) (quoting *Cooper Cameron v. U.S.*

*Dep't of Lab., OSHA*, 280 F.3d 539, 543 (5th Cir. 2002)). The agency is entitled to summary judgment if "the agency proves that it has fully discharged its obligations under FOIA, and there is no genuine issue of material fact, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Gahagan v. U.S.C.I.S.*, 147 F. Supp. 3d 613, 620 (E.D. La. 2015) (citing *Weisberg v. D.O.J.*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)).

When an agency asserts that documents or portions of documents are exempt from disclosure under a FOIA exemption, the court conducts a *de novo* review to ascertain whether the claimed exemption applies. 5 U.S.C. § 552(a)(4)(B); *Cooper Cameron Corp.*, 280 F.3d at 543. The agency has the burden of proving that withheld documents are properly exempt from disclosure and may satisfy this burden through the submission of affidavits or declarations. *Highland Cap. Mgmt., LP v. I.R.S.*, 408 F. Supp. 3d 789, 801 (N.D. Tex. 2019); *Gahagan*, 147 F. Supp. 3d at 620. The affidavits must be clear, specific, and reasonably detailed while describing the withheld information in a factual and nonconclusory manner. *Cooper Cameron Corp.*, 280 F.3d at 543. Thus, "because the burden to establish an exemption remains with the agency, the district court should not grant summary judgment based on a 'conclusory and generalized assertion, even if the FOIA requester has not controverted that assertion.'" *Batton*, 598 F.3d at 175 (quoting *Cooper Cameron Corp.*, 280 F.3d at 543). Accordingly, "a court 'generally will grant an agency's motion for summary judgment *only if* the agency identifies the documents at issue and explains why they fall under exemptions.'" *Id.*

In analyzing affidavits and declarations submitted by an agency, the agency's affidavits are entitled to a "presumption of legitimacy." *Negley v. F.B.I.*, 589 F. App'x 726, 730 (5th Cir. 2014); *see also U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991). A plaintiff can overcome this

presumption through contradictory evidence or by showing that the agency acted in bad faith in handling the plaintiff's FOIA request. *Negley*, 598 F. App'x at 730; *Highland*, 408 F. Supp. 3d at 801. However, this presumption of legitimacy "does not relieve the withholding agency of its burden of proving that the factual information sought falls within the statutory exemption asserted." *Batton*, 598 F.3d at 176 (citing *Stephenson v. I.R.S.*, 629 F.2d 1140, 1145 (5th Cir. 1980)).

Furthermore, while an agency's *affidavits* are entitled to a presumption of good faith, "that does not mean that the agency is entitled to a presumption that its *search* was adequate." *Negley*, 598 F. App'x at 730 (emphasis added). Good faith in responding to a FOIA request, as compared to conducting an adequate search in response to that request, are related, but separate issues. *Id.* at n.7 (citing *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985) ("[O]nce the agency has shown by convincing evidence that its search was reasonable, . . . then the burden is on the requester to rebut that evidence by a showing that the search was not in fact in good faith. Summary judgment would be improper if the adequacy of the agency's search were materially disputed on the record."). So, while a plaintiff can overcome the presumption of legitimacy accorded to an agency's affidavits through a showing of bad faith, "he can defeat summary judgment on the adequacy of the search by presenting evidence that the affidavits do not describe an adequate search." *Id.* (finding that any contrary rule would "impose too high a burden on the plaintiff" and would contravene the summary judgment standard). Thus, in addition to a showing of bad faith, "the plaintiff can prevent summary judgment by introducing evidence that creates a genuine dispute as to the adequacy of the search." *Id.*

## DISCUSSION

Under FOIA, a court may only enjoin an agency from withholding records if those records

are withheld improperly. *Goldgar v. O.I.P.*, 26 F.3d 32, 34 (5th Cir. 1994). If accused of a FOIA violation, the agency must show that (1) it performed an adequate search for responsive documents; and (2) it provided the plaintiff with all the requested documents, except those from which the agency was exempted. *Batton*, 598 F.3d at 175–76.

Presently before the Court are the Government's motion for summary judgment (Dkt. #39) and Huddleston's cross-motion for summary judgment (Dkt. #46). The Government argues it is entitled to summary judgment for two reasons: (1) "the FBI and the OIP have established that the searches were adequate," and (2) "the withholdings under each of the FOIA Exemptions were proper" (Dkt. #39 at p. 6). Huddleston responds by alleging the Government responded to his requests in bad faith and attacking both the adequacy of the Government's search and its use of specific exemptions. Based on these errors, Huddleston requests the Court grant summary judgment in his favor, compel the Government to disclose certain information related to his FOIA requests, and conduct additional searches for potentially responsive records. The Court will address each issue in turn.

## I.      Bad Faith

In support of its motion for summary judgment, the Government submitted declarations from three FBI personnel that generally attest to and describe the Government's responses to Huddleston's FOIA requests and also explain the Government's justifications for withholding certain records. In considering an agency's motion for summary judgment, the agency's affidavits are "entitled to a presumption of legitimacy." *Batton*, 598 F.3d at 176. A FOIA requester can overcome this presumption by putting forth evidence that contradicts the affidavits or evidence of agency bad faith. *Id.* The Court addressed Huddleston's allegations of bad faith in its Order on *In Camera* Review and held that Huddleston had not presented the Court with tangible evidence

suggestive of bad faith sufficient to overcome the presumption of legitimacy afforded to the Government's declarations (Dkt. #68). *See Hall & Assocs. v. E.P.A.*, 846 F. Supp. 2d 231, 246 (D.D.C. 2012) (stating that mere suspicions of wrongdoing are insufficient to overcome the presumption); *Silets v. D.O.J.*, 945 F.2d 227, 231 (7th Cir. 1991) ("There must be tangible evidence of bad faith; without it the court should not question the veracity of agency submissions."). Huddleston has not presented the Court with any other evidence of bad faith that the Court did not already consider in its Order on *In Camera* Review. Accordingly, just as the Court previously held, Huddleston has not sufficiently persuaded the Court that there is tangible evidence of bad faith sufficient to overcome the presumption of legitimacy afforded to the Government's declarations.

## II.   Adequacy of Search

As noted, the Government moves for summary judgment on the basis that the FBI's and OIP's searches for documents responsive to Huddleston's requests were adequate. Huddleston disagrees, specifically challenging the adequacy of the FBI's search. Huddleston does not challenge the adequacy of any search conducted by the OIP. The Court will first discuss the general legal standards applicable to the issue of search adequacy under FOIA.

### A.  Legal Standards

To obtain summary judgment, an agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested. *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). While an agency is not required to search every possible location, once an agency has reason to know that a system may contain responsive documents, it must conduct a search of that location barring undue burden. *Id.*; *see also Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 327 (D.C. Cir. 1999). The Court does not evaluate "'whether there might exist any other documents possibly

12

responsive to the request, but rather whether the *search* for those documents was *adequate*.'"

*Gahagan*, 147 F. Supp. 3d at 622 (emphasis in original) (quoting *Weisberg v. D.O.J.*, 745 F.2d

1476, 1485 (D.C. Cir. 1984)).

Agencies may establish adequacy through a reasonably detailed affidavit which sets forth

the search terms and the type of search performed and avers the agency searched all files likely to

contain responsive materials. *Id.* If an agency alleges that it cannot find records responsive to a

plaintiff's request, then the agency has the burden to prove that the records do not exist. *Goldgar*,

26 F.3d at 34 ("It is the agency's burden to prove the non-existence of the records sought."). "In

situations where records do not exist, affidavits are probably not only sufficient but possibly the

best method of verification." *Stephenson*, 629 F.2d at 1145.

However, if a review of the record raises "substantial doubt" as to the adequacy of the

agency's search, particularly in view of well-defined requests and positive indications of

overlooked materials, summary judgment is inappropriate. *Valencia-Lucena*, 180 F.3d at 326; *see*

*also Negley*, 589 F. App'x at 730 (stating that to prevail against an agency on summary judgment,

"the [plaintiff] needs to point to some genuine dispute as to a material fact that [makes] summary

judgment inappropriate"). Failure to search systems following the discovery of documents which

suggest that another location may uncover relevant materials positively indicates overlooked

materials and thus creates a fact issue as to adequacy of the search. *Id.* That said, the plaintiff

cannot call into question the adequacy of the search by engaging in "[m]ere speculation that [not]

yet uncovered documents may exist." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C.

Cir. 1991).

**B.  The FBI's Database and Indexing Systems**

To show that the FBI's search in this case was adequate, the FBI provided an extensive

explanation of the FBI's database and indexing systems, how those systems are generally searched, and how those systems were searched in this case. In his declaration, Seidel states he is "familiar with the procedures followed by the FBI in responding to requests for information pursuant to FOIA," as well as the specific procedures followed in responding to Huddleston's requests (Fourth Seidel Declaration ¶ 3).

Seidel begins by explaining the FBI's central database system. The Central Records System ("CRS") "is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI" (Seidel Fourth Declaration ¶ 47). The CRS functions as the database for the entire FBI, including the FBI headquarters, field offices, and legal attaché offices worldwide.

Seidel then explains that in 1995, the FBI implemented the Automated Case Support ("ACS") system to aid in electronic, integrated case management accessible by all FBI offices worldwide. ACS contains a feature called the Universal Index ("UNI") which is an automated index that allows the CRS to be searched via ACS. UNI provides all FBI offices with a centralized, electronic means of indexing pertinent information to FBI files for future retrieval via index searching (Seidel Fourth Declaration ¶ 52). According to Seidel, a UNI index search in ACS is capable of locating FBI records in both paper and electronic formats created before its 1995 FBI-wide implementation (Seidel Fourth Declaration ¶ 52). For older records that were not electronically indexed in ACS, the FBI conducts a manual review through the use of paper indices.

Seidel states that ACS remained the leading case management system until 2012 when the FBI began using Sentinel. Since 2012, all newly generated FBI records are created in Sentinel. And in 2018, "ACS was decommissioned and ACS data was migrated into Sentinel, including the ACS indices data and digitized investigative records formerly available in ACS" (Seidel Fourth

Declaration ¶ 54). Now, if a search needs to be conducted of records stored in the CRS or indexed in ACS, the search is conducted through Sentinel. The FBI believes that "[a] search of the CRS automated indices, available within Sentinel and the ACS search function in Sentinel, in most cases represent[s] the most reasonable means . . . to locate records potentially responsive to FOI[A] requests" (Seidel Fourth Declaration ¶ 55).

Finally, Seidel explains that for records related to electronic surveillance sought, administered, or conducted by the FBI, the FBI uses the Electronic Surveillance Indices ("ELSUR"). Information accessible in ELSUR is "indexed within, and searchable by, the same UNI application employed to locate CRS records" (Seidel Fourth Declaration ¶ 59). Thus, while "the ELSUR indices [have] a distinct legal identity from the CRS," the FBI is able to retrieve information indexed in ELSUR and CRS by searching the automated indices in Sentinel (Seidel Fourth Declaration ¶ 59).

### C.  The FBI's General Practices to Locate Responsive Records

Seidel maintains that entries in the FBI's databases are designed to be searched through two general methods: (1) a main index entry search and (2) a cross-reference index entry search. A main index entry "is created for each individual or non-individual that is the subject or focus of an investigation," and will identify the main subject in the case title of the file (Fourth Seidel Declaration ¶ 49). So, for example, a main entry search for "John Doe" would populate any records where "John Doe" is mentioned in the document's title. Compared to a main index entry, a reference index entry "is created for each individual or non-individual associated with an investigation, but who or which are not the main subject or focus of the investigation," and thus will not be identified in the case title of the file (Fourth Seidel Declaration ¶ 49). However, the FBI only indexes information it considers of sufficient significance for its future retrieval. In other

words, "the FBI does not index every individual name or other subject matter" mentioned in a record in the CRS (Seidel Fourth Declaration ¶ 50). Thus, as particularly relevant to a reference entry, the entry will not populate in a search unless the FBI indexing agent subjectively believed the entry contained information of sufficient significance about the desired search term subject to justify future retrieval of that entry related to that subject. Using the same example as before, a cross reference entry search for "John Doe" would populate any records where the indexing agent had determined that the record mentioned or discussed "John Doe" in a manner sufficiently significant to warrant retrieval of that information for future searches of information related to "John Doe," even though his name may not be contained in the title of the record.

FOIA requests are handled within the FBI by the Record/Information Dissemination Section ("RIDS"). When the FBI receives a FOIA request, RIDS generally begins by searching, gathering, analyzing, and sorting potentially relevant records indexed within the various FBI records systems. But while Sentinel, and the CRS and ACS via Sentinel, serve as the FBI's initial and primary means for locating records in response to a FOIA request, "the identification of records indexed . . . does not automatically mean the indexed records are responsive to the subject" (Seidel Fourth Declaration ¶ 56). Rather, while "[i]ndex searches are the means by which potentially responsive records are located," ultimately a RIDS analyst must "consider potentially responsive indexed records against the specific parameters of individual requests" (Seidel Fourth Declaration ¶ 56). The RIDS analyst will then make a responsiveness determination "to determine the total pool of records responsive to an individual request" (Seidel Fourth Declaration ¶ 56).

Further, when conducting a search of the FBI's databases, RIDS' initial standard search is conducted only to identify main index entries responsive to the request (Seidel Fourth Declaration ¶ 60). RIDS generally does not conduct a cross-reference index entry search to locate any reference

material potentially responsive to a plaintiff's request unless and until the plaintiff files a lawsuit against the FBI (Seidel Fourth Declaration ¶ 60).

### D.  The FBI's Search in Response to Requests Related to Seth Rich

One of the main reasons Huddleston argues the FBI's search was inadequate is based on the inconsistent results of responsive records located by the FBI in response to Clevenger's request for information on Seth Rich compared to Huddleston's request for information on Seth Rich. Thus, the Court will briefly describe the methods and procedures the FBI used for each before addressing whether the FBI's search for records in response to Huddleston's request was adequate.

In response to Clevenger's September 1, 2017 FOIA request, RIDS first conducted an index search of the CRS for responsive main index and reference index records by employing the UNI application of ACS. *Clevenger*, 2020 WL 1846565 at *3. For this search, RIDS used the terms "Seth, Conrad," "Conrad, Seth," and "Seth, Conrad, Rich." *Id.* at *3 n.8. This search located no main index or reference index records. The FBI then conducted a search of its Sentinel index for both main and reference file records using the same search terms as before. *Id.*  This search again resulted in no main or reference file records being located. *Id.* In addition to the above search efforts, the FBI contacted the WFO twice and confirmed that the WFO did not open an investigation into the murder of Seth Rich. *Id.* at *4, *8. However, the FBI did not search the WFO's e-mail system, stating it was "only required to search locations reasonably calculated to yield responsive records" and contending there was no reasonable basis to conclude that responsive records would be located by a search of the WFO's e-mail systems. *Id.* The FBI explained that all records with "investigative significance" are placed in the CRS for record keeping. *Id*. Thus, according to the FBI, to the extent any responsive WFO e-mails or records of the Computer Analysis Response Team ("CART") existed, they would have been located through the FBI's CRS

searches. *Id*. at *9.

In comparison, the first search the FBI conducted in response to Huddleston's request was not RIDS' standard main index entry search. Rather, on June 15, 2020, after Clevenger notified the FBI as to the existence of the two-page e-mail chain, RIDS began by consulting with United States Office of Special Counsel ("SCO") personnel who had first-hand knowledge of the files that the SCO maintained in the FBI's CRS which were, and continue to be, reviewed and processed in response to the Judicial Watch FOIA request (Fourth Seidel Declaration ¶ 64). Based on the SCO employees' knowledge of the contents of the records processed in the Judicial Watch case, it was determined that several of the records mentioned Seth Rich. As a result, RIDS then conducted a term search of the text of all the Judicial Watch material to determine if any of those records were responsive to Huddleston's request (Fourth Seidel Declaration ¶¶ 61, 64). For this search, RIDS used the terms "Seth Rich" and "Seth Conrad Rich" to search the files that SCO maintained in the FBI's CRS. This search resulted in the location of numerous reference records potentially responsive to Huddleston's request.

Then, on July 6, 2020, RIDS conducted the FBI's standard search for main index entry and cross-reference index entry records stored within CRS, just as it had for Clevenger's request. For this standard search, RIDS searched CRS by employing the Sentinel indices and the ACS indices available through Sentinel for the following search terms: "Seth Rich" and "Seth Conrad Rich" (Seidel Fourth Declaration ¶ 63). This search located no responsive main or reference files indexed in CRS. To explain why the two-page e-mail chain and other Judicial Watch documents were not discovered through the FBI's standard index search, the FBI states that the "content of the e-mail and the fact that it was not indexed to subject Seth Rich indicates it was not deemed of sufficient significance for future retrieval" (Fourth Seidel Declaration ¶ 7). Thus, despite the fact the FBI

determined several of the SCO's documents stored in the FBI's CRS were responsive to Huddleston's request, these documents were not able to be located through a main entry or reference entry search because the FBI agent that originally indexed the records did not find any information or discussions about Seth Rich contained within the documents to be significant.

After the FBI determined that some files mentioning Seth Rich existed within CRS, but were not locatable through a standard index search, RIDS circulated a request to other FBI offices that may potentially have similarly indexed records responsive to Huddleston's request (Fourth Seidel Declaration ¶ 65). Specifically, RIDS forwarded Huddleston's request to the FBI Headquarters, Office of Public Affairs, and the WFO, asking each office to conduct a search of their database systems, as well as paper and manual files, for any other responsive records (Fourth Seidel Declaration ¶ 65). In addition, RIDS "recommended that each recipient division/unit circulate the request among those in its Division/Office reasonably likely to possess responsive records" (Fourth Seidel Declaration ¶ 65). Each of these offices reported back to RIDS that they had completed the requested searches and no responsive records were located.

Moreover, just like in Clevenger's case, the WFO confirmed that it "did not open an investigation into the murder of Seth Conrad Rich, nor did it provide investigative or technical assistance," such as through CART, to the Metropolitan Police Department ("MPD") (Fourth Seidel Declaration ¶ 136).[4] Thus, because the WFO never investigated Seth Rich's murder, the FBI determined that an electronic search of the WFO's e-mail database was not reasonably likely to locate responsive records. The FBI also states that "[t]o the extent there were relevant [WFO] e-mails, they would have been serialized and indexed in the CRS for recordkeeping [and] future

---

[4] Seth Rich's death was investigated by the MPD. Soon after his death, the WFO offered to assist the MPD with its investigation; however, MPD declined the offer (Fourth Seidel Declaration ¶ 136). As a result, the FBI states it did not open an investigation into the murder of Seth Rich, nor did it provide investigative or technical assistance to MPD.

retrieval and located through the FBI's CRS search" (Fourth Seidel Declaration ¶ 66).

Finally, by e-mail dated February 8, 2021, OIP referred the FBI to approximately 1,296 pages and a link to an excel spreadsheet totaling 75 pages of potentially responsive records, from which the FBI ultimately handled approximately 180 pages (Fourth Seidel Declaration ¶ 14). These records consisted, in relevant part, of SCO e-mail communications. RIDS consulted with SCO employees, and determined, based on a review of the SCO files, that no responsive material existed within these documents (Fourth Seidel Declaration ¶ 67). However, from these documents, the FBI did identify a lead to additional potentially responsive material maintained in a non-SCO related file within the FBI's San Francisco Field Office. As a result, the FBI conducted a term search of the San Francisco Field Office's investigative files using the terms "Seth Rich" and "Seth Conrad Rich." This search resulted in the location of additional responsive reference records (Fourth Seidel Declaration ¶ 67).

In the end, the FBI's various searches located over 20,000 pages of non-indexed reference records potentially responsive to Huddleston's request for information on Seth Rich. Of that, 1,596 pages were determined to be responsive to Huddleston's request (Fourth Seidel Declaration ¶ 181).

### E.  Whether the FBI's Search was Adequate

Based on the above information, the FBI claims it adequately conducted its search, citing the terms used and its search of its database systems, as well as its search of various individual FBI offices that leads suggested potentially possessed relevant records (Dkt. #39 at pp. 20–25). The FBI further avers that the search was reasonably calculated to uncover potentially responsive documents and that the agency followed all leads in its search. Huddleston raises several arguments as to why the FBI's search was inadequate.

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt

that its search was reasonably calculated to uncover all relevant documents." *Valencia-Lucena*, 180 F.3d at 325. The agency bears the burden of demonstrating that its search was reasonably calculated to uncover all relevant documents. *Highland*, 408 F. Supp. 3d at 801; *Gahagan*, 147 F. Supp. 3d at 620. If the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Valencia-Lucena*, 180 F.3d at 32

Huddleston first argues that the FBI's indexing systems "are worthless" because no files were located through the FBI's standard index search in responding to either his or Clevenger's request. Huddleston is correct that the standard main entry and reference entry searches of the FBI's CRS system conducted in this case and Clevenger's failed to locate any responsive records. In particular, the standard searches failed to locate the 20,000 pages of potentially relevant material, including the two-page e-mail chain that states "Seth Rich" in both the subject line and the body of the e-mail. However, as a general rule, an agency's failure to locate a few pages or a specific document is not alone sufficient to find the agency's search was inadequate. *See, e.g.*, *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (finding agency's failure "to turn up one specific document in its search does not alone render a search inadequate"). But the FBI did not miss "a few pages" here. The FBI missed *20,000 pages*. Such a high rate of error in populating responsive documents is alarming and brings into question whether the FBI's standard CRS index search is truly "the most reasonable means . . . to locate records potentially responsive to FOI[A] requests" as the FBI wants this Court to believe (Seidel Fourth Declaration ¶ 55).

Even so, the fact that an agency failed to locate a large volume of records does not, by itself, compel a finding that the agency's search was inadequate. *See Batton*, 598 F.3d at 176 (explaining that while a claimant may assert that other documents exist that were not located in

the agency's search, a court "must decide only whether the search was adequate"); *Negley*, 589 F. App'x at 731 (finding claimant's allegation that agency's search failed to locate potentially 500,000 documents did not alone demonstrate inadequacy). That is, *unless* the claimant can demonstrate that the agency failed to follow up on a clear lead identifying a particular type of record or location where responsive documents may be located. *Negley*, 589 F. App'x at 731 (citing *Campbell v. D.O.J.*, 164 F.3d 20, 27, 28 (D.C. Cir. 1998)). In Clevenger's case, after the FBI conducted its initial search locating no responsive records, Clevenger notified the FBI of the existence of the Judicial Watch e-mail chain and its relevance to his request (Case No. 1:18-CV-01568, E.D.N.Y., Dkt. #51). At that time, the FBI responded that "[t]he e-mail cited by [Clevenger] is simply a casual inquiry with a single reference to [Seth] Rich prompted by something reported in news coverage. It is not a substantive e-mail concerning Rich that would have been that indexed, and therefore, located through the CRS searches for records pertaining to Rich" (Case No. 1:18-CV-01568, E.D.N.Y., Dkt. #52 at p. 3). The FBI then reaffirmed its stance that "the search of the CRS conducted by the FBI" was adequate because it was conducted in a manner that "would have located records for 'Seth Rich'" (Case No. 1:18-CV-01568, Dkt. #52 at p. 3).

Undoubtedly, this was proven false by the responsive documents the FBI located in responding to Huddleston's requests in the present case. To be sure, the FBI repeatedly cites to the e-mail chain and other documents produced in the Judicial Watch case as the reason the FBI searched for, and found, the thousands of pages of documents potentially responsive to Huddleston's request (Seidel Fourth Declaration ¶¶ 61, 64–67). Thus, while the search in Clevenger's case may not have been inadequate simply because the FBI failed to locate these potentially responsive documents, *Negley*, 589 F. App'x at 731, an agency's search is inadequate if the agency failed to locate documents because it did not follow up on a clear lead. *See Halpern*

*v. F.B.I.*, 181 F.3d 279, 288–89 (2d Cir. 1999) ("When the request demands all agency records on a given subject[,] [ ] the agency is obliged to pursue any 'clear and certain lead' it cannot in good faith ignore."); *Meeropol v. Meese*, 790 F.2d 942, 953 (D.C. Cir. 1986) ("[I]t would be unreasonable to expect even the most exhaustive search uncover *every* responsive file[,] what is expected of a law-abiding agency is that it admit and correct error when error is revealed.").

Nonetheless, the FBI's apparent failure to follow up on a lead in Clevenger's case, which it now recognizes was indicative of responsive documents related to Seth Rich, does not result in the FBI's search being inadequate in the present case. In contrast to Clevenger's case, the FBI here went beyond its standard CRS index search. In responding to Huddleston's requests, based on RIDS' review of the documents produced in Judicial Watch, RIDS conducted a search of SCO files maintained in the FBI's CRS. Further, based on a lead contained in documents referred to the FBI by the OIP, the FBI conducted a search of non-SCO related files within the San Francisco Field Office. Additionally, the FBI forwarded Huddleston's FOIA requests to the FBI Headquarters, Office of Public Affairs, and the WFO and instructed these offices to search for any potentially responsive records. The FBI submitted Seidel's declaration, which sufficiently details these searches conducted by the FBI, the parameters of those searches, and the results from each search. In the absence of contrary evidence, Seidel's declaration is sufficient to demonstrate the FBI conducted an adequate search in compliance with FOIA. *See Negley*, 598 F. App'x at 730; *Highland*, 408 F. Supp. 3d at 801.

Despite the searches of these various offices, Huddleston contends that the FBI's search was inadequate because it did not search WFO e-mail accounts and text messages. The Court is not persuaded by this argument. First, "[t]here is no requirement that an agency search every record system." *Oglesby*, 920 F.2d at 68. Rather, "[w]hen a plaintiff questions the adequacy of the search

an agency made in order to satisfy its FOIA request, the key question is whether the search was *reasonably calculated* to discover the requested documents, and not whether every document in existence was found by the search." *Cui v. FBI*, 551 F. Supp. 3d 4, 18 (E.D.N.Y. 2021) (internal quotations and citations omitted) (emphasis added). The WFO is the FBI local field office for Washington, D.C. Thus, based on its location, the WFO presumably would be the local field office that would have investigated Seth Rich's death were the FBI to open an investigation.[5] However, because local law enforcement did not accept the WFO's offer to assist with the investigation, Seidel maintains that neither the WFO, nor the FBI, have ever opened an investigation into Seth Rich's death (Fourth Seidel Declaration ¶ 136). Accordingly, as Seidel indicates, the WFO would not be reasonably likely to possess any investigatory records related to Seth Rich.

Huddleston argues, however, that the two-page e-mail chain, which originated within the WFO, indicates that the WFO may possess responsive records. However, as the FBI points out, the contents of the e-mail confirm that the WFO did not open an investigation into Seth Rich's death. Thus, the WFO would not have any investigatory records as no investigation existed. Furthermore, other than this two-page e-mail, the FBI contends that there were no leads contained in any of the records the FBI processed here indicating that the WFO might possess other responsive documents. From this, the FBI concludes that any records of significance the WFO may possess would already be indexed in the FBI's CRS. Accordingly, the Court finds no error in the FBI's determination that the WFO was not reasonably likely to possess other records responsive to Huddleston's request. *See Nolen v. D.O.J.*, 146 F. Supp. 3d 89, 97 (D.D.C. 2015) (stating that a search is generally adequate where the agency explained "why the specified [challenged] record systems are not reasonably likely to contain responsive records").

---

[5] This is further indicated by the WFO's offer to assist MPD with its investigation into Seth Rich's death (Fourth Seidel Declaration ¶ 136).

Moreover, to the extent Huddleston believes the WFO has additional responsive records, the WFO has represented otherwise. As discussed, the FBI forwarded Huddleston's request to the WFO and instructed the WFO to conduct a search of their database systems, as well as paper and manual files, for any records responsive to Huddleston's requests (Fourth Seidel Declaration ¶ 65). The WFO responded that it conducted the requested search and was unable to locate any responsive records. Thus, unlike in Clevenger's case where he argued inadequacy because no search of the WFO was conducted, the FBI *did* initiate a search of the WFO's records here. No responsive records were found. Accordingly, based on the evidence currently before the Court, the Court finds Huddleston's arguments "are insufficient to require the FBI to conduct further searches" of the WFO. *See Mobley v. C.I.A.*, 924 F. Supp. 2d 24, 44 (D.D.C. 2013); *see also Stone v. D.O.J.*, No. 3:19-CV-985, 2020 WL 5134755, at *2 (N.D. Tex. Aug. 10, 2010) ("While it is the agency's burden to prove the non-existence of records sought, an agency meets that burden by providing evidence that the FOIA officer conducted a thorough search of the agency's records to no avail.").

Lastly, along the same lines, Huddleston argues that the FBI's search was inadequate because the FBI did not search CART or other cyber units, and it did not search private e-mail accounts, text messages, and private storage drives of certain FBI employees. The FBI responds that all FBI employees are required to store agency records on CRS or other FBI databases (Fifth Seidel Declaration ¶ 10). Thus, to the extent any responsive records existed from these sources, the FBI contends that the records would be indexed in CRS. Specifically in regards to private communication devices, the FBI further explains that these are not the types of sources that would typically be expected to contain agency records, and Huddleston has not articulated any facts to suggest otherwise (Dkt. #54 at p. 5). As previously stated, a plaintiff's "mere speculation that [not]

yet uncovered documents might exist, does not undermine" the adequacy of the agency's search. *SafeCard Servs.*, 926 F.2d at 1201. Through Seidel's declaration, the FBI has sufficiently explained why these additional sources were not searched in this case. Moreover, Huddleston has made no showing that, by the close of the FBI's search, clear leads had emerged suggesting a need to conduct a further search of these sources. Thus, the Court finds that the FBI's decision to not search these additional sources was reasonable under the circumstances and does not render the FBI's search inadequate.

In sum, the Court finds that the FBI conducted a legally adequate search using "methods which can be reasonably expected to produce the information requested" in Huddleston's FOIA requests. *Batton*, 598 F.3d at 176. Accordingly, the FBI is entitled to summary judgment on this issue.

### F.  Whether the OIP's Search was Adequate

As a preliminary matter, it is unclear from Huddleston's motion for summary judgment whether he believes any search conducted by the OIP in this case was inadequate. Huddleston never alleges bad faith on the part of OIP, nor does he directly challenge the adequacy of the OIP's searches or search methods. However, a footnote in Huddleston's motion states it is unclear "whether the OIP searched the text messages of SCO personnel" and thus requests the Court direct the OIP to search these sources (Dkt. #46 at p. 8 n.3). To the extent Huddleston is challenging the adequacy of the OIP's searches, the Court is not persuaded by Huddleston's arguments.

Brinkman's First Declaration exhaustively describes the role of the OIP in responding to Huddleston's FOIA requests. Brinkman explains the OIP's databases, search methods, search process, and search parameters, both generally and as-applied to Huddleston's requests, and discusses the results of those searches (Brinkman First Declaration ¶¶ 20–31). Other than the OIP's

search of text messages, Huddleston does not challenge any of this information. Thus, Brinkman's declaration is entitled to a presumption of legitimacy, and Huddleston has asserted no basis to overcome this presumption. *See Negley*, 598 F. App'x at 730.

Regarding OIP's search of text messages, Brinkman states that the OIP "has no indication that any text messages responsive to [Huddleston's] request exist that would not have been captured within OIP's searches, and OIP identified no leads that would suggest that any such text messages exist" (Second Brinkman Declaration ¶ 6). The OIP thus contends that Huddleston's potential argument of inadequacy "miss[es] the mark" (Dkt. #54 at p. 6). The OIP correctly states that the question is not whether OIP "should have addressed private communications or storage in their declarations, but rather, given the presumption of regularity that agency employees adhere to agency policy, whether [Huddleston] has provided any evidence that that presumption should be overcome" (Dkt. #54 at p. 6). Huddleston did not address the OIP's argument in his sur-reply (Dkt. #65). Regardless, the Court agrees with the OIP. Huddleston has not provided any evidence indicating that a search of SCO employee text messages by the OIP would be reasonably expected to produce information potentially responsive to his requests. *Oglesby*, 920 F.2d at 68; *Batton*, 598 F.3d at 176. Accordingly, the DOJ is entitled to summary judgment on this issue.

## III.   Applicability of Exemptions

The FOIA mandates broad disclosure of government records to the public, subject to nine enumerated exceptions. *See* 5 U.S.C. § 552(b). Based on FOIA's broad disclosure purpose, the Supreme Court has "consistently stated that FOIA exemptions are to be narrowly construed." *D.O.J. v. Julian*, 486 U.S. 1, 8 (1988)). When an agency asserts that documents or portions of documents are exempt from disclosure under a FOIA exemption, the court conducts a *de novo* review to ascertain whether the claimed exemption applies. 5 U.S.C. § 552(a)(4)(B); *Cooper*

*Cameron Corp.*, 280 F.3d at 543. Here, The FBI withheld information under a variety of FOIA exemptions, including Exemptions 1, 3, 4, 5, 6, and 7 (Dkt. #39 at p. 32).[6] Huddleston claims that the FBI improperly withheld information under specific exemptions. Each challenged exemption is discussed below.[7]

### A.  Exemption 1

Huddleston challenges the FBI's withholding of information under FOIA Exemption 1. FOIA Exemption 1 exempts records from disclosure which are:

> (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.

5 U.S.C. § 552(b)(1). Where an agency withholds information under Exemption 1, the agency "must provide an affidavit, explaining in as much detail as possible, the Executive order covering the information and the basis for its claim that it can be required neither to confirm nor deny the existence of the requested records." *Blum v. N.S.A.*, No. A-09-CA-769, 2010 WL 11537459, at *3 (W.D. Tex. Apr. 12, 2010), *aff'd*, 424 F. App'x 358 (5th Cir. 2011) (citing *McNamera v. D.O.J.*, 974 F. Supp. 946, 953 (W.D. Tex. 1997)).

Pursuant to this exemption, the FBI withheld or redacted, among other information, details of intelligence activities, sources, and methods related to national security. Seidel cites to Executive Order 13526 ("E.O. 13526"). E.O. 13526 protects from disclosure classified information on matters of national security (Fourth Seidel Declaration ¶ 77). For information to fall under E.O. 13526's protection, the following requirements must be satisfied:

---

[6] The OIP also withheld information pursuant to FOIA Exemptions 3, 4, 6, and 7. Neither Huddleston's motion nor any of his responsive pleadings make any mention of the OIP's use of these exemptions, and there is no indication on the record that Huddleston is claiming the OIP improperly withheld information. Thus, Huddleston has not asserted a fact issue exists related to the propriety of the OIP's withholding of information under these exemptions. Accordingly, the Court finds in favor of the DOJ on this issue.

[7] Huddleston did not challenge several other exemptions the FBI raised to withhold documents, and thus the Court does not address those exemptions.

(1)   An original classification authority is classifying the information;

(2)   The information is owned by, produced by or for, or is under the control of the United States Government;

(3)   The information falls within one or more of the categories of information listed in § 1.4 [of E.O. 13526]; and

(4)   The original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage

Exec. Order No. 13,526, § 1.1, 75 Fed. Reg. 707 (Jan. 5, 2010).

All of the above requirements are satisfied in this case. Seidel states that he holds original classification and declassification authority pursuant to §§ 1.3 and 3.1 of E.O. 13526 (Fourth Seidel Declaration ¶ 2). Any responsive documents in this case were produced by the FBI and the OIP, which are agencies of the United States Government. Further, Seidel, in his capacity as Section Chief of RIDS, determined that the requested information concerned intelligence activities, intelligence sources or methods, and foreign relations or foreign activities of the United States (Fourth Seidel Declaration ¶¶ 2, 81). Accordingly, the FBI has satisfied E.O. 13526's requirements for the information to be subject to classification. Thus, the intelligence activities, sources, and methods withheld by the FBI are properly classified under E.O. 13526 and are exempt from disclosure if the FBI has established that public disclosure of the information will harm national security.

Seidel states that the information was withheld "to protect intelligence methods utilized by the FBI for gathering intelligence data" (Fourth Seidel Declaration ¶ 82). Seidel explains that releasing this information could cause "serious or exceptionally grave damage" to the national security of the United States for the following reasons: "(1) disclosure would allow hostile entities

to discover the current intelligence gathering methods used by the FBI; (2) disclosure would reveal current specific targets of the FBI's national security investigations; and (3) disclosure would reveal the determination of the criteria used and priorities assigned to current intelligence and counterintelligence investigations" (Fourth Seidel Declaration ¶ 83).

In reviewing national security concerns under Exemption 1, courts "have consistently deferred to executive affidavits predicting harm to the national security and have found it unwise to undertake searching judicial review." *Ctr. for Nat. Sec. Stud. v. D.O.J.*, 331 F.3d 918, 927 (D.C. Cir. 2003). Thus, while FOIA exemptions are generally reviewed under a *de novo* standard, an agency's affidavit on national security issues is accorded substantial weight "because the Executive departments for national defense and foreign policy matters have unique insights into what adverse [e]ffects might occur as a result of a particular classified record." *Id.* (internal quotations and citations omitted). Accordingly, an agency's statements supporting exemption need only "contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption." *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009). Where no evidence on the record suggests otherwise, "the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions." *Id.*

Huddleston specifically questions the FBI's motive for invoking Exemption 1. He argues that there is no national security interest related to information on Seth Rich. Instead, he claims the exemption was invoked "to prevent embarrassment to . . . the SCO, the FBI and their senior management" related to the alleged collusion between President Trump and the Russians, and an alleged cover-up of the FBI and CIA's conspiracy to overthrow President Trump (Dkt. #46 at pp. 24–26). Huddleston admits that none of these claims are "established with certainty" (Dkt. #46

at p. 26). Further, Huddleston "is not asking the Court to overrule Exemption 1 at this stage, but [rather] to permit further discovery" (Dkt. #46 at p. 23).

Huddleston's speculation about the FBI's motive for withholding information under Exemption 1 is not sufficient to demonstrate that the information was improperly withheld. First, Seidel's declaration, which is entitled to substantial weight in this area, *Ctr. for Nat. Sec. Stud.*, 331 F.3d at 927, sufficiently details why the information falls within Exemption 1, and why disclosure of that information would be detrimental to national security. Moreover, regardless of Huddleston's opinion on national security, the Court will not second-guess issues the Government has deemed to have importance to national security concerns. *See id.*; *Larson*, 565 F.3d at 865. Thus, the Court finds that the FBI properly withheld information under Exemption 1. Accordingly, the FBI is entitled to summary judgment on this issue.

### B.  Exemption 3

Huddleston challenges the FBI's withholding of information under FOIA Exemption 3. FOIA Exemption 3, 5 U.S.C. § 522(b)(3), states that an agency need not disclose any documents "specifically exempted from disclosure by statute" if the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular type of matters to be withheld." *Batton*, 598 F.3d at 177.[8]

The FBI asserted Exemption 3 pursuant to the National Security Act of 1947 as amended by the Intelligence Reform and Terrorism Prevention Act of 2003, 50 U.S.C. § 3024(i)(1). The

---

[8] To clarify the interplay between FOIA exemptions and other applicable statutes, FOIA exemptions do not mandate an agency's nondisclosure of certain information. To be sure, FOIA exemptions "do nothing more than vest an agency with discretion to withhold information that must otherwise be disclosed." *Sealed Appellee #1 v. Sealed Appellant*, 199 F.3d 437, 1999 WL 1067548, at *2 (5th Cir. 1999) (unpub.). However, "[i]f another statute or regulation bars release of the information," and that statute qualifies as a withholding statute under the specific FOIA exemption at issue, "the agency lacks discretion to disclose" the information. *Id.* (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 291–94 (1979)).

National Security Act makes the Director of National Intelligence responsible for "protect[ing] from unauthorized disclosure intelligence sources and methods." § 3024(i)(1); *see also CIA v. Sims*, 471 U.S. 159 (1985) (concluding that the National Security Act qualifies as a withholding statute under Exemption 3). Pursuant to the authority vested by the National Security Act, the Director of National Intelligence promulgated Intelligence Community Directive 700, which provides that the heads of the Intelligence Community shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure" (Fourth Seidel Declaration ¶ 96 (citing Intelligence Community Directive 700, June 7, 2012, ¶ E. 2a)). The FBI is one of the eighteen member agencies compromising the Intelligence Community, and as such, must abide by this directive.

Huddleston does not raise any challenges specific to Exemption 3. Rather, he "incorporates his previous discussion of Exemption 1" on national security (Dkt. #46 at p. 26). Seidel explains that the FBI withheld certain intelligence sources and methods under Exemption 3 because this information, if revealed, would compromise the agency's intelligence-gathering efforts (Fourth Seidel Declaration ¶ 97). Therefore, Seidel states that the FBI is prohibited from disclosing the information under the National Security Act. Seidel further explains that Exemption 3 was also raised to protect Federal Grand Jury Information pursuant to Federal Rule of Criminal Procedure (6)(e), and pen register information under the Pen Register Act, 18 U.S.C. § 3123(d). Huddleston concedes that grand jury information and pen register information are properly exempt from disclosure under Exemption 3 (Dkt. #46 at p. 26).

In *Sims*, the Supreme Court analyzed the National Security Act under Exemption 3, and unequivocally instructed that "it is the responsibility of the Director of [National] Intelligence, not of the judiciary, to weigh the variety of complex and subtle factors in determining whether

disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." *Sims*, 471 U.S. at 180. The Fifth Circuit later addressed this holding, stating that *Sims* "stands for the proposition that because [the National Security Act] is a withholding statute under [Exemption 3], the FOIA simply does not apply to material the [Director of National Intelligence] specifically has exempted on the ground that it pertains to or could give rise to inferences about intelligence sources and methods." *Knight v. CIA*, 872 F.2d 660, 664 (5th Cir. 1989). Thus, in the absence of bad faith, the Fifth Circuit held it was unwilling to second guess the Director of National Intelligence or his designees on issues of national security. *Id.* "What may seem overbroad or trivial to [the court] 'may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context.'" *Id.* at 664–65 (quoting *Sims*, 471 U.S. at 178).

Given the broad authority intelligence agencies have to withhold information on national-security grounds or on the basis that disclosure of the information would threaten intelligence-gathering efforts, the Court finds the FBI has sufficiently shown that it properly withheld information under Exemption 3. Accordingly, the FBI is entitled to summary judgment on this issue.

### C.  Exemption 4

Huddleston challenges the Government's withholding of information under FOIA Exemption 4. FOIA Exemption 4 exempts records that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 522(b)(4). Thus, Exemption 4 "appl[ies] to commercial information supplied to government agencies under regulatory requirements." *Hoover v. U.S. Dep't of the Interior*, 611 F.2d 1132, 1146 n.5 (5th Cir. 1980).

Under this exemption, "[i]nformation is 'confidential' only if its disclosure is likely to impair the government's ability to obtain necessary information in the future or to cause substantial harm to the competitive position of the person from whom the information was obtained." *Sharyland Water Supply Corp. v. Block*, 755 F.2d 397, 398 (5th Cir. 1985) (internal citations omitted). "To prove substantial competitive harm, the party seeking to prevent disclosure must show by specific factual or evidentiary material, not conclusory or generalized allegations, that it actually faces competition and that substantial competitive injury would likely result from disclosure." *Id.* "When a person shows that information or materials fall within [E]xemption 4, the government is precluded from releasing" the information. *Sealed Appellee #1 v. Sealed Appellant*, 199 F.3d 437, 1999 WL 1067548, at *3 (5th Cir. 1999) (unpub.).

Pursuant to Exemption 4, the FBI withheld a ten-page report (the "Report"). The FBI contends the Report was clearly marked as "Copyright Propriety and Confidential – Not to be Shared with Third Parties" (Dkt. #54 at p. 17). To determine if the Report qualified for protection under Exemption 4, the FBI contacted the private commercial institution the Report was obtained from. The institution responded that the information located by the FBI was treated as private by the institution, and it was shared with an expectation the FBI would not disclose the information publicly (Fourth Seidel Declaration ¶ 103). Specifically, the institution stated that the information in the Report was proprietary in nature and any public release would be detrimental to their commercial interests (Fourth Seidel Declaration ¶ 103). The institution informed the FBI it would not have supplied the Report originally without a belief the FBI would hold the information in confidence (Fourth Seidel Declaration ¶ 103). Based on the institution's response, the FBI determined the Report contained confidential information and was provided to the FBI under an assurance of confidentially, and consequently was exempt from disclosure under Exemption 4.

Huddleston generally contends that it is impossible to tell from Seidel's declarations even the general nature of the information in the Report. To this, the FBI stated that additional information concerning the Report could not be provided without revealing the contents of the Report or violating the assurance of confidentiality the FBI gave to the institution.

To resolve this dispute, the Court conducted *in camera* review of the Report. *See* (Dkt. #68). After conducting *in camera* review, the Court is satisfied that the FBI properly withheld the Report under Exemption 4. The Court also agrees that further information about the Report cannot be disclosed under FOIA without revealing the confidential information contained therein. Accordingly, the FBI is entitled to summary judgment on this issue.

### D.  Exemption 5

Huddleston challenges the FBI's withholding of information under FOIA Exemption 5. FOIA Exemption 5 states that an agency may withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Courts have interpreted this provision to cover materials that "'reflect the personal opinions of the writer rather than the policy of the agency,' but not 'factual material that does not reveal the deliberative process.'" *Batton*, 598 F.3d at 183 (quoting *Morley v. C.I.A.*, 508 F.3d 1108, 1127 (D.C. Cir. 2007)). Thus, "Exemption 5 incorporates the privileges which the government enjoys under the relevant statutory and case law in the pretrial discovery context." *Diocesan Migrant & Refugee Srvs., Inc. v. I.C.E.*, No. EP-19-CV-236, 2021 WL 289548, at *8 (W.D. Tex. Jan. 28, 2021) (quoting *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984)). The "[t]hree common law privileges encompassed in [E]xemption (b)(5) include: (1) the attorney work-product privilege; (2) the attorney-client privilege; and (3) the governmental deliberative process privilege." *Id.* (citing *Tax Analysts v. I.R.S.*, 294 F.3d 71, 76

(D.C. Cir. 2002)).

Pursuant to Exemption 5, the FBI withheld certain information that it determined constituted privileged, deliberative material, and privileged attorney work-product material. Specifically, the FBI withheld the following: (1) portions of e-mail communications between FBI employees containing preliminary opinions on agency decisions; (2) the entirety of intra-agency deliberate draft handwritten interview notes of SCO employees when investigating Russia's alleged interference in the 2016 election and other related investigations; (3) the entirety of a draft interview prompt and draft outline used by FBI employees during the interviews of third party subjects of investigative interest; and (4) the entirety of eighteen pages of draft prosecution memoranda prepared by or at the direction of FBI attorneys and compiled for purposes of determining whether to prosecute particular individuals (Fourth Seidel Declaration ¶¶ 106–118).

Huddleston raises the crime-fraud exception to the attorney-client and work product privileges to claim that some of this information may have been improperly withheld under Exemption 5 (Dkt. #46 at p. 28). However, the Court already addressed this argument in its Order on *In Camera* Review (Dkt. #68). As applicable here, the Court was not persuaded that the crime-fraud exception is applicable to compel production of documents withheld under Exemption 5. Huddleston has not raised any additional arguments on this issue, and thus the Court sees no reason to reconsider its prior ruling. Additionally, the potential applicability of the crime-fraud exception is the only argument Huddleston raises in challenging the FBI's withholding of information under Exemption 5. Having disposed of this argument, the Court is aware of no other basis on the record suggesting the FBI's withholding was improper. Accordingly, the Court finds the FBI properly withheld the above-described documents under Exemption 5 and is entitled to summary judgment on this issue.

### E.  Exemptions 6 and 7(C)

Huddleston challenges the FBI's withholding of information under FOIA Exemptions 6 and 7(C).[9] FOIA Exemption 6 allows agencies to exempt from disclosure information contained in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).[10] "Pursuant to [E]xemption 6, an agency may delete personal details within a document, provided the details to be deleted are reasonably severable and the overall privacy interests of the individual clearly outweigh the presumption of public disclosure." *Sherman v. U.S. Dep't of Army*, 244 F.3d 357, 361 (5th Cir. 2001) (citing *Avondale Indus., Inc. v. N.L.R.B.*, 90 F.3d 955, 958 (5th Cir. 1966)). Similarly, Exemption 7(C) permits an agency to withhold records compiled for law enforcement purposes if production of the records "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § (b)(7)(C).[11]

"Privacy interest" in this context is broadly defined to "encompass [an] individual's control of information concerning his or her person." *Sherman*, 244 F.3d at 362 (quoting *U.S. Dep't of*

---

[9] Because both exemptions concern information withheld due to individual privacy concerns, the FBI raised both exemptions together when it withheld any information on that ground. Accordingly, the Court will also address the exemptions together.

[10] The threshold inquiry for Exemption 6 "is whether the information requested includes 'files' within the meaning of" Exemption 6. *Sherman v. U.S. Dep't of Army*, 244 F.3d 357, 361 (5th Cir. 2001). "The Supreme Court has interpreted [E]xemption 6 'files' broadly to include any 'information which applies to a particular individual.'" *Id.* (quoting *Ray*, 502 U.S. at 175). "If the request includes such personal information," courts then turn to examining "whether release of the information would constitute a clearly unwarranted invasion of that person's privacy." *Id.* Here, the FBI withheld records based on personal third-party information contained within those records. Huddleston does not contend that the withheld records do not include personal information—only that the individual's privacy interests are not sufficient to overcome the disclosure of their personal information. Thus, the Court finds that the FBI has satisfied Exemption 6's threshold inquiry.

[11] Before an agency can invoke any subpart of Exemption 7, including Exemption 7(C), the agency must demonstrate that the records or information at issue were compiled for law enforcement purposes. *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153, 156 (1989). Here, the records withheld by the FBI were created and compiled in furtherance of the FBI's role in the SCO investigation and related investigations. The FBI explains that "these records were created and compiled to document the FBI's investigation of potential crimes and threat to the national security, thus, the FBI determined they were created and compiled for law enforcement purposes" (Fourth Seidel Declaration ¶ 120). Huddleston does not dispute that the records were compiled for law enforcement purposes, and the Court sees no reason on the record to conclude otherwise. Thus, the Court finds that the FBI has satisfied Exemption 7's threshold inquiry.

*Defense v. Fed. Labor Rels. Auth.*, 510 U.S. 487, 500 (1994)). On the other hand, "public interest" is defined narrowly to consider only "the extent to which disclosure would serve the core purpose of the FOIA, which is contributing significantly to the public understanding of the operations or activities of the government." *Id.* Moreover, in considering the public's interest, the purpose for which the request for information was made is irrelevant. *Id.* at 362. Rather, "the court must consider only whether the requested information sheds light on agency action." *Id.*

In the Fifth Circuit, courts apply a three-part test to determine if these exemptions apply. *See Halloran v. Veterans Admin.*, 874 F.2d 315, 319 (5th Cir. 1989). "The first step is to identify and evaluate the specific privacy interests implicated by the information encompassed by the disclosure request." *Id.* The second step "is to identify and evaluate the particular public interests that may be served—or disserved—by disclosure of the information." *Id.* After the court examines each of these interests, the court moves on to the third step where it "perform[s] the actual weighing of the interests for and against disclosure." *Id.* Based on this test, whether disclosure is warranted "depends not on the particular purpose for which the document is requested, but on the nature of the document requested and its relationship to the basic purpose of the FOIA to open agency action to the light of public scrutiny." *Driggers v. United States*, No. 3:11-CV-229, 2011 WL 5525337, at *6 (N.D. Tex. Oct. 26, 2011) (citing *Batton*, 598 F.3d at 180).

The Fifth Circuit has compared the balancing tests contained in Exemptions 6 and 7(C) and has recognized two differences. *See Halloran*, 874 F.2d at 319. First, Exemption 6 applies to disclosures that "would constitute an invasion of privacy," whereas Exemption 7(C) applies to disclosures that "could reasonably be expected to constitute" an invasion of privacy. *Id.* Second, Exemption 6 requires that an invasion of privacy be "clearly unwarranted" before nondisclosure is appropriate, whereas Exemption 7(C) requires only that the invasion of privacy be

"unwarranted." *Id.* Based on these differences, the Fifth Circuit has concluded that Congress intended for the standard for evaluating a threatened invasion of privacy under Exemption 7(C) be broader than that used for Exemption 6. *Id.*; *see also A.C.L.U. v. D.O.J.*, 655 F.3d 1, 6 (D.C. Cir. 2011) ("Exemption 7(C) is more protective of privacy than Exemption 6 and thus establishes a lower bar for withholding material."). That said, "[d]espite the differences between Exemptions 6 and 7(C), the privacy inquiry for each is essentially the same, with the difference being the magnitude of the public interest that is required to override the respective privacy interests protected by the exemptions." *Walsh v. FBI*, 952 F. Supp. 2d 71, 89 (D.D.C. 2013) (internal quotations omitted). Thus, if an agency satisfies its burden to justify withholding information under Exemption 6, it has also met the lighter burden under Exemption 7(C). *Id.*

In sum, to justify withholding information under Exemptions 6 and 7(C), the FBI must demonstrate that release of the information would constitute a clearly unwarranted invasion of the privacy interests of the relevant individuals, and that these personal privacy interests are not outweighed by any relevant interest of the public. *Sherman*, 244 F.3d at 362. Under these exemptions, the FBI withheld certain information about specific individuals, such as the individual's name or other identifying information, that the FBI contends would shed light on the FBI's performance of its mission to protect and defend the United States against terrorism and foreign intelligence threats and to uphold the criminal justice system of the United States (Fourth Seidel Declaration ¶ 125). This did not include withholding names of any high-ranking FBI officials in policy-making positions or individuals in public positions as the FBI does not consider these individuals to have privacy rights while acting in their official capacity (Fourth Seidel Declaration ¶ 125). For each instance where information was withheld, the FBI states it determined that the individuals' privacy interests outweighed any public interest in disclosure (Fourth Seidel

Declaration ¶ 125). Huddleston specifically challenges the FBI's assertion of Exemptions 6 and 7(C) as it relates to the names and information of Aaron Rich Deborah Sines, and Seth Rich. The privacy-interests analysis for Aaron Rich and Deborah Sines, because they are both still alive, differs from the privacy interests analysis for Seth Rich. Thus, for clarity, the Court will address these claims as grouped below.

### 1.  Interests Analysis for Aaron Rich and Deborah Sines

As discussed previously, Huddleston's First Request sought, in part, information on Aaron Rich and Deborah Sines. In responding to this request, the FBI stated that it would neither confirm nor deny the existence of such records because "[t]he mere acknowledgement of the existence of FBI records on [these] third[-]party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy" (Fourth Seidel Declaration ¶ 22). The FBI contends that it cannot release information on Aaron Rich and Deborah Sines because Huddleston "has not provided a signed privacy waiver executed by either individual that would authorize the FBI to release information from FBI files to [Huddleston], if such information exists" (Fifth Seidel Declaration ¶ 36). Thus, as to Aaron Rich and Deborah Sines, the FBI relies on a privacy *Glomar* response,[12] meaning it will neither confirm nor deny the existence or non-existence of records pursuant to Exemptions 6 and 7(C). Huddleston argues that Aaron Rich and Deborah Sines

---

[12] Under the *Glomar* doctrine, an agency may, pursuant to FOIA's statutory exemptions, refuse to confirm or deny the existence of certain records in response to a FOIA request. *See Phillippi v. C.I.A.*, 546 F.2d 1009 (D.C. Cir. 1976) (establishing the *Glomar* doctrine). While the Fifth Circuit has yet to directly address whether an agency may issue a *Glomar* response to a FOIA request under these circumstances, other circuit courts, as well as district courts within the Fifth Circuit, have uniformly upheld the practice. *See, e.g., Rutila v. U.S. Dep't of Transp.*, No. 3:16-CV-2911, 2020 WL 3585575, at * 3 (N.D. Tex. Apr. 27, 2020), *report and recommendation adopted*, 2020 WL 2552944 (N.D. Tex. May 20, 2020); *Blum v. N.S.A.*, No. A-09-CA-769, 2010 WL 11537459, at *2 (W.D. Tex. Apr. 12, 2010), *aff'd*, 424 F. App'x 358 (5th Cir. 2011); *Claudio v. Social Sec. Admin.*, No. H-98-1911, 2000 WL 33379041, at *8-9 (S.D. Tex. May 24, 2000); *Larson v. Dep't of State*, 565 F.3d 857, 861-62 (D.C. Cir. 2009); *Carpenter v. D.O.J.*, 470 F.3d 434, 436-37 (1st Cir. 2006); *Bassiouni v. C.I.A.*, 392 F.3d 244, 246 (7th Cir. 2004); *see also Wilner v. N.S.A.*, 592 F.3d 60, 68 (2d Cir. 2009) (collecting cases). While Huddleston disagrees with the FBI's weighing of privacy interests under Exemptions 6 and 7(C), he does not argue that the FBI's use of a *Glomar* response in this case was otherwise improper.

implicitly waived all claims to personal privacy because they publicly commented about their roles in the Seth Rich investigation.[13]

The Court finds that Aaron Rich and Deborah Sines have personal privacy interests in preventing the public disclosure of their information recognizable under Exemptions 6 and 7(C). First, courts have recognized that "persons who are not the subjects of the investigation may nonetheless have their privacy invaded by having their identities and information about them revealed in connection with the investigation." *Halloran*, 874 F.2d at 320; *see also Rahim v. F.B.I.*, 947 F. Supp. 2d 631, 643 (E.D. La. May 31, 2013) (recognizing that "cooperating witnesses have significant privacy interests which outweigh the public interest in disclosure"). Further, Huddleston implies throughout his motion that Aaron Rich was potentially a part of the DNC e-mail scandal and has engaged in other criminal behavior (Dkt. #46 at pp. 13, 16, 32). To the extent Huddleston believes Aaron Rich to be the subject of an FBI investigation, "[t]here can be no clearer example of an unwarranted invasion of privacy than to release to the public that another individual was the subject of a criminal investigation." *See Halloran*, 874 F.2d at 320 (internal citations omitted). As the Fifth Circuit has stated, "[t]his fact has long been recognized in the FOIA context, and has often served as the basis for excepting information from disclosure under Exemption 7(C)." *Id.* (collecting cases). The Fifth Circuit has found a district court's refusal to acknowledge these privacy interests to be legal error. *Id.* at 321.

Moreover, even if Aaron Rich and Deborah Sines publicly commented about their roles in the Seth Rich investigation, this does not divest them of their privacy interests. "[T]hat otherwise-

---

[13] Huddleston also contends that the FBI protected the identities of some government personnel, informants, and witnesses but openly published the name of witness Jason Fishbein. However, the FBI responds that "the FBI's release of the name Jason Fishbein was a result of the official acknowledgment of Mr. Fishbein within the 'Report On the Investigation Into Russian Interference In the 2016 Presidential Election'" (Fifth Seidel Declaration ¶ 36). Thus, Jason Fishbein's name was not released due to Huddleston's FOIA request but was publicly released for a different, official reason.

private information may have been at one time or in some way in the 'public' domain does not mean that a person irretrievably loses his or her privacy interests in it." *Halloran*, 874 F.2d at 322 (rejecting district court's conclusion that because individual had participated in the investigation, no invasion of privacy could occur because their information was already "known to the public"); *see also D.O.J. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 761–62 (1989) ("[O]ur cases have recognized the privacy inherent in the nondisclosure of certain information even where the information may have been at one time public"). Thus, even when an individual's private information has been publicly disseminated in the past, the individual "still retain[s] substantial interests in preventing the further dissemination of the information." *Halloran*, 874 F.2d at 322 n.10 (citing *Bast v. D.O.J.*, 665 F.2d 1251, 1255 (D.C. Cir. 1981) ("[R]enewed publicity brings with it a renewed invasion of privacy. The renewed intrusion is subject, in its own right, to FOIA protection, [and thus] implicate[s] legitimate privacy interests under the 7(C) exemption.")). Accordingly, the Court finds that Aaron Rich and Deborah Sines have recognizable privacy interests in the nondisclosure of their personal information contained within responsive records under Exemptions 6 and 7(C) to the extent responsive records containing such information exists.

Because the Court finds that Aaron Rich and Deborah Sines have recognizable privacy interests, the Court must next determine whether the public interest in the disclosure of any such records outweighs their privacy concerns. Huddleston, as the FOIA requester, has the burden to "(1) 'show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'" *Boyd v. Crim. Div. of D.O.J.*, 475 F.3d 381, 387 (D.C. Cir. 2007) (quoting *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)). Further, "privacy interests are particularly difficult to overcome when law enforcement information regarding third

parties is implicated." *Martin v. D.O.J.*, 488 F.3d 446, 457 (D.C. Cir. 2007). "'[T]he only relevant public interest in the FOIA balancing analysis under *Favish* is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.'" *Rahim*, 947 F. Supp. 2d at 644 (quoting *Fed. Labor Rels. Auth.*, 510 U.S. at 497).

Huddleston did not address the public interests under this analysis or allege that a public interest outweighed Aaron Rich's and Deborah Sines' privacy interests. Thus, as the party with the burden to establish a countervailing public interest, the Court finds Huddleston has not satisfied this burden. *See Boyd*, 475 F.3d at 387. Further, given the amount of weight provided to the protection of third-party information contained in law enforcement records, *Martin*, 488 F.3d at 457, the Court finds that any potentially relevant public interest does not outweigh the privacy interests of Aaron Rich and Deborah Sines under the circumstances. Accordingly, the Court finds the FBI properly withheld this information under Exemptions 6 and 7(C). Accordingly, the FBI is entitled to summary judgment on this issue.

### 2.  Interests Analysis for Seth Rich

Under Exemptions 6 and 7(C), the FBI withheld the contents of Seth Rich's personal laptop in their entirety. The FBI argues this withholding was proper because Seth Rich's survivors have a privacy interest in preventing the public release of this information that outweighs the public's interest in disclosure.

It does not appear that any courts within the Fifth Circuit have previously considered whether the deceased or family members of the deceased have a privacy interest under FOIA. However, courts outside of the Fifth Circuit have considered the issue. In general, courts have recognized that the "privacy interest in nondisclosure of identifying information may be

diminished where the individual is deceased." *Schrecker v. D.O.J.*, 349 F.3d 657, 661 (D.C. Cir. 2003). That said, while "the death of the subject of personal information does diminish to some extent the privacy interest in that information, [ ] it by no means extinguishes that interest." *Wessler v. D.O.J.*, 381 F. Supp. 3d 253, 259 (S.D.N.Y. 2019). Thus, although "the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living," there are certain "reputational interests and family-related privacy expectations [that] survive death." *Campbell*, 164 F.3d at 33–34.

Under what some agencies have termed the "survivor privacy doctrine," *see, e.g.*, *McWatters v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, No. 20-CV-1092, 2022 WL 3355798, at * 3 (D.D.C. Aug. 15, 2022), courts have recognized that family members of the deceased have privacy interests recognizable under FOIA. For example, in *Favish*, the Supreme Court held that a deceased's family members had a privacy interest in preventing the disclosure of the deceased's death-scene photographs that could be properly considered under FOIA Exemption 7(C). 541 U.S. at 168–71. In recognizing that family members of the deceased possess privacy interests under FOIA, the Supreme Court explained that "family members have a personal stake in honoring and mourning their dead and objecting to unwarranted public exploitation that, by intruding upon their own grief, tends to degrade the rites and respect they seek to accord to the deceased person who was once their own." *Id*. at 168.

However, the Supreme Court's holding in *Favish* was limited to surviving family members' rights to personal privacy with respect to a deceased's death-scene images. Other than death-scene images, courts have generally only expanded a family member's privacy interests to include autopsy reports and audio files of their close relative's final moments. *See, e.g.*, *Katz v. Nat'l Archives & Records Admin.*, 862 F. Supp. 476, 485–86 (D.D.C. 1994), *aff'd*, 68 F.2d 1438

(1995) (holding family of Present John F. Kennedy had privacy interest in preventing the disclosure of both the x-rays and optical photographs taken during the President's autopsy); *Badhwar v. U.S. Dep't of Air Force*, 829 F.2d 182, 185–86 (D.C. Cir. 1987) (holding families of deceased aircraft pilots had privacy interest in autopsy reports of the deceased); *Wolk Law Firm v. Nat'l Transp. Safety Bd.*, 392 F. Supp. 3d 514, 527 (E.D. Pa. 2019) (holding relatives of deceased had privacy interest in accident site photos and videos "depicting mutilated human remains, autopsy reports, and medical case reviews"); *but see Charles v. Office of the Armed Forces Med. Exam'r*, 935 F. Supp. 2d 86, 99 (D.D.C. 2013) (refusing to consider privacy interest of family members under Exemption 6 where, compared to *Favish*, agency failed to show that the family members "would even be able to discern which redacted [autopsy] records relate[d] to their deceased family member").

For example, in *N.Y. Times Company v. NASA*, 782 F. Supp. 628 (D.D.C. 1991), the court held that transcripts and recordings of the final voice communications of the astronauts aboard the Challenger Space Shuttle were properly withheld under Exemption 6. The court noted that the privacy interests of the deceased astronauts' family members were protected because the recordings contained intimate details about the deceased, such as "the sound of the astronauts' voices." *NASA*, 782 F. Supp. at 631. The court further explained that "[w]hat the astronauts said may not implicate privacy interests," but "*how* the astronauts said what they did, the very sound of the astronauts' words, does constitute a privacy interest." *Id.* (emphasis in original). The court concluded that this privacy interest was substantial because releasing the records may cause the families of the deceased to "be subjected not just to a barrage of mailings and personal solicitations, but also to a panoply of telephone calls from media groups as well as a disruption of their peace of mind every time a portion of the tape is played within their hearing." *Id.* at 632.

Thus, were the FBI attempting to apply the Exemptions on the basis to protect death-scene photographs or the autopsy report of Seth Rich, or potentially even audio recordings of his final moments, the law would arguably support withholding that information based on the privacy interests of Seth Rich's surviving family members. However, that is not what the FBI withheld here. Under Exemptions 6 and 7(C), the FBI states it "withheld information derived from Seth Rich's personal laptop as such information would violate the privacy rights of the survivors of Seth Rich" (Fourth Seidel Declaration ¶ 136).[14] The FBI claims that "Seth Rich's personal laptop contains[,] among other things, photographs [and] various types of media and documents" (Fourth Seidel Declaration ¶ 136 n.42). Yet, the FBI then states that because "the FBI had no involvement in the extraction of the data from Seth Rich's personal laptop, there is no way to know with certainty if the information provided by the source and maintained by the FBI in the [SCO's] record collection, accurately depicts the contents of the information contained on Seth Rich's personal laptop at the time of his death" (Fourth Seidel Declaration ¶ 137). Despite allegedly being unable to confirm the accuracy of the information that may or may not be on Seth Rich's laptop, the FBI argues that the laptop "may contain information of family (parents and siblings), friends or acquaintances (professional or personal), his favorite music and other material that would reveal details concerning both personal and sensitive relationships," so his survivors have a substantial privacy interest in not having that information publicly disclosed (Fourth Seidel Declaration ¶ 139).

The Court is not persuaded by the FBI's argument that Seth Rich's survivors have a privacy interest in withholding the entirety of the information contained on Seth Rich's laptop. Pointedly, the FBI cites to no case law for the proposition that survivors of the deceased have a privacy

---

[14] The FBI admits that "Seth Rich has no privacy interests due to being deceased" (Fourth Seidel Declaration ¶ 139).

interest in information related to the deceased's favorite music or relationship history. Further, preventing the public from knowing Seth Rich's favorite band is in no way comparable to releasing his autopsy report or photographs from when he was shot. With autopsy reports and death-scene photographs, the survivors have a recognized privacy interest because publicly revealing often-gruesome photos of their loved one and intimate details about their loved one's death may cause the survivors "additional pain, disruption to peace of mind, additional anguish, or annoyance or harassment." *Favish*, 541 U.S. at 170; *see also NASA*, 782 F. Supp. at 632. For example, in *Favish*, the deceased's sister wrote, "I have nightmares and heart-pounding insomnia as I visualize how he must have spent his last few minutes and seconds of his life." 541 U.S. at 167. She then explained her opposition to publication of the deceased's death-scene photographs, stating, "I fear that the release of [additional] photographs certainly would set off another round of intense scrutiny by the media . . . [R]eleasing any photographs . . . would constitute a painful unwarranted invasion of my privacy." *Id.* The FBI has not demonstrated that this same principle applies here to provide Seth Rich's survivors with a privacy interest over the contents of his laptop.

To withhold information under Exemptions 6 and 7(C), the agency must demonstrate a privacy interest that might by invaded by disclosure. The mere possibility that a privacy interest may be invaded is not enough. *See Dep't of the Air Force v. Rose*, 425 U.S. 352, 380 n.19 (1976). And "[i]f no significant privacy interest is implicated . . . FOIA demands disclosure." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989). The FBI has not satisfied its burden of showing more than a *de minimis* privacy interest that would justify withholding information from Seth Rich's laptop under Exemptions 6 and 7(C). *Charles*, 935 F. Supp. 2d at 100. As a result, the Court does not reach the balancing test analysis. *See Halloran*, 874 F.2d at 319 (noting courts only conduct a balancing analysis after identifying a privacy interest and a public

interest); *Aguirre v. S.E.C.*, 551 F. Supp. 2d 33, 53 (D.D.C. 2008) (citing *Ripskis v. Dep't of Hous. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984) ("The inquiry ends if substantial privacy interests are not compromised.")); *Gilman v. U.S. Dep't of Homeland Sec.*, 32 F. Supp. 3d 1, 10 (2014) (stating that a court employs the balancing test only if it determines there is a substantial privacy interest in the information).[15]

Accordingly, the Court finds the FBI improperly withheld this information under FOIA, and the Court is thus authorized to order its production. *See* 5 U.S.C. § 552(a)(4)(B) (authorizing federal courts to "order the production of any agency records improperly withheld from the complainant"). Huddleston is entitled to summary judgment on this issue.

**F.  Exemption 7(D)**

Huddleston challenges the FBI's withholding of information under FOIA Exemption 7(D). Under FOIA Exemption 7(D), an agency may withhold records compiled for law enforcement purposes if production of the records:

> could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D). "[T]he exemption is thus properly invoked only where a source provided information based upon an express grant of confidentiality or 'in circumstances from which such an assurance could reasonably be inferred.'" *Mongomery v. I.R.S.*, 330 F. Supp. 3d 161, 170 (D.D.C. 2018) (quoting *D.O.J. v. Landano*, 508 U.S. 165, 172 (1993)).

---

[15] Regardless, the public interest under these Exemptions "focuses on the citizens' right to be informed about 'what their government is up to.'" *Comm. for Freedom of Press*, 489 U.S. at 773. Huddleston has at least generally alleged that the public has an interest in knowing whether the FBI is improperly withholding information under FOIA (Dkt. #28 at pp. 10–16). Even an abstract public interest such as this is sufficient, *see generally Halloran*, 874 F.2d at 323, particularly where no privacy interest is rightly asserted.

Under this exemption, the FBI states it withheld information provided by foreign government agency authorities under an implied assurance of confidentiality (Fourth Seidel Declaration ¶ 152). The FBI explains that, although the foreign agency referenced in the records at issue here did not request its relationship with the FBI be classified, it did request the relationship not be disclosed (Fourth Seidel Declaration ¶ 153). The FBI contends that the "release of official United States Government documents revealing the existence of such confidential relationship with a long-term foreign government partner . . . reasonably could be expected to strain relations between the United States and foreign governments and lead to negative diplomatic, political, or economic repercussions" (Fourth Seidel Declaration ¶ 154). Further, the FBI states that "a breach of this relationship can be expected to have a chilling effect on the free flow of vital law enforcement/national security information to the FBI, which would impede the FBI's effectiveness in countering/solving crimes and protecting national security" (Fourth Seidel Declaration ¶ 154). Huddleston argues the FBI improperly withheld this information in bad faith as an alleged cover-up of the FBI's potential conspiracy with foreign agents or foreign governments for the purpose of influencing President Trump's election (Dkt. #46 at p. 29). Huddleston further alleges that "the American public has a right to know whether the FBI and the CIA conspired with foreign agents or governments to hide the source of the DNC e-mail leaks" (Dkt. #46 at p. 29).

While Huddleston's concerns may be understandable, the FBI has met its burden here. "Exemption 7(D) differs from other FOIA exemptions in that its applicability [does not] depend[ ] on the specific factual contents of a particular document." *Lesar v. D.O.J.*, 636 F.2d 472, 487–88 (D.C. Cir. 1980). "[I]nstead, the pertinent question is whether the information at issue was furnished by a 'confidential source' during the course of a legitimate criminal law investigation." *Id.* The FBI, through Seidel's declarations, has alleged that the foreign government at issue

provided information under an assurance of confidentiality and describes how the public disclosure of information would hinder its ability to properly seek cooperation from other sources and gather confidential information. Courts have upheld identical claims under Exemption 7(D) in the past. *See Schoenman v. F.B.I.*, 763 F. Supp. 2d 173, 200 (D.D.C. 2011) (collecting cases); *Prop. of the People, Inc. v. D.O.J.*, 539 F. Supp. 3d 16, 27 (D.D.C. 2021). Accordingly, the Court finds that the FBI properly withheld the information under Exemption 7(D).

### G.  Exemption 7(E)

Finally, while Huddleston does not directly challenge the FBI's withholding of information under Exemption 7(E), he does argue that the FBI improperly withheld whether or not it used "code names" assigned to specific individuals in searching for records responsive to his requests (Dkt. #46 at p. 17). As mentioned, Huddleston's Third Request sought records concerning code names assigned to individuals as part of the Crossfire Hurricane investigation, including code names associated with Seth Rich and Aaron Rich. In responding to this request, the FBI notes that in some instances, it did use publicly acknowledged code names to conduct relevant searches (Dkt. #54 at pp. 11–12). However, as to any code name that may or may not exist relating to Seth Rich and Aaron Rich, the FBI and the OIP provided an Exemption 6, 7(C), and 7(E) *Glomar* response (Dkt. #54 at p. 11). The FBI contends that, in addition to infringing on the privacy interests of third parties, "merely acknowledging the existence or non-existence of records responsive" to this request "would trigger one or more harms under FOIA Exemption (b)(7)(E)" (Fourth Seidel Declaration ¶ 70).

FOIA Exemption 7(E) exempts from disclosure information that "would disclose techniques and procedures for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C.

§ 522(b)(7)(E). "In order to show that it is justified in withholding the information under FOIA Exemption 7(E), an agency must 'demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'" *Bradley v. I.R.S.*, No. 5:17-CV-737, 2019 WL 4980459, at *7 (W.D. Tex. Aug. 5, 2019) (quoting *Blackwell v. F.B.I.*, 646 F.3d 37, 42 (D.C. Cir. 2011)). Further, "[b]ecause the text of FOIA [E]xemption 7(E) exempts from disclosure records that 'could reasonably be expected to risk circumvention of the law,' the [FBI] 'does not have to prove that circumvention is a necessary result.'" *Highland Capital Mgmt., LP v. I.R.S.*, 408 F. Supp. 3d 789, 818 (N.D. Tex. 2019) (quoting *Mayer Brown, LLP v. I.R.*S., 562 F.3d 1190, 1193 (D.C. Cir. 2009)). "Instead, the [FBI] need only show that there is a chance of a reasonably expected risk that the law would be circumvented if the information withheld is disclosed." *Id*.

To satisfy this burden, the FBI contends that "[h]ow, to whom, and under what circumstances the FBI assigns code-names to individuals or operations [] is itself a law enforcement technique or procedure that the FBI protects pursuant to Exemption (b)(7)(E)" (Fourth Seidel Declaration ¶ 40). The FBI explains that "[c]ode names are unique and assigned to solely one particular subject or initiative of national security interest," and "are used in lieu of the [subject's] actual name, description, and information" (Fourth Seidel Declaration ¶ 40). In analyzing Exemption 7(E), courts have recognized that FBI code names, symbol methodology, and electronic monitoring techniques "fall squarely within the type of material envisioned" by the Exemption. *Canning v. D.O.J.*, No. 11-1295, 2017 WL 2438765, at *11 (D.D.C. June 5, 2017); *see also, e.g.*, *Rios v. United States*, No. 15-CV-1183-TSC, 2021 WL 430053, at *1 (D.D.C. Feb. 8, 2021) (holding that the redaction of operation code names on the basis that disclosure "could provide insight into the actual operation[s]" of the DEA satisfied the "relatively low bar" for an agency to justify its withholdings under Exemption 7(E)).

The Court is persuaded that disclosure of this material, to the extent it exists, could reasonably be expected to risk circumvention of the law. Accordingly, the Court finds that the FBI properly withheld any information that it may possess on code names under Exemption 7(E).[16] Thus, the FBI is entitled to summary judgment on this issue.

## CONCLUSION

The Government's search in this case was far from perfect. Had it not been for Huddleston's persistence, it is likely that the Government's failure to locate over 20,000 pages of potentially responsive records would have gone unnoticed. Nonetheless, as the law currently stands, a government agency can fail to locate thousands of pages of responsive documents, and yet still be in compliance with its obligations under FOIA so long as the agency's search was "adequate." That is the case here. While the Government initially failed to locate over 20,000 pages of potentially responsive records, the Government's search this time around was reasonably calculated to discover the documents Huddleston requested. And despite his efforts to do so, Huddleston was unable to present compelling evidence to the contrary. Without such evidence, the Government's search in this case is considered adequate under the law. Accordingly, the Government is entitled to summary judgment on this issue.

Further, with the exception of information related to Seth Rich's laptop, the Court finds the Government properly withheld or redacted information responsive to Huddleston's requests in accordance with the FOIA's exemptions. With regard to Seth Rich's laptop, the Court finds the Government improperly withheld this information under FOIA Exemptions 6 and 7(C).

It is, therefore, **ORDERED** that Defendants' Motion for Summary Judgment (Dkt. #39) is **GRANTED in part** and **DENIED in part.**

---

[16] Because the Court finds the information was properly withheld under Exemption 7(E), the Court does not reach whether the information was also properly withheld under Exemptions 6 and 7(C).

It is further **ORDERED** that Plaintiff's Cross-Motion for Summary Judgment (Dkt. #46) is **GRANTED in part** and **DENIED in part.**

It is further **ORDERED** that the Government shall produce the information it possesses related to Seth Rich's laptop and responsive to Plaintiff's FOIA requests within 14 days of this Order.

**IT IS SO ORDERED.**

 **SIGNED this 29th day of September, 2022.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE