## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

**BRIAN HUDDLESTON**,

        Plaintiff,

vs.

**FEDERAL BUREAU OF
INVESTIGATION and UNITED
STATES DEPARTMENT OF
JUSTICE**

        Defendant

**Case No. 4:20-cv-447-ALM**

## <u>REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR CLARIFICATION</u>

NOW COMES Brian Huddleston, the Plaintiff, replying in support of Plaintiff's

Motion for Clarification of the Memorandum Opinion and Order Entered September 29,

2022 (hereinafter "Motion to Clarify")(Dkt. #77):

### <u>Introduction</u>

As its name indicates, Defendant FBI's Combined Reply / Response to Pending

Briefing Regarding Seth Rich's "Laptops" (hereinafter "Reply / Response") (Dkt. #83)

merges two separate issues, namely the releasability of documents from (1) Seth Rich's

personal laptop and (2) Seth Rich's work laptop. In order to avoid confusion and expedite

matters, the Plaintiff will address only the work laptop (and related documents) in this

response.

- 1 -

As indicated in the Motion to Clarify, the existence of Seth Rich's work laptop has been known to Mr. Huddleston for some time. And Mr. Huddleston fully expected that laptop – like almost any other laptop – to contain information of some kind. The real surprises are as follows:

- After years of denials, the FBI has finally admitted that Seth Rich is directly linked to the "hack" of the Democratic National Committee email servers in 2016.

- The FBI has been in possession of a report about Seth Rich's work laptop for nearly five years, yet purportedly it did not discover that report until after Mr. Huddleston filed his Motion to Clarify.

- The FBI had yet another technique, heretofore undisclosed, for hiding records from FOIA requesters.

The second revelation is particularly noteworthy. The existence of a forensic report on the contents of Seth Rich's work laptop has been something of a "holy grail" among those who question the official narrative about Seth Rich and his possible involvement in leaking DNC emails to Wikileaks. Renowned journalist Sy Hirsh first disclosed his knowledge of the report in early 2017, *see* Rusty Weiss, "Journalist Seymour Hersh Claims Seth Rich Was Wikileaks Source," August 2, 2017 *The Political Insider* (https://thepoliticalinsider.com/seymour-hersh-seth-rich/) (attached as Exhibit 1),[1] and the *Fox News* scandal surrounding its reporting on Seth Rich, that culminated in a public retraction of its Seth Rich story, was based on the network's inability to satisfy journalistic standards that the report was real. *See* Justin Bey, *Fox News retracts story on*

---

[1] As attested by his electronic signature below, Ty Clevenger declares under penalty of perjury under the laws of the United States that the exhibits to this document are true and correct copies of the documents that he represents them to be.

*Seth Rich murder investigation*, May 24, *CBS News*, (https://www.cbsnews.com/news/ seth-rich-murder-investigation-story-retracted-fox-news/) (Exhibit 2). One need only listen to the audio recording of Sy Hersh's discussion of the report, available publicly at https://search.yahoo.com/search?fr=mcafee&type=E211US105G0&p=sy+hersh+recordin g+on+Seth+Rich, to appreciate the importance of the report both to those interested in the truth and those in power who want it suppressed. The FBI's belated disclosure of the existence of the forensic report (and the related chain of custody forms) raises new questions about the adequacy of the Bureau's search, its good faith in prior disclosures, and the lawfulness of its attempt to shield all information relating to the work laptop from public disclosure under FOIA.

The newly-revealed report ostensibly relates only to the manner in which data was imaged (or copied), but imaging of computers is a relatively straightforward process. As discussed below, that process would not normally require a comprehensive forensic report, unless there were encrypted files or other challenges that could point to communications with Wikileaks. For example, if Seth Rich had downloaded DNC data (the "contents" of interest) and then transferred that data to a thumb drive, the FBI would not have relied on the "contents" of the laptop or the tape drive, but on the forensic analysis. The latter would address any technical obstacles (*e.g.*, challenges created by the use of an encrypted browser such as a Tor browser), that might otherwise obscure relevant evidence.

Although the foregoing revelations are new, the game is not.  Having been backed into a corner by Mr. Huddleston yet again, the FBI reluctantly discloses documents that it should have disclosed many years before. As usual, the FBI has denied, delayed, and then – only when cornered – the FBI has disclosed.

## **Argument**

The Reply / Response is conclusory and makes no attempt to explain why particular exemptions apply to specific records. Instead, the Reply / Response relies on the declaration of FBI records chief Michael Seidel, which Mr. Huddleston will discuss below. Mr. Seidel is now on his <u>sixth</u> declaration, and it exudes a certain "dog ate my homework" aura. *See* Sixth Declaration of Michael G. Seidel (hereinafter "Sixth Declaration")(Dkt. #83-1). Each new declaration brings more inconsistencies and contradictions, each new declaration raises more questions than it answers, and each new declaration diminishes Mr. Seidel's credibility. Consider Paragraph 13(c) of the Sixth Declaration, which makes an astonishing admission: "The FBI found no indication that the FBI relied on the content of the work laptop, DVD, or tape drive." That cannot possibly be squared with the remainder of the declaration, which claims everything must be withheld because it is all relevant to the prosecution of Russian intelligence agents who purportedly were involved in hacking the Democratic National Committee in 2016. How can the work laptop's contents be evidence in support of the prosecutions if the FBI has never "relied on" them? One must wonder if Mr. Seidel bothers to read his declarations before he signs them.

It is worth remembering Special Counsel Robert M. Mueller's declaration that Seth Rich played no role in leaking DNC emails. Mr. Mueller made that statement in single, conclusory paragraph in his investigative report. *See* Special Counsel Robert M. Mueller, "Report On The Investigation Into Russian Interference In The 2016 Presidential Election" (hereinafter "Mueller Report") March 2019, U.S. Department of Justice, p. 48 ([https://www.justice.gov/archives/sco/file/1373816/download](https://www.justice.gov/archives/sco/file/1373816/download)) (Exhibit 3). Now, whether he realizes it or not, Mr. Seidel has greatly impugned Mr. Mueller's investigation. According to Mr. Seidel, Mr. Mueller made his public pronouncement about Seth Rich without anyone on his team bothering to investigate Mr. Rich's work laptop. *See* Sixth Declaration ¶13(c). For that matter, nobody on Mr. Mueller's team bothered to examine Mr. Rich's personal laptop contents. *See* Fourth Declaration of Michael G. Seidel ¶137 (Dkt. #37-1).  The FBI conducted the investigation on behalf of Mr. Mueller, *see* Sixth Declaration ¶22, and it now appears that the investigation was deeply flawed and perhaps an outright sham. No wonder the FBI has tried for more than five years to keep this scandal under wraps.

**A. Records are records, and bureaucrats cannot rewrite the law.**

In the Reply / Response, the FBI admits that it discovered yet another batch of responsive records (years after this case was filed), but it offers an *Alice in Wonderland* defense for its failure to retrieve them sooner: the records are not really records. The FBI produced a copy of its policies – which apparently have not been released publicly until now – stating that digital evidence (or "DE") is not a record for purposes of FOIA. *See*

Policy 6.1, "Digital Evidence Policy Guide," Federal Bureau of Investigation p. 43 (Dkt. #83-2, p. 55).[2] Granted, the FOIA statute itself does not define "agency record." *Cox v. Dep't of Justice*, 504 F. Supp. 3d 119, 145 (E.D.N.Y. 2020), citing *Forsham v. Harris*, 445 U.S. 169, 187, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980) (Brennan, J., dissenting) ("The Court concedes, of course, that the statute itself does not define 'agency records.'"). Nonetheless, courts strongly disfavor gamesmanship about what constitutes an agency record. *See, e.g., Cause of Action Inst. v. United States Dep't of Justice*, 999 F.3d 696, 703–04 (D.C. Cir. 2021).

> "A FOIA request should not require the specificity and cunning of a carefully drawn set of discovery requests, so as to outwit narrowing legalistic interpretations by the government." *Providence Journal Co. v. F.B.I.*, 460 F.Supp. 778, 792 (D.R.I.1978), reversed on other grounds, 602 F.2d 1010 (1st Cir.1979), cert. denied, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980). Where, as here, the requestor has endeavored to carefully specify what documents were being requested, the Court will not allow an agency's quibbling to obscure the issues.

*Norwood v. F.A.A.*, 580 F. Supp. 994, 1001 (W.D. Tenn. 1983).[3] Nothing in the FOIA statute or case law suggests that a federal record ceases to be a record merely because it is designated as digital evidence.[4]

---

[2] Notably, the policy guide is produced by the FBI's Operational Technology Division ("OTD"). *See* Dkt. #83-2, p. 8. In his cross-motion for summary judgment, Mr. Huddleston castigated the FBI for its attempt to shield OTD records from FOIA searches. Dkt. #46 at 10-13. As noted in a joint status report filed on March 31, 2022, the FBI responded by agreeing to search for records within OTD. *See* Dkt. #50, p.4. Despite that agreement, the FBI somehow failed to identify any records pertaining to the work laptop until now. Somebody at the FBI needs to explain that discrepancy. Perhaps the Court needs to order the FBI to conduct a more thorough search.

[3] The present case is somewhat reminiscent of *Negley v. F.B.I.*, where the district court awarded attorney fees to a FOIA requester based on revelations about FBI techniques for hiding documents from FOIA requesters. 818 F. Supp. 2d 69, 75 (D.D.C. 2011), dismissed, No. 13-5242, 2013 WL 5610260 (D.C. Cir. Sept. 17, 2013). In *Negley*, the requestor discovered that the FBI excluded electronic surveillance records ("ELSUR") and other databases from its FOIA

- 6 -

The FBI's attempt to redefine "agency record" is both internally inconsistent and hypocritical. The FBI readily conceded that the contents of the *personal* laptop were "agency records" within the meaning of FOIA. Yet the contents of the *work* laptop are not "agency records," according to the FBI, merely because it designated those records as "DE." See Dkt. #83-2, p. 55. Like the magical and undefined phrase "investigative significance," *see* Motion for In Camera Review (Dkt. #28) 6-7, this is an utterly subjective term that allows FBI personnel to hide public records according to their own personal whims. If FBI personnel want to hide an embarrassing document, they can simply omit it from the infamous search indices or designate it "DE."

An FBI-302 form was provided to the court *in camera*, *see* Order Granting Defendant FBI's Unopposed Motion for Leave to Submit Exhibit *In Camera* (Dkt. #85), and that report reveals that the personal laptop was provided to the FBI to help determine whether the Russians perpetrated a false flag operation, *i.e.*, by hacking into Seth Rich's electronic devices to make it *appear* that he was the source of the DNC emails published by Wikileaks. In other words, the government's narrative is that the Russians stole the emails, but they subsequently tampered with Seth's computers in order to shift the blame to him. *Id*.; *see also* Plaintiff's Response in Opposition to Defendant FBI's Motion for

---

search indices. Now that Mr. Huddleston has discovered that the FBI excludes digital evidence ("DE") from its search indices, he intends to cite this case in his forthcoming supplemental request for attorney fees.

[4] For the reasons set forth in this reply, Mr. Huddleston wishes to challenge the legality of the FBI's regulation. *See Cause of Action Inst. v. United States Dep't of Justice*, 999 F.3d 696, 703–04 (D.C. Cir. 2021)(FOIA requestor allowed to challenge Department of Justice FOIA regulations apart from FOIA claims themselves). If the Court wishes, Mr. Huddleston will brief that issue separately.

Clarification or, in the Alternative, Reconsideration of the Memorandum Opinion and Order entered September 29, 2022 (Dkt. #76), citing public statements and testimony from former Asst. U.S. Attorney Deborah Sines.[5] Thus the personal laptop contents and the work laptop contents were both pertinent to the same investigation. So why does one contain "agency records" when the other does not?

The FBI relies on two cases in support of its argument that the work laptop records are not "agency records." In *U.S. Dep't of Justice v. Tax Analysts*, the Court held that an agency record is one that is (1) created or obtained by the agency and (2) under the control of the agency at the time of the FOIA request. 492 U.S. 136, 144–45, 109 S. Ct. 2841, 2848, 106 L. Ed. 2d 112 (1989).  The FBI concedes (as it must) that it "obtained" the records, therefore it concedes the first prong. For the second prong, *Tax Analysts* relied upon the definition of "agency records" found in the Records Disposal Act, 44 U.S.C. § 3301, namely "all books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States Government *under Federal law or in connection with the transaction of public business* ...." *Tax Analysts*, 492 U.S. at 145, 109 S. Ct. at 2848 (emphasis in original), citing *Forsham v. Harris*, 445 U.S. 169, 183 100 S.Ct. 977, 985, 63 L.Ed.2d 293 (1980).  The FBI cannot plausibly argue that it received the work laptop records by any means other than "in connection with the transaction of

---

[5] Although the government narrative is not discussed in Dkt. #76 itself, the evidentiary attachments referenced on pages 5-6 include Ms. Sines's public statements and testimony about the purported attempt by Russia to frame Seth Rich *post mortem*, namely by planting false electronic information to make it *appear* that he was the source of the leaks.

public business." That alone should answer the question of whether the records are "agency records."

The FBI also relies on four criteria from *Burka v. U.S. Dep't of Health & Human Services*, namely "(1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files." 87 F.3d 508, 515 (D.C. Cir. 1996). Mr. Huddleston respectfully asks the Court to read that case in its entirety, because it is not nearly so helpful to the FBI as the FBI seems to suggest. Furthermore, the case is not binding in this circuit, and it has fallen out of favor even in the D.C. Circuit:

> The D.C. Circuit has questioned the helpfulness of the four *Burka* factors. *See Cause of Action v. Nat'l Archives & Records Admin.*, 753 F.3d 210, 214–15 (D.C. Cir. 2014) (noting that the Court's past application of the test revealed "its considerable indeterminacy," particularly in cases where the agency documents "do not present the sort of questions the *Burka* test purports to answer"), quoting *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 220 (D.C. Cir. 2013).

*Physicians Comm. for Responsible Med. v. United States Dep't of Agric.*, 316 F. Supp. 3d 1, 10 (D.D.C. 2018).

With respect to the first bullet point in *Burka*, the FBI argues that because the work laptop itself was not FBI *property*, then the data derived from that laptop is not an agency *record*.  Neither Mr. Seidel nor the FBI cites any authority in support of this argument, therefore the issue is waived. Furthermore, it should be obvious that the

Democratic National Committee "relinquish[ed] control over the records" when it provided the laptop, its contents, *and a forensic report about that laptop* to the FBI. [6] With regard to the second bullet point, the FBI may not be free to dispose of the laptop itself, but if it created the tape drive and the disk, then it is certainly has the "ability... to use and dispose of the [tape drive and the disk] as it sees fit." The third bullet point highlights the absurdity and dishonesty of the FBI's argument: on one hand, the FBI claims it never looked at the data nor relied on it, *see* Sixth Declaration ¶13(c), but on the other hand it claims the data is needed to prosecute Russian hackers. *See id*. at ¶¶27-29. How can one know whether the tape or disk contains useful data – "digital evidence," no less – without first looking at the data and then relying on it? Finally, the FBI's argument with respect to the fourth bullet point – *i.e.*, "the degree to which the document was integrated into the agency's record system or files" – highlights the chicanery inherent in the FBI's records practices.[7] As this Court has seen time and again, the FBI uses magical, subjective phrases like "investigative significance" or "digital evidence" that allow FBI personnel to exclude public records from public view. According to the FBI's own policies, a record has not been "integrated into the agency's record system or files" so long as an FBI employee declares – *abra cadabra!* – that it is "digital evidence." Dkt.

---

[6] The laptop was provided to the FBI *voluntarily* by Perkins Coie, the law firm that represented the Democratic National Committee. *See* June 28, 2018 Email from [redacted] to "LRA," BATES-numbered document 985 (Dkt. #77-1).

[7] Mr. Seidel tries to analogize the work laptop *and its contents* to a "bloody glove or a firearm." Sixth Declaration ¶13(d). While the analogy might work with respect to the laptop itself, one cannot download records from a "bloody glove or a firearm," hence the analogy fails with respect to the *records* stored on the laptop. The analogy likewise fails with respect to reports written about the laptop.

#83-2, p. 55. In sum, the FBI's arguments about "agency records" are nothing short of dishonest, and they should be rejected.

**B. "Newly Located Records"**

After Mr. Huddleston asked some inconvenient (and obvious) questions in his Motion for Clarification, the FBI decided to ask a few questions of its own and – *Shazam!* – more records suddenly turned up. *See* Sixth Declaration ¶15. One must wonder whether the nation's "premier law enforcement agency" is run by Inspector Clouseau. By its own admission, the FBI (1) received Seth Rich's work laptop; (2) received records related to that laptop, and (3) downloaded records from that work laptop, yet somehow it never connected the dots leading back to Seth Rich. In fact, the FBI insists that Seth Rich's name is never mentioned in the chain-of-custody form or the forensic report. Sixth Declaration ¶15. This begs a question, and one that Mr. Huddleston has raised before: is the FBI hiding records about Seth Rich by referencing him internally only by his *Crossfire Hurricane* code name (reportedly "Crossfire Panda") rather than by his given name? *See* Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment (hereinafter "Cross-Motion")(Dkt. #46) p. 17 and Plaintiff's Surreply in Opposition to Defendants' Motion for Summary Judgment and Reply in Support of Plaintiff's Cross-Motion for Summary Judgment (hereinafter " MSJ Surreply") (Dkt. #65) pp. 10-13. Not only has the FBI refused to reveal what code name was assigned to Mr. Rich, it has refused to state whether it searched for records utilizing his code name. If the FBI is still refusing to

search his code name, then that would partially explain why records are still dribbling out after so many years.

Notably, Mr. Seidel volunteered to produce the newly-found documents (totaling seven pages) for *in camera* review by the Court. Sixth Declaration 9 n.5. Mr. Huddleston strongly urges the Court to accept the invitation, because some important questions need to be answered. Why, for example, would an investigator write a report about someone's laptop without mentioning that person's name?  Does the report instead use a code name (like "Crossfire Panda") or does the report otherwise indicate that the DNC emails were leaked by an unnamed internal source? Mr. Seidel describes the three-page forensic report as one "detailing the actions performed by an outside entity to image the work laptop." *Id*. at ¶15. That raises yet more questions.[8] According to Mr. Seidel, we are only talking about *imaging* a laptop – *i.e.*, reproducing its contents on a disk or tape – rather than *analyzing* its contents, but that is implausible if the prosecutions are, in fact, dependent upon the report.[9] It defies credulity to suggest that someone copied the laptop contents onto disk and tape, and Russian intelligence agents will be prosecuted based on

---

[8] The record is somewhat ambiguous, but Paragraph 10 of the Sixth Declaration indicates that the work laptop was received from an outside source, while Paragraph 11 indicates that the tape drive and disk were "located" while searching for the work laptop. Accordingly, it is not entirely clear whether the FBI itself imaged some of the data.

[9] The FBI seeks to withhold the report and chain-of-custody forms in their entirety. Presumably, the report would contain basic facts such as how many gigabytes were downloaded. How would the disclosure of such mundane facts in a *Vaughn* index jeopardize national security or the prosecution of Russian intelligence agents?

the laptop contents, but the FBI never analyzed the digital *evidence* or produced its own report about it. Clearly, the FBI is still hiding something.[10]

### C.  The FBI did not segregate or process the vast majority of records, much less identify them in a *Vaughn* index.

The de facto *Vaughn* index produced by the FBI discusses seven pages-worth of records. Dkt. #83-2, p. 6. That's it. The index does not contain a single reference to the records copied from the work laptop, which likely number in the thousands. That is nowhere near adequate. Not even close. "In a large document it is vital that the agency specify in detail which portions of the document are disclosable and which are allegedly exempt." *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996), quoting *Vaughn v. Rosen,* 484 F.2d 820, 827 (D.C.Cir.1973).

According to Mr. Seidel, "[f]urther description of the information withheld, beyond what is provided in this declaration, could identify the actual exempt information." Sixth Declaration ¶16. Once again, Mr. Seidel's testimony is preposterous. Seth Rich worked for the Democratic National Committee, not the Central Intelligence Agency. His laptop almost certainly contained voter registration information, political analysis, emails about lunch plans, etc. Although much of that information is likely exempt, it is not top-secret information that would endanger national security if it were

---

[10] The 302 form regarding the personal laptop, *supra* 7, will show that the laptop was collected because of concerns that Russian actors were seeking to hack into Seth Rich's accounts. As discussed above, *id.*, the federal prosecutor assigned to the murder case has already said as much. This claim needs to be compared with the report, letter and chain of custody form relating to the work laptop. If the two sets of records are inconsistent, then the FBI has not been forthright about its interest in the laptops.

merely described in general terms in a *Vaughn* index. In the interest of efficiency, and given the near-certainty that the FBI will ask for another 66 years to process the contents of the work laptop, Mr. Huddleston will disclose his primary subject of interest. Mr. Huddleston wants to know whether the DNC emails published by Wikileaks were ever stored – at any time – on Mr. Rich's laptop. On May 7, 2020, the House Intelligence Committee published the December 5, 2017 testimony of Shawn Henry, CEO of CrowdStrike, Inc., the company hired by the DNC (and relied upon by the FBI and Mr. Mueller) to examine its computers. *See* Aaron Mate, "Hidden Over 2 Years: Dem Cyber-Firm's Sworn Testimony It Had No Proof of Russian Hack of DNC," https://www.realclearinvestigations.com/articles/2020/05/13/hidden_over_2_years_dem_cyber-firms_sworn_testimony_it_had_no_proof_of_russian_hack_of_dnc_123596.html (Exhibit 4) and Transcript of December 5, 2017 Testimony of Shawn Henry (hereinafter "Henry Transcript"), https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Shawn_Henry-MTR_Redacted.pdf (Exhibit 5). Mr. Henry admitted that his company had no "concrete evidence" that the DNC emails were hacked remotely, only evidence that files were "staged for exfiltration." Henry Transcript, p. 32. Mr. Huddleston wants to know if those files were found on Mr. Rich's work laptop, regardless of how they might have gotten there.

If there is a multi-gigabyte folder on Mr. Rich's work laptop that contains thousands of DNC emails that do not belong to Mr. Rich, then the FBI could readily disclose that fact in a *Vaughn* index without jeopardizing national security or any

criminal prosecutions.[11] And if there is metadata indicating that such a file existed but was downloaded to a thumb drive, that metadata also should be disclosed. Mr. Huddleston seeks the metadata to determine whether the records were truly hacked (versus being downloaded to a thumb drive).[12] Mr. Huddleston has explained previously that he *specifically* requested metadata, and metadata is subject to production under FOIA. *See* Cross-Motion 30-31 (citing cases). Neither the metadata nor the records are described anywhere in the *Vaughn* index. The Court should order the FBI to produce such an index within 60 days.

Mr. Huddleston also should discuss *Brady vs. Maryland*, a case that is only indirectly relevant here. 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97, 10 L. Ed. 2d 215 (1963). If there is any evidence whatsoever that would tend to exonerate the Russian defendants, namely evidence that Seth Rich was the source of the DNC emails published by Wikileaks, then the Department of Justice would be obligated to disclose that information to the Russian defendants. *Id*. The FBI cannot, therefore, claim that the prosecutions would be jeopardized by the mere acknowledgement that such exculpatory

---

[11] On the other hand, if the work laptop contained evidence that Seth Rich was feuding with other DNC employees about the DNC's support of Hillary Clinton over Bernie Sanders, then the actual records should be produced insofar as it would not jeopardize national security or the prosecution of Russian intelligence agents.

[12] As detailed below, the FBI cannot invoke national security exemptions for the purpose of concealing illegal activity or government misconduct. In his report, Special Counsel Robert Mueller declared – in a single conclusory paragraph – that Mr. Rich played no role in the DNC email leaks. Mueller Report 48. If the metadata reveals that the emails were "exfiltrated" from Mr. Rich's laptop by any means, then someone in the federal government perpetrated a fraud, and the FBI cannot cite national security as a basis for concealing the evidence of that misconduct. Exec. Order 13,526 § 1.7(a).

records exist. The Government would not only be obligated to disclose the existence of such records, but the records themselves. *Id*.

Similarly, the FBI cannot plausibly argue that the prosecutions – much less national security – would be jeopardized by acknowledging the mere *existence* of records about Russian agents trying to hack into Seth Rich's devices. That claim already has been asserted publicly by the federal prosecutor assigned to Mr. Rich's murder case. *See supra* 7. National security cannot be jeopardized because there is no longer a secret to be hidden.

### D.  Exemption (b)(3): National Security

According to Mr. Seidel, "the FBI is asserting Exemption 3, at times in conjunction with Exemption 7(E) to withhold unclassified intelligence sources and methods that were employed as law enforcement techniques, procedures, or guidelines, and thus would qualify as both an intelligence source and method under Exemption 3 and a law enforcement technique under Exemption 7(E)." There are, however, some important exceptions to national security exemptions:

> In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security.

Exec. Order 13,526 § 1.7(a).  For the reasons set forth below, national security is not implicated by the documents in questions, therefore the exemption does not apply.

On January 11, 2023, Plaintiff's Counsel sent an email to Defendants' Counsel inquiring about the third-party documents described in Paragraph 15 of the Sixth Declaration:

> I have another question regarding the work laptop, specifically about the report described in Paragraph 15 of the Seidel's sixth declaration. We would like to know whether the report was produced by a private entity such as CrowdStrike.
>
> If the report was produced by Crowdstrike, then it would be covered by my specific request for records from Crowdstrike, and it should be included in the FBI's forthcoming supplemental motion for summary judgment.[13] Either way, please ask the FBI if it is willing to disclose whether the report came from a private entity or government entity. That's an important distinction for purposes of briefing. Thank you.

January 11, 2023 Email from Ty Clevenger to Andrea Parker (Exhibit 6).[14] It is a near certainty that the records in question were produced by CrowdStrike and, if so, then the FBI cannot plausibly assert national security objections, namely because it has already acknowledged that it relied on records from CrowdStrike. *See supra* 13-14; *see also* Joint Status Report (Dkt. #78). Furthermore, the testimony of CrowdStrike CEO Shawn Henry – wherein he acknowledges that his private firm was responsible for investigiating the purported "hack" – is already a matter of public record. *Supra* 13-14.

---

[13] The FBI belatedly produced records from CrowdStrike, and only after Mr. Huddleston pointed out that he had specifically requested records from CrowdStrike. *See* Cross-Motion 18 and Joint Status Report (Dkt. #78). The forthcoming motion for summary judgment is supposed to address those belatedly-produced records. Dkt. #78.

[14] Mr. Huddleston respectfully asks the Court to read the entire email string found in Exhibit 6. Thus far the FBI has not responded to a single request for clarification.

### D.  Exemption (b)(7)(A)-1: Information the disclosure of which could reasonably be expected to interfere with pending enforcement proceedings.

For all of the reasons explained above, the disclosure of the seven pages in question could not "reasonably be expected to interfere with pending enforcement proceedings." Recall Paragraph 13(c) of the Sixth Declaration: "The FBI found no indication that the FBI relied on the content of the work laptop, DVD, or tape drive." If the FBI investigated the Russian "hacking" but did not rely on any of the content from the work laptop, it is implausible to suggest that a *report* about that laptop is somehow essential to the prosecution of Russian intelligence agents. In short, the FBI cannot have it both ways. Certainly the FBI might need to redact portions of those pages (for the reasons discussed below), but the FBI has no plausible basis for withholding the records *in toto*.

In support of the FBI's reliance on Exemption (7)(A)-1, Mr. Seidel offers his typical, conclusory boilerplate.

(1) "The release of this information would reveal details concerning the pending enforcement procedures, to include the existence and location of the investigation."

**Response**: We already know that the investigation existed because Mr. Seidel disclosed it in his own declaration. Sixth Declaration ¶28. We also know that the investigation was conducted by Special Counsel Robert M. Mueller in Washington, DC, and the Russian defendants purportedly acted in Russia. *See* Mueller Report (https://www.justice.gov/archives/sco/file/1373816/download).

(2) "The FBI determined release of any of this material would provide criminals and foreign agents of foreign powers with information about the United States government's investigation and enforcement strategies in these ongoing matters, which could allow criminals and our national adversaries to predict

and potentially thwart these strategies, and/or allowing them to discover and tamper with witnesses and destroy evidence."

**Response:** If the FBI has the work laptop in its secure evidence room, as it claims, then the revelation of seven pages about that worktop (or its contents) would not allow the Russian defendants or anyone else to destroy evidence. And if the three-page forensic report was produced by CrowdStrike rather than the FBI, then the FBI needs to explain how revelation of the records "would provide criminals and foreign agents of foreign powers with information about the United States government's investigation and enforcement strategies…" That is particularly true since the FBI simultaneously claims that it did not rely on the work laptop or its contents.

Mr. Seidel does not make any attempt to apply his legal arguments to the facts of this case, instead leaving it up to the Court to guess what he is talking about. The same is true for Paragraph 29 of his declaration. If, for example, individual names are redacted from the chain-of-custody forms, then how could the release of those forms trigger any of the concerns in paragraph 29? That is particularly true if the "individual" in question is CrowdStrike. In any event, the FBI waived its arguments about Exemption 7(a)-1 as a result of inadequate briefing. *See Boggs v. Krum Indep. Sch. Dist.*, 376 F. Supp. 3d 714, 722 (E.D. Tex. 2019), quoting *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008), in turn quoting *Castro v. McCord*, 259 F. App'x 664, 665 (5th Cir. 2007)("A party 'waives an issue if he fails to adequately brief it.').

### D.  Exemption (b)(7)(E): Investigative techniques and procedures.

In yet another round of boilerplate, Mr. Seidel declares that release of the seven pages would interfere with "highly sensitive" law enforcement techniques and procedures. Sixth Declaration ¶34. This begs yet another question: How could a report about imaging (*i.e.*, copying) data from a laptop invoke such concerns? The report might

well contain information subject to other exemptions, and that information could be redacted, but the mere fact that somebody imaged data from a laptop is unremarkable. Techniques for imaging hard drives are widely known and the manner in which a computer is imaged cannot have any intrinsic law enforcement. *See, e.g.,* https://www.easeus.com/backup-utility/computer-imaging.html. Mr. Huddleston could walk into the nearest Best Buy and have the Geek Squad copy data from his laptop. If CrowdStrike copied data from a laptop and then wrote a report about it, then no "highly sensitive *law enforcement* techniques and procedures" are implicated because CrowdStrike is not a law enforcement agency.[15] In any event, the FBI has waived the argument due to inadequate briefing. *Boggs,* 376 F. Supp. 3d at 722.

### E. Other exemptions.

The FBI "name drops" other FOIA exemptions, but without any explanation whatsoever. *See* Sixth Declaration ¶18 and attachment to December 9, 2022 Letter from Michael G. Seidel to Brian Huddleston (Dkt. #83-2 at p.6). Perhaps there are some individual names that need to be redacted, but the FBI does not explain why entire pages need to be redacted. Once again, the FBI has waived the argument due to inadequate briefing. *Boggs,* 376 F. Supp. 3d at 722.

### Conclusion

The FBI should have identified the work laptop contents and related reports before this case was ever filed. Their excuses and proffered defenses are too little, too late. All

---

[15] If CrowdStrike was working directly for the FBI, then the FBI might reasonably argue that CrowdStrike was acting as its agent. In this case, however, CrowdStrike was working for the Democratic National Committee, *infra* 14, which obviously is not a law enforcement agency.

seven pages referenced in Paragraph 16 of the Sixth Declaration should be produced for

*in camera* inspection, and the FBI should begin processing the work laptop contents

immediately and on a much-expedited schedule.

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Counsel for Plaintiff Brian Huddleston**

**Certificate of Service**

On January 13, 2023, I filed a copy of this response with the Court's ECF system, which should result in automatic notification via email to Asst. U.S. Attorney Andrea Parker, Counsel for the Defendants, at andrea.parker@usdoj.gov.

**/s/ Ty Clevenger**
Ty Clevenger