IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

BRIAN HUDDLESTON,

               Plaintiff,

     v.

FEDERAL BUREAU OF
INVESTIGATION and UNITED
STATES DEPARTMENT OF JUSTICE,

             Defendants.

CIVIL ACTION No. 4:20CV00447

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

BRIAN HUDDLESTON,

Plaintiff,

v.

FEDERAL BUREAU OF
INVESTIGATION and UNITED
STATES DEPARTMENT OF JUSTICE,

Defendants.

CIVIL ACTION No. 4:20CV00447

## EIGHTH DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

1.       I am the Section Chief of the Record/Information Dissemination Section (RIDS),

Information Management Division (IMD), Federal Bureau of Investigation (FBI), Winchester,

Virginia. I joined the FBI in September 2011, and prior to my current position, I was Assistant

Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit,

from November 2012 to June 2016; and Assistant General Counsel, FBI Office of the General

Counsel, Freedom of Information Act (FOIA) Litigation Unit, from September 2011 to

November 2012. In those capacities, I had management oversight or agency counsel

responsibility for FBI FOIA and Privacy Act (FOIPA) litigation cases nationwide. Prior to

joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration (DEA),

from September 2006 to September 2011, where among myriad legal responsibilities, I advised

on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits

nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various

1

assignments from 1994 to September 2006 culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation Division, where I oversaw FOIPA litigation for the U.S. Army. I am an attorney licensed in the State of Ohio and the District of Columbia.

2.     In my official capacity as Section Chief of RIDS, I supervise approximately 238 FBI employees, supported by approximately 82 contractors, who staff a total of ten (10) Federal Bureau of Investigation Headquarters (FBIHQ) units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010), and the preparation of declarations in support of Exemption 1 claims asserted by the FBI under the FOIA. The Section Chief, RIDS, has been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1, respectively. The statements contained in this declaration are based on my personal knowledge, information provided to me in my official capacity, and conclusions and determinations reached and made in accordance therewith.

3.     Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a. I am aware of the FBI's standard position to neither confirm nor deny the existence of certain categories of

unacknowledged records: intelligence records, watch list records, Witness Security Program records, records for Incarcerated Individuals and Confidential Informant Records.

4.    The FBI submits this supplemental declaration to provide justification for the FBI's standard position to neither confirm nor deny the existence of unacknowledged records within the following categories: national security or foreign intelligence records pursuant to FOIA Exemption 1 and Exemption 3, in conjunction with 50 U.S.C. § 3024(i)(1); records that would identify any individual in the Witness Security Program pursuant to FOIA Exemption 3 and 18 U.S.C. § 3521; records that would identify any individual on a watchlist pursuant to FOIA Exemption 7(E); records or information, the release of which could reasonably be expected to endanger the life or physical safety of any incarcerated individual pursuant to FOIA Exemptions 7(E) and 7(F), and records, the release of which could reasonably be expected to endanger the life or physical safety of a confidential human source (CHS) pursuant to FOIA Exemptions 7(D), 7(E), and 7(F).

## THE FBI'S DUAL LAW ENFORCEMENT AND INTELLGENCE MISSIONS

5.    The FBI's mission "is to protect the American people and uphold the Constitution of the United States." *See* the FBI's mission statement at http://www.fbi.gov/about/mission. The FBI's mission priorities include: protect the United States from terrorist attacks; protect the United States against foreign intelligence, espionage, and cyber operations; combat significant cybercriminal activity; combat public corruption at all levels; protect civil rights; combat transnational criminal enterprises; combat significant white-collar crime; and combat significant violent crime. *Id.* Pursuant to 28 USC §§ 533, 534, and Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM) and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another

3

agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States.

## CONSISTENT ASSERTION OF STANDARD *GLOMAR* RESPONSES

6.      In accord with these dual missions and authorities, the FBI relies on a *Glomar* response to FOIA requests when acknowledging the existence or non-existence of certain categories of responsive records would result in harm to an interest protected by one or more FOIA exemptions.[1] To be credible and effective, the FBI must assert a *Glomar* response regardless of whether responsive records exist (i.e., including when the FBI does not possess responsive records). If the FBI invoked a *Glomar* response only when it possesses responsive records, the *Glomar* response would be interpreted as an admission that responsive records exist.

## INTELLIGENCE *GLOMAR*

7.      To the extent Plaintiff's requests may implicate classified or unclassified intelligence records and acknowledging the existence or non-existence of such records would harm an interest protected by the FOIA, a *Glomar* response pursuant to Exemptions 1 and/or 3, in conjunction with the National Security Act of 1947 [5 U.S.C. §§ 552(b)(1), (b)(3) and/or 50 U.S.C. § 3024(i)(1)], as applicable. The FBI asserts a standard *Glomar* response to neither confirm nor deny the existence of classified or unclassified records about certain subjects, because the fact that classified or unclassified records exist or do not exist is exempt from disclosure pursuant to FOIA Exemptions 1 and/or 3. The FBI asserts this standard response for

---

[1] The FBI submits this supplemental declaration to provide justification for the FBI's standard position to neither confirm nor deny the existence of unacknowledged records within the following categories: national security or foreign intelligence records pursuant to FOIA Exemption 1 and Exemption 3

such requests, regardless of whether the FBI located other responsive records.[2] The FBI's

justification for invoking a standard *Glomar* response in response to FOIPA requests is provided

in more detail below.

### Glomar of Intelligence Activities, Sources, and Methods

8.      The FBI consistently neither confirms nor denies the existence of records related

to the national security or foreign intelligence pursuant to FOIA Exemptions 1 and 3, as

applicable [5 U.S.C. §§ 552(b)(1), (b)(3) and 50 U.S.C. § 3024(i)(1), as applicable]. The FBI

invokes the Exemption 1 and 3 *Glomar* response to protect certain records the FBI may or may

not have compiled while carrying out its responsibilities to investigate threats to the national

security and to gather foreign intelligence. Confirming or denying the existence of such records

could reveal the existence or non-existence of certain intelligence-related investigations and

intelligence activities, sources and methods, including foreign activities, sources, and methods,

the disclosure of which reasonably could be expected to cause damage to the national security of

the United States. The types of records that typically fall under this *Glomar* response may

include, but are not limited to, national security investigative files pertaining to, for example,

terrorism or counterintelligence; documents containing information regarding sensitive methods

and techniques, such as surveillance targeting acknowledged subjects of national security

interest; documents containing information regarding non-public national security related

---

[2] The FBI's addendum, attached to FBI response letters, notifies requesters that the FBI routinely asserts a standard *Glomar* response pursuant to FOIA Exemptions 1 and/or 3, as applicable, in conjunction with the National Security Act of 1947 [5 U.S.C. §§ 552(b)(1), (b)(3) and/or 50 U.S.C. § 3024(i)(1)], as to the existence or non-existence of classified or unclassified intelligence records pertaining to the subject of the FOIA request, because acknowledging the existence or non-existence of classified or unclassified records in the context of the specific subject requested would harm an interest protected by the FOIA. This standard notice also includes *Glomar* responses applicable to other types of requests, which also apply to Plaintiff's requests and are discussed later in this declaration.

intelligence programs or events; and documents pertaining to non-public joint intelligence community (IC) assessments concerning threats to the national security of the United States. Due to the sensitivity and potentially classified nature of this information, should the Court request additional information the FBI can submit a classified *in camera* declaration to the Court. As noted above, the *Glomar* response is a standard response not intended to indicate that certain national security, intelligence related, or similar types of records do or do not exist.

9.      To the extent Plaintiff's requests seek records, the existence or non-existence of which would reveal intelligence such as national security, intelligence-related, or similar types of records, the FBI's *Glomar* response is justified, because the existence or non-existence of responsive records is classified in the interest of national security and/or protected by statute, particularly the National Security Act of 1947 (50 U.S.C. § 3024 (i)(1)).

*FOIA Exemption 1: Classified Information*

10.     FOIA Exemption 1 protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

11.     The FBI is bound by Executive Order 13526 which currently governs classification.[3] It provides for the protection of intelligence activities, sources, and methods. Executive Order 13526 § 1.4(c). Moreover, Executive Order 13526 explicitly authorizes an

---

[3] Executive Order 13526 § 1.1(a) provides that information may be originally classified only if all the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in § 1.4 of Executive Order 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage.

agency to use a *Glomar* response in this type of situation. Specifically, section 3.6(a) provides that, "[a]n agency may refuse to confirm or deny the existence or non-existence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." *Id.* at § 3.6(a).

12.     Records responsive to these requests, if any, would necessarily be held by the FBI, and would therefore be "owned by, produced by or for, or ... under the control of the United States Government." *Id.* at § 1.1(a)(2). The existence or non-existence of such records "pertains to . . . intelligence activities" or "intelligence sources or methods." *Id.* at § 1.4(c). An intelligence activity or method includes any intelligence action or technique utilized by the FBI or other Intelligence Community (IC) members against a targeted individual or organization determined to be of national security interest, and includes any procedure, such as engaging a source, utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method, and information generated by it, is needed by United States intelligence agencies to carry out their respective missions. Second, confidentiality must be maintained with respect to the use or non-use of the activity or method, including the use of an intelligence source, if the viability, productivity, and usefulness of the activity or method are to be preserved.

13.     Intelligence activities and methods, including sources must be protected from disclosure in every situation, particularly when the intelligence activity or method, including a source, or its specific use, is not known to the individual or organization against which it is deployed, since the individual or organization could take countermeasures to diminish or nullify its effectiveness. Generally, intelligence activities and methods are valuable only as long as they remain unknown. Once an intelligence activity or method (or the fact of its use or non-use in a

certain situation) is discovered, its continued successful use is seriously jeopardized. In the case of intelligence sources, disclosure can result in threats to the source's life and safety, as well as that of the source's family and others close to the source.

14.     The U.S. Government must do more than prevent disclosure of direct references to intelligence activities and methods, it must also prevent indirect references to them. One vehicle for gathering information about the U.S. Government's capabilities is to review official information. Terrorists, terrorist organizations, and other hostile foreign intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the utility of a particular activity or method. Thus, even seemingly innocuous, indirect references to an intelligence activity or method could have significant adverse effects when juxtaposed with publicly available information.

15.     Acknowledging the existence or non-existence of records responsive to a request pertaining to intelligence activities or methods could confirm or refute the FBI's reliance on a particular intelligence activity or method, which could, in turn, reveal non-public information regarding the nature of the FBI's intelligence interests and priorities, along with its intelligence activities, and methods—information that is desired by hostile actors who seek to thwart the ability of the FBI to gather intelligence. Accordingly, to confirm or deny that the FBI possesses records responsive to a request related to the FBI's intelligence function risks compromising intelligence activities and methods, including sources, and thus poses at least a serious risk to the national security of the United States.

16.     The determination that the existence or non-existence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to

8

prevent or delay the release of information that does not require protection in the interests of the national security.

*FOIA Exemption 3 and the National Security Act of 1947 (50 U.S.C. § 3024(i)(1))*

17.   FOIA Exemption 3 protects matters "specifically exempted from disclosure by statute . . . if that statute . . . (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the Open FOIA Act of 2009, specifically cites to this paragraph." 5 U.S.C. § 552(b)(3). Here, the statute on which the FBI relies is the National Security Act of 1947 (NSA of 1947), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA). This statute provides that the Director of National Intelligence (DNI) "shall protect intelligence sources and methods from unauthorized disclosure."[4] As relevant to 5 U.S.C. § 552(b)(3)(B), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009. On its face, the NSA of 1947 leaves no discretion to agencies to withhold or not information about intelligence sources and methods from the public. Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute. *See CIA v. Sims*, 471 U.S. 159 (1985).

18.   To fulfill its obligation to protect intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the IC for the classification of information under applicable law, executive orders, or other presidential directives, for access to and dissemination of intelligence, and for the preparation of intelligence products. *See* 50 U.S.C. §

---

[4] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1). As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

3024(i)(2). In implementing this authority, the DNI promulgated Intelligence Community Directive (ICD) 700, which provides that IC elements shall protect "national intelligence and intelligence sources, methods and activities from unauthorized disclosure."[5] The FBI is one of 18 member agencies comprising the IC and, as such, must protect intelligence sources and methods.

19.     As described above, Congress enacted the NSA of 1947, as amended by the IRTPA, to protect the IC's sources and methods of gathering intelligence. The statute makes no distinction between source and method information classified under Executive Order 13526 and source and method information that is unclassified. The FBI determined that such intelligence sources and methods could be disclosed if the FBI acknowledges the existence or non-existence of national security-related or intelligence-related records responsive to a FOIA or Privacy Act request. The disclosure of the existence or non-existence of a national security investigation could reasonably be expected to result in harm to the national security, because disclosure would provide adversaries with valuable insight into the FBI's investigative efforts. Armed with this information, adversaries could use the information to devise more effective counter-surveillance techniques to shield their activities from detection. Disclosure would also permit hostile governments to appraise the scope, focus, location and capabilities of the FBI's intelligence-gathering methods and activities and allow hostile agents to devise countermeasures to circumvent them. In sum, the disclosure of this type of information could reasonably be expected to cause serious damage or even exceptionally grave damage to the national security, as it would (a) reveal actual intelligence sources and methods utilized by the FBI against specific targets; (b) disclose the intelligence-gathering capabilities of such sources and methods; and (c) provide an assessment of the ability of such sources and methods to obtain information on a specific target

---

[5] Intelligence Community Directive (ICD), dated June 7, 2012, at ¶ E.2.a.

during a specific period of time, thus severely disrupting the FBI's intelligence-gathering capability. Therefore, the FBI is prohibited from disclosing the existence or non-existence of such information pursuant to 50 U.S.C. § 3024(i)(1). Accordingly, to the extent Plaintiff's requests seek records on intelligence sources or methods, the National Security Act of 1947, in conjunction with Exemption 3, provides an additional and independent basis for the FBI's *Glomar* response to neither confirm nor deny the existence of any such records.

### WITNESS SECURITY PROGRAM *GLOMAR*

*Exemption 3 and 18 U.S.C. § 3521(b)(1)(G)*

20.     In requests seeking records concerning an individual, the FBI can neither confirm nor deny the existence of records which could identify a participant in the Witness Security Program pursuant to FOIA Exemption 3 and Privacy Act Exemption (j)(2) [5 U.S.C. § 552 (b)(3) and 5 U.S.C. § 552a (j)(2)]. Information concerning the Witness Security Program is protected by statute, specifically 18 U.S.C. § 3521(b)(1)(G), which states that the Attorney General may, by regulation:

> disclose or refuse to disclose the identity or location of the person relocated or protected, or any other matter concerning the person or program after weighing the danger such a disclosure would pose to the person, the detriment it would cause to the general effectiveness of the program, and the benefit it would afford to the public or to the person seeking disclosure.

By memo dated April 29, 2003, then Attorney General John Ashcroft promulgated regulations stating that, pursuant to 18 U.S.C. §§ 3521(b)(1) and (3), as now implemented by 28 C.F.R. § 0.111B(b), and A.G. Order No. 2511-2001, no agency, entity, or person associated with the program is permitted to release any information concerning the operations of the federal Witness Security Program or its participants. These restrictions on the release of information pertain to information regarding current and former protected witnesses, even if the release would be to the witness, and they pertain to information regarding deceased witnesses.

As relevant to 5 U.S.C. § 552(b)(3)(B), 18 U.S.C. §3521[6] is a statute enacted before the date of enactment of the Open FOIA Act of 2009. The FBI has no discretion to disclose such information.[7] To publicly identify the existence of witness protection in the context of a particular request would indicate the presence of Witness Protection Program information in responsive records, thus revealing information that is statutorily prohibited from being disclosed. The mere acknowledgment of the existence or non-existence of such records in the context of and in response to a particular request triggers foreseeable harm to the operations of the federal Witness Security Program and its participants. Accordingly, when the FBI receives a request for records on an individual pursuant to the Privacy Act or the FOIA, the FBI consistently neither confirms nor denies the existence of Witness Security Program records, because to be credible and effective, the FBI must use this *Glomar* response in all such cases regardless of whether responsive records actually exist or not. If the FBI only invoked a *Glomar* response when it actually possessed responsive records, the *Glomar* response would be interpreted as an admission that responsive records exist. This *Glomar* response is a standard response to requests to the FBI seeking records on an individual, regardless of whether the requester asks for Witness Security Program-related records and regardless of whether the individual is living or deceased.

21.     To the extent the request seeks records on an individual, the FBI can neither confirm nor deny the existence of any such records because the very existence or non-existence of this information is exempt from disclosure pursuant to FOIA Exemption (b)(3) in conjunction with 18 U.S.C. § 3521.

---

[6] 18 U.S.C. § 3521 was enacted on October 12, 1984.

[7] The Open FOIA Act of 2009 was enacted on October 28, 2009. *See* Pub. L. 111-83, 123 Stat. 2142, 2184.

## WATCH LIST INFORMATION *GLOMAR*

22.     The FBI can neither confirm nor deny the existence of an unacknowledged

individual's name on a watch list pursuant to FOIA Exemption 7(E) and, in instances where a

requester seeks records on themselves, Privacy Act Exemption (j)(2) [5 U.S.C. § 552 (b)(7)(E)

and 5 U.S.C. § 552a (j)(2)]. When the FBI receives a request for records on an individual

pursuant to the Privacy Act or the FOIA, the FBI consistently neither confirms nor denies the

existence of watchlist records in all such requests. This *Glomar* response is a standard response

to requests to the FBI seeking records on an individual, regardless of whether the individual is

living. The FBI's standard response should not be read to indicate that watchlist records exist

because to be credible and effective, the FBI must assert this *Glomar* response in all such cases

regardless of whether responsive records actually exist. If the FBI only invoked a *Glomar*

response when it actually possesses responsive records, the *Glomar* response would be

interpreted as an admission that responsive records exist.

### FOIA EXEMPTION 7(E)

23.     FOIA Exemption 7(E) exempts from disclosure "records or information compiled

for law enforcement purposes, but only to the extent that the production of such law enforcement

records or information ... would disclose techniques and procedures for law enforcement

investigations or prosecutions ... if such disclosure could reasonably be expected to risk

circumvention of the law." 5 U.S.C. § 552(b)(7)(E). As a threshold matter, the existence or non-

existence of watchlist information meets Exemption 7's requirement of being "compiled for law

enforcement purposes," because the FBI is the primary investigative agency of the federal

government with authority to conduct investigations and activities to protect the United States

and its people from terrorism and threats to national security, and further the foreign intelligence

13

objectives of the United States. The FBI's records concerning terrorist watchlists were compiled

and created in furtherance of the FBI's law enforcement and national security functions, and

information contained on terrorist watchlists is used to enable the FBI to perform its core law

enforcement and national security related duties.

24.     Disclosure of the existence or non-existence of watchlist records in response to a

request for records on an individual "would disclose techniques and procedures for law

enforcement investigations" and "disclosure could reasonably be expected to risk circumvention

of the law." 5 U.S.C. § 552(b)(7)(E). If an individual knows who is or is not on a watchlist, they

can understand what types of behavior are pertinent to placement on a watch list. This

knowledge would allow criminals to develop countermeasures to conceal their activities and

thwart efforts to combat crime and protect the national security of the United States. Confirming

that an individual is on a watchlist would reasonably be expected to compromise investigative

operations because it would induce the individual to flee, hide or destroy evidence, and/or

change their behaviors to avoid detection. Confirming that an individual is not on a watchlist

could embolden a criminal to continue his/her activities and encourage other criminals to follow

a similar path shown to avoid detection. This, in turn, would enable the targets of the watchlist to

circumvent the ability of the FBI to effectively use this important law enforcement technique,

therefore allowing circumvention of the law.

25.     The FBI asserts this standard *Glomar* response to all requests for records on an

individual, because given the sensitive information contained in the watch list, the mere

acknowledgment of the existence or non-existence of responsive records would trigger harm to

an interest protected by FOIA Exemption 7(E).

## INCARCERATED INDIVIDUALS RECORDS *GLOMAR*

27.     The FBI can neither confirm nor deny the existence of unacknowledged records or information compiled for law enforcement purposes, which could reasonably be expected to endanger the life or physical safety of any incarcerated individual in the context of a specific investigation is exempt pursuant to FOIA Exemptions (b)(7)(E) and (b)(7)(F). 5 U.S.C. §§ 552(b)(7)(E), (b)(7)(F).

### FOIA Exemption 7(E)

28.     Disclosure of the existence of records concerning incarcerated individuals in response to a particular request would not only be an unwarranted personal privacy and potentially disclose the identity of or information provided by (outside of its investigative use) an incarcerated individual, it could reveal non-public investigative strategies and the scope of intelligence available to the FBI, and could provide criminals with information the analysis of which would result in the detection of the individual and reduce the ability of the FBI to utilize incarcerated individuals in the future. Additionally, publicizing the circumstances in which these individuals are utilized and when they are not utilized, would reduce the likelihood of cooperation of current and future individuals because it would become easier for criminals to identify these individuals in specific circumstances. Criminals could aggregate information about the specific situations when the FBI chooses to employ incarcerated individuals to develop a road map of the FBI's related strategies, capabilities, and vulnerabilities, and use that information to create countermeasures to thwart the use of these individuals in similar situations. Such actions would damage the FBI's ability to collect valuable human intelligence information and reduce their overall effectiveness. Therefore, the FBI asserts a standard *Glomar* response in

all such requests, neither confirming nor denying whether incarcerated individuals records exist in response to a request for records on an individual, pursuant to FOIA Exemption 7(E).

FOIA Exemption 7(F)

29.     FOIA Exemption 7(F) permits the withholding of "records or information compiled for law enforcement purposes…the production of [which]…could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F).

30.     The FBI asserts a *Glomar* response as to the existence or non-existence of records that would endanger the life or physical safety of an incarcerated individual. Experience has shown that when identifying information concerning these individuals becomes known, that disclosure places them in a particularly vulnerable position and subjects them to violent retaliation through physical harm or even death. Therefore, the FBI asserts a standard *Glomar* response in all such requests for the records on an individual, neither confirming nor denying whether incarcerated individuals records exist pursuant to FOIA Exemption 7(F).

**CONFIDENTIAL HUMAN SOURCE RECORDS *GLOMAR***

26.     The FBI can neither confirm nor deny the existence of unacknowledged records or information compiled for law enforcement purposes, concerning the use of confidential human sources (CHS) in the context of a specific investigation. The fact of the existence or non-existence of information about a CHS or the FBI's CHS program, is exempt pursuant to FOIA Exemptions (b)(7)(D), (b)(7)(E), and (b)(7)(F). 5 U.S.C. §§ 552(b)(7)(D), (b)(7)(E), (b)(7)(F).

FOIA EXEMPTION 7(D)

27.     Exemption (b)(7)(D) protects records or information compiled for law enforcement purposes when disclosure "could reasonably be expected to disclose the identity of a confidential source, including a State, local or foreign agency or authority or any private

16

institution which furnished information on a confidential basis, and, in the case of a record or

information compiled by a criminal law enforcement authority in the course of a criminal

investigation or by an agency conducting a lawful national security intelligence investigation,

information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D).

28.    In response to a request for records concerning an individual, the FBI cannot

confirm nor deny the existence of any records that would disclose the fact that an individual is or

was a CHS, without proof that the individual was officially confirmed to be an FBI CHS by the

FBI or DOJ. Accordingly, the FBI relies on a standard *Glomar* response pursuant to FOIA

Exemption (b)(7)(D) so as not to acknowledge the existence or non-existence of such records.

Doing otherwise jeopardizes the FBI's confidential sources and CHS program. If the FBI

responded substantively when the individual is not, in fact, a CHS, but refused to confirm

whether responsive records exist when the individual is a source. The harm from such disclosure

is two-fold. First, disclosure would endanger FBI CHSs as the FBI's FOIA responses would

create a pattern whereby criminals could easily discern who is and is not an FBI CHS. This

would expose FBI CHSs to reprisal, in many forms, by those on whom they provided

information and others who may think negatively of their cooperation with the FBI. Second, it

would indicate an unwillingness on the part of the FBI to take appropriate measures to ensure the

safety and confidentiality of its CHSs. This would dissuade current and future sources from

providing critical, law enforcement relevant information to the FBI. Accordingly, the FBI must

rely on a *Glomar* response in any instance in which a requester seeks records on an individual.

29.    In requests seeking records on an individual, where the requester has not provided

any documentation to suggest that the FBI has officially acknowledged that the individual is a

CHS, the FBI must refuse to confirm or deny whether or not responsive records exist. The FBI

does this in any instance when records about an unacknowledged CHS could be implicated, to prevent harm to CHSs individually and to the CHS program overall.

FOIA EXEMPTION 7(E)

30.     Disclosure of the existence of records concerning CHSs in response to a particular request would not only be an unwarranted personal privacy and potentially disclose the identity of or information provided by (outside of its investigative use) a CHS, it could reveal non-public investigative strategies and the scope of intelligence available to the FBI, and could provide criminals with information the analysis of which would result in the detection of CHSs and reduce the ability of the FBI to utilize CHSs in the future. Additionally, publicizing the circumstances in which CHSs are utilized and when they are not utilized, would reduce the likelihood of cooperation of current and future CHSs because it would become easier for criminals to identify CHSs in specific circumstances. Criminals could aggregate information about the specific situations when the FBI chooses to employ CHSs to develop a road map of the FBI's CHS-related strategies, capabilities, and vulnerabilities, and use that information to create countermeasures to thwart the use of CHSs in similar situations. Such actions would damage the FBI's ability to collect valuable human intelligence information and reduce the overall effectiveness of the FBI's CHS program. Therefore, the FBI asserts a standard *Glomar* response in all such requests, neither confirming nor denying whether CHS records exist in response to a request for records on an individual, pursuant to FOIA Exemption 7(E).

FOIA EXEMPTION 7(F)

31.     FOIA Exemption 7(F) permits the withholding of "records or information compiled for law enforcement purposes…the production of [which]…could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F).

32.     The FBI asserts a *Glomar* response as to the existence or non-existence of records that would endanger the life or physical safety of a CHS. Experience has shown that when identifying information concerning a CHS becomes known, that disclosure places the CHS in a particularly vulnerable position and subjects the CHS to violent retaliation through physical harm or even death. Therefore, the FBI asserts a standard *Glomar* response in all such requests for the records on an individual, neither confirming nor denying whether CHS records exist pursuant to FOIA Exemption 7(F).

## CONCLUSION

33.     To the extent the requests at issue in this litigation implicates records that could reveal the existence of unacknowledged intelligence records, watchlist records, Witness Security Program records, incarcerated individuals or CHS records, the FBI can neither confirm nor deny the existence or non-existence of such records because to do so would reveal classified or unclassified intelligence sources and methods, disclose the identity of or endanger the life or physical safety of an incarcerated individual, disclose the identity of or endanger the life or physical safety of a CHS, or disclose non-public sensitive FBI techniques, information which the very existence of is exempt pursuant to FOIA Exemptions 1, 3, 7(D), 7(E), and 7(F).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this _20th_ day of January 2023.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia