## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

**BRIAN HUDDLESTON**,

     Plaintiff,

vs.

**FEDERAL BUREAU OF INVESTIGATION and UNITED STATES DEPARTMENT OF JUSTICE**

     Defendant

**Case No. 4:20-cv-447-ALM**

## PLAINTIFF'S RESPONSE TO DEFENDANT FBI'S NOTICE OF SUPPLEMENTAL SEARCH DECLARATION AND VAUGHN INDICES and PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COMES Brian Huddleston, the Plaintiff, responding in opposition to Defendant FBI's Notice of Supplemental Search Declaration and Vaughn Indices (hereinafter "Supplemental Search") (Dkt. #95) and further moving the Court to grant partial summary judgment in his favor:

### Introduction

Time and again, Mr. Huddleston has caught the FBI "hiding the ball" in response to his FOIA requests. On October 7, 2022, Mr. Huddleston noted that the FBI had ignored a *specific* request for records from CrowdStrike, Inc.:

> [The declaration of FBI Section Chief Michael Seidel] made no reference to reports from CrowdStrike, Inc., and the Plaintiff knows for certain that such

- 1 -

records exist. The Plaintiff has attached a FOIA production from the FBI to Aaron Mate wherein the FBI disclosed at least one page of such a document.

*See* Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment (hereinafter "Cross-Motion")(Dkt. #46) 18.  Caught red-handed, the FBI belatedly agreed to search for additional records, *see* Defendants' Unopposed Motion to Stay Briefing Schedule (Dkt. #48), and lo and behold, the FBI found some CrowdStrike reports. *See* Supplemental Search. Unfortunately, the FBI's search is still inadequate, and it appears to be deliberately inadequate. As indicated below, the FBI failed to mention two additional CrowdStrike that already have been acknowledged publicly, and it redacted information that already has been released publicly. True to form, FBI personnel tried to redact / withhold everything and then hope that they could get away with it.

**<u>Factual background</u>**

In order to appreciate the Supplemental Search, one must consider the bizarre circumstances surrounding the CrowdStrike reports. On September 16, 2021, prominent attorney Michael A. Sussman was indicted for lying to the FBI about connections between then-Presidential candidate Donald Trump and the Russian government. *See* Indictment (Dkt. #1), *United States v. Michael A. Sussman*, Case No. 1:21-cr-00582-CRC (D.D.C). The Indictment is attached as Exhibit 1,[1] and Mr. Huddleston encourages the Court to read the 27-page document in its entirety. The government presented the

---

[1] As witnessed by his electronic signature below, Ty Clevenger testifies under penalty of perjury under the laws of the United States that the exhibits attached to this document are true and correct copies of the documents that he describes them to be.

Indictment, thus it owns all of the allegations therein, and those allegations are very relevant here.

The Indictment alleges that Mr. Sussman was an attorney for Mr. Trump's political opponent and nemesis, Democrat Hillary Clinton. Indictment ¶4. The Indictment bizarrely and euphemistically alleges that Mr. Sussman worked for "Law Firm-1," but it is a matter of public record that Mr. Sussman worked for Perkins Coie, LLP at all times relevant to the Indictment. *See, e.g., Charlie Savage, et al., "*Durham Is Said to Seek Indictment of Lawyer at Firm With Democratic Ties," September 15, 2021 New York Times (https://www.nytimes.com/2021/09/15/us/politics/durham-michael-sussmann-trump-russia.html) (attached as Exhibit 2) and Robert Legare, "Attorney with ties to 2016 Clinton campaign acquitted in first Durham special counsel trial," March 31, 2022 *CBS News* (https://www.cbsnews.com/news/michael-sussmann-trial-durham-verdict/) (attached as Exhibit 3). As reflected on its own website, Perkins Coie represents the Democratic National Committee (hereinafter "DNC"), *see, e.g.*, https://www.perkinscoie.com/en/experience/democratic-national-committee-2.html (attached as Exhibit 4), and Perkins Coie is no stranger to this case. Perkins Coie provided Seth Rich's work laptop to the FBI on behalf of the DNC. *See* June 28, 2018 Email from [redacted] to "LRA," BATES-numbered document 985 (Dkt. #77-1).

Perkins Coie's role in the "Russian collusion" fraud was ubiquitous, as was the role of Mr. Sussman. *See* Aaron Maté, "Coming Into Focus: Hillary's Secretive, Russiagate-Flogging Pair of Super-Lawyers," October 19, 2021 *RealClearInvestigations*,

(https://www.realclearinvestigations.com/articles/2021/10/19/coming_into_focus_hillarys
_secretive_russiagate-flogging_pair_of_super-lawyers_799168.html) (attached as Exhibit
5). Of particular interest here is the fact that Perkins Coie – and Sussman in particular –
hired CrowdStrike to write the very reports that the FBI is now trying to withhold. *Id*; *see
also* Transcript of December 5, 2017 testimony of CrowdStrike CEO Shawn Henry
(hereinafter "Henry Transcript"), Permanent Select Committee on Intelligence, U.S.
House of Representatives at 6-8 (https://www.dni.gov/files/HPSCI_Transcripts/2020-05-
04-Shawn_Henry-MTR_Redacted.pdf) (attached as Exhibit 6).

    The Indictment explains in great detail how Mr. Sussman hired others to write
bogus reports, then used those bogus reports to spur an FBI investigation of Mr. Trump.
But that is only the tip of the iceberg:

> At the time [that the DNC emails were published by Wikileaks], CrowdStrike was
> not the only Clinton campaign contractor focusing on Russia. Just days before
> Sussmann hired CrowdStrike in April, his partner Elias retained the opposition
> research firm Fusion GPS to dig up dirt on Trump and the Kremlin.
>
> These two Clinton campaign contractors, working directly for two Clinton
> campaign attorneys, would go on to play highly consequential roles in the ensuing
> multi-year Russia investigation.
>
> Working secretly for the Clinton campaign, Fusion GPS planted Trump-Russia
> conspiracy theories in the FBI and US media via its subcontractor, former British
> spy Christopher Steele. The FBI used the Fusion GPS's now debunked "Steele
> dossier" for investigative leads and multiple surveillance applications putatively
> targeting Trump campaign volunteer Carter Page.
>
> CrowdStrike, reporting to Sussmann, also proved critical to the FBI's work. Rather
> than examine the DNC servers for itself, the FBI relied on CrowdStrike's forensics
> as mediated by Sussmann.

The FBI's odd relationship with the two Democratic Party contractors gave Sussmann and Elias unprecedented influence over a high-stakes national security scandal that upended U.S. politics and ensnared their political opponents. By hiring CrowdStrike and Fusion GPS, the Perkins Coie lawyers helped define the Trump-Russia narrative and impact the flow of information to the highest reaches of U.S. intelligence agencies.

The established Trump-Russia timeline and the public record, including overlooked sworn testimony, congressional and Justice Department reports, as well as news accounts from the principal recipients of government leaks in the affair, the Washington Post and the New York Times, help to fill in the picture.

Aaron Maté, "Coming Into Focus: Hillary's Secretive, Russiagate-Flogging Pair of Super-Lawyers" (Exhibit 5) (citing public records).

According to the government's own Indictment, plus the other information cited above, Mr. Sussman was hellbent on framing Mr. Trump as a Russian asset, and Mr. Sussman was willing to generate and procure false reports in order to achieve that result. Yet now, when it is convenient, the FBI claims that Mr. Sussman's handiwork was "created and compiled for law enforcement purposes" and contains "classified intelligence sources and methods" such that it must be protected like the nation's nuclear launch codes. *See* Seventh Declaration of Michael G. Seidel (hereinafter "Seventh Declaration") (Dkt. #95-1) ¶¶23 and 29, respectively. Thus when Mr. Sussman is useful to the FBI, he is a patriotic American. And when Mr. Sussman is not useful to the FBI, he is a conniving criminal.

Meanwhile, the FBI never conducted its own investigation into the purported hacking of the DNC servers. *See* Reply in Support of Plaintiff's Motion for Clarification (hereinafter "Clarification Reply") (Dkt. #92) at 5 (citing two of Mr. Seidel's

declarations) and Aaron Maté, "Hidden Over 2 Years: Dem Cyber-Firm's Sworn Testimony It Had No Proof of Russian Hack of DNC," May 13, 2020 *RealClearInvestigations*, ([https://www.realclearinvestigations.com/articles/2020/05/13/hidden_over_2_years_dem_cyber-firms_sworn_testimony_it_had_no_proof_of_russian_hack_of_dnc_123596.html](https://www.realclearinvestigations.com/articles/2020/05/13/hidden_over_2_years_dem_cyber-firms_sworn_testimony_it_had_no_proof_of_russian_hack_of_dnc_123596.html)) (Dkt. #92-4) (citing Henry Transcript). Instead, the FBI deferred to a private contractor hired by a corrupt lawyer with a history of fabricating evidence against his political opponents, *i.e.*, Mr. Sussman.[2] The FBI had never before and has never since allowed a purported crime victim to hire its own private firm to investigate a purported hacking incident in lieu of an actual criminal investigation. Not only is the idea absurd, it is contrary to the Department of Justice's guidelines and flatly prohibited by the FBI's specific policies. *See* Ovie L. Carroll, et al., "Computer Forensics: Digital Forensic Analysis Methodology," CyberCrime Lab, U.S. Department of Justice (attached as Exhibit 7) and "Digital Evidence Policy Guide," Federal Bureau of Investigation (Dkt. #83-2, pp. 8-76). Perhaps an analogy is in order. It is as if National Bank A alleged that it was hacked by the agents of National Bank B, but the FBI allowed National Bank A to hire its own investigators to produce a redacted report, which the government then used to indict the purported agents of National Bank B in lieu of an actual FBI investigation.[3]

---

[2] This brings to mind the immortal words of syndicated columnist Dave Barry: "I promise I am not making this up."

[3] That actually is an oversimplification, because somewhere in the mix would be a corrupt lawyer with a history of inducing private investigators to produce false reports about opposing parties.

It is not difficult to figure out why the FBI is trying so hard to hide the CrowdStrike reports. As conceded by CrowdStrike's own CEO, the company never had any "concrete evidence" that the DNC servers were hacked *at all*, whether by Russian agents or anyone else. *See* Aaron Maté, "Hidden Over 2 Years: Dem Cyber-Firm's Sworn Testimony It Had No Proof of Russian Hack of DNC" (Dkt. #92-4) (citing Henry Transcript). Yet the FBI and Special Counsel Robert M. Mueller procured *criminal indictments* on the basis of those inconclusive, *partially-redacted* CrowdStrike reports. *Id*. This is reminiscent of a related set of indictments procured by Mr. Mueller and the FBI. Thirteen Russian individuals and three Russian companies were indicted on February 16, 2018, purportedly for interfering in the 2016 Presidential election. *See* "Grand Jury Indicts Thirteen Russian Individuals and Three Russian Companies for Scheme to Interfere in the United States Political System," February 16, 2018 Press Release, U.S. Department of Justice (https://www.justice.gov/opa/pr/grand-jury-indicts-thirteen-russian-individuals-and-three-russian-companies-scheme-interfere) (attached as Exhibit 8).  Given the fact that Russia had (and has) no extradition treaty with the United States, Mr. Mueller could safely assume that none of the defendants would show up in court and challenge his dubious evidence via discovery. But Mr. Mueller made a very serious miscalculation: the corporate defendants faced no risk of incarceration, so one of them actually appeared in court to contest the charges. Faced with the prospect of having to reveal its supporting "evidence," the government dismissed the case. *See* Sarah N. Lynch, "U.S. prosecutors drop Mueller-era case against Russian firm," March 16, 2020

*Reuters* (https://www.reuters.com/article/us-usa-trump-russia-concord/u-s-prosecutors-drop-mueller-era-case-against-russian-firm-idUSKBN21405P) (attached as Exhibit 9); *see also* George Parry, "Mueller's Concord Mismanagement Is Convulsing," June 23, 2018 *The American Spectator* (https://spectator.org/muellers-concord-mismanagement-is-convulsing/) (Exhibit 10). It is not difficult to see the parallels to this case. Mr. Mueller's team procured indictments of Russian "hackers" on the basis of the dubious CrowdStrike reports, and now the FBI wants to save itself and the Justice Department from further embarrassment by hiding the purported "evidence" from the public.

As the "Twitter Files" revealed recently, the FBI's top brass has deeply involved itself in corrupt, partisan politics. *See* Brian Flood, "Twitter Files Part 7: FBI, DOJ 'discredited' information about Hunter Biden's foreign business dealings," December 19, 2022 Fox News (https://www.foxnews.com/media/twitter-files-part-7-fbi-doj-discredited-information-about-hunter-bidens-foreign-business-dealings) (attached as Exhibit 11). Those corrupt, partisan politics are on full display in this case: the FBI has something to hide, and it is desperately (and dishonestly) trying to hide it.[4]

## **Argument**

### 1.  The FBI failed to brief the issues before the Court.

Before proceeding further, Mr. Huddleston must note that a party waives an argument when it does not brief that argument. *See Boggs v. Krum Indep. Sch. Dist.*, 376 F. Supp. 3d 714, 722 (E.D. Tex. 2019), quoting *Audler v. CBC Innovis Inc.*, 519 F.3d

---

[4] The core question raised by this case is not a trivial one: Did the FBI plant a false flag on a nuclear adversary for the sake of advancing a partisan, domestic political agenda?

239, 255 (5th Cir. 2008); *Domain Prot., LLC v. Sea Wasp, LLC*, 426 F. Supp. 3d 355, 377 (E.D. Tex. 2019) (citing cases), aff'd sub nom. *Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*, 23 F.4th 529 (5th Cir. 2022); *In re Hensley*, 551 B.R. 792, 807 (E.D. Tex. 2015); and *In re Mullican*, 417 B.R. 408, 415 (E.D. Tex. 2009) (citing cases). Time and again, the Defendants have been warned about inadequate (or non-existent) briefing, *see, e.g.*, Dkt. #65 at 12, Dkt. #76 at 6-8, Dkt. #77 at 2, Dkt. #92 at 18, yet the practice continues unabated. At some point, the Defendants must face the music for their willful failure to play by the rules.

The Supplemental Search, which is in reality a supplemental motion for summary judgment, consists of a single paragraph that briefly references FOIA exemptions but does not cite a single case in support of any argument. In fact, there is not a single legal argument in the Supplemental Search. It purports to incorporate by reference the Seventh Declaration, and that declaration then purports to incorporate earlier declarations as well as the Eighth Declaration of Michael G. Seidel (hereinafter "Eighth Declaration") (Dkt. #95-5). Such practice is strongly disfavored in the Fifth Circuit and by district courts elsewhere.

Relying primarily on the Federal Rules of Appellate Procedure, the Fifth Circuit has rejected parties' attempts to incorporate arguments by reference rather than address their arguments in an appellate brief. *Rigas v. United States*, 486 Fed. Appx. 491, 497 n.6 (5th Cir. 2012) (citing cases) and *Turner v. Quarterman*, 481 F.3d 292, 295 n.1 (5th Cir. 2007) (citing cases). In *Miller UK Ltd. v. Caterpillar, Inc.*, the district court rejected

a party's attempt to substitute an attachment in lieu of briefing an argument. 292 F.R.D.

590, 592 (N.D. Ill. 2013) (citing cases).  The *Miller UK* court noted that parties

sometimes employ the tactic to circumvent page limits. *Id*.

In this district, the page limit for a motion for summary judgment is 30 pages. *See*

Local Rule CV-7(a)(1).  When added together, the Supplemental Search, Seventh

Declaration, and Eighth Declaration comprise 50 pages, and that's not including all of the

earlier declarations that Mr. Seidel incorporates by reference. Meanwhile, as the Court

can see for itself, the Seventh Declaration references various statutes, but it is not a legal

brief. Furthermore, and as detailed below, the Seventh Declaration often describes

exemptions, but it omits the facts that would allow the Court to determine whether an

exemption applies. Likewise, the Eighth Declaration and the earlier declarations are not

legal briefs. Accordingly, the FBI has waived all of its arguments due to inadequate

briefing. Mr. Huddleston will nonetheless address the various exemptions referenced by

Mr. Seidel, notwithstanding Mr. Seidel's failure to *brief* those exemptions.

## 2.  The FBI's *Glomar* response is baseless.

A government agency may assert a "*Glomar*" response (*i.e.*, "neither confirm nor

deny" the existence of records) if a statutory exemption would be undermined by the

mere acknowledgement that responsive records exist. *See Phillips v. C.I.A.*, 655 F.2d

1325 (D.C. Cir. 1981). A *Glomar* response can "only be justified in unusual

circumstances, and only by a particularly persuasive affidavit." *New York Times Co. v.*

*U.S. Dept. of Justice*  756 F.3d 100, 122 (2d Cir. 2014), opinion amended on denial of

reh'g 758 F.3d 436 (2d Cir. 2014), supplemented 762 F.3d 233 (2d Cir. 2014), citing

*American Civil Liberties Union v. C.I.A.*, 710 F.3d 422, 433 (D.C. Cir. 2013). Mr.

Seidel's Seventh Declaration and Eighth Declaration both fail that test, and as detailed

below, they fail it miserably.

A requester may challenge a *Glomar* response either by arguing that "the agency

has previously official[ly] acknowledged the fact of the existence of a requested record"

or by arguing that disclosure would not cause any harm under the FOIA exemption

invoked. *James Madison Project v. DOJ*, 302 F. Supp. 3d 12, 20 (D.D.C. 2018) (internal

quotation marks omitted). Both prongs militate against the FBI's *Glomar* response. As

explained below, the FBI already has acknowledged the existence of additional

CrowdStrike reports. Furthermore, release of those records would cause no harm "under

the FOIA exemption invoked." *Id*. "In *Glomar* cases, courts may grant summary

judgment on the basis of agency affidavits that contain 'reasonable specificity of detail

rather than mere conclusory statements, and if they are not called into question by

contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial*

*Watch, Inc. v. U.S. Dept. of Justice*, 898 F.Supp.2d 93, 101 (D.D.C. 2012), quoting

*Electronic Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir.2012). There is no

"reasonable specificity" in Mr. Seidel's declaration, but there is both "contradictory

evidence in the record" and "evidence of agency bad faith" that militates in favor of

disclosure.

With respect to the latter, Mr. Huddleston should note that the FBI waited to invoke *Glomar* until it was caught red-handed. *Supra* at 2 (citing the record).  Mr. Huddleston proved that the FBI possessed CrowdStrike records, Cross-Motion 18, and only then did the FBI assert *Glomar*.  (Furthermore, he has now proved that the FBI improperly redacted the *titles* of the CrowdStrike reports. *Infra* at 15-16). This is not unlike the FBI's "hide the ball" stunt regarding Seth Rich's work laptop. *See* Clarification Reply 5-7. Only when caught does the FBI come clean. That is plain evidence of bad faith, thus the FBI's belated attempt to invoke *Glomar* should be viewed with extraordinary suspicion.

### (a) The CrowdStrike reports were revealed publicly before Mr. Huddleston submitted his FOIA request, therefore *Glomar* does not apply.

More than *three years* before Mr. Huddleston filed his FOIA request, the public was informed that the FBI was relying on reports from CrowdStrike rather than conducting its own investigation into the 2016 DNC "hack." *See* "Washington Post, D.N.C. Says Russian Hackers Penetrated Its Files, Including Dossier on Donald Trump," June 14, 2016, (https://www.nytimes.com/2016/06/15/us/politics/russian-hackers-dnc-trump.html) (attached as Exhibit 12) and Evan Perez and Daniella Diaz, "FBI: DNC rebuffed request to examine computer servers," January 5, 2017 *CNN* (https://www.cnn.com/2017/01/05/politics/fbi-russia-hacking-dnc-crowdstrike/index.html) (attached as Exhibit 13).  Before Mr. Huddleston filed his FOIA request, the government *officially* acknowledged the three reports disclosed in the Supplemental Search, plus it acknowledged the existence of *additional* reports that were

*not* disclosed in the Supplemental Search. *See* Government's Response to Defendant's Motion to Compel Unredacted CrowdStrike Reports (hereinafter "Government Response to Stone") (Dkt. #123), *United States v. Roger Stone*, Case No. 1:19-cr-00018-ABJ (D.C.D. 2019) (attached as Exhibit 14). Accordingly, "the agency has previously official[ly] acknowledged the fact of the existence of a requested record," and a *Glomar* response is therefore improper. *James Madison*, 302 F. Supp. 3d at 20 (D.D.C. 2018).

**(b) Release of the CrowdStrike reports will not harm law enforcement.**

The FBI's invocation of *Glomar* also fails under the second prong set forth in *James Madison*. The FBI invoked Exemption (b)(7)(E) as a basis for refusing to confirm or deny the existence of CrowdStrike records. Seventh Declaration ¶¶7-11.  For the reasons explained below, *infra* at 18-19, Exemption (b)(7) does not apply at all, but let's momentarily pretend that it does for the sake of argument (if for no other reason than because it illustrates the FBI's bad faith). Subsection (b)(7)(E) applies to disclosure of "records or information compiled for law enforcement purposes [when disclosure] would disclose techniques and procedures for law enforcement investigations, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. §552(b)(7)(E). In his attempt to apply the exemption to Mr. Huddleston's request, Mr. Seidel resorted to the typical conclusory, nonsensical boilerplate:

> How, from whom, and under what circumstances the FBI collects information – is itself a law enforcement technique or procedure that the FBI protects pursuant to Exemption (b)(7)(E). Thus, the FBI confirming that it has or does not have responsive records would be tantamount to acknowledging where the FBI is or is

not applying investigative resources thus disclosing the scope of law enforcement techniques and procedures. Therefore, merely acknowledging the existence or non-existence of records responsive to Plaintiff's request would trigger harm under FOIA Exemption (b)(7)(E) with respect to "[a]ny reports from CrowdStrike, Inc. that were obtained by the FBI while assisting Special Counsel Robert Mueller's Investigation.

But the FBI already has acknowledged the role that CrowdStrike played in the "Russian collusion" investigation. It is ridiculous to suggest that merely accepting a report from a private company is "a law enforcement technique or procedure that the FBI protects pursuant to Exemption (b)(7)(E)."

### 3.  The FBI disclosed only three CrowdStrike reports, but the government previously acknowledged additional reports.

In his Supplemental Motion for Interim Payment of Costs and Attorney Fees (hereinafter "Fee Motion") (Dkt. #96), Mr. Huddleston preliminarily addressed some of the problems in the Supplemental Search. For one thing, the FBI restricted its search to documents in the office of Special Counsel Robert S. Mueller III even though the request was not so limited. *Id*. The FBI claimed that it produced three CrowdStrike reports (albeit only the cover pages) because those reports had been identified publicly, but the very declaration filed by the FBI revealed <u>six</u> CrowdStrike reports. *See* Fee Motion 3, citing Seventh Declaration ¶12(a). Some of those reports may be duplicates, but we know for certain that there are others. On May 31, 2019 – nearly a year before Mr. Huddleston filed his FOIA request – the government acknowledged the existence of the three reports discussed in the Seventh Declaration as well as other reports from CrowdStrike.  *See* Government Response to Stone at 3. From the *Stone* case, we know that there were at

- 14 -

least two additional reports, *see* Reply to Motion to Compel Unredacted Versions of the

CrowdStrike Report (hereinafter "Stone Reply") (Dkt. #134), *Stone* (attached as Exhibit

15) at 2 (Mr. Stone's counsel acknowledging that they were allowed to see two additional

reports), neither of which were disclosed in this case. Significantly, the government

*voluntarily* allowed Mr. Stone's defense counsel to review all of the CrowdStrike reports

(or at least the five or more reports disclosed thus far). *See* Government's Response to

Stone at 3.[5] As if that was not bad enough, Mr. Seidel already knew all of the foregoing

facts when he filed his Seventh Declaration. In Paragraph 12(c) of that declaration, he

acknowledged the *Stone* case and even quoted part of the Government Response to Stone.

It is therefore utterly implausible to suggest that Mr. Seidel was unaware of the additional

reports disclosed on the *Stone* docket, and it is equally implausible to suggest that Mr.

Stone was unaware that at least five of the reports already had been shared with Mr.

Stone's counsel. Either Mr. Seidel tried to deceive the Court, or he failed to read his own

declaration before signing it. Either is inexcusable.[6]

**4.  The FBI made improper redactions.**

     Using the Seventh Declaration, Mr. Huddleston can establish for certain that the

FBI has made excessive and improper redactions. The FBI's Exhibit A (Dkt. #95-2)

---

[5] This obliterates the government's argument that the reports contain secret intelligence or law enforcement information that cannot be disclosed.

[6] Insofar as an FBI lawyer falsified evidence in a related case in order to procure a warrant to investigate the Trump campaign, see "FBI Attorney Admits Altering Email Used for FISA Application During 'Crossfire Hurricane' Investigation," August 19, 2020 Press Release, U.S. Department of Justice (https://www.justice.gov/usao-ct/pr/fbi-attorney-admits-altering-email-used-fisa-application-during-crossfire-hurricane) (attached as Exhibit 16), it should come as no surprise that another FBI lawyer might give misleading testimony in this case.

contains cover sheets for three of the reports produced by CrowdStrike. The FBI redacted the very *titles* of those reports, citing the exemption found at 5 U.S.C. §552(b)(4). That subsection exempts "trade secrets and commercial or financial information obtained from a person and privileged or confidential." *Id*. In the same filing, however, Mr. Seidel disclosed the titles of the reports that had been redacted in his Exhibit A. Each report is titled either "Draft Incident Investigation Report for the Democratic National Committee" or "Draft Incident Investigation Report for the Democratic Congressional Campaign Committee." Seventh Declaration ¶12(a). How exactly would disclosure of those titles reveal "trade secrets and commercial or financial information obtained from a person and privileged or confidential"? Clearly, it would not. And note that the FBI has withheld *every single page* from each of the CrowdStrike reports. It is utterly implausible to suggest that there is not a single sentence in any of the reports that is subject to disclosure.[7]

In his Clarification Reply, Mr. Huddleston noted that the contents of the work laptop are not subject to any of FOIA's law enforcement exemptions, in part because the laptop contents ultimately would have to be disclosed to the Russian defendants. *See* Clarification Reply at 15, citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194,

---

[7] At the very least, this militates in favor of *in camera* review of the CrowdStrike reports. And since Mr. Stone's attorneys were permitted to view at least five of the CrowdStrike reports, then Mr. Huddleston's counsel should be permitted to do the same. The undersigned has spent scores of hours tracking down the inconsistencies and false statements in the FBI's filings, and it would take many more hours to identify and expose the inconsistencies in the FBI's application of exemptions to the CrowdStrike reports. The undersigned cannot successfully advocate for his client if he is not permitted to view the reports that the government *has already disclosed* to other lawyers.

1196–97, 10 L. Ed. 2d 215 (1963). The same is true here. If the government actually intended to prosecute the Russia defendants, then it would be forced to disclose the CrowdStrike reports.  That assumes, of course, that the government is actually serious about prosecuting the Russian defendants, and that assumption is indeed dubious. *See* George Parry, "Mueller's Concord Mismanagement Is Convulsing," *supra* at 8. Given the FBI's symbiotic relationship with Perkins Coie, CrowdStrike, and Mr. Sussman, it is far more likely that the government is using the indictments as a pretext to hide their collective misconduct.

**5.  The FBI improperly restricted the scope of its search for CrowdStrike records.**

The FBI had a duty to conduct a good-faith search for responsive records, as opposed to a narrow, hyper-technical search:

> "A FOIA request should not require the specificity and cunning of a carefully drawn set of discovery requests, so as to outwit narrowing legalistic interpretations by the government." *Providence Journal Co. v. F.B.I.*, 460 F.Supp. 778, 792 (D.R.I.1978), reversed on other grounds, 602 F.2d 1010 (1st Cir.1979), cert. denied, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980). Where, as here, the requestor has endeavored to carefully specify what documents were being requested, the Court will not allow an agency's quibbling to obscure the issues.

*Norwood v. F.A.A.*, 580 F. Supp. 994, 1001 (W.D. Tenn. 1983). The FBI's "quibbling" in this case is indeed an attempt to "obscure the issues" before the Court. As explained in the Fee Motion, the FBI improperly limited its search to "reports from CrowdStrike, Inc. that were obtained by the FBI while assisting Special Counsel Robert Mueller's Investigation." Fee Motion 3, citing Seventh Declaration ¶14. Mr. Huddleston's actual request, however, seeks the following:

> All data, documents, communications, records or other evidence indicating whether Seth Rich, Aaron Rich, or any other person or persons were involved in transferring data from the Democratic National Committee to Wikileaks in 2016, either directly or through intermediaries. This request includes, <span style="color:red">but is not limited to</span>, any reports from CrowdStrike, Inc. that were obtained by the FBI while assisting Special Counsel Robert Mueller's investigation.

First Amended Complaint 3, ¶6 (Dkt. #3) (emphasis added). If the FBI is in possession of additional reports from CrowdStrike – *or any other person or entity* – concerning "Seth Rich, Aaron Rich, or any other person or persons… involved in transferring data from the Democratic National Committee," then those reports would fall squarely within the scope of "[a]ll data documents, communications, records or other evidence…"  In other words, the request clearly covers <u>all</u> reports about the transfer of DNC emails to Wikileaks, not just the ones in the Special Counsel's Office, and not just the ones produced by CrowdStrike. Finally, the request clearly covers "communications" between the FBI and CrowdStrike (as well as other entities), thus any email exchanges between representatives of the FBI and representatives of CrowdStrike must be disclosed. The same is true for emails exchanged between the Office of Special Counsel and CrowdStrike.

## 6.  The FBI cannot rely on Exemption (b)7.

In Paragraph 23 his Seventh Declaration, Mr. Seidel makes a critical admission about the applicability of Exemption 7: "Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must demonstrate the records or information at issue was [*sic*] compiled for law enforcement purposes."  The latter part of that paragraph, however, is flagrantly untruthful. Mr. Seidel wrote as follows:

> Under [the FBI's] investigative authority, the responsive records herein were
> created and compiled in furtherance of the FBI's role in the Special Counsel's
> Office (SCO) investigation and related investigations. These records were created
> and compiled to document the FBI's investigation of potential crimes and threats
> to the national security, thus, the FBI determined they were created and compiled
> for law enforcement purposes.

Seidel Declaration ¶23. Paragraph 23 is flatly contradicted by Paragraph 12(c) of the

same document. As noted above, Paragraph 12(c) quotes the Government's Response to

Stone, and it is worth reprinting here:

> By May 2016, the Democratic National Committee ("DNC") and the Democratic
> Congressional Campaign Committee ("DCCC") became aware that their computer
> systems had been compromised by intrusions, and they hired the cybersecurity
> company CrowdStrike to identify the extent of the intrusions and mitigate the
> threat. On June 14, 2016, the DNC, via CrowdStrike, publicly announced that it
> had been hacked by Russian government actors. See, Washington Post, D.N.C.
> Says Russian Hackers Penetrated Its Files, Including Dossier on Donald Trump,
> June 14, 2016, available at https://www.nytimes.com/2016/06/15/us/politics/
> russian-hackers-dnc-trump.html.  At the direction of the DNC and DCCC's legal
> counsel, CrowdStrike prepared three draft reports. Copies of these reports were
> subsequently produced voluntarily to the government by counsel for the DNC and
> DCCC.

Government Response to Stone at 2-3. Given the foregoing admission, it is preposterous

for Mr. Seidel testify that "the records or information at issue [were] compiled for law

enforcement purposes." Seventh Declaration ¶23. The "records or information at issue"

were compiled by a private company on behalf of a political party, then shared by the

attorneys for that political party. Mr. Seidel's testimony is false, and he either knew it

was false when he executed the Seventh Declaration, or he did not read the Seventh

Declaration before he signed it. Again, this is inexcusable.

**7.  Nothing in the CrowdStrike reports should be deemed classified.**

Section 1.7 of Executive Order 13,526 bars classifying information in order to conceal violations of the law. Exec. Order 13,526 § 1.7(1), 75 Fed. Reg. 707 (Jan. 5, 2010). A plaintiff alleging that an agency has classified information to conceal a violation of law "must provide something more than conjecture to show that the agency's withholding decision violates Executive Order 13,526." *Associated Press v. FBI*, 265 F. Supp. 3d 82, 96–97 (D.D.C. 2017). Credible evidence is required. *See Canning v. U.S. Dep't of Just.*, 848 F. Supp. 1037, 1047–48 (D.D.C. 1994) (rejecting plaintiff's challenge where plaintiff presented claims "based primarily on speculation" and failed to present "credible evidence that the agency's motives for its wisthholding decisions were improper or otherwise in violation of E.O. 12356").

*Smith v. United States Nat'l Archives & Records Admin.*, 415 F. Supp. 3d 85, 97–98 (D.D.C. 2019). Section 1.7 is actually broader than *Smith* suggests. "In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security." Exec. Order 13,526 § 1.7(a).

According to the Seventh Declaration, the FBI applied national security exemption (b)(1)-1 "to withhold classified information concerning the character and title of a case for specific types of intelligence activities directed at specific targets of national security." Seventh Declaration ¶27. Elsewhere, Mr. Seidel testified that the FBI asserted Exemption 3 "to withhold information that would reveal classified intelligence sources and methods protected by Exemption 1." *Id*. at ¶29.  At least three of the four exemptions in Exec. Order 13,526 § 1.7(a) are relevant here. First, the information "does not require

protection in the interest of national security." The CrowdStrike reports were compiled

by a private company on behalf of a political party, then shared by the attorneys for that

party.  How, for example, could disclosure "reveal classified intelligence sources and

methods," even theoretically?  Recall that the government *voluntarily* allowed Mr.

Stone's attorneys to view the documents in question, and there is no evidence that any of

those attorneys had security clearances. Government Response to Stone at 2-3.

Furthermore, CrowdStrike openly disclosed the fact that it was blaming Russian hackers,

the government openly disclosed the indictments of those purported hackers, and then the

government tied those indictments back to the CrowdStrike reports. *Compare*

Government Response to Stone at 2 *with* Stone Reply at 1 ("Paragraphs 1-8 of the

[Stone] Indictment illustrate that the government has adopted CrowdStrike's non-

privileged work product and view that the Russian state provided DNC's data to

WikiLeaks"); [8] Defendant Roger Stone's Motion to Suppress, *Stone* (Dkt. #100) (attached

as Exhibit 17) (noting that the government designated the *Stone* case as related to the

cases against the purported Russian hackers); and Notice of Designation of Pending*

Related Criminal Case Pursuant to Local Rule 57.12(a)(1), *Stone* (Dkt. #27-1) (attached

as Exhibit 18).[9] Finally, the testimony of CrowdStrike CEO before the House Intelligence

Committee already has been released publicly. *See* Exhibit 6.

Subsections 1.7(a)(1) and 1.7(a)(2) are also applicable here. All of the evidence

discussed thus far indicates that the FBI is hiding / withholding the CrowdStrike reports

---

[8] The indictment itself is not available on the public docket.
[9] Taken together, we now know that Mr. Sussman, Perkins Coie, CrowdStrike, the FBI, and the 2016 DNC "hack" are completely interrelated with Seth Rich and his laptops.

to "conceal violations of law, inefficiency, or administrative error," Exec. Order 13,526 §

1.7(a)(1), namely to cover up its misconduct in the whole "Russian collusion" fiasco.

Relatedly, the FBI is hiding / withholding the CrowdStrike reports to "prevent

embarrassment to a person, organization, or agency." *Id*. at 1.7(a)(2). The FBI already

has suffered some major "black eyes" with respect to the Russia investigation, including

a scathing report from the Department of Justice's Inspector General about misconduct

during the investigation, *see* December 2019 "Review of Four FISA Applications and

Other Aspects of the FBI's Crossfire Hurricane Investigation"

(https://s3.documentcloud.org/documents/6571581/IG-Report-Exec-Summary.pdf)

(executive summary attached as Exhibit 19), thus the FBI has a very strong incentive to

fabricate national security concerns in order to save itself from further embarrassment.

After all, it's hard to imagine something more embarrassing for the FBI than having to

admit that Seth Rich played a role in the DNC leaks and the bureau knew it, but FBI

chieftans nonetheless accepted "evidence" against Russia that was fabricated by a corrupt

lawyer acting on behalf of a political party.

**8.  The CyberSecurity Information Sharing Act of 2015 is inapplicable.**

The purpose of the CyberSecurity Information Sharing Act of 2015 (hereinafter

"CISA 2015") is, according to Mr. Seidel, "to encourage robust sharing of useful

cybersecurity information among all types of entities – private, Federal, state, local,

territorial, and tribal." Seventh Declaration ¶30, citing 6 U.S.C.§§1500-1510. He

provides considerable detail about CISA 2015 and how it works, then states that the

relevant exemption has been applied to certain pages in the CrowdStrike reports. Seventh

Declaration ¶32.  What he fails to explain is *how* CISA 2015 applies to the CrowdStrike

reports, and that is a fatal omission.

CISA 2015 subsections 1500-1510 encompass a lot of text and a lot of

requirements. Furthermore, those subsections direct various executive branch officials to

adopt regulations for implementing those requirements. *Id*. Did CrowdStrike comply with

those requirements? Mr. Seidel provides us with no evidence one way or another, but one

can be certain that CrowdStrike did <u>not</u> comply with those requirements, and that fact is

important. "If cyber threat indicators or defensive measures are shared for other purposes,

they are not shared in accordance with CISA 2015 and, therefore, will not receive CISA

2015's legal protections." *See* Guidance to Assist Non-Federal Entities to Share Cyber

Threat Indicators and Defensive Measures with Federal Entities under the Cybersecurity

Information Sharing Act of 2015, CyberSecurity and Infrastructure Security Agency,

U.S. Department of Homeland Security at 7 (attached as Exhibit 20).

Instead of being generated by IT personnel and shared with the government in real

time, the CrowdStrike reports were written at the direction of the lawyers for a political

party, and then *eventually* shared with the FBI in *redacted* form. *See* Government

Response to Stone. Notably, *technical details* were redacted from the report that was

provided to the FBI. *Id*. at 2.  If CrowdStrike had provided the report to the FBI for the

purpose of countering future cyberattacks, then it would not have omitted those technical

details.

And note that Mr. Seidel's own declaration trips him up once again. He testifies that the CrowdStrike reports were provided to the FBI for law enforcement purposes, Seventh Declaration ¶23, *i.e.*, to prosecute Russian hackers. That would be consistent with Mr. Sussman's habit of procuring fraudulent investigative reports and then sharing the reports with the FBI for purposes of generating baseless criminal investigations of his political enemies. Supra at 2-6.  In any event Mr. Seidel offers no evidence whatsoever that the reports were submitted to the FBI for purposes of CISA 2015, therefore his argument fails.

## Conclusion

The FBI waived all exemptions by failing to brief them. Even if the FBI had properly asserted those exemptions, each one of them would fail. Mr. Huddleston respectfully urges the Court to do the following:

- Order the FBI to search for and produce all of the information covered by the request reprinted on pages 17-18, *supra*. In other words, the FBI should search for <u>all</u> reports from CrowdStrike – or any other person or entity – concerning "Seth Rich, Aaron Rich, or any other person or persons… involved in transferring data from the Democratic National Committee," including all reports about the transfer of DNC emails to Wikileaks, not just the ones in the Special Counsel's Office, and not just the ones produced by CrowdStrike. The FBI should also search for and produce all "communications" between the FBI and CrowdStrike (as well as other entities), including email exchanges between *representatives* of the FBI and *representatives* of CrowdStrike (such as Mr. Sussman). The same is true for emails exchanged between the Office of Special Counsel and CrowdStrike.

- Order the FBI to produce <u>all</u> CrowdStrike reports without redactions. In the alternative, the Court could order the FBI to permit Plaintiff's Counsel to review undredacted reports for purposes of further briefing.

The Supplemental Search should be rejected, and Mr. Huddleston's cross-motion for summary judgment should be granted. The FBI has had too many mulligans already, and its endless prevarications should no longer be tolerated by the Court.

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
212 S. Oxford Street #7D
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Counsel for Plaintiff Brian Huddleston**

## Certificate of Service

On February 21, 2023, I filed a copy of this response with the Court's ECF system, which should result in automatic notification via email to Asst. U.S. Attorney Andrea Parker, Counsel for the Defendants, at andrea.parker@usdoj.gov.

**/s/ Ty Clevenger**
Ty Clevenger