Exhibit 19

**REDACTED FOR PUBLIC RELEASE**



# Office of the Inspector General
## U.S. Department of Justice

### OVERSIGHT ★ INTEGRITY ★ GUIDANCE



# Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation

Oversight and Review Division 20-012                    December 2019

All information contained herein is unclassified
Date: 12/8/2019   BY: C28W34B64
This redacted version only

**REDACTED FOR PUBLIC RELEASE**



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

## Background

The Department of Justice (Department) Office of the Inspector General (OIG) undertook this review to examine certain actions by the Federal Bureau of Investigation (FBI) and the Department during an FBI investigation opened on July 31, 2016, known as "Crossfire Hurricane," into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government's efforts to interfere in the 2016 U.S. presidential election. Our review included examining:

- The decision to open Crossfire Hurricane and four individual cases on current and former members of the Trump campaign, George Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn; the early investigative steps taken; and whether the openings and early steps complied with Department and FBI policies;

- The FBI's relationship with Christopher Steele, whom the FBI considered to be a confidential human source (CHS); its receipt, use, and evaluation of election reports from Steele; and its decision to close Steele as an FBI CHS;

- Four FBI applications filed with the Foreign Intelligence Surveillance Court (FISC) in 2016 and 2017 to conduct Foreign Intelligence Surveillance Act (FISA) surveillance targeting Carter Page; and whether these applications complied with Department and FBI policies and satisfied the government's obligations to the FISC;

- The interactions of Department attorney Bruce Ohr with Steele, the FBI, Glenn Simpson of Fusion GPS, and the State Department; whether work Ohr's spouse performed for Fusion GPS implicated ethical rules applicable to Ohr; and Ohr's interactions with Department attorneys regarding the Manafort criminal case; and

- The FBI's use of Undercover Employees (UCEs) and CHSs other than Steele in the Crossfire Hurricane investigation; whether the FBI placed any CHSs within the Trump campaign or tasked any CHSs to report on the Trump campaign; whether the use of CHSs and UCEs complied with Department and FBI policies; and the attendance of a Crossfire Hurricane supervisory agent at counterintelligence briefings given to the 2016 presidential candidates and certain campaign advisors.

## OIG Methodology

The OIG examined more than one million documents that were in the Department's and FBI's possession and conducted over 170 interviews involving more than 100 witnesses. These witnesses included former FBI Director Comey, former Attorney General (AG) Loretta Lynch, former Deputy Attorney General (DAG) Sally Yates, former DAG Rod Rosenstein, former Acting AG and Acting DAG and current FBI General Counsel Dana Boente, former FBI Deputy Director Andrew McCabe, former FBI General Counsel James Baker, and Department attorney Bruce Ohr and his wife. The OIG also interviewed Christopher Steele and current and former employees of other U.S. government agencies. Two witnesses, Glenn Simpson and Jonathan Winer (a former Department of State official), declined our requests for voluntary interviews, and we were unable to compel their testimony.

We were given broad access to relevant materials by the Department and the FBI. In addition, we reviewed relevant information that other U.S. government agencies provided the FBI in the course of the Crossfire Hurricane investigation. However, because the activities of other agencies are outside our jurisdiction, we did not seek to obtain records from them that the FBI never received or reviewed, except for a limited amount of State Department records relating to Steele; we also did not seek to assess any actions other agencies may have taken. Additionally, our review did not independently seek to determine whether corroboration existed for the Steele election reporting; rather, our review was focused on information that was available to the FBI concerning Steele's reports prior to and during the pendency of the Carter Page FISA authority.

Our role in this review was not to second-guess discretionary judgments by Department personnel about whether to open an investigation, or specific judgment calls made during the course of an investigation, where those decisions complied with or were authorized by Department rules, policies, or procedures. We do not criticize particular decisions merely because we might have recommended a different investigative strategy or tactic based on the facts learned during our investigation. The question we considered was not whether a particular investigative decision was ideal or could have been handled more effectively, but rather whether the Department and the FBI complied with applicable legal requirements, policies, and procedures in taking the actions we reviewed or, alternatively, whether the circumstances surrounding the decision indicated that it was based on



# Executive Summary
*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

inaccurate or incomplete information, or considerations other than the merits of the investigation. If the explanations we were given for a particular decision were consistent with legal requirements, policies, procedures, and not unreasonable, we did not conclude that the decision was based on improper considerations in the absence of documentary or testimonial evidence to the contrary.

## The Opening of Crossfire Hurricane and Four Related Investigations, and Early Investigative Steps

*The Opening of Crossfire Hurricane and Four Individual Cases*

As we describe in Chapter Three, the FBI opened Crossfire Hurricane on July 31, 2016, just days after its receipt of information from a Friendly Foreign Government (FFG) reporting that, in May 2016, during a meeting with the FFG, then Trump campaign foreign policy advisor George Papadopoulos "suggested the Trump team had received some kind of suggestion from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to Mrs. Clinton (and President Obama)." The FBI Electronic Communication (EC) opening the Crossfire Hurricane investigation stated that, based on the FFG information, "this investigation is being opened to determine whether individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia." We did not find information in FBI or Department ECs, emails, or other documents, or through witness testimony, indicating that any information other than the FFG information was relied upon to predicate the opening of the Crossfire Hurricane investigation. Although not mentioned in the EC, at the time, FBI officials involved in opening the investigation had reason to believe that Russia may have been connected to the WikiLeaks disclosures that occurred earlier in July 2016, and were aware of information regarding Russia's efforts to interfere with the 2016 U.S. elections. These officials, though, did not become aware of Steele's election reporting until weeks later and we therefore determined that Steele's reports played no role in the Crossfire Hurricane opening.

The FBI assembled a Headquarters-based investigative team of special agents, analysts, and supervisory special agents (referred to throughout this report as "the Crossfire Hurricane team") who conducted an initial analysis of links between Trump campaign members and Russia. Based upon this analysis, the Crossfire Hurricane team opened individual cases in August 2016 on four U.S. persons—Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn—all of whom were affiliated with the Trump campaign at the time the cases were opened.

As detailed in Chapter Two, the Attorney General's Guidelines for Domestic Operations (AG Guidelines) and the FBI's Domestic Investigations Operations Guide (DIOG) both require that FBI investigations be undertaken for an "authorized purpose"—that is, "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." Additionally, both the AG Guidelines and the DIOG permit the FBI to conduct an investigation, even if it might impact First Amendment or other constitutionally protected activity, so long as there is some legitimate law enforcement purpose associated with the investigation.

In addition to requiring an authorized purpose, FBI investigations must have adequate factual predication before being initiated. The predication requirement is not a legal requirement but rather a prudential one imposed by Department and FBI policy. The DIOG provides for two types of investigations, Preliminary Investigations and Full Investigations. A Preliminary Investigation may be opened based upon "any allegation or information" indicative of possible criminal activity or threats to the national security. A Full Investigation may be opened based upon an "articulable factual basis" that "reasonably indicates" any one of three defined circumstances exists, including:

> An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity.

In Full Investigations such as Crossfire Hurricane, all lawful investigative methods are allowed. In Preliminary Investigations, all lawful investigative methods (including the use of CHSs and UCEs) are permitted except for mail opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA. An investigation opened as a Preliminary Investigation may be converted subsequently to a Full Investigation if



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

information becomes available that meets the predication standard. As we describe in the report, all of the investigative actions taken by the Crossfire Hurricane team, from the date the case was opened on July 31 until October 21 (the date of the first FISA order) would have been permitted whether the case was opened as a Preliminary or Full Investigation.

The AG Guidelines and the DIOG do not provide heightened predication standards for sensitive matters, or allegations potentially impacting constitutionally protected activity, such as First Amendment rights. Rather, the approval and notification requirements contained in the AG Guidelines and the DIOG are, in part, intended to provide the means by which such concerns can be considered by senior officials. However, we were concerned to find that neither the AG Guidelines nor the DIOG contain a provision requiring Department consultation before opening an investigation such as the one here involving the alleged conduct of individuals associated with a major party presidential campaign.

Crossfire Hurricane was opened as a Full Investigation and all of the senior FBI officials who participated in discussions about whether to open a case told us the information warranted opening it. For example, then Counterintelligence Division (CD) Assistant Director (AD) E.W. "Bill" Priestap, who approved the case opening, told us that the combination of the FFG information and the FBI's ongoing cyber intrusion investigation of the July 2016 hacks of the Democratic National Committee's (DNC) emails, created a counterintelligence concern that the FBI was "obligated" to investigate. Priestap stated that he considered whether the FBI should conduct defensive briefings for the Trump campaign but ultimately decided that providing such briefings created the risk that "if someone on the campaign was engaged with the Russians, he/she would very likely change his/her tactics and/or otherwise seek to cover-up his/her activities, thereby preventing us from finding the truth." We did not identify any Department or FBI policy that applied to this decision and therefore determined that the decision was a judgment call that Department and FBI policy leaves to the discretion of FBI officials. We also concluded that, under the AG Guidelines and the DIOG, the FBI had an authorized purpose when it opened Crossfire Hurricane to obtain information about, or protect against, a national security threat or federal crime, even though the investigation also had the potential to impact constitutionally protected activity.

Additionally, given the low threshold for predication in the AG Guidelines and the DIOG, we concluded that the FFG information, provided by a government member the United States Intelligence Community (USIC) deems trustworthy, and describing a first-hand account from an FFG employee of a conversation with Papadopoulos, was sufficient to predicate the investigation. This information provided the FBI with an articulable factual basis that, if true, reasonably indicated activity constituting either a federal crime or a threat to national security, or both, may have occurred or may be occurring. For similar reasons, as we detail in Chapter Three, we concluded that the quantum of information articulated by the FBI to open the individual investigations on Papadopoulos, Page, Flynn, and Manafort in August 2016 was sufficient to satisfy the low threshold established by the Department and the FBI.

As part of our review, we also sought to determine whether there was evidence that political bias or other improper considerations affected decision making in Crossfire Hurricane, including the decision to open the investigation. We discussed the issue of political bias in a prior OIG report, *Review of Various Actions in Advance of the 2016 Election*, where we described text and instant messages between then Special Counsel to the Deputy Director Lisa Page and then Section Chief Peter Strzok, among others, that included statements of hostility toward then candidate Trump and statements of support for then candidate Hillary Clinton. In this review, we found that, while Lisa Page attended some of the discussions regarding the opening of the investigations, she did not play a role in the decision to open Crossfire Hurricane or the four individual cases. We further found that while Strzok was directly involved in the decisions to open Crossfire Hurricane and the four individual cases, he was not the sole, or even the highest-level, decision maker as to any of those matters. As noted above, then CD AD Priestap, Strzok's supervisor, was the official who ultimately made the decision to open the investigation, and evidence reflected that this decision by Priestap was reached by consensus after multiple days of discussions and meetings that included Strzok and other leadership in CD, the FBI Deputy Director, the FBI General Counsel, and a FBI Deputy General Counsel. We concluded that Priestap's exercise of discretion in opening the investigation was in compliance with Department and FBI policies, and we did not find documentary or testimonial evidence that political bias or improper motivation influenced his decision. We similarly found that, while the formal documentation opening each of the four individual investigations was approved by Strzok (as required by the DIOG), the



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

decisions to do so were reached by a consensus among the Crossfire Hurricane agents and analysts who identified individuals associated with the Trump campaign who had recently traveled to Russia or had other alleged ties to Russia. Priestap was involved in these decisions. We did not find documentary or testimonial evidence that political bias or improper motivation influenced the decisions to open the four individual investigations.

*Sensitive Investigative Matter Designation*

The Crossfire Hurricane investigation was properly designated as a "sensitive investigative matter," or SIM, by the FBI because it involved the activities of a domestic political organization or individuals prominent in such an organization. The DIOG requires that SIMs be reviewed in advance by the FBI Office of the General Counsel (OGC) and approved by the appropriate FBI Headquarters operational section chief, and that an "appropriate [National Security Division] official" receive notification after the case has been opened.

We concluded that the FBI satisfied the DIOG's approval and notification requirements for SIMs. As we describe in Chapter Three, the Crossfire Hurricane opening was reviewed by an OGC Unit Chief and approved by AD Priestap (two levels above Section Chief). The team also orally briefed National Security Division (NSD) officials within the first few days of the investigations being initiated. We were concerned, however, that Department and FBI policies do not require that a senior Department official be notified prior to the opening of a particularly sensitive case such as this one, nor do they place any additional requirements for SIMs beyond the approval and notification requirements at the time of opening, and therefore we include a recommendation to address this issue.

*Early Investigative Steps and Adherence to the Least Intrusive Method*

The AG Guidelines and the DIOG require that the "least intrusive" means or method be "considered" when selecting investigative techniques and, "if reasonable based upon the circumstances of the investigation," be used to obtain information instead of a more intrusive method. The DIOG states that the degree of procedural protection the law and Department and FBI policy provide for the use of a particular investigative method helps to determine its intrusiveness. As described in Chapter Three, immediately after opening the investigation, the

Crossfire Hurricane team submitted name trace requests to other U.S. government agencies and a foreign intelligence agency, and conducted law enforcement database and open source searches, to identify individuals associated with the Trump campaign in a position to have received the alleged offer of assistance from Russia. The FBI also sent Strzok and a Supervisory Special Agent (SSA) abroad to interview the source of the information the FBI received from the FFG, and also searched the FBI's database of CHSs to identify sources who potentially could provide information about connections between individuals associated with the Trump campaign and Russia. Each of these steps is authorized under the DIOG and was a less intrusive investigative technique.

Thereafter, the Crossfire Hurricane team used more intrusive techniques, including CHSs to interact and consensually record multiple conversations with Page and Papadopoulos, both before and after they were working for the Trump campaign, as well as on one occasion with a high-level Trump campaign official who was not a subject of the investigation. We found that, under Department and FBI policy, although this CHS activity implicated First Amendment protected activity, the operations were permitted because their use was not for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States. Additionally, we found that under FBI policy, the use of a CHS to conduct consensual monitoring is a matter of investigative judgment that, absent certain circumstances, can be authorized by a first-line supervisor (an SSA). We determined that the CHS operations conducted during Crossfire Hurricane received the necessary FBI approvals and that, while AD Priestap knew about and approved of all of the operations, review beyond a first-level FBI supervisor was not required by Department or FBI policy.

We found it concerning that Department and FBI policy did not require the FBI to consult with any Department official in advance of conducting CHS operations involving advisors to a major party candidate's presidential campaign, and we found no evidence that the FBI consulted with any Department officials before conducting these CHS operations. As we describe in Chapter Two, consultation, at a minimum, is required by Department and FBI policies in numerous other sensitive circumstances, and we include a recommendation to address this issue.

Shortly after opening the Carter Page investigation in August 2016, the Crossfire Hurricane team discussed the possible use of FISA-authorized



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

electronic surveillance targeting Page, which is among the most sensitive and intrusive investigative techniques. As we describe in Chapter Five, the FBI ultimately did not seek a FISA order at that time because OGC, NSD's Office of Intelligence (OI), or both determined that more information was needed to support probable cause that Page was an agent of a foreign power. However, immediately after the Crossfire Hurricane team received Steele's election reporting on September 19, the team reinitiated their discussions with OI and their efforts to obtain FISA surveillance authority for Page, which they received from the FISC on October 21.

The decision to seek to use this highly intrusive investigative technique was known and approved at multiple levels of the Department, including by then DAG Yates for the initial FISA application and first renewal, and by then Acting Attorney General Boente and then DAG Rosenstein for the second and third renewals, respectively. However, as we explain later, the Crossfire Hurricane team failed to inform Department officials of significant information that was available to the team at the time that the FISA applications were drafted and filed. Much of that information was inconsistent with, or undercut, the assertions contained in the FISA applications that were used to support probable cause and, in some instances, resulted in inaccurate information being included in the applications. While we do not speculate whether Department officials would have authorized the FBI to seek to use FISA authority had they been made aware of all relevant information, it was clearly the responsibility of Crossfire Hurricane team members to advise them of such critical information so that they could make a fully informed decision.

## The FBI's Relationship with Christopher Steele, and Its Receipt and Evaluation of His Election Reporting before the First FISA Application

As we describe in Chapter Four, Steele is a former intelligence officer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ who, in 2009, formed a consulting firm specializing in corporate intelligence and investigative services. In 2010, Steele was introduced by Ohr to an FBI agent, and for several years provided information to the FBI about various matters, such as corruption in the International Federation of Association Football (FIFA). Steele also provided the FBI agent with reporting about Russian oligarchs.

In 2013, the FBI completed the paperwork allowing the FBI to designate Steele as a CHS. However, as described in Chapter Four, we found that the FBI and Steele held significantly differing views about the nature of their relationship. Steele's handling agent viewed Steele as a former intelligence officer colleague and FBI CHS, with obligations to the FBI. Steele, on the other hand, told us that he was a businessperson whose firm (not Steele) had a contractual agreement with the FBI and whose obligations were to his paying clients, not the FBI. We concluded that this disagreement affected the FBI's control over Steele during the Crossfire Hurricane investigation, led to divergent expectations about Steele's conduct in connection with his election reporting, and ultimately resulted in the FBI formally closing Steele as a CHS in November 2016 (although, as discussed below, the FBI continued its relationship with Steele through Ohr).

In June 2016, Steele and his consulting firm were hired by Fusion GPS, a Washington, D.C., investigative firm, to obtain information about whether Russia was trying to achieve a particular outcome in the 2016 U.S. elections, what personal and business ties then candidate Trump had in Russia, and whether there were any ties between the Russian government and Trump or his campaign. Steele's work for Fusion GPS resulted in his producing numerous election-related reports, which have been referred to collectively as the "Steele Dossier." Steele himself was not the originating source of any of the factual information in his reporting. Steele instead relied on a Primary Sub-source for information, who used his/her network of sub-sources to gather information that was then passed to Steele. With Fusion GPS's authorization, Steele directly provided more than a dozen of his reports to the FBI between July and October 2016, and several others to the FBI through Ohr and other third parties. The Crossfire Hurricane team received the first six election reports on September 19, 2016—more than two months after Steele first gave his handling agent two of the six reports. We describe the reasons it took two months for the reports to reach the team in Chapter Four.

*FBI's Efforts to Evaluate the Steele Reporting*

Steele's handling agent told us that when Steele provided him with the first election reports in July 2016 and described his engagement with Fusion GPS, it was obvious to him that the request for the research was politically motivated. The supervisory intelligence analyst who supervised the analytical efforts for the Crossfire Hurricane team (Supervisory Intel Analyst)



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

explained that he also was aware of the potential for political influences on the Steele reporting.

The fact that the FBI believed Steele had been retained to conduct political opposition research did not require the FBI, under either DOJ or FBI policy, to ignore his reporting. The FBI regularly receives information from individuals with potentially significant biases and motivations, including drug traffickers, convicted felons, and even terrorists. The FBI is not required to set aside such information; rather, FBI policy requires that it critically assess the information. We found that after receiving Steele's reporting, the Crossfire Hurricane team began those efforts in earnest.

We determined that the FBI's decision to receive Steele's information for Crossfire Hurricane was based on multiple factors, including: (1) Steele's prior work as an intelligence professional for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; (2) his expertise on Russia; (3) his record as an FBI CHS; (4) the assessment of Steele's handling agent that Steele was reliable and had provided helpful information to the FBI in the past; and (5) the themes of Steele's reporting were consistent with the FBI's knowledge at the time of Russian efforts to interfere in the 2016 U.S. elections.

However, as we describe later, as the FBI obtained additional information raising significant questions about the reliability of the Steele election reporting, the FBI failed to reassess the Steele reporting relied upon in the FISA applications, and did not fully advise NSD or OI officials. We also found that the FBI did not aggressively seek to obtain certain potentially important information from Steele. For example, the FBI did not press Steele for information about the actual funding source for his election reporting work. Agents also did not question Steele about his role in a September 23, 2016 *Yahoo News* article entitled, "*U.S. intel officials probe ties between Trump advisor and Kremlin*," that described efforts by U.S. intelligence to determine whether Carter Page had opened communication channels with Kremlin officials. As we discuss in Chapters Five and Eight, the FBI assessed in the Carter Page FISA applications, without any support, that Steele had not "directly provided" the information to *Yahoo News*.

## The First Application for FISA Authority on Carter Page

At the request of the FBI, the Department filed four applications with the FISC seeking FISA authority

targeting Carter Page: the first application on October ▮, 2016, and three renewal applications on January ▮, April ▮, and June ▮, 2017. A different FISC judge considered each application and issued the requested orders, collectively resulting in approximately 11 months of FISA coverage targeting Carter Page from October ▮, 2016, to September ▮, 2017. We discuss the first FISA application in this section and in Chapter Five.

### Decision to Seek FISA Authority

We determined that the Crossfire Hurricane team's receipt of Steele's election reporting on September 19, 2016 played a central and essential role in the FBI's and Department's decision to seek the FISA order. As noted above, when the team first sought to pursue a FISA order for Page in August 2016, a decision was made by OGC, OI, or both that more information was needed to support a probable cause finding that Page was an agent of a foreign power. As a result, FBI OGC ceased discussions with OI about a Page FISA order at that time.

On September 19, 2016, the same day that the Crossfire Hurricane team first received Steele's election reporting, the team contacted FBI OGC again about seeking a FISA order for Page and specifically focused on Steele's reporting in drafting the FISA request. Two days later, on September 21, the FBI OGC Unit Chief contacted the NSD OI Unit Chief to advise him that the FBI believed it was ready to submit a formal FISA request to OI relating to Page. Almost immediately thereafter, OI assigned an attorney (OI Attorney) to begin preparation of the application.

Although the team also was interested in seeking FISA surveillance targeting Papadopoulos, the FBI OGC attorneys were not supportive. FBI and NSD officials told us that the Crossfire Hurricane team ultimately did not seek FISA surveillance of Papadopoulos, and we are aware of no information indicating that the team requested or seriously considered FISA surveillance of Manafort or Flynn.

We did not find documentary or testimonial evidence that political bias or improper motivation influenced the FBI's decision to seek FISA authority on Carter Page.

### Preparation and Review Process

As we detail in Chapter Two, the FISC Rules of Procedure and FBI policy required that the Carter Page FISA applications contain all material facts. Although







# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

the FISC Rules do not define or otherwise explain what constitutes a "material" fact, FBI policy guidance states that a fact is "material" if it is relevant to the court's probable cause determination. Additionally, FBI policy mandates that the case agent ensure that all factual statements in a FISA application are "scrupulously accurate."

On or about September 23, the OI Attorney began work on the FISA application. Over the next several weeks, the OI Attorney prepared and edited a draft application using information principally provided by the FBI case agent assigned to the Carter Page investigation at the time and, in a few instances, by an OGC attorney (OGC Attorney) or other Crossfire Hurricane team members. The drafting process culminated in an application that asserted that the Russian government was attempting to undermine and influence the upcoming U.S. presidential election, and that the FBI believed Carter Page was acting in conjunction with the Russians in those efforts. The application's statement of facts supporting probable cause to believe that Page was an agent of Russia was broken down into five main elements:

- The efforts of Russian Intelligence Services (RIS) to influence the upcoming U.S. presidential election;
- The Russian government's attempted coordination with members of the Trump campaign, based on the FFG information reporting the suggestion of assistance from the Russians to someone associated with the Trump campaign;
- Page's historical connections to Russia and RIS;
- Page's alleged coordination with the Russian government on 2016 U.S. presidential election activities, based on Steele's reporting; and
- Page's statements to an FBI CHS in October 2016 that that he had an "open checkbook" from certain Russians to fund a think tank project.

In addition, the statement of facts described Page's denials of coordination with the Russian government, as reported in two news articles and asserted by Page in a September 25 letter to then FBI Director Comey.

The application received the necessary Department approvals and certifications as required by law. As we fully describe in Chapter Five, this application received more attention and scrutiny than a typical FISA application in terms of the additional layers

of review and number of high-level officials who read the application before it was signed. These officials included NSD's Acting Assistant Attorney General, NSD's Deputy Assistant Attorney General with oversight over OI, OI's Operations Section Chief and Deputy Section Chief, the DAG, Principal Associate Deputy Attorney General, and the Associate Deputy Attorney General responsible for ODAG's national security portfolio. However, as we explain below, the Department decision makers who supported and approved the application were not given all relevant information.

*Role of Steele Election Reporting in the First Application*

In support of the fourth element in the FISA application—Carter Page's alleged coordination with the Russian government on 2016 U.S. presidential election activities—the application relied entirely on the following information from Steele Reports 80, 94, 95, and 102:

- Compromising information about Hillary Clinton had been compiled for many years, was controlled by the Kremlin, and had been fed by the Kremlin to the Trump campaign for an extended period of time (Report 80);
- During a July 2016 trip to Moscow, Page met secretly with Igor Sechin, Chairman of Russian energy conglomerate Rosneft and close associate of Putin, to discuss future cooperation and the lifting of Ukraine-related sanctions against Russia; and with Igor Divyekin, a highly-placed Russian official, to discuss sharing with the Trump campaign derogatory information about Clinton (Report 94);
- Page was an intermediary between Russia and the Trump campaign's then manager (Manafort) in a "well-developed conspiracy" of cooperation, which led to Russia's disclosure of hacked DNC emails to WikiLeaks in exchange for the Trump campaign's agreement to sideline Russian intervention in Ukraine as a campaign issue (Report 95); and
- Russia released the DNC emails to WikiLeaks in an attempt to swing voters to Trump, an objective conceived and promoted by Page and others (Report 102).

We determined that the FBI's decision to rely upon Steele's election reporting to help establish probable cause that Page was an agent of Russia was a judgment reached initially by the case agents on the

vii



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

Crossfire Hurricane team. We further determined that FBI officials at every level concurred with this judgment, from the OGC attorneys assigned to the investigation to senior CD officials, then General Counsel James Baker, then Deputy Director Andrew McCabe, and then Director James Comey. FBI leadership supported relying on Steele's reporting to seek a FISA order on Page after being advised of, and giving consideration to, concerns expressed by Stuart Evans, then NSD's Deputy Assistant Attorney General with oversight responsibility over OI, that Steele may have been hired by someone associated with presidential candidate Clinton or the DNC, and that the foreign intelligence to be collected through the FISA order would probably not be worth the "risk" of being criticized later for collecting communications of someone (Carter Page) who was "politically sensitive." According to McCabe, the FBI "felt strongly" that the FISA application should move forward because the team believed they had to get to the bottom of what they considered to be a potentially serious threat to national security, even if the FBI would later be criticized for taking such action. McCabe and others discussed the FBI's position with NSD and ODAG officials, and these officials accepted the FBI's decision to move forward with the application, based substantially on the Steele information.

We found that the FBI did not have information corroborating the specific allegations against Carter Page in Steele's reporting when it relied upon his reports in the first FISA application or subsequent renewal applications. OGC and NSD attorneys told us that, while the FBI's "Woods Procedures" (described in Chapter Two) require that every factual assertion in a FISA application be "verified," when information is attributed to a FBI CHS, the Woods Procedures require only that the agent verify, with supporting documentation, that the application accurately reflects what the CHS told the FBI. The procedures do not require that the agent corroborate, through a second, independent source, that what the CHS told the FBI is true. We did not identify anything in the Woods Procedures that is inconsistent with these officials' description of the procedures.

However, absent corroboration for the factual assertions in the election reporting, it was particularly important for the FISA applications to articulate the FBI's knowledge of Steele's background and its assessment of his reliability. On these points, the applications advised the court that Steele was believed to be a reliable source for three reasons: his professional background; his history of work as an FBI CHS since 2013; and his prior non-election reporting,

which the FBI described as "corroborated and used in criminal proceedings." As discussed below, the representations about Steele's prior reporting were overstated and had not been approved by Steele's handling agent, as required by the Woods Procedures.

Due to Evans's persistent inquiries, the FISA application also included a footnote, developed by OI based on information provided by the Crossfire Hurricane team, to address Evans's concern about the potential political bias of Steele's research. The footnote stated that Steele was hired by an identified U.S. person (Glenn Simpson) to conduct research regarding "Candidate #1's" (Donald Trump) ties to Russia and that the FBI "speculates" that this U.S. person was likely looking for information that could be used to discredit the Trump campaign.

*Relevant Information Inaccurately Stated, Omitted, or Undocumented in the First Application*

Our review found that FBI personnel fell far short of the requirement in FBI policy that they ensure that all factual statements in a FISA application are "scrupulously accurate." We identified multiple instances in which factual assertions relied upon in the first FISA application were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information the FBI had in its possession at the time the application was filed. We found that the problems we identified were primarily caused by the Crossfire Hurricane team failing to share all relevant information with OI and, consequently, the information was not considered by the Department decision makers who ultimately decided to support the applications.

As more fully described in Chapter Five, based upon the information known to the FBI in October 2016, the first application contained the following seven significant inaccuracies and omissions:

1. Omitted information the FBI had obtained from another U.S. government agency detailing its prior relationship with Page, including that Page had been approved as an "operational contact" for the other agency from 2008 to 2013, and that Page had provided information to the other agency concerning his prior contacts with certain Russian intelligence officers, one of which overlapped with facts asserted in the FISA application;

2. Included a source characterization statement asserting that Steele's prior reporting had been "corroborated and used in criminal proceedings,"



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

which overstated the significance of Steele's past reporting and was not approved by Steele's handling agent, as required by the Woods Procedures;

3. Omitted information relevant to the reliability of Person 1, a key Steele sub-source (who was attributed with providing the information in Report 95 and some of the information in Reports 80 and 102 relied upon in the application), namely that (1) Steele himself told members of the Crossfire Hurricane team that Person 1 was a "boaster" and an "egoist" and "may engage in some embellishment" and (2) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;

4. Asserted that the FBI had assessed that Steele did not directly provide to the press information in the September 23 *Yahoo News* article based on the premise that Steele had told the FBI that he only shared his election-related research with the FBI and Fusion GPS, his client; this premise was incorrect and contradicted by documentation in the Woods File—Steele had told the FBI that he also gave his information to the State Department;

5. Omitted Papadopoulos's consensually monitored statements to an FBI CHS in September 2016 denying that anyone associated with the Trump campaign was collaborating with Russia or with outside groups like WikiLeaks in the release of emails;

6. Omitted Page's consensually monitored statements to an FBI CHS in August 2016 that Page had "literally never met" or "said one word to" Paul Manafort and that Manafort had not responded to any of Page's emails; if true, those statements were in tension with claims in Report 95 that Page was participating in a conspiracy with Russia by acting as an intermediary for Manafort on behalf of the Trump campaign; and

7. Included Page's consensually monitored statements to an FBI CHS in October 2016 that the FBI believed supported its theory that Page was an agent of Russia but omitted other statements Page made that were inconsistent with its theory, including denying having met with Sechin and Divyekin, or even knowing who Divyekin was; if true, those statements contradicted the claims in Report 94 that Page

had met secretly with Sechin and Divyekin about future cooperation with Russia and shared derogatory information about candidate Clinton.

None of these inaccuracies and omissions were brought to the attention of OI before the last FISA application was filed in June 2017. Consequently, these failures were repeated in all three renewal applications. Further, as we discuss later, we identified 10 additional significant errors in the renewal applications.

The failure to provide accurate and complete information to the OI Attorney concerning Page's prior relationship with another U.S. government agency (item 1 above) was particularly concerning because the OI Attorney had specifically asked the case agent in late September 2016 whether Carter Page had a current or prior relationship with the other agency. In response to that inquiry, the case agent advised the OI Attorney that Page's relationship was "dated" (claiming it was when Page lived in Moscow in 2004-2007) and "outside scope." This representation, however, was contrary to information that the other agency had provided to the FBI in August 2016, which stated that Page was approved as an "operational contact" of the other agency from 2008 to 2013 (after Page had left Moscow). Moreover, rather than being "outside scope," Page's status with the other agency overlapped in time with some of the interactions between Page and known Russian intelligence officers that were relied upon in the FISA applications to establish probable cause. Indeed, Page had provided information to the other agency about his past contacts with a Russian Intelligence Officer (Intelligence Officer 1), which were among the historical connections to Russian intelligence officers that the FBI relied upon in the first FISA application (and subsequent renewal applications). According to the information from the other agency, an employee of the other agency had assessed that Page "candidly described his contact with" Intelligence Officer 1 to the other agency. Thus, the FBI relied upon Page's contacts with Intelligence Officer 1, among others, in support of its probable cause statement in the FISA application, while failing to disclose to OI or the FISC that (1) Page had been approved as an operational contact by the other agency during a five-year period that overlapped with allegations in the FISA application, (2) Page had disclosed to the other agency contacts that he had with Intelligence Officer 1 and certain other individuals, and (3) the other agency's employee had given a positive assessment of Page's candor.

Further, we were concerned by the FBI's inaccurate assertion in the application that Steele's prior reporting had been "corroborated and used in criminal



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

proceedings," which we were told was primarily a reference to Steele's role in the FIFA corruption investigation. We found that the team had speculated that Steele's prior reporting had been corroborated and used in criminal proceedings without clearing the representation with Steele's handling agent, as required by the Woods Procedures. According to the handling agent, he would not have approved the representation in the application because only "some" of Steele's prior reporting had been corroborated—most of it had not—and because Steele's information was never used in a criminal proceeding. We concluded that these failures created the inaccurate impression in the applications that at least some of Steele's past reporting had been deemed sufficiently reliable by prosecutors to use in court, and that more of his information had been corroborated than was actually the case.

We found no evidence that the OI Attorney, NSD supervisors, ODAG officials, or Yates were made aware of these issues before the first application was submitted to the court. Although we also found no evidence that Comey had been made aware of these issues at the time he certified the application, as discussed in our analysis in Chapter Eleven, multiple factors made it difficult for us to precisely determine the extent of FBI leadership's knowledge as to each fact that was not shared with OI and not included, or inaccurately stated, in the FISA applications. These factors included, among other things, limited recollections, the inability to question Comey or refresh his recollection with relevant, classified documentation because of his lack of a security clearance, and the absence of meeting minutes that would show the specific details shared with Comey and McCabe during briefings they received, beyond the more general investigative updates that we know they were provided.

## FBI Activities After the First FISA Application and FBI Efforts to Assess Steele's Election Reporting

On October 31, 2016, shortly after the first FISA application was signed, an article entitled "A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump," was published by *Mother Jones.* Steele admitted to the FBI that he was a source for the article, and the FBI closed him as a CHS for cause in November 2016. However, as we describe below, despite having been closed for cause, the Crossfire Hurricane team continued to obtain information from Steele through Ohr, who met with the FBI on 13 occasions to pass along information he had been provided by Steele.

In Chapter Six, we describe the events that followed Steele's closing as a CHS, including the FBI's receipt of information from several third parties who had acquired copies of the Steele election reports, use of information from the Steele reports in an interagency assessment of Russian interference in the U.S. 2016 elections, and continuing efforts to learn about Steele and his source network and to verify information from the reports following Steele's closure.

Starting in December 2016, FBI staff participated in an interagency effort to assess the Russian government's intentions and actions concerning the 2016 U.S. elections. We learned that whether and how to present Steele's reporting in the Intelligence Community Assessment (ICA) was a topic of significant discussion between the FBI and the other agencies participating in it. According to FBI staff, as the interagency editing process for the ICA progressed, the Central Intelligence Agency (CIA) expressed concern about the lack of vetting for the Steele election reporting and asserted it did not merit inclusion in the body of the report. An FBI Intel Section Chief told us the CIA viewed it as "internet rumor." In contrast, as we describe in Chapter Six, the FBI, including Comey and McCabe, sought to include the reporting in the ICA. Limited information from the Steele reporting ultimately was presented in an appendix to the ICA.

FBI efforts to verify information in the Steele election reports, and to learn about Steele and his source network continued after Steele's closure as a CHS. In November and December 2016, FBI officials travelled abroad and met with persons who previously had professional contacts with Steele or had knowledge of his work. Information these FBI officials obtained about Steele was both positive and negative. We found, however, that the information about Steele was not placed in his FBI CHS file.

We further learned that the FBI's Validation Management Unit (VMU) completed a human source validation review of Steele in early 2017. The VMU review found that Steele's past criminal reporting was "minimally corroborated," and included this finding in its report that was provided to the Crossfire Hurricane team. This determination by the VMU was in tension with the source characterization statement included in the initial FISA application, which represented that Steele's prior reporting had been "corroborated and used in criminal proceedings." The VMU review also did not identify any corroboration for Steele's election reporting among the information that the Crossfire Hurricane team had collected. However, the VMU did not include this finding in its written validation report





# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

and therefore members of the Crossfire Hurricane team and FBI executives were unaware of it.

We also found that the FBI's interviews of Steele, his Primary Sub-source, a second sub-source, and other investigative activity, revealed potentially serious problems with Steele's descriptions of information in his reports. For example, as detailed in Chapters Six and Eight, the Primary Sub-source made statements during his/her January 2017 FBI interview that were inconsistent with multiple sections of the Steele reports, including some that were relied upon in the FISA applications. Among other things, regarding the allegations attributed to Person 1, the Primary Sub-source's account of these communications, if true, was not consistent with and, in fact, contradicted the allegations of a "well-developed conspiracy" in Reports 95 and 102 attributed to Person 1.

We further determined that the Crossfire Hurricane team was unable to corroborate any of the specific substantive allegations regarding Carter Page contained in Steele's election reporting which the FBI relied on in the FISA applications. We were told by the Supervisory Intel Analyst that, as of September 2017, the FBI had corroborated limited information in the Steele election reporting, and much of that was publicly available information. Most relevant to the Carter Page FISA applications, the allegations contained in Reports 80, 94, 95, and 102, which were relied upon in all four applications, remained uncorroborated and, in several instances, were inconsistent with information gathered by the Crossfire Hurricane team.



## The Three Renewal Applications for Continued FISA Authority on Carter Page

As noted above, the FBI filed three renewal applications with the FISC, on January ▮▮, April ▮, and June ▮, 2017. In addition to repeating the seven significant errors contained in the first FISA application and outlined above, we identified 10 additional

significant errors in the three renewal applications, based upon information known to the FBI after the first application and before one or more of the renewals. We describe the circumstances surrounding these 10 errors in Chapter Eight, and provide a chart listing additional errors in Appendix One. As more fully described in Chapter Eight, the renewal applications:

8. Omitted the fact that Steele's Primary Sub-source, who the FBI found credible, had made statements in January 2017 raising significant questions about the reliability of allegations included in the FISA applications, including, for example, that he/she had no discussion with Person 1 concerning WikiLeaks and there was "nothing bad" about the communications between the Kremlin and the Trump team, and that he/she did not report to Steele in July 2016 that Page had met with Sechin;

9. Omitted Page's prior relationship with another U.S. government agency, despite being reminded by the other agency in June 2017, prior to the filing of the final renewal application, about Page's past status with that other agency; instead of including this information in the final renewal application, the OGC Attorney altered an email from the other agency so that the email stated that Page was "not a source" for the other agency, which the FBI affiant relied upon in signing the final renewal application;

10. Omitted information from persons who previously had professional contacts with Steele or had direct knowledge of his work-related performance, including statements that Steele had no history of reporting in bad faith but "[d]emonstrates lack of self-awareness, poor judgment," "pursued people with political risk but no intelligence value," "didn't always exercise great judgment," and it was "not clear what he would have done to validate" his reporting;

11. Omitted information obtained from Ohr about Steele and his election reporting, including that (1) Steele's reporting was going to Clinton's presidential campaign and others, (2) Simpson was paying Steele to discuss his reporting with the media, and (3) Steele was "desperate that Donald Trump not get elected and was passionate about him not being the U.S. President";

12. Failed to update the description of Steele after information became known to the Crossfire



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

Hurricane team, from Ohr and others, that provided greater clarity on the political origins and connections of Steele's reporting, including that Simpson was hired by someone associated with the Democratic Party and/or the DNC;

13. Failed to correct the assertion in the first FISA application that the FBI did not believe that Steele directly provided information to the reporter who wrote the September 23 *Yahoo News* article, even though there was no information in the Woods File to support this claim and even after certain Crossfire Hurricane officials learned in 2017, before the third renewal application, of an admission that Steele made in a court filing about his interactions with the news media in the late summer and early fall of 2016;

14. Omitted the finding from a FBI source validation report that Steele was suitable for continued operation but that his past contributions to the FBI's criminal program had been "minimally corroborated," and instead continued to assert in the source characterization statement that Steele's prior reporting had been "corroborated and used in criminal proceedings";

15. Omitted Papadopoulos's statements to an FBI CHS in late October 2016 denying that the Trump campaign was involved in the circumstances of the DNC email hack;

16. Omitted Joseph Mifsud's denials to the FBI that he supplied Papadopoulos with the information Papadopoulos shared with the FFG (suggesting that the campaign received an offer or suggestion of assistance from Russia); and

17. Omitted information indicating that Page played no role in the Republican platform change on Russia's annexation of Ukraine as alleged in the Report 95, which was inconsistent with a factual assertion relied upon to support probable cause in all four FISA applications.

Among the most serious of the 10 additional errors we found in the renewal applications was the FBI's failure to advise OI or the court of the inconsistences, described in detail in Chapter Six, between Steele and his Primary Sub-source on the reporting relied upon in the FISA applications. Although the Primary Sub-source's account of these communications, if true, was not consistent with and, in fact, contradicted the allegations of a "well-developed conspiracy" in Reports 95 and 102 attributed to Person 1, the FBI did not share this information with OI. The

FBI also failed to share other inconsistencies with OI, including the Primary Sub-source's account of the alleged meeting between Page and Sechin in Steele's Report 94 and his/her descriptions of the source network. The fact that the Primary Sub-source's account contradicted key assertions attributed to his/her own sub-sources in Steele's Reports 94, 95, and 102 should have generated significant discussions between the Crossfire Hurricane team and OI prior to submitting the next FISA renewal application. According to Evans, had OI been made aware of the information, such discussions might have included the possibility of foregoing the renewal request altogether, at least until the FBI reconciled the differences between Steele's account and the Primary Sub-source's account to the satisfaction of OI. However, we found no evidence that the Crossfire Hurricane team ever considered whether any of the inconsistencies warranted reconsideration of the FBI's assessment of the reliability of the Steele reports or notice to OI before the subsequent renewal applications were filed.

Instead, the second and third renewal applications provided no substantive information concerning the Primary Sub-source's interview, and offered only a brief conclusory statement that the FBI met with the Primary Sub-source "[i]n an effort to further corroborate Steele's reporting" and found the Primary Sub-source to be "truthful and cooperative." We believe that including this statement, without also informing OI and the court that the Primary Sub-source's account of events contradicted key assertions in Steele's reporting, left a misimpression that the Primary Sub-source had corroborated the Steele reporting. Indeed, in a letter to the FISC in July 2018, before learning of these inconsistencies from us during this review, the Department defended the reliability of Steele's reporting and the FISA applications by citing, in part, to the Primary Sub-source's interview as "additional information corroborating [Steele's] reporting" and noting the FBI's determination that he/she was "truthful and cooperative."

The renewal applications also continued to fail to include information regarding Carter Page's past relationship with another U.S. government agency, even though both OI and members of the Crossfire Hurricane expressed concern about the possibility of a prior relationship following interviews that Page gave to news outlets in April and May 2017 stating that he had assisted other U.S. government agencies in the past. As we describe in Chapter Eight, SSA 2, who was to be the affiant for Renewal Application No. 3 and had been the affiant for the first two renewals, told us that he wanted a definitive answer to whether Page



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

had ever been a source for another U.S. government agency before he signed the final renewal application. This led to interactions between the OGC Attorney assigned to Crossfire Hurricane and a liaison from the other U.S. government agency. In an email from the liaison to the OGC Attorney, the liaison provided written guidance, including that it was the liaison's recollection that Page had or continued to have a relationship with the other agency, and directed the OGC Attorney to review the information that the other agency had provided to the FBI in August 2016. As noted above, that August 2016 information stated that Page did, in fact, have a prior relationship with that other agency. The next morning, immediately following a 28 minute telephone call between the OGC Attorney and the OI Attorney, the OGC Attorney forwarded to the OI Attorney the liaison's email (but not the original email from the OGC Attorney to the liaison setting out the questions he was asking). The OI Attorney responded to the OGC Attorney, "thanks I think we are good and no need to carry it any further." However, when the OGC Attorney subsequently sent the liaison's email to SSA 2, the OGC Attorney altered the liaison's email by inserting the words "not a source" into it, thus making it appear that the liaison had said that Page was "not a source" for the other agency. Relying upon this altered email, SSA 2 signed the third renewal application that again failed to disclose Page's past relationship with the other agency. Consistent with the Inspector General Act of 1978, following the OIG's discovery that the OGC Attorney had altered and sent the email to SSA 2, who thereafter relied on it to swear out the third FISA application, the OIG promptly informed the Attorney General and the FBI Director and provided them with the relevant information about the OGC Attorney's actions.

None of the inaccuracies and omissions that we identified in the renewal applications were brought to the attention of OI before the applications were filed. As a result, similar to the first application, the Department officials who reviewed one or more of the renewal applications, including Yates, Boente, and Rosenstein, did not have accurate and complete information at the time they approved them.

We do not speculate whether or how having accurate and complete information might have influenced the decisions of senior Department leaders who supported the four FISA applications, or the court, if they had known all of the relevant information. Nevertheless, it was the obligation of the FBI agents and supervisors who were aware of the information to ensure that the FISA applications were "scrupulously accurate" and that OI, the Department's decision

makers, and ultimately, the court had the opportunity to consider the additional information and the information omitted from the first application. The individuals involved did not meet this obligation.

## Conclusions Concerning All Four FISA Applications

We concluded that the failures described above and in this report represent serious performance failures by the supervisory and non-supervisory agents with responsibility over the FISA applications. These failures prevented OI from fully performing its gatekeeper function and deprived the decision makers the opportunity to make fully informed decisions. Although some of the factual misstatements and omissions we found in this review were arguably more significant than others, we believe that all of them taken together resulted in FISA applications that made it appear that the information supporting probable cause was stronger than was actually the case.

We identified at least 17 significant errors or omissions in the Carter Page FISA applications, and many additional errors in the Woods Procedures. These errors and omissions resulted from case agents providing wrong or incomplete information to OI and failing to flag important issues for discussion. While we did not find documentary or testimonial evidence of intentional misconduct on the part of the case agents who assisted OI in preparing the applications, or the agents and supervisors who performed the Woods Procedures, we also did not receive satisfactory explanations for the errors or problems we identified. In most instances, the agents and supervisors told us that they either did not know or recall why the information was not shared with OI, that the failure to do so may have been an oversight, that they did not recognize at the time the relevance of the information to the FISA application, or that they did not believe the missing information to be significant. On this last point, we believe that case agents may have improperly substituted their own judgments in place of the judgment of OI, or in place of the court, to weigh the probative value of the information. Further, the failure to update OI on all significant case developments relevant to the FISA applications led us to conclude that the agents and supervisors did not give appropriate attention or treatment to the facts that cut against probable cause, or reassess the information supporting probable cause as the investigation progressed. The agents and SSAs also did not follow, or appear to even know, the requirements in the Woods Procedures to re-verify the factual assertions from previous applications



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

that are repeated in renewal applications and verify source characterization statements with the CHS handling agent and document the verification in the Woods File.

That so many basic and fundamental errors were made by three separate, hand-picked teams on one of the most sensitive FBI investigations that was briefed to the highest levels within the FBI, and that FBI officials expected would eventually be subjected to close scrutiny, raised significant questions regarding the FBI chain of command's management and supervision of the FISA process. FBI Headquarters established a chain of command for Crossfire Hurricane that included close supervision by senior CD managers, who then briefed FBI leadership throughout the investigation. Although we do not expect managers and supervisors to know every fact about an investigation, or senior officials to know all the details of cases about which they are briefed, in a sensitive, high-priority matter like this one, it is reasonable to expect that they will take the necessary steps to ensure that they are sufficiently familiar with the facts and circumstances supporting and potentially undermining a FISA application in order to provide effective oversight, consistent with their level of supervisory responsibility. We concluded that the information that was known to the managers, supervisors, and senior officials should have resulted in questions being raised regarding the reliability of the Steele reporting and the probable cause supporting the FISA applications, but did not.

In our view, this was a failure of not only the operational team, but also of the managers and supervisors, including senior officials, in the chain of command. For these reasons, we recommend that the FBI review the performance of the employees who had responsibility for the preparation, Woods review, or approval of the FISA applications, as well as the managers and supervisors in the chain of command of the Carter Page investigation, including senior officials, and take any action deemed appropriate. In addition, given the extensive compliance failures we identified in this review, we believe that additional OIG oversight work is required to assess the FBI's compliance with Department and FBI FISA-related policies that seek to protect the civil liberties of U.S. persons. Accordingly, we have today initiated an OIG audit that will further examine the FBI's compliance with the Woods Procedures in FISA applications that target U.S. persons in both counterintelligence and counterterrorism investigations. This audit will be informed by the findings in this review, as well as by our prior work over the past 15 years on the Department's and FBI's use of

national security and surveillance authorities, including authorities under FISA, as detailed in Chapter One.

## Issues Relating to Department Attorney Bruce Ohr

In Chapter Nine, we describe the interactions Department attorney Bruce Ohr had with Christopher Steele, the FBI, Glenn Simpson (the owner of Fusion GPS), and the State Department during the Crossfire Hurricane investigation. At the time of these interactions, which took place from about July 2016 to May 2017, Ohr was an Associate Deputy Attorney General in the Office of the Deputy Attorney General (ODAG) and the Director of the Organized Crime and Drug Enforcement Task Force (OCDETF).

*Ohr's Interactions with Steele, the FBI, Simpson, and the State Department*

Beginning in July 2016, at about the same time that Steele was engaging with the FBI on his election reporting, Steele contacted Ohr, who he had known since at least 2007, to discuss information from Steele's election reports. At Steele's suggestion, Ohr also met in August 2016 with Simpson to discuss Steele's reports. At the time, Ohr's wife, Nellie Ohr, worked at Fusion GPS as an independent contractor. Ohr also met with Simpson in December 2016, at which time Simpson gave Ohr a thumb drive containing numerous Steele election reports that Ohr thereafter provided to the FBI.

On October 18, 2016, after speaking with Steele that morning, Ohr met with McCabe to share Steele's and Simpson's information with him. Thereafter, Ohr met with members of the Crossfire Hurricane team 13 times between November 21, 2016, and May 15, 2017, concerning his contacts with Steele and Simpson. All 13 meetings occurred after the FBI had closed Steele as a CHS and, except for the November 21 meeting, each meeting was initiated at Ohr's request. Ohr told us that he did not recall the FBI asking him to take any action regarding Steele or Simpson, but Ohr also stated that "the general instruction was to let [the FBI] know...when I got information from Steele." The Crossfire Hurricane team memorialized each of the meetings with Ohr as an "interview" using an FBI FD-302 form. Separately, in November 2016, Ohr met with senior State Department officials regarding Steele's election reporting.

Department leadership, including Ohr's supervisors in ODAG and the ODAG officials who



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

reviewed and approved the Carter Page FISA applications, were unaware of Ohr's meetings with FBI officials, Steele, Simpson, and the State Department until after Congress requested information from the Department regarding Ohr's activities in late November 2017.

We did not identify a specific Department policy prohibiting Ohr from meeting with Steele, Simpson, or the State Department and providing the information he learned from those meetings to the FBI. However, Ohr was clearly cognizant of his responsibility to inform his supervisors of these interactions, and acknowledged to the OIG that the possibility that he would have been told by his supervisors to stop having such contact may have factored into his decision not to tell them about it.

We concluded that Ohr committed consequential errors in judgment by (1) failing to advise his direct supervisors or the DAG that he was communicating with Steele and Simpson and then requesting meetings with the FBI's Deputy Director and Crossfire Hurricane team on matters that were outside of his areas of responsibility, and (2) making himself a witness in the investigation by meeting with Steele and providing Steele's information to the FBI. As we describe in Chapter Eight, the late discovery of Ohr's meetings with the FBI prompted NSD to notify the FISC in July 2018, over a year after the final FISA renewal order was issued, of information that Ohr had provided to the FBI but that the FBI had failed to inform NSD and OI about (and therefore was not included in the FISA applications), including that Steele was "desperate that Donald Trump not get elected and was passionate about him not being the U.S. President."

*FBI Compliance with Policies*

The FBI's CHS Policy Guide (CHSPG) provides guidance to agents concerning contacts with CHSs after they have been closed for cause, as was the case with Steele as of November 2016. According to the CHSPG, a handling agent must not initiate contact with or respond to contacts from a former CHS who has been closed for cause absent exceptional circumstances that are approved by an SSA. The CHSPG also requires reopening of the CHS if the relationship between the FBI and a closed CHS is expected to continue beyond the initial contact or debriefing. Reopening requires high levels of supervisory approval, including a finding that the benefits of reopening the CHS outweigh the risks.

We found that, while the Crossfire Hurricane team did not initiate direct contact with Steele after his

closure, it responded to numerous contacts made by Steele through Ohr. Ohr himself was not a direct witness in the Crossfire Hurricane investigation; rather, his purpose in communicating with the FBI was to pass along information from Steele. While the FBI's CHS policy does not explicitly address indirect contact between an FBI agent and a closed CHS, we concluded that the repeated contacts with Steele should have triggered the CHS policy requiring that such contacts occur only after an SSA determines that exceptional circumstances exist. While an SSA was present for the meetings with Ohr, we found no evidence that the SSAs made considered judgments that exceptional circumstances existed for the repeated contacts. We also found that, given that there were 13 different meetings with Ohr over a period of months, the use of Ohr as a conduit between the FBI and Steele created a relationship by proxy that should have triggered, pursuant to FBI policy, a supervisory decision about whether to reopen Steele as a CHS or discontinue accepting information indirectly from him through Ohr.

*Ethics Issues Raised by Nellie Ohr's Former Employment with Fusion GPS*

Fusion GPS employed Nellie Ohr as an independent contractor from October 2015 to September 2016. On his annual financial disclosure forms covering calendar years 2015 and 2016, Ohr listed Nellie Ohr as an "independent contractor" and reported her income from that work on the form. We determined that financial disclosure rules, 5 C.F.R. Part 2634, did not require Ohr to list on the form the specific organizations, such as Fusion GPS, that paid Nellie Ohr as an independent contractor during the reporting period.

In addition, for reasons we explain in Chapter Eleven, we concluded that the federal ethics rules did not require Ohr to obtain Department ethics counsel approval before engaging with the FBI in connection with the Crossfire Hurricane matter because of Nellie Ohr's prior work for Fusion GPS. However, we found that, given the factual circumstances that existed, and the appearance that they created, Ohr displayed a lapse in judgment by not availing himself of the process described in the ethics rules to consult with the Department ethics official about his involvement in the investigation.

*Meetings Involving Ohr, CRM officials, and the FBI Regarding the MLARS Investigation*



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

Ohr's supervisors in ODAG also were unaware that Ohr, shortly after the U.S. elections in November 2016, and again in early 2017, participated in discussions about a money laundering investigation of Manafort that was then being led by prosecutors from the Money Laundering and Asset Recovery Section (MLARS), which is located in the Criminal Division (CRM) at the Department's headquarters.

As described in more detail in Chapter Nine, in November 2016, Ohr told CRM Deputy Assistant Attorney General Bruce Swartz and Counsel to the CRM Assistant Attorney General Zainab Ahmad about information he was getting from Steele and Simpson about Manafort. Between November 16, 2016 and December 15, 2016, Ohr participated in several meetings that were attended, at various times, by some or all of the following individuals: Swartz, Ahmad, Andrew Weissmann (then Section Chief of CRM's Fraud Section), Strzok, and Lisa Page. The meetings involving Ohr, Swartz, Ahmad, and Weissmann focused on their shared concern that MLARS was not moving quickly enough on the Manafort criminal investigation and whether there were steps they could take to move the investigation forward. The meetings with Strzok and Page focused primarily on whether the FBI could assess the case's relevance, if any, to the FBI's Russian interference investigation. MLARS was not represented at any of these meetings or told about them, and none of attendees had supervisory responsibility over the MLARS investigation.

There were no meetings about the Manafort case involving Ohr, Swartz, Ahmad, and Weissmann from December 16, 2016 to January 30, 2017. On January 31, 2017, one day after Yates was removed as DAG, Ahmad, by then an Acting CRM Deputy Assistant Attorney General, after consulting with Swartz and Weissmann, sent an email to Lisa Page, copying Weissmann, Swartz, and Ohr, requesting a meeting the next day to discuss "a few Criminal Division related developments." The next day, February 1, Swartz, Ohr, Ahmad, and Weissmann met with Strzok, Lisa Page, and an FBI Acting Section Chief. None of the attendees at the meeting could explain to us what the "Criminal Division related developments" were, and we did not find any. Meeting notes reflect, among other things, that the group discussed the Manafort criminal investigation and efforts that the Department could undertake to investigate attempts by Russia to influence the 2016 elections. MLARS was not represented at, or told about, the meeting.

We are not aware of information indicating that any of the discussions involving Ohr, Swartz,

Weissmann, Ahmad, Strzok, and Lisa Page resulted in any actions taken or not taken in the MLARS investigation, and ultimately the investigation remained with MLARS until it was transferred to the Office of the Special Counsel in May 2017. We also did not identify any Department policies prohibiting internal discussions about a pending investigation among officials not assigned to the matter, or between those officials and senior officials from the FBI. However, as described in Chapter Nine, we were told that there was a decision not to inform the leadership of CRM, both before and after the change in presidential administrations, of these discussions in order to insulate the MLARS investigation from becoming "politicized." We concluded that this decision, made in the absence of concerns of potential wrongdoing or misconduct, and for the purpose of avoiding the appearance that an investigation is "politicized," fundamentally misconstrued who is ultimately responsible and accountable for the Department's work. We agree with the concerns expressed to us by then DAG Yates and then CRM Assistant Attorney General Leslie Caldwell. Department leaders cannot fulfill their management responsibilities, and be held accountable for the Department's actions, if subordinates intentionally withhold information from them in such circumstances.

## The Use of Confidential Sources (Other Than Steele) and Undercover Employees

As discussed in Chapter Ten, we determined that, during the 2016 presidential campaign, the Crossfire Hurricane team tasked several CHSs, which resulted in multiple interactions with Carter Page and George Papadopoulos, both before and after they were affiliated with the Trump campaign, and one with a high-level Trump campaign official who was not a subject of the investigation. All of these CHS interactions were consensually monitored and recorded by the FBI. As noted above, under Department and FBI policy, the use of a CHS to conduct consensual monitoring is a matter of investigative judgment that, absent certain circumstances, can be authorized by a first-line supervisor (a supervisory special agent). We determined that the CHS operations conducted during Crossfire Hurricane received the necessary FBI approvals, and that AD Priestap knew about, and approved of, all of the Crossfire Hurricane CHS operations, even in circumstances where a first-level supervisory special agent could have approved the operations. We found no evidence that the FBI used CHSs or UCEs to interact with members of the Trump campaign prior to the opening of the Crossfire Hurricane investigation. After the opening of the investigation, we



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

found no evidence that the FBI placed any CHSs or UCEs within the Trump campaign or tasked any CHSs or UCEs to report on the Trump campaign. Finally, we also found no documentary or testimonial evidence that political bias or improper motivations influenced the FBI's decision to use CHSs or UCEs to interact with Trump campaign officials in the Crossfire Hurricane investigation.

Although the Crossfire Hurricane team's use of CHSs and UCEs complied with applicable policies, we are concerned that, under these policies, it was sufficient for a first-level FBI supervisor to authorize the domestic CHS operations that were undertaken in Crossfire Hurricane, and that there was no applicable Department or FBI policy requiring the FBI to notify Department officials of the investigative team's decision to task CHSs to consensually monitor conversations with members of a presidential campaign. We found no evidence that the FBI consulted with any Department officials before conducting these CHS operations. We believe that current Department and FBI policies are not sufficient to ensure appropriate oversight and accountability when such operations potentially implicate sensitive, constitutionally protected activity, and that they should require, at minimum, Department consultation. As noted above, we include a recommendation in this report to address this issue.

Consistent with current Department and FBI policy, we learned that decisions about the use of CHSs and UCEs were made by the case agents and the supervisory special agents assigned to Crossfire Hurricane. These agents told the OIG that they focused the CHS operations on the FFG information and the four investigative subjects, and that they viewed CHS operations as one of the best methods available to quickly obtain information about the predicating allegations, while preventing information about the nature and existence of the investigation from becoming public, and potentially impacting the presidential election.

During the meeting between a CHS and the high-level Trump campaign official who was not a subject of the investigation, the CHS asked about the role of three Crossfire Hurricane subjects—Page, Papadopoulos, and Manafort—in the Trump campaign. The CHS also asked about allegations in public reports concerning Russian interference in the 2016 elections, the campaign's response to ideas featured in Page's Moscow speech, and the possibility of an "October Surprise." In response, the campaign official made no comments of note about those topics. The CHS and the high-level campaign official also discussed ████████

 We found that the Crossfire Hurricane team made no use of any information collected from the high-level Trump campaign official, because the team determined that none of the information gathered was "germane" to the allegations under investigation. However, we were concerned that the Crossfire Hurricane team did not recall having in place a plan, prior to the operation involving the high-level campaign official, to address the possible collection of politically sensitive information.

As discussed in Chapter Ten, through the use of CHSs, the investigative team obtained statements from Carter Page and Papadopoulos that raised questions about the validity of allegations under investigation. For example, when questioned in August 2016 about other individuals who were subjects in the investigation, Page told a CHS that he had "literally never met" or "said one word to" Manafort and that Manafort had not responded to any of Page's emails. As another example, Papadopoulos denied to a CHS that anyone associated with the Trump campaign was collaborating with Russia or with outside groups like WikiLeaks in the release of emails. Papadopoulos stated that the "campaign, of course, [does not] advocate for this type of activity because at the end of the day it's...illegal" and that "our campaign is not...engag[ing] or reaching out to WikiLeaks or to the whoever it is to tell them please work with us, collaborate because we don't, no one does that...." Papadopoulos also said that "as far as I understand...no one's collaborating, there's been no collusion and it's going to remain that way." In another interaction, Papadopoulos told a CHS that he knew "for a fact" that no one from the Trump campaign had anything to do with releasing emails from the DNC, as a result of Papadopoulos's involvement in the Trump campaign. Despite the relevance of this material, as described in Chapters Five and Seven, none of Papadopoulos's statements were provided by the Crossfire Hurricane team to the OI Attorney and Page's statements were not provided to the OI attorney until June 2017, approximately ten months after the initial Carter Page FISA application was granted by the FISC.

Through our review, we also determined that there were other CHSs tasked by the FBI to attempt to contact Papadopoulos, but that those attempted contacts did not lead to any operational activity. We also identified several individuals who had either a connection to candidate Trump or a role in the Trump



campaign, and were also FBI CHSs, but who were not tasked as part of the Crossfire Hurricane investigation. One such CHS did provide the Crossfire Hurricane team with general information about Crossfire Hurricane subjects Page and Manafort, but we found that this CHS had no further involvement in the investigation.

We identified another CHS that the Crossfire Hurricane team first learned about in 2017, after the CHS voluntarily provided his/her handling agent with an [redacted]—and the handling agent forwarded the material, through his supervisor and FBI Headquarters, to the Crossfire Hurricane team. [redacted] The handling agent told us that, when he subsequently informed the Crossfire Hurricane team that the CHS had access to [redacted], a Crossfire Hurricane team intelligence analyst asked the handling agent to collect [redacted] from the CHS, which the handling agent did. We found that the Crossfire Hurricane team determined that there was not "anything significant" in this [redacted] collection, and did not seek to task the CHS. While we found that no action was taken by the Crossfire Hurricane team in response to receiving [redacted], we nevertheless were concerned to learn that the handling agent for the CHS placed [redacted] into the FBI's files, and we promptly notified the FBI upon learning that they were still being maintained in the FBI's files. We further concluded that, because the CHS's handling agent did not understand the CHS's political involvement, no assessment was performed by the source's handling agent or his supervisors (none of whom were members of the Crossfire Hurricane team) to determine whether the CHS required re-designation as a "sensitive source" or should have been closed during the pendency of the campaign.

While we concluded that the investigative activities undertaken by the Crossfire Hurricane team involving CHSs and UCEs complied with applicable Department and FBI policies, we believe that in certain circumstances Department and FBI policies do not provide sufficient oversight and accountability for investigative activities that have the potential to gather sensitive information involving protected First Amendment activity, and therefore include recommendations to address these issues.

Finally, as we also describe in Chapter Ten, we learned during the course of our review that in August 2016, the supervisor of the Crossfire Hurricane investigation, SSA 1, participated on behalf of the FBI in a strategic intelligence briefing given by Office of the Director of National Intelligence (ODNI) to candidate Trump and his national security advisors, including Michael Flynn, and in a separate strategic intelligence briefing given to candidate Clinton and her national security advisors. The stated purpose of the FBI portion of the briefing was to provide the recipients "a baseline on the presence and threat posed by foreign intelligence services to the National Security of the U.S." However, we found that SSA 1 was selected to provide the FBI briefings, in part, because Flynn, who was a subject in the ongoing Crossfire Hurricane investigation, would be attending the Trump campaign briefing.

Following his participation in the briefing of candidate Trump, Flynn, and another Trump advisor, SSA 1 drafted an EC documenting his participation in the briefing, and added the EC to the Crossfire Hurricane investigative file. We were told that the decision to select SSA 1 to participate in the ODNI briefing was reached by consensus among a group of senior FBI officials, including McCabe and Baker. We noted that no one at the Department or ODNI was informed that the FBI was using the ODNI briefing of a presidential candidate for investigative purposes, and found no applicable FBI or Department policies addressing this issue. We concluded that the FBI's use of this briefing for investigative reasons could potentially interfere with the expectation of trust and good faith among participants in strategic intelligence briefings, thereby frustrating their purpose. We therefore include a recommendation to address this issue.

## Recommendations

Our report makes nine recommendations to the FBI and the Department to assist them in addressing the issues that we identified in this review:

- The Department and the FBI should ensure that adequate procedures are in place for OI to obtain all relevant and accurate information needed to prepare FISA applications and renewal applications, including CHS information. In Chapter Twelve, we identify a few specific steps to assist in this effort.

# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

- The Department and FBI should evaluate which types of SIMs require advance notification to a senior Department official, such as the DAG, in addition to the notifications currently required for SIMs, especially for case openings that implicate core First Amendment activity and raise policy considerations or heighten enterprise risk, and establish implementing policies and guidance, as necessary.

- The FBI should develop protocols and guidelines for staffing and administrating any future sensitive investigative matters from FBI Headquarters.

- The FBI should address the problems with the administration and assessment of CHSs identified in this report, including, at a minimum, revising the FBI's standard CHS admonishments, improving the documentation of CHS information, revising FBI policy to address the acceptance of information from a closed CHS indirectly through a third party, and taking other steps we identify in Chapter Twelve.

- The Department and FBI should clarify the terms (1) "sensitive monitoring circumstance" in the AG Guidelines and the DIOG to determine whether to expand its scope to include consensual monitoring of a domestic political candidate or an individual prominent within a domestic political organization, or a subset of these persons, so that consensual monitoring of such individuals would require consultation with or advance notification to a senior Department official, such as the DAG, and (2) "prominent in a domestic political organization" so that agents understand which campaign officials fall within that definition as it relates to "sensitive investigative matters," "sensitive UDP," the designation of "sensitive sources," and "sensitive monitoring circumstance."

- The FBI should ensure that appropriate training on DIOG § 4 is provided to emphasize the constitutional implications of certain monitoring situations and to ensure that agents account for these concerns, both in the tasking of CHSs and in the way they document interactions with and tasking of CHSs.

- The FBI should establish a policy regarding the use of defensive and transition briefings for investigative purposes, including the factors to be considered and approval by senior leaders at the FBI with notice to a senior Department official, such as the DAG.

- The Department's Office of Professional Responsibility should review our findings related to the conduct of Department attorney Bruce Ohr for any action it deems appropriate. Ohr's current supervisors in CRM should also review our findings related to Ohr's performance for any action they deem appropriate.

- The FBI should review the performance of all employees who had responsibility for the preparation, Woods review, or approval of the FISA applications, as well as the managers, supervisors, and senior officials in the chain of command of the Carter Page investigation for any action it deems appropriate.