# Exhibit 5



# Office of the Inspector General
## U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election

Oversight and Review Division 18-04                                    June 2018

### 4. Limitations in the Consents to Search the Culling Laptops

In addition to the immunity agreements, which the Department entered into to obtain possession of the culling laptops, the Department entered into consent agreements with both Mills and Samuelson in order to enable the FBI to search the laptops with certain limitations. The consent agreements provided that the "sole purposes of the search" were:

> "[T]o search for any .pst files, or .ost files, or compressed files containing .pst or .ost files, that were created by Platte River Networks ("PRN") after June 1, 2014 and before February 1, 2015, in response to requests for former Secretary Clinton's email from her tenure as Secretary of State;"
>
> "[T]o attempt to identify any emails from, or remnants of, the PRN Files that could potentially be present on the Device;"
>
> "[T]o identify any emails resident on the Device sent to or received from" Hillary Clinton's known email accounts, "for the period of January 21, 2009 through February 1, 2013;" and
>
> "[T]o conduct a forensic analysis of the device to determine whether the Device was subject to intrusions or otherwise compromised."

The consent agreements described in detail a two-phase process the FBI would use to search the devices for the listed purposes. In the first phase, OTD would search the allocated space of the devices for the .pst files created by Combetta. If the intact .pst files were found, OTD would not move on to the second phase. If not, OTD would go on to the second phase, which would entail searching both the allocated and unallocated space for "any emails, fragments of emails, files, or fragments of files" that could "clearly be identified as having been sent to or received by" one of Clinton's email accounts during her tenure.[106]

Witnesses told us, and contemporaneous text and instant message exchanges among FBI employees show, that negotiating the consent agreements was a difficult process and, at least at the outset, Strzok and others at the FBI believed that the prosecutors were giving Wilkinson too much control.[107] However,

---

[106] The consent agreements also each provided: "As soon as the investigation is completed, and to the extent consistent with all FBI policies and applicable laws, including the Federal Records Act, the FBI will dispose of the Device and any printed or electronic materials resulting from your search." According to talking points drafted by members of the Midyear team in October 2016, the FBI had agreed to destroy the laptops because the laptops contained classified information and, as such, could not be returned to the attorneys following compliance with FOIA and Federal Records Act obligations. The draft talking points stated that as of October 2016 the laptops had not been destroyed, because the FBI was still "under a legal obligation to preserve the laptops and other electronic media due to numerous pending FOIA requests." On June 11, 2018, the FBI informed the OIG that the FBI still had in its possession the culling laptops and all other evidence collected during the Midyear investigation.

[107] FBI employees have the ability to communicate internally via Microsoft Lync instant messages when logged on to their FBI workstation. We discovered several Lync messages that were relevant to our review, and we discuss these in Section XI of this chapter and in Chapter Twelve.

stated they did not consult the USAM provisions regarding obtaining evidence from attorneys concerning their representation of clients.

Based on these findings, the report concluded:

> INSD assessed the FBI Midyear Exam investigation successfully determined classified information was improperly stored and transmitted on Clinton's email server, and classified information was compromised by unauthorized individuals, to include foreign government's or intelligence services, via cyber intrusion or other means [referring to compromises of email accounts associated with certain individuals who communicated with Clinton's server, such as Blumenthal]. However, the structure of the investigation and prosecution team, as prescribed in the CD PG, and treatment of the investigation as a traditional espionage matter rather than a criminal investigation significantly hindered the ability of the investigative team to obtain full, accurate and timely information.

## XI. Instant Messages Relating to the Conduct of the Midyear Investigation

FBI employees have the ability to communicate internally via Microsoft Lync instant messages when logged on to their FBI workstation. As part of our review, the OIG identified contemporaneous instant messages in which Agent 1 expressed concerns about the quality of the Midyear investigation. These messages were sent to numerous FBI employees, including an agent assigned to the Midyear filter team (Agent 5). Agent 1 and Agent 5, who are now married, were in a relationship for the entirety of the Midyear investigation. We identified additional instant messages sent by Agent 1 and Agent 5 that raised concerns about potential bias. We discuss these messages and others in Chapter Twelve.

The Midyear filter team was responsible for conducting an initial review of evidence obtained during the investigation and ensuring that nothing that was either beyond the scope of the FBI's authority to review or protected by a valid privilege was provided to the investigative team. We found that Agent 1 and Agent 5 exchanged numerous instant messages about the Midyear investigation. However, we identified no instances where Agent 5 provided Midyear-related information to Agent 1 that should have been withheld from the investigative team. Agent 1 and Agent 5 told us that their Midyear supervisors were aware of their relationship by the end of 2015 at the latest and it was never identified as a concern.

We asked Agent 1 generally about his use of instant messaging on his FBI workstation. Agent 1 told us that he believed that instant messages were not retained by the FBI and therefore used less caution with those communications than he would have with other types of communications, such as email or text messages. Agent 1 also repeatedly emphasized that the instant messages served as a type of emotional release for him. Agent 1 stated:

# CHAPTER TWELVE:
# TEXT MESSAGES, INSTANT MESSAGES, USE OF PERSONAL EMAIL, AND ALLEGED IMPROPER DISCLOSURES OF NON-PUBLIC INFORMATION

This Chapter discusses text messages from FBI-issued mobile devices and instant messages exchanged on FBI systems that raised concerns of potential bias. We describe key text messages and instant messages we identified during our review, as well as explanations for these messages that the involved employees offered during their OIG interviews. We also identified instances where FBI employees, including Comey and Strzok, used personal email accounts to conduct official government business. Lastly, we discuss allegations that Department and FBI employees improperly disclosed non-public information.

## I.   Text Messages and Instant Messages

During the course of our review, we requested and received text messages from FBI-issued mobile devices and instant messages exchanged on the FBINet and SCINet Lync applications for FBI personnel involved in the Midyear investigation.[192] We also requested text messages for Department personnel involved in the Midyear investigation, but were informed that the Department does not retain text messages for more than 5 to 7 days.[193] The OIG previously expressed concerns in a 2015 report about the text message retention practices of the Department's four law enforcement components, and we recommend that ODAG consider taking steps to improve the retention and monitoring of text messages Department-wide.[194]

After receiving FBI text messages and instant messages responsive to keywords we provided to the FBI, we identified messages for certain FBI personnel

---

[192]  FBINet is the FBI's computer system for information classified at the Secret level, while its SCINet system handles Top Secret and compartmented information.

[193]  After reviewing a draft of this report, the Midyear prosecutors told the OIG that they did not use text messages, and that the only text messages they received were from the Midyear agents about logistical arrangements.

[194]  In March 2015, the OIG issued a report pertaining to the handling of sexual harassment allegations by the Department's four law enforcement components, the FBI, the Drug Enforcement Administration (DEA), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the U.S. Marshal's Service (USMS).  In that report, we noted that all four components had weaknesses detecting sexually explicit text messages and images, and that two components did not archive text messages sent and received by its employees.  We therefore recommended that all four law enforcement components, in coordination with ODAG, should (1) acquire and implement technology and establish procedures to effectively preserve text messages and images for a reasonable period of time, and should make that information available to misconduct investigators and for discovery purposes; and (2) take concrete steps to acquire and implement technology to proactively monitor text message and image data for potential misconduct.  *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *The Handling of Sexual Harassment and Misconduct Allegations by the Department's Law Enforcement Components*, Evaluation and Inspections Division Report 15-04 (March 2016), https://go.usa.gov/xQGz4 (accessed May 9, 2018).

On Election Day on November 8, 2016, Agent 1 and Agent 5 exchanged the following instant messages.

> 14:21:10, Agent 1:  "You think HRC is gonna win right?  You think we should get nails and some boards in case she doesnt"
>
> 14:21:56, Agent 5:  "she better win… otherwise i'm gonna be walking around with both of my guns."
>
> 14:22:05, Agent 5:  "and likely quitting on the spot"
>
> 14:28:43, Agent 1:  "You should know;….."
>
> 14:28:45, Agent 1:  "that"
>
> 14:28:50, Agent 1:  "I'm….."
>
> 14:28:56, Agent 1:  "with her."
>
> 14:28:58, Agent 1:  "ooooooooooooooooooo"
>
> 14:29:02, Agent 1:  "show me the money"
>
> 14:29:03, Agent 5:  "<:o)"
>
> 14:29:14, Agent 5:  "screw you trump"
>
> 14:19:18, Agent 5:  "wheeeeeeeeeeeeeeeeeeeeeeeeee!"
>
> 14:29:32, Agent 5:  "go baby, go!  let's give her Virginia"
>
> 14:30:03, Agent 1:  "not to my country.  You just cant get up and try to appeal to all the worst things in humans and fool my country…."
>
> 14:30:12, Agent 1:  "Just 49% of us….."
>
> 14:30:25, Agent 5:  "let's hope it's 49% or less…"
>
> 14:30:31, Agent 5:  "we'll find out…"

In a December 6, 2016 exchange, Agent 5 complained to Agent 1 about being required to be on call on the day of the presidential inauguration.  In the middle of expressing displeasure about this, Agent 5 sent a message to Agent 1 that stated, "fuck trump."  On February 9, 2017, in the context of an FBI employee receiving a presidential award for public service, Agent 5 messaged, "...I think now that trump is the president, i'd refuse it.  it would be an insult to even be considered for it."

==We asked Agent 1 and Agent 5 about their use of instant messaging generally and about these messages in particular.  As mentioned in Chapter Five, Agent 1 told us that he believed that instant messages were not retained by the FBI and therefore used less caution with those communications than he would have with other types of communications, such as email or text messages.==[208]  Agent 5

---

[208] Agent 1 explained the reason for his belief that the instant messages were not retained, stating, "So my understanding of [instant messaging] in the FBI is that it was implemented about four or five years ago, roughly.  Because I did internal investigations, at the time I was on the espionage

also made this point, stating that she considered these exchanges as a private "outlet" to Agent 1. Both Agent 1 and Agent 5 apologized for their use of instant messaging in this manner and told us that they were embarrassed.

We asked Agent 1 whether he believed these political discussions raised questions about the integrity or reliability of the Midyear investigation. Agent 1 stated:

> I don't based on knowing my actions. I guess I would kind of repeat what I said before. Yes, I, I have personal, a personal life, private opinions, private views. I think what happened here is that I used instant message and chat like it was my home.
>
> …I like the job of fact-finding and having it lead you where you go. I don't start any day with an endgame in mind of let it, let it go to, go to that. That's the way I think I act, that's how I think I've acted over my whole career. That's how I, that's how I know I acted in, in this case.
>
> Yeah, I think that, I understand your question because it's an FBI system. I just unfortunately did not view it that way and did not use it that way. I used it as, as, you know, some of my worst hits here, as a, a way to relieve stress, as a way to be jocular, as a way to exaggerate, as a way to blow off steam, as a, you know, potentially get sympathy from, and then, you know, it was compounded by frustrations from other people coming to me for answers for why certain people got elected, and is it our fault, and, so I think there was a, kind of a cocktail of, of stress in this case that came out on this system like it was a conversation.
>
> So I, I don't, I don't think so based on knowing my actions and what I did knowing the actions of the people around me.

We also asked Agent 1 whether his personal beliefs impacted his investigative actions in Midyear. Agent 1 responded:

> [I]n no way do I think it, it impacted my view. I guess the best way is almost like a, it's almost like you switch on your, when, when we did our morning meetings, it was what do we have and where do we go next? It, it was just like almost, you know, like there's a, there's the professional side, the do your job side, and there's a personal side. And I think a lot of this falls into the personal side.

---

squad, my awareness was that it was not logged by the FBI because I tried to get those records for internal investigations." Agent 5 stated the she also had requested instant messages in prior internal investigations and been told that they were not preserved. Agents 1 and 5 told the OIG that they learned in April 2017 that the FBI had retained instant messages since February 2015, as the result of receiving a memorandum about preservation and criminal discovery obligations stemming from the FBI's instant messaging system. The FBI email distributing this memorandum advised employees that the FBI began preserving instant messages in February 2015 and stated, "Lync should not be used for substantive communications."