UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

BRIAN HUDDLESTON,

Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION and UNITED STATES DEPARTMENT OF JUSTICE,

Defendants.

CIVIL ACTION No. 4:20CV00447

**DECLARATION OF MELISSA A. CORCORAN**

I, Melissa A. Corcoran, declare as follows:

1. I am the Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division, Federal Bureau of Investigation (FBI), Winchester, Virginia. I have held this position since October 2026. I joined the FBI in 2009. Prior to my current position, I served as Section Chief of the Resource Management Section in the Operational Technology Division; Assistant Section Chief for the Operational Collection and Exploitation Section; Unit Chief for the Electronic Surveillance Technology Support Unit; Supervisory Special Assistant to the Assistant Director for the Huntsville Program Office; Executive Staff Unit Chief; Supervisory Special Assistant to the Assistant Director of the Operational Technology Division; Unit Chief of the Executive Staff Unit and Supervisory Special Assistant for the Executive Assistant Director for the Science and Technology Branch; Supervisory Special Assistant to the Assistant Director for the Terrorist Screening Center; Strategic Officer of the Audit and Compliance Program; and support for the Administrative Officer and the Office of

the Assistant Director in the Terrorist Screening Center.

2. In my official capacity as Section Chief of RIDS, I supervise nine Federal Bureau of Investigation Headquarters (FBIHQ) units and two field operational service center units. RIDS' collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA, 5 U.S.C. § 552, as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974, 5 U.S.C. § 552a; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. In my role as Section Chief, my responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010) and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA. The statements contained in this declaration are based upon my personal knowledge, including information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3. Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from the FBI's files pursuant to the provisions of the FOIA and the Privacy Act of 1974. Specifically, I am familiar with the FBI's handling of Plaintiff's FOIA requests that are the subject of this litigation. This declaration incorporates and supplements information previously provided in the FBI's prior declarations in this case.

4. The FBI submits this declaration in response to Plaintiff's Motion for Reconsideration of Search Adequacy Rulings ("Plaintiff's Motion.") (Dkt. No. 257.) Plaintiff has requested that the court reconsider and vacate the Court's earlier rulings concerning the

adequacy of the FBI's searches and Plaintiff claims that the sworn statements upon which the Court's rulings relied are contradicted by the declassified records, including those published by the White House Transparency Task Force (WHTTF).

5. In Plaintiff's Motion, three investigations are discussed throughout: 1) Crossfire Hurricane, 2) Oxferd Comma, and 3) March Toll. Plaintiff's Motion also asserts that the FBI's use of prohibited and restricted files is a basis to discredit prior statements made by the FBI in this case. Plaintiff concludes that Plaintiff's own findings reveal the existence of additional responsive records and Plaintiff claims that the FBI deliberately placed these allegedly responsive records outside of the system searched.

**THE FBI DOES NOT CONDUCT SEARCHES FOR REQUEST SUBJECTS TO WHICH A *GLOMAR* APPLIES[1]**

6. The FBI initially issued a *Glomar* as it related to Items 1-4 of Plaintiff's June 1, 2020, FOIA request, in which the FBI advised Plaintiff that the FBI could neither confirm nor deny the existence of responsive records because doing so would foreseeably cause harm that Exemptions 6, 7(C) and/or 7(E) were designed to prevent.[2] The FBI does not conduct searches for subjects that have not been officially acknowledged or for which a requester has not provided proof of death, a privacy waiver, or sufficient information to establish that the public interest

[1] A *Glomar* response is one that refused to confirm or deny the existence of certain records in response to a FOIA request. See *Wilner v. NSA*, 592 F.3d.60, 67 (2d Cir.2009). The term "*Glomar*" refers to the subject of a FOIA request submitted to the CIA. The requester sought information concerning a ship named the *Glomar* Explorer and the CIA refused to confirm or deny the CIA's knowledge of the *Glomar* vessel, because to do so would compromise the national security or divulge intelligence sources and methods. *Phillippi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981).

[2] Items 1-4 of Plaintiff's June 1, 2020, FOIA request, requested records revealing the code names assigned "to any and all individuals" as part of the Crossfire Hurricane investigation, assigned to any and all sub-sections of the Crossfire Hurricane investigation, or which were assigned to Seth Rich or Aaron Rich

outweighs the privacy interests of the third party. However, if a requester submits evidence of an official acknowledgment by the Department of Justice (DOJ) or by the FBI acknowledging the existence of requested records, the *Glomar* may be pierced, as to that specific acknowledged information or the existence of records on the subject. If the FBI determines that a *Glomar* has been pierced the FBI conducts a search for the acknowledged responsive records. Typically, the FBI only considers information provided at the time the FOIA request is submitted because the FBI does not perpetually re-evaluate the FBI's responses to a FOIA request as new information may be disclosed or becomes available in the future.[3] Furthermore, the Plaintiff bears the burden to prove that information has been officially disclosed or acknowledged by the government.

**THE FBI DOES NOT CONTINUOUSLY REANALYZE THE FBI'S DETERMINATIONS BASED ON NEWLY RECEIVED INFORMATION NOT PROVIDED AT THE TIME OF THE REQUEST**

7. Contrary to standard practice, but in a good faith effort to resolve this litigation, the FBI has accommodated Plaintiff's requests to reconsider the FBI's responses based on newly discovered information and recently and officially acknowledged information that Plaintiff did not provide to the FBI at the time the request was submitted to the FBI or any time before the briefings.

PIERCING OF THE FBI'S *GLOMAR* CONCERNING MICHAEL FLYNN AND CARTER PAGE

8. The *Glomar* was pierced as to Carter Page ("Page") and Michael Flynn ("Flynn")

[3] When the Plaintiff submitted his April 9, 2020, and June 20, 2020, FOIA requests, Plaintiff failed to provide the information identified in Plaintiff's recent Motion. Specifically, only now has Plaintiff provided information concerning records released by the WHTTF that Plaintiff alleges are responsive to Plaintiff's request, as well as records contained in a binder relating to the FBI's Crossfire Hurricane investigation that Plaintiff alleges Plaintiff requested. Notwithstanding that Plaintiff failed to provide this information with Plaintiff's request, the FBI has evaluated the information released by the WHTTF, but would require additional time to evaluate and determine if the *Glomar* is further pierced as it relates to any potentially responsive information contained in the binder.

after the FBI discovered that an official, public acknowledgment that Page and Flynn were assigned code names in the U.S. Department of Justice, Office of Inspector General's, December 2019 (Revised) report, which is titled "Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation" ("OIG Report".) *See* Fourth Declaration of Michael G. Seidel, ¶ 43. (Dkt. 39-1.) The Plaintiff's request letter dated June 1, 2020, wherein the Plaintiff sought records revealing the code names assigned to any and all individuals as part of the Crossfire Hurricane investigation did not include this information. Based on the information provided at the time of the FBI's *Glomar* determination, August 6, 2020, the FBI's response was correct. Almost a year later, in April 2021, and after Plaintiff filed this litigation, the FBI became aware that the codenames of Page and Flynn had been officially acknowledged by DOJ within the OIG report. The FBI then took the extraordinary step, during this litigation, of negotiating with Plaintiff to narrow the scope of Plaintiff's request for Crossfire Hurricane code names (FOIPA Request No. 1465971-0). Plaintiff narrowed the request to a single document for each individual/file containing the code name (whether the information within the record remained redacted or not). The Plaintiff agreed. The FBI made a release to Plaintiff on June 24, 2021. *See* Fourth Declaration of Michael G. Seidel, ¶¶ 28-29.

FBI'S EVALUATION OF THE OXFERD COMMA AND MARCH TOLL INVESTIGATIVE RECORDS

9. On August 18, 2026, Plaintiff's counsel alerted FBI counsel of a July 30, 2026, declassified set of records posted to the WHTTF website. The website included records from FBI code named investigations Oxferd Comma and March Toll. The FBI conducted an evaluation of the Oxferd Comma and March Toll records and determined the Oxferd Comma and March Toll records are not responsive to Plaintiff's request, for records revealing the code names assigned "to any and all individuals" as part of the Crossfire Hurricane investigation, assigned to any and all sub-sections of the Crossfire Hurricane investigation, or which were assigned to Seth Rich or

Aaron Rich. In addition, Plaintiff's *other* requests are specific to different third parties who are not the subject of the Oxferd Comma or March Toll investigations.

10. The Oxferd Comma opening electronic communication (EC) states the FBI was predicating the newly opened investigation on predetermined criteria set forth by the Crossfire Hurricane investigation based on an assessment of reliable lead information received during the course of the investigation. The EC does not state that the Oxferd Comma investigation was to *further* the goals of the Crossfire Hurricane investigation, but rather to open a new and separate investigation into whether President Trump may have wittingly or unwittingly involved in activities on behalf of the Government of the Russian Federation. Likewise, the March Toll opening EC indicates the March Toll investigative file was opened due to a referral from the Judiciary Committee based on a representation made by former Attorney General Sessions in Sesson's Senate confirmation hearing regarding contact with Russian officials.

11. The FBI has taken great effort to accommodate Plaintiff's requests for information throughout this litigation; however, the FBI cannot respond in perpetuity as each new revelation is disclosed to the public, especially when Plaintiff will already have that *publicly available* information. Doing so would mean that this litigation will proceed into perpetuity to the unfair and disadvantage to other FOIA requesters who have submitted fully compliant requests.

CROSSFIRE HURRICANE BINDER

12. Plaintiff alleges that the Crossfire Hurricane binder matches the text of Item 4 of Plaintiff's April 9, 2020, FOIA request[4] submitted to the FBI and Plaintiff's June 5, 2020, FOIA

[4] Item 4 of Plaintiff's April 9, 2020 FOIA request, sought, "All data, documents, communications, records or other evidence indicating whether Seth Rich, Aaron Rich, or any other person or persons involved in transferring data from the Democratic National Committee to Wikileaks in 2016, either directly or through intermediaries. This request includes, but is not

request submitted to the U.S. Department of Justice. Plaintiff further alleges that investigative documents contained within the Crossfire Hurricane binder "bear the captions and code names associated with the Crossfire Hurricane umbrella investigation and its individual-subject files: documents 'revealing the code names assigned to any and all individuals as part of the Crossfire Hurricane investigation,' within Items 1 and 2 of the June 1, 2020 request."

13. The FBI advised Plaintiff that the FBI was unable to conduct a search for records responsive to the portion of the Plaintiff's FOIA request seeking records regarding "any other person or persons" involved in transferring data from the Democratic National Committee to WikiLeaks in 2016, either directly or through intermediaries. Specifically, in ¶ 18 of the Fifth Seidel Declaration, the FBI stated that this portion of Plaintiff's FOIA request did not constitute a valid FOIA request. The FBI explained that, pursuant to Department of Justice regulations implementing the FOIA, codified at 28 C.F.R. § 16.3(b), a request must "describe the records sought in sufficient detail to enable Department personnel to locate them with a reasonable amount of effort." Accordingly, Plaintiff's request failed to satisfy this requirement because the phrase "any other person or persons" did not identify specific individuals and was therefore too vague to permit a reasonable search for responsive records.

14. With respect to Items 1 and 2 of Plaintiff's April 9, 2020, FOIA request, the FBI issued a *Glomar* response, neither confirming nor denying the existence of responsive records. The FBI asserted that acknowledging the existence or nonexistence of such records would foreseeably cause the harms that Exemptions 6, 7(C), and/or 7(E) are intended to prevent. The FBI further stated that, when asserting a *Glomar* response, it is the FBI's policy not to conduct a

---

limited to, any reports from CrowdStrike, Inc. that were obtained by the FBI while assisting Special Counsel Robert Mueller's investigation."

search for responsive records because the nature of the request itself precludes acknowledgment of whether responsive records exist or not.

**THE FBI CONDUCTED SEARCHES THAT WERE REASONABLY CALCULATED TO UNCOVER ALL RELEVANT DOCUMENTS RESPONSIVE UNDER THE FOIA TO PLAINTIFF'S REQUESTS**

15. As the court previously determined, the FBI previously conducted searches that were reasonably calculated to uncover all relevant documents responsive under the FOIA to Plaintiff's requests. The FBI determined the newly discovered WHTTF released records pertaining to the Oxferd Comma and the March Toll investigations are not responsive, nor would the investigative files be reasonably likely to contain records responsive under the FOIA to the subjects of Plaintiff's specific requests and, therefore, the FBI has no reason to search the Oxferd Comma and March Toll investigative files.

16. The FBI previously conducted a search of the FBI's Central Records System, for the subjects of Plaintiff's requests. Additionally, the FBI followed all logical leads in an effort to locate responsive records, including consulting with FBI personnel knowledgeable of the Crossfire Hurricane and related investigations. The FBI conducted numerous targeted searches, including the FBI's Washington Field Office (WFO) and other offices, where RIDS determined that personnel familiar with the subjects of the requests would reasonably be located, and requested searches of the files at these locations (manual, paper, and electronic) in an effort to locate responsive records. *See* Fourth Seidel Decl., ¶ 65. To the extent Plaintiff sought a search of the Crossfire Hurricane investigative file using the names of any unidentified individuals, the FBI cannot search for unacknowledged, unnamed third parties (those to which a *Glomar* would apply) because such a request does not reasonably describe specific subjects that an FBI employee could use to develop search terms with a reasonable amount of effort. *See* Fifth Seidel

Decl., ¶ 18. When a requester does not provide a named subject (individual's name or investigative topic), it is not possible to conduct an index search because there is no term to include within the search functions of the Central Records System.[5] As information was located or provided by Plaintiff during the course of this litigation, indicating that information has been publicly acknowledged and disclosed, the FBI worked with Plaintiff to calibrate the FBI's search methods and revise the FBI's original determinations to account for newly discovered information.

17. The FBI has explained that the FBI's indices search is merely how the FBI locates potentially responsive records. In fact, if the electronic record is not within the system, the file must be located and requested in order for a RIDS employee to conduct a responsiveness review. *See* Fourth Seidel Decl., ¶ 56. *This applies whether the file is a prohibited file, restricted file, or a fully viewable file*. Additionally, when conducting index searches, the RIDS personnel who conduct searches in response to FOIPA requests are specifically granted the ability to access certain indexed information that would provide sufficient information for these RIDS employees to either determine responsiveness on the face of the information or to identify any files that the employee may need to obtain for further review and determination for responsiveness. *This includes prohibited files and restricted files*. *See* Second Decl. of Shannon R. Hammer, ¶8 (Dkt. No. 209-1.). Plaintiff claims that prohibited access, unlike restricted access, prevents detection of the existence of potentially relevant serials, and makes prior FBI statements provably inaccurate. This is not true. To the contrary, the opening EC and placeholders that were mentioned provide

[5] Unless Plaintiff provides a privacy waiver, proof of death, or sufficient information to show that the public interest in the identification of that third party outweighs the privacy interest of the individual, conducting a search by their name is an unwarranted invasion of their personal privacy. Such a search, and the resulting indication of whether records exist, would cause harms that Exemptions 6 and 7(C) are designed to prevent. *See* Fourth Seidel Decl., ¶ 36.

evidence that FBI agents indexed both prohibited cases and restricted cases in Sentinel in order to document their existence.

18. Regardless of Plaintiff's inaccuracy, his own Motion points to other statements by former RIDS Section Chief Michael G. Seidel indicating that in this case, RIDS did not rely solely on the search of the case file via Sentinel, but also conducted additional targeted search efforts by contacting FBI HQ, Office of Public Affairs ("OPA"), and WFO and asking FBI HQ, OPA and WFO to search their databases as well as their paper and manual files. As relevant here, the files Plaintiff now wants the FBI to search for originated in WFO. Having knowledge of the existence of the paper file for the investigations referenced by Plaintiff, if WFO personnel had reason to believe responsive records were likely located in those files, WFO would have manually searched those files.

**THE ALLEGED MISSPELLING OF "OXFERD" IN CODE NAME "OXFERD COMMA" IS NOT EVIDENCE OF AN ATTEMPT AT DECEPTION**

19. "Oxferd" is not misspelled. Plaintiff claims that "the FBI has misused the code-naming process: the "OXFERD" caption misspelling was propagated through the caption block, every running header, the notification to the Deputy Attorney General, and the closing communication two years later.…" Plaintiff further claims that "a misspelled index term defeats retrieval by anyone searching the correct spelling, and the only plausible explanation for such a pattern of misspellings is that senior FBI officials were systematically trying to conceal records from search results." *See* Plaintiff's Motion, p. 17, n. 4. This is not true.

20. A code name is merely a shorthand identifier used in day-to-day internal discussions, primarily for security reasons. In the event information is leaked (intentionally or inadvertently) outside of the agency, the amount of damage would likely be reduced by the use of the code name when referring to a particular investigation. Whereas investigations are indexed

by the names of individuals, events, organizations, or other subjects of investigative interest. *See* Fourth Seidel Decl., ¶ 49. Typically, records are indexed using several types of identifiers. The allegation that the word was misspelled to deceive others seeking to locate information on the subject of the investigation within the CRS is factually implausible. Records are indexed using multiple types of identifiers, and a code name is no different from a case file number or a source symbol number in their purpose. The key is consistent use in the investigative records, that Plaintiff concedes occurred here. A code name's spelling does not affect authorized employees' ability to conduct indices searches of the CRS.

**CONCLUSION**

21. To the extent Plaintiff failed to provide sufficient information to identify individuals (or a privacy waiver, proof of death, or evidence of a significant public interest that outweighs the substantial privacy interest of the individual), the FBI properly asserted a privacy *Glomar*. The FBI does not conduct searches when a *Glomar* applies. In a good faith effort to accommodate Plaintiff, the FBI recognized a *Glomar* may be pierced when records have been subsequently publicly acknowledged, even though such information was neither provided with the request. Here, the FBI conducted searches of all FBI files and locations reasonably likely to have responsive records, the spelling of a code name had no effect on the ability of RIDS employees to locate responsive records, and the records Plaintiff now demands are available to the public at the WHTTF website.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

MELISSA CORCORAN
Digitally signed by MELISSA CORCORAN
Date: 2026.11.06 16:28:14 -05'00'

Melissa A. Corcoran
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia